Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

*Motion for pro hac vice forthcoming
**Admitted pursuant to Arizona Supreme Court Rule 38(d)
***Admitted to practice in Arizona and Texas. Practice in Washington, D.C. limited to federal courts and supervised by D.C.-barred attorney.

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT, | No. |
|---|---|
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| KRIS MAYES, in her official capacity as the Attorney General of the State of Arizona; JEFFREY D. GLOVER, in his | |

official capacity as the Director of the Arizona Department of Public Safety; JASMINE BLACKWATER-NYGREN, in her official capacity as the County Attorney of Apache County; LORI ZUCCO, in her official capacity as the County Attorney of Cochise County; AMMON BARKER, in his official capacity as the County Attorney of Coconino County; BRADLEY D. BEAUCHAMP, in his official capacity as the County Attorney of Gila County; SCOTT BENNETT, in his official capacity as the County Attorney of Graham County; GARY GRIFFITH, in his official capacity as the County Attorney of Greenlee County; RACHEL SHACKELFORD, in her official capacity as the County Attorney of La Paz County; RACHEL MITCHELL, in her official capacity as the County Attorney of Maricopa County; MATTHEW J. SMITH, in his official capacity as the County Attorney of Mohave County; BRAD CARLYON, in his official capacity as the County Attorney of Navajo County; LAURA CONOVER, in her official capacity as the County Attorney of Pima County; BRAD MILLER, in his official capacity as the County Attorney of Pinal County; GEORGE SILVA, in his official capacity as the County Attorney of Santa Cruz County; DENNIS MCGRANE, in his official capacity as the County Attorney of Yavapai County; and KAROLYN KACZOROWSKI, in her official capacity as the County Attorney of Yuma County,

Defendants.

2

**INTRODUCTION**

1.    This action challenges Section 5 of Arizona House Concurrent Resolution ("HCR") 2060 (56th Leg. (2nd regular session)), enacted pursuant to Proposition 314 ("Prop. 314") and now codified as Ariz. Rev. Stat. ("A.R.S.") §§ 13-4295 and 13-4295.01-4295.06. Under this novel system (hereinafter "Section 5"), the State of Arizona has created its own immigration system in which state police arrest noncitizens for alleged violations of a state immigration entry crime; state prosecutors bring charges in state courts; and state judges order deportations. The federal government has no input into this process.

2.    Section 5 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority. Congress has created a carefully calibrated immigration system, with detailed procedures that determine whether a person may remain in the United States, when to pursue criminal entry charges in the exercise of prosecutorial discretion, and what protections people receive to ensure that they do not face persecution or torture upon removal.

3.    Congress placed all relevant authority in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the sensitive foreign policy implications of these powers. Section 5 jettisons this system, wresting control from the federal government and depriving individuals subjected to Section 5 of the federal rights and due process that Congress ensured that they have, including the rights to contest removal and seek asylum.

4.    Section 5 is patently illegal. A state cannot replace Congress's immigration scheme with its own. Plaintiff Florence Immigrant & Refugee Rights Project hereby files this complaint for declaratory and permanent injunctive relief. Plaintiff concurrently seeks a temporary restraining order and preliminary injunction necessary to enjoin enforcement of Section 5.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

6. Venue is proper in the District of Arizona because all Defendants are located in the District and because a substantial portion of the relevant events occurred or will occur in the District. 28 U.S.C. § 1391(b)(1), (2).

**PARTIES**

**A. Plaintiff**

7. Plaintiff Florence Immigrant & Refugee Rights Project ("Florence Project") is a nonprofit legal services organization whose mission is to provide free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona. Florence Project's vision is to ensure that all immigrants facing removal in Arizona have access to counsel that will enable them to either pursue relief from removal or speedily resolve proceedings, as well as to understand their rights under the law and to be treated fairly and humanely.

8. Florence Project serves thousands of detained adults and unaccompanied children in Arizona each year.

9. Florence Project's work includes (1) free direct legal representation of detained adult noncitizens in every stage of federal removal proceedings; (2) free direct legal representation in federal removal proceedings and immigration-related state juvenile proceedings for unaccompanied children detained in Office of Refugee Resettlement ("ORR") custody, or previously detained in ORR custody prior to being reunified with vetted sponsors in Arizona or placed in foster care; (3) the provision of legal orientation and education programs and other pro se support to adults and children who do not have counsel and are facing removal; (4) the placing of dozens of immigration cases with pro bono counsel and mentoring of pro bono counsel; and (5) trauma-informed case management, including support from Florence Project social workers.

10. Florence Project annually represents hundreds of clients held in federal immigration detention centers in Eloy and Florence, Arizona, in all stages of federal immigration proceedings.

11. Florence Project annually provides pro se services, including immigration-related legal orientation and education services, individual consultations, and court preparation, to more than one thousand individuals facing removal.

12. Florence Project is the only nonprofit organization in Arizona that provides direct legal services to people who are detained and subject to immigration proceedings in the state.

13. Florence Project is Arizona's exclusive provider of services to noncitizens deemed mentally incompetent under the National Qualified Representative Program ("NQRP").[1]

**B. Defendants**

14. Defendant Kris Mayes is the Attorney General for the State of Arizona. As Arizona's top prosecuting authority, Defendant Mayes serves as the chief legal officer of the state under A.R.S. § 41-192. Defendant Mayes is sued in her official capacity.

15. Defendant Jeffrey D. Glover is the Director of the Arizona Department of Public Safety. The Department of Public Safety engages in law enforcement throughout the State of Arizona. Defendant Glover is "directly responsible . . . for the conduct and administration of the department." A.R.S. § 41-1711(D). Defendant Glover is sued in his official capacity.

16. Defendant County Attorneys Jasmine Blackwater-Nygren, Lori Zucco, Ammon Barker, Bradley D. Beauchamp, Scott Bennett, Gary Griffith, Rachel Shackelford, Rachel Mitchell, Matthew J. Smith, Brad Carlyon, Laura Conover, Brad Miller, George Silva, Dennis McGrane, and Karolyn Kaczorowski (collectively, "Defendant County Attorneys") are the County Attorneys for Apache, Cochise, Coconino, Gila, Graham,

---

[1] *See also* U.S. Department of Justice, Executive Office for Immigration Review, EOIR Policy Manual Sec. 2.5, https://www.justice.gov/eoir/policy-manual-eoir/part-I/chapter-2-5.

Greenlee, La Paz, Maricopa, Mohave, Navajo, Pima, Pinal, Santa Cruz, Yavapai, and Yuma Counties, respectively. Defendant County Attorneys are the top prosecuting authorities for their respective counties. Defendant County Attorneys are sued in their official capacity.

**STATEMENT OF FACTS**

**A. Legal Background: Comprehensive Federal Immigration System**

17. The federal government has exclusive power over immigration. *See, e.g., Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

18. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq*.

19. Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. Congress has frequently amended the relevant provisions of the INA, including particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the immigration regime in countless ways. Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

20. The INA was amended in 1980 by the Refugee Act, Pub. L. No. 96-212, to codify certain protections for those fleeing violence and danger. Under U.S. law, every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum, "whether or not" they enter at a port of entry. 8 U.S.C. § 1158(a)(1).

21. Congress provided a range of other protections within the INA. Consistent with international obligations, people cannot be removed to countries where they will face persecution, 8 U.S.C. § 1231(b)(3)(A), or torture, *id*. § 1231 Note. Likewise, Congress has provided various other forms of relief, including status for unaccompanied children,

*id.* § 1101(a)(27)(J), trafficking victims, *id.* § 1101(a)(15)(T), and victims of crimes, *id.* § 1101(a)(15)(U). All of these protections allow the federal government to permit a person who otherwise would have no legal status to avoid removal.

22. The INA contains complex and exclusive procedures for determining immigration and citizenship status and for determining whether an individual may lawfully remain in the United States, either temporarily or permanently. *See, e.g.*, 8 U.S.C. § 1229a(a)(3). Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not be permitted to remain in the United States. The answer to that question can only be reached through the processes outlined in the INA and may depend on the discretionary determinations of federal officials.

23. Many people who enter the United States between ports of entry ultimately obtain federal authorization to remain in the United States temporarily, indefinitely, or permanently.

24. Congress has established that entry into the United States is a crime under certain circumstances. 8 U.S.C. § 1325 ("Improper Entry by Alien") provides criminal penalties for noncitizens who, *inter alia*, enter the United States at any time or place other than as designated by immigration officers. 8 U.S.C. § 1326 ("Reentry of Removed Aliens") provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal. 8 U.S.C. § 1253 ("Penalties Related to Removal") provides criminal penalties for a failure to comply with a federal order of removal.

25. Congress also created specific procedures to remove individuals from the United States. These are generally called removal proceedings and can take multiple forms, including full removal proceedings, pursuant to 8 U.S.C. § 1229a; expedited removal proceedings, pursuant to 8 U.S.C. § 1225; and reinstatement of removal proceedings, pursuant to 8 U.S.C. § 1231(a)(5). Each of these proceedings requires, at a minimum, notice and an opportunity to contest the grounds for removal, as well as an

opportunity to raise humanitarian claims for protection from removal, including under the withholding of removal statute and the Convention Against Torture.

26. Under federal law, people may remain in the United States while civil removal proceedings prescribed by the INA are pending.

27. Prosecution for the federal entry crimes, the decision to pursue the removal of a given person from the country, and the choice of which of the available removal processes to invoke, are all matters of federal discretion. Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships, and humanitarian concerns.

### B. Prop. 314, Section 5

#### 1. State immigration enforcement regime

28. Prop. 314 is the proposition containing HCR 2060 (2024), which appeared on the November 2024 ballot in the Arizona general election.

29. Prop. 314 was enacted into law on November 25, 2024, following the Arizona Secretary of State's certification of the general election results.

30. Section 5 of Prop. 314 creates two new criminal offenses under Arizona law: "Illegal entry from foreign nation," A.R.S. §13-4295.01; and "Refusal to comply with order to return to a foreign nation," A.R.S. §13-4295.02.

31. Each of these offenses can only be committed by a person who is an "alien," meaning a person who is not a citizen or national of the United States. A.R.S. § 13-4295(1).

32. Section 5's "Illegal entry from foreign nation" provision, codified at A.R.S. § 13-4295.01, makes it "unlawful for a person who is an alien to enter or attempt to enter this state directly from a foreign nation at any location other than a lawful port of entry." *Id.* § 13-4295.01(A).

33. "[A]ffirmative defense[s]" exist for individuals whom the federal government granted "lawful presence" under the terms of the state statute or "asylum" under 8

U.S.C. § 1158, or if the conduct was not a violation of the federal improper entry statute, 8 U.S.C. § 1325. A.R.S. § 13-4295.01(B).

34. The "Illegal Entry" provision, § 13-4295.01, does not provide a defense for people who are currently seeking asylum, other humanitarian protection, or any other relief available under federal law. And it provides no defense for people paroled into the United States "pursuant to a programmatic grant of parole" or "[r]equired to be detained under the immigration and nationality act but . . . paroled into the United States." *Id.* § 13-4295.01(E).

35. A violation of § 13-4295.01 is a class 1 misdemeanor upon a person's first offense, punishable by up to six months in jail, fines, and probation. Repeat offenses are a class 6 felony, punishable by up to four months to two years in prison. *Id.* § 13-4295.01(F).

36. Section 5 creates a new state judicial power to deport individuals from the United States. Specifically, it authorizes state courts to "enter an order that requires the person to return to the foreign nation from which the person entered or attempted to enter the United States or the person's nation of origin." *Id.* §13-4295.03(C). Section 5 makes an "Order to Return" a mandatory part of all judgments imposed for a conviction of the new "illegal entry" crime. *Id.* Further, Section 5 requires that the "Order to Return" "include an authorization" for state or local law enforcement to transport the individual to effectuate removal. *Id.* §13-4295.03(D).

37. Section 5 also authorizes a state judge to enter an Order to Return *prior to* a conviction for illegal entry under § 13-4295.01 upon dismissal of the pending charge. After determining that probable cause exists, a state judge may issue an Order to Return if the individual agrees to the order and meets certain requirements. *Id.* § 13-4295.03(A)-(B).

38. Section 5 creates a second criminal offense: "Refusal to comply with order to return to a foreign nation." This is a class 4 felony, punishable by up to 3.75 years in prison. *Id.* § 13-4295.02.

39. Section 5 also provides civil immunity for state and local public entities that enforce the provision. *Id.* § 13-4295.05.

### 2. Enforceability

40. Section 5 may not be enforced in any manner until any part of Section 2 of Texas's Senate Bill 4 ("S.B. 4"), or any other law of any other state similar thereto, has been in effect for a period of sixty consecutive days. *Id.* § 13-4295.04.

41. S.B. 4 was enjoined in its entirety when Prop. 314 passed in November 2024. *See United States v. Texas*, No. 24-50149, ECF 163-1 (5th Circ. Mar. 26, 2024) (order denying Texas's motion for stay of injunction). No other state law had, or has, wholly or partially gone into effect for sixty consecutive days. However, on April 24, 2026, the Fifth Circuit Court of Appeals issued an opinion vacating the district court's injunction because it found that the plaintiffs in that case lacked standing. *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026). The mandate issued on May 15, 2026. *United States v. Texas*, No. 24-50149, ECF 445-1 (5th Cir. May 15, 2026). No new injunction has enjoined the entirety of S.B. 4 since that time.

### 3. New state immigration system under Section 5

42. Section 5 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system. It authorizes state officers to arrest, detain, and remove individuals from the United States, and mandates removal for those who are convicted of the new state crime of illegal entry—all without any input from federal officials.

43. Section 5 requires state officers to make determinations of federal immigration status and to incarcerate and issue orders of removal to noncitizens pursuant to these determinations. It does not provide noncitizens with any of the mechanisms or pathways to apply for or receive federal protection from removal that are available under federal immigration law. Moreover, the system does not require state courts to pause cases for determinations of status from the federal government or while federal immigration proceedings take place. Individuals who are eligible for and who would

ultimately obtain relief from removal under federal immigration law can nevertheless still be subject to a state Order to Return to Foreign Nation under Section 5.

44. Arizona adopted Section 5, as a whole, to address the perceived failures of the federal government to arrest, detain, and remove noncitizens.

45. Arizona mandates that an individual receive a public defender only where an individual is actively facing a jail or prison sentence. *See* A.R.S. Rules Crim. Proc., Rule 6.1(b)(1). Thus, where a prosecutor chooses not to seek jail time for an individual charged under A.R.S. § 13-4295.01 or A.R.S. § 13-4295.02, an individual is not guaranteed a public defender as of right, even when that person may be ordered to depart the United States as a result of that charge or conviction.

### C. Section 5's Effect on Florence Project

46. Enforcement of Section 5 will directly and substantially frustrate Plaintiff Florence Project's mission of providing free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona. It will perceptibly impair Florence Project's ability to provide direct legal services to individuals it aids, directly affecting and interfering with Florence Project's core legal services.

47. Roughly 50% of the clients whom Florence Project serves entered the United States in Arizona without inspection, and their actions would violate A.R.S. § 13-4295.01. Generally, adults apprehended in Arizona are sent to the three federal immigration detention centers in Arizona—Florence Detention Center, Florence Correctional Center, and Eloy Detention Center—which are served exclusively by Florence Project.

48. Florence Project's model of providing access to counsel is entirely centered on federal immigration proceedings in federal immigration courts and federal court.

49. Florence Project's attorneys are civil immigration attorneys, not criminal attorneys. Florence Project does not have any attorneys who specialize in state criminal proceedings. Its attorneys do not practice in state court, except for in limited civil

juvenile proceedings. Roughly 50% of Florence Project's attorneys are not barred in the state of Arizona, because a state law license is not required for practice in federal immigration court. Florence Project does not currently have attorneys capable of representing individuals in state criminal proceedings, including proceedings pursuant to Section 5.

50. Florence Project provides legal services to adults detained at the federal immigration detention centers in Eloy and Florence, Arizona, as well as children who are in ORR custody or who are not detained. Florence Project does not currently serve adults, youth, or children held in local jails.

51. The federal immigration detention centers for the detained adults whom Florence Project serves are concentrated within twenty-five miles of each other in Pinal County. However, people detained at those detention centers are initially apprehended in counties throughout the state. Florence Project also has unaccompanied child clients located in counties throughout the state.

52. Section 5 will lead to Florence Project's clients or prospective clients being taken into custody under Section 5 charges in three distinct ways.

53. **First,** some individuals will first be arrested by state or local law enforcement officials and placed in state or local custody to face state criminal charges under Section 5, rather than initially being apprehended for federal immigration reasons and detained at a federal immigration detention center. These individuals will not have the opportunity to access Florence Project's pro se services at the federal immigration detention center, including initial consultations, or to be directly represented by Florence Project based on their presence at the federal immigration detention center. This includes individuals whom Florence Project would otherwise have been appointed to represent in federal immigration proceedings under the National Qualified Representative Program ("NQRP") or would have selected for representation under its Universal Representation Pilot Program. It also includes individuals whom Florence Project would otherwise have prioritized to represent using its limited resources.

54. **Second,** it is likely that some individuals will be placed in ICE custody but subsequently transferred to state or local criminal custody to face state prosecution and removal under state law.

55. **Third,** Florence Project has clients who have been released into the community, including both NQRP clients released on bond—whom Florence Project continues to represent in their immigration proceedings following their release—and child clients whom Florence Project continues to represent following their release to vetted sponsors or placement in foster care. These clients released into the community will be at risk of arrest, prosecution, and removal under state law, and it is likely that at least some if not many of these Florence Project clients will be arrested, prosecuted, and removed under Section 5.

56. Because of these realities, Section 5 will fundamentally and directly interfere with Florence Project's core work.

   *1. Impairment of Florence Project's Provision of Direct Legal Services*

57. Providing direct legal services—both pro se services and direct representation—to detained adults and children in Arizona facing removal from the United States is central to Florence Project's mission and vision. Florence Project currently works to ensure that *all* individuals detained in Arizona and facing removal have access to high-quality pro se services. Florence Project provides direct representation to some individuals facing removal in every detention center in Arizona. Its vision is to ensure that all individuals detained in Arizona and facing removal from the United States, as well as all unaccompanied children facing removal from the United States, have access to high-quality direct representation and are treated fairly and humanely.

58. Section 5 will interfere with Florence Project's provision of direct legal services to detained adults and children and youth in Arizona. Florence Project will attempt to provide both direct representation and pro se services to individuals arrested and charged under Section 5, including both services related to federal immigration

11

proceedings and services related to state immigration charges. But Section 5 will create severe barriers to Florence Project doing so.

*A. Florence Project's Provision of Legal Services Related to State Criminal Proceedings Under Section 5*

59.     Florence Project will seek, long-term, to provide pro se services and direct representation related to Section 5 to individuals charged under Section 5 who do not qualify for appointment of an attorney under Ariz. Rule of Crim. Proc. 6.1(b)(1). Specifically, Florence Project will seek to provide these services to unrepresented individuals in federal immigration detention for whom state or county prosecutors are seeking an Order of Return to Foreign Nation but not jail time. Florence Project will also seek to provide legal services, including direct representation related to state criminal proceedings, to existing NQRP clients charged under Section 5. However, it will face severe barriers to doing so and may not ultimately be successfully able to do so, due to the extraordinary amount of organizational resources required to engage in representation in state criminal proceedings. In the immediate term, Florence Project will not be able to represent its existing clients in state criminal proceedings under Section 5.

60.     Florence Project's staff has no expertise in state criminal law. In order to represent individuals in state proceedings under Section 5, Florence Project will need to retrain its attorneys and overhaul its approach for a completely different court in which the attorneys have no prior experience, with different rules of procedure. Florence Project will need to hire attorneys to train its attorneys in representing individuals in state criminal proceedings. Currently, Florence Project's new hires who are recent law school graduates train for three to four weeks on litigation in immigration courts; training for representing individuals in state criminal proceedings is expected to be of similar length. And during the time that Florence Project attorneys are training, they will be unable to manage their normal case load, and Florence Project will have to decrease its provision of legal services accordingly.

61. Additionally, because practice in immigration court does not require an Arizona law license, about 50% of Florence Project's attorneys are not barred in Arizona and will need to become able to practice in Arizona courts, either through full admission or limited admission under Rule 38 of the Supreme Court of Arizona. Rule 38 permits attorneys who are not barred in Arizona, who work for an approved legal services organization and meet certain requirements, to provide legal services as pro bono counsel. Securing limited admission, or full admission to the Arizona Bar as needed, will take additional attorney and staff time.

62. Further, organizing and managing the new training and the relevant certifications and admissions will require Florence Project leadership to expend additional time. Leadership will not be able to spend this time working with staff on existing programmatic activities or engaging in other organizational priorities, including fundraising, hiring, and personnel management.

63. Florence Project will also need to secure malpractice insurance commensurate with expanding its legal representation services into a new practice area.

64. Florence Project currently represents adults primarily at the federal immigration courts in Florence and Eloy, Arizona. For representation of adults in state criminal proceedings under Section 5, Florence Project attorneys will need to travel to state courts throughout Arizona. This travel will expend attorney time and organizational resources, including in mileage reimbursement.

65. Because Florence Project currently does not have staff trained to represent individuals in state criminal proceedings, it will not be able to immediately represent existing clients charged under Section 5—including clients who may not otherwise be guaranteed representation.

66. Because Florence Project has limited resources, it may not be able over the longer term to undertake the extensive training and ongoing commitment of organizational resources that representation of individuals in state criminal proceedings under Section 5 would require. The barriers created by Section 5 state criminal

13

proceedings therefore risk categorically preventing Florence Project from representing some detained adults and youth and children in Arizona facing removal from the United States, including people at risk of being unrepresented. This jeopardizes the success of Florence Project's representation in federal immigration court of existing clients charged under Section 5, and it impairs Florence Project's ability to achieve its vision of universal representation of individuals facing removal in Arizona.

*B. Florence Project's Provision of Legal Services to Clients and Prospective Clients Detained in Local Jails Under Section 5*

67. The detention of Florence Project's existing and prospective clients in local jails under Section 5 will create barriers to Florence Project's representation. This includes both detention of Florence Project's clients and prospective clients whom it represents in their federal immigration proceedings and detention of Florence Project's clients whom it would represent in state criminal proceedings under Section 5.

68. Florence Project staff lacks experience providing legal services to individuals in local jails. Florence Project's clients and prospective clients are detained in federal immigration detention, held in ORR custody, or—for some NRQP and unaccompanied child clients—released to the community or placed in foster care.

69. Under Section 5, Florence Project will have clients and prospective clients detained in local jails throughout the state.

70. The detention of Florence Project's clients and prospective clients in many local jails will introduce significant logistical complexity that will make it far more difficult to reach any client. This will mean that Florence Project will expend more time to reach any client—time that cannot be spent on other aspects of representation—and in some cases may be entirely unable to reach a client for time-sensitive matters on a timely basis.

71. Different jails and detention centers have different procedures. A Florence Project staff member going to a new jail or detention center must learn the procedures for that new facility regarding phone conversations with clients; video visits; in-person

meetings; rules for working with interpreters; how to navigate the mail system; how to obtain client signatures; and how to get clearance to enter facilities. Navigating different procedures for different facilities and learning new procedures for new facilities takes increased time. Because Section 5 will require Florence Project's staff to work in local jails throughout the state to serve existing and prospective clients, it will add time to Florence Project's work in service of these clients.

72. Further, under Section 5, Florence Project will have clients and prospective clients detained in local jails throughout the state—whereas, currently, Florence Project's clients and prospective clients are detained at three detention centers concentrated within twenty-five miles, or for unaccompanied children at a number of ORR facilities in or near Phoenix or Tucson. Florence Project attorneys and social services staff will need to travel much further to meet with their clients in these local jails. This travel will take up attorney and other staff time that cannot be spent working on clients' cases or otherwise furthering the work of the organization, and it will also expend organizational resources on payment for transportation—primarily mileage reimbursement for driving. A single trip to Mohave County, for example, will take 7-10 hours in travel time for a round trip from Florence Project's Tucson and Phoenix offices, and between roughly $282 and $446 in mileage reimbursement (depending on the departure city).

73. For clients who require in-person interpreters, including NQRP clients, Florence Project will need to either find new interpreters in new locations across the state or pay its existing interpreters to travel throughout the state.

C. *Section 5's Impact on Florence Project's Successful Representation of Existing and Prospective Clients in Federal Immigration Proceedings*

74. Section 5 also poses a barrier to Florence Project's successful representation of existing clients in federal immigration proceedings who are subject to Section 5. Florence Project's existing clients will be impacted by Section 5 in two ways: clients whom Florence Project is representing in their removal proceedings who are then

removed from ICE custody to face state prosecution under Section 5, and clients released to the community whom Florence Project continues to represent in federal immigration proceedings—both NQRP clients and child or young adult clients—who will be arrested and prosecuted under Section 5.

75. Florence Project will face difficulty in finding where clients are detained in local jails. This is particularly true for NQRP clients, who face difficulties communicating with their attorneys.

76. Florence Project will face the same obstacles to serving these clients in local jails described above. It will be more difficult to schedule legal calls, obtain the requisite signatures for declarations and other forms, and prepare and review documents.

77. Florence Project will face strict immigration deadlines for existing clients in state or local custody. This is especially problematic because of the time that will be spent looking for these clients, navigating local jails, and traveling to reach them.

78. In addition to Florence Project's attorneys facing these obstacles, Florence Project's social services team will face essentially the same obstacles. Florence Project's social services team works with vulnerable adults, including NQRP clients, pregnant clients, clients with medical vulnerabilities, and clients who are parents whose children have been placed in child services custody. It will be more difficult for Florence Project's social services team to meet with clients in state or local jails under Section 5 regularly. For some clients held under Section 5 charges, the social services team will likely not be able to ensure continuity of care because of inability to travel to them in the time or frequency needed for such continuity. Organizational resources expended until that point will have diminished impact or will have been wasted where Florence Project cannot ensure continuity of care.

79. Moreover, Section 5 will impair Florence Project's provision of direct legal services to prospective clients and pro se individuals in federal immigration proceedings. Florence Project will not be able to access prospective clients and pro se

individuals for legal education, an initial consultation, or pro se support to the extent that it would if they were detained in federal immigration detention. It will be more difficult to establish representation by conducting an initial consultation and getting a signed Form G-28 for representation with USCIS, or getting consent to enter a Form E-28 for representation with EOIR.

80. Further, if a person fails to appear for an immigration hearing, they can be removed in absentia. It is likely that Section 5 will result in the inability of Florence Project's clients and prospective clients to attend hearings while they are in state custody.

81. And fundamentally, Section 5 will prevent Florence Project from seeking and securing relief from removal from the United States in cases where, in the absence of Section 5, it would have been able to do so. In some instances, Florence Project's clients will have pathways to relief under federal immigration law that are not available under Section 5—meaning that they can be removed under Section 5, with no available defense, even though they could seek and secure relief from removal under federal law. And some forms of relief require presence in the United States during the pendency of the application, such as Special Immigrant Juvenile Status and asylum, and those pending applications protect them under federal law from removal by the federal government.

82. There is no way under Section 5 to secure relief from a state Order of Return to Foreign Country on bases that are available in federal immigration proceedings, such as risk of persecution or torture or the fact that a person has been a victim of trafficking.

83. There is no way under Section 5 to secure relief from a state Order of Return to Foreign Country where an individual has a pending asylum application, a pending special immigrant juvenile petition, or is otherwise in the process of seeking, or eligible for, relief for removal under federal immigration law.

84. For example, because Section 5 only provides an affirmative defense for individuals granted asylum or "lawful presence," A.R.S. § 13-4295.01, a Florence

Project client who flees torture in Mexico may be released on bond with a pending claim for asylum and withholding of removal, only to be apprehended by Arizona state law enforcement and ordered to return to Mexico.

85. As a result, Florence Project will be unable to successfully seek or secure relief for clients and prospective clients whom it otherwise could have aided, including people who would go on otherwise to win such relief. For clients whom Florence Project has already begun to represent in their federal immigration proceedings who have an open case and receive an Order to Return to Foreign Nation under Section 5, Florence Project's organizational resources expended until that point will have been wasted, and Florence Project will not have been able to provide legal services it otherwise could have.

### D. Section 5's Impact on Florence Project's Services to Mentally Incompetent Clients Eligible for NQRP

86. Section 5 will create severe barriers to Florence Project's immigration legal representation of individuals whom an immigration judge has found to be mentally incompetent. Under the national program NQRP, which is an outgrowth of the class action litigation *Franco-Gonzalez v. Holder*, No. CV-10-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), immigration judges appoint Florence Project the legal representative of mentally incompetent individuals, who cannot meaningfully participate in their removal proceedings. This includes individuals who are in ICE custody and (1) have a mental disorder causing serious limitations in communication, memory, or general mental and/or intellectual functioning; (2) exhibit active psychiatric symptoms or behavior; (3) receive a diagnosis of psychosis, bipolar disorder, schizophrenia, major depressive disorder (with psychotic features), dementia, neurocognitive disorder, or intellectual development disorder; or (4) for whom an immigration judge finds a bona fide doubt about the detainee's competency to self-represent in the proceedings. *See Franco-Gonzalez v. Holder*, No. CV-10-02211, 2014 WL 5475097, at *3 (C.D. Cal. Oct. 29, 2014).

87. Once the immigration judge designates an individual as qualifying for NQRP, the individual receives a Qualified Representative ("QR") to represent them in their removal proceedings. Florence Project assigns an attorney to serve as each NQRP client's QR. All individuals who qualify at immigration detention centers within the state of Arizona receive a QR from Florence Project unless Florence Project has reached the contracted number of cases under its NQRP contract. However, Florence Project may also take on more than the contracted number of cases depending on capacity and need.

88. Due to their acute vulnerability to the deleterious effects of immigration detention, most NQRP class members receive a guaranteed bond hearing after being detained for six months. Florence Project continues to represent individuals in NQRP even if they are released from immigration detention, throughout their immigration proceedings, so long as they continue to reside in Arizona.

89. Many of Florence Project's NQRP clients continue to reside in Arizona.

90. QRs from the Florence Project devote an exceptional amount of time and effort toward ensuring that NQRP protections ensure fair treatment for their clients. Florence Project staff spend disproportionate time on NQRP cases because these clients lack the ability to communicate clearly, coherently, and consistently. For example, QRs must often revisit certain topics of conversation in order to validate or reconcile details that dictate their client's eligibility for immigration relief and equities.

91. In every NQRP-appointed case, QRs are expected to evaluate and file motions for procedural safeguards, which aim at protecting the client's case interests given their specific limitations or illnesses. Safeguards often permit QRs to ask leading questions of clients; Immigration Judges to disregard inconsistent details of client testimony; the Department of Homeland Security to waive bars to certain forms of immigration relief; and clients to avoid certain topics of testimony.

92. NQRP clients are particularly at risk of contact with the criminal justice system following their release. Like others with severe mental health symptoms, NQRP clients

are at risk of their most acute mental health symptoms leading to crisis intervention by law enforcement. And NQRP clients frequently face difficulty in accessing necessary care.

93. Section 5 will severely impair Florence Project's ability to provide direct immigration legal services to NQRP clients. NQRP clients released from federal immigration custody for the pendency of their federal removal proceedings will be at risk of arrest, detention, and prosecution under the new state laws, and it is likely that at least some NQRP clients will be arrested. Because these individuals have difficulty communicating, it will be difficult for Florence Project—their legal representative—to locate them following arrest. Once they are located, their detention and prosecution under state statute will pose significant barriers to Florence Project's efforts to represent them in seeking relief from removal. First, even individuals eligible for federal immigration relief, whom Florence Project would otherwise be able to aid in securing relief from removal, are at risk of conviction and an Order of Return to Foreign Nation under state law. There will be some NQRP clients whom Florence Project would have been able to help remain in the United States for whom it will be unable to do so—after expending significant resources as a QR.

94. NQRP clients in federal immigration custody will similarly be at risk of being transferred to local jails to face criminal charges under Section 5. For the same reasons, Florence Project will have difficulty locating them and representing them in seeking relief from removal.

95. Florence Project's NQRP clients in the midst of their federal immigration proceedings will in many instances be facing time-sensitive deadlines. NQRP clients frequently have particularly complex cases, and they frequently require more time to meet with attorneys than the average client due to their communication difficulties. At minimum, detention in a state jail will require Florence Project to expend significant resources to locate these clients and visit them pursuant to such deadlines—including time and resources in attorney travel throughout the state. At worst, Florence Project

will be unable to locate NQRP clients in time and will miss crucial deadlines for federal immigration relief.

96. Florence Project will also need to ensure that NQRP clients have high-quality representation in their state criminal proceedings with the potential to lead to a state Order of Return to Foreign Nation, including by potentially serving as counsel in their state criminal proceedings as warranted, to ensure that its clients have the best possible prospect for relief from removal from the United States.

97. Moreover, Florence Project obtains its NQRP clients by being appointed as their legal representatives in federal immigration court. For individuals who are instead funneled into Arizona's parallel state immigration system, Florence Project will not have the opportunity to be appointed their QR by an immigration judge. Thus, Florence Project will lose a crucial means of ensuring that it can represent and serve mentally incompetent individuals facing removal from the United States—a core part of its clientele.

98. Florence Project will have to expend organizational resources in attempting to devise and implement a system to attempt to locate and communicate with mentally incompetent people in local jails for whom Florence Project otherwise would have been appointed as their QR. This is particularly important given the frequent complexity of their federal immigration claims, the difficulty in communicating with them, and the potential for time-sensitive immigration deadlines that need to be acted on rapidly. Such a system will not, however, identify individuals as readily or accurately as direct appointment in immigration court, even if it can be devised and implemented across the local jails throughout Arizona.

     *E. Section 5's Impact on Florence Project's Legal Representation of Children and Young Adults*

99. Section 5 will also create significant barriers to Florence Project's legal representation of children and young adults. Many of Florence Project's Children's Program clients are released to the community, to a vetted sponsor living in Arizona or

in foster care, in both urban and rural areas in the state. Florence Project continues to represent them in their immigration proceedings. These children are at risk of arrest, detention, and removal under Section 5. Section 5, unlike some other states' laws, does not exempt children.

100. For its child and youth clients charged under Section 5, Florence Project will face the same barriers to representation in their federal immigration proceedings as for adult clients stemming from detention in local jails. But Section 5's burdens are particularly heightened for children because immigration courts have extremely fast dockets for children, and because children and youth face greater difficulties than adults in communicating with counsel from detained settings.

101. Additionally, Florence Project represents minors released to the community for whom it must file for time-sensitive relief.

102. One such form of time-sensitive relief is SIJS. Federal law provides unaccompanied children with heightened protections in immigration proceedings and access to certain forms of humanitarian relief. *See* 6 U.S.C. § 279(g)(2). One such form of relief is Special Immigrant Juvenile Status ("SIJS"), which is available to unmarried noncitizen youth under age 21 who have been abused, neglected, abandoned, or similarly mistreated by a parent and who obtain the required state-court findings that reunification is not viable and that return to their country of origin is not in their best interests. *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11. SIJS beneficiaries may later seek lawful permanent residence and are exempt from several grounds of inadmissibility that would otherwise prevent adjustment of status. *See* 8 U.S.C. §§ 1153(b)(4), 1255(h)(1)-(2). In Arizona, a dependency or guardianship in juvenile court—important for SIJS—must be filed and completed before a minor turns eighteen, in a process taking roughly six months. *See* Ariz. Rev. Stat. §§ 8-202, 8-246(A). Youth seeking SIJS must apply prior to the age of 21. *See* 8 C.F.R. § 204.11(b)(1).

103. Further, children seeking asylum should apply before age eighteen to preserve the protections available to unaccompanied children under the TVPRA, including

exemption from the one-year filing deadline and access to a less adversarial USCIS asylum process. *See* 8 U.S.C. § 1158(a)(2)(E), (b)(3)(C); *Matter of M-A-C-O-*, 27 I. & N. Dec. 477, 479–81 (B.I.A. 2018).

104. For clients for whom relief is time-sensitive who are arrested and charged under Section 5, Florence Project will face significant barriers to locating them in local jails and working with them to timely advance their immigration cases. Florence Project will need to expend additional resources to do so and, in some instances, will be at risk of not being able to do so in time.

105. As for adults, some of Florence Project's child and young adult clients will be able to seek and secure relief under federal immigration law but will be unable to seek and secure relief from an Order to Return to Foreign Nation under Section 5. These clients will be ordered removed under state law despite the available federal pathways to relief, and Florence Project's organizational resources expended on their behalf until that point will have been wasted.

*F. Section 5's Impact on Florence Project's Pro Bono Placements and Pro Se Materials*

106. Florence Project places pro bono cases with external attorneys. As a result of Section 5, Florence Project's pro bono team will need to engage in new outreach to create a new roster of pro bono attorneys specifically licensed in Arizona and competent to represent clients in state criminal proceedings. Further, Section 5 will impair Florence Project's existing pro bono work where clients and prospective clients are transferred from ICE custody to state or local custody to face state criminal proceedings under Section 5. Florence Project's pro bono attorneys do not necessarily have the experience and resources to support clients sent to Section 5 proceedings, and they will face the same barriers to accessing their clients in state jails as Florence Project attorneys will. Further, Florence Project will be unable to place prospective clients transferred to local jails with pro bono counsel, absent the organization's development of a separate system to assist these individuals throughout the state,

because it will not have had an opportunity to conduct an initial consultation and assess relief from removal.

107.     Section 5 will also require Florence Project to develop entirely new pro se materials for people detained in local jails pursuant to Section 5 and for people facing state criminal proceedings under Section 5. These materials will need to be focused on a different court system, different kinds of proceedings, and a different type of detention from Florence Project's existing materials. Florence Project will also need to work to place these materials in local jails throughout the state on an ongoing basis, a greater undertaking than placing the materials at three federal immigration detention centers that will require a greater expenditure of resources.

>   2.  *Section 5's Impact on Florence Project's Universal Representation Program*

108.     Pursuant to Florence Project's mission, it has implemented a Universal Representation pilot project, furthering its ultimate goal of universal representation for people facing removal in the state of Arizona. Section 5 interferes with that pilot project and jeopardizes Florence Project's work toward this goal, by creating significant barriers to representation of individuals in state removal proceedings. It will not only prevent prospective clients from reaching the client pool but will also disrupt representation following retention for clients transferred to local jails to face prosecution under Section 5.

* * *

109.     In sum, Section 5 will interfere with Florence Project's core work of legal services provision to detained adults and children facing removal in Arizona. And it will impair Florence Project's ability to represent clients and to achieve its mission and vision in Arizona. Section 5 will require Florence Project to expend significant organizational resources, including in attorney time and financially, both up-front and on an ongoing basis.

24

110. Section 5 will impair Florence Project's high-quality legal representation of clients facing removal from the United States and identification and aid to prospective clients and pro se individuals.

111. As a result of Section 5, Florence Project will be able to represent fewer detained adults and children and will be able to provide pro se services to fewer detained adults and children

112. And, as a result of Section 5, Florence Project will be unable to successfully represent individuals in seeking and securing relief from removal from the United States where it otherwise could have done so. This is due to the differences between the limited defenses to a state Order to Return to Foreign Nation and the broader avenues for relief from removal under federal immigration law.

## CLAIM FOR RELIEF

### Count One: Preemption (In Equity)

113. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

114. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

115. Section 5 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

116. Section 5 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

**CONCLUSION**

WHEREFORE Plaintiff requests that the Court grant the following relief:

    a. Declare that Section 5 is unlawful in its entirety;

    b. Preliminarily and permanently restrain and enjoin Defendants, their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with them from enforcing Section 5; and

    c. Grant any other and further relief that this Court may deem fit and proper.

Date: July 9, 2026

Respectfully submitted,

/s/ *Kathryn Huddleston*
Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

/s/ *John M. Mitchell*
John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

*Motion for pro hac vice forthcoming
**Admitted pursuant to Arizona Supreme Court Rule 38(d)
***Admitted to practice in Arizona and Texas. Practice in Washington, D.C. limited to federal courts and supervised by D.C.-barred attorney.
*Attorneys for Plaintiff*