IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| Florence Immigrant & Refugee Rights Project, | No. |
| Plaintiff, | |
| v. | |
| Mayes, *et al*., | |
| Defendants. | |

**DECLARATION OF ROXANA AVILA-CIMPEANU, DEPUTY DIRECTOR, THE FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT**

1

*I, Roxana Avila-Cimpeanu, make the following statements on behalf of myself and the Florence Immigrant and Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project"). In my role as Deputy Director, I make executive decisions related to Florence Project's programs, structure, planning and budgets, and oversee the management of the direct services programs—which include the Adult Legal Program, the Children's Program and the Integrated Social Services Program.  I also assist the Executive Director in the oversight and supervision of the support teams, including the Office of People and Culture, the Finance Team and the Operations Team.

2. I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, where I oversee our Legal and Social Service Programs, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona. During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and pro bono mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement ("ORR") and Immigration and Customs Enforcement ("ICE") custody in Arizona.

2

**Florence Project's Mission and Scope**

3. Florence Project's mission is to provide free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona. The vast majority of such people in Arizona – and approximately 69% to 86% of all detained noncitizens nationally – go unrepresented in immigration court. Florence Project works to address this inequity both locally and nationally. Florence Project's vision is to ensure that all immigrants facing removal have access to counsel that will enable them to either pursue relief from removal or speedily resolve proceedings, understand their rights under the law, and be treated fairly and humanely.

4. To that end, Florence Project provides high-quality immigration legal services and education to thousands of people in immigration custody in Arizona every year. Florence Project's attorneys annually represent hundreds of clients who are held in isolated detention centers in Eloy and Florence, Arizona before the immigration court, the Board of Immigration Appeals ("BIA"), and federal district courts and circuit courts of appeal in removal proceedings and additional immigration-related proceedings (such as habeas petitions). Our full-scope representation caseload before the Executive Office of Immigration Review ("EOIR") is between 275 and 300 cases annually. Florence Project legal staff also provide Know Your Rights legal presentations ("KYRs") and conduct individualized orientations, education, and pro bono screening for individuals detained at federal immigration detention centers and facing removal from the United States, under provisions allowing for such legal services under the Performance Based National Detention Standards. All of these legal services are focused on immigration proceedings and immigration detention.

5. Florence Project attorneys also serve as appointed counsel under the National Qualified Representative Program ("NQRP") for individuals deemed mentally incompetent to represent themselves in removal proceedings, maintaining a

3

caseload of about 100 such cases annually. NQRP representation includes representation of individuals (1) who have a mental disorder causing serious limitations in communication, memory, or general mental and/or intellectual functioning; (2) who exhibit active psychiatric symptoms or behavior; (3) who receive a diagnosis of psychosis, bipolar disorder, schizophrenia, major depressive disorder (with psychotic features), dementia, neurocognitive disorder, or intellectual development disorder; or (4) for whom an immigration judge finds a bona fide doubt about the individual's competency to self-represent in the proceedings.

6. Florence Project also represents unaccompanied children ("UC") before EOIR and other federal agencies, as well as federal and state courts, in immigration-related and juvenile court proceedings. Federal law defines an "unaccompanied child" as a child who lacks lawful immigration status, is under 18 years of age, and has no parent or legal guardian in the United States available to provide care and physical custody, and this designation can follow a child even after they have turned 18. 6 U.S.C. § 279(g)(2). The Florence Project represents unaccompanied children under 18 as well as young adults who have reached the age of majority in the time we have been working with them, but who still retain the legal protections granted to UCs. In 2025, the Florence Project provided direct representation to more than 800 children and youth in immigration-related proceedings. Additionally, Florence Project provides KYRs and legal orientations on immigration proceedings and immigration-related matters to unaccompanied children in ORR custody, and play a crucial role in ensuring that children in detention are treated with dignity and respect.

7. Florence Project also has a Pro Bono Program that places dozens of cases with volunteer attorneys before the immigration courts, the BIA, the U.S. District Court for the District of Arizona, and the U.S Court of Appeals for the Ninth Circuit. In

4

recent years, Florence Project has placed on average between 30 to 50 matters annually with volunteer attorneys.

8. Since 2017, Florence Project has provided legal education, and direct representation to migrants in Nogales, Mexico. We expanded that program in 2020 due to Arizona's inclusion in the so-called Migration Protection Protocols ("MPP") and other shifts in border policy. The vast majority of individuals we encountered who were enrolled in the MPP faced unique due process complications in litigating their claims from Mexico, with a significant number needing support with appeals and motions to reopen or remand.  Even though MPP is no longer in place, our border team continues to provide legal education and resources in Nogales, which is critical at this moment given the constant change in immigration policies and rules that affect the migrant community and access to asylum.  The team continues to monitor these policy changes and the challenges that asylum seekers and other migrants face on a daily basis, and adapt the scope of services accordingly.

9. Florence Project has a staff of about 130 people, including attorneys, social workers, and support staff. They are dedicated to Florence Project's core work of providing legal and social services to the thousands of children and detained adults facing removal in Arizona. Our staff are based primarily in Phoenix, Tucson, and Florence, Arizona.

10. In 2024, Florence Project provided immigration legal services, including legal orientation and education, to more than 12,500 people. In 2025, Florence Project clients were nationals of over 80 countries and spoke more than 35 languages. That year, we provided 1,329 adults, all of whom were detained in federal immigration custody, with individual legal orientation on immigration proceedings and immigration detention. We provided 284 detained adults with full legal representation in immigration proceedings, including 118 people who received representation through NQRP. We provided 1,065 unaccompanied children with

legal orientations on immigration-related matters, and 889 children and youth received immigration legal representation from Florence Project. A total of 499 people, including 327 unaccompanied children, received critical social services to support them while navigating their immigration cases, including medical care, mental health support, education, and job resources. We represented 46 people on appeals in 2025 and represented about 20 people in habeas petitions in federal court.

**Florence Project's Core Service Areas**

11. Florence Project is dedicated to providing free legal and social services for detained adults and unaccompanied children in Arizona facing removal from the United States. There is no guaranteed right to counsel in immigration courts, and few detained people can afford or access private counsel. Thus, since our founding in 1989, Florence Project's core work has focused on two dual central goals. First, Florence Project is committed to ensuring that both adults and children in detention have the opportunity to be represented by an attorney in their immigration proceedings, regardless of their ability to locate or pay private counsel. As such, Florence Project attorneys directly represent both children and adults who are detained and facing deportation in their removal proceedings before EOIR and the BIA. This goal of access to full representation for all also means that one of Florence Project's core functions is to facilitate immigration representation of detained adults and children by pro bono attorneys, by recruiting, training, and mentoring external pro bono attorneys. In total, 90-95% of Florence Project's core work is focused on removal defense and related matters before EOIR; where our work focuses on relief before United States Citizenship and Immigration Services ("USCIS"), it is almost always on behalf of a person who has or had concurrently pending proceedings before EOIR. The remaining 5-10% of our legal practice is focused on supporting clients with legal services and representation in juvenile court cases for immigrant children, federal court

litigation on immigration-related matters before the Ninth Circuit, petitions for a writ of habeas corpus, and other immigration-related federal litigation. Second, Florence Project provides critical legal education and orientation services for people who are detained in immigration proceedings and do not have immigration counsel. This includes KYRs; workshops that cover specific topics such as bond, asylum, and cancellation of removal in greater depth; creation of *pro se* resources to support individuals without counsel; and individualized *pro se* support and orientation to those without counsel. A very small portion of our time is devoted to other forms of national immigration advocacy.

12. We are the only nonprofit organization in the state of Arizona that provides direct legal services to people detained and subject to immigration proceedings in Arizona.

13. In providing direct representation and pro se services, we serve many clients and pro se individuals who are seeking Asylum, Withholding of Removal, Special Immigrant Juvenile Status, and additional forms of immigration relief available under the federal immigration system to people who enter the United States not at a port of entry. Hundreds of the people to whom we provide legal services each year—either via direct representation or via pro se services—are seeking such relief. Some of our clients are not eligible for asylum but are eligible for other relief from removal, such as statutory withholding of removal, relief under the Convention Against Torture, U visas for victims and witnesses of crimes, T visas for victims of human trafficking, and other relief from removal.

14. Access to counsel is highly important for detained adults facing removal from the United States, and providing that access to counsel is at the core of our mission. Detained adults face major barriers to representing themselves when they are facing removal, including language access issues, trauma, medical, and mental health needs, limited access to records, and expedited court schedules that exacerbate these obstacles.

15. The consequences of lack of access to counsel are even more severe for unaccompanied children and adults not competent to represent themselves, which is why representation of these populations is a high priority for our organization. . U.S. Immigration law is complex and ever-changing, and it can be challenging for anyone to understand the immigration court process, identify legally relevant facts, and be able to articulate facts that meet the legal definitions of abuse, abandonment, trafficking, family violence, or persecution without trauma-informed legal assistance. It is also important to recognize the role that trauma plays in a person's ability to feel comfortable enough to share the darkest days of their lives, recall details that happened in distressing situations, or understand the legal significance of facts of their lives, and this barrier is heightened in a detention context.

16. To provide effective representation and other services, the Florence Project must meet with individuals in person. Meeting in person is crucial for building trust and rapport with clients, in order to elicit deeply personal and potentially traumatic details that are necessary for written declarations and other corroborating evidence. In-person meetings are also the most effective way to discuss and counsel on complicated legal topics and strategic decisions in individuals' cases and prepare for in-court testimony.

17. Phone or video calls are not an effective replacement for in-person meetings. For one, calls are often not an option. It is difficult to coordinate a call with a detained client, and sometimes it is nearly impossible to conduct a secure and private call that is crucial to getting all of the sensitive information required. Even clients who are not detained lack proper internet access and private spaces to conduct calls. As a result, calls often drop. Even when calls are available, they are not as effective as in-person communication because eye contact and bodily cues are crucial for communicating successfully with clients who have experienced trauma and may need breaks. This makes hearing, document, and declaration preparation over the

phone incredibly challenging. Some immigration related applications even require a "wet" signature from the clients, and basic paperwork needed to initiate the attorney-client relationship—such as retainers and releases of information—also require this.  The entire process of getting an immigration form properly completed depends on in-person interactions, as clients often need a trauma-informed and developmentally appropriate walk through the form, examples, repetition and significant time to work on those documents even with attorney's support.  None of this can be successfully done over the phone, and our current practice involves multiple in-person meetings, either in the detention facilities or our offices.

18. Because the attorneys who work on our Adult Program can represent adults before EOIR and USCIS with a valid law license from any valid jurisdiction within the United States, we do not specifically require that those attorneys be licensed in Arizona. For the attorneys who work on our Children's Program (18 out of 45 total), they are required to become licensed to practice in Arizona in order to be able to represent children in state court proceedings, but those proceedings are limited to matters of juvenile law—for example, dependency or guardianship. About 50% of our attorneys are licensed solely outside of Arizona. Likewise, the large majority of our practice is civil, immigration-related law, with some civil juvenile court practice for child clients. We do not have any attorneys on staff who specialize in or currently practice criminal law.

19. The provisions of Proposition 314, Section 5 ("Section 5") rendering unlawful entry a state crime, authorizing state court judges to issue state "orders to return to foreign nation," and rendering refusal to depart under such a state removal order also a state crime would severely impact the ability of Florence Project to execute our core mission and provide direct legal services to our clients and prospective clients.

9

20. To understand the degree to which Section 5 will interfere with Florence Project's core services, it is important to understand Florence Project's basic organizational structure. Florence Project has four broad programmatic areas, each tasked with providing direct legal services to our clients: the Children's Program, the Adult Program, the Integrated Social Services Program, and the Advocacy Program.

21. The Children's Program focuses on representing unaccompanied children who are detained in ORR custody while facing removal proceedings, and unaccompanied children and youth who were previously detained in ORR custody prior to being reunified with vetted sponsors or placed in foster care in Arizona. Under federal law, children in ORR custody have the right to be placed in the least restrictive setting that is in the best interest of the child, thus, many of our clients are initially held in Arizona and then reunified with family members in Arizona or elsewhere in the country. Although the unaccompanied children and youth we serve may qualify for relief that they must pursue before USCIS, they simultaneously face removal in immigration courts. In 2025, the Children's Program served over 1,065 unaccompanied children in Arizona, providing full immigration-related representation to over 889 unaccompanied children. The Children's Program includes a team dedicated to placing these cases with external pro bono attorneys, and in 2025 the team was able to place more than 50 matters with those volunteers.

22. The Adult Program primarily serves adults who are detained in ICE custody in the three immigration detention centers located in Florence and Eloy, Arizona. As a general matter, individuals apprehended in Arizona are sent to these detention centers—Florence Detention Center, Florence Correctional Center, and Eloy Detention Center—although there are sometimes exceptions. For example, there may be capacity reasons that DHS sends individuals apprehended in Arizona to a different state. We estimate that about 50% of the clients we serve entered the

10

United States in Arizona not at a port of entry. Others entered through Texas, California, New Mexico, or other jurisdictions.

23. Individuals in these remote detention centers attend hearings inside the facilities or by video with Immigration Judges ("IJs"). In 2025, the Adult Program provided free legal services to about 1,300 adults in ICE custody, including full representation to nearly 300 adults facing removal, more than 100 of whom had been deemed mentally incompetent to represent themselves due to a serious mental health condition. Florence Project attorneys are appointed in this latter set of cases by EOIR to serve as qualified representatives under the NQRP and pursuant to the permanent injunction in *Franco-Gonzalez v. Holder*, No. CV-10-02211, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014), which addressed the rights and protections due to incompetent adults facing removal proceedings.

24. The Adult and Children's Program have the following cohorts:

a. *Pro Se* Cohort: Legal staff in the *pro se* cohort offer immigration-related legal orientation and education services as well as other forms of *pro se* support to individuals who do not have counsel and are facing removal while in ICE or ORR custody. For the Children's Program, staff provide services, including group KYRs, individual consultations, support in addressing conditions of detentions issues, and court preparation. For the Adult Program, staff services include providing group KYRs; one-on-one education in immigration law and procedure, including appellate procedure; *pro se* workshops on various forms of relief; assistance gathering, understanding, and translating documents, including assistance interpreting and understanding forms related to the removal process; and developing and distributing specialized *pro se* guides. Our adult *pro se* team has training and skill in developing rapport with potentially incompetent individuals and alerting the immigration court to such individuals so that they may obtain representation under the NQRP.

11

b. Direct Representation Cohort: The direct representation cohort provides free, in-house representation to detained individuals in defensive removal proceedings. This cohort also does a limited amount of non-detained full representation in immigration proceedings, but only for adults who were previously detained where Florence Project was appointed as representative under the NQRP and unaccompanied children who were previously detained in ORR custody. In November 2025, our adult team launched a Universal Representation model to offer free legal representation to detained unrepresented adults appearing in removal proceedings regardless of demographics, legal claims, or other factors. While this pilot program is small, our goal is to provide proof of concept and show that access to an attorney makes proceedings more fair, more efficient, and less expensive for taxpayers by reducing the amount of time that people spend in detention—as a first step toward realizing our goal of universal representation for individuals facing removal in Arizona. On the Children's Team, our attorneys also provide direct representation to children in ORR custody, children in foster care, and unaccompanied children and youth who were previously in ORR custody, including before EOIR, USCIS, and—as relevant to children's immigration matters—state juvenile courts.

c. Pro Bono Cohort: Florence Project's Adult and Children's Pro Bono Cohorts place and mentor cases with outside pro bono counsel. Because there are relatively few pro bono resources in Arizona, Florence Project has a long history of cultivating pro bono resources from national pools to provide high-quality representation before immigration courts, the BIA, and federal courts. This serves to maximize the pool of pro bono attorneys available for representation – serving Florence Project's core work and mission – and helps mitigate the legal and due process errors that arise

when so many individuals with valid legal claims must go forward in their removal proceedings *pro se*.

25. The Integrated Social Services Program works closely with the Adult and Children's Programs to provide critical trauma-informed case management. Florence Project social workers focus on needs assessments and service planning; provide critical support to legal teams in developing a trauma-informed approach to their legal cases; and provide specialized services to help Florence Project identify and provide ongoing support to clients with mental health conditions. Because most clients struggle with the experience of detention, our social workers support clients with psychoeducation and trainings on situation-specific coping mechanisms. They also train and support Florence Project legal staff on how to work with suicidal clients or clients experiencing mental health conditions.

26. The Advocacy Program works closely with legal and social services staff across Florence Project's program areas. Staff in the advocacy program support Florence Project's mission and vision by representing clients in strategic federal court litigation, including petitions for review before the Ninth Circuit; BIA appeals of particularly high importance, potential impact, or complexity; and strategic district court litigation, including petitions for writ of habeas corpus and other immigration-related district court litigation. Additionally, the Advocacy Program supports legal programs by mentoring and providing technical support to staff on cases that raise particularly complex or novel legal issues.

27. In sum, all the work described above is centered around helping detained adults and detained and formerly detained unaccompanied children in Arizona have full and fair access to a meaningful process while in removal proceedings.

**The Impact of Section 5 on Florence Project**

28. Section 5 will fundamentally and directly interfere with our core work. Section 5 creates a state crime if a noncitizen enters Arizona from a foreign country anywhere other than a port of entry; it also authorizes state judges to enter removal

13

orders. Thus, Section 5 would result in a separate and parallel process to the federal system in which we work.

29. Section 5 will impair Florence Project's ability to provide our core legal services at our current levels, and will have a severely detrimental impact on our ability to fulfill our mission and vision. This is due to fundamental differences between how the current federal immigration system operates in Arizona, and how our model for providing legal services is designed and implemented given the current system, and the separate, parallel state immigration system that Section 5 will create. Some of the realities of the current system include:

   a. Fundamentally, Florence Project's attorneys are civil immigration attorneys who practice in federal immigration court. We are not criminal attorneys. We do not practice in state court, except for our Children's Program's practice in limited civil juvenile proceedings. Florence Project's model of providing access to counsel is entirely centered within federal immigration proceedings. We do not have staff who are currently capable of representing individuals in state criminal proceedings, including state criminal proceedings with the potential to result in orders of removal under state law. We have not needed to have staff capable of representing individuals in state criminal proceedings leading to orders of removal, because no such system has previously existed in the state of Arizona.

   b. Florence Project also currently works with clients and prospective clients detained in federal immigration detention centers, not in local jails. And the detention centers in which we work, in Eloy and Florence, are concentrated in a small area of the state—essentially halfway between Phoenix and Tucson, in Pinal County.

   c. While the federal immigration detention centers for the detained adults we serve are located in Pinal County, the people at those detention centers who have been apprehended in Arizona are apprehended in counties throughout

the state. We also serve unaccompanied child clients detained in ORR facilities in counties throughout the state.

30. Based on our experience with how state criminal charges intersect with federal immigration detention, we anticipate that Section 5 will lead to individuals being taken into local custody in relation to possible federal immigration detention in three ways:

a. Some individuals will first be arrested by state or local law enforcement officials and placed in state or local custody to face state criminal charges under Section 5, rather than initially being apprehended for federal (not state) immigration reasons and detained at a federal immigration center. Florence Project will not be able to access these individuals in order to provide pro se services at the federal immigration detention center, including initial consultations, or to directly represent individuals in federal immigration proceedings based on their presence at the federal immigration detention center. This includes individuals for whom we would otherwise have been appointed as their Qualified Representative in federal immigration proceedings under the NQRP, or individuals whom we would have selected for representation under our Universal Representation Pilot Program. It also includes individuals we would otherwise have chosen to use our limited resources to represent outside our Universal Representation model, particularly extremely vulnerable individuals, or individuals with viable but complicated legal claims where representation is crucial.

b. It is likely that some individuals will be placed in ICE custody but subsequently transferred to criminal custody to face state prosecution and removal under state law. This process can occur, and currently does occur, with respect to state criminal proceedings, both for (A) individuals who are initially arrested on state criminal charges and then sent to ICE custody after their release from initial arrest and (B) individuals who are first taken

15

into ICE custody but whom state or local officials subsequently move forward with prosecuting.

c. Our clients who are released into the community—including both our NQRP clients who are released on bond and whom we continue to represent in their immigration proceedings following their release, and our unaccompanied child clients whom we continue to represent following their release—will be at risk of arrest, prosecution, and removal under state law. Such clients live throughout the state, including in both urban and rural areas.

If Section 5 were to go into effect, it would have at least the following specific effects on our services:

**Section 5's Impairment of Florence Project's Provision of Direct Legal Services to Detained Adults and Unaccompanied Children Facing Removal in Arizona**

31. Section 5 will interfere with Florence Project's provision of direct legal services to adults and unaccompanied children in federal detention in Arizona who are facing removal from the United States. This work is central to Florence Project's mission and vision. We will attempt to provide direct legal services—both pro se services and direct representation—to such individuals, in accordance with our mission and vision.

32. We will attempt to provide orientation, information, and legal assistance—both pro se services and direct representation—to individuals in state detention arrested and charged solely under Section 5, including both services related to their state immigration charges and services related to federal immigration proceedings.

**Barriers to Florence Project's Provision of Legal Services Related to State Criminal Proceedings Under Section 5**

33. We will attempt to provide pro se services and direct representation to individuals charged under Section 5 who do not qualify for appointment of an attorney under Ariz. Rule of Crim. Pro. 6.1(b)(1). Specifically, we anticipate that individuals

16

released from local jails on bond will then be detained by U.S. Immigration and Customs Enforcement and taken to federal immigration detention centers, as is common throughout the state of Arizona. For such individuals not facing "punishment involving a loss of liberty," Ariz. Rule of Crim. Pro. 6.1(b)(1)(1), they are not entitled to a court-appointed public defender as of right under Rule 6.1. We will thus attempt to provide pro se services and direct representation to unrepresented individuals in federal immigration detention for whom state or county prosecutors are seeking an Order of Return to Foreign Nation but not jail time.

34. We will seek to provide these legal services, as we currently do to individuals in Arizona facing removal, because of Florence Project's mission and because of our vision that *all* individuals in Arizona facing removal from the United States should have access to counsel. We currently work to provide pro se services and the opportunity for initial consultations that may lead to full representation in seeking relief from removal from the United States to all adults and children in federal immigration detention in Arizona, pursuant to that mission and vision. We will seek to combat the creation of legal black holes where individuals do not have access to such pro se services and the potential for full representation to seek relief from removal from the United States, categorically, because of the place in which they are detained or because they are in state rather than federal removal proceedings.

35. We will also seek to provide legal services, including direct representation, to existing NQRP clients charged under Section 5 because of our existing NQRP practice and our particular focus on providing access to counsel for mentally incompetent individuals in removal proceedings in Arizona. See below paragraphs 44-49 for greater detail on the barriers we will face in providing representation to NRQP clients under Section 5.

17

36. We will face severe barriers to successfully providing legal services related to Section 5 criminal proceedings. As described, our staff do not currently practice state criminal law. In order to represent individuals in state proceedings under Section 5 with the potential to lead to an order of removal, we would need to retrain our attorneys and overhaul our approach for a completely different court in which we have no experience. For example, the rules of evidence and other procedural rules are different in immigration proceedings than in state court in Arizona. We would need to hire attorneys to train our attorneys in representation in state criminal court. Detailed training is key to Florence Project's provision of high-quality direct legal services. Our specialized teams—the Adult Program and the Children's Program, for example—each have detailed internal onboarding and ongoing legal education. For new Florence Project hires who are recent law school graduates, we provide three to four weeks of training on the basics of immigration proceedings and litigating in the immigration courts. I anticipate that we would need, at minimum, training of similar length to ensure that our attorneys are providing high-quality representation to individuals facing state proceedings under Section 5. During that time, our attorneys would be unable to manage their normal case load, and we would have to decrease our provision of direct legal services commensurate with the anticipated weeks that those attorneys would spend in training.

37. Practice in immigration court requires only a valid law license from *any* state or jurisdiction. For that reason, about 50% of our attorneys are not barred in Arizona. To represent clients in state court, we would need to ensure that those attorneys either became barred in Arizona or were able to practice in Arizona courts for limited purposes. Many of our attorneys would likely be eligible to practice in Arizona under Rule 38 of the Supreme Court of Arizona. This provision permits attorneys who are not barred in Arizona, who are working for an approved legal services organization, and who meet certain requirements—as relevant here,

including a minimum number of two years of practice—to provide legal services as pro bono counsel. Many of the attorneys on our Children's Team practice in Arizona under this provision. We would need to seek limited admission to practice on that basis for eligible attorneys not already admitted to practice in Arizona. Securing such limited admission, or full admission to the Arizona Bar as needed, will take additional attorney, staff, and administrative time.

38. Managing the relevant certifications and admissions under Rule 38 will require key members of the Florence Project leadership to expend meaningful time, perhaps as much as about 10-20% of our work time in the initial months after Section 5 goes into effect and additional time on an ongoing basis. Key members of leadership will also need to expend time organizing training on state criminal representation. This is time that leadership will not be able to spend on improving existing programmatic activity, working directly with staff on existing programmatic activity, or undertaking other critical organizational activities like fundraising, hiring, and personnel management.

39. We also pay for malpractice insurance to cover our attorneys in the event of a malpractice claim against them. Expanding our legal representation services to cover an entirely new practice area would necessarily increase both our exposure to malpractice claims, as well as the corresponding coverage we would secure to appropriately mitigate that risk.

40. We currently represent adults primarily at the federal immigration courts in Florence or Eloy, Arizona. Section 5 will require our attorneys to travel to state courts throughout the state to represent our clients. Such travel will expend attorney time and organizational resources, including mileage reimbursement. The cost will be significant, as the current legally required mileage reimbursement rate is 72.5 cents per mile.  A visit to the Coconino County Court, for instance, represents 520 miles round trip (8 hours) from our Tucson office and 288 miles round trip (4 hours and 42 minutes) from our Phoenix office, which means

19

$374.40 per trip from Tucson and $207.36 from Phoenix. This is just one example from one county and each office; therefore, the cumulative effect of this travel costs for several staff members and several clients in different counties throughout Arizona will be extremely burdensome and almost prohibitive for the organization.

41. The amount of time and organizational resources required for attorney training to represent individuals facing state orders of removal in state court and for ongoing additional work to possibly represent them in state criminal proceedings under Section 5 will necessarily decrease the number of individuals whom our attorneys can represent and to whom they can provide pro se information and materials. This decrease will be substantial, given the amount of time that these activities will require—likely hundreds if not thousands of hours across the organization as we initially transform our provision of direct legal services in an effort to respond to Section 5, and hundreds if not thousands of hours per year across the organization as Section 5's implementation continues. This means that we will not be able to represent dozens of individuals, or perhaps even more, whom we otherwise could have.

42. Because we do not currently have staff trained to represent individuals in state criminal proceedings and because cases under Section 5 will involve significant operational costs, we will not be able to immediately represent our existing clients in state criminal proceedings under Section 5. This means that our NQRP clients, clients who are children and youth, and adult clients are at risk of being charged under Section 5 without guaranteed representation, if they are not facing jail or imprisonment.

43. Because of our organization's limited resources, we may not be able to re-train our staff in state criminal proceedings or hire additional staff to address these needs and commit to ongoing provision of representation for individuals under Section 5. We would seek to prioritize representation first to our existing clients, particularly

our NQRP clients and our clients who are children and youth. And we are committed to our vision of ensuring that all immigrants facing removal have access to counsel, understand their rights and are treated fairly and humanely. We are currently in every immigration detention center in Arizona for exactly that reason, and we have launched our Universal Representation Pilot Program for that reason. But the barriers created by Section 5 state criminal proceedings may categorically prevent us from representing some detained adults, youth, and children in Arizona facing removal from the United States.

**Barriers to Florence Project's Provision of Legal Services to Clients, Prospective Clients, and Pro Se Individuals Detained in Local Jails Under Section 5**

44. The detention of our existing clients in local jails under Section 5 will create barriers to our ongoing representation of them. The detention of prospective clients in local jails under Section 5 will likewise create barriers to our ability to represent them in federal immigration matters and to provide pro se services related to federal immigration matters.

45. Our staff broadly lacks experience with navigating providing legal services to individuals in local jails. Our entire Adult Program adult clientele and pool of prospective adult clients are detained in federal immigration detention. Our Children's Program clients are children in ORR custody, or children or youth released to vetted sponsors or foster care. Under Section 5, we will have clients and prospective clients detained in local jails throughout the state. This will introduce significant logistical complexity that will make it far more difficult to reach any client and will mean that by necessity we will reach fewer clients. This is because jails and detention centers are not all the same: different jails and detention centers have different procedures. An attorney going to a new jail or detention center must figure out how to get a client on the phone; how to conduct a video visit; how to meet with a client before going to court; the rules for working with interpreters at the jail or detention center; and how to obtain client signatures.

21

We have experienced this problem when attorneys on our Children's Program have clients who have moved to adult immigration custody and they then have to spend valuable time learning the logistics of client visitation and communication for each specific facility, in addition to the laws that pertain to adults. Dealing with a single new jail or detention center places increased burdens on attorneys and support staff, much less multiple new local jails as we will need to under Section 5.

46. Additionally, under Section 5, we will have clients and prospective clients detained in local jails throughout the state, with state criminal proceedings under the new state crimes created by Section 5 throughout the state. Providing effective legal services to both existing and new clients will require significantly more driving on the part of our attorneys—likely at least hundreds of hours every year across the organization, if not more. This time is time that these attorneys cannot spend working on clients' cases. Additionally, Florence Project reimburses employees for mileage, and so we anticipate up to tens of thousands of dollars each year in additional mileage reimbursement due to Section 5.

47. We also will face the same challenges in terms of navigating jail procedures and traveling as we seek to provide pro se services to individuals. It will take us additional time to determine how to offer pro se workshops at local jails throughout the state and to travel on an ongoing basis throughout the state to host such workshops. Because of the burden of the increased travel time, increased time in needing to hold multiple workshops at many different local jails, and administrative complexity of arranging such workshops, we will need to dramatically increase our organizational resources expended to reach individuals subject to Section 5, and we may not reach such individuals in time to aid them.

48. We will face additional challenges in locating in-person interpreters for clients who require such interpretation. We will need to engage in additional coordination, either finding new interpreters in new locations across the state or

paying for our existing interpreters to travel throughout the state. In-person interpreters are particularly important for our clients with mental health and competency concerns, with whom communication is particularly challenging.

49. Further, in addition to attorney time, the hurdles created by the detention of clients and prospective clients in local jails will also take away valuable time from our legal assistants' other work, which includes drafting declarations, filling out immigration-related forms, and preparing clients for court.

**Section 5's Impact on Florence Project's Successful Representation of Existing and Prospective Clients in Federal Immigration Proceedings**

50. Section 5 also poses a barrier to our successful representation of existing clients in federal immigration proceedings who are subject to Section 5. We anticipate that we will have clients whom we are representing in their removal proceedings who are then removed from ICE custody to face state prosecution under Section 5. We also anticipate that we will have clients released to the community whom we continue to represent in federal immigration proceedings—both NQRP clients and young clients—who will be arrested and prosecuted under Section 5.

51. For our clients removed from ICE custody to face state prosecution and our clients released in the community and then arrested under Section 5, most likely we will face difficulty in finding where they are detained. For individuals detained in ICE custody, ICE offers an online detainee locator. To our knowledge, local jails have no such universal tool. We will need to spend time locating our clients and learning how to communicate them, while navigating things like immigration court-ordered deadlines and immigration relief timeliness rules (for example, the requirement to file for asylum within one year of entry).

52. Once we locate our clients detained in state jails, we will face the same difficulties in communicating with them described above. See *supra* 44-49.

53. For existing clients who are in state custody, we will face strict immigration deadlines. The more time that we spend looking for someone and dealing with the

23

increased administrative burdens and travel time that come from detention in a local jail, the less time we have to work on their case. This is especially problematic due to the time constraints and filing deadlines involved in federal immigration proceedings and state court civil juvenile proceedings. We need significant time to prepare documents and identify and transfer evidence for federal immigration proceedings, for clients we represent. And at the moment, most of our non-detained clients meet us at our offices, where we have the trauma-informed spaces, equipment, and materials needed to conduct such meetings and file for petitions, which is something that would be challenging to recreate should attorneys have to travel across the state.

54. Further, Section 5 will impair our provision of direct legal services for federal immigration proceedings to prospective clients. As potential clients and participants in our pro se services are pulled in and out of ICE custody to face state prosecution and possible removal under state law—or prospective clients whom we would have served, such as NQRP clients, are removed under state law before they can even reach us—we will not be able to access clients for legal education, an initial consultation, or pro se support as we would if these clients were exclusively in EOIR removal proceedings. This will make it extremely difficult to schedule legal calls, establish representation, get the requisite signatures for declarations and other forms, and prepare and review documents. And as explained above, even if we eventually locate a prospective client (or client), it is extremely difficult to schedule a call at a new facility, let alone an in-person meeting in a confidential and private space.

55. For prospective clients removed from ICE custody to face state prosecution, initial hearings are set within weeks of detention, and clients often have just a few weeks to look for counsel or legal information before appearing again in court. This harsh timeline will make it extremely difficult for us to access them and provide an initial consultation, establish representation, and effectively represent them.

24

56. If a person fails to appear for an immigration court hearing, they will be removed *in absentia. See* 8 CFR § 1003.26 (c). For purposes of this rule, written notice of the hearing to the noncitizen will be considered sufficient if it was provided at the most recent address provided by the noncitizen. See 8 CFR § 1003.26 (d). Given the number of law enforcement agencies potentially involved in the implementation of Section 5 and the lack of precedent and experience with such a unique parallel removal system, it is unlikely that those agencies will maintain timely communication with EOIR to update the individual's address, engage with the Department of Homeland Security to coordinate the closure of the case or similar actions, and avoid these outcomes. Thus, it is extremely likely that Section 5 will result in our clients' and prospective clients' inability to attend hearings when they are in state custody which could lead to wrongful *in absentia* removal orders in the federal immigration system.

57. Further, there are frequently federal immigration policy changes that affect our clients' and prospective clients' cases that require rapid response. With Section 5 in effect, we will have difficulty timely communicating with individuals subject to such a sudden policy change and detained in local jails subject to Section 5 and will need to expend valuable organizational resources to rapidly locate and communicate with them. We will be at risk of not timely reaching individuals subject to federal policy changes who need fast action in their immigration cases or fast legal information, or ability to ascertain an updated case strategy. This is true for both existing clients and prospective clients.[1]

58. More fundamentally, Section 5 will prevent us from seeking and securing relief from removal from the United States in cases where, in the absence of Section 5, we would have been able to do so. In some instances, our clients will have

---

[1] We will also have less staff time and fewer other organizational resources to respond to sudden federal immigration policy changes due to the organizational burden created by Section 5.

25

available pathways to relief under federal immigration law that are not available under Section 5—meaning that they can be removed under Section 5, with no available affirmative defense, even though they could seek and secure relief from removal under federal law. There is no way under Section 5 to ask for relief in state court from an Order of Removal on bases that are available in federal immigration proceedings, such as risk of persecution or torture or the availability of relief because a person is a victim of trafficking. Section 5 has no carve-out or affirmative defense for individuals in the process of seeking, or eligible for but not yet having secured, relief from removal under federal immigration law.

59. As just one example, Section 5 makes the federal government's grant of asylum an affirmative defense to "illegal entry from foreign nation," A.R.S. § 13-4295.01(B)(1), but it does not make a pending asylum application an affirmative defense. As a result, in some instances, our clients and prospective clients will be eligible to seek and secure asylum but will nevertheless be subject to removal under Section 5—because they have not yet secured asylum.

60. We will therefore be unable to successfully seek or secure such relief for clients and prospective clients we otherwise could have aided, including people who would go on otherwise to win such relief. And for clients whom we have already begun to represent in their federal immigration proceedings who are subjected to an Order to Return to Foreign Nation under Section 5, our organizational resources expended until that point will have been wasted, and we will not have been able to provide legal services we otherwise could have.

**Section 5's Impact on Florence Project's Provision of Social Services to Existing Clients**

61. Further, Section 5 will affect our provision of social services to existing clients. Our social services team works with vulnerable adults, including NQRP clients and others in particularly difficult circumstances such as pregnant women, clients with medical vulnerabilities, and parents whose children have been placed in child

services custody. Our social services team will face similar problems working with our existing clients due to their detention in local jails under Section 5, including transfers out of immigration detention to local jails and the detention of released NQRP clients in local jails. It will be even more difficult for our social services team to meet with clients regularly, connect them with services, and ensure that they follow the conditions of their release plans (e.g., medication and, if they are re-released from local jails, transportation and housing), requiring greater expenditure of organizational resources to achieve the same result we would have otherwise. This is for essentially the same reasons that our attorneys will have greater difficulty providing legal services: our social services workers will need to travel to jails throughout the state, will need to provide services in local jails with new and different procedures for accessing clients, and will have difficulty locating clients who are transferred. For some clients, our social services team will likely not be able to ensure continuity of care because they will not be able to travel to them in the time or frequency that is needed for such continuity. Our organizational resources expended until that point will have diminished impact or will have been wasted where we cannot ensure continuity of care, and we will not have been able to provide social services we otherwise could have provided.

**Section 5's Impact on Florence Project's Services to Incompetent Clients Eligible for NQRP**

62. Our representation of clients who have been found to be incompetent before the immigration court, the BIA, and courts of appeals under NQRP comprises a large part of the legal services we provide. This representation is intensive and holistic, meaning that the legal team works in tandem with our social services team to address conditions of detention, release plans, and legal representation. Our appointment as counsel under NQRP is non-discretionary, as our federal government sub-contract, requires that we accept a certain number of NQRP cases each year. Most NQRP clients are eligible for bond in immigration court, and we

also provide representation in those proceedings. We also continue to represent NQRP clients in their removal proceedings if they are released from ICE custody to live with a sponsor in the state.

63. Our representation of NQRP clients takes a disproportionate amount of time because of the frequent complexity of the cases, the holistic nature of the representation, and the difficulty that our NQRP clients face in communication. Our NQRP clients often lack the ability to communicate clearly, coherently, and consistently. As a result, our Qualified Representatives ("QRs") representing our NQRP clients must often revisit certain topics of conversation in order to validate or reconcile details that dictate their client's eligibility for immigration relief and equities.

64. Additionally, in every NQRP-appointed case, QRs are expected to evaluate and file motions for procedural safeguards, which aim at protecting the client's case interests given their specific limitations or illnesses. Safeguards often permit QRs to ask leading questions of clients; Immigration Judges to disregard inconsistent details of client testimony; the Department of Homeland Security to waive bars to certain forms of immigration relief; and clients to avoid certain topics of testimony. This also adds to the representation's time and complexity.

65. In addition to this, NQRP clients suffering from severe mental health symptoms are more likely to come into contact with law enforcement and the criminal justice system, despite research showing that individuals with serious mental illness are more likely to be victims rather than perpetrators of crime, for two reasons. Like others with severe mental health symptoms, NQRP clients are at risk of their most acute mental health symptoms leaving them vulnerable, which can result in crisis intervention being performed by law enforcement, becoming unhoused, which often results in low-level offenses such as trespassing or disorderly conduct. Oftentimes, symptoms and behaviors of an individual experiencing psychiatric symptoms may be misinterpreted as hostility or resistance. NQRP clients

28

frequently face particular difficulty accessing mental and behavioral health services due to the high costs and inaccessibility of such services and language barriers.

66. Section 5 will deeply impair our representation of NQRP clients. First, Section 5 will interfere with our representation of NQRP clients who become our clients as a result of Florence Project's appointment as their Qualified Representative by an immigration judge. Our NQRP clients are eligible for a bond hearing after being detained in immigration custody for six months. We continue to represent our NQRP clients in their immigration proceedings when they are released into the community on bond and continue to live in Arizona—including continued representation of numerous NQRP clients released on bond who have entered the United States in Arizona not via a port of entry. These clients live in counties throughout the state. Once released, these clients will be at risk of arrest under state law, detention in local jails, and placement in state criminal proceedings that can result in a state of order of removal due to Section 5. At least some of these clients will likely be arrested and charged under Section 5. Additionally, our NQRP clients detained at Florence and Eloy who entered the United States through Arizona not at a port of entry will be at risk of state charges under Section 5 and transfer from federal to state custody to face such charges. At least some of these clients will likely be charged under Section 5.

67. Section 5 will work two distinct sets of harms to our representation of individuals who are already Florence Project's clients and who are then arrested under Section 5: harm to our legal representation of them in their federal immigration proceedings due to their detention in local jails under Section 5, and harm to our legal representation of them due to state orders of removal that can result from Section 5.

68. Florence Project's NQRP clients' detention in local jails under Section 5 charges will create barriers to our representation. As described above, Florence Project

29

attorneys will face significant barriers to representing any clients in local jails. *See supra* 44-49. For NQRP clients, these barriers to representation will be heightened due to their difficulties in communication and the additional obstacles that they face to navigating legal processes. *See supra* 62-64. It will take more time to locate NQRP clients, because they will have greater difficulty communicating with us and their loved ones once they are arrested—and in some cases may not be able to do so effectively. It will take more time to communicate with them while they are detained, because they will struggle to navigate the new systems of local jails. In the meantime, the clock will be ticking on immigration deadlines. It will be more difficult for us to meet these deadlines, and even where we are able to locate and communicate with a client on time, we will need to expend organizational resources to do so. We need lengthy in-person meetings with our NQRP clients due to their communication difficulties. This will be a more time-intensive process when they are in local jails rather than in the community. We will need to navigate jail procedures and plan around jail visiting times—for legal teams, for social services staff, and for interpreters—which will add time to representation. We will also likely need to meet with at least some of our NQRP clients for a longer period of time than we would if they were released into the community because they will be confused and disoriented by their detention in a local jail.

69. And state Orders of Return to Foreign Nation under Section 5 will prevent us from seeking and securing relief from removal from the United States for NQRP clients for whom we otherwise could have sought and secured such relief in *federal* immigration proceedings. In other words, in the absence of Section 5, we would be able to seek and secure relief under federal immigration law, but because of Section 5's mismatch with federal immigration law, they will nevertheless be subject to a state Order of Return to Foreign Nation. For example, NQRP clients often have extremely sensitive, fact-based claims for protection from removal,

including requests for asylum, withholding of removal, and protection under the Convention Against Torture. Our staff spends months putting together a compelling case for representation. But our NQRP clients with pending claims for such protection from removal under federal immigration law can still be arrested by state or local law enforcement, charged under Section 5, and issued a state order of removal—with no affirmative defense that they have such a pending claim. We will be unable to effectively represent these clients in seeking and securing relief from removal under Section 5, even where we could have done so in federal immigration proceedings. And time and organizational resources that we have expended on their federal immigration case through the point at which they are arrested and removed under state law will have been effectively wasted.

70. Section 5 will also create significant barriers to our ability to represent individuals eligible for NQRP but for whom we have not yet been appointed as the QR. Ordinarily, the federal immigration judge assesses an individual and, upon finding that they are mentally incompetent, appoints Florence Project as the QR for that individual. There is no provision for such assessments in Section 5. And NQRP clients typically face very significant hurdles to locating and communicating with prospective or existing counsel on their own—particularly in detention settings such as a local jail. As a result, for prospective NQRP clients who are arrested by state or local law enforcement under Section 5 or transferred to state custody pursuant to state criminal charges before they can be appointed a QR, we may never encounter them to be able to represent them in proceedings facing removal, whether federal or state—even when we otherwise could have done so and would have been appointed as their representatives.

71. Moreover, we will have to expend organizational resources in devising and implementing a system to attempt to locate and communicate with mentally incompetent people in local jails for whom we otherwise would have been appointed as counsel under NQRP. The creation of this system is particularly

31

important given the frequent complexity of their federal immigration claims, the difficulty in communicating with them, and the potential for time-sensitive immigration deadlines that need to be acted on rapidly. Florence Project's ability to represent such mentally incompetent people facing removal from the United States will be undermined without creating such a system to identify them in the first place. This representation is, again, a core part of the legal services that Florence Project currently provides.

**Additional Barriers to Florence Project's Provision of Legal Services to Unaccompanied Children Due to Section 5**

72. Section 5 will create additional barriers to our ability to provide high-quality legal services to unaccompanied immigrant children, in addition to the barriers described above. *See supra* 31-41 and 44-49. Access to counsel is essential to translate a child's experience into legally cognizable claims and to coordinate with sponsors, family members, schools, medical providers, and state courts.

73. Unlike some other states' laws creating separate state removal schemes that exempt children, Section 5 does not exempt children.

74. Attorneys representing children and adults before USCIS may not have timely access to their clients in order to prepare fact-intensive documents, obtain original signatures, or appear for USCIS appointments and interviews.

75. Section 5's burdens on our provision of legal services to unaccompanied children are especially heightened due to the immigration courts' extremely fast dockets for children. Detained children currently appear in EOIR about every few weeks, and non-detained individuals are also experiencing accelerated removal hearings. Our team will be unable to provide timely, high-quality representation where Section 5 interferes with these timelines by detaining children and youth in local jails in the state or requiring them to appear elsewhere in the state for criminal adjudication.

76. Moreover, we represent young people released to the community for whom we have to file for dependency or asylum before they turn 18, or for Special

32

Immigrant Juvenile Status before they turn 21. For our clients who are not detained, who are arrested and charged with violation of state law under Section 5, it will be exceedingly difficult for us to locate them in local jails and to advance their immigration case while they are detained in local jails. We often need to seek specific relief before a child turns 18 that requires roughly six months to effectuate before the child turns 18. We must act quickly, and if we are working with a child on their case and they disappear, we will be missing out on critical time. We regularly have clients who are close to the six-month-before-18 mark already. We will need to expend organizational resources in advancing their immigration cases while detained in local jails, which will be more resource-intensive than if they were released into the community due to the increased staff time necessary to travel to local jails and deal with the procedures of local jails. We also will be at risk of not being able to provide our clients with the necessary legal services to successfully advance their cases due to delays created by their detention in local jails—given the increased difficulty of locating them, communicating with them while detained, obtaining signatures, and meeting court and other filing deadlines. And, in in some cases, our UC clients have to apply for relief before they turn 18 years of age, or they will forfeit the opportunity to avail themselves of the protections guaranteed to UCs under the TVPRA.

77. Once we locate our UC clients detained in local jails, we will face the same obstacles to communicating with them described above. See *supra* 44-49. But these obstacles will be heightened because of the particular difficulties that they face as unaccompanied children. See *supra* 72-76.

78. As with our adult clients, we will have child or young adult clients whom we could have assisted in obtaining relief from removal under federal law, but who will be ordered removed under state law due to the discrepancies between federal immigration law and Section 5. In many cases, our young clients are merely waiting for a visa to become available so they can file for a green card, and a

33

removal under Section 5 will additional attorney time spent on navigating the ramifications of the removal to already filed forms of relief in unprecedented situations, and in cases where continued presence is required in the United States. For example, for SIJS, "[a petitioner is eligible for classification as a special immigrant juvenile ... if [the petitioner] ...[i]s physically present in the United States." 8 C.F.R. § 204.11(b)(3) (2026).

79. In sum, Section 5 will interfere with our legal education, screening, and representation processes of unaccompanied minors and youth before federal agencies and courts. It will also impact our ability to establish meaningful rapport with our clients and to properly advise them.

**<u>Section 5's Impact on Florence Project's Pro Bono Placements</u>**

80. Without being able to predict whether a client or prospective client will be reliably present in ICE or ORR custody for removal proceedings, our pro bono team will have to find new mechanisms to account for the parallel state removal system, including trying to place cases with attorneys licensed in Arizona and competent to represent people in criminal proceedings. This will require new outreach efforts with firms and attorneys who do that work. The Section 5 system will undermine pro bono placements when clients are pulled from ICE custody to face criminal charges because we cannot assess relief from removal, the fundamental first step in a pro bono placement, when we do not have access to the prospective client. This will result in the slowing or pausing of pro bono placements. Our staff and pro bono attorneys currently do not have the expertise, resources, and structure to find and support those clients that will be diverted into this parallel state system. Second, even if we are able to screen a client and place that client with a pro bono attorney, clients transferred to state custody will face barriers in meeting with their pro bono counsel on the fast timelines required in immigration court. This again will result in a decrease or suspension of pro bono placements as we attempt to devise workarounds to ensure that our pro bono attorneys have access to their

clients and additional time to dedicate to tracking down and advising clients detained in state facilities.

**Section 5's Impact on Florence Project's Provision of Pro Se Materials, Orientation, and Workshops to Individuals Detained in Arizona and Facing Removal from the United States**

81. For our pro se services, we will need to develop new materials for individuals detained in local jails and for individuals facing removal under state law, tailored to both the new detention settings and the new state removal mechanism, which will take staff time and organizational resources. Development of these new materials will differ from, for example, updating pro se materials due to changes in federal immigration law. We will need to develop entirely new materials geared toward a different court system and different proceedings with different procedural protections and different avenues for relief, as well as entirely new materials regarding navigating how to obtain legal information in a new setting, local jails. This will require the expenditure of orders of magnitude more staff time than a routine regular or annual update based on changing case law.

82. We will need to work with numerous local jails, rather than just three federal immigration adult detention centers and various ORR shelters, to attempt to place pro se materials, to attempt to replenish them on an ongoing basis, and to attempt to hold legal orientations and workshops on both the new state removal proceedings and on federal immigration matters—particularly relief with potentially time-sensitive deadlines for individuals detained in state or local custody. We will likely not be able to reach some individuals for pro se materials and/or workshops because we will likely not have the organizational resources to do so in counties throughout the state on an ongoing basis—particularly for workshops, which will require extensive organizational resources in the form of both staff travel time and the logistical complexity of arranging such workshops in local jails throughout the state.

**Section 5's Impact on Florence Project's Universal Representation Program**

83. Launched in November 2025, the Florence Project's Universal Representation pilot provides free, merits-blind representation to selected detained individuals appearing in Eloy and Florence immigration courts, without limiting assistance based on demographics, perceived case strength, or claim type. This is a proof-of-concept model designed to gather data and build toward a true universal representation system for people in Arizona facing removal from the United States. The program reflects our broader mission to provide free legal and social services to detained adults and unaccompanied children in Arizona and our vision that all immigrants facing removal in Arizona should have access to counsel and be treated fairly and humanely. The initial pilot is small, but we hope to show through empiric evidence that having qualified attorneys makes removal proceedings both fairer and more efficient and to scale the program up in future. Section 5, for all the reasons discussed above, will interfere with the Universal Representation Program by preventing prospective clients from reaching us and disrupting our representation efforts after we have signed a retainer with the client. Additionally, this interference risks preventing us from gathering full and robust data about access to counsel that is so important to demonstrating the effects of this program, because our effective and successful representation of some individuals in the pilot may be prevented by the barriers created by Section 5.

**The Impact of Section 5 on Florence Project Will Be Significant**

84. Section 5 will greatly disrupt the system in which we work. Detention in ICE and ORR custody and removal proceedings before EOIR—where we provide the bulk of our work—are not fair systems. They are deeply flawed. However, they are at least somewhat predictable and familiar, and they are the systems in which our staff is trained and licensed to provide high-quality services. Allowing Section 5 to create a tandem and often contradictory state removal process will leave the Florence Project unable to work effectively or efficiently.

85. The amount of time and organizational resources required to effectively represent individuals in state criminal proceedings under Section 5, effectively represent clients located in local jails throughout the state, and effectively provide pro se services to individuals subject to Section 5 will necessarily decrease the number of individuals whom our attorneys can represent and to whom they can provide pro se information and materials. This decrease will be substantial, given the amount of time that such representation will require—likely hundreds to thousands of hours per year across the organization as Section 5's implementation continues. This means that we will not be able to represent dozens of individuals, or perhaps even more, whom we otherwise could have.

86. Additionally, Florence Project will be unable to successfully represent individuals in seeking and securing relief from removal from the United States, where it otherwise could have, because of the differences between Section 5's affirmative defenses and the broader avenues for relief from removal under federal immigration law.

87. Florence Project will also be prevented from representing individuals with mental health conditions who otherwise would have been placed in the NQRP program, for which Florence Project receives funding on a per-person basis. The inability to reach those individuals will have a direct impact on Florence Project's resources. As explained above, *supra* 62-71, Section 5 will also affect Florence Project's capacity to effectively represent NQRP clients whose cases initiated in federal immigration court but were eventually transferred to local jurisdictions.

88. As a result, fewer detained unaccompanied children and adults will receive legal screenings, fewer will be accepted for representation, and more must appear in adversarial proceedings alone. It is likely that meritorious claims will never be identified, evidence will not be gathered in time, necessary juvenile court proceedings will not be filed, forms of immigration relief will not be timely filed, and vulnerable people will be removed or detained without a meaningful

37

opportunity to present their cases. With Section 5 in place, Florence Project will not be able to provide legal services that are core to our mission and vision that we otherwise would have provided.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 9th of July, 2026 in Phoenix, Arizona.

*Roxana Avila-Cimpeanu*

_____

Roxana Avila-Cimpeanu

Deputy Director

The Florence Immigrant and Refugee Rights Project

38