# EXHIBIT 9

# AN UNCERTAIN PATH

## Justice for Crimes and Human Rights Violations against Migrants and Refugees in Mexico

By: José Knippen, Clay Boggs, and Maureen Meyer | **NOVEMBER 2015**

**RESEARCH REPORT**











# TABLE OF CONTENTS

KEY FINDINGS ........................................................................... 3

ACRONYMNS ............................................................................. 4

INTRODUCTION ........................................................................ 5
- Methodology and collaboration with migrant shelters and defenders in the production of this report

THE SOUTHERN BORDER PROGRAM AS A FRAMEWORK
FOR INCREASING MIGRATION ENFORCEMENT ..................... 8
- The Southern Border Program
- The participation of security forces in migration enforcement operations
- Budget
- Cooperation with the United States

HUMAN RIGHTS VIOLATIONS AND CRIMES AGAINST MIGRANTS ..... 18
- Kidnappings
- Human trafficking
- Summary executions
- Enforced disappearances
- Sexual violence
- Robbery, assault, and extortion, accompanied by physical and psychological abuse
- Detention and access to the right to asylum

INVESTIGATING AND SANCTIONING CRIMES AND
HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS ............... 34
- Data on investigations into crimes against migrants
- Obstacles to reporting crimes and human rights violations
- Specialized prosecutors: An effective response?
- The National Human Rights Commission and State Human Rights Commissions
- The Responsibility of the National Migration Institute

CONCLUSIONS AND RECOMMENDATIONS ........................... 46

REFERENCES ............................................................................. 49

# KEY FINDINGS

- **THE SOUTHERN BORDER PROGRAM HAS SIGNIFICANTLY INCREASED MIGRATION ENFORCEMENT OPERATIONS, AS WELL AS MIGRANT DETENTIONS AND DEPORTATIONS.** From July 2014 to June 2015, detentions of migrants rose 73 percent compared to the same period the year before; between July 2013 and June 2014, 97,245 migrants were detained, while 168,280 were detained between July 2014 and June 2015. Furthermore, government data indicates there has been an increase in migration enforcement operations; however, more reliable data is needed.

- **THIS INCREASED ENFORCEMENT HAS PROMPTED AN UPTICK IN HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS.** Abuses have been documented in these migration operations, which are increasingly conducted in conjunction with security forces. Migrant shelters have documented kidnappings, extortions, robberies, and abuses throughout the country.

- **GIVEN THIS CONTEXT, THE MEXICAN GOVERNMENT'S EFFORTS TO STRENGTHEN ITS CAPACITY TO PROTECT MIGRANTS HAVE FALLEN SHORT OF WHAT IS NEEDED.** For example, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) only has 15 protection officers in the entire country to ensure access to international protection for the more than 100,000 migrants detained during the course of a year. Moreover, COMAR's budget did not increase in real terms from 2014 to 2015.

- **THERE IS NO EVIDENCE THAT VICTIMS OF CRIMES AND HUMAN RIGHTS VIOLATIONS HAVE EFFECTIVE ACCESS TO JUSTICE, DESPITE THE CREATION OF NEW SPECIALIZED PROSECUTORS' OFFICES.** There is a lack of conclusive data regarding justice for migrants in Mexico. The most detailed data are from the specialized prosecutor's office in Oaxaca, which reports that, of the 383 complaints received over four years, only 96 resulted in a preliminary investigation being opened and only four resulted in sentences for the perpetrators. Additionally, of the 1,617 complaints of human rights violations against migrants that the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) received from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institution implicated in the complaint.

- **THE SOUTHERN BORDER PROGRAM HAS FOCUSED ON ENFORCEMENT ACTIVITIES AND THIS FOCUS IS REFLECTED IN THE BUDGET OF THE NATIONAL MIGRATION INSTITUTE (*INSTITUTO NACIONAL DE MIGRACIÓN*, INM). INDEED, IN 2014 THE INM SPENT THE LARGEST BUDGET IN ITS HISTORY.** For its part, the United States government has offered the Mexican government political and financial support for migration enforcement, especially following the drastic increase in the number of unaccompanied minors and migrant families—primarily from Central America—arriving at the United States' southwest border.

# ACRONYMS

| | |
|---|---|
| **CAIMFS** | Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur*) |
| **CCAMYN** | Centro Comunitario de Atención al Migrante y Necesitado |
| **CEDH** | State Human Rights Commission (*Comisión Estatal de Derechos Humanos*) |
| **CNDH** | National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*) |
| **COMAR** | Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*) |
| **CUSAEM** | Auxiliary and Urban Security Forces of the State of Mexico (*Cuerpos de Seguridad Auxiliar Urbana del Estado de México*) |
| **DHS** | Department of Homeland Security |
| **FEVIMTRA** | Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*) |
| **GATES** | Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*) |
| **GROMS** | Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*) |
| **IACHR** | Inter-American Commission on Human Rights |
| **INAI** | National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales*) |
| **INCLE** | International Narcotics Control and Law Enforcement |
| **INM** | National Migration Institute (*Instituto Nacional de Migración*) |
| **OPI** | Child Protection Officer (*Oficial de Protección a la Infancia*) |
| **PEF** | Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*) |
| **PEM** | Special Migration Program (*Programa Especial de Migración*) |
| **PGJE** | State Attorney General's Office (*Procuraduría General de Justicia del Estado*) |
| **PGR** | Federal Attorney General's Office (*Procuraduría General de la República*) |
| **PPTM** | Municipal Preventive and Transit Police (*Policía Preventiva y Tránsito Municipal*) |
| **REDODEM** | Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*) |
| **SAT** | Tax Administration Service (*Servicio de Administración Tributaria*) |
| **SEDENA** | Army (*Secretaría de la Defensa Nacional*) |
| **SEGOB** | Ministry of the Interior (*Secretaría de Gobernación*) |
| **SEIDO** | Deputy Attorney General's Office for Special Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*) |
| **SEMAR** | Navy (*Secretaría de Marina*) |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UPM** | Migration Policy Unit (*Unidad de Política Migratoria*) |

# INTRODUCTION

On June 2, 2015, armed men opened fire on five vehicles that had stopped on a roadway close to Caborca, Sonora. Between 100 and 120 undocumented men, women, and children were inside the vehicles; they were traveling through Mexico with the hope of crossing the border into the United States. At least three people died in the attack and several migrants fled toward the United States.[1] Two days later, the state Attorney General's Office (*Procuraduría General de Justicia del Estado*, PGJE) in Sonora reported that it had rescued 15 survivors (two Mexicans and 13 Central Americans) and recovered three bodies. The 13 Guatemalans and Salvadorans were deported to their countries by the National Migration Institute (*Instituto Nacional de Migración*, INM) in mid-June. Prior to this, the survivors had told members of civil society organizations that likely between 30 and 40 migrants were murdered during the attack.[2]

This attack demonstrates the persistence of a pattern of crime and human rights violations against migrants in Mexico. The events in Caborca took place nearly a year after Mexican President Enrique Peña Nieto launched the Southern Border Program, which promised a comprehensive approach to promoting development, security, and human rights on the Mexican border with Guatemala and Belize.[3] The most obvious and consistent measure under the Southern Border Program has been the intensification of migration enforcement operations throughout Mexico, especially in the southern states of Chiapas, Tabasco, and Oaxaca. Authorities have taken measures to prevent migrants from traveling by train;[4] set up new checkpoints in the southern border region; relocated between 10 and 15 percent of INM personnel from their regular assignments to strengthen the southern border; and conducted more frequent raids on hotels where migrants are known to stay. Migrant detentions have skyrocketed: between July 2014 and June 2015, detentions of migrants rose 73 percent compared to the same period in the previous year; between July 2014 and June 2015, authorities detained 168,280 migrants, up from 97,245 detained between July 2013 and June 2014. In fact, from October 2014 to May 2015, the INM detained more Central American migrants than the US Border Patrol (the INM's 110,043 versus the Border Patrol's 85,131).[5]

## TERMINOLOGY

*This report uses the term "migrant" to refer to individuals traveling through Mexico en route to the United States. It is important to acknowledge that this is a mixed flow of migrants that includes persons who leave their countries principally to improve their living conditions, whether for economic reasons or for family reunification, as well as persons who are fleeing persecution and/or violence, and victims of human trafficking. Furthermore, although many are from Guatemala, El Salvador, or Honduras, Mexican migrants may also be victims of the same patterns of violence and human rights abuses, even when they are in Mexico.*

These migration enforcement efforts are significant, but they are not without precedent. For years authorities have conducted raids and set up checkpoints throughout the country—primarily in the south—and each year they have detained and deported thousands of migrants: Mexico deported 79,643 migrants in 2012; 80,902 in 2013; and 107, 814 in 2014.[6]

As of the writing of this report, the facts of the Caborca case and the whereabouts of all the victims had not been clarified. The case illustrates migrants' absolute defenselessness against the organized crime networks that control significant portions of Mexican territory. Policy changes like the Southern Border Program have not only failed to alter this situation, to a certain extent they have even exacerbated the patterns of crimes and human rights violations against migrants. Migration is more clandestine than ever, as migrants and smugglers have sought to avoid the checkpoints and raids that have proliferated in the southern states, and to some degree, all over the country. This has had an impact on the routes migrants use, inasmuch as they have had to look for alternatives, including traveling on foot, which makes them easy prey for criminal gangs. These new routes mean they have less contact with shelters, most of which are run by clergy, and which were established to assist migrants along the route of the cargo train, known as "The Beast" ("*La Bestia*").[7] As a result, the Southern Border Program has made it more difficult for human rights advocates and organizations to identify and report crimes and human rights violations against migrants.[8]

Although the Mexican government has spoken a great deal about the need to protect migrants crossing through the country, there is no meaningful evidence that authorities have made significant progress in investigating or punishing the criminal groups or the police officers, soldiers, and INM agents that take advantage of vulnerable migrants. Despite the creation of several state-level specialized prosecutors' offices whose principal duty is to investigate and

prosecute crimes against migrants, punishment for these crimes continues to be extremely rare. In the state of Oaxaca, there have only been four sentences handed down for crimes against migrants in four years. Likewise, the presence of human rights commissions (federal and state) in the states through which migrants travel has led to few recommendations being issued to the institutions involved in migration enforcement. For example, of the 1,617 complaints received by the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institutions implicated in human rights violations.

While there has been little progress in fighting impunity, enforcement activities have escalated. Officials are detaining and deporting migrants rapidly; as a result, civil society organizations, human rights advocates, and asylum attorneys have few opportunities to hear migrants' stories about what they have experienced in Mexico or reasons why they have left their home countries. Furthermore, the increase in operations along train tracks and roadways has led to changes in traditional migration routes, especially for the most vulnerable migrants, who travel without human smugglers and are most dependent on the train to travel northward. Migrants and smugglers have gone back to clandestine routes that have now become more dangerous, including travel on foot or by sea. Therefore, a growing number of migrants that cross Mexico are practically invisible. If the Mexican government continues conducting migration enforcement under the same policy framework, using the same methods, and relying on the same corrupt and deficient authorities, it is likely we will know less and less about the migrant population's fate.

This report aims to assess the Mexican government's performance in investigating and punishing crimes and human rights violations against migrants traveling in an irregular situation, as well as against Mexican migrants crossing Mexico or who are deported from the United

States. Based on this analysis, the report sets out a series of recommendations for concrete and realistic policy changes that the Mexican government, and, where appropriate, the United States government, can make to prevent crimes and human rights violations against migrants.

In the long term, if the Mexican government truly intends to implement a migration policy that respects human rights, it is important that authorities more effectively investigate and sanction crimes and human rights violations against migrants, regardless of whether they have been committed by individuals, gangs, large organized crime networks, or public servants. Doing so would not only help protect one of the most vulnerable populations within Mexico's borders, but it would also strengthen the institutions responsible for enforcing migration policy in Mexico.

## METHODOLOGY AND COLLABORATION WITH MIGRANT SHELTERS AND DEFENDERS IN THE PRODUCTION OF THIS REPORT

This report is the result of close collaboration between the Washington Office on Latin America (WOLA), *Fundar, Centro de Análisis e Investigación*, and seven shelters and organizations that advocate for migrants' rights in five areas of Mexico:

- *Casa del Migrante de Saltillo "Frontera con Justicia," AC* in Saltillo, Coahuila;

- *Red Sonora*, a network of organizations located in the northern state of Sonora: Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN)* in Altar;

- *Albergue de Migrantes "Hermanos en el Camino"* in Ixtepec, Oaxaca;

- *La 72, Hogar—Refugio para Personas Migrantes* in Tenosique, Tabasco;

- *Un Mundo, Una Nación* in Apizaco, Tlaxcala; and

- The migrants' rights advocate, Irazú Gómez.

The document is based on a series of visits to the abovementioned shelters and organizations, interviews with personnel and the migrant population, interviews with local authorities, and an exhaustive review of the shelters' case documentation. A total of 30 interviews were conducted during the research for this report.[9]

The work of migrant shelters in Mexico is of the utmost importance in advocating for and defending migrants' human rights. These shelters, most of which are run by or in coordination with the Catholic Church, operate with minimal funds and few personnel. They represent the first line of defense for vulnerable migrants. They provide food, temporary refuge, clothes, and medical attention, in addition to making it possible for migrants to contact their families. Furthermore, they take statements and report crimes and human rights violations to authorities. In many cases, migrant shelter personnel have directly confronted corrupt or indifferent officials, or even members of organized crime groups. All too frequently, migrant shelter personnel throughout Mexico have been harassed and threatened as a result of their work.[10]

# THE SOUTHERN BORDER PROGRAM
## AS A FRAMEWORK FOR INCREASING MIGRATION ENFORCEMENT

## THE SOUTHERN BORDER PROGRAM

*Under Peña Nieto, these agents are violating rights under the cover of law, operations have resumed, and INM agents are being implicated as perpetrators— now, together with the Federal Police. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

With the Southern Border Program (*Programa Frontera Sur*), Mexico appears to be responding to pressure from the U.S. government following the mid-2014 "humanitarian crisis" of migrant children arriving at the U.S. border. The statement from the Office of the President of Mexico announcing the program indicates that the program aims to "protect and safeguard the human rights of migrants who enter and pass through Mexico, as well as establish order at international crossings to boost development and security in the region."[11] However, in its implementation, the Southern Border Program has focused mostly on migration enforcement, and, at its outset, on preventing migrants from using the cargo trains, known as "The Beast," as a means of transportation. Since then, the number of checkpoints and operations has continued to climb, resulting in large numbers of detentions and deportations.

## TABLE 1
## DETENTIONS AND DEPORTATIONS IN MEXICO
### BEFORE AND AFTER THE SOUTHERN BORDER PROGRAM

|  | JULY 2013 TO JUNE 2014 | JULY 2014 TO JUNE 2015 | PERCENT INCREASE |
|---|---|---|---|
| TOTAL DETENTIONS | 97,245 | 168,280 | 73 |
| DETENTIONS OF CENTRAL AMERICANS | 91,905 | 156,992 | 71 |
| DETENTIONS OF MINORS (FROM ALL COUNTRIES) | 17,092 | 27,513 | 61 |
| TOTAL DEPORTATIONS | 86,692 | 141,290 | 63 |
| DEPORTATIONS OF CENTRAL AMERICANS | 84,457 | 138,451 | 64 |
| DEPORTATIONS OF MINORS (FROM ALL COUNTRIES) | 13,925 | 21,935 | 58 |

*Source: Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias 2013, 2014, 2015, http://bit.ly/1jMKo18.*

On July 8, 2014, one day after President Peña Nieto announced the Southern Border Program, the "Decree creating the Coordinating Office for Comprehensive Attention to Migration at the Southern Border" (*Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur*) was published in Mexico's Official Federal Gazette (*Diario Oficial de la Federación*). This document revisits the 2014-2018 National Security Program's "consolidation of the Comprehensive Strategy for Attention at the Southern Border." Nevertheless, no public policy document exists to substantiate the Decree.[12]

The shelters and organizations involved in the production of this report are located in places that were traditionally "obligatory" on the route taken by migrants passing through Mexico, as they are locations through which the cargo train passes and where migrants may get off or on the train. Since late 2014, some shelters have seen a decrease in the flow of migrants arriving at their doors, as is the case of the shelters in Ixtepec and Saltillo. For example, the shelter in Ixtepec, which once received approximately one thousand migrants per month, now sees no more than an average of 100 migrants per week.[13] In Tlaxcala, an increase in the presence of security agents on the train (Auxiliary and Urban Security Forces of the State of Mexico, *Cuerpos de Seguridad Auxiliar Urbana del Estado de México*, CUSAEM), in addition to the barriers ("*barrotes*") put up on one side of the train tracks that traverse Apizaco mean fewer and fewer migrants are now using the train.[14]

In its first report, the Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur*, CAIMFS) notes that:

> The government of the Republic, via the different federal agencies responsible for handling migration, has taken actions designed to implement the provisions of that strategy; such is the case of the operations launched on August 1, 2014 to afford safety to migrants who were using the train from the Isthmus of Tehuantepec to travel within the country. This operation is being successfully coordinated by the National Migration Institute (*Instituto Nacional de Migración*, INM) (…). In it, the INM is joined by different federal government agencies such as (…) [the] federal Attorney General's Office (*Procuraduría General de la República*, PGR), the Army (*Secretaría de la Defensa Nacional*, SEDENA), the Federal Police, the Navy (*Secretaría de Marina*, SEMAR), in addition to the Government of the State of Chiapas and representatives of the Isthmus of Tehuantepec Railroad.[15]

One consequence of the Southern Border Program has been an escalation in human rights violations against migrants during operation, detention, and deportation processes, including in the methods used to detect undocumented migrants (particularly the use of allegedly discriminatory criteria, such as physical appearance), the use of force in arrests, the difficulty in accessing humanitarian visas and asylum, and poor conditions in the migration detention centers.

*Many migrants report being chased by the INM for two hours through the woods, (with agents) running behind them, shouting things at them, physical aggressions, sometimes blows, sometimes they are robbed or their documents are taken from them, theft or extortion directly by the police and military, meaning they have to pay in order to pass through. —Emilie Viklund, La 72*

During migration enforcement operations, physical and psychological aggressions occur; in addition, migrants are stripped of their money and belongings. These operations have ironically been named "rescues" by the government, though most times this is not the case. Such operations have proliferated since mid-2014, but official figures about how often they occur are not consistent.

In response to an appeal for review of an information request filed with the National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales,* INAI), the INM provided the following information about the number of migration enforcement operations carried out. In 2013, 14,246 operations were conducted nationwide. In 2014, the number of operations surged to 20,074, that is, it grew by 41 percent. The increases were concentrated in the states of Chiapas, Tabasco, Oaxaca, and Guerrero, but there were also significant increases in Baja California,

Baja California Sur, Coahuila, and Sonora.[16] However, in response to another appeal for review of an information request filed with the INAI, the INM provided different figures: 16,181 operations in 2013 and 27,992 in 2014 (a 73 percent increase). The increases appear to be concentrated in the same states, but the change in Chiapas is far more pronounced (rising from 1,297 to 8,192).[17]

According to statistics published on the Migration Policy Unit's (*Unidad de Política Migratoria,* UPM) website, the INM detained approximately 60,000 foreigners between August and December 2014. This figure comes close to the one mentioned by INM Commissioner Ardelio Vargas Fosado during a press conference on March 3, 2015: 64,215 individuals were purportedly "rescued" by the INM during that same period. If the problems related to the operations and subsequent detentions and deportations were already known, it is likely that these problems have worsened due to the increase in operations, detentions, and deportations, and the speed with which they are occurring.

## THE PARTICIPATION OF SECURITY FORCES IN MIGRATION ENFORCEMENT OPERATIONS

Only the INM can verify the immigration status of foreigners in Mexican territory. The Migration Law, however, provides that other authorities may assist the INM in its control, verification, and enforcement functions (but they may not carry out such functions on their own).[20] In particular, the law states that the Federal Police shall act in support of and in coordination with the INM in its migration enforcement activities. The Migration Law Regulations specify that the INM should request the Federal Police's support when there is a presumed risk in the migration enforcement or verification operation to be conducted. The involvement of different security forces, such as the Federal Police and the Army (*Secretaría de la Defensa Nacional,* SEDENA), as well as the federal Attorney General's Office (*Procuraduría General de la República,* PGR), has become more frequent in migration enforcement operations since mid-

2014. From 2013 through July 2014—the month in which the Southern Border Program was announced—the average number of operations in which another authority participated alongside the INM was 125.8 per month. From July 2014 to April 2015, this number climbed to an average of 429 per month (see graphic 1).

Moreover, in June 2014, the INM and the Federal Police signed a cooperation agreement to provide support in the control, verification, search, and transfer of migrants, as well in securing the perimeters of migrant detention centers (Convenio de Colaboración para brindar apoyo en el control, verificación, revisión y traslado de migrantes, así como resguardo perimetral de Estaciones Migratorias); such agreement facilitates the involvement of the Federal Police in migration enforcement operations.[21]

# PARTICIPATION OF SECURITY AND JUSTICE AGENCIES IN MIGRATION ENFORCEMENT OPERATIONS



FEDERAL POLICE
STATE POLICE
MUNICIPAL POLICE

FEDERAL ATTORNEY GENERAL'S OFFICE
STATE ATTORNEY GENERAL'S OFFICE
UNIFIED POLICE (*MANDO ÚNICO*)

ARMY
NAVY

Source: Prepared by the authors with data from the Instituto Nacional de Migración's response to Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1RA3kuy.

*In the military zone in Tenosique, the local battalion has a hand in causing harm to migrants: at checkpoints they commit violations to the right of free transit, they ask for identification, commit sexual assault, we've also learned of the participation of soldiers in migrant smuggling, something that cannot be reported because of everything that it signifies. —Brother Tomás González, La 72*

In practice, it is very difficult to monitor the conduct of other authorities during migration enforcement operations with the INM because no clear regulations exist, nor are there control mechanisms in place. Statements from migrants and defenders reveal that the INM as well as other authorities, such as police and soldiers, commit human rights violations during the operations.

The operation conducted on May 1, 2015 in Tenosique, Tabasco illustrates a recurring pattern: agents used excessive force and threatened, pushed, and beat the migrants. Both INM and police agents were identified as perpetrators.

> The cargo train arrived at the Tenosique station at 6 p.m., where it stopped indefinitely; this made it possible for more than 100 migrants to climb aboard. Among this group of individuals were several families, women, children, and a 12 year-old girl. In this case, La 72 documented the presence of two vehicles, one from the Beta Group [Grupo Beta] and the other from the municipal police. Thereafter, you could hear how one of the train's operators said over the radio that [the train] was not going to move until the authorities arrived. At around 8 p.m. the federal assistant delegate and local delegate of the INM led an intense pursuit of the migrants who were on the train tracks and in the surrounding areas. Also involved were at least three Federal Police vehicles, two "volantas" [mobile checkpoints], two INM pickup trucks,

one Beta Group vehicle, and the federal assistant delegate's private vehicle. The La 72 team, exercising its right to observe, monitor, and document, witnessed the following: multiple detentions were made using verbal and physical aggression; one migrant who managed to escape the operation confirms that he was threatened with a firearm. The authorities involved in the operation used force to get people off the train by violently pulling them while the cargo train was in motion, thereby unnecessarily risking their physical integrity.[22]

The Migration Law and its regulations are not clear as to the objective and scope of the involvement of other authorities and there are no specific guidelines that regulate or limit the use of force. There are general agreements in place and the INM requests support for each operation through official letters. Nonetheless, all of the aforementioned authorities have their own different internal rules, practices, and issues. Hence, it is important that the Ministry of the Interior (*Secretaría de Gobernación*, SEGOB) develop clear regulations for the conduct of such operations that take into account the complaints of excessive use of force by the INM and other authorities.

It is likewise important to point out that, in addition to the migration enforcement operations coordinated by the INM, other authorities also conduct migration enforcement operations separately, despite the fact that such operations fall exclusively within the jurisdiction of the INM.

This pattern is illustrated by the June 14, 2015 testimony from "Antonio" (pseudonym), a deported Mexican migrant:

> I was in the DeConcini [Nogales] station four days after the last time they deported me. I was seated on the benches in the hallway where you go into immigration. It was 7:00 in the morning. Two officers arrived by bike wearing green vests [tourist police] and asked me where I was from. I told them from Chihuahua. They didn't believe me, they handcuffed me, and took me away by force, kicking me in the shin; I wasn't drunk or high or anything, nothing. They called for a patrol car and put me in. The judge told me I wasn't Mexican, that I was from Honduras. He made me sing the national anthem to him three times and tell him the names of two presidents we've had. I did, and even so, he locked me up and told me they were going to keep me detained for 36 hours. I was locked up. After 15 hours I began to pound on the bars so the judge would come. They came and handcuffed me to the bars and started slapping me.

> They left me there and about five hours later, the judge arrived. And he told me he was going to let me go. And he did, but very beaten up.[23]

Operations that consist of pursuits on public streets jeopardize the lives and safety of migrants. We became aware of several cases in which this type of pursuit of migrants resulted in migrants getting hurt, or in some cases killed.[24]

It is clear that the number of migration enforcement operations conducted by the INM with the support of other authorities has increased very rapidly since the Southern Border Program was launched. Without clear guidelines to regulate and limit the use of force and the role of the different authorities involved, it is difficult to monitor whether the operations are being conducted properly. In light of the multiple reports of human rights violations committed during operations, and the documentation of several incidents in which migrants have been hurt or have lost their lives because of them, the intensification of operations aimed at enforcement and detention is concerning.



*INM van in Nogales, Sonora*

## BUDGET

The Mexican government executes its budget through budget programs. Proposed spending for a fiscal year is published in the Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*, PEF). After the necessary adjustments and execution of the PEF, the Public Account is published the following year. It is revealing to see the amounts approved by Mexico's Chamber of Deputies for some budget programs related to migrants, in particular, those of the INM, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR), the UPM,[25] and the CAIMFS (see table 2). This, bearing in mind that public policies without adequate resources for their implementation are nothing more than demagogy.

## TABLE 2
# FEDERAL EXPENDITURES BUDGETS (PEF)
## BY BUDGET PROGRAM AND RECIPIENT UNIT

| BRANCH / BUDGET PROGRAM (ADMINISTRATIVE UNIT IN CHARGE) | PEF 2012 | PEF 2013 | PEF 2014 | PEF 2015 |
| --- | --- | --- | --- | --- |
| BRANCH: 04 INTERIOR | – | – | – | – |
| E006 REFUGEE ASSISTANCE SERVICES (COMAR) | 22,256,164 | 24,618,444 | 25,661,594 | 25,308,083 |
| E008 MIGRATION SERVICES AT BORDERS, PORTS, AND AIRPORTS (INM) | 1,997,490,727 | 2,024,924,785 | 2,173,783,360 | 1,966,084,661 |
| P019 COORDINATE MIGRATION POLICY (UPM) | 16,910,321 | 13,043,403 | 63,014,070 | 62,876,173 |
| P019 COORDINATE MIGRATION POLICY (CAIMFS) | - | – | – | 102,011,743 |

*Source:* *Prepared by Rodolfo Córdova, Fundar researcher, using data from the Secretaría de Hacienda y Crédito Público. Data from 2015 can be found in the 2015 PEF: http://bit.ly/1L8WMCT. The values for 2012, 2013, and 2014 taken from the corresponding PEFs: http://bit.ly/1aEFG0g. However, they were adjusted for inflation (meaning that they are real, not nominal, amounts). 2015 is the base year (=100) and all of the amounts are in Mexican pesos.*

Table 2 shows the evolution of the budgets for COMAR (which has remained the same over the past three years), of the INM (which has remained high), and of the UPM (which shows a clear increase), and we can see the creation of the CAIMFS (which has a higher budget than that of the UPM).

It is worthwhile to note what was actually spent in the specific case of the INM (see table 3). What is striking is the difference between the approved budget and the actual expenditures by the INM.

This is because the Chamber of Deputies approves only current expenditures (salaries and wages) and operations costs for the first quarter. The INM generates some of its own revenues, including from the collection of fees and fines. The actual expenditures by the INM have increased year after year and have never been as high as they were 2014: in that year, the difference between the approved budget and the INM's expenditures reached 70 percent.

## TABLE 3
# INM APPROVED BUDGET VS. EXPENDITURES

| YEAR | APPROVED BUDGET (PEF) | EXPENDITURES (PUBLIC ACCOUNT) | DIFFERENCE (EXPENDITURES VS. BUDGET) | PERCENT INCREASE |
|---|---|---|---|---|
| 2009 | 1,956,019,701 | 3,037,482,050 | 1,081,462,348 | 55 |
| 2010 | 2,096,784,055 | 3,312,537,612 | 1,215,753,558 | 58 |
| 2011 | 1,982,853,338 | 3,314,831,343 | 1,331,978,006 | 67 |
| 2012 | 1,996,619,411 | 3,358,490,502 | 1,361,871,091 | 68 |
| 2013 | 2,025,574,493 | 3,363,374,620 | 1,337,800,127 | 66 |
| 2014 | 2,173,783,360 | 3,701,746,413 | 1,527,963,053 | 70 |
| 2015 | 1,966,084,661 | – | – | – |

Source:  Prepared by Rodolfo Córdova, Fundar researcher, with data from the Secretaría de Hacienda y Crédito Público. The 2015 data are available in the 2015 PEF: http://bit.ly/1L8WMCT. The amounts from 2009-2014 were taken from the corresponding PEFs, available at: http://bit.ly/1aEFG0g, and were adjusted for inflation (the amounts are real not nominal). 2015 is the base year (=100) and all amounts are in Mexican pesos.

When we study the expenditures authorized each quarter by the Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*), we see that as of the first quarter of 2014 expenditures rise in lock step with the increase in migrant detentions (see graphic 2).[26]

## GRAPHIC 2
# INM BUDGET VS. APPREHENSIONS



Source:  Prepared by Rodolfo Córdova based on the quarterly reports of the Secretaría de Hacienda y Crédito Público, available at: http://bit.ly/1FLxfiM.

The parallel increase in the budget and the number of detentions confirms that the INM has indeed intensified its enforcement, despite the adverse impacts these processes have on migrants' human rights. In order to track such trends for the entire federal public administration, there must be progress in developing a cross-cutting annex in the PEF for migrants, a tool that would identify the resources allocated to migration-related agencies. This would increase transparency and could be a solid foundation for redistributing resources in order to protect human rights. In addition to the SEGOB, INM, and COMAR, it goes without saying that the Federal Police, the PGR, and the CNDH should also be included in said exercise. The annex is an important commitment included in the Special Migration Program (*Programa Especial de Migración*, PEM), a recently created program that was prepared with extensive involvement of civil society. In contrast, neither the basic program budget nor the budgetary structure of the Southern Border Program and the CAIMFS is known, which casts a shadow over what the PEM could have achieved for migrants and their families.

## COOPERATION WITH THE UNITED STATES

Mexico's Southern Border Program followed a dramatic spike in the number of unaccompanied minors and families arriving at the United States' southern border from Central America. The Obama administration's response to this crisis is at least in part responsible for Mexico's new focus on migration enforcement, particularly the expedited deportation of Central American migrants, including unaccompanied minors. During the first months of 2014, the number of Central American children, whether accompanied or not, who arrived at the U.S. border grew markedly. In January 2014, the U.S. Border Patrol, an agency of the Department of Homeland Security (DHS), detained 3,711 children; in June 2014 that figure had reached 10,631, more than double the number of detentions in June 2013.[28]

The U.S. government has provided assistance to the Mexican government for border security and migration enforcement principally through the Merida Initiative, a security aid package. Congress has approved US$2.4 billion in Merida aid since 2008; approximately US$1.5 billion has been delivered.[29] As part of this support, the government of the United States delivered more than US$90 million to the INM through fiscal year 2012, primarily in equipment and training.[30]

The Merida Initiative is organized in four "pillars," the third of which is to "create a 21st century border structure," further described by the Department of State as facilitating "legitimate commerce and movement of people, while curtailing the illicit flow of drugs, people, arms, and cash."[31] While this third pillar of the Merida Initiative initially focused on the border between the United States and Mexico, much of the cooperation has clearly moved to Mexico's border with Guatemala and Belize. In July 2014, Ambassador Tom Shannon, Counselor of the State Department, revealed that the State Department was working with the government of Mexico on enforcement at its southern border, providing some US$86 million in funds already included in Merida through the International Narcotics Control and Law Enforcement (INCLE) account. Furthermore, Congress allocated up to US$79 million in additional funds in fiscal year 2015 for this same purpose.[32] It is important to keep in mind that U.S. assistance to Mexico for migration enforcement and border security has been provided not only to the INM, but also to Mexico's customs agency (*Servicio de Administración Tributaria*, SAT), Navy (*Secretaría de Marina*, SEMAR), Army, and the Federal Police. This support ranges from non-intrusive scanning equipment, to helicopters, patrol boats, information technology, biometric kiosks, workshops, and training sessions.[33]

It is clear that this type of assistance will continue and will likely be expanded due to the concern

about Central American migration expressed by members of the U.S. Congress and by executive branch officials. Such concern has continued to grow since the "surge" in the number of Central American children arriving at the United States' southern border in the summer of 2014. Members of the U.S. Congress have expressed their support for the Southern Border Program on several occasions over the past year. In fact, some members of Congress have made statements in which they call on Mexico—and in some cases on the countries of Central America—to take additional measures to stem the flow of Central Americans through Mexico.[34]

Conversely, few members of Congress have expressed concern over how vulnerable migrants in Mexico are.[35] They have more often expressed doubts over whether Mexico is doing enough to detain migrants who cross through the country. Statements of that kind were heard particularly frequently in the months after the "crisis" of unaccompanied children reached its climax in the summer of 2014.[36]



*Fray Tomás González, Director of La 72, Hogar—Refugio para Personas Migrantes*

# HUMAN RIGHTS VIOLATIONS
## AND CRIMES AGAINST MIGRANTS

This section provides an overview of the current situation regarding human rights violations and crimes against migrants. Existing documentation makes clear that migrants in transit through Mexico are victims of multiple crimes and human rights violations, such as kidnapping, human trafficking, enforced disappearance, sexual violence, assault, and aggravated robbery. Despite various efforts to quantify these incidents, it is not precisely known how frequently they occur. As a result of the challenges mentioned in this section, there is likely a significant under-reporting of human rights violations and crimes against migrants.

There have been several studies on the subject of crimes and human rights violations against migrants, including two special CNDH reports on migrant kidnappings from 2009 and 2011[37] and two recent reports from the Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*, REDODEM) from 2013 and 2015.[38] Additional data and information has been made available by Mexican authorities (the federal and state attorneys general offices) in their responses to several information requests. Nevertheless, all these sources have their own limitations. The CNDH data, for example, are limited to kidnappings and are from 2009 to 2011. The REDODEM data, for its part, only include the cases of migrants who arrived at one of the network's shelters and decided to share their experiences, while government data only include the few cases in which migrants made the decision to file a complaint.

This report does not seek to provide definitive estimates about the frequency of crimes against migrants in Mexico. However, it does include recent data and experiences documented by migrant shelters, alongside previously unreleased government data and data from other sources, underscoring the need to generate, systematize, and publically disseminate greater information about patterns of crimes and human rights violations against migrants.

## KIDNAPPINGS

The kidnapping of migrants was widely documented in the 2009 Special Report prepared by the CNDH, which included migrant testimony taken during a series of visits to migrant shelters and detention centers. In 2011, the CNDH updated this information in a second Special Report, which estimated that 20,000 migrants were kidnapped in a single year. It is not known whether kidnappings have increased or decreased since then; data from migrant shelters appear to indicate an increase from 2013 to 2014, but the evidence is not sufficient to draw definitive conclusions or to make projections about trends on a national level. (It should be further noted that the data from the shelters reflect cases documented in a single location, even though the events may have transpired elsewhere.) Other sources have broader geographic coverage (the CNDH reports are based on case documents that include information from the entire country).[39]

TABLE 4
# MIGRANT KIDNAPPING CASES
## DOCUMENTED BY MIGRANT SHELTERS

| YEAR | LA 72, TENOSIQUE, TABASCO | CASA DEL MIGRANTE DE SALTILLO, COAHUILA | RED SONORA |
|---|---|---|---|
| 2013 | 10 | 7 | – |
| 2014 | 33 | 15 | 31 |
| 2015 (JAN-APR) | 3 | – | 3 |

Source: Cases documented by La 72, Casa del Migrante de Saltillo, and the Red Sonora.

Documentation carried out by migrant shelters and organizations also makes it possible to identify trends and changes in the pattern of kidnappings. Migrant kidnappings in Mexico have long been known to occur along the train route; organized crime groups have occasionally worked with corrupt train operators to stop the train and force the migrants off, sometimes in large groups. There have also been cases in which migrants have been taken off of buses or taken away from bus stations or hotels using force or deceit. Now that fewer migrants are traveling by train, migrant shelters report that this latter form of kidnapping appears to be more common. Mass kidnappings seem to occur less frequently; migrants tend to be abducted in small groups or one by one. In some cases, criminals force smugglers to turn migrants over to them once they reach a certain point along the route.[40]

Victims are taken to "safe houses" for several days and are forced, by means of threats, beatings, and sometimes even torture, to provide the phone numbers of their relatives in the United States or in Central America, who they then contact to request money, sometimes thousands of dollars, via money transfer services such as Western Union or MoneyGram. Once kidnapped, migrants may also be forced to work on an ongoing basis or until the criminals decide the migrants have worked enough to be taken across the border into the United States. In other cases, they may be killed if their relatives fail to pay the ransom.

The principal reason that criminal groups abduct migrants is to hold them for ransom, but there have also been reports of migrants who were kidnapped in an apparent attempt to deter them from traveling within a certain area that is important for drug trafficking.

*Regarding kidnappings, they've been happening in groups, with Central Americans. People were tortured not so much to demand money but to send a message. In two of the kidnappings, the messages were that they didn't want Central Americans passing through the area.* —Perla Del Angel, Centro de Recursos para Migrantes

## HUMAN TRAFFICKING

Migrants in Mexico, both Mexicans and foreigners, have been identified as being particularly susceptible to human trafficking. Most foreign victims of human trafficking in Mexico hail from the Americas, especially Guatemala, El Salvador, and Honduras.  In a number of cases, migrants become victims of human trafficking because they are unable to pay their smugglers and are therefore forced into labor or into performing sex work to pay off their debts. In other cases, criminal groups kidnap migrants not only to ask for ransom, but also to force the migrants to work in drug trafficking as "mules" or in marijuana or poppy fields.[42]

The testimony given by "Hugo" (pseudonym), a 23-year-old Mexican who was deported after living nearly all his life in the United States, provides a detailed description of the horror of experiencing human trafficking first hand.

> I was deported to Nogales, Sonora and started looking for work. A man offered me work and I went to work at his house. After a few days of work he refused to pay me and told me I had to work for him and if I didn't, that they were going to kill me. Several armed men arrived and beat me and put me in the trunk of a car where they kept me for 12 hours. They took me to a room where there were about 7 or 8 other people. They took us to work in a covered truck and made us dig tunnels.

I would remove the bags of dirt and haul them to the truck. We would work all night long and they would take us back to the room in the morning. They wouldn't let us sleep. If we fell asleep they would throw cold water in our faces or kick us in the stomach. They beat us whenever we asked for food or water and threatened to kill us if we refused to cooperate. They took away some of the abductees when they became weak from hunger and had gone crazy, saying "their time has come." Twice they made me clean the bathroom and it was full of blood. I didn't know if they had killed the people they took away, but those people never returned. I was held hostage and forced to work for nearly a month. I was finally able to escape with some others and we came across the municipal police. We asked for their help, but they ignored us and drove away in their car. Since then, I have felt like they were after me.[43]

There have also been reports that some government officials are directly involved in human trafficking networks. For example, in 2013, the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*, FEVIMTRA) detained INM officials and other public servants in connection with human trafficking.[44]

## SUMMARY EXECUTIONS

The most infamous and horrendous crime committed against migrants in transit through Mexico is the massacre of 72 migrants on a ranch in the municipality of San Fernando in the state of Tamaulipas. The migrants, the vast majority of whom were from Central and South America, were taken off buses and murdered between August 22 and 23, 2010. Their bodies were discovered on August 24, 2010[45] after one of the three survivors—an Ecuadorian who had

been shot in the face and neck—escaped and walked several miles to alert the authorities, who, when they arrived at the ranch, found that the 72 migrants had been summarily executed and their bodies tossed in the ground.[46]

A number of theories exist as to why the migrants were killed: the most widely accepted is that they had refused to work for an organized crime group.[47] Declassified documents from the Mexican

government regarding the massacre include the testimony of a member of the *Los Zetas* criminal organization in which he alleges that the local municipal police were accomplices in the crime.[48] Less than one year later, in April 2011, the remains of 193 individuals were discovered in clandestine mass graves in that same town in Tamaulipas, and in May 2012, the remains of 49 others were found in Cadereyta, Nuevo León. In the latter two cases, the victims were both Mexicans and Central Americans (though there continue to be unidentified remains) who were heading to the U.S.-Mexico border.[49]

## ENFORCED DISAPPEARANCES

The United Nations Committee on Enforced Disappearances, in its recommendations to the Mexican government in February 2015, expressed concern for the vulnerability of migrants in Mexico, especially minors, given the problem of enforced disappearances.[50] Several Mexican civil society organizations and migrant shelters work directly with committees of Central American families established to search for disappeared migrants. Furthermore, for the last ten years a caravan has been organized every year for Central American mothers searching for their children who disappeared in Mexico.[51]

Nevertheless, as is the case with other human rights violations , it is a challenge to quantify disappearances of migrants in Mexico. In the Inter-American Commission on Human Rights (IACHR) 2013 report on the human rights of migrants in Mexico, the IACHR highlights that there is no single registry of disappeared migrants and that authorities do not keep consistent figures. Furthermore, the *Fundación para la Justicia y el Estado Democrático de Derecho*, a civil society organization with expertise in the topic, underscores that there is no certainty about number of disappeared persons in Mexico, and even less so in the case of migrants.[52]

## SEXUAL VIOLENCE

According to the information collected by migrant shelters, migration flows through Mexico have always included women, even if male migrants remain the majority. The likelihood that women and girls will be victimized during their transit through Mexico is high. Sexual violence has become a part of the journey through Mexico, especially for female migrants; indeed, it is well known that Central American women inject contraceptives to avoid becoming pregnant from their potential rapists. It has also been reported that men have been victims of this kind of violence.[53] The IACHR, in its 2013 report, documented different cases of sexual violence, assaults during kidnappings, and sexual exploitation. It also reported on the case of a 15-year-old Honduran girl who was sexually assaulted by an INM official in Tenosique, Tabasco. With regard to this case, the CNDH issued "Recommendation No. 54/2012, On the sexual assault case involving the migrant minor V1," on September 28, 2012, so that the INM would take measures against the local delegate and four other officials.[54]

It is difficult to document cases of sexual violence because the victims may be afraid, feel embarrassed, or have internalized what they suffered. In Tabasco, there has been an increase in the lesbian, gay, bisexual, and transgender population, which are also sometimes victims of sexual violence.[55]

"Natalia" (pseudonym), a Honduran woman who was staying at the *La 72* shelter decided to file a sexual assault complaint with the Specialized Prosecutor for Attention to Migrants (*Fiscalía Especializada para la Atención a Migrante)* in Tenosique, Tabasco. A month before, the young woman was threatened at gunpoint and forced to have sexual relations with a human smuggler in a hotel in Tapachula, Chiapas. Several days

after she managed to escape, she was detained by the INM and deported to Honduras without anyone confirming her status as a victim. When she crossed the southern border of Mexico for the second time and reached *La 72* in Tenosique, Tabasco, she was provided legal assistance and decided to report these events. The only result she obtained was that the prosecutor's office decided to give jurisdiction of the case to the state of Chiapas, so that it could be investigated there. Natalia is awaiting a decision on her application for a humanitarian visa.[56]

## ROBBERY, ASSAULT, AND EXTORTION, ACCOMPANIED BY PHYSICAL AND PSYCHOLOGICAL ABUSE

Robbery, assault, and extortion are among the most frequent crimes committed against migrants. The number of reported crimes indicates that there was an increase in robberies committed from 2014 to 2015 in the states of Chiapas, Oaxaca, and Tabasco. The Tabasco prosecutor's office, for example, reported that there were 26 reports of robbery between July 2013 and May 2014, while there were 35 in the same period from 2014 to 2015.[57] Documentation by migrant shelters reveals a proliferation of perpetrators since the implementation of the Southern Border Program. Common criminals and members of organized crime, as well as public officials, commit these offenses, which in the first place constitute property crimes, but are also routinely accompanied by torture, cruel treatment, or in the worst case, loss of life.

When public officials commit these crimes, however, they are also commiting human rights violations, as these authorities are harming an individual's security. Furthermore, it should be noted that, almost invariably, multiple violations are committed as part of what might seem to be a single incident: for example, a migrant may be threatened or beaten when robbed, just as a migrant that is kidnapped may be forced to work (trafficked).

In 2014 authorities participated in one out of every five crimes against migrants (20.16 percent) that were documented by REDODEM members. The most frequent crimes were robbery and extortion. Among the authorities who are most often implicated as perpetrators in these cases, the involvement of the Federal Police, in 41 percent of the cases, and of the municipal police, in 23 percent, is striking.[58]

It is important to distinguish between larceny, aggravated robbery, assault, and extortion. All of these acts involve taking possession of the victim's property. What changes is the seriousness of the crime according to the kind of harm inflicted on the victim and society. In cases of extortion, the migrants are forced (by intimidation, for example) to surrender their property. In cases of robbery or assault, property is taken violently and by force (the harm always goes beyond the victim's property and is therefore considered serious). Extortion also involves harm that surpasses property because it is an attack on the integrity and freedom of the victim who is forced to do something prohibited by law or to allow the official in question to omit doing something he or she should do in the performance of his or her duties. Article 164 of the Mexican Federal Criminal Code provides that extortion is aggravated when it is committed by public officials, particularly by law enforcement or the armed forces.[59]

Both robbery and extortion are committed by individuals, as well as by authorities, including the Federal Police, the INM, and local police. A common pattern in the case of migrants is that an individual or official will demand money in order to let migrants continue their journey. Thus, the journey carries a price above and beyond the fee that in many cases they have already paid to a coyote to leave their countries. These acts go hand in hand with threats and attacks which, when

committed by public officials, constitute cruel treatment, and in some cases torture.

We were having dinner in the Federal District, there in Lechería opposite the metro station. Some 10 minutes after dinner a Mexican man came and began to chat. He began asking whether we had crossed [the border], whether it was the first time, and we fell into the trap of listening to him and chatting. After 15 minutes of chatting a private passenger car—a Chevy—arrived. A screech of brakes could be heard. The driver got out, as well as the passenger, and came over to us and told us, "We are the state police and I'm going to take you in." He had a uniform on, but it was under his jacket. One of them had an earring. "Get in," he ordered. They were threatening me with an Uzi. They put me in the car. Another fellow traveler ran. In the truck there was a civilian and two police officers. The driver was not a police officer. They took me about a kilometer and a half south of the station. There they asked us for money; otherwise, they were going to kidnap us for a long time until we paid the ransom. They asked us to hand over what we had, otherwise the ransom would be US$10,000. Behind the car a seven-man patrol arrived in a state police car. They took our clothes, all of them, so we wouldn't escape. There were two of us. The third guy had run. We gave them the MXN$2,000 we had on us. They left us naked and without shoes, without anything. The police officers from the patrol car were guarding the area. My fellow traveler was from Durango. We saw a Federal Police car approaching. We took advantage of that moment to run and flee. We headed for the woods. I covered myself with a shirt that I found.

When a man saw that we were bound for the woods, he helped us. He took us to his house and gave us clothes and shoes because he said, "Here all the police rob you." And he told us to be very careful because if they did find us, they would kill us for having escaped. We waited until dawn and went to the train station. I filed a complaint in Guadalajara, Jalisco, at the FM4 [*FM4 Paso Libre*, a civil society organization] but I didn't want to wait six months to follow through on it.[60]

The shelters and organizations involved in this report have documented many cases and testimonies regarding robbery, assault, and extortion, and have established some clear patterns. In Tabasco and the Isthmus of Oaxaca, the pattern of assaults has changed since the end of 2014 because migrants can no longer reliably use the cargo train for transportation. Local authorities, as well as the staff of the migrant shelters *Hermanos en el Camino* in Ixtepec and *La 72* in Tenosique, have identified some very specific places where these attacks take place. The migrants recount in their testimonies that they are assaulted by groups of individuals with Mexican accents that seem to know the area well. Sometimes these individuals even offer food and lodging, only to later attack them with machetes or other weapons and take everything from them. In these cases, certain locations are repeatedly mentioned: the area between Arriaga, Chiapas and Ixtepec, Oaxaca (in particular Corazones), as well as the area surrounding Tenosique, Tabasco.

In Tenosique, the data from the shelter *La 72* shows that the majority (89 percent) of the cases documented in 2013 were assaults or extortions. In 2014, in addition to a high number of assaults and extortions, other crimes, including abuse of authority linked to migration raids, became increasingly common (see table 5).

## TABLE 5
## CASES OF ASSAULT AND EXTORTION OF MIGRANTS
### DOCUMENTED BY LA 72

| YEAR | VICTIMS (TOTAL) | ASSAULTS | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 | 1,108 | 745 | 236 | 127 |
| 2014 | 1,497 | 595 | 218 | 684 |
| 2015 (JAN–APR) | 476 | 189 | 60 | 227 |

*Source: Documentation records from La 72. The column labeled "victims" refers to the number of cases La 72 documented and accompanied. The total number of crimes committed may actually be even higher.*

Both shelters, as well as prosecutors from Ixtepec and Tenosique, mentioned in interviews that despite the frequency of the robberies, assaults, and extortion in the area, authorities' response to reports filed has been limited. Surveillance operations were conducted in the areas identified by migrants, but investigative police have not found any suspects. Three Honduran migrants identified the INM as the perpetrators of robbery and intimidation.

> We filed a report of our robbery; it was committed by INM agents. We entered in Mexico via el Ceibo, and when we were 11 kilometers from Tenosique we were already tired and our feet were very sore. We encountered an INM patrol but we didn't run. Four migrants who were with us did run. Four INM agents got out of the car, searched our bodies, our things, and then asked if we had dollars. They took the backpack and MXN$500 from one of us. Afterwards we went into the reed bed and an agent yelled: "Fire away at those bastards!" We took off. We hid for a while, and when we came out, we continued our journey. When we got to Tenosique, we filed a report with the PGR but it wasn't handled well.[61]

In the north of Mexico, in particular in Saltillo, Coahuila and the border zone of Sonora, cases of robbery and extortion committed by authorities have been documented and the involvement of police forces is striking. In 2014, the Federal Police was accused of being responsible in 37 of the 66 cases of extortion documented by the *Casa del Migrante de Saltillo.*

## TABLE 6
## CASES OF ROBBERY AND EXTORTION OF MIGRANTS COMMITTED BY AUTHORITIES
### DOCUMENTED BY THE CASA DEL MIGRANTE DE SALTILLO

| YEAR | TOTAL CASES | ROBBERY | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 (JUL-DEC) | 113 | 26 | 38 | 49 |
| 2014 | 149 | 37 | 66 | 46 |

*Source: Documentation records from the Casa del Migrante de Saltillo.*

The cases systematized by the three organizations that make up the *Red Sonora* reveal that the cases of extortion are crimes against property, but also against liberty. For example, State agents detain migrants for purposes of extorting them at a checkpoint on the road. Sometimes they put them in patrol cars, take them to other places, and bring them back by bus, in something akin to an express kidnapping. In Sonora, the cases of both extortion and robbery involve restrictions on free transit, arbitrary detentions, threats, and cruel treatment.

The authorities that are most frequently accused of being perpetrators are the Federal Police and the Municipal Preventive and Transit Police, but also noteworthy is the involvement of the State Security Police, Federal Protection, and the INM. Testimonies recount the collusion of some authorities in organized crime. These cases are difficult to document because migrants often fear reprisal.

## TABLE 7
## CASES OF ROBBERY, EXTORTION, TORTURE, CRUEL TREATMENT, AND THREATS AGAINST MIGRANTS
### DOCUMENTED BY THE RED SONORA

| YEAR | ROBBERY | EXTORTION | TORTURE | CRUEL TREATMENT | THREATS |
|---|---|---|---|---|---|
| 2014 | 35 | 49 | 15 | 43 | 11 |
| 2015 (JAN-JUN) | 8 | 25 | 6 | 18 | 9 |

*Source: Red Sonora case registry.*

From the point of view of migrant rights advocates, robbery, assault, and extortion of migrants have always been frequent and persist to date. However, now that flows are not concentrated on trains, the places where the crimes occur and the perpetrators have proliferated. As highlighted previously, since the Southern Border Program was announced in July 2014, there has been a deployment of migration and security authorities nationwide and there seems to be greater coordination between the INM, Federal Police, and local police. The number of migration operations carried out has risen in general, as has the number of operations in which an authority other than the INM, like the Federal Police, is involved. This has led to an increase in migrant detentions. This same deployment and coordination, in addition to offending the dignity of those individuals subject to the verification and detention processes, may have led to a mushrooming of actors who abuse and take advantage of migrants. Furthermore, as will be described later, the fact that prosecutors' offices, in particular specialized prosecutors' offices, report meager results in investigating these cases, underscores an implicit message: it is extremely unlikely that those who rob, assault, extort, threaten, or torture a migrant will be punished.



*Mural at the migrant shelter Hermanos en el Camino in Ixtepec, Oaxaca*

# DOCUMENTATION OF HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN SONORA

The organizations that make up the *Red Sonora* ("Sonora Network")—Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado* (CCAMYN) in Altar—have devoted themselves to providing assistance to migrants in the Sonora desert region that borders the state of Arizona. The migrants they help are mostly Mexicans and Central Americans. Having seen how violence and abuse committed by authorities was becoming increasingly common, these organizations decided to strengthen their documentation and advocacy efforts. About two years ago the organizations began documenting cases of human rights violations against migrants because clear patterns had emerged of authorities' involvement in the abuse of migrants in a context of almost complete impunity.

> *Abuses happen and nothing happens. The authorities then take advantage to diminish resources. There is no intention of wanting to help. The treatment we give our brothers is shameful. A trip from Hermosillo to Los Angeles by plane costs US$1,000 and migrants pay up to US$8,000 without any assurances and they are treated inhumanely. You can't even compare.* —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado

Documentation is a process by which the collection of key data about cases (in this instance, migrants and their experience during transit through or deportation to Mexico) enables the identification of patterns of abuse and the monitoring of cases. It entails the creation of a methodology and system that, in addition to recording migrants' personal data and the types of assistance provided to them, such as meals or lodging, includes variables about human rights violations and the authorities identified as responsible by the migrants. The system of the *Red Sonora* is special because it is shared in real time.

**THE MOST IMPORTANT FINDINGS THAT HAVE EMERGED FROM THIS EFFORT, WHICH INCLUDE 215 CASES (151 CASES DOCUMENTED IN 2014 AND 64 CASES FROM JANUARY TO JUNE 2015) ARE THE FOLLOWING:**

1. The Federal Police is the authority that is most frequently singled out as responsible for the human rights violations against migrants documented by the *Red Sonora*: 64 of the 215 cases (29.8 percent). It is followed by the Municipal Transit and Preventive Police (*Policía Preventiva y Tránsito Municipal*, PPTM) with 49 cases (22.8 percent). The

involvement of the PGR and the State Security Police also stands out (both at 16 cases or 7.4 percent). Finally, Federal Protection (which provides surveillance and security for federal government officials, assets, and buildings) is implicated in 15 cases (seven percent).

The patterns of human rights violations that the Federal Police and the PPTM commit against migrants are very similar. First of all, they violate the right to personal liberty (through the restriction of free transit, arbitrary detention, and kidnapping); secondly, they violate property rights (through extortion and robbery); and thirdly, they violate humane treatment (through cruel treatment, torture, and threats). This shows that these authorities first detain migrants and use excessive force or physical or psychological violence in order to then take their money and belongings. Although the patterns are similar, there are important differences.

## GRAPHIC 3
## AUTHORITIES IMPLICATED AS PERPETRATORS
### CASES DOCUMENTED FROM JANUARY 2014 TO JUNE 2015



**MUNICIPAL TRANSIT AND PREVENTIVE POLICE 22.8%**

**STATE SECURITY POLICE 7.4%**

**FEDERAL ATTORNEY GENERAL'S OFFICE 7.4%**

**POLICE 7.0%**

**FEDERAL PROTECTION SERVICE 7.0%**

**INM 4.6%**

**OTHER ACTOR / GANG 4.2%**

**OTHER ACTOR / PRIVATE SECURITY 1.9%**

**STATE INVESTIGATIVE POLICE 1.9%**

**TOURISM POLICE 1.9%**

**OTHER ACTOR / SMUGGLER 0.9%**

**FEDERAL POLICE 29.8%**

**UNIDENTIFIED 0.5%**
**NAVY 0.9%**
**ARMY 0.9%**
**U.S. BORDER PATROL 0.9%**

**215 CASES TOTAL**

*Source: Red Sonora case registry.*

2. Regarding the physical location where documented abuses occurred, there are differences in the authorities' conduct. In cases where migrants were assaulted during their journey by bus on the roadway, the involvement of the Federal Police is singled out in 36 of the 64 cases (56.3 percent, the majority in Sonora, close to where the organizations are located). While walking down the street, for example in Nogales, migrants are more often victimized by local authorities such as the PPTM (24 out of 49 cases, or 49 percent). Cases

of abuses also occurred frequently in specific places where authorities had identified the presence of migrants, including near government offices, on the train tracks, or in bus terminals. In these cases, which have been primarily documented in Nogales, both Federal Police and municipal police have been singled out as perpetrators.

3. The specific situation or circumstance that led to the human rights violation in 30.2 percent of all cases was a checkpoint on the roadway. In another 16.7 percent of the cases, the catalyst was that authorities identified an individual on the street as having "the appearance of a migrant." The latter reveals the problem of discrimination, especially on the part of the PPTM.

The importance of these findings lies in the identification of clear patterns of abuse on the part of authorities and in well-identified places. Nearly all migrants mention the same checkpoint on the roadway close to the Santa Anna crossroads in their testimony. There is also a strong presence of organized crime in the area, which may conceal even more abuses that migrants are reluctant to share. Collusion between organized crime and authorities is also a real possibility; as a result, the total number of abuses in which public officials have been involved is impossible to determine.

Finally, the Kino Border Initiative has discovered that migrants have suffered gross human rights violations at the Nogales train station. From April 2014 to February 2015, more than 60 migrants reported having suffered torture, cruel treatment (beatings, threats, and insults), as well as discrimination, at the hands of Federal Protection. For this reason, on February 18, 2015, the Kino Border Initiative filed a complaint with the CNDH, requesting an investigation and precautionary measures.



*Inside Centro Comunitario de Atención al Migrante y Necesitado in Altar, Sonora*

# DETENTION AND ACCESS TO THE RIGHT TO ASYLUM

Migrants, in their journey through Mexico, can be detained by the INM and "housed" at migrant detention centers or provisional holding facilities. Official Mexican government documents make no mention of migrant detentions, rather of "appearances" (*presentaciones*) and "housing" (*alojamiento*). Thus, the person detained is not immediately made available to the competent authority or brought before a judge. Detention is illegal if it is carried out without cause and it is arbitrary if, even where there is cause, it is carried out using methods that are inconsistent with human rights. It is important to point out that detained migrants must be immediately informed of the reason for their detention and the crimes they are accused of in simple language (only mentioning the legal grounds is insufficient), as well as their rights, including that of consular and linguistic assistance. It is likewise important that migrants be informed of their right to request asylum.[62]

The migrant population in Mexico comes mainly from countries in which conditions of generalized violence prevail, especially El Salvador, Honduras, and Guatemala. Indeed, of the 107,814 migrants returned by Mexican migration authorities in 2014, 104,269 (96.7 percent) came from those three countries.[63] In 2014, Honduras had a homicide rate of 68 per 100,000 people.[64] Meanwhile, the violence in El Salvador is increasing, and in the month of August there were 907 homicides, which is the highest figure on record since the end of the civil war in 1992.[65]

The INM has 32 migrant detention centers, where as general rule migrants are held for 15 days, although in some cases they are held for longer periods. There are 14 "Type A" provisional holding facilities, where migrants may be detained for up to 48 hours, and 12 "Type B" provisional facilities, where they can be held for up to seven days, although in practice these limits are frequently exceeded.[66] Although the focus of this report is not the human rights situation of individuals in migration detention, it is pertinent to note that detention should be used only as an exceptional measure, and alternatives should be applied as a rule. There is a wide array of documentation regarding conditions in detention centers, including the reports *La ruta del encierro* (2014) and *Derechos cautivos* (2015) by several civil society organizations, and the Inter-American Commission on Human Rights' 2013 report, *Human Rights of Migrants and other Persons in the Context of Human Mobility in Mexico*. These reports emphasize the lack of information provided to migrants, the excessive duration of detention, the lack of specialized assistance for children and adolescents, access to justice, and the poor conditions in migrant detention centers.

*Families with two to four children arrive from Honduras and El Salvador. Many of them are single mothers whose husbands have been killed and they are fleeing and seeking asylum. One girl married a former gang member who had distanced himself from the gang, but they killed his brother and his first wife. They requested asylum in Guatemala and obtained it, but when they found out he was a gang member they began to harass them and make their life hell. She decided to go to the U.S. to seek asylum. She entered through Tenosique but the INM detained her. —Alberto Donis, Albergue de Migrantes "Hermanos del Camino"*

It is important to reiterate that since the Southern Border Program began, the number of migrants detained and deported has risen dramatically; from July 2014 to June 2015, detentions rose 73 percent compared to the same period in the previous year. This new agility in the detention-deportation process means it is unlikely that during this process individuals obtain enough information and are provided with an opportunity to assert their right to asylum or their rights as victims of crime. Migrant testimonies documented by the organizations involved in this report make clear that when migrants do decide to file a complaint, it is not always done in their first attempt to cross Mexico, but rather after being deported or with support from shelter staff. It is therefore even more important to allow civil society organizations, legal counsel, and other trusted persons access to migrant detention centers and provisional holding facilities, and to make procedures to enter more flexible.

The Mexican government's refusal to recognize the detention of migrants as such and its insistence on using euphemistic terms puts detained migrants in legal limbo. Because they are not technically detained, migrants do not enjoy the same rights as detained persons, namely, access to legal representation; however, they are deprived of their liberty. This is particularly harmful for potential asylum seekers who are often detained and deported without being informed of their rights or afforded a fair opportunity to tell their stories to a competent authority. Mexico only recognized 451 individuals' refugee status in 2014, of which 413 were from the northern triangle, according to COMAR.[68] The number of individuals with recognized refugee status is very small when compared to the number of deportations.[69] It is likely that many of these individuals were potentially eligible for asylum. In 2014, the United Nations High Commissioner for Refugees (UNHCR) conducted a survey of 200 unaccompanied minors detained in Mexico City and Chiapas and found that nearly half (48.6 percent) could have qualified for international protection.[70]

## TABLE 8
## ASYLUM APPLICATIONS
## 2013–FIRST HALF OF 2015

| | 2013 | 2014 | 2015 (FIRST HALF OF THE YEAR) |
|---|---|---|---|
| APPLICATIONS | 1,296 | 2,137 | 1,383 |
| GRANTED | 270 | 451 | 289 |
| DENIED | 455 | 840 | 618 |
| ABANDONED | 543 | 767 | 438 |
| COMPLEMENTARY PROTECTION | 28 | 79 | 37 |

Source:   Comisión Mexicana de Ayuda a Refugiados, Estadísticas, www.comar.gob.mx/es/COMAR/Estadisticas_COMAR.

It is important to highlight that Mexico has ratified the Cartagena Declaration on Refugees, which recognizes the right to asylum in cases of "generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[71] Furthermore, the Mexican government has enshrined this broader definition of "refugee" in the 2011 Law on Refugees, Complementary Protection, and Political Asylum (*Ley sobre Refugiados, Protección Complementaria y Asilo Político*).[72] Therefore, there are grounds for the government to recognize the status of a large number of refugees who are clearly fleeing Central America. In contrast, the United States has not ratified the Cartagena Declaration on Refugees; the U.S. government only grants asylum to those individuals who show that they "were persecuted or fear persecution due to race, religion, nationality, political opinion, or membership in a particular social group."[73]

Among the various reasons why Mexico has so many potential refugees and so few recognized refugees is that few migrants identify themselves as potential refugees and apply for asylum. In 2014, only 2,137 people applied for asylum in Mexico, including 1,769 Hondurans, Guatemalans, and Salvadorans.[74] The limited number of asylum applicants also reflects the fact that in many cases migrants do not know their rights or are poorly informed. According to the UNHCR report *Arrancados de Raíz*, only 27 percent of children interviewed at migrant detention centers in Tapachula and the Federal District knew of their right to asylum.[75] The problem is exacerbated by the lack of access to legal representation: there are few pro bono asylum attorneys in Mexico, and the civil society organizations that are involved in representing asylum seekers report difficulties in entering the detention centers.[76] *La 72*, which has provided assistance to asylum seekers, reports significant delays in obtaining interviews for asylum seekers with COMAR officials (the interviews must be requested through the INM), as well as delays throughout the asylum process. As a result, many asylum seekers abandon or desist from the process.[77]

It is likewise important to mention that the increase in detentions by the INM has not been accompanied by a significant increase in COMAR's capacity. This is significant because now that the INM has intensified its enforcement actions, it is in contact with a greater number of migrants who may be eligible to obtain refugee status.[78] Therefore, there is a growing need for agents who are trained to identify vulnerable individuals who require international protection, conduct asylum interviews, and process applications. Despite this uptick in detentions, COMAR's budget did not increase in real terms from 2014 to 2015,[79] and the agency only has 15 agents throughout the entire country to conduct asylum interviews.[80]

# SCAPEGOATS:
# THE CRIMINALIZATION OF MIGRANTS

It is true that some migrants commit crimes; in fact, in some cases, crimes against migrants have even been committed by other migrants. However, it is just as true that there is a worrisome pattern of falsely accusing migrants of having committed crimes. According to a 2014 report by the *Centro de Derechos Humanos Miguel Agustín Pro Juárez* (Centro Prodh), between May and October 2013, there were 1,219 people of Central American origin in Mexico's state and federal prisons.[81] They are far from their families and support networks and many lack legal representation. It is not known how many have been falsely accused, and/or how many have been victims of torture. Coverage in some media outlets of criminality in areas where migrants transit also fosters the perception that migrants are criminals or are a danger to residents.[82]

Between 2013 and 2014, the migrant shelter *Casa del Migrante de Saltillo* documented 35 cases of torture of migrants by municipal police and elite forces such as the Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*, GROMS) and Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*, GATES). The case of "Carlos" (pseudonym), a young Honduran, is illustrative.

> On May 14, 2013, Carlos was traveling by taxi to a hotel in Saltillo, where he was to meet three fellow travelers from Honduras. As the taxi approached the hotel, there were several patrol cars surrounding it. A hooded officer came over to the taxi, detained him, and asked him what nationality he was. When Carlos said that he was Honduran, the officer took him out of the cab, put his t-shirt over his head, took him by the feet and cuffed him. He grabbed him by the shoulders and put him in the patrol car where his fellow travelers were. After 15 minutes they arrived at a place where the migrants were tortured. They destroyed Carlos' documents, pointed a weapon at him, and put it in his mouth. They ordered them to write out a list of drugs on a piece of paper while they had a dog that attacked them. When they arrived at the municipal jail, they placed Carlos in an area for children and adolescents. [However,] they forced him to say he was an adult so they would transfer him to the state prison [*Centro de Rehabilitación Social*, CERESO] (…) Before meeting with the medical examiner, officers threatened them and told them to say that they had fallen from the train. A policewoman took photos and video footage of them.[83]

The victims filed a complaint with the Coahuila State Human Rights Commission (*Comisión Estatal de Derechos Humanos*, CEDH) against the GROMS elite corps, in which they specified the kinds of threats and injuries received (blows to the hand with a bat, blows to the face, chest, back, and legs, electric shocks, and waterboarding). The CEDH issued "Recommendation No. 114/2014" on October 9, 2014 (a year and four months after receiving the complaint) for violation of the right to privacy due to the illegal searches and domiciliary visits, violation of the right to humane treatment and personal safety due to the injuries, and violation of the right to legality and legal certainty due to wrongful exercise of public duties. They refused to investigate additional acts, including torture or forced confession.[84]

# INVESTIGATING AND SANCTIONING
## CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS

> *Unfortunately, one thing is the facts, and another thing is the law. —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado*

The context in which crimes are committed against migrants requires special attention, as well as a forceful response from the State to investigate, sanction, and prevent the repetition of these acts. Such crimes constitute human rights violations when they are committed by public officials. The data we obtained regarding authorities' performance in investigating and sanctioning these acts, combined with the migrant shelters' firsthand accounts, indicate that efforts to address human rights violations and crimes against migrants continue to fall short.

## DATA ON INVESTIGATIONS INTO CRIMES AGAINST MIGRANTS

> *There are no real investigative proceedings. I accompanied a complaint in 2014, a man was assaulted by municipal police; they beat him. Because he did not have any information on the patrol car's number or the names of individuals, the public prosecutor told him that the complaint would not move forward, that it was in vain. —Diana Castillo, Casa del Migrante de Saltillo*

Currently, there are several reasons why it is challenging to collect data on investigations of crimes committed against migrants in Mexico. One of them is that investigating such crimes involves many agencies, including the PGR—especially the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia Contra Mujeres y Trata de Personas*, FEVIMTRA) and the Deputy Attorney General Specialized in Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*, SEIDO)— as well as state attorneys general offices, including the offices of specialized prosecutors for crimes against migrants that have been created in several states. Furthermore, not all prosecutors and attorneys general offices record data on the results of investigations, including whether the

cases were successfully prosecuted and whether there was a judgment handed down by the courts. The problem of data fragmentation is exacerbated by the inconsistent manner in which these different agencies document and categorize their data. In some cases, the crimes are not classified in the same way, and moreover, not all agencies specify whether the victim was a migrant.

Despite these challenges, the authors of this report requested and obtained data from some agencies that shed light on the frequency of investigations of crimes against migrants in Mexico and, in some cases, the stage of the investigative proceedings. These data reveal that despite multiple obstacles and dangers, there are indeed hundreds of migrants who have had the courage to file a complaint with federal and state

authorities. Nonetheless, the authors have not found information that points to a real effort on the part of Mexican authorities to ensure that these complaints lead to effective investigations, and even less, convictions of the perpetrators.

At a federal level, the data on crimes against migrants are especially sparse. In a response to an information request, the PGR stated that all its documents are in its Institutional System for Statistical Information (*Sistema Institucional de Información Estadística*), but that "its databases lack the variables that allow for knowing or identifying information involving migrants as victims and State agents as perpetrators of unlawful acts under federal jurisdiction."[85] If it is true that the PGR is currently unable to disaggregate its data according to victims or perpetrators, this lack of capacity

constitutes a fundamental obstacle to conducting a thorough assessment of the PGR's performance in investigating crimes against migrants.

The PGR stated that SEIDO does have some data about crimes against migrants in Mexico. Without providing a breakdown by offense, the PGR explained that between 2011 and 2014, it had initiated 397 preliminary investigations for crimes against migrants. Opening these investigations could be considered a positive step by the government to investigate the criminal networks that commit such crimes. However, the fact that SEIDO failed to provide information about the results of these preliminary investigations, particularly the number of convictions, makes it difficult to evaluate the seriousness or efficacy of such efforts.[86]

*The PGJE does not have qualified personnel. For example, for sex crimes, they take statements in front of everyone, the doctor is a man, and they encourage the survivors to minimize the events. With regard to the expert analysis, practically the only thing they do is a reconstruction of the events; they take them to the scene; there are no technical elements. — Salvador Leyva, La 72*

## OBSTACLES TO REPORTING CRIMES AND HUMAN RIGHTS VIOLATIONS

Victims of crime in Mexico, whether they are Mexican citizens, migrants in transit, or other foreigners, are unlikely to see justice done in their cases. There are many obstacles in the long road to justice in Mexico, including a lack of trust in the authorities, the fear of retaliation, slow proceedings, and authorities' lack of investigative capacity. Such obstacles and dangers affect all victims regardless of their nationality; however, migrants, and particularly migrants in transit, face additional challenges.

It is important to recognize the critical role played by migrant shelters in informing migrants of their rights, including their right to initiate proceedings to regularize their migration status and/or file a report or complaint regarding crimes or human rights abuses to which they have been victim. Migrant shelter staff members draw on their significant experience accompanying cases to analyze the shortcomings of official investigations and procedures. Such analysis facilitates the identification of opportunities for improving the government's response to crimes and human rights violations against migrants.

*Violence has become normalized to such an extent that people cannot identify the violations of their rights or crimes. They take it as if it were a part of life, especially women [with regard to] sexual violence. So that violence is covered up with the economic argument. How you experience the violence determines whether you file a report or complaint. When they enter Mexico, they already know what lies ahead, that they may be robbed, kidnapped, raped. That is why they don't file a complaint and [think] it is better to just continue, otherwise their family will stop helping them. Out of 100 cases, only five stay behind to file a complaint. Those are the people who come by themselves and can wait for a humanitarian visa. This is increasing; more people are coming who have no one to help them, but they decide to take the risk and try it alone. —Diana Castillo, Casa del Migrante de Saltillo*

Migrants and their defenders underscore that one of the main problems is the scant probability that any given complaint will lead to results. These low expectations are due to the lengthy nature of the proceedings and the superficial nature of the investigations (forensic analysis is conducted in a perfunctory way and is not tailored to each case). The lack of protection for those who report authorities or organized crime is another significant hindrance to filing a complaint.

An obstacle to investigations that was mentioned repeatedly in interviews with local authorities is the inherent mobility of migrants. Also mentioned was the fact that migrants are rarely able to identify the perpetrators of the crime. All these challenges persist and combined, they complicate access to justice while also explaining the limited number of complaints.

*There is a great deal of fear about filing a report. Those who do decide to file a report don't believe in justice, they are not from Nogales and their plans are not to stay here and move forward with the proceedings. (...) Getting a response to the report takes a long time. In July 2014, we filed a complaint against the agency specialized in sex crimes and intra-familial violence. This week, after a year, they just closed the case because there was a change in personnel; it was another person who didn't do what they were supposed to, processing the cases. We have to pressure them to get a response to the reports and complaints. We need personnel to do this follow-up; to bolster this work we would need an attorney, a psychologist, a doctor, another social worker. This would help to document the cases and have time to devote to advocacy. —Marla Conrad, Kino Border Initiative*

When migrants who are victims of crime during their time in Mexico reach their destination or are deported to their countries of origin, it is difficult to file a complaint. They may not, for example, have any way to prove injuries and other damages. Although the overwhelming majority of migrants in Mexico come from El Salvador, Honduras, and Guatemala, there are no established mechanisms either for migrants who have already been deported, or family members who learn of the crime, to inform Mexican authorities about these crimes from their countries of origin.

Nor are there effective mechanisms for migrants who reach the United States to file a report with the Mexican authorities. Although U.S. authorities could exercise jurisdiction for crimes that involve individuals residing in the United States (for example, in a kidnapping, if the ransom is demanded from a family member in the United States), few cases are reported. This is due to

the fact that few migrants are aware that this possibility, and many fear going to the authorities if they are undocumented in the United States.

After the hearing on "Access to Justice for Migrants" held on March 20, 2015, as part of the 154th Regular Session of the IACHR, the Mexican government committed to creating a transnational mechanism for the search for and investigation of crimes against migrants. There now is a definitive proposal for creating a Specialized Unit of the Transnational Mechanism and Investigation of Crimes against Migrants (*Unidad Especializada del Mecanismo Transnacional e Investigación de Delitos Contra Migrantes*) within the PGR. This unit would have the power to, *inter alia*, investigate and prosecute crimes committed against foreign and Mexican migrants. Nevertheless, as of the writing of this report, the PGR had not formalized the unit's creation.



*Crosses in Altar, Sonora represent migrants who have died in Arizona, Texas, and California*

## SPECIALIZED PROSECUTORS: AN EFFECTIVE RESPONSE?

When a migrant is victim to a crime that falls within state jurisdiction (*fuero común*), they should be able to seek recourse in the criminal justice system in the state where they are located, regardless of their immigration status. But state-level criminal justice systems in Mexico have failed to appropriately respond to crimes against migrants, and civil society organizations within Mexico and internationally have demanded that state governments redouble their efforts. In response to these demands, several state governments in Mexico created specialized prosecutors' offices for crimes committed against migrants. The first specialized prosecutor's office for providing assistance to migrants was established in 2008 in the state of Chiapas, with offices in Tapachula and prosecutors from the Public Prosecutor's Office (*Ministerio Público*) in Arriaga, Palenque, Comitán, Huixtla, Tuxtla Gutiérrez, Suchiate, and Comalapa.

More recently, specialized prosecutors' offices were established in 2011 in Oaxaca and Veracruz, in 2014 in Tabasco and Coahuila, and in 2015 in Campeche and Quintana Roo. The prosecutor's office in Tenosique was created following the precautionary measures granted by the IACHR due to threats received by the staff of the shelter *La 72*, while the Saltillo prosecutor's office was created as part of the State Human Rights Program, which brings together civil society organizations, including the *Casa del Migrante de Saltillo*.

## TABLE 9
## SPECIALIZED PROSECUTORS' OFFICES FOR MIGRANTS

| STATE | NAME OF PROSECUTOR'S OFFICE | YEAR EST. |
|---|---|---|
| CHIAPAS | *Fiscalía Especializada en Delitos Cometidos en contra de Inmigrantes* | 2008 |
| OAXACA | *Fiscalía de Atención al Migrante* | 2011 |
| VERACRUZ | *Fiscalía Especial de Atención al Migrante* | 2011 |
| COAHUILA | *Fiscalía Especializada para la Atención de Delitos Cometidos en agravio de Migrantes* | 2014 |
| TABASCO | *Fiscalía Especializada para la Atención al Migrante* | 2014 |
| CAMPECHE | *Fiscalía de Atención al Migrante* | 2015 |
| QUINTANA ROO | *Fiscalía Especializada en Delitos Cometidos en contra de Migrantes* | 2015 |

*Source:* Website of the Chiapas State Attorney General's Office: http://bit.ly/1OcAnXA;
Website of the Oaxaca State Attorney General's Office: http://bit.ly/1OcAt1o;
Website of the Veracruz State Attorney General's Office: http://bit.ly/1OcAxhR;
Website of the Coahuila State Government: http://bit.ly/1OcC9rU;
Website of the Tabasco State Attorney General's Office: http://bit.ly/1OcAJxz;
Website of the Chiapas State Government: http://bit.ly/1OcBFlp.

It is too soon for a definitive assessment of the work of these state prosecutors' offices. In theory, designating an authority with the sole responsibility of addressing the issue of crimes committed against migrants, one that is properly trained and equipped with procedures that are tailored to the specific characteristics of these crimes, could lead to more effective investigations and better access to justice for migrants who are victims of crimes. However, initial data, particularly from the Oaxaca prosecutor's office, strongly indicate that the presence of specialized prosecutors' offices has not yet led to the intended outcome. The experiences of migrant shelters confirm that the creation of these specialized offices does not necessarily entail an effective response, unless such offices possess sufficient resources, personnel, capacities, and the political will to conduct timely investigations and ensure that cases reach a satisfactory resolution.

It bears mentioning that many migrants are frequently referred to the prosecutors' offices by the shelters and organizations advocating for their rights. Lack of trust and awareness of their undocumented status may prevent migrants from going to the specialized prosecutors' office on their own, so shelters provide legal assistance when there is no public legal assistance available. This can make a significant difference in terms of how seriously a complaint or report is taken. The experience shelters have had with these offices is quite varied, but there are some commonalities.

> *More than 110 complaints have been made since the Southern Border Program began, with 411 persons having filed reports. The prosecutor has not been able to arrest anyone. —Alberto Donis, Albergue de Migrantes "Hermanos en el Camino"*

In addition to the problems previously identified regarding the prolonged duration of investigations and proceedings, which is exacerbated for those cases that are referred to other states, we have also detected a lack of appropriate office settings for migrants to file complaints, particularly in the prosecutors' offices in Tenosique, Tabasco and Ixtepec, Oaxaca. These offices sometimes lack private rooms for individuals to provide sensitive testimony or personnel properly trained to take statements in sensitive cases, such as those that involve sexual violence. Authorities claim to be aware of the sensitive nature of these cases, but it is not clear how they have modified their actions to address these situations. Public areas should not be used to receive testimony in cases of sexual violence, and it is important that the prosecutor is sensitive to gender issues. Finally, public officials must know how to serve victims and have the appropriate level of sensitivity to ensure that victims do not unnecessarily relive painful experiences, and thus become re-victimized.

Specialized prosecutors' offices must have updated, accessible data on the results of their work. In interviews with some prosecutors, offices were ambiguous on the number of preliminary investigations initiated and the number of indictments. We therefore requested the information through the state governments' information transparency systems. The states of Chiapas, Tabasco, Oaxaca, and Veracruz have all stated they do indeed have a registry of crimes committed against migrants. In Chiapas, the specialized prosecutor's office for migrants reported that from the beginning of 2013 through April 2015, a total of 950 preliminary investigations had been opened for cases of crimes against migrants, including organized crime, homicide, human trafficking, rape, and the "smuggling of illegals." The office stated that

information regarding the number of sentences "was not available in the unit's files, as it was not their purview."[88] Although the prosecutor's office certainly does not have the jurisdictional authority to issue judgments in cases of crimes against migrants (that authority belongs to the judge under the jurisdiction of the judicial authority), it would be rather improbable for a prosecutor's office to have no knowledge of the matter. The fact that the Chiapas specialized prosecutor's office lacks information on convictions implies a worrisome indifference towards understanding and measuring the outcome of its work. Meanwhile, the specialized prosecutor's office for migrants in Tabasco reported having information on 209 crimes committed against migrants in the state, the most frequent crime being robbery (59 in 2013, 10 in 2014, and 31 in 2015).[89]

In contrast, the Oaxaca prosecutor's office did provide more comprehensive data for cases of crimes against migrants for 2011 through May 2015, including the number of reports (383 in total), preliminary investigations opened (96 in total), cases referred to other states (130 in total), and sentences (four in total). According to these numbers, 25 percent of the complaints led to preliminary investigations, which is approximately half national average for all crimes between 2010 and 2014 (a period that partially corresponds to Oaxaca's data and offers an approximate idea of how the results obtained by the prosecutors' offices compare to the national average). Only four percent of the preliminary investigations launched by the Oaxaca Attorney General's Office resulted in a sentence. This low percentage is indicative of the poor quality of the investigations.

## TABLE 10
## CASES OF CRIMES AGAINST MIGRANTS
### DOCUMENTED BY THE GOVERNMENT OF OAXACA

|  | 2011 | 2012 | 2013 | 2014 | 2015 (JAN–MAY) | TOTAL |
|---|---|---|---|---|---|---|
| REPORTS | 22 | 52 | 103 | 123 | 83 | 383 |
| PRELIMINARY INVESTIGATIONS | 7 | 14 | 24 | 19 | 32 | 96 |
| CASES REFERRED TO OTHER STATES | 4 | 17 | 36 | 59 | 14 | 130 |
| SENTENCES | – | – | 3 | 1 | – | 4 |

Source: Oaxaca State Attorney General's Office, response to information request 16795, July 22,2015, document available on WOLA's website, http://bit.ly/1kaCVcs.

These paltry outcomes match the findings of other investigations. For example, in a response to an IACHR information request, the Mexican government reported that between 2008 and 2011, district courts in Mexico ruled on a mere 57 criminal cases involving migrants (and it is unclear how many cases involved migrants as victims and how many cases involved migrants as defendants). Upon evaluating these statistics, the IACHR expressed its "deep concern at what is clearly the State's patently inadequate response in terms of the investigation, prosecution, and punishment of such crimes."[91]

The information obtained clearly shows that the majority of reports of crimes against migrants do not end in convictions. Advocates and some prosecutors agree that key problems occur during the investigations, particularly due to bureaucratic internal procedures, including the large number of official communications necessary to conduct investigations, carry out forensic analysis, and obtain evidence. Another challenge is the lack of economic resources available to prosecutors to travel to the site of the incident; expert examinations must be tailored to the intricacies of each case and must be conducted expeditiously. In many cases, it is difficult for migrants to identify their perpetrators, as they are not familiar with the uniforms or vehicles of the authorities in a country through which they are transiting. This should be considered during the investigation.

Another recurring problem is when the crime occurred in one state, but is reported in another. In such cases, the prosecutors' offices should refer the complaint to the corresponding state. This, however, does not always happen in a timely fashion, further complicating efforts by migrants or their legal advisors to follow-up on the cases.

These problems, when compounded with migrants' aspiration to continue their journey and their lack of means to subsist while waiting for the case to be processed, perpetuate the cycle of impunity.[92]

*The local public prosecutor in Agua Prieta put up obstacles to avoid taking complaints for crimes committed in other states. It wanted migrants to travel to file the complaints there, for example to Veracruz. For cases from Nogales or Naco, they wanted the migrants to travel there, even though they're in Sonora. We talked to them and told them it wasn't their job to investigate, just to refer the case and then they agreed to take the complaint. The only other way is for the organization's attorney to write up a complete report of the events, print it, sign it; that way they only have to certify it. This can make it more accessible. —Perla Del Angel, Centro de Recursos para Migrantes*

Hence, despite the existence of specialized prosecutors' offices and the efforts of some prosecutors, the lack of capacity and resources combined with the lack of political will and sensitivity impedes effective investigations. Based on the experiences of the shelters and organizations involved in this report, we can conclude that, even though the prosecutors' offices receive the complaints and open preliminary investigations, they do not follow through on their primary duty of obtaining justice.

The government of Mexico should carefully assess the performance of existing prosecutors' offices, before promoting the creation of new offices. The federal and state governments should work together to ensure that specialized prosecutors' offices possess the physical space and resources necessary to operate, and that staff are appropriately and effectively trained. The government should also acknowledge that prosecutors are limited in their capacity to fully resolve migrants' obstacles to justice. In particular, as will be described later, it is vital for the migrants who do report crimes to have access to humanitarian visas. Such visas are important not only because they are an incentive to report the crimes, but also because they enable migrants to remain in the country during the duration of proceedings.

# THE NATIONAL HUMAN RIGHTS COMMISSION AND STATE HUMAN RIGHTS COMMISSIONS

*Migrants continue to have more trust in the legal work of non-judicial bodies, like the CNDH and CEDHs; in many cases, they are the only mechanism that migrants can use for accessing justice. Nonetheless, they fail to respond to real needs: they are very bureaucratic, the victim has to provide all evidentiary exhibits, and they cannot investigate. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

When federal authorities violate migrants' human rights, the victims are entitled to file a complaint with the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH), which has various offices across the country. The State Human Rights Commissions (*Comisiones Estatales de Derechos Humanos*, CEDHs) takes cases in which the human rights violations were committed by local authorities. In some cases, both the CNDH and the CEDHs refer migrants to other bodies, including local attorneys general offices and shelters. Some migrant shelters and organizations believe the CNDH and CEDHs are most approachable for demanding justice, but their procedures and investigative capacities are not particularly expeditious or effective. It does appear that it is easier for migrants and their advocates to get in contact with the CNDH than with the CEDHs, as the latter (at least in the cases of Tabasco and Oaxaca, whose offices are in Tenosique and Ixtepec) reported having received very few migrants.

The recommendations that the CNDH and CEDHs can issue to authorities that have committed human rights violations are not binding; however, they can have a positive impact. Given their formal nature, it is difficult for authorities to ignore them entirely.

These commissions also have the authority to conduct conciliation efforts; however, the shelters report that, based on their experience, migrants who are victims have a limited role in this process.

To better understand the frequency and outcomes of the CNDH's interventions in cases of human rights violations against migrants, we requested public information regarding such complaints received by the CNDH. According to the figures obtained, between December 1, 2012 and June 15, 2015, the CNDH reported having received 1,617 complaints, of which 1,220 were against the INM, followed by 143 complaints against the Federal Police, and 120 against the PGR. Only 18 complaints were officially initiated.[93]

The system that the CNDH utilizes to categorize human rights violations provides little insight into the nature of the acts themselves. The CNDH uses categories such as "inappropriately providing a public service" and "actions or omissions that infringe upon the rights of migrants and their family members."

Strikingly, only four out of the 1,617 complaints recorded led to the CNDH issuing recommendations. This figure highlights the limited capacities of the CNDH to investigate allegations of human rights violations and guarantee that they are not repeated.

Table 11 shows that most (73.7 percent) of the incidents for which formal complaint proceedings were initiated occurred in the southern states of Chiapas, Oaxaca, Tabasco, and Veracruz, in the Federal District, and in the northern state of Tamaulipas. The fact that there the CNDH offices in these states receive an even higher number of overall complaints is because some receive complaints of incidents that took place in another state. For example, in Ixtepec, Oaxaca, most of the complaints are related to human rights violations committed in Chiapas.

## TABLE 11
## DISTRIBUTION OF COMPLAINTS REGARDING HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS
## DECEMBER 1, 2012-JUNE 15, 2015

| STATE | NO. OF COMPLAINTS | CNDH OFFICE | NO. OF COMPLAINTS |
|---|---|---|---|
| CHIAPAS | 326 | TAPACHULA | 210 |
| FEDERAL DISTRICT | 279 | GENERAL DIRECTORATE FOR ATTENTION TO MIGRANTS (*DIRECCIÓN GENERAL DEL PROGRAMA DE ATENCIÓN A MIGRANTES*) | 498 |
| VERACRUZ | 241 | COATZACOALCOS | 127 |
| OAXACA | 132 | IXTEPEC | 265 |
| TAMAULIPAS | 116 | REYNOSA | 159 |
| TABASCO | 98 | VILLAHERMOSA | 135 |

Source: CNDH, response to information request 00036515, document available on WOLA's website, http://bit.ly/1kaBL0D.

We heard a variety of perspectives during the interviews at CNDH field offices in Villahermosa, Tabasco; Ixtepec, Oaxaca; and Nogales, Sonora. In Villahermosa, most of the complaints of violations stemmed from migration enforcement operations; others were attributed to the municipal police. However, we noted that the response to these operations was limited to rudimentary procedures such as interviewing detained migrants, and ensuring the minors spoke with one of the INM's Child Protection Officers (*Oficial de Protección a la Infancia*, OPI).[94] In Saltillo, most of the cases were police abuse from police officers at various levels and mistreatment in migrant detention centers. Similiarly, the cases in Ixtepec mostly involved treatment at migration detention centers and police abuse of authority. According to the director of the CNDH field office in Ixtepec,

Oaxaca, there has been an uptick in cases since the launch of the Southern Border Program.

The CNDH is equipped with a rather sound infrastructure to service migrant cases through its various offices with resources from the Fifth General Inspection Unit (*Quinta Visitaduría*). It bears noting, however, that specializing in migration issues should not be limited merely to knowledge of the Migration Law or the INM's obligations during enforcement operations or migrant detention, or the internal regulations of other authorities; specialization also requires understanding international human rights standards to ensure that their intervention truly prevents repetition. This could entail, for example, recommending changes in regulations or resource allocation.

# THE RESPONSIBILITY OF THE NATIONAL MIGRATION INSTITUTE

The INM is often singled out by migrants, shelters, and the CNDH for perpetrating human rights violations during operations and at migrant detention centers. Excessive use of force during migration enforcement operations figures prominently in reported cases of abuse and such cases have multiplied since the Southern Border Program began. Inside migrant detention centers, the INM is the authority charged with informing migrants of their rights, including their right to seek asylum and request a humanitarian visa if they have been victims of a crime. However, testimonies confirm that INM agents often fail to inform migrants of their rights or they tell migrants that applying for asylum will result in prolonged detention, in order from discourage potential asylum seekers.[95]

These problems are at least partly due to the lack of internal and external oversight for INM operations. Although the INM has an Internal Control Body (*Órgano Interno de Control*) that can impose administrative sanctions on agents for failing to fulfill their duties, it does not yet have an Internal Affairs Unit able to open investigations against agents for alleged criminal activities or serious misconduct or disciplinary infractions. Such a unit, however, is provided for in the SEGOB's internal regulations.[96] The INM does possess a Citizen Council, but the conditions for conducting internal oversight could be bolstered further.[97] As for external oversight, civil society organizations have limited access to migrant detention centers, and procedures for determining entrance remain opaque. According to the "Agreement issuing operating procedures for the National Migration Institute migrant detention centers and provisional holding facilities," civil society organizations must apply to be included in an access registry, but there are no clear standards for authorization.[98] This procedure

should not be discretional and must be flexible in order to ensure that organizations can assist migrants by informing them of their rights, as well as monitor detention conditions.

While there are few incentives for reporting crimes, Mexican legislation allows for migrant who are victims of crime to apply for "visitor resident status for humanitarian reasons" (Migration Law, Article 52, paragraph V).[99] Such a permit would grant temporary residence to migrant who are victims of a crime that is committed in Mexico and that the authorities recognize. Nonetheless, the INM has issued few humanitarian visas in recent years, and organizations report that only a few of the applications that they have accompanied have been successful. This number, however, is increasing, according to government data (see table 12).[100]

The support provided by the shelters and organizations in the procedures to obtain a humanitarian visa greatly increases the probability of a favorable outcome. One of the hurdles that migrant shelters have identified in obtaining humanitarian visas is the requirement that the crime must be a felony, as provided for in Article 50 of the regulations of the Migration Law. However, whether or not a given crime is considered a felony depends on the particular state's criminal procedure legislation. This determination could also depend on the opinion and willingness of the prosecutor to consider the context of the migrant's vulnerability. If the complaint does not clearly specify the degree of the crime, it is up to the INM's discretion to interpret the crime. That decision, however, technically belongs within the purview of the justice system. The small number of visas granted could, thus, be increased by standardizing the procedures for determining the severity of crimes.

## TABLE 12
## HUMANITARIAN VISAS* ISSUED BY THE INM

|  | 2012 | 2013 | 2014 | 2015 (JAN-JUN) |
|---|---|---|---|---|
| TOTAL | 108 | 277 | 623 | 527 |
| CENTRAL AMERICA | 103 | 208 | 501 | 461 |

*Tarjetas de Visitante por Razones Humanitarias (TVRH)
Source: Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias 2012, 2013, 2014, 2015, http://bit.ly/1jMKo1.

Although filing a report is a requirement for accessing a humanitarian visa, this visa has become a prerequisite for migrants to access justice. It is impossible for migrants to remain present for the duration of criminal proceedings without it. It is, therefore, important for the process to be clear, simple, and leave no leeway for discretion.

The information in this section demonstrates that, despite the obstacles migrants face in reporting crimes, there have indeed been complaints in recent years filed by migrant victims of crimes or human rights violations, many of whom have been accompanied by migrant shelters. In light of problems documented, it is necessary to improve the number of reports filed as well as the number of investigations carried out and sentences and recommendations issued. It would seem that the creation of specialized prosecutors' offices has not succeeded in incentivizing migrants to report crimes, nor has it led to successfully prosecuting criminals. Advocates and some prosecutors agree that the results obtained by these specialized prosecutors leave room for improvement, and also that the criteria for granting humanitarian visas to migrant who are victims of crime must be clarified.

This section has made clear that migrants face greater obstacles in accessing justice than others; the next section proposes feasible changes that would help to reduce that discrepancy.

# CONCLUSIONS AND RECOMMENDATIONS

A review of official data, reports, and documented cases has given us a picture of the crimes and human rights violations committed against migrants, as well as important clues as to what specific obstacles lie in the way of access to justice. In addition, we have identified a direct relationship between the intensification of migration enforcement under the Southern Border Program and a number of violations of specific rights. Current policies have led to more frequent violations of the rights to humane treatment, liberty, and access to asylum.

Serious crimes against migrants, including kidnappings, trafficking, disappearances, and murders continue to occur; the June 2015 attack against a group of migrants in Caborca, Sonora and the possible disappearance of some members of that group is emblematic. Federal, state, and municipal police rob and extort money from migrants, and those acts are frequently accompanied by physical and psychological abuse.

Migrant shelters and civil society organizations produce the most reliable data on this subject through their documentation, but we have not found any information that enables us to assess the State's intervention in these cases.

Despite the existence of some specialized prosecutors' offices for assisting migrants and focused efforts by migrant shelters and civil society organizations to report and document cases, most cases go unpunished. When migrants go to the authorities to file reports, cases are often hampered, primarily during the investigation stage. Humanitarian visas available to certain migrants who have been victims of crimes are granted by the INM almost solely when the migrant has the legal assistance of a civil society organization. In addition, given the situation of human rights violations migrants face, the CNDH's intervention in cases of complaints and recommendations falls short.



*Mural in La 72, Hogar—Refugio para Personas Migrantes*

# RECOMMENDATIONS

**WE BELIEVE THE FOLLOWING RECOMMENDATIONS TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES ARE BOTH IMPORTANT AND FEASIBLE.**

## TO THE NATIONAL MIGRATION INSTITUTE (INM):

**STRENGTHEN INTERNAL OVERSIGHT AND ACCOUNTABILITY TO PREVENT HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS FROM OCCURRING WITHIN THE FRAMEWORK OF MIGRATION ENFORCEMENT ACTIVITIES,** specifically through the establishment of an Internal Affairs Unit equipped with the necessary financial and human resources and the political will to investigate allegations of crimes and human rights violations perpetrated by INM agents.[101]

## TO THE MINISTRY OF THE INTERIOR (SEGOB):

**PROMOTE A NATIONAL STRATEGY FOR IMPLEMENTING AND MONITORING THE 2014-2018 SPECIAL MIGRATION PROGRAM (PEM) THAT INCLUDES, AS A CORE ELEMENT, SUFFICIENT FUNDING.** Rather than creating new programs that further duplicate responsibilities, such as the Southern Border Program, the 2014-2018 PEM should be held up as the primary public policy document regarding migration by all federal government agencies and should be implemented as such. To this end, there must be a transparent allocation of sufficient funding for the PEM.

**CREATE AN ASYLUM AND INTERNATIONAL PROTECTION POLICY THAT UPHOLDS MEXICO'S VALUES.** COMAR's budget must be increased so that it is proportional to the increased needs of the migrant population and so that each individual who so desires may have the opportunity to tell his or her story to an official specialized in asylum. Specifically, there is an urgent need to hire and train more COMAR protection officers to conduct eligibility interviews, as well as to evaluate the possibility of opening new COMAR offices at key points along the migration route, such as on the border between the state of Tabasco and Guatemala.

It is also necessary to build institutional capacity and enhance mechanisms for coordination between the INM and COMAR in order to inform all migrants in Mexican territory about their right to asylum and international protection, as well as facilitate cooperation with civil society organizations that provide legal assistance in order to increase the number of requests and reduce the rate of desisted or abandoned cases.

In addition, cooperation agreements should be reached with university law schools nationwide in order to encourage attorneys to provide pro bono assistance to migrants eligible for refugee status in Mexico.

**DEVELOP CLEAR REGULATIONS FOR MIGRATION ENFORCEMENT OPERATIONS, SPECIFICALLY REGARDING APPROPRIATE PLACES AND CIRCUMSTANCES IN WHICH TO CONDUCT THEM, COOPERATION BETWEEN THE INM AND OTHER**

**AUTHORITIES, THE RESPONSIBILITIES OF EACH OF THESE AUTHORITIES, AND CLEAR LIMITS ON THE USE OF FORCE.** Such regulations should include a protocol that regulates and limits the use of force during migration enforcement operations, ensures the training of all agents on such guidelines, and establishes oversight and sanctions. The UPM's website should post up-to-date information on the number of migration enforcement operations, broken down by month and state.

It is also necessary to develop a clear protocol on the procedure for granting humanitarian visas, including explicit and consistent definitions of eligibility requirements in order to eliminate discretion, and mechanisms for coordination between the PGR, the PGJEs, the INM, and civil society organizations.

## TO THE FEDERAL ATTORNEY GENERAL'S OFFICE (PGR):

**IMPLEMENT THE SPECIALIZED UNIT OF THE TRANSNATIONAL MECHANISM AND INVESTIGATION OF CRIMES AGAINST MIGRANTS** (*Unidad Epecializada del Mecanismo Transnacional e Investigación de Delitos contra Migrantes*). Create a protocol for investigating crimes against migrants that facilitates cooperation between the PGR and state attorneys general offices. Such a protocol should include travel provisions for prosecutors and agents, so they can receive reports in places such as consulates, migrant detention centers, and shelters.

Work with the states to standardize and systematize data collection on investigations and prosecutions in connection with crimes against migrants, including case outcomes, and make such data available on a monthly basis on the PGR's website.

## TO THE GOVERNMENT OF THE UNITED STATES:

**PROMOTE THE INVESTIGATION OF CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN MEXICO.** Provide technical assistance to the Mexican government and to the countries of Central America on the investigation and sanctioning of crimes against migrants that are transnational in nature. Through the Department of Justice, broaden technical assistance to Mexico's specialized prosecutors' offices, including training staff on investigative techniques.

Through the Merida Initiative, the Department of State should work with the Mexican government to determine ways to support the INM in strengthening oversight mechanisms, such as through the establishment of an Internal Affairs Unit.

The Department of State's Bureau of Population, Refugees, and Migration must continue to support efforts to strengthen the Mexican government's capacity to identify, protect, and assist vulnerable migrants in Mexico.

## TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES:

**EXPLORE THE CREATION OF PROSECUTOR EXCHANGE PROGRAMS REGARDING THE STRATEGIC USE OF HUMANITARIAN VISAS AS AN INCENTIVE FOR REPORTING CRIMES COMMITTED AGAINST MIGRANTS, AS WELL AS TO SHARE SUCCESSFUL PRACTICES IN INVESTIGATING CRIMES AGAINST MIGRANTS.**

# REFERENCES

[1] Angélica Jocelyn Soto Espinosa, "Más de 100 migrantes desaparecidos tras ataque de grupo armado," *Cimacnoticias*, July 2, 2015, accessed September 25, 2015, http://bit.ly/1LvYfDl.

[2] Amnesty International, "México debe investigar el atroz aumento de los ataques y homicidios de migrantes", June 18, 2015, accessed September 25, 2015, http://bit.ly/1OcDSNK; Testimony and information received by the authors; Comisión Nacional de los Derechos Humanos, *Investiga la CNDH la probable ejecución de tres migrantes centroamericanos, cuyos cuerpos fueron hallados en Caborca, Sonora,* June 9, 2015, accessed September 25, 2015, http://bit.ly/1OcDUoX.

[3] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[4] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[5] In some places like Apizaco, Tlaxcala, the company Ferrosur has placed barriers next to the train tracks, which have already caused seven serious accidents, including one that was fatal.

[6] For years, images of Central American migrants riding as stowaways on trains were used to demonstrate the serious risks that migrants face when crossing Mexico, as well as the Mexican government's apparently permissive approach to transmigration. In this regard, the Southern Border Program was a great success (although some migrants continue to travel by freight train, the numbers have decreased and it is only happening in some parts of the country). WOLA, "Mexico Now Detains More Central American Migrants than the United States", June 11, 2015, accessed September 25, 2015, http://bit.ly/1MlQy2U. Boletines Mensuales de Estadísticas Migratorias 2012, 2013, 2014, 2015. Migration Policy Unit, Secretariat of the Interior, http://bit.ly/1jMKo18.

[7] Lupita Thomas and Xóchitl Álvarez, "Abren 16 rutas más peligrosas para migrantes", *El Universal*, June 14, 2015, accessed September 25, 2015, http://eluni.mx/1OcE0wG.

[8] The areas of concern with respect to migrants' human rights include: lack of access to asylum (only 270 refugees recognized in 2013 and 451 in 2014); the excessive use of force by migration officials; detention of children; prolonged detention of asylum-seekers; and failure to provide protection or effective access to justice for victims of crimes and human rights violations. The United Nations Special Rapporteur on the Human Rights of Migrants, Jorge Bustamante, visited Mexico in 2008, and expressed concern about migrants' victimization by gangs and government officials, and about the government's detention and deportation practices. For its part, the Inter-American Commission on Human Rights (IACHR) published an extensive report on migrants' human rights in Mexico in 2013, based on a visit made in 2011: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, 2013, accessed October 27, 2015, http://bit.ly/1KBsgMU.

[9] When conducting research for this report, the authors also consulted a wide array of secondary sources, including a series of reports from Mexican civil society organizations on the situation of migrants, government reports, and reports from NGOs on crime and victimization, as well as several evaluations on Mexico's law enforcement and criminal justice institutions. We have also analyzed official documents, including migration data regularly published by SEGOB, as well as a series of information requests made to the federal and state government through the service *Infomex*.

[10] Many migrant rights advocates have had to resort to national and international protection mechanisms, including the CNDH, the federal Protection Mechanism for Human Rights Defenders and Journalists, and the IACHR, in order to obtain basic protection from authorities: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 106. Even when protection measures are granted, the implementation has been poor. WOLA and Peace Brigades International, *The Mechanism to Protect Human Rights Defenders and Journalists in Mexico: Challenges and Opportunities*, February 3, 2015, accessed September 25, 2015, http://bit.ly/1OcE3ZB.

[11] México: Presidencia de la Republica, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur".

[12] Diario Oficial de la Federación, "Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur," July 8, 2015, accessed October 15, 2015, http://bit.ly/1Lw0ir2

[13] According to the *Red de Documentación de Organizaciones Defensoras de Migrantes* (REDODEM), the flow of migrants assisted by its 15 member organizations dropped abruptly in mid-2014. In the first half of the year, 21,000 people passed through their shelters and soup kitchens. In the second half of the year, the number was not even half that, but records show there were still 10,000 migrants. REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migration Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx.

[14] It is worth noting that migrants often pay in installments from their place of origin to a "*pollero*" or "*coyote*" to cross the border.

[15] Secretaría de Gobernación, *Coordinación para la Atención Integral de la Migración en la Frontera Sur, Informe de Actividades Julio de 2014—Julio de 2015*, document obtained via Infomex request number 0000400282715, available on WOLA's website, http://bit.ly/1kay9LQ.

[16] Instituto Nacional de Migración, Resolución del Comité de Información, Infomex request 0411100011515, April 16, 2015, accessed September 25, 2015, http://bit.ly/1OcEnHN.

[17] Instituto Nacional de Migración, Respuesta a la solicitud de información pública, Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1KBwKDh.

[18] According to figures from SEGOB, in 2013 the INM detained 86,298 foreigners. In 2014, the number of foreigners detained increased to 127,149. Secretaría de Gobernación, Unidad de Política Migratoria, *Boletines Mensuales de Estadísticas Migratorias 2013 y 2014*, http://bit.ly/1jMKo18.

[19] Ardelio Vargas, "Combate el Gobierno de la Republica Delitos Cometidos en Contra de Migrantes" Press Conference, March 3, 2015, document obtained via Infomex request 0411100024215, June 17, 2015, available on WOLA's website, http://bit.ly/1kaQUPk.

[20] Diario Oficial de la Federación, "Decreto por el que se expide la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones de la Ley General de Población, del Código Penal Federal, del Código Federal de Procedimientos Penales, de la Ley Federal contra la Delincuencia Organizada, de la Ley de la Policía Federal, de la Ley de Asociaciones Religiosas y Culto Público, de la Ley de Inversión Extranjera, y de la Ley General de Turismo" May 25, 2011, accessed October 6, 2015, http://bit.ly/1VBUpPO.

[21] Policía Federal, *Convenio de Colaboración para brindar apoyo en el control, verificación, vigilancia, revisión y traslado de migrantes, así como resguardo perimetral de las estaciones migratorias*, document obtained via Infomex, request 0413100043715, May 27, 2015, document available on WOLA's website, http://bit.ly/1kaRAV3.

[22] La 72, CODEMIRE, COMPA, and Movimiento Migrante Mesoamericano, "INM y PF realizan operativo violento en Tabasco contra migrantes y defensores de derechos humanos," May 3, 2015, accessed October 6, 2015, http://bit.ly/1VBSWJf.

[23] Case documented and followed by the Kino Border Initiative, a civil society organization based in Nogales that is a member of the *Red Sonora*.

[24] "*Federales y personal del INM dejan morir ahogado a un joven migrante centroamericano*", Sin Embargo, March 18, 2015, accessed September 25, 2015, http://bit.ly/1OcEqDq; Carlos Marí, "*Perseguían policías a migrantes accidentados*", *Reforma*, June 28, 2015, accessed September 25, 2015, http://bit.ly/1OcEtz0.

[25] The UPM was created in August 2012 and its mission is: "To develop and propose strategies, programs, and actions to establish a comprehensive, consistent, and well-founded Mexican migration policy that respects and safeguards human rights, facilitates the documentation of migration, and helps to preserve national sovereignty and security, taking into account the branches of government, government orders, and civil society in a framework of shared responsibility with the governments of other countries and of contributing to national development." See: http://bit.ly/1OcEtPB.

[26] The Mexican public administration tends to spend most of the budget at the end of the year, which explains the expenditure increases shown in the last quarters of 2013 and 2014.

[27] The Special Migration Program (*Programa Especial de Migración*, PEM) was published in the Mexico's Official Federal Gazette (*Diario Oficial de la Federación*) on April 30, 2013. The PEM is a cross-cutting multi-sectoral instrument that sets forth the Mexican government's priorities with regard to migration. Its preparation stems from the 2013-2018 National Development Plan (*Plan Nacional de Desarrollo*). The PEM, which consists of five objectives and several strategies and courses of action, seeks to coordinate the work between different bodies and government levels with the aim of ensuring migrants' well-being, taking into account the origin, transit, destination, and return processes. Diario Oficial de la Federación, "Programa Especial de Migración 2014-2018," April 30, 2014, accessed September 25, 2015, http://bit.ly/1OcEzXv.

[28] United States Border Patrol, "Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions by Month - FY 2010-2014," data updated September 2014, accessed September 25, 2015, http://1.usa.gov/1OcECCJ.

[29] Clare Seelke and Kristin Finklea, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, Congressional Research Services, May 7, 2015, accessed October 1, 2015 http://bit.ly/1OcEDq8.

[30] *Presupuesto priorizado de los Proyectos para INM en los FY10 y FY 11*, document provided to WOLA in 2012.

[31] U.S. Embassy – Mexico, "The Merida Initiative – An Overview", May 2015, accessed September 25, 2015, http://1.usa.gov/1OcEEue.

[32] Thomas A. Shannon, "Testimony to Senate Foreign Relations Committee," July 17, 2014, accessed September 25, 2015, http://1.usa.gov/1OcEIdq; Congressional Research Service, "Mexico's Recent Immigration Enforcement Efforts," April 29 2015, accessed September 25, 2015, http://bit.ly/1OcEItV. Congress allocated funds totaling US$79 million for border security and/or judicial reform, without specifying amounts.

[33] Adam Isacson, Maureen Meyer, and Gabriela Morales, Mexico's Other Border: Security, Migration, and the Humanitarian Crisis at the Line with Central America, WOLA, June 2014, accessed September 25, 2015, http://bit.ly/1OcEJ0R.

[34] For example, during a budget hearing on U.S. assistance to Central America in March 2015, Rep. Kay Granger, Chairwoman of the State, Foreign Operations and Related Programs Subcommittee of the House Appropriations Committee stated that, "Our neighbor, Mexico is on the front lines of combatting the illegal migration issue and we must do all we can to help Mexico strengthen its borders." Office of Congresswoman Kay Granger, "Granger Opening Statement: Budget Hearing – Assistance to Central America," March 24, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHpV.

[35] For example, Rep. Albio Sires, Ranking Member of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, stated during a June 25, 2014 Subcommittee hearing that "reports indicate that the migrants are increasingly citing widespread incident[s] of extortion, kidnapping and other abuses committed by both criminal groups and Mexican federal, state and local police officials. Mexico must work together with the Central American neighbors to address security concerns along the southern border." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis," June 25, 2014, information accessed October 27, 2015, http://1.usa.gov/1O67YD1. In another rare instance of dissent, during an April 30, 2015 Western Hemisphere Subcommittee hearing, Representative Joaquín Castro raised questions about Mexico's Southern Border Plan: "Many folks have been cut off from riding what is known as the Beast—the train that ultimately leads them on the path toward the United States. But what I would like to see going back through the testimony that you all give is an understanding of how we are doing that with respect for human rights or understanding the cost of human life." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Migration Crisis: Oversight of the Administration's Proposed $1 Billion Request for Central America," April 30, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHGy.

[36] For example, Congressman Jeff Duncan, Chairman of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, asked Deputy Assistant Secretary Palmieri the following question during the aforementioned June 25, 2014 hearing: "What has changed within the country of Mexico that it has allowed 60,000 children to transit that area? Whether they are Honduran or Guatemalan or El Salvadorean [sic], they crossed that border and they came through Mexico to get to the United States. They didn't get on an airplane. They walked or they rode a train or in a car or something and we are talking about, what, 3-year-olds?" House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis."

[37] Comisión Nacional de los Derechos Humanos, Informe Especial Sobre los Casos de Secuestro en Contra de Migrantes, June 15, 2009, accessed September 25, 2015, http://bit.ly/1L4VR2W; Comisión Nacional de los Derechos Humanos, Informe Especial Sobre Secuestro de Migrantes en México, February 22, 2011, accessed September 25, 2015, http://bit.ly/1L4VW6D.

[38] The 2015 REDODEM report is *Migrantes invisibles, violencia tangible* information accessed on October 15, 2015, http://bit.ly/1Lw2Aqd; while the 2013 report is *Narrativas de la transmigración centroamericana en su paso por México*, accessed October 7, 2015, http://bit.ly/1VEUkW6.

[39] Other reports include: Centro de Derechos Humanos Miguel Agustín Pro Juárez (Centro Prodh) and Casa del Migrante de Saltillo, *Cuaderno de Secuestros de Migrantes*, December 2011, information accessed September 28, 2015, http://bit.ly/1OcELGa; Latin America Working Group, *Perilous Journey*, October 2014, information accessed September 28, 2015, http://bit.ly/1OcEMK6; and Maureen Meyer and Stephanie Brewer, A Dangerous Journey Through Mexico: *Human Rights Violations against Migrants in Transit*, WOLA and Centro Prodh, January 2011, information accessed October 7, 2015, http://bit.ly/1VEUMUj.

[40] Interview with Brother Tomás González, Director of La 72, conducted by Gabriela Morales on April 29, 2015.

[41] U.S. Department of State, *Trafficking in Persons Report 2014, "Mexico,"* information accessed October 6, 2015, http://1.usa.gov/1OcEPpu.

[42] The IACHR indicated in its 2013 report that "During its visit to Reynosa, Tamaulipas, the Commission was told of cases of Mexican migrants who, after being deported, were abducted by criminal organizations like the Los Zetas Cartel or the Gulf Cartel, who locked them in safe houses, cemetery vaults and elsewhere. During their captivity the migrants are beaten severely and their entry into the United States will at times depend on whether they are willing to carry drugs into United States territory. This problem is particularly severe in the state of Tamaulipas." Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 61.

[43] Case documented by members of the Red Sonora.

[44] Silvia Otero, PGR liga a agentes del INM con trata", *El Universal*, September 24, 2013, information accessed September 28, 2015, http://eluni.mx/1OcERxq.

[45] Salvador Camarena, "*Hallados 72 cuerpos de inmigrantes 'sin papeles' en un rancho en México,"El País*, August 26, 2010, information accessed September 28, 2015, http://bit.ly/1OcEUcH.

[46] "Presidente de El Salvador dice que hay un tercer sobreviviente de masacre," CNN México, September 5, 2010, information accessed September 28, 2015, http://cnn.it/1OcEXVM.

[47] Reference is made in survivors' statements, Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 68.

[48] The National Security Archive, "Mexico: Los Zetas Drug Cartel Linked San Fernando Police to Migrant Massacres," December 22, 2014, information accessed September 28, 2015, http://bit.ly/1L4Wae4.Nick Miroff and William Booth, "Mass graves in Mexico reveal new levels of savagery," *Washington Post*, April 24, 2011, information accessed September 28, 2015, http://wapo.st/1OcEXFj; Alberto Nájar, "*México: ¿quiénes son los muertos de Cadereyta?"*,BBC, May 22, 2012, information accessed September 28, 2015, http://bbc.in/1OcF43H; "*Identifican a ocho migrantes hondureños entre víctimas de masacre en México*", El Heraldo, December 22, 2013, information accessed September 28, 2015, http://bit.ly/1OcF4AX. In its report on the situation of Central American migrants in transit through Mexico, the IACHR noted that it had received documents that contain "testimony given by migrants who said they had witnessed mass killings in which several dozen people were murdered and that they had been held in captivity with upwards of 400 people. Some migrants told of having witnessed mutilations, decapitations, migrants who were hammered to death;

there were even stories of bodies being dissolved in barrels of acid." IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 70.

[49] Case documents compiled on the website of the organization Foundation for Justice and the Democratic Rule of Law (*Fundación para la Justicia y el Estado Democrático de Derecho*), http://bit.ly/1OcF8R7, information accessed October 1, 2015.

[50] "Concluding observations of the United Nations Committee on Enforced Disappearances (CED) review of Mexico," February 13, 2015, accessed September 28, 2015, http://bit.ly/1OcFbfF..

[51] For example, the regional network Truth and Justice for Migrants (*Verdad y justicia para migrantes*) is made up of family members of disappeared migrants from Honduras and El Salvador, along with civil society organizations, http://bit.ly/1M6ChTG. The Central American mothers' convoy is organized every year by the Mesoamerican Migrant Movement (*Movimiento Migrante Mesoamericano*), http://bit.ly/1FN4T7J.

[52] See, *Informe alternativo presentado al Comité contra la Desaparición Forzada en vista del examen del informe de México durante la 8ª sesión del Comité, de 2 a 13 de febrero de 2015* (Alternative report submitted to the UN Committee on Enforced Disappearances in light of the review of Mexico's report during the Committee's 8th session from February 2 to 13, 2015), December 2014, p. 16, 2015, accessed October 7, 2015, http://bit.ly/1LztU8X. It is noteworthy that in February 2015 the CED concluded that in much of Mexico there is a grave crisis of generalized disappearances. Enorced disappearance is understood as "the act of depriving a person or persons of his or their freedom, in whatever way, perpetrated by agents of the state or by persons or groups of persons acting with the authorization, support, or acquiescence of the state, followed by an absence of information or a refusal to acknowledge that deprivation of freedom or to give information on the whereabouts of that person, thereby impeding his or her recourse to the applicable legal remedies and procedural guarantees." Article 2, Inter-American Convention on Forced Disappearance of Persons, adopted at Belém do Pará, Brazil, June 9, 1994, at the Twenty-fourth Regular Session of the General Assembly (to the Organization of American States), accessed October 7, 2015, http://bit.ly/1LztkYF.

As a result of the CED's review, the Mexican government began a process of preparing a law on enforced disappearance. While this law was being drawn up, groups of victims and organizations expressed concern about having their experiences included in the new legislation.

In multiple cases the Inter-American Court of Human Rights has defined disappearance as: "Involuntary or enforced disappearance constitutes a multiple and continuing violation of a number of rights protected by the Convention, because not only does it produce an arbitrary deprivation of liberty, but it also endangers personal integrity, safety and the very life of the detainee. Moreover, it places the victim in a state of complete defenselessness, resulting in other related crimes." Case of Bámaca-Velásquez v. Guatemala, Judgment of November 25, 2000, para. 128. See also, among others, IACHR. Report 53/96. Case 8.074. Francisco José Antonio Pratdesaba Barillas (Guatemala); Report 54/96. Case 8.075. Luis Gustavo Marroquín (Guatemala); Report 55/96. Case 8.076. Axel Raúl Lemus García (Guatemala); Report 56/96. Case 9.120. Ana Lucrecia Orellana Stormont (Guatemala); Report 3/98. Case 11.221. Tarcisio Medina Charry (Colombia); Report 51/99. Cases 10.471; 10.955; 11.014; 11.066; 11.070; 11.067; 11.163 (Perú); IACHR Case 10.247 et al., para. 178, Peru, Report Nº 101/01, October 11, 2001, Extrajudicial Executions and Enforced Disappearances of Persons, Considerations relating to enforced disappearances.

[53] Alma Gudiño, *"Consignan a policía de Ramos Arizpe por violar a migrante"*, *Excelsior*, February 23, 2015, accessed September 28, 2015, http://bit.ly/1OcFc3h.

[54] National Human Rights Commission, Recommendation No. 54/2012 *Sobre el caso de agresión sexual a la menor migrante V1*, of September 28, 2012, accessed September 29, 2015, http://bit.ly/1OcFcQP.

[55] Interview with staff from La 72, conducted by Gabriela Morales from April 29 to May 1, 2015.

[56] Natalia's (pseudonym) complaint, reviewed with her explicit authorization.

[57] Manu Ureste and Yosune Chamizo, *"Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur", Animal Político*, July 7, 2015, accessed September 28, 2015, http://bit.ly/1OcFdnN.

[58] REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migrant Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx

[59] Mexican Chamber of Deputies, *Código Penal Federal – Ultima reforma (Federal Criminal Code – Latest reform)*, December 26, 2013, accessed October 7, 2015, http://bit.ly/1RkI6Bm. .

[60] Documentation of case assisted by Kino Border Initiative, a civil society organization and member of the Sonora Network.

[61] Testimony taken by the authors at La 72, April 30, 2015.

[62] It is easy to confuse the different terms related to asylum and refugees. The organizations that have collaborated on this report prefer to refer to the right to asylum in a broad sense and individuals who are migrants and refugees, based on the idea that an individual's status does not depend on an administrative decision. Indeed, governments are the ones who confer or fail to confer refugee status on an individual. "Asylum seekers" are what people are called when the danger they are fleeing from has yet to be evaluated. Many countries have a specific legal framework for cases of political persecution (thus distinguishing between humanitarian and political asylum). In Mexico, Article 13 of the Law on Refugees, Complementary Protection, and Political Asylum  provides that an individual will be granted refugee status under the following conditions:

> They are outside of the country of which they are nationals, to which they cannot return for well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions;

> They have fled from their country of origin because their lives, security, or liberty have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights, or other circumstances that have gravely disturbed public order, and

> For circumstances that have emerged in their country of origin or as a result of activities undertaken during their time on domestic territory they have well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions, or their lives, security, or liberty may be threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances that have gravely disturbed public order.

Law on Refugees, Complementary Protection, and Political Asylum, 2011, accessed October 7, 2015, http://bit.ly/1GoSuSk.

[63] *Boletín Estadístico de SEGOB*, 2014, accessed October 15, 2015 http://bit.ly/1jMKhm0.

[64] National Autonomous University of Honduras (*Universidad Nacional Autónoma de Honduras*) and the University Institute for Democracy, Peace and Security (*Instituto Universitario en Democracia, Paz, y Seguridad*), *Observatorio de la Violencia (Observatory of violence)*, February 2015, accessed September 28, 2015, http://bit.ly/1OcFhEe..

[65] *"El Salvador confirma a agosto como el mes más violento desde la guerra civil"*, BBC, September 2, 2015, accessed September 28, 2015, http://bbc.in/1OcFkzT.

[66] Communiqué from INM to members of its Citizen's Council, dated June 23, 2015.

[67] *La Ruta del Encierro Sin Fronteras*, 2014, accessed September 28, 2015, http://bit.ly/1OcFlUk *"Derechos Cautivos"*, *Sin Fronteras*, 2015, accessed September 28, 2015, http://bit.ly/1OcFmHR.

[68] Secretariat of the Interior, *"Estadísticas Comar"*, September 22, 2015, accessed September 28, 2015, http://bit.ly/1OcFo2D. For reasons that are unclear, the Secretariat of the Interior provides a much lower figure—296—for the number of refugees documented as permanent residents in 2014; Secretariat of the Interior, Migration Policy Unit, and the National Migration Institute, 2014 Monthly Migration Statistics Report, 2014, accessed October 10, 2015 http://bit.ly/1OcFuap.

[69] Ibid.

[70] United Nations High Commissioner for Refugees, *Arrancados de Raíz*, accessed September 28, 2015, http://bit.ly/1Kl0Qv4. .

[71] Chamber of Deputies of the Honorable Congress of the Union, *Law on Refugees, Complementary Protection, and Political Asylum*, October 30, 2014, accessed September 28, 2015, http://bit.ly/1OcFwPu

[72] Ibid.

[73] U.S. Citizenship and Immigration Services, "Refugees", accessed September 28, 2015, http://1.usa.gov/1OcFzef

[74] Secretariat of the Interior, "Estadísticas COMAR", September 22, 2015, September 28, 2015, http://bit.ly/1JBst5L..

[75] United Nations High Commissioner for Refugees (UNHCR), *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y separados de Centroamérica y su necesidad de protección internacional*  2014, accessed October 1, 2015, http://bit.ly/1OcFBTb

[76] IACHR, Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico, p. 227-228

[77] Interview with Salvador Leyva, attorney for La 72, conducted by Gabriela Morales on April 29, 2015. It is worth noting that in 2015, investigators from the Human Rights Institute of Georgetown Law School conducted a week-long investigative mission to Tapachula, Chiapas, and the capital of Guatemala. They conducted interviews with 45 migrants and found that children were not appropriately interviewed to identify their need for international protection nor were they informed about their right to seek asylum. Furthermore, investigators found that the conditions, as well as the length, of detention dissuade children

from applying for asylum. Georgetown Law Human Rights Institute, *The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection*, April 2015, information accessed on October 27, 2015. http://bit.ly/1O6ajOk.

[78] Clay Boggs, Carolina Carreño y Diana Martinez, "New Data Show that Mexico has Intensified Its Immigration Operations Without Building an Adequate Refugee Protection System," Washington Office on Latin America, June 24, accessed September 28, 2015, http://bit.ly/1Lzsxae.

[79] Secretariat of Finance, "Presupuesto de Egresos de la Federación" ("Federal Expenditures Budget"), September 9, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyk.

[80] Manu Ureste, *"México recibe 67% más solicitudes de refugio, pero sólo tiene 15 oficiales para atender 2 mil casos"*, *Animal Político*, June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyz.

[81] Miguel Agustín Pro Juárez Center for Human Rights (*Centro de Derechos Humanos Miguel Agustín Pro Juárez*) and the Migrant Affairs Program of the Ibero-American University, Mexico City Campus (*Programa de Asuntos Migratorios de la Universidad Iberoamericana Campus Ciudad de México*), *Migrantes en prisión: La incriminación de migrantes en México*, September 2014, accessed September 28, 2015, http://bit.ly/1OcFgQt.

[82] The phenomenon of falsely accusing migrants of crimes became evident thanks to the case of Ángel Amílcar Colón Quevedo, an indigenous Garífuna man from Honduras, who in January 2009 left his country headed for the United States. Detained in a house where he was awaiting a "coyote" to take him to the US, Ángel was falsely accused of participating in organized crime. Following his detention he was assaulted and tortured by the army and federal police agents, who above all made reference to the color of his skin and his origins as a foreign migrant. He was jailed at the Federal Social Readaptation Center No 4 Northwest (*Centro Federal de Readaptación Social No. 4 Noroeste*), in Tepic, Nayarit. The Miguel Agustín Pro Juárez Center for Human Rights took charge of his legal defense and undertook a publicity campaign to gain his release. Five years, six months and seven days later on October 16, 2014 he was released after the PGR presented its decision to not indict.

[83] Cases documented by the Saltillo Migrant Shelter (*Casa de Migrante de Saltillo*).

[84] Ibid.

[85] Federal Attorney General's Office, Deputy Attorney General's Office for Legal and International Affairs, General Directorate of Legal Affairs, Official Letter SJAI/DGAJ/08863/2015, response to Infomex request, number 0001700224815, July 14, 2015, document available on the WOLA website, http://bit.ly/1kaC0bS.

[86] Procuraduría General de la Republica, Subprocuraduría Jurídica y de Asuntos Internacionales, Dirección General de Asuntos Jurídicos, Oficio SJAI/DGAJ/08863/2015, respuesta a solicitud de información folio 0001700224815, July 15, 2015, available on WOLA's website, http://bit.ly/1kaC0bS.

[87] Organization of American States, "Report on the 154th Session of the IACHR", June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFE1w.

[88] This information was taken from the four responses to requests for information from the Chiapas Government. The first three requests were made independently of this report by journalist Manu Ureste of *Animal Político* to the Government of Chiapas, the State's Attorney General's Office, the Specialized Prosecutor's Office on Crimes against Immigrants (responses to requests for information, number 12855

(data for 2013); 12856 (data for 2014); and 12857 (data for 2015), June 5, 2015). Documents available on WOLA's website, http://bit.ly/1kayxdl (2013); http://bit.ly/1kayBdb (2014); and http://bit.ly/1kayFJK (2015). However, the aforementioned request did not make reference to the number of sentences handed down. As such, it was necessary to consult the response to the request submitted by the authors of this report (the Government of Chiapas, the State's Attorney General's Office, and the Specialized Prosecutor's Office on Crimes against Immigrants (response to request for information, number 12960, June 18, 2015), available on WOLA's website, http://bit.ly/1kazoe8.

[89] Response from the Tabasco Attorney General's Office to the request for information, number 00993815, June 10, 2015, as part of an investigative journalism report. See Manu Ureste and Yosune Chamizo, *"Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur", Animal Político.* July 7, 2015, accessed September 28, 2015: http://bit.ly/1OcFdnN. Documents available on the WOLA website, http://bit.ly/1kaBnPt (2013); http://bit.ly/1kaBryW (2014); and http://bit.ly/1kaBvP7 (2015). For 2014 and 2015, the document refers to "information pertaining to migrants (injured party)," while for 2013 it only refers to "information pertaining to migrants (injured party) [sic]." This creates confusion as to whether the 2013 data include cases with migrants who are perpetrators or only victims. The IACHR criticizes this same lack of precision in its report, when analyzing the response given by the Mexican state to its request for information on cases of crimes against migrants (Inter American Commission on *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 136).

[90] National Statistics and Geography Institute (Instituto Nacional de Estadística y Geografía), National Survey of Victimization and Perception of Safety (*Encuesta Nacional de Victimización y Percepción sobre Seguridad Pública*, ENVIPE) 2015, "Principales Resultados," accessed October 16, 2015 http://bit.ly/1Mu3y2L, p. 27.

[91] Ibid.

[92] The case of Beylin Sarmiento, a Honduran murdered while crossing Mexico in August 2014, shows that the lack of communication among state Attorney General's Offices can have serious consequences. John Washington, "Who Killed Beylin Sarmiento?" T*he Nation*, August 11, 2015. Accessed September 28, 2015. See http://bit.ly/1OcFG9F.

[93] National Human Rights Commission, in response to request for information, number 00036515, July 1, 2015, document available on WOLA's website, http://bit.ly/1kaBOJK.

[94] OPIs are Federal Migration Agents whose duty it is to guarantee respect of child migrant rights, particularly unaccompanied minors. The INM currently has 543 OPIs in its 32 regional delegations. OPIs are selected to receive ongoing specialized training. Their duties are to: (1) protect the physical and mental integrity of children; (2) immediately provide basic health, food, clothing, and shelter services; (3) facilitate contact between minors and their families via free telephone calls; (4) keep minors apprised of their migratory status, using a kind, age-appropriate language; and (5) assist child migrants throughout their repatriation process. INM website. Accessed October 7, 2015, http://bit.ly/1LztuiV.

[95] Interview with Alberto Xicoténcatl, conducted by Gabriela Morales. May 14, 2015.

[96] Diario Oficial de la Federación, *"Reglamento Interior de la Secretaria de Gobernación"* ("Internal Regulations for the Secretariat of the Interior), February 4, 2013. Accessed September 28, 2015: http://bit.ly/1OcFGGy.

[97] See, Rodolfo Córdova, *"Transformar construyendo: dos años de Presidencia del Consejo Ciudadano del Instituto Nacional de Migración, informe rendición de cuentas"*, *Fundar*, August 2015. Accessed October 7, 2015, http://bit.ly/1LzvJCB; and Adam Lane, Bryan Maekawa, Manuel Ruiz and Ricardo Vázquez, *"Mejores prácticas para los consejos consultivos ciudadano en México"*, May 11, 2015.

[98] Diario Oficial de la Federación, "Acuerdo por el que se emiten las Normas para el funcionamiento de las Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración", August 11, 2012. Accessed September 28, 2015: http://bit.ly/1OcFIhL.

[99] Migration Law, http://bit.ly/1OiZaZ0.

[100] See Articles 178 through 184 of the Migration Law Regulations. Diario Oficial de la Federación, "Decreto por el que se expide el Reglamento de la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones del Reglamento de la Ley General de Población y del Reglamento de la Ley de Asociaciones Religiosas y Culto Público, September 29, 2012. Accessed September 28, 2015: http://bit.ly/1OcFJ5n.

[101] SEGOB's internal regulations provide for an Internal Affairs Unit within the INM, but no such unit has yet been established. The functions, objectives, and goals of such Unit should be consistent with best practices on this matter and approved by the INM's Citizen's Council.

## ABOUT THE ORGANIZATIONS

**CASA DEL MIGRANTE DE SALTILLO "FRONTERA CON JUSTICIA", AC,** in Saltillo, Coahuila, provides comprehensive humanitarian assistance as well as case documentation and legal services.

**FUNDAR, CENTRO DE ANÁLISIS E INVESTIGACIÓN, AC** is a civil society organization based in Mexico City, Mexico that works toward a substantive democracy.

**ALBERGUE DE MIGRANTES "HERMANOS EL CAMINO,"** in Ixtepec, Oaxaca, provides comprehensive humanitarian assistance to migrants in transit in Mexico.

**LA 72, HOGAR—REFUGIO PARA PERSONAS MIGRANTES,** is a Franciscan project dedicated to providing comprehensive assistance to migrants and refugees traveling through Tenosique, Tabasco in Mexico.

**WOLA (WASHINGTON OFFICE ON LATIN AMERICA)** is a leading research and advocacy organization that promotes human rights in the Americas.

**LA RED SONORA** is a network of three organizations based in Sonora, Mexico dedicated to defending and providing humanitarian assistance to migrants in Mexico.
- **Centro Comunitario de Atención al Migrante y Necesitado,** in Altar, is a migrant shelter run by the local Nuestra Señora de Guadelupe Church.
- **Centro de Recursos para Migrantes,** in Agua Prieta, works to provide humanitarian assistance to migrants and document abuses.
- **Kino Border Initiative** is an organization based in Nogales, Sonora and Nogales, Arizona that works in support of migrants and refugees in the United States and Mexico.

**UN MUNDO, UNA NACIÓN, AC** is an organization dedicated to providing humanitarian assistance and promoting the human rights of migrants in Apizaco, Tlaxcala.

## ABOUT THE AUTHORS

José Knippen is a migration project coordinator at Fundar. Clay Boggs was a Program Officer at WOLA until October 2015. Maureen Meyer is WOLA's Senior Associate for Mexico and Migrant Rights.

## ACKNOWLEDGMENTS

We thank the following people for their contributions to this report. Gabriela Morales worked with WOLA and Fundar in the research for this report and made a series of field visits to migrant shelters and organizations to gather documentation and conduct interviews. Irazú Gómez has worked as a migrant rights advocate in Puebla for many years. Rodolfo Córdova, a researcher at Fundar, and Kristel Muciño, WOLA's Communications Director, offered valuable suggestions to multiple versions of the report. Hannah Smith, WOLA Program Assistant, and Andrés Díaz, a researcher at Fundar, edited the text of the report. We also want to thank Mike Evans of the National Security Archive for advice on the process of requesting information through the Infomex system. This report would not have been possible without the generous support of the Ford Foundation, the MacArthur Foundation, and CAMMINA-the Alliance for Migration in Central America and Mexico.

# EXHIBIT 10



WOMEN'S
REFUGEE
COMMISSION

Research, Rethink, Resolve,

Migrant and Refugee Caravans:
Failed Responses to Women and Children in Need
of International Protection and Humanitarian Aid

May 2019

The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice.

## Acknowledgements
This study was made possible by generous funding support from CAMMINA, Hispanics in Philanthropy, and Oak Foundation.

This report was written by Tatiana Brofft and reviewed by Michelle Brané, Leah Chavla, Ursela Ojeda, and Dale Buscher of the Women's Refugee Commission. It was edited by Lauren Wolkoff and designed by Diana Quick.

The author thanks Omar Robles and Jimmy McDonough for their valuable contributions in the research process.

The Women's Refugee Commission extends deep thanks to the research participants, particularly the refugees and migrants, who generously shared their time and experiences, as well as: Al Otro Lado, Albergue Jesús el Buen Pastor, Albergue Madre Asunta, Albergues YMCA, Alma migrante, Asylum Access, Catholic Legal Immigration Network, Centro de Derechos Humanos Fray Matías de Córdova, Comisión Mexicana de Ayuda a Refugiados, Comité Estratégico de Ayuda Humanitaria, Consejo Nacional para Prevenir la Discriminación, Desarrollo Integral para la Familia, Doctors Without Borders, El Colegio de la Frontera Norte , Futbol Más, Grupo Beta, Human Rights First, Human Rights Watch, Instituto para las Mujeres en la Migración, Instituto Nacional de Migración , International Organization for Migration, Jesuit Refugee Service, Secretaría de Relaciones Exteriores, Tech Palewi, Servicio Nacional de Empleo, Sistema de Desarrollo Integral de la Familia (DIF), Una mano amiga en la lucha contra el SIDA, United Nations Children's Fund, United Nations High Commissioner for Refugees , and US Customs and Border Protection.

Cover photo: Girls who traveled with the 2018  caravans at the Benito Juárez sports complex shelter. © Michelle Brané

© 2019 Women's Refugee Commission

# Contents

Background ..................................................................................................................................................1

Objectives and Methodology ..................................................................................................................... 3

Map of the Region and Main Route of the 2018 Caravan .................................................................... 4

Mexico: Protection Gaps and Risks........................................................................................................... 4

United States: Closing Borders................................................................................................................... 8

Heightened Tensions against Immigrants in Mexico and the US ....................................................11

Recommendations ......................................................................................................................................11

Acronyms and Abbreviations................................................................................................................... 13

Endnotes ...................................................................................................................................................... 14

*"We left Honduras in July, before the caravans started. The Maras were after us.*

*"We moved slowly through Mexico. We were taking temporary jobs to have enough money to feed the kids and for a smuggler for the most dangerous parts of the journey. When the caravan arrived, we were already in San Luis Potosi, but we decided to go back and join it in Guadalajara. It would be safer. We were constantly afraid of being deported, extorted, robbed, or having a child kidnapped … you know, the usual. In that, I do feel the caravan was safer than traveling alone. Also, people were nicer, they gave us food and clothes. Even a police officer helped me when my boy was dehydrated.*

*"But I never felt safe."*

—Lili,[1] a woman from Honduras in her early 20s who joined the caravans in Mexico, traveling with her husband and four children. (Interviewed by the Women's Refugee Commission in Tijuana on November 30, 2018)

# BACKGROUND

Over the last decade, an increasing number of Hondurans, Salvadorans, and Guatemalans have been forced to flee their countries of origin due to widespread criminal violence, life-threatening gender and domestic violence, and extreme economic hardship.[2] In recent years, particularly in the first months of 2019, the number of unaccompanied children and families forced to flee has sharply increased.[3] The levels of violence and human rights violations Central Americans experience resemble those of people in war-torn countries.[4] Notwithstanding, this humanitarian crisis has largely evolved in the shadows. It has been neglected by the US and Mexican governments, which—failing to recognize the refugee nature of the displacement—have turned a blind eye to the lack of safe and legal channels to claim asylum, as well as to the deadly risks and systematic abuses faced by Central Americans in their journey to safety.[5]

On October 12, 2018, a group of 160 people left San Pedro Sula, Honduras,[6] one of the most violent cities in the world.[7] The dire living conditions of people from Central America, paired with the well-known dangers of the migrant trail, proved fertile ground for turning the rumors of a historically large caravan into a self-fulfilling prophecy.[8] By the time it reached the Mexican border with Guatemala, more than 7,000 refugees and migrants were moving north at the same time.[9] Four additional smaller groups followed, bringing the estimated total to more than 17,900 caravan members traveling through Mexico between October and December 2018.[10] Central Americans saw in caravans a traveling strategy to render themselves and their plight visible and thus obtain safe passage to Mexico and the US.[11]



*Drawing made by Salvadoran boy in psychosocial support activity. When asked to share his drawing and memories about his house in his hometown, he referred to violent incidents.*

The size, cohesion, and organization of the 2018 caravan fueled constant monitoring and reporting by journalists and human rights defenders.[12] In the case of this group, putting the spotlight on people on the move generally deterred large-scale criminal activities and human rights violations. Moreover, it rallied humanitarian aid and highlighted the need for policy responses. To a certain extent, the 2018 caravans delivered on the expectation of reducing costs, granting protection, and facilitating transit through Mexico.[13]

However, a risk assessment conducted by the Women's Refugee Commission (WRC) found that the protection offered by caravans is extremely narrow. People who follow this traveling strategy still face myriad risks and protection gaps. Furthermore, WRC is concerned that, due to heightened xenophobia and immigration control, members of the caravans that traveled Mexico in the first four months of 2019 were more exposed to ever-present dangers such as police abuse and criminal activities[14] and received less humanitarian support.[15] Caravans had unintended consequences on public opinion and policy decisions that will affect refugees and migrants adversely over the long term.



# OBJECTIVES AND METHODOLOGY OF THE ASSESSMENT

From November 26, 2018 to January 25, 2019, WRC assessed the protection risks faced by women, children, and families traveling in caravans through Mexico.

WRC engaged in semi-structured interviews with members of the caravan to learn about why they were fleeing their countries of origin and traveling in large groups, their needs, the risks they face during the journey, and their intended destination. Individuals were informed that they could refuse to participate or to answer questions they deemed sensitive. The team also met with relevant authorities and key stakeholders, such as international organizations, nongovernmental organizations (NGOs), and faith groups, to map their capacities and share concerns regarding the rights and well-being of caravan members.

WRC began the assessment in Tijuana because asylum seekers and migrants in this border city with the US had completed their journey through Mexico, which allowed them to report on the whole route. Additionally, it was the locality were the largest group concentrated for the longest time. This situation multiplied the needs and challenges in terms of service provision and protection. In Tijuana, WRC visited shelters run by civil society for families, women, and children, as well as the temporary shelters set up by the government at the Benito Juarez sports complex and the Barretal concert venue. Additionally, WRC visited the job fair offered by the Mexican National Employment Service (SNE) to learn about who was availing themselves of the option to regularize their immigration status in Mexico, how they were doing so, and why. WRC also visited the Mexican side of El Chaparral port of entry to document the dynamics that obstruct access to international protection in the US.

WRC returned to Tijuana to assess the evolution of the situation and follow up with persons interviewed in the first visit. The team identified the impact of having transferred refugees and migrants to Barretal as well as of the policies of the incoming Mexican administration of Andrés Manuel López Obrador.

Following the research conducted in Tijuana, WRC traveled to Tapachula to identify the needs and risks faced by the caravan when they arrived to Mexico, as well as of women, children, and youth who separated from the main group. In this border city with Guatemala, the team made a field visit to the immigration station Siglo XXI, the largest in Mexico; visited shelters run by civil society and UNHCR; and participated in psychosocial activities for refugee children.

To have a comprehensive perspective, WRC met with representatives of the Mexican federal government in Mexico City and of national headquarters of international organizations and NGOs that have provided services and protection to the 2018 Caravans and inquire about their preparedness for future caravans. Additionally, WRC conducted media monitoring and desk research.

This initial evaluation is a snapshot of a moving target and constantly changing dynamic and political context.



# MAP OF THE REGION AND MAIN ROUTE OF THE 2018 CARAVAN



# MEXICO: PROTECTION GAPS AND RISKS

WRC was particularly troubled by the fact that neither the caravan itself nor the Mexican government response to it provided adequate protection to women and children. The caravans provided unaccompanied children and single women the option to link themselves with a family, friends, or partner for the journey north. While these relationships offer some protections, WRC identified a significant number of cases in which they created problematic situations that led to violence and abuse. A service provider shared a story of a 12-year-old Mexican girl who joined the caravan to look for her mother, who lived in northern Mexico. On the journey, she met a family with whom she stayed for protection but eventually they restricted her movement and prevented her from speaking to or approaching authorities, service providers, and even other children. When her real identity was discovered and she was rescued and referred to Mexico's child services agency (DIF),[16] authorities found her real family had been looking for her.[17]

Overall, pressure to stay with the caravan in a group put the most vulnerable populations at high risk by preventing them from seeking assistance and support when needed and rendering them and their specific needs invisible. WRC spoke with women and children who were unwilling to go to specialized shelters that could provide better care and services. They said they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group. A pregnant woman told the WRC that she crossed the Suchiate river just after a threatened miscarriage of her seven-month pregnancy because she did not want to be left behind in Guatemala while the rest of the group advanced into Mexico.[18]




*Women and children told the WRC that they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group.*

Despite the pressure and efforts to stay together, the caravan left women and children behind, in both a metaphorical and a literal sense. Structural barriers, such as security considerations and having to care for the children, prevented them from participating in decision-making meetings.[19] Those who followed the caravan, such as humanitarian workers, human rights and international organizations, reported that, as the group advanced, the presence of women and families reduced. They pointed out that contingents composed mostly of young single men who could move faster took the lead.[20] WRC met a boy in southern Mexico who was unable to keep up with the caravan because his prosthetic leg broke.[21] He is only one example. Many women, families, and people with disabilities who could not maintain the pace lagged or stopped along the route, were left behind, or opted for voluntary repatriation. Women who traveled in the caravan, service providers, and government officials expressed outrage that women and children were pushed to the front of the caravan whenever there was confrontation with authorities. Otherwise, they were left behind.[22]

Furthermore, the humanitarian response, both from Mexican authorities and nongovernmental actors, was lacking and had few or no age and gender considerations, reproducing systemic obstacles that hamper women and children's access to information and services, as well as their ability to exercise their rights. WRC did not identify any safe space for women or child care services to assist them. In Tijuana, the Mexican government set up a job fair featuring representatives from the agencies that process asylum claims and humanitarian visas. Due to the lack of services that addressed women's needs, women interviewed by WRC were often unaware of the job fair because this information did not reach them or did not attend because they assumed that having to care for their children meant they would not qualify for a job, or because accessing those locations with children was a challenge.

 
Service provision was intermittent, placed a heavy reliance on overburdened civil society organizations and inexperienced volunteers, and was distributed without engaging beneficiaries. WRC spoke with women and children who had gone days without eating and who reported that water was scarce or not potable. Mothers and humanitarian aid workers expressed concerns that children were at risk of malnutrition.[23] People on the move slept on the streets or were housed in overcrowded, unsanitary shelters. The WRC team observed how unhygienic conditions and lack of protection against the elements resulted in widespread sickness.

Privacy and safety considerations geared to prevent sexual and gender-based violence were substandard. When WRC visited Benito Juarez and Barretal, the two temporary shelters the Mexican government set up in Tijuana to hold caravan members, the team observed that overcrowding resulted in insufficient designated space for families, women, and children. There was only one space for these three populations, which implied that even single women, women with their children, and unaccompanied girls in a so-called safe space were placed together with men they did not know. Moreover, while these shelters claimed to offer sex-separated toilets, in most cases they were rows of portable toilets that were used interchangeably and had broken locks. Showers had no privacy barriers; at best they were separated by improvised sheets and blankets.

WRC learned of instances of domestic violence, sexual harassment, physical assaults, transactional sex, forced prostitution, and rape, and yet there was no clear referral network for survivors. Assistance services were bureaucratic and cumbersome, rendering them practically inaccessible. The absence of prevention and response to sexual and gender-based violence was stark. There were no safe spaces for women to privately report abuse. When people would raise questions about post-rape care, they were met with silence and frozen looks by health care providers at Barretal, even though by law they should be available.[24]

Access to protections in Mexico is not always meaningful. The asylum system has considerable shortcomings, including prolonged or unnecessary use of immigration detention, proceedings that last for years with restrictions on geographical mobility that force applicants to remain in insecure and underdeveloped areas, limited integration options, and underdeveloped and under-resourced refugee status determination procedures.[25] In the case of unaccompanied children, these shortcomings are compounded by flawed or nonexistent best interests determinations. In Mexico, children in need of international protection are inadequately screened, or not screened at all, and are often returned to places where they fear irreparable harm,[26] violating the principle of *non-refoulement* —a cornerstone of refugee protection that prescribes that no one should be returned to a country where his or her life or freedom would be threatened by persecution, other ill-treatment, or torture.[27] Furthermore, since the Mexican and US child protection services do not communicate with each other, the Mexican protection service does not consider protection or family reunification in the US as an option.[28]

The glaring lack of information, coupled with the troubling widespread misinformation, heightened risks. WRC spoke in Tijuana and Tapachula[29] with refugees and migrants who were making ill-informed decisions—such as abandoning their asylum applications, rejecting moving to safer spaces, or hiring a smuggler—that increased their vulnerability and in some cases put them at grave danger. The inability of the Mexican government, international organizations, legal service providers, and humanitarian agencies to fill the information void facilitated dangerous power dynamics that led to manipulation and abuse. Both in Tapachula and in Tijuana, WRC spoke to numerous people who were deeply confused and misinformed about immigration procedures both in Mexico and the US. An accredited humanitarian worker shared that, while they gave accurate information about asylum in Mexico, people in the caravan with megaphones accused them of being untruthful.[30]



Protection gaps were compounded by the indisputable fact that parts of Mexico are not safe.[31] WRC learned of cases of child labor, forced prostitution, forced recruitment, kidnapping, forced drug dealing, and trafficking, as well as misconduct and human rights violations by authorities. Service providers shared stories of an accusation of sexual assault against a government official in Tapachula,[32] men in Benito Juárez shelter being tricked into jobs and having been forced to clean blood from cars,[33] and girls and trans women being forcibly prostituted.[34] The two places where caravan members waited the longest—Tapachula and Tijuana— have a large presence of criminal organizations and are hubs of the illegal sex industry.[35]

> "A man offered me and some friends a job. He also offered to bring us to a safe shelter; that is how we got here. We did not follow up with the job offer because I noticed he had a Barrio 18 tattoo.[36] I have not left the shelter since we arrived. I do not want to run into him and I'm scared of gangs and organized crime operating in the city."
> —Adriana, a woman in her 40s from El Salvador who traveled in the caravan with some friends. Interviewed by WRC in Tijuana on December 19, 2018.

All service providers interviewed by WRC agreed that institutional challenges were aggravated by the Mexican government's lack of leadership and preparedness in responding to the caravans. Even though the advance of the 2018 caravan was widely reported, when it reached Mexico there was no protocol in place to grant humanitarian assistance nor to process the arrival of large numbers of people seeking protection. Federal authorities at the time decided that local governments would be responsible for providing basic needs and social services. This resulted in poor planning, for example the government of Tijuana opening a temporary shelter with capacity for 2,000 persons that, two weeks later, held over 6,000 persons in precarious conditions. This shelter later closed, and the people still housed there at the time had to be transferred to a new shelter.[37] Additionally, the avenues available to caravan members to seek legal status in Mexico were constantly changing—ranging from strict border enforcement to a two-week pilot program of documenting all caravan members with humanitarian visas.[38]





*Shelters set up for migrants soon became severely overcrowded and unsanitary.*

To date, no long-term policy has been outlined or implemented by the Mexican government. As a result, since mid-March there is a mounting administrative and humanitarian crisis at Mexico's southern border. More and more people are stranded in precarious conditions because Mexico's National Institute of Migration (INM) increased immigration enforcement against caravans and temporarily suspended immigration procedures in Tapachula, where the immigration station is at capacity and people are being held in detention-like temporary shelters.[39]

One reason for the Mexican government's insufficient response for the 2018 caravans was the fact that, in the last third of that year, a significant number of authorities at all levels of government, including the president, were in a lame duck period.[40] While the synchronized displacement of more than 10,000 people would naturally create challenges, Mexico has the capacity to offer an adequate humanitarian response.[41] Once the new government came into power, it has struggled to reconcile its seemingly contrasting objectives of avoiding a confrontation with the US government[42] and fulfilling its promise of a new immigration policy that follows a human rights approach and leaves behind its deterrence and contention approach.[43]

Improvisation, lack of clarity regarding responsibilities, changing strategies, informal procedures, and overreliance on volunteers have prevented the government from mitigating risks and left basic needs unsatisfied.

## UNITED STATES: CLOSING BORDERS

Caravan members were trapped in one of Mexico's most dangerous cities[44] as a direct consequence of a preexisting US practice of turning back and regulating the number of asylum seekers that can present themselves at a port of entry (a practice known as "metering").[45] Everything about this illegal

practice, which is currently under litigation,[46] jeopardizes the rights and integrity of people in need of international protection. WRC observed on its visits to Tijuana that asylum seekers are asked to register on an unofficial list with an average two-month waiting time to present their claim. This practice was confirmed by a Customs and Border Protection (CBP) officer in San Diego[47] and is also occurring at ports of entry across the border.[48] Given that neither the US nor Mexico accept their evident participation in this ad hoc process, the list is run by migrants themselves. As it has no clear guidelines, regulations, oversight, or accountability, the process prevents the most vulnerable populations from being identified, jeopardizes people's privacy, and opens the floodgates for corruption and abuse. On the day after WRC spoke with list managers— questioning what oversight existed to prevent exploitation—the team learned of a migrant who came forward to report demands for sex and/or money in exchange for getting on the list.[49] Since then, interviews with migrants have revealed numerous instances of extortion.[50]

Even more problematic, WRC identified that metering is leaving unaccompanied children with no avenue to present themselves at a US port of entry, systematically ignoring their best interests and denying their right to seek asylum or be granted protection under US laws. Unaccompanied migrant children are not only turned back by Mexican authorities when they approach a US port of entry, they are also not allowed on the list.[51] CBP confirmed to WRC that unaccompanied children who approach the border without authorization are turned back and told to get in line unless they are with an attorney.[52] Migrants managing the list in Tijuana told WRC that children must be with an adult in order to get on the list or go the border once their name is called. This practice denies children access to their right to claim protection in the US independent of related adults, in violation of the Trafficking Victims Protection Reauthorization Act, US immigration and asylum law, and the 1951 Refugee Convention.[53]



*The border.*



Mexican and US immigration officials are aware of the illegalities of this practice. WRC directly informed them of our findings and concerns.[54] Nonetheless, CBP continues to accept children only reluctantly in some cases where they are escorted by Members of Congress, lawyers, or advocacy organizations.[55] These exceptions, while lifesaving for those children who find assistance, do not address the illegality of turning away unaccompanied children. Accompaniment is not a legal requirement for seeking protection. At the time of this writing, unfortunately only a handful of the more than 100 unaccompanied children in Tijuana have been identified and assisted.[56]

WRC observed that unaccompanied children who have not found representation or assistance through volunteers are living in unhealthy and dangerous conditions. Children hesitate to approach Mexico's child services agency (DIF),[57] because it will not allow them to claim protection in the US— even if doing so is in their best interests. In fact, the WRC team was told repeatedly that children run from and avoid DIF, and that they are often distrustful of adults approaching them to offer assistance.[58] Left with no other option, unaccompanied children must make impossible choices between the dangers of:
  A. staying stranded in Tijuana indefinitely;
  B. entering the US without inspection between ports of entry;
  C. looking for a smuggler or another adult to accompany them across the border (thereby creating an opportunity for those who wish to traffic or otherwise harm a child to prey upon them by exploiting this practice); or
  D. submitting to voluntary return (even when it means returning to a place where their life and freedom are at risk, amounting to *refoulement*).

All these are situations the US government should aim to prevent rather than encourage. In December 2018, three Honduran children in Tijuana who traveled with the caravan and had not presented themselves at a port of entry due to metering, were tortured—and two of them were brutally murdered. At least two of them had already been identified as having a strong case for accessing protection in the US.[59] This was a painful confirmation that the caravan, Mexico, and especially the US are failing to protect children on the move. In the words of the director of the shelter where the children were staying: "It was Mexican criminals who killed them, but it was the US government who sent them to the slaughterhouse."[60]

Furthermore, the 2018 caravan had the unintended consequence of giving the US government pretext to move forward with its plans to extra-territorialize the waiting time of asylum procedures to Mexican territory by expanding the interpretation of section 235(b)(2)(C) of the US Immigration and Nationality Act (INA).[61] This expanded interpretation allows for the return to Mexico of asylum seekers—arriving at a port of entry or entering the US from Mexico between ports of entry—for the duration of their immigration proceedings.

This policy, officially named "Migrant Protection Protocols," also known as "Remain in Mexico," has created insurmountable barriers to due process, access to counsel, and the ability to present meaningful defenses to removal before US courts. Remain in Mexico disrupts the right to family unity for those with loved ones already residing in the US and traps asylum seekers in a potentially dangerous environment. On April 8, 2019, a federal court issued an injunction on these returns.[62] However, this policy has not yet been ruled out. On May 7, 2019, an appeal court overturned the injunction. Remain in Mexico and metering are examples of how the US an Mexican governments are blocking access to protection and endangering migrants.[63]

# HEIGHTENED TENSIONS AGAINST IMMIGRANTS IN MEXICO AND THE US

While the visible forced displacement of large numbers of Central Americans—and the precarious, dangerous conditions in which they traveled—rallied altruistic and humanitarian support among some sectors of Central American, Mexican, and US societies, in others it fueled xenophobic sentiments that led to calls for increased border and immigration enforcement.[64]

In January 2019, a new caravan began its journey in search of a safe haven.[65] Mexico's incoming administration expressed its intention to offer a comprehensive response following a human rights approach—seeming to signal a positive step to safeguard the rights of migrants, guarantee adequate humanitarian response, and address root causes by promoting regional development.[66] For two weeks in January, Mexico offered humanitarian visas to more than 12,500 caravan members arriving at Mexico's southern border.[67] However, six months in, no long-term policy has been put in place and service provision to members of caravans in Mexico still has considerable shortcomings.[68] President Trump's strong criticism of Mexico's immigration policies[69] seems to be contributing to a shift in Mexico's policy back to its old deterrence and containment approach.[70] WRC is concerned that, if implemented without adequate oversight or human rights considerations, immigration enforcement in Mexico will continue to violate people's rights and put them in extremely dangerous situations.

Heightened xenophobia, Mexico's inconsistent policies, and the US decision to continue narrowing avenues to protection suggest that future caravans might face even grimmer conditions than the 2018 caravan.

To prevent another humanitarian disaster and the loss of more lives, the US, Mexico, and Central American countries need to come together to offer a comprehensive regional response— not only to caravans but also to address the underlying refugee situation and its root causes.

# RECOMMENDATIONS

## Design and implement a comprehensive regional strategy

- El Salvador, Guatemala, Honduras, Mexico, and the US should **design and implement a comprehensive,** rights-based, gender- and age-sensitive **regional strategy** that honors domestic and international obligations to refugees and migrants, ensures adequate humanitarian relief to people on the move, and addresses the root causes of displacement.

## Honor domestic and international law

- The US should **allow asylum seekers**—particularly unaccompanied children—**to present themselves immediately at ports of entry,** and should **stop metering** asylum seekers and implementing the Migrant Protection Protocols, also known as **Remain in Mexico.**

- Mexico should oppose **US actions that limit access to protection** in violation of international **law,**

 
including the Migrant Protection Protocols and safe third-country declarations.

- Mexico and the US should **establish** communication, collaboration, and referral **mechanisms to respect the best interests of the child** where appropriate.

- Mexico and the US should **streamline** their **asylum systems**—while still ensuring due process, family unity, and non-refoulement—**and enhance reception capacity.**

- All relevant actors should actively **counter growing anti-immigrant rhetoric and practices.**

## Ensure adequate humanitarian relief

- All relevant actors[71] should **prioritize planning and preparedness** for large displacements of people, and **meaningfully engage refugees and migrants.**

  - Mexico should comply with international standards and guidelines for shelter sites and service provision.

- **International humanitarian agencies should offer technical expertise, and capacity.**

- All actors should **ensure availability of and access to information.**

- **Human rights defenders** should continue to **monitor and take adequate measures when abuse is identified.**

## Address root causes

- All governments should continue to advance initiatives that **promote human security, rule of law, accountability, and prosperity in the region.**



# ACRONYMS AND ABBREVIATIONS

CBP        US Customs and Border Protection

COMAR      Mexico's Commission for Refugee Assistance

DHS        Department of Homeland Security

DIF        National System for Integral Family Development

IACHR      Inter-American Commission on Human Rights

IOM        International Organization for Migration

INM        Mexico's National Institute of Migration

KIND       Kids in Need of Defense

NGO        Nongovernmental organization

SEGOB      Mexico's Ministry of the Interior

SNE        Mexico's National Employment Service

SRE        Mexico's Ministry of Foreign Affairs

UNICEF     United Nations Children's Fund

UNHCR      United Nations High Commissioner for Refugees

WOLA       Washington Office on Latin America

WRC        Women's Refugee Commission

# ENDNOTES

1 All names have been changed to protect the privacy and identity of the persons interviewed.

2 Abdel Camargo, *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y/o separados de Centroamérica y sus necesidades de protección internacional,* UNHCR, 2014. UNHCR, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection,* March 13, 2014; UNHCR, *Women on the Run: First-hand accounts on Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico,* October 26, 2015. UNICEF, *Desarraigados en Centroamérica y México: Los niños migrantes y refugiados se enfrentan a un círculo vicioso de adversidad y peligro;* August 2018. Sandra Albicker, et al., *La caravana de migrantes centroamericanos en Tijuana 2018: diagnóstico y propuestas de acción*, El Colegio de la Frontera Norte, 2018, pp. 2-4.

3 U.S. Customs and Border Protection Commissioner, Kevin McAleenan, El Paso Press Conference, March 27, 2019, https://www.cbp.gov/newsroom/speeches-and-statements/el-paso-press-conference-transcript. CBP, *Agency Experiences Record Number of Apprehensions/Inadmissible Family Units,* March 5, 2019, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2019-southwest-border-migration-stats. Kristen Bialik, "Border apprehensions increased in 2018—especially for migrant families," Pew Research Center, January 16, 2019, http://www.pewresearch.org/fact-tank/2019/01/16/border-apprehensions-of-migrant-families-have-risen-substantially-so-far-in-2018/. Cristobal Ramón, "2018 Border Apprehensions Confirm Longer-Term Shift to Families and Children," Bipartisan Policy Institute, November 7, 2018, https://bipartisanpolicy.org/blog/2018-border-apprehensions-confirm-longer-term-shift-to-families-and-children/.

4 Doctors without Borders, *MSF Pulse: Violence and migration from Central America—why are people seeking asylum in the US?,* October 19, 2018, http://www.doctorswithoutborders.ca/article/msf-pulse-violence-and-migration-central-american-—-why-are-people-seeking-asylum-us.

5 Doctors without Borders, *MSF Pulse*. See also, Adam Isacson, Maureen Meyer, and Hannah Smith, *Increased Enforcement at Mexico's Southern Border: An Update on Security, Migration, and US Assistance,* WOLA, November 2015.

6 Sandra Albicker, et al., p. 6.

7 Christopher Woody, "These were the 50 most violent cities in the world in 2017," *Business Insider*, March 6, 2018, https://www.businessinsider.com/most-violent-cities-in-the-world-2018-3.

8 IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico,* OEA/SER.L/V/II:, Doc. 48/13, December 30, 2013. WOLA, "Migrant Shelters and Organizations Denounce That 99% of Crimes Against Migrants in Mexico Remain in Impunity," July 28, 2017, https://www.wola.org/2017/07/99-crimes-migrants-mexico-remain-impunity/. Doctors without Borders, *MSF Pulse.*

9 UNHCR, *Guatemala protection monitoring report: large mixed movements* (October 15–November 21), https://acnur.org/5c2417894.

10 9,400 persons reported to remain in Mexico and 8,500 returned to Honduras and El Salvador. UNHCR, IOM and UNICEF, *Inter-Agency Response: Mixed Movements from the North of Central America 15 October— December 15, 2018*, https://www.acnur.org/op/op_fs/5c241d274/mixed-migration-flows-from-the-north-of-central-america-inter-agency-response.html.

11 Sandra Albicker, et al., pp.5- 6.

12 News outlets that covered the Caravans included: ADN40, Al Jazeera, Animal Político, Buzzfeed, CNN, El Universal, Fox News, Reforma, Reuters, Televisa, *The Guardian, The Intercept, The LA Times, The New York Times, The Washington Post*, TV Azteca, Vox. Human rights organizations included, among others: Amnesty International, Centro de Derechos Humanos Fray Matías de Córdova, Human Rights First, Human Rights Watch, Jesuit Migrant Service, Kids in Need of Defense, and Programa de Asuntos Migratorios de la Universidad Iberoamericana. Among the international organizations: IACHR, IOM, UNICEF, and UNHCR.

13 Sandra Albicker, et al., pp.5-6, 16-29.

14 Ariadna García, "Encinas detalla que son 44 los desaparecidos en Tamaulipas," *El Universal*, March 12, 2019, https://www.eluniversal.com.mx/nacion/seguridad/son-44-desaparecidos-en-tamaulipas-confirma-alejandro-encinas. Antonio Hernández, "Publican fotos de migrantes reportados como desaparecidos en Tamaulipas", *Milenio,* March 29, 2018, https://www.milenio.com/policia/fgr-publica-imagenes-migrantes-reportados-desaparecidos-tamaulipas. Jesuit Network, *Denunciamos el hostigamiento, uso de la fuerza y la detención arbitraria de migrantes y personas que acompañan el caminar de las Caravanas del Éxodo Centroamericano por parte de la Policía de la Ciudad de México,* February 15, 2019, http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/7521843add620334e0e9c447695fac64.pdf. lena Reina, "La frontera Sur de México es una olla de presión", *El País*, April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/

wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

15 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante.ibero.mx.

16 National System for Integral Family Development (DIF).

17 Phone interview with service provider on December 30, 2018.

18 Interviewed by WRC on November 30, 2018.

19 Interview with a humanitarian worker in Tapachula on January 10, 2019.

20 Dynamic referred by service providers interviewed in Tijuana on December 18, 2018 and in Tapachula on January 10, 2018.

21 Interview in Tapachula on January 9, 2019.

22 "Migrantes colocaron al frente a mujeres y niños para empujar la reja: Navarrete," *Vanguardia*, October 19, 2018, https://vanguardia.com.mx/articulo/navarrete-descarto-utilizar-violencia-vs-caravana-de-migrantes. Dynamic also referred by women interviewed in Tijuana on November 30, 2018, service providers (interviewed in Tijuana on December 18, 2018, in Tapachula on January 10, 2018), a researcher on Tijuana (interviewed in Tapachula on January 9, 2018), Mexican official (interviewed in Mexico City on December 10, 2018), and officers from an international organization interviewed in Mexico City on January 7, 2019.

23 Coordination meeting of service providers in Tijuana on November 28, 2018 and women interviewed in Tijuana on November 30, 2018.

24 Official Mexican Norm on Domestic and Sexual Violence and Violence against Women (NOM 046-SSA2-2005), April 16, 2009.

25 UNHCR, A*genda para la protección de las personas refugiadas en México: 2019-2024*, http://www.acnur.org/fileadmin/Documentos/RefugiadosAmericas/Mexico/Agenda_proteccion_Mexico_2019-2024.pdf. Mark Manly, "Hacia una nueva agenda sobre refugiados en México," *El Universal,* May 18, 2018, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/hacia-una-nueva-agenda-sobre-refugiados-en-mexico.

26 Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019. Georgetown Law Human Rights Institute Fact-Finding Project, *The Cost of Stemming the Tide: How immigration enforcement practices in southern Mexico limit migrant children's access to international protectio*n, April 13, 2015. Human Rights Watch, *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children,* March 2016.

27 Enshrined, among others on: Art. 33 (1) of the 1951 Convention relating to the Status of Refugees; Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment; Section III(5) of the 1984 Cartagena Declaration on Refugees; Art. 5 and 6 of Mexico's Law on Refugees, Complementary Protection and Political Asylum.

28 Jennifer Podkul, *The Protection Gauntlet: How the United States is Blocking Access to Asylum Seekers and Endangering the Lives of Children at the US Border,* Kids in Need of Defense (KIND), December 21, 2018, https://supportkind.org/wp-content/uploads/2018/12/Protection-Gauntlet_12-21-18-FINAL.pdf.

29 Tapachula is where those who claimed asylum when they arrived in Mexico awaited their refugee status determination, and Tijuana is where most of the caravan was stranded once they reached the US border.

30 Interview in Tapachula on January 10, 2019.

31 InSight Crime, "Balance de InSight Crime sobre los homicidios en 2018," January 22, 2019. https://es.insightcrime.org/noticias/analisis/balance-de-insight-crime-sobre-los-homicidios-en-2018/.

32 Interview with an official of a humanitarian agency in Mexico City on January 7, 2019.

33 Email for human rights defender in Tijuana on December 6, 2018.

34 Interview with human rights defender in Tijuana on December 18, 2018. Interview with health service provider in Tapachula on January 8, 2019.

35 Laura Sánchez, "Lujuria, Sexo, las 24 horas del día en Tijuana," *El Universal*, March 24, 2016, https://www.eluniversal.com.mx/articulo/estados/2016/03/25/lujuria-sexo-las-24-horas-del-dia-en-tijuana#imagen-7. , Sheldon Zhang, *Sex trafficking in a border community: a field study on sex trafficking in Tijuana, Mexico,* University of California, San Diego, 2012. Jimena Duarte, "Migración y prostitución en Chiapas, de la necesidad al placer," February 12, 2018, https://www.excelsior.com.mx/nacional/2017/02/17/1146931.

36 Barrio 18 is one of the largest gangs in the Americas. It operates in Central and North America.

37 Sandra Albicker, et al., p. 8.

38 *Medidas del gobierno de México ante la eventual llegada a la frontera sur de la caravana de migrantes hondureños,* SEGOB, October 17, 2018, https://www.gob.mx/segob/prensa/medidas-del-gobierno-de-mexico-ante-la-eventual-llegada-a-la-frontera-sur-de-la-caravana-de-migrantes-hondurenos-178838?idiom=es. *El Presidente Enrique Peña Nieto anuncia el Plan "Estás en tu casa" en apoyo a los migrantes centroamericanos que se encuentran en México*, SRE, October 26, 2018, https://



**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

www.gob.mx/sre/prensa/el-presidente-enrique-pena-nieto-anuncia-el-plan-estas-en-tu-casa-en-apoyo-a-los-migrantes-centroamericanos-que-se-encuentran-en-mexico?idiom=es. Jorge Alejandro Medellín, "Cierra INM registro de migrantes; entregará 12,600 visas humanitarias," January 30, 2019, https://lasillarota.com/cierra-inm-registro-de-migrantes-entregara-12600-visas-humanitarias/268836. Interview with humanitarian worker in Mexico City on January 25, 2019. Óscar Gutiérrez, "Caravana de migrantes es detenida a su entrada por Chiapas," *El Universal*, February 2, 2017, https://www.eluniversal.com.mx/estados/caravana-de-migrantes-es-detenida-su-entrada-por-chiapas.

39 lena Reina, "La frontera Sur de México es una olla de presión", *El País*, April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

40 Carina García, "Elección 2018. La más grande de la historia", *El Universal*, July 1, 2018, https://www.eluniversal.com.mx/elecciones-2018/eleccion-2018-la-mas-grande-de-la-historia. Lexica, "El proceso de transición más largo del mundo," *Animal Político*, September 12, 2018, https://www.animalpolitico.com/el-blog-de-lexia/el-proceso-de-transicion-mas-largo-del-mundo/.

41 Mark Manly, "Las lecciones de las caravanas," *El Universal*, January 18, 2019, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/las-lecciones-de-las-caravanas.

42 Misael Zavala y Alberto Morales, "No me voy a enganchar en debates con Trump: AMLO", *El Universal*, April 24, 2019, https://www.eluniversal.com.mx/nacion/no-me-voy-enganchar-en-debates-con-trump-amlo. Trudy Rubin, "Mexico has a strategy to deal with Trump's wall and rejection of migrants", *The Philadelphia Inquirer*, March 13, 2019, https://www.philly.com/opinion/commentary/mexico-trump-amlo-migrants-braceros-andres-manuel-lopez-obrador-20190313.html. Misael Zavala, "Por muro, no me voy a pelear con el presidente Trump:AMLO", *El Universal*, September 22, 2018, http://www.eluniversal.com.mx/nacion/politica/por-muro-no-me-voy-pelear-con-el-presidente-trump-amlo.

43 Roberto Velasco, "Mexico stands with migrants. The new US asylum policy must respect their rights", *The Washington Post*, January 28, 2019, https://www.washingtonpost.com/opinions/2019/01/28/mexico-stands-with-migrants-new-us-asylum-policy-must-respect-their-rights/?utm_term=.5b1dfcbb0ccc. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g

44 "En Tijuana, uno de cada 10 homicidios en el país," *La Jornada Baja California*, October 25, 2018, https://www.jornada.com.mx/ultimas/2018/10/25/en-tijuana-uno-de-cada-10-homicidios-en-el-pais-7122.html.

45 We are 'metering', which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, " DHS Secretary, Kirstjen Nielsen, interview on Fox News (May 15, 2018), quoted by Amnesty International, USA: *'You Don't Have Any Rights Here.'* Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border,* Strauss Center at UT Austin, Center for US-Mexican studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

46 *Al Otro Lado, Inc. v. Nielsen*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.)

47 Meeting with CBP officer in San Diego, California, on November 29, 2018.

48 Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border,* Strauss Center at UT Austin, Center for US-Mexican Studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

49 Interview with legal service providers on November 29, 2018.

50 Stephanie Leutert, Ellie Ezzell, et al. and Emily Green, "Exclusive: Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice*, March 13, 2019, https://news.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum.

51 Adolfo Flores, "Mexican Authorities are Stopping Unaccompanied Kids from Seeking Asylum in the US at Every Turn," *BuzzFeed News*, February 13, 2019, https://www.buzzfeednews.com/article/adolfoflores/children-unaccompanied-asylum-immigration-mexico-border. "Upon approaching the port of entry, the delegation was stopped by Mexican authorities who refused to allow the children to proceed any further to present their asylum claims. The authorities claimed that asking for asylum at the port of entry is against proper procedure and advised the children to get on the asylum waitlist. The authorities also claimed that the asylum waitlist is kept in an informal notebook managed by the asylum seekers themselves ... In any case, minors are not allowed to put their names on the list. Children have no choice but to present their claims at the port of entry." @amnestyusa, December 29, 2019. Twitter.

52 Meeting with CBP officer in San Diego, California, on November 29, 2018.

53 Zuzana Cepla, *Trafficking Victims Protection Reauthorization Act Safeguards Children,* National Immigration Forum, May 23, 2018, https://immigrationforum.org/article/trafficking-victims-protection-reauthorization-act-safeguards-children/.


54 Meeting with CBP officer in San Diego, California, on November 29, 2018. Telephone conversation with CBP high level official on December 7, 2018. Meetings with high-level Mexican officer from the Ministry of Foreign Affairs, National Institute of Migration, and Mexican Commission for Refugee Assistance in Mexico City on January 15, 2019.

55 John Bowden, "Dem lawmaker says she helped group of migrants enter US, apply for asylum," *The Hill*, December 12, 2018, https://thehill.com/latino/419287-dem-lawmaker-to-join-group-of-migrants-applying-for-asylum. *Reps. Jimmy Gomez and Nanette Barragán Travel to Southern Border to Investigate Conditions of Asylum Seekers,* December 18, 2018, https://gomez.house.gov/news/documentsingle.aspx?DocumentID=431. "Last night, a delegation of our senior leadership joined partners @NIJC, @AlOtroLado_Org, and @TransLawCenter in accompanying three LGBT minors fleeing violence and persecution in Central America. Here's what we found ...The delegation refused to leave until the children were allowed to present their claims. In order to discourage the delegation to leave, Mexican authorities asked everyone with proper documents to proceed through the port of entry while the delegation stood to the side. Over an hour later, our director @MargaretLHuang was able to negotiate an agreement w/ Mexican authorities. She & an interpreter would accompany the children onto US soil to ask for asylum if the rest of the delegation left. The children were then processed & made it into the US. Yesterday's standoff with Mexican officials validates reports that authorities there are cooperating with the US to dissuade people from asking for asylum. It demonstrates the lengths Mexico and the US will take to violate the human rights of people, including children, desperately seeking safety." @amnestyusa, December 29, 2019. Twitter.

56 Per the information provided by service providers on the ground, estimates of UMC in Tijuana varied from 120 to 200. The estimates include all unaccompanied children in Tijuana in December 2018 and January 2019, not only those who traveled with the caravans.

57 National System for Integral Family Development (DIF).

58 Interviews with children in Tijuana on November 29, 2018 and on December 17, 2018. Interview with child service provider in Tijuana on November 29, 2018. Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019.

59 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018. Ed Vulliamy, "Tricked, abducted and killed: the last day of two children migrants in Mexico," *The Guardian*, February 16, 2019, https://www.theguardian.com/world/2019/feb/16/tijuana-migrant-child-murders-mexico-us-asylum. Julia Gavarrete and Heather Gies, "Honduran teen fled gangs at home only to be murdered while stranded at the US-Mexico Border," *The Intercept*, February 23, 2019, https://theintercept.com/2019/02/23/unaccompanied-minor-migrants-us-border-policy/.

60 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018.

61 Exec. Order No. 13767, 82 FR 8793 (2017), Sec. 7. "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration" Department of Homeland Security, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

62 Order granting motion for preliminary injunction filed on April 8, 2019. *Innovation Law Lab v. Nielsen*, No. 3:19-cv-00807-RS. Document 73.

63 Miriam Jordan, "Trump Administration Can Keep Sending Asylum Seekers to Mexico, Court Rules", New York Times, May 7, 2019, https://www.nytimes.com/2019/05/07/us/asylum-seekers-trump-mexico.html.

64 Redacción, "Agreden en Guatemala a caravana migrante y los obligan a entrar a México", *SDPnoticias,* January 28, 2019, https://www.sdpnoticias.com/internacional/2019/01/28/agreden-en-guatemala-a-caravana-migrante-y-los-obligan-a-entrar-a-mexico. Mary Lee Grant y Nick Miroff, "Milicias esperan en Texas a la caravan migrante que busca cruzar la frontera", *El Economista*, November 4, 2018, https://www.eleconomista.com.mx/internacionales/Milicias-esperan-en-Texas-a-la-caravana-20181104-0072.html. Elías Camhaji, "La xenophobia sale a las calles de Tijuana", *El País*, November 19, 2018, https://elpais.com/internacional/2018/11/18/mexico/1542511725_499305.html.

65 UNHCR, *Monitoreo de protección en Ciudad Hidalgo, México,* February 4, 2019, https://www.acnur.org/op/op_fs/5c59d76e4/monitoreo-de-proteccion-en-ciudad-hidalgo-mexico.html.

66 *Derechos humanos y cooperación con Centroamérica, base de política migratorio 2018-2014: Sánchez Cordero,* SEGOB, December 19, 2018, https://www.gob.mx/segob/prensa/derechos-humanos-y-cooperacion-con-centroamerica-base-de-politica-migratoria-2018-2024-sanchez-cordero?idiom=es.

67 @INMI_mx, "Informativo 28 enero 2019, El Salvador: 231; Guatemala: 470; Haití: 1; Honduras: 2,238; Nicaragua: 35; Brasil:2; Angola: 1," January 28, 2018. Twitter. @INMI_mx," Informativo 28 enero 19, registró 12,574 solicitudes de visitante por razones humanitarias de adultos migrantes," January 28, 2018. Twitter.

68 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante.ibero.mx.

69 "... Mexico must stop illegals from entering the U.S ... /... through their country and our Southern Border. Mexico has for many years made a fortune off the U.S., far greater than Border Costs. If Mexico doesn't immediately stop ALL illegal immigration coming into the United States through our southern Border, I will be CLOSING.../...the Border, or large section of the Border, next week. This would be so easy for Mexico to do, but they just take our money and 'talk'". @realDonaldTrump, March 29, 2019, Twitter. "We have a National Emergency at our Southern Border. The Dems refuse to do what they know is necessary - amend our immigration laws. Would immediately solve the problem! Mexico, with the



**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

strongest immigration laws in the World, refuses to help with illegal immigration & drugs!" ". @realDonaldTrump, March 28, 2019, Twitter. "Mexico is doing NOTHING to help stop the flow of illegal immigrants to our Country. They are all talk and no action. Likewise, Honduras, Guatemala and El Salvador have taken our money for years, and do Nothing. The Dems don't care, such BAD laws. May close the Southern Border!" @realDonaldTrump, March 28, 2019, Twitter.

70 Fabiola Martínez, "Frontera sur de México está 'desbordada', advierte Sánchez Cordero," *La Jornada*, March 27, 2019, https://www.jornada.com.mx/ultimas/2019/03/27/frontera-sur-de-mexico-esta-desbordada-sanchez-cordero-671.html.

71 Governments of all countries in the region, international organizations, humanitarian agencies, civil society organizations, human rights defenders, shelters, community-based organizations, service providers, and faith groups.



WOMEN'S
REFUGEE
COMMISSION

Research. Rethink. Resolve.

Women's Refugee Commission | 15 West 37th Street | New York, NY 10018

212.551.3115 | info@wrcommission.org | womensrefugeecommission.org

# EXHIBIT 11



Search hrw.org

English

**DONATE NOW**

Trending    World Cup 2026    **Trump Administration and Human Rights**    Crisis in the Middle East    Sudan

May 31, 2022 12:54PM EDT  |  Report

**Available In**    English    Español

# US: LGBT Asylum Seekers in Danger at the Border

Biden Should Immediately Safeguard At-Risk Groups, Restore Asylum Access

 





At a rally in Tijuana, Mexico, people hold placards reading "Stand for Asylum" and "Stop Title 42 Now." The US policy often called "Title 42" allows border agents to expel people summarily to Mexico or their countries of origin with no opportunity to apply for asylum. © 2022 Aimee Melo/picture-alliance/dpa/AP Images

(Ciudad Juárez) – Lesbian, gay, bisexual and transgender (LGBT) people and other asylum seekers fleeing persecution in their home countries experience abusive and dangerous conditions in Mexico



**English**        DONATE NOW

Protection Protocols, commonly known as "Remain in Mexico," and the Title 42 summary expulsion policy – continue to be used under the Biden administration to block access to the asylum system for most people who try to cross into the US to seek safety. This includes people at a greater risk of harm in Mexico because of their particular conditions or identities, including gender identity or expression, disability, and age who should be entitled to an exception from expulsion. US authorities should stop sending asylum seekers to Mexico or expelling them to their countries of origin and should quickly process people waiting at the border to seek asylum who are at particular risk of abuse.

"The United States should restore access to asylum for all, but so long as Biden is blocked from doing so, he should at the very least immediately use existing exceptions for at-risk asylum seekers, including LGBT people," said Ari Sawyer, US border researcher at Human Rights Watch. "Continuing to summarily expel LGBT and HIV-positive asylum seekers to Mexico or their country of origin places their lives at serious risk."

US government protocols include exceptions for asylum seekers at a greater risk, and President Joe Biden has promised US agents will apply them. But border agents have broad discretion to grant or deny exceptions, and there are no clear consequences for agents who fail to do so or checks to ensure that exceptions are being handled properly, Human Rights Watch found.

Despite a recognition by the US Department of Homeland Security (DHS) that LGBT people may face "increased risk of harm in Mexico due to their sexual orientation or gender identity," Human Rights Watch documented cases in which border officials returned LGBT asylum seekers, including those with HIV, to Mexico under both abusive anti-asylum policies.

Human Rights Watch conducted 29 interviews with asylum seekers, migrants' rights groups, and United Nations agency officials in April and May 2022, in person and by phone, in Ciudad Juárez and Mexico City, and in El Paso, Texas. Human Rights Watch undertook research in coordination with Casa de Colores, a US-Mexican organization working to provide shelter and legal services to LGBT asylum seekers.

LGBT asylum seekers told Human Rights Watch they had been expelled even after expressing their fear of returning and telling border agents they identified as LGBT, had HIV, or had experienced abuse related to their gender identity, gender expression, or sexual orientation. They also described serious abuse during their journeys to the border, including by Mexican officials.

One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face,



She said that when she explained to US border officials that she was a lesbian seeking asylum from Honduras and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again.

Previous Human Rights Watch research has highlighted the risk of illegal and arbitrary arrest, torture, extrajudicial execution, sexual assault, and enforced disappearance for LGBT people in Central America.

Although the Biden administration has moved to terminate both Title 42 and Remain in Mexico, several US state officials have filed suits in federal court, resulting in orders to keep the programs in place during the litigation.

A federal district court judge has temporarily blocked the Biden administration from ending the expulsion policy, which was first issued at the start of the Covid-19 pandemic against the recommendation of top public health experts. There is no evidence that people seeking asylum pose a public health threat to the United States, and the expulsion policy cannot be justified on public health grounds.

Though the initial Title 42 was issued without "notice and comment" procedures, allowing a period for the public to comment, the judge found that the Biden administration should have gone through these administrative consultation processes to end Title 42. Some US lawmakers have proposed legislation that would keep summary expulsions in place until pandemic public health measures are terminated.

Asylum seekers and other migrants sent to Mexico are often unable to support themselves or access basic services such as shelter, food, water, safe transportation, or health care, and have no meaningful recourse for abuses from criminal cartels or Mexican authorities. In the Mexican state of Tamaulipas, Human Rights Watch found that asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals.

LGBT people constitute one particularly at-risk group of asylum seekers, among others, including people with disabilities and chronic health conditions, Black and Indigenous asylum seekers, asylum seekers who do not speak Spanish as a first language, and families traveling with children.

LGBT asylum seekers and asylum seekers with HIV described additional discrimination and abuse as well as barriers to accessing essential services, including life-saving antiretroviral therapy and gender-affirming health care, services that include medical and mental health services, continuation of



**English**          DONATE NOW

Human Rights Watch asked Mexico's National
Migration Institute for more information on
allegations made against immigration agents.
The agency responded on May 31 and said they
were unaware of any reports of such abuses, were not able to investigate them, and that the Mexican
constitution prohibits such behavior.

⊟ **National Institute of Migration Response to HRW
5.31.22**

The United States has an obligation to protect refugees from returning to a threat of persecution, ill-
treatment, and threats to life and safety, Human Rights Watch said. President Biden should ensure that
the United States complies with its domestic and international legal obligations to respect the right to
seek asylum.

"LGBTQ+ and HIV-positive asylum seekers face grave risks to their health and safety from the time
they flee their countries, often after years of targeted abuse, to when they arrive at the US border," said
Susana Coreas, director of Casa de Colores. "Biden has rightly committed to protecting LGBTQ+
refugees. He should follow through on that promise and ensure all asylum seekers are welcomed with
dignity at the border."

**Abuse at the US Border**

Human Rights Watch spoke with 20 LGBT asylum seekers in Ciudad Juárez, Mexico, who hoped to
cross into the United States and be allowed to seek protection. Nearly all reported they were not
approaching the border or trying to ask US officials for asylum because they feared they would be
expelled to Mexico or their country of origin. They said they preferred to wait for the Biden
administration to restore access to asylum or for legal aid to make a request for exemption from the
expulsion policy. Four asylum seekers reported that they had previously been expelled to Mexico or
their country of origin without an asylum screening.

When Adolfo H. and Gerardo C., a gay couple fleeing Cuba and El Salvador, respectively, who like
others interviewed are not identified by their real names for their protection, tried to seek asylum at
the US border in February 2022, they were expelled by US Customs and Border Protection (CBP)
agents to Mexico. They had previously experienced extortion several times by Mexican immigration
agents, who stopped them at various points along their journey and demanded payment to continue. At
the time, they were not yet married. US officials told the couple that Adolfo could stay and seek asylum
in the United States because he is from Cuba but that his partner would be expelled, even though
border officials had the authority to allow both men in. Instead, they gave them the option of being
separated or of being expelled together. They said that while they were in custody, US officials told



- José M., a gay man who fled death threats in Honduras based on his sexual orientation, said he had tried to cross the border in March 2021. He was afraid to stay in Mexico, where he said he has experienced extortion and violence at the hands of Mexican police and discrimination at shelters. On his way to the border, Mexican immigration agents stopped the bus he was on and made everyone get off, he said, forcing each migrant to pay a bribe of about US$25 each or be expelled from the country. He also said that because of his gender expression and sexual orientation, some shelters did not allow him to stay there, leaving him to sleep on the streets. In Ciudad Juarez, the shelter operators told him it was a sin to be gay and said that if he and other LGBT asylum seekers didn't go to religious service, they would be forced to leave. He said he had told US border officials that he is gay and that he was afraid to be sent to Mexico, but hours later CBP agents sent him to Mexico. Before expelling him, US officials made him throw away everything he had, including the few clothes he had. US border agents typically throw away migrants' possessions, including items such as medicine, baby blankets, important identity documents, documents needed to prove an asylum claim, and memorabilia that hold sentimental value, claiming the practice is for health and safety reasons.

The Biden administration has also recently placed some LGBT people in the Remain in Mexico program, officials with the International Organization of Migration (IOM) told Human Rights Watch, sending them to Ciudad Juárez despite the exemption for LGBT people and others at particular risk of abuse. IOM operates a shelter for newly expelled or returned asylum seekers to test them for Covid-19 and provide quarantine before they move on to other shelters. IOM officials said LGBT asylum seekers had been sent to Mexico even after they explicitly told US border agents about their gender identity or sexual orientation.

**Abuses in Country of Origin**

LGBT asylum seekers interviewed reported serious abuses in their countries of origin, including rape, assault, death threats, extortion, and forced disappearances or killings of romantic partners and friends.

- Juan C., a transgender man, fled Honduras after he received death threats related to his gender identity and activism in an LGBT rights organization. He said that several LGBT people he has known have been killed or disappeared there. He said that the police detained him without charges on several occasions. In 2021, two men raped him and his girlfriend after saying, "Who is the man and who is the woman in the relationship?" and saying that the couple were transgender



- Eduardo O., a gay man from Honduras, said he fled the country shortly after gang members beat his romantic partner to death. Gang members had previously threatened to kill Eduardo. Then in June 2021, the same gang members attacked him and his partner while they were together. While Eduardo was able to escape, he said, his partner could not. He said he reported his partner's murder to the police, who did not investigate.

- Kayla R., a transgender woman from Guatemala, said she had to flee and seek asylum after the gangs who were extorting the business where she worked beat her when she and the store owner couldn't pay, leaving prominent scars on her face. On another occasion, gang members beat her in the street while using anti-LGBT slurs. They left a large gash and scar on her head.

**Discrimination and Abuse in Mexico**

Human Rights Watch also documented serious abuse and discrimination against LGBT asylum seekers in Mexico. Several LGBT asylum seekers said that Mexican immigration agents, police, and National Guard soldiers targeted them for extortion. Other asylum seekers experienced kidnapping, sexual assault, robbery, and other physical violence by both Mexican government officials and criminals.

- Brenda F., a transgender woman, fled El Salvador in 2017 after gang members who wanted her to sell drugs beat and threatened to kill her. After applying for protection and living for a few years in Mexico, she said she was riding a bus from Monterrey to Matamoros in the Mexican state of Tamaulipas in May 2020 when, at a checkpoint, immigration agents pulled her off the bus and took her into an office about 25 meters away. While another immigration agent stood watch outside the office, the agent questioned her about her destination and reason for traveling, she showed him an order from a doctor for laboratory tests. He accused her of lying and of wanting to cross into the United States and grabbed his genitalia, saying if she wouldn't "give me what I want," he could have two police officers expel her to Guatemala. Afterward, he told her that if she reported him, he had already taken a photo of her identification and would come after her. She said she knows other trans women who have experienced sexual assault at the hands of Mexican immigration agents.

- Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money.



to watch. They went to the Mexican Commission for Refugee Assistance (COMAR), Mexico's refugee authority, in Tapachula, Chiapas, where they applied for asylum in Mexico. COMAR gave them a document confirming that they were in the process of seeking asylum in Mexico, giving them legal status in Mexico. An immigration agent apprehended them outside the COMAR office as they left. When he saw their application documents, he tore them up, saying they were meaningless and sent them to a detention center. They were released and then took a bus to the US-Mexico border. They said Mexican immigration agents periodically stopped the bus and boarded it to extort them and other migrants, saying they had to pay if they wanted to continue their journey to the US border.

- Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood. The police detained her and another transgender woman she was traveling with for two days without food and water and then turned them over to immigration agents, who sent them to an immigration detention facility. There, she said, a Mexican immigration agent told her she should report the crime, which would make her eligible for a one-year humanitarian visa, giving her legal status in Mexico. She said she would like to do so, and that the agent took down her information but never gave her any paperwork or began any immigration process. Instead, after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her.

Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.

Accessing lifesaving health care for asylum seekers with HIV or other chronic illnesses was also difficult, asylum seekers said. All five HIV-positive asylum seekers interviewed, and one asylum seeker with diabetes and hypertension, said they had gone periods ranging from a few weeks to four months, without their necessary medication because they did not have any money or support.

- Mari R., a transgender woman who is HIV positive and who fled Honduras after she refused to sell drugs for a gang whose members had raped and threatened to kill her, went without her antiretroviral medication in Mexico for four months. In April, with the support of Derechos



**English**     DONATE NOW

Four transgender asylum seekers, as well as IOM officials and a local trans rights organization called Red Solidaria Trans, said that transgender asylum seekers have not had access to gender-affirming health care in Ciudad Juárez.

- Brenda F., a transgender woman who fled after facing an attempted gang recruitment and death threats in El Salvador, said she had previously been taking hormones but that in Ciudad Juárez, she has not been able to access to gender-affirming hormone care, though she has repeatedly tried. "They always say they don't offer that care, they can't, or they don't know how," she said. Transgender people who take hormones to develop secondary sex characteristics consistent with their gender identity and expression experience a reversal of these physical traits when hormone therapy is stopped, which can cause distress among other symptoms. Brenda said she hasn't had access to hormone care since October 2021 and that she is suffering from depression as a result. "I have asked for help getting my hormones and they have said they don't offer that kind of support here [in Ciudad Juárez]," she said. "We are suffering marginalization in that way – hormone treatment is necessary, and they are denying us."

**Recommendations**

**To the Biden Administration**

- Continue and redouble efforts to end the Remain in Mexico program and Title 42 summary expulsions, including by initiating a "notice and comment" rulemaking process to end Title 42.

- While these abusive policies remain in place, ensure that border agents do not to return at-risk asylum seekers under the Remain in Mexico program or expel them under the Title 42 summary expulsion policy. People at particular risk of harm include LGBT asylum seekers; those with HIV, disabilities, and chronic health conditions; Black and Indigenous asylum seekers; those who do not speak Spanish as a first language; and families traveling with children.

- Take immediate steps to parole into the United States all LGBT asylum seekers and other asylum seekers at particular risk of harm who have previously been subjected to the Remain in Mexico program or the Title 42 summary expulsion policy.

- Review regulations, Board of Immigration Appeals and Attorney General decisions, and policies and other guidance, rescinding or amending as appropriate to ensure consistency with the right to seek asylum and the right to protection from return to harm or threat of harm as defined in



**English**          DONATE NOW

- Continue to increase the number of appropriately trained personnel – asylum officers, doctors, child-care specialists, mental health services professionals and other first responders – at the border using funds currently allocated toward immigration enforcement and detention.

- Beyond initial screening of migrants, transfer humanitarian reception, including migrant processing and asylum functions, from CBP to a separate government agency, such as the Federal Emergency Management Agency (FEMA), or groups with trauma-informed training and whose mission is to perform humanitarian services.

- Take steps to ensure that LGBT asylum seekers and asylum seekers with HIV feel safe enough to self-identify while in the custody of CBP, including by ensuring that US officials affirmatively explain a policy of nondiscrimination and ask each migrant if they would like to share their gender identity and sexual orientation.

- Investigate and discipline US border agents who wrongfully send LGBT asylum seekers and other particularly at-risk asylum seekers to Mexico or their countries of origin.

- Work with Mexico and other governments to implement a holistic regional plan for access to protection and safe and dignified migration.

**To the US Congress**

- Reject proposed legislation introduced by Sens. James Lankford (R-Oklahoma) and Kyrsten Sinema (D-Arizona) to keep Title 42 in place until after the government's Covid-19 emergency declaration is terminated.

- Enact legislation to end the Title 42 summary expulsion and Remain in Mexico policies.

**To the Mexican Government**

- End the practice of accepting non-Mexican nationals sent to Mexico by US authorities under the Remain in Mexico and Title 42 summary expulsion policies.

- Investigate abuses by Mexican immigration agents, including reports of extortion at immigration checkpoints, and take disciplinary action against any found to have been involved in such conduct.

- Ensure that Mexican immigration agents do not expel people who may need international protection without due process and screening for fear of return to potential harm.



**English**          DONATE NOW

Institute of Migration.

Your tax deductible gift can help stop human rights violations and save lives around the world.

| $50 | $100 | $250 |
|---|---|---|
| $500 | $1000 | Other |

DONATE NOW

Region / Country   Mexico, United States, Immigrants' Rights and Border Policy

Topic   LGBT Rights, Refugees and Migrants, Asylum Seekers

RELATED CONTENT

📄 National Institute of Migration Response to HRW 5.31.22

MORE READING





International Convention on the Elimination of Racial Discrimination (ICERD)

April 21, 2022  |  Letter

## Leaders of Human Rights Groups Urge Biden to Safeguard Asylum Access in the US

## REPORTS



October 21, 2021  |  Report

## "They Treat You Like You Are Worthless"

**Internal DHS Reports of Abuses by US Border Officials**



January 6, 2021  |  Report

## "Like I'm Drowning"

**Children and Families Sent to Harm by the US 'Remain in Mexico' Program**

## MOST VIEWED

1   July 6, 2026  |  Dispatches

## Burkina Faso Puts Study Abroad Under Junta Control



2   July 8, 2026  |  News Release

## Germany: Government Curbing Freedom of Information Act





English        DONATE NOW



**4**  November 12, 2018  |  News Release

Pakistan: Girls Deprived of Education



**5**  July 25, 2017  |  Report

"I Want to Be Like Nature Made Me"

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**



## Get Updates On Rights Issues Worldwide

Enter an email address        Sign Up

## Connect With Us

Contact Us  |  Corrections  |  Privacy Policy  |  Permissions  |  Site Map  |  Child Safeguarding  |  Text Version



**English**    DONATE NOW

Human Rights Watch | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | t 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

# EXHIBIT 12



# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE



**Evasion of Asylum Law
and Title 42 Abuse Must End—
and Never Be Revived**

December 2022

## Introduction

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an asylum transit ban – an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing



survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

**Key Findings**

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward** *refoulement* **to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations**. They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her



seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

## Recommendations

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.



- **Biden Administration:** Take all steps to ensure a final end to the Title 42 policy, restore compliance with U.S. refugee law and treaties, continue to request appropriations to conduct timely asylum adjudications and address backlogs, oppose any efforts to force continuation or resurrection of the Title 42 policy or similar policies, and reject any proposals to replace Title 42 with other policies that block, ban or prevent refugees from seeking asylum in the United States and/or turn them away to danger. Never again use an actual or purported pathway to the U.S. as an excuse to evade refugee law or abrogate the right to seek asylum.

- **Department of Homeland Security:** As Title 42 ends, uphold U.S. refugee law at U.S. ports of entry and along the border, ramp up asylum adjudication capacity and end attempts to replace it with other illegal and inhumane Trump-era policies, and during the time Title 42 is still in place, take all legally available actions to restore asylum access at and between ports of entry and mitigate the harms of Title 42, including through the use of exceptions to Title 42 and by affirmatively screening individuals subjected to Title 42 for fear of return to persecution and torture, as U.S. law and international treaty obligations require.

- **Centers for Disease Control and Prevention:** Publicly identify steps to ensure public health authority is never again misused to evade refugee law and endanger the lives and safety of people seeking protection, and if the Title 42 policy should be prolonged yet again, take any additional steps necessary to help ensure its firm and final termination.

- **The Government of Mexico**: End cooperation with U.S. policies that violate international law and/or result in human rights violations, and take steps to end Mexican police and other officers' perpetration of and complicity or acquiescence in attacks, extortions, kidnappings, rape and other harms inflicted on migrants and asylum seekers.

---

**Title 42 expansion returns Venezuelans fleeing persecution and humanitarian catastrophe to danger, deplorable conditions**

On October 12, 2022, the Biden administration announced it would expand the use of Title 42 to expel Venezuelans to Mexico, through a "New Migration Enforcement Process," pairing the expansion with a new limited humanitarian parole program that would enable some Venezuelans to enter the United States. The parole program's requirements actually preclude many refugees from accessing it, including due to its identification, sponsorship, and airline ticket purchase requirements, as well as its numerical limitations. The Hope Border Institute, which interviewed expelled asylum seekers in October, concluded that the program "left no path for relief for the people in the most vulnerable situations" and left thousands of Venezuelans in Mexico "in a cruel state of limbo."

While UNHCR and other U.N. agencies welcomed efforts to provide safe pathways for displaced persons, they warned that such pathways "cannot come at the expense of the fundamental human right to seek asylum." In their statement, these U.N. authorities specifically reminded the United States that: "**Access to safe territory for asylum seekers is a cornerstone of the 1951 Refugee Convention and of international refugee law. We remain concerned by asylum restrictions that are inconsistent with international law standards, including those imposed through Title 42 public health action, and reiterate the call for their urgent termination.**" Days after the Biden administration's decision to expand Title 42 to expel Venezuelans seeking U.S.



asylum, CBP again acknowledged in an October 21, 2022 statement that recent arrivals at the southern border included "an increased number of asylum seekers fleeing [the] authoritarian regime[] in Venezuela."

Venezuelans expelled to or blocked in Mexico due to Title 42's expanded use are now stranded in highly dangerous Mexican border cities as well as other locations in Mexico that lack capacity to safely accommodate them. Many are also at risk of onward *refoulement* – illegal return - to persecution and torture, with some Venezuelans pushed across the border into Guatemala and others flown directly back to Venezuela by Mexican authorities. Title 42 expulsions of Venezuelans by DHS are also separating families at the border.

The expanded use of Title 42 has already resulted in thousands of Venezuelans expelled to Mexico without access to the U.S. asylum process. Between October 12 and mid-November 2022, more than 8,000 Venezuelans were expelled by DHS to Mexico. As of November 7, more than 2,100 Venezuelans had been expelled to Ciudad Juárez alone since the policy was expanded less than a month prior. Human Rights First researchers interviewed multiple sources who indicated that around December 1, 2022, DHS in the El Paso region began conducting lateral expulsions of Venezuelans to Matamoros and other cities and appeared to have halted direct expulsions to Ciudad Juárez.

As it has wielded Title 42 to expel Venezuelans to Mexico, CBP has separated some families at the border and turned away mothers, daughters, wives, partners, and other family members to danger in Mexico. For example:

- **In October 2022, DHS released Miguel Peñaranda, a Venezuelan man, and his 18-year-old stepson into the United States but expelled to Mexico Peñaranda's wife, Heyllyn Yepez, and his 18-year-old stepdaughter.** The family members, who had entered the United States in El Paso, were separated and flown to other parts of the border within Texas: Peñaranda and his stepson were flown to Brownsville, where they were released, while Yepez and her daughter were flown to Laredo, where they were expelled at the border and then bused to Acapulco, Mexico. Yepez told *The New York Times*, **"I never, ever could have imagined this happening…How can they do this to families? It's so inhuman."**

- **DHS separated a Venezuelan family of four in October 2022, releasing the father and son into the United States to pursue their asylum claims while expelling the mother and daughter to Mexico under Title 42,** according to a migrant shelter director in Austin, Texas.

- **A young Venezuelan woman was separated from her mother at the border in October 2022, and while she was processed into the United States, her mother was expelled to Mexico,** according to a migrant shelter director in Austin, Texas.

- **DHS has separated numerous Venezuelan married couples since October 2022.** A woman who was returned to Ciudad Juárez without her husband in October 2022 told *Reuters*, "I am alone in a country where I have no one to help me. He was my only companion, my only help, my only support."

- **In October 2022, DHS expelled a mother to Mexico while her 20-year-old son was permitted to seek asylum in the United States.**



- **DHS separated Luis Alexander Bonilla from his mother, sister, and nine-year-old nephew at the border, detained Bonilla for 11 days, and expelled him to Tijuana, Mexico in October 2022.** Bonilla told Milenio his mother had been expelled to Ciudad Juárez, Mexico. Two weeks after the family had entered the United States, Bonilla was unaware of the whereabouts of his sister and nephew.

Venezuelans who are stranded after expulsion or are unable to seek asylum at ports of entry due to Title 42's continuation face grave dangers in Mexico. As UNHCR, IOM and UNICEF publicly warned the United States after it announced this Title 42 expansion in October, "[m]any people subject to this measure since its implementation in March 2020 have been sent to border communities with significant security challenges, limited support networks and inadequate shelter capacities, making their return to Mexico both dangerous and unsustainable." Many Venezuelan asylum seekers have already been targeted by cartels and corrupt officials in Mexico for kidnappings and other violent attacks in the wake of this Title 42 expansion. Some recent examples include:

- **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him.** He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there.

- **In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez.** The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42. After Mexican authorities forced him to leave the encampment, he moved to the plaza where he was then attacked.

- **A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November 2022 by CBP under the Title 42 Venezuelan expansion.** They were detained by CBP for 10 days without blankets or access to showers. A CBP officer told them "You should have stayed in your country," confiscated and kept their documents, and lied to the family, telling them they were being transferred to a U.S. shelter only to then laugh at them as they were instead subjected to a lateral expulsion and sent to Sonora. The family made their way back to Juárez only to face the attempted abduction and a cartel shooting outside their shelter, as the mother explained to Human Rights First researchers.

- **A Venezuelan family with two young daughters stranded in Mexico due to Title 42 was kidnapped from a hotel in Ciudad Juárez by two hooded, armed men.** The family had been waiting for an opportunity to seek asylum in the United States. The kidnappers held the family captive for 12 days until their relatives were forced to pay a $30,000 ransom.

The U.S. government's expulsion of Venezuelans to Mexico violates U.S. *non-refoulement* legal obligations not only by exposing them to serious harm in Mexico but also because returned individuals are at high risk of onward or so-called chain *refoulement* to countries where they would face persecution or torture. Mexican officials ordered some expelled Venezuelans to



depart Mexico through the southern border within 15 days, while others were provided Mexican migration documents (*forma migratoria múltiple* or FMM) leaving them with temporary status in Mexico for reportedly as little as one week in some cases.

Expelled Venezuelans are at risk of detention and potential deportation by Mexican authorities without access to the asylum process in Mexico. For instance, a video posted online in October 2022 appears to show hundreds of Venezuelans and other nationals detained in a Mexican National Migration Institute (*Instituto Nacional de Migración* or INM) facility near the U.S.-Mexico border, reporting they had been held in crowded, unsanitary conditions for weeks. Venezuelans, as well as other asylum seekers and migrants in Mexico often report that Mexican police and other government officials routinely extort them by threatening them with deportation. In Ciudad Juárez, Mexican National Guard officers have reportedly entered hotels where Venezuelans are staying, demanded their documents, and detained those without valid visas, according to a witness account in a video posted to social media.

In early November 2022, INM began flying some Venezuelans, who supposedly agreed to be repatriated, directly to Venezuela – though there is no indication that any international or independent authorities observed these returns to confirm that they were voluntary. Concerningly, displaced Venezuelans transiting through Mexico reported in October 2022 that Mexican migration officials forced them to sign false documentation stating that they had voluntarily requested to leave Mexico through the southern border to Guatemala. In late September 2022, just prior to the Title 42 expansion, hundreds of Venezuelans were reportedly deceived by Mexican authorities into boarding buses that transported them to the land border with Guatemala. These incidents reflect a well-documented history of failures by Mexican immigration officers to inform detained migrants of their right to seek asylum and failure to forward their requests to the Mexican asylum agency.

Displaced Venezuelans in Guatemala may face further chain expulsion. In 2022, with support from the U.S. government, Guatemalan authorities expelled more than 9,000 Venezuelans across the border into Honduras without consistently administering protection screenings.

Many Venezuelans expelled by DHS to Mexico have been stranded in deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities have transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity. For instance:

- **DHS has expelled hundreds of Venezuelans to Tijuana since October 2022, including some who were flown from the Texas border and expelled to Tijuana without being provided any information about what was happening to them.** Mexican immigration officers also reportedly abandoned at a bus station in Tijuana 60 Venezuelans whom DHS had expelled. With Tijuana shelters full, some spent several nights sleeping on the ground. A fitness center was later prepared to provide temporary shelter for 300 Venezuelans expelled to Tijuana from the United States.

- **On a Saturday in October 2022, Mexican migration officers bused approximately 100 displaced Venezuelans whom DHS had expelled to Mexico City, abandoning them without food, accommodation, or basic support outside an office of the Comisión Mexicana de Ayuda a Refugiados (COMAR), the Mexican refugee assistance agency, which was closed for the weekend.** As of December 2022, migrant shelters in Mexico City are full beyond their capacity as Venezuelans expelled from the United States continue to be bused there, resulting in hundreds sleeping in city streets. Shelters are operating at double capacity with many sleeping on mattresses in common spaces, according to Gretchen Kuhner, director of the *Instituto para las Mujeres en la Migración* (IMUMI). Kuhner said IMUMI and other nonprofit organizations in



Mexico City have had to provide food, shelter, medications, and other supplies to Venezuelans arriving in the city.

- **The Mexican government has bused at least 600 Venezuelans whom DHS had expelled from the United States to the central Mexican city of Hermosillo, where shelters struggling to meet their needs are requesting food and clothing donations.** Those bused to Hermosillo include 24-year-old Juan Carlos García, who reported that he could not afford to travel to Mexico City to reunite with his relatives, from whom DHS separated him at the border.

- **Thousands of Venezuelans, including many who had been expelled from the United States under Title 42, have been sleeping in dangerous conditions in makeshift tent encampments.** Approximately 12,000 migrants and asylum seekers, most of whom are Venezuelan, have been sleeping in a makeshift tent encampment on a muddy sports field in San Pedro Tapanatepec in Oaxaca state, Mexico. In Ciudad Juárez, in November 2022, as many as a thousand Venezuelans were staying in a tent encampment on the Rio Grande near the El Paso port of entry, where temperatures had dropped below freezing and many fell ill. In November 2022, members of an organized criminal group attempted to kidnap residents of the encampment, rt thm into separate lines for men, women, and families, and instructed them to enter nearby vehicles, but the kidnappers retreated when law enforcement intervened. Ciudad Juárez government officials cleared the camp in late November 2022, citing safety concerns.

The Hope Border Institute in El Paso concluded based on its interviews with asylum seekers and migrants that the expanded expulsions of Venezuelans "separated family units and placed individuals, including vulnerable people such as young children, single mothers and elderly people on the streets, lacking access to food, shelter and medical support."

---

**Court-ordered Title 42 continuation condemns asylum seekers and migrants expelled to or blocked in Mexico to grave dangers**

The continued implementation of Title 42 is causing mounting human rights abuses against asylum seekers and migrants blocked in or expelled to Mexico. Individuals and families who are expelled or blocked from protection due to Title 42 are targeted for attacks in Mexico by corrupt officials as well as powerful cartels that exercise control throughout the border region and profit from kidnapping, torturing, and extorting asylum seekers turned away by the United States. These attacks often target asylum seekers and other migrants on account of their race, gender, sexual orientation, gender identity, and nationality. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in or transiting through Mexico.

**As of the date this report was published in December 2022, Human Rights First has tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021.** This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys. Some recent attacks on people stranded in or expelled to Mexico due to Title 42's court-ordered continuation and recent expansion by DHS include:



- [Ibrahima Gueye](#), **a 39-year-old Senegalese man, was shot and killed in a Tijuana park in broad daylight on October 18, 2022.** Police believe Gueye, who was carrying a backpack with clothing and personal belongings, was attacked by members of the violent "de la Castillo" group, which is engaged in criminal migrant smuggling in the area. With asylum seekers unable to approach ports of entry to request asylum, some have attempted to cross into the United States, unaware of danger from violent groups that control access to the border.

- **In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry.** The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation.

- **A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42.** The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First.

- **A Guatemalan woman and her four-year-old son were kidnapped in Nogales and held captive for four days after DHS expelled them under Title 42. The family had sought U.S. protection to escape threats from the son's father.** The man who kidnapped the family had approached them offering help after DHS expelled them to Nogales, where they had no support and were unfamiliar with the area, according to Kino Border Initiative, who spoke with the woman in July 2022.

- **Mexican immigration (INM) officers kidnapped and turned over to the Zetas cartel a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo.  The cartel held the family hostage for three months, tortured them, and extorted their relatives.** The mother told Kino Border Initiative in July 2022 that the family had watched as their captors killed other migrants who attempted to escape.

- **An Indigenous Guatemalan woman and her three young children were kidnapped and extorted after CBP officers turned them away from asylum protection at the Nogales port of entry.** The woman told Kino Border Initiative in September 2022 that after the family was expelled, a woman approached them offering to bring them to a free shelter, but instead led them to a house where they were held captive for ransom.

- **In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water.** The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First.

- **Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned**



**them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter.** The mother reported the incident to Al Otro Lado.

With Title 42 still in place, Mexican asylum seekers fleeing persecution and torture are trapped in or expelled by DHS to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations. Mexican asylum seekers stranded in Mexico or turned away from U.S. protection due to Title 42 have been brutally attacked and threatened, including:

- **A young asylum-seeking woman was decapitated by cartel members who had previously threatened her in southern Mexico after DHS turned her and her children away and would not allow them to seek asylum at a port of entry, citing Title 42.** The woman's brother-in-law, who is also seeking asylum, told Human Rights First in September 2022 that the family had been unable to find space in Tijuana shelters and after spending several nights in the streets, had no choice but to return to their hometown where they had been threatened.

- **In late October 2022, DHS used Title 42 to turn away a transgender woman from southern Mexico who had sought protection at a port of entry near Tijuana, Mexico, after an assailant had tried to kill her.** She reported to Al Otro Lado that she had suffered violence and discrimination based on her gender and sexual orientation, including multiple rapes, in Mexico.

- **A trans woman from the south of Mexico and her Indigenous partner remain stranded in Ciudad Juárez after fleeing death threats based on their race, gender, and sexual orientation by a criminal group who disappeared the woman's gay cousin and warned her not to look for him.** The woman told Human Rights First, "I am harassed every day of my life. I am afraid to go outside. There is so much hate. Even churches won't help us."

- **A woman from Michoacán who travelled to the Calexico port of entry in August 2022 with her infant and her younger brothers, ages 10 and 13, was threatened by cartel members after DHS officers turned them away due to Title 42.** The cartel members shot and killed the woman's husband in front of the family while they were eating lunch together, then threatened the woman after she reported the murder to police. The family had attempted to seek asylum at the Calexico port of entry, but U.S. officers turned them away because of Title 42. The woman told Human Rights First they fled to another city after receiving messages from neighbors warning them that the cartel members who had threatened them knew they were in Mexicali.

- **A Mexican lesbian woman who had suffered multiple attacks in her hometown due to her sexual orientation, including being kidnapped, raped, and threatened with death by police officers, was turned away from asylum protection at the San Ysidro port of entry in October 2022.** The woman reported her experience to Al Otro Lado.

- **A gay man from southern Mexico who had suffered beatings, sexual assaults, and an attempted kidnapping in his hometown due to his sexual orientation was turned away from**



**asylum at the El Paso port of entry in October 2022.** The man reported to Al Otro Lado that the people threatening him had killed his nephew to intimidate him.

- **A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022.** The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten, and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats.

- **An Indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana.** She shared with Al Otro Lado that after the family was turned away, she was sexually abused by Mexican police in Tijuana.

The broad reach of cartels and other organized criminal groups in Mexico, which often have ties to government authorities (including Mexican military collusion with cartels that was recently confirmed by data leaks), can make relocation within Mexico impossible for Mexicans fleeing persecution and torture. For instance, at least three Mexican asylum seekers reported to Kino Border Initiative in October 2022 that the organized criminal groups persecuting them had pursued them to multiple cities within the country where they had moved in an attempt to escape these threats, confirming the national reach of these organizations.

In addition, humanitarian, faith, and legal workers assisting asylum seekers stranded in Mexico continue to face threats, as Human Rights First has previously documented, including:

- **In June 2022, cartel members kidnapped Baptist Pastor Lorenzo Ortiz, who has long provided humanitarian aid to asylum seekers in Nuevo Laredo and Monterrey, including those expelled or blocked under Title 42.** In July 2022, the U.N. Special Rapporteur on human rights defenders condemned the kidnapping, indicating that the cartel who kidnapped Ortiz accused him of stealing their business and refused to believe he aids migrants free of charge. The Special Rapporteur said, "Ortiz's case shows the extraordinary risk that human rights defenders run to provide basic support in the region. This is not an acceptable state of affairs." In November 2022, the Special Rapporteur continued to express grave concern that Pastor Ortiz was being "threatened, surveilled and harassed for his work in defence of the rights of migrants," and that asylum seekers and migrants "in his shelters are being abducted, harassed and extorted, with the alleged acquiescence of local police."

- **Another shelter in Nuevo Laredo was forced to shut down after a violent cartel demanded the shelter pay a "protection fee,"** according to a migrant who had been staying there and who reported the incident to Kino Border Initiative in October 2022. The migrant said that when the shelter closed, their family and other shelter residents were forced onto Nuevo Laredo streets, where members of a cartel photographed and threatened them.

- **In August 2022, an Al Otro Lado staff member was robbed at gunpoint in Tijuana in a plaza near the San Ysidro port of entry while accompanying asylum seekers who had been**



**instructed by CBP to appear at the port at 6 a.m. to be processed under an exception to Title 42.**

- **Members of organized criminal groups have threatened numerous staff and residents of several Tijuana shelters, including Ágape Misión Mundial and Espacio Migrante, in connection with their work assisting migrants with the Title 42 exemption process.** In November 2022, Embajada Migrante, a migrant shelter in Tijuana, was forced to close due to threats by members of an organized criminal group. A director of Embajada Migrante told EFE that members of an organized criminal group that controls the area have been harassing shelter staff for months, and at one point forcibly entered the shelter at night, demanding $200 from each of the migrants as a fee for crossing the border.

- **In November 2022, members of a violent cartel attacked a migrant shelter in Ciudad Juárez, plowing down its gate with a truck.** The cartel members forced the migrants to line up against a wall and ordered them to turn over their cell phones. The cartel retreated after realizing the space was a faith-based migrant shelter.

**Triggering Multiple Crossings, Artificially Inflating CBP's Border Encounters Statistics**

The continued and now expanded use of Title 42 is, while in place, trampling on U.S. refugee and immigration laws, preventing them from being upheld, prolonging disorder at the border, and inflating Customs and Border Protection (CBP) encounter statistics due to repeat entry attempts. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has increased, according to government data. Information released by CBP shows that in FY 2019 repeat crossings made up 7 percent of Border Patrol encounters, but with Title 42 in place since March 2020, repeated crossings rose to 27 percent of Border Patrol encounters in FY 2021, were 22 percent in August 2022 and 19 percent in September and October 2022 (the last months with data available).

Repeat crossings triggered by Title 42 expulsions have artificially inflated CBP's border apprehension statistics. CBP has concluded that the number of border encounters "was partly driven by high recidivism rates (repeat encounters) among individuals processed under the CDC's Title 42 public health authorities, meaning the actual number of unique individuals attempting to cross the border was substantially lower than total encounters." For example, in September 2022, government data shows that at least 43,000 encounters with Border Patrol were with individuals who had crossed the border multiple times, such that CBP acknowledged that its encounters statistics "overstate the number of unique individuals arriving at the border." Recent analysis by Syracuse University's Transactional Records Access Clearinghouse emphasizes the need for more accurate CBP data on repeat entry attempts. The American Immigration Council estimates that there were over 1.2 million repeat border encounters from August 2021 to September 2022 with Title 42 in place – inflating CBP's border apprehension data.



**Pushing dangerous crossings, resulting in record deaths as asylum remains blocked at ports of entry**

As Title 42 continues to block asylum at ports of entry, tens of thousands of migrants and asylum seekers are waiting in border cities for the opportunity to enter the United States through a limited exemption process. The exemption process requires nonprofit organizations and service providers, including migrant shelters, to refer migrants and asylum seekers with particular vulnerabilities in Mexico to DHS for consideration for Title 42 exemptions. Border cities in Mexico lack capacity to serve the thousands of migrants and asylum seekers stranded in Mexico awaiting the opportunity to request Title 42 exemptions. For example, shelters are full beyond capacity in Reynosa, forcing many migrants and asylum seekers to sleep in tent encampments or on the streets, often in sweltering heat or freezing temperatures. In September 2022, Haitian migrants frustrated by the slow Title 42 exemption process protested outside Reynosa shelters. Likewise, small tent encampments have emerged outside shelters in Tijuana, where tens of thousands of migrants and asylum seekers remain stranded as they await the opportunity to request Title 42 exemptions.

For people seeking refuge from persecution, the denial of access to asylum at U.S. ports of entry leaves them stranded in dangerous border cities and pushes some to attempt risky and sometimes life-threatening border crossings.  These crossings result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and organized criminal groups that control border crossings. At least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began tracking and recording border crossing deaths in 1998. The true number of deaths is likely much higher, as Border Patrol only counts deaths of individuals the agency identifies.

Some of the people who have died or were seriously injured while attempting to cross the U.S.-Mexico border to reach refuge in the United States include:

- **Dozens of migrants and asylum seekers have drowned since July 2022 attempting to cross the Rio Grande to enter Texas from the Mexican state of Chihuahua.** They include a five-year-old Guatemalan girl who drowned after a strong current ripped the girl from her mother's arms in August 2022, a 3-year-old boy who died in August 2022, nine individuals whose bodies were recovered on a single day in September 2022, and 12 people whose bodies were recovered on a single day in July 2022. Eagle Pass fire chief Manuel Mello said, "it's basically a drowning a day that you're seeing."

- **Twenty-two migrants and asylum seekers have drowned in the river and in the agricultural canals of the El Paso, Texas region in 2022 while attempting to cross the U.S.-Mexico border.** They include a young Colombian man whose body was recovered from the Rio Bravo in Reynosa, Mexico in November 2022.

- **In December 2022, a Russian man and another migrant drowned in the Pacific Ocean while attempting to swim across the U.S. border from Tijuana.**



- **In August 2022, Mexican brothers Carlos Enrique Mendoza and Edgar Mendoza died from dehydration, and were found with their bodies embracing,** in the Arizona desert after a criminal smuggling organization abandoned them.

- **A Guatemalan asylum seeker fleeing death threats in his country who had previously been expelled under Title 42 was hospitalized after he became lost in the desert in the Arizona border region as he attempted to seek U.S. protection** for the second time in September 2022. He was expelled again after recovering, according to Kino Border Initiative.

- **In December 2022, an Indian man and his 3-year-old son died after falling off the border wall** attempting to enter the United States from Tijuana, Mexico. An Indian woman also fell off the border wall and sustained injuries.

---

**CBP misconduct exacerbates danger for people subjected to Title 42**

CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that increase their vulnerability to danger and violent crime in Mexico. Some Border Patrol agents have failed to provide medical attention to people with injuries, carried out Title 42 expulsions in the middle of the night, and expelled migrants and asylum seekers without their personal belongings. These practices exacerbate the risks migrants and asylums seekers face in Mexico after expulsion.

For example, CBP has endangered the lives of migrants at the Arizona border by carrying out expulsions in the middle of the night. Kino Border Initiative reported that CBP expelled at least sixteen migrants and asylum seekers to Nogales between the nighttime hours of 12:00 and 3:00 a.m. in August 2022. The organization also reported that some migrants were expelled in the rain, at times when shelters and services were closed, and had to sleep in the streets. After these CBP expulsions, some migrants were then robbed by Mexican police and other individuals. Those expelled at night include a Mexican mother and daughter fleeing sexual violence, who were expelled to Nogales at 3:00 am in August 2022.

CBP also continues to separate families subjected to Title 42 expulsions. In addition to the many examples of Venezuelan family separations detailed in a previous section, CBP separated a Mexican family fleeing death threats by cartel members in Guerrero who burned their house and killed a relative. CBP allowed the mother and younger brother to seek U.S. asylum but expelled the 18-year-old sister to Ciudad Juárez alone, according to a shelter director who assisted the young woman.

In its research, Human Rights First heard numerous accounts of instances where Border Patrol and CBP agents engaged in abusive conduct or failed to provide necessary medical attention for migrants and asylum seekers with serious medical conditions or injuries before expelling them to Mexico, including:

- **Border Patrol agents refused to provide medical attention to a woman who was eight months pregnant and who requested aid for complications with her pregnancy.** The woman



told Kino Border Initiative in October 2022 that she had requested a medical examination on three occasions while in Border Patrol custody after she had not felt the baby move in hours, but Border Patrol officers expelled her to Nogales, Mexico without allowing her to see a doctor. The following morning, the woman experienced severe pain and went to a hospital, where she learned the baby had died.

- **In July 2022, a Border Patrol officer beat an asylum seeker who requested water in the Arizona desert and told him "if you want water, go get it in your own country,"** The man told Kino Border Initiative that the officer had shoved his face into the ground, kicked him repeatedly, and stood on the back of his head, causing the man to bleed and lose consciousness. Officers eventually took the man to the hospital after repeated requests but expelled him to Mexico without any of his medical paperwork. He said, **"*I'm trying to escape death in my country, only to nearly die here [in the US].*"**

- **Border Patrol agents denied medical attention to a migrant who was stung on his hip by a venomous scorpion and was having difficulty breathing.** A Border Patrol agent told him to "sit down and be quiet" when he asked for medical attention for the sting. He was only brought to the emergency room and provided an anti-venom shot many hours later, after his condition had worsened while he waited in a holding cell. The man told Kino Border Initiative in October 2022 that Border Patrol agents later expelled the man to Mexico without returning his personal belongings.

- **Border Patrol agents ignored the pleas for medical attention of a man who had been severely beaten by members of an organized criminal group before seeking U.S. protection.** The man told Kino Border Initiative in October 2022 that Border Patrol agents expelled him to Mexico without providing medical attention and instructed him to ask Mexican authorities for help for his injuries.

CBP and Border Patrol officers also seize and fail to return migrants' personal property. In October 2022, ACLU of Arizona and other nonprofit organizations assisting migrants at the Arizona border sent a letter expressing concern about the practice to CBP Commissioner Chris Magnus. They wrote: "Border Patrol agents in Arizona are forcing migrants they apprehend to discard all their belongings into on-site dumpsters, the only exceptions being a single layer of clothing and certain items that can fit into a 7-by-7-inch plastic bag…The mass dispossession of migrants' belongings by Border Patrol agents is not new, yet the problem has now reached unprecedented levels of magnitude and severity." Personal belongings migrants have been forced to discard include "**items of religious, sentimental, medical, and legal significance.**" The letter indicates that in some cases, Border Patrol has provided claim tickets that would supposedly enable migrants to reclaim seized belongings, but the agency expelled those individuals to Mexico under Title 42 without providing them an opportunity to reclaim their property.

In November 2022, members of Congress Bennie Thompson, Joaquin Castro, Raúl Grijalva and Nanette Barragán requested that the Government Accountability Office "conduct a review of [CBP's] activities, policies, and procedures regarding the handling of personal property belonging to individuals in its custody."



During the course of its research, Human Rights First also heard reports of CBP and Border Patrol taking personal possessions from asylum seekers or migrants, or forcing them to discard passports, religious items, money, and other essential personal items. For example:

- **Several Venezuelan asylum seekers told Human Rights First in December 2022 that CBP expelled them without their personal possessions.** One family was expelled in November 2022 without any of the documents they had brought that were critical to their asylum case, including identification documents, birth certificates, and evidence for their asylum cases.

- **In October 2022, CBP expelled dozens of migrants and asylum seekers, including many Venezuelans, to Tijuana without any of their personal possessions, including their passports and clothing.** Nicole Ramos, Al Otro Lado's Border Rights Project director, said Al Otro Lado has had to purchase clothes and other basic supplies for individuals whose personal belongings had been seized by CBP.

- **At least thirty migrants and asylum seekers have reported to Kino Border Initiative that Border Patrol or CBP destroyed or failed to return their personal possessions from September to November 2022.** One man said Border Patrol agents confiscated his cash, a diamond ring his father had given him, a bible, the keys to his home, his cell phone with all his contacts, and his identity documents, including his birth certificate.

- **Another person reported to Kino Border Initiative that Border Patrol officers seized the SIM card from his cell phone, pocketed the cash and credit cards from his wallet, and tore up his birth certificate in front of him.** Another individual observed a Border Patrol agent rip up $3,000 pesos from a migrant they had apprehended. The officer said, "this is trash, this is of no value to you here" before disposing of the ripped bills in a trash can.

**Expansive use of Title 42 further undermines specious public health rationale, violates U.S. refugee obligations**

The increasingly expansive use of Title 42 and the calls to further prolong its use as a tool – albeit an ineffective and counterproductive one – for border management have completely undermined the already flimsy pretense that the Title 42 policy is justified on public health grounds. Indeed, Marty Cetron, the director of the CDC's Division of Global Migration and Quarantine, told congressional investigators in May 2022 that the CDC order issued by the Trump administration to expel asylum seekers and migrants under Title 42 "did not originate from CDC." It has long been confirmed that the White House pressured the CDC to issue the order after the CDC's medical experts objected to its lack of justification as a public health measure. Cetron noted that he had refused to sign the CDC order, asked to be "excused" from the policy, and warned of the "significant harms" that could arise from its use. In addressing a statement he had reportedly made to colleagues at the time, Cetron confirmed to congressional investigators that this statement was consistent with some of his concerns about the order: "**to use public health authority that has never, ever been used this way, it's to keep Hispanics out of the country and it's wrong**."

The Biden administration's decision to expand use of Title 42 to Venezuelans, which was clearly a decision based on migration management considerations, was additional confirmation that the



policy has nothing to do with public health. Following the announcement of this expansion, which made no mention of public health in the context of Title 42 expulsions and repeatedly described the expansion as part of a migration management strategy, leading epidemiologists and public health experts wrote to President Biden emphasizing that the continued and expanded use of Title 42 is a "travesty" and that the Biden administration was "manipulating and misusing public health to advance immigration control objectives."

Not only has DHS expanded its misuse of Title 42 public health authority by adding a new nationality to its expulsion list, but some DHS officers appear to be using the supposed public health policy to expel people who have been in the United States for weeks or years, evading the (minimal but critical) due process protections of U.S. immigration law. Some DHS officers have used Title 42 as cover to expel individuals who have long resided in the United States to Mexico without due process, in some instances in coordination with Texas state officers. For example:

- **In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First.** After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney.

- **DHS also expelled a middle-aged Mexican man who had been in the United States for at least several weeks after a Texas state sheriff pulled over the trailer truck he was driving in a small Texas town in July 2022.** The sheriff demanded to see the man's permit to drive the truck, which he produced, and then asked for his work permit, which the man did not have. The sheriff detained the man in an isolated area where the man was provided no opportunity to speak with U.S. officials or to make any phone calls before DHS expelled him to Mexico, according to Kino Border Initiative.

The U.S. government is also using Title 42 to expel asylum seekers and migrants to Mexico after they have been arrested, jailed for weeks or months, and subjected to state prosecution under Texas' illegal Operation Lone Star. These prosecutions violate Article 31 of the Refugee Convention which generally prohibits the penalization of asylum seekers for their entry or presence in a country to seek refugee protection. DHS's expulsion of asylum seekers subject to Operation Lone Star also interferes with their ability to defend themselves against pending state criminal charges and to challenge abusive and discriminatory treatment by state and local authorities. Examples of these wrongful expulsions include:

- **In August 2022, DHS expelled to Honduras a 22-year-old Honduran asylum seeker who had spent three weeks in Texas state custody after he was charged with criminal trespass under Operation Lonestar.** The young man had posted bond so that he could be released to challenge the criminal charges against him, but Texas authorities immediately turned him over to CBP upon release from custody. Though the man was visibly distressed and expressed his fear of returning to Honduras on multiple occasions, DHS expelled him to Honduras, where he remains in hiding from individuals who threatened his life, according to a South Texas legal services provider.



- **The same legal services office assisted two other Honduran individuals whom DHS expelled to Mexico under Title 42 after they had spent two months in Texas state custody on pending criminal charges under Operation Lonestar, which were dismissed.**

The expansive and expanded misuse of Title 42 is additional confirmation that the Title 42 policy has nothing to do with public health but has instead been wielded to punish people for migrating or for exercising their human right to seek asylum from persecution.



**Acknowledgements**

This report was written and researched by Julia Neusner, Kennji Kizuka, Eleanor Acer, Ana Ortega and Alejandra Aguilar Ruiz. Rebecca Gendelman, Ruby Ritchin, Robyn Barnard, Licha Nyiendo, and Jim Bernfield contributed edits to the report. Camille Chabot, Crystal Choi, Rosie Foulds, Lauren Good, Leslie Herrera, Hannah Ismael, Akif Khan, Diana Padilla Legaspi, Ana Linares, Valeria Gerber Mariscal, Chris Mathrua, Neeka Mirpour, Samantha Navarrete, Semantha Norris, Ivette Orozco, Jemma Paradise, Ashley Quezada, Kathleen Quinn, Rachel Raps, Gwenyth Rodriguez, Cole Seither, and Syeda Shagufta of the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles) contributed additional research for this report. Our thanks to the many colleagues, including those from Al Otro Lado, Las Americas Immigrant Advocacy Center, Hope Border Institute, Immigrant Defenders Law Center, Instituto para las Mujeres en la Migración, Kino Border Initiative, UC Hastings Center for Gender and Refugee Studies, and other attorneys, law firms, and service providers who provided case examples and assisted in referring asylum seekers for interview. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

**Mission Statement**

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

© 2022 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org



# EXHIBIT 13

ARTICLE

# Mexico's Asylum System: Good in Theory, Insufficient in Practice

March 15, 2023

Arturo Castellanos-Canales

SHARE

    

RELATED TOPICS

Border    Legal Immigration    Refugees/Asylees

**Updated on May 10, 2023 to reflect the start of the implementation of the Circumvention of Lawful Pathways Rule.**

On May 11, 2023, the Biden administration **started implementing a rule** that creates a presumption of **asylum ineligibility** that would severely

Skip to content

presumption of asylum ineligibility — with limited exceptions — for migrants who travel through a third country unless they apply for and are denied asylum before reaching the United States. Considering that most asylum seekers travel through Mexico to reach the United States, this paper explores Mexico's asylum system to determine whether it is an efficient, functional, and viable alternative for migrants to apply for asylum.

Mexico is a country whose asylum legal framework, in theory, is among the world's most inclusive and protective of asylum seekers. In recent years, Mexico has made significant legislative improvements to adapt to the new hemispheric migration patterns.[2] In addition, around 70% of asylum applications in Mexico are resolved favorably, granting refugee status to most applicants.[3] However, despite the good intentions of Mexican legislators and the high approval rate of asylum applications, the administrative authorities in charge of reviewing asylum applications are underfunded and face a growing number of asylum applications.

In addition, Mexico's economic and demographic circumstances are not ideally positioned to absorb large numbers of refugees. Finally, Mexico itself has systemic problems with gang and gender-based violence, undermining it as a destination country for asylum seekers fleeing gang and gender-based violence.

## Mexico's Asylum System

Asylum seekers looking for protection in Mexico have, in theory, a simple three-step path to being recognized as refugees:

Skip to content

2. Apply for asylum before the Mexican Commission for Refugee Help (COMAR); and

3. Wait 45 business days for COMAR to resolve their case.

### Step 1: Travel to Mexico

Except for political figures[4] and family members of refugees — who can apply for asylum abroad[5] — asylum seekers must travel to Mexico to apply for asylum.[6] Once in Mexico, migrants are eligible for asylum regardless of how they enter the country:

1. By commercial flight;

2. By land or sea at ports of entry; or

3. Between ports of entry.

Traveling commercially to Mexico can be fairly easy for nationals of some countries and very difficult for citizens of others.[7] Mexico does not require visas for citizens or permanent residents of the United States, Canada, Japan, the United Kingdom, the European Union, and the Schengen Area. In addition, nationals from any country member of the Pacific Alliance — namely Colombia, Chile, and Peru[8] — as well as Argentina, Australia, Bahamas, Belize, Bolivia, Costa Rica, Hong Kong, Iceland, Israel, Jamaica, Monaco, New Zealand, Panamá, Paraguay, and Uruguay can enter Mexico without a visa.[9] Moreover, individuals with valid visas from the United States, regardless of their nationality, do not require Mexican visas.[10]

Those who do not meet the criteria listed above must obtain a Mexican visa

Skip to content

to get a Mexican visa, foreign nationals must demonstrate their economic solvency by showing a bank account statement with an average balance of around $3,200 USD over the last three months. [11] They must also show proof of employment, with approximately $1,000 USD monthly earnings for the previous three months.[12]

If migrants are denied Mexican visas, they can travel by land or sea to Mexico — either through ports of entry or between them — and apply for asylum.

## Step 2: Apply for asylum before the Mexican Commission for Refugee Help (COMAR)

Once in Mexico, all migrants can apply for asylum at no cost within 30 days[13] of their arrival at any of the ten locations[14] of the Mexican Commission for Refugee Help (COMAR).[15] To apply for asylum in Mexico, applicants must demonstrate a reasonable fear of being persecuted, imprisoned, or tortured due to their race, religion, nationality, gender, membership of a particular social group, or political opinion.[16] In addition, asylum seekers are eligible for refuge in Mexico if they demonstrate that their liberty or life could be placed in danger by armed conflicts, systemic violence, or substantial human rights violations in their countries of origin.[17] The latter criterion makes Mexico's definition of refugee one of the most inclusive in the world and in line with the Cartagena Declaration on Refugees.[18]

## Step 3: Wait for COMAR's resolution

Skip to content

COMAR will also assign a Refugee Unique Code (CUR) that will allow applicants to access all public services, including healthcare and education.[20] With the certificate and the CUR, asylum seekers can obtain a Visitor Card for Humanitarian Reasons (TVRH), which allows them to work while the application is processed. [21] As a general rule, COMAR must complete the asylum process and notify the applicant within 45 business days from the date the process started.[22] However, due to backlogs related to the Covid-19 pandemic and an increasing number of asylum applications, some COMAR resolutions are taking up to 100 days. [23]

If COMAR denies asylum, applicants have 15 business days to appeal the decision.[24] If, after the appeal, COMAR denies asylum again, the agency must consider whether the applicant is eligible for complementary protection.[25] Complementary protection – equivalent to "withholding from removal"[26] in the United States – provides relief from deportation to asylum seekers who have failed in their claim for refugee status but whose lives would be in danger if sent back to their countries of origin.[27] The status of complementary protection grants access to all public services in the country.

## Rights of Refugees in Mexico

If COMAR grants asylum, the applicant immediately becomes a refugee. [28] Refugees in Mexico[29] have the right to apply for refugee status for their family members abroad.[30] Even after Mexico recognizes the refugee status of an individual, they have the right to apply for asylum in another country. In that case, Mexico suspends their refugee status while

Skip to content

the process in a third country is under consideration. However, that refugee status can resume when they return to Mexico.[31]

### *Access to public benefits and right to travel*

Refugees in Mexico have the right to access all public benefits, including free healthcare and education.[32] They also have the right to settle anywhere in the country as long as they notify COMAR of any change of residence.[33]

### *Specific protections for migrant children*

Notably, the Mexican asylum framework has specific provisions that protect migrant children, regardless of whether they are unaccompanied or traveling with a legal guardian.[34] All children who arrive in the country as migrants, and their legal guardians, are automatically granted humanitarian parole.[35] Once they are granted humanitarian parole, they can apply for asylum. Mexican law forbids the separation of migrant families when children are involved.[36] Moreover, the law forbids the detention of migrant children for reasons related to their migration status. [37]

# Obstacles to the Asylum Process in Mexico

While the asylum system in Mexico seems easy to navigate on paper, there are multiple obstacles hindering the asylum process in the country:

> **There are only 10 locations of COMAR across the country:** Asylum seekers can only apply for asylum before COMAR authorities.

Skip to content

have been overwhelmed by the growing number of petitions in recent years.[38]

**As a general rule, asylum seekers must remain in the state where they filed their asylum application:** Asylum seekers must present themselves every week at the COMAR location where they filed their application. The asylum process automatically ends if the applicant fails to appear before COMAR for two consecutive weeks.[39] Among the many problems derived from the lack of sufficient locations is that many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce. For instance, the busiest COMAR location is the one in Tapachula, Chiapas — Mexico's poorest state, where 76% of the population lives in precarious conditions below the poverty line.[40]

**COMAR is overwhelmed with the growing number of applications it receives:** Between 2014 and 2019, Mexico registered a 5,325% increase in the number of asylum applications — from 1,296 in 2014 to 70,314 in 2019. Asylum applications decreased in 2020 due to the Covid-19 pandemic, falling to 40,914. However, the number skyrocketed in 2021 to 129,791 applications, dipping slightly to 118,478 in 2022.[41] According to recent estimates, COMAR has been expecting a similar number of asylum applications in 2023. However, it is expected that the Biden administration's proposed rule will significantly increase the number of asylum applications filed in Mexico. Because applicants would be required to show an asylum denial in third countries they have transited through, thousands of migrants will presumably file for asylum in Mexico just to receive an initial denial permitting them to

Skip to content

**COMAR is an underfunded agency with a massive backlog:** Due to the increasing number of asylum applications, COMAR's annual budget has increased from $1.1 million USD in 2017[42] to $10.3 million USD in 2023.[43] However, that budget remains insufficient to provide adequate asylum services and handle the massive increase in the number of people applying for asylum.[44]

**Mexico's economic and demographic circumstances are not well-situated to absorb large numbers of refugees:** Mexico has the 15th-largest economy in the world, with a GDP of $1.2 trillion USD.[45] Compared to the United States' $23.3 trillion USD economy, Mexico's capacity to absorb refugees is limited. In addition, unlike America's aging population, Mexico's younger population generates excess workers[46] leading a considerable portion of its population to seek labor opportunities abroad.[47] These realities pose challenges to Mexico as it now attempts to absorb thousands of asylum seekers into its workforce.

**Mexico has a systemic problem of gang and gender-based violence:** Gender-based violence in Mexico is systemic. Over 70% of women in Mexico have experienced gender-based violence, [48] with an average of 6 women disappearing every day in the country.[49] Moreover, gang violence in Mexico took the lives of over 26,000 people in 2022 in Mexico.[50] Asylum seekers in Mexico have increasingly been victimized by gang violence and are regularly targeted by cartels and other transnational criminal organizations who take advantage of their vulnerability, with scores of those seeking protection being

Skip to content

thousands of asylum seekers fleeing violence in their countries of origin.

# Conclusion

In recent years, Mexico's asylum system has made significant legislative improvements to adapt to the new hemispheric migration patterns. The country's definition of 'refugee' is among the world's most inclusive, and its asylum agency – COMAR – has made real progress in recent years. As a consequence, the approval rate of asylum applications has improved considerably. However, problems remain – Mexico's asylum system is overwhelmed and underfunded.

Despite some recent strides, Mexico's asylum system is struggling to keep up with the massive uptick in hemispheric migration over the past half-decade, and Mexican economic and demographic numbers pose challenges to absorbing large numbers of asylum seekers. Persistent struggles with domestic violence and gang violence also pose a challenge in serving as refuge for those fleeing similar violence in their countries of origin.

Across the U.S.-Mexico border, the Biden administration's new rule that will force many U.S. asylum seekers to first apply for asylum in Mexico will only further strain the Mexican asylum system. The expected new surge of applications would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. While Mexico's asylum system has demonstrated progress and may eventually serve as an important hemispheric receiving country for those fleeing danger, it currently is not ready for the likely influx of asylum seekers it faces in the coming months and years.

Skip to content

## Sources:

[1] Homeland Security Department and the Executive Office for Immigration Review; Notice of Proposed Rulemaking: Circumvention of Lawful Pathways; Federal Register. February 23, 2023. Available at **https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways**

[2] See transitory articles of Ley de Migracion. Available at **https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf**

[3] Comisión Mexicana de Ayuda a Refugiados (COMAR); La COMAR en numeros: Estadistica enero 2023. February 16, 2023. Available at **https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es**

[4] Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role. See Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 2-I.

[5] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 61.

[6] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 11.

[7] Viajeros en Ruta; Paises que necesitan visa para Mexico;

Skip to content

[8] Alianza del Pacifico; Available at **https://alianzapacifico.net/**

[9] Consulado General de Mexico en Atlanta; Personas exentas de presentacion de visa para viajar a Mexico; Available at **https://consulmex.sre.gob.mx/atlanta/index.php/visafee/247-personas-exentas-de-presentacion-de-visa-para-viajar-a-mexico#:~:text=Nacionales%20de%3A%20Argentina%2C%20Australia%2C,Uni%C3%B3n%20Europea%2C%20Uruguay%20y%20Venezuela**.

[10] Secretaria de Relaciones Exteriores de Mexico; Visas; Available at **https://consulmex.sre.gob.mx/boston/index.php/component/content/article/8-documentos-de-identidad/62-visas-ingles?Itemid=122**; Last Updated March 1, 2023.

[11] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at **https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf**

[12] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at **https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf**

[13] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 18.

Skip to content

Palenque in the state of Chiapas, Guadalajara in the state of Jalisco, Saltillo in the state of Coahuila, Monterrey in the state of Nuevo León, Tijuana in the state of Baja California and Ciudad Juárez in the State of Chihuahua. *See* UNHCR, Contact COMAR. Available at [https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/](https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/)

[15] Comision Mexicana de Ayuda a Refugiados; Available at [https://www.gob.mx/comar](https://www.gob.mx/comar)

[16] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, I-II

[17] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, III

[18] Cartagena Declaration on Refugees, 1984; UNHCR. Available at [https://www.unhcr.org/en-us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-international-protection.html](https://www.unhcr.org/en-us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-international-protection.html)

[19] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 22.

[20] UNHCR; How to Apply for Refugee Status in Mexico; Available at [https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/](https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/)

[21] Instituto Nacional de Migracion; Cambio a visitante por razones

Skip to content

https://www.gob.mx/tramites/ficha/cambio-a-visitante-por-razones-humanitarias/INM827

[22] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[23] UNHCR; How to Apply for Refugee Status in Mexico; Available at https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[24] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 25.

[25] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 29.

[26] American Immigration Council; The Difference Between Asylum and Withholding of Removal; October 6, 2020. Available at https://www.americanimmigrationcouncil.org/research/asylum-withholding-of-removal#:~:text=Individuals%20who%20have%20been%20banned,United%20States%20and%20work%20legally.

[27] Ruma Mandal; Protection Mechanisms Outside of the 1951 Convention ("Complementary Protection"); UNHCR; June 2005; Available at https://www.unhcr.org/435df0aa2.pdf

[28] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 26.

Skip to content

**[29]** Asylum seekers, refugees, and political asylees are three different concepts under Mexican law. An asylum seeker is a person who has left their country and is seeking protection from persecution and serious human rights violations in another country, but who hasn't yet been legally recognized as a refugee and is waiting to receive a decision on their asylum claim. A refugee is a person whose asylum claim was resolved favorably. Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role.

**[30]** Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 58.

**[31]** Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 35 BIS.

**[32]** Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 44.

**[33]** Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 49.

**[34]** Ley de Migracion; Art. 11

**[35]** Ley de Migracion; Art. 52-V-b

**[36]** Ley de Migracion; Art. 99

**[37]** Ley de Migracion; Art. 6

**[38]** UNHCR; How to Apply for Refugee Status in Mexico; Available at

Skip to content

refugiado-en-mexico/

[39] Reglamento de la Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[40] Consejo Nacional de Evaluacion de la Politica de Desarrollo Social (CONEVAL); Informe de evaluacion y pobreza Chiapas 2020; Available at https://www.coneval.org.mx/coordinacion/entidades/Documents/Informes_de_pobreza_y_evaluacion_2020_Documentos/Informe_Chiapas_2020.pdf

[41] Diego Badillo; Éxodo a Estados Unidos, sin precedentes, convierte a México en sala de espera de migrantes; El Economista; January 15, 2023. Available at https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html

[42] Dan Kosten; Mexico's Asylum System is Inadequate; National Immigration Forum; October 29, 2019. Available at https://forumtogether.org/article/mexicos-asylum-system-is-inadequate/

[43] Alejandro Gomez; Presupuesto para Comar este 2023 superará los 196 millones de pesos; Diario del Sur; January 8, 2023. Available at https://www.diariodelsur.com.mx/local/presupuesto-para-comar-este-2023-superara-los-196-millones-de-pesos-9434246.html

[44] Jorge Butron, Comar admite crisis; "nos ven como agencia de viajes",

Skip to content

https://www.razon.com.mx/mexico/comar-admite-crisis-ven-agencia-viajes-513107

[45] Georank; Mexico vs the United States: Economic Indicators Comparison. Available at https://georank.org/economy/mexico/united-states

[46] United Nations Population Fund (UNFPA); Mexico: Population Pyramid; Available at https://www.unfpa.org/data/demographic-dividend/MX

[47] Emma Israel and Jeanne Batalova; Mexican Immigrants in the United States; Migration Policy Institute; November 5, 2020. Available at https://www.migrationpolicy.org/article/mexican-immigrants-united-states-2019

[48] INEGI; Violencia contra las mujeres en Mexico. April 29, 2022. Available at https://www.inegi.org.mx/tablerosestadisticos/vcmm/

[49] Secretaría de Seguridad y Protección Ciudadana; En México desaparecen 6 mujeres por cada día del año; El Economista; April 21, 2022. Available at https://www.eleconomista.com.mx/politica/En-Mexico-desaparecen-6-mujeres-por-dia-del-ano-SSPC-20220420-0166.html

[50] Oscar Lopez; As Mexico's epidemic of violence rages on, authorities seem powerless to stop it; The Guardian; December 8, 2022. Available at https://www.theguardian.com/world/2022/dec/08/as-mexicos-epidemic-of-violence-rages-on-authorities-seem-powerless-to-stop-it

Skip to content

**[51]** Miriam Jordan; Smuggling Migrants at the Border Now a Billion-Dollar Business; New York Times; July 25, 2022. Available at **https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html**

Author: Arturo Castellanos-Canales

