7/9/26, 12:18 AM

Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria

Case 2:26-cv-04831-MTL    Document 1-6    Filed 07/09/26    Page 1 of 68

deportation. Maricopa County remains the only Arizona county to provide office space for ICE agents in its jails.

Arpaio's efforts to arrest undocumented immigrants began under the same 287(g) agreement, which also allowed local officers to question individuals' immigration status during routine policing. Sheridan says he disagreed with Arpaio's tactics and tried to persuade him to not target day laborers or set up patrols in mostly Latino communities like Guadalupe. (Arpaio told Arizona Luminaria and ProPublica that he considered enforcing immigration laws to be part of his job.)

During a 2015 court hearing, Sheridan denied that he knew about a 2011 preliminary injunction — issued while he was Arpaio's chief deputy — barring the Sheriff's Office from making immigration arrests. He didn't learn about the injunction until 2014, Sheridan said.

Evidence presented in court showed Sheridan had been notified starting in 2011. Snow accused Sheridan and Arpaio of "deliberately" violating the order, withholding evidence and failing to investigate and discipline deputy misconduct, among other things. "Sheriff Arpaio and Chief Deputy Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees," Snow wrote in a 2016 ruling. He held them in civil contempt of court.

7/9/26, 12:18 AM
Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 2 of 68
Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria



- 15 -

U.S. District Judge G. Murray Snow ruled in 2016 that then-Sheriff Joe Arpaio and his chief deputy at the time, Jerry Sheridan, were ultimately responsible for the department's conduct. Obtained and highlighted by ProPublica.

"I don't even remember exactly why the judge held me in contempt of the court — what exactly he used against me," Sheridan told Arizona Luminaria and ProPublica. "He didn't think that I was truthful because I wasn't aware of something. And I was very truthful."

Arpaio did not endorse Sheridan's 2024 bid for sheriff and has declined to talk about him while hinting at a falling-out. "I made a couple mistakes, which are management mistakes," Arpaio told Arizona Luminaria and ProPublica. "I may have appointed a couple of wrong people. But in managing, you try to back up your people and so on. So, in any big organization, you can't be perfect."

Sheridan filled key leadership positions in his administration with former colleagues who worked under Arpaio and who, like Sheridan, had left the Sheriff's Office after Arpaio lost reelection. Sheridan appointed retired Sgt. Clint Doyle to the Court Implementation Division, which is responsible for enforcing the court's mandates. And he rehired Paul Chagolla, who ran public relations at the time of Arpaio's raids and sweeps. Snow criticized Doyle's appointment, calling out Sheridan for attempting to bypass a court requirement that key leadership roles dealing with the Melendres settlement be approved by the monitor.

Doyle and Chagolla didn't respond to requests for comment.

Christine Wee, the lead attorney for the American Civil Liberties Union of Arizona, told Arizona Luminaria and ProPublica that it was alarming to see so many from Arpaio's administration return. "These folks were instrumental in the abuse and the terror that so many of our clients had to experience," she said. "And then to bring them back in again, I think it sends a dangerous message to the community."

Sheridan acknowledges the criticism, but points to improvements like significantly reducing the misconduct complaints backlog. "From the sins of the previous administration, we're now three different sheriffs since then, and some people just don't want to let go."

Case 2:26-cv-04831-MTL    Document 1-6    Filed 07/09/26    Page 4 of 68



Residents of Gila Bend at a March 2025 town hall Credit: Jesse Rieser for ProPublica

Case 2:26-cv-04831-MTL    Document 1-6    Filed 07/09/26    Page 5 of 68



Sheridan and other representatives of the Maricopa County Sheriff's Office at a March 2025 town hall. Credit: Jesse Rieser for ProPublica

Since Sheridan took office last January, Arizona Luminaria and ProPublica have attended seven of his public appearances, reviewed his public remarks and interviewed him on three occasions. During that time, his assertions that the department had done enough to justify ending court oversight grew bolder, and Republican allies amplified his efforts.

"It's about time that the public gets over some of the things that happened well over a decade ago and to realize the deputy sheriffs that work in their community are really good law enforcement officers," he told Arizona Luminaria and ProPublica in a March 2025 interview.

Ending the settlement would eliminate the near-constant recordkeeping tasks deputies face while on duty, including documenting 13 details about each traffic stop. This hampers their "ability to do the job," Sheridan said, and discourages interacting with the public. Deputies fear prolonging a traffic stop, even for a brief chat, will lead to discipline.

"If they see somebody walking down the street, they can't just pull over and say, 'Hi, how are you doing?'" Sheridan told Arizona Luminaria and ProPublica. "Every time they contact a member of the public, it is a lengthy process. And so it slows them down and it intimidates them not to want to do it."

Last March, Sheridan began organizing meetings, in addition to the court-ordered gatherings, in rural communities policed by the Sheriff's Office.

In Gila Bend, a town of about 1,800 southwest of Phoenix, Sheridan said he wanted to hear about locals' needs. The town pays more than $900,000 a year to the Sheriff's Office for public safety services.

"I'm a good leader and our deputies are responsive to your needs," Sheridan told the group inside a community center. "And that's really what this is all about, right? The sheriff's main job is to keep people safe."

A slide displayed data about traffic stops, calls for service and dispatch times. "For the population that's here in Gila Bend, for the number of violent crimes — at least the ones that are notated here –– you guys are a very safe community," a sheriff's office lieutenant told the group.

The town's vice mayor, Chris Riggs, a former deputy himself, disagreed. Crimes weren't being reported, making the town seem safer than it is, he said.

Residents "just don't trust MCSO anymore," Riggs said. "They'll deal with it themselves."

Several residents agreed.

No deputies live in Gila Bend, where response times lag and police services have suffered, they said.

"Deputies aren't like they used to be, where they get out and they mingle with the community," Riggs said.

Sheridan blamed the settlement for overburdening the department.

Ten days later, residents of Aguila, an unincorporated community nestled among farms where the population swells to about 1,000 during the winter growing season, told the sheriff they too felt neglected by deputies.

"We have 9,224 square miles to cover" and limited resources, Sheridan said.

Sheridan has tried to address this. When he took office, there were about 140 vacancies for patrol deputies. He raised starting pay to compete with other local law enforcement agencies in the county. By the start of 2026, vacancies declined to 65, according to his office. Sheridan called it one of his biggest successes in his first year.

But hiring was still hindered by the paperwork deputies do to comply with the settlement, he said.



Sheridan at a meeting in Gila Bend, where some residents said they had lost trust in the Sheriff's Office. Credit: Jesse Rieser for ProPublica

The Sheriff's Office has made significant progress on a key requirement of the court: reducing the backlog of misconduct investigations. Although it has been cut by 76% since November 2022, there are still about **475 claims** that haven't been investigated, and three recently completed investigations dated from 2017.

In June, the Sheriff's Office released the court-mandated traffic stop report for 2024.

Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 8 of 68

It tracked some improvements. But when all traffic stops by deputies were analyzed, the report concluded: "Stops involving Hispanic drivers were more likely to result in an arrest than stops involving White drivers"; and traffic stops involving Black drivers, who are not covered in the Melendres settlement, were more likely to take longer and result in an arrest compared to stops of white drivers.

Despite the findings, Sheridan insisted there was no racial profiling at the department.

In July, the court's monitor team held another community meeting to review the Sheriff's Office's progress. It was in Maryvale, a West Phoenix neighborhood where three-quarters of the residents identify as Latino.

Before it began, Sheridan told Arizona Luminaria and ProPublica that while he remained committed to reaching full compliance with the court's requirements, a majority of Republicans on the county's governing board "have a different perspective because they're the ones that fund what the sheriff does."

Three members of the Maricopa County Board of Supervisors were at the meeting.

Latino residents and advocates from the heavily Democratic area typically made up a majority of attendees. But this crowd was mostly white Republicans, including some from retirement communities miles away. From the front of the gym, Sheridan could see signs that read, "We support MCSO," and, "Take the handcuffs off Jerry!"

Case 2:26-cv-04831-MTL    Document 1-6    Filed 07/09/26    Page 9 of 68



The West Phoenix neighborhood of Maryvale is predominantly Latino. Credit: Jesse Rieser for ProPublica

Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 10 of 68



Residents from other parts of Maricopa County, many of them white, filled a Maryvale community meeting to call for court oversight of the Sheriff's Office to end.
Credit: Jesse Rieser for ProPublica

Republican Supervisor Debbie Lesko, who represents retirement communities in western parts of the metro area, said she believed the settlement was getting in the way of public safety. "They're spending a lot of time on paperwork instead of being able to provide public safety. And when I talked to the sheriff's department, they said it's hurting the morale of the deputies."

When Latino residents asked questions and voiced concerns, they were interrupted by jeers and groans from white members of the audience.

Warshaw, the court monitor, pleaded for the crowd to allow others to speak.

Sheridan's supporters focused on $350 million the county supervisors had approved since 2013 to implement the court-mandated reforms, including $226 million allocated to the Sheriff's Office. The monitor later found

7/9/26, 12:18 AM
Case 2:26-cv-04831-MTL  Document 1-6  Filed 07/09/26  Page 11 of 68
Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria

that the Sheriff's Office had greatly exaggerated total expenses, and the judge cautioned county leaders against citing the dollar figure because it was misleading.

"Mr. Warshaw, tell the judge to stop looting Maricopa County tax dollars to pay for that oversight," Tom Berry, a retiree from Sun City, said to the monitor. "Advise the judge to stop the oversight."

The case hinges on how well the Sheriff's Office complies with 368 paragraphs outlined in four court orders aimed at rooting out racial profiling, Warshaw responded. "Is there still work to be done? Yes, there is still work to be done. Is this thing going to go on forever? No."

"It looks like it," a woman blurted.

Salvador Reza is a longtime organizer of Latino communities and day laborers who regularly attends meetings related to the settlement. He said it appeared Republicans were organizing to call for an immediate end to court oversight, which Sheridan would welcome.

"That's what he's hoping, that the federal court lets him off the hook so he can do whatever he wants," Reza said, noting he was concerned by Sheridan's history with Arpaio and approach to the case since taking office. "So there's no way that we can rebuild trust in the community knowing very well who Sheridan is."

Sheridan denied he had coordinated with the supervisors to publicly call for an end to the settlement.

Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 12 of 68



The most recent annual report on the Sheriff's Office showed improvements but also found that "stops involving Hispanic drivers were more likely to result in an arrest than stops involving White drivers."
Credit: Jesse Rieser for ProPublica

Months later, debate over the settlement's cost came to a head.

Community members asked for details about how the $226 million the sheriff's department had attributed to enforcing the settlement was spent. The monitor's team published a report in October that concluded the Sheriff's Office had greatly exaggerated the cost. More than $163 million, about 72%, of the total attributed to the reforms was unrelated or lacked justification, the report found.

Sheridan attacked the audit.

"These guys are not CPAs, they don't have the experience to do an audit of a huge government operation," he said on the conservative talk radio show where he regularly appeared. "The sheriff's budget is about $700 million a year, and the county's budget is a couple of billion. They don't have the expertise to do this, and so they come up with this report."

He listed some expenses, including an order to create and staff new divisions. "We have three Ph.D.s that are analysts, and all of this has led to the fact that there has been no racial profiling or bias in well over 10 years, and that's the gist of this lawsuit."

Sheridan's attorneys petitioned the court to dispute the audit but later dropped the challenge, saying the county wanted to avoid additional "unnecessary" expenses.

The audit reinforced many Latino community members' belief that the agency couldn't be trusted.

After the raucous gathering in Maryvale, advocates alleged there had been an effort to intimidate Latino residents, including the use of racial insults in a forum intended to gather their input and check on the Sheriff's Office's progress.

Judge Snow held the next public meeting at the federal courthouse. He acknowledged the increasingly vocal opposition to the settlement and its costs, but defended it as necessary.

"This is not an easy case. It is an expensive case. It is a case where everybody in Maricopa County has benefited, whether or not they appreciate it," Snow said, before noting there was still work to do resolving the backlog of misconduct reports. "Sheriff Sheridan has done a considerable amount in reducing the backlog he was left with, but there is still a considerable backlog to be resolved."

Sheridan conceded the settlement had made his office better, even if it sometimes caused friction. Still, attorneys for the Sheriff's Office and the county government argued to Snow that they had done enough to end his oversight.

In December, the county filed a motion to sidestep the remaining reforms and end court supervision. Sheridan's attorneys signed onto the motion in January.

"After 14 years, four sheriffs, and hundreds of millions spent tax dollars, it is essential to defend taxpayer money if federal oversight is no longer warranted," Thomas Galvin, the Republican chair of the Maricopa County Board of Supervisors at the time, said in a video statement released after the motion was filed.

Attorneys representing Latino residents in the Melendres case opposed the bid to end court oversight. Snow has yet to rule on the motion.

Raul Piña, a member of a court-mandated Community Advisory Board tasked with helping the Sheriff's Office rebuild trust with Latinos, said the push to end oversight ignored a plain fact: The most comprehensive

Case 2:26-cv-04831-MTL    Document 1-6    Filed 07/09/26    Page 14 of 68

data still showed the department hadn't eliminated bias from its policing.

"If Melendres goes away, that takes away significant protections for brown and Black people or the immigrant community in Maricopa County," he said.



Sheridan addresses Latino faith leaders and residents at a February town hall in the Phoenix suburb of Gilbert. Credit: Jesse Rieser for ProPublica

Since it joined the Melendres case and settlement in 2015, the U.S. Department of Justice had supported the reforms. But with Trump back in the White House, Suraj Kumar, an attorney in the DOJ's Civil Rights Division, informed Snow in January that the DOJ backed efforts to end oversight of the Sheriff's Office.

This added to Latino community leaders' worries that the Sheriff's Office could once again, as it had under Arpaio, partner with ICE and allow deputies to enforce immigration laws.

Sheridan tried to put those concerns to rest, saying that if court oversight ended, he would not enter such an agreement.

Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 15 of 68

But the questions grew louder as ICE surged into Los Angeles, Chicago and Minneapolis to carry out mass deportations. **Phoenix was reportedly next**.

After a U.S. citizen was killed during ICE operations in Minnesota, Sheridan was asked on a conservative radio talk show what he would do if something similar happened in Arizona.

His deputies would step in if ICE agents did anything "illegal," Sheridan said in the mid-January interview.

Four days later, Sheridan backtracked, saying he would instead side with immigration officers: "I will be here to protect them to do that and keep people from interfering with them."

Cornejo, the community activist who attended the meeting in Guadalupe, read the reversal as a sign that Sheridan was too easily swayed and could not be trusted without court oversight. "Facing a crowd that tends to lean to the left, he's going to give rhetoric that kind of says that he's working on those things that he's supposed to be," Cornejo said. "If he's with more conservatives, his language and rhetoric is completely different."

Sheridan said that his position has not changed and that he "firmly believes that the Sheriff's Office is in full compliance and that the current oversight should be concluded."

Later that month, ICE raided 15 metro Phoenix restaurants that federal prosecutors alleged had knowingly hired undocumented laborers. Protests erupted outside some of the raided restaurants.

Sheridan sent deputies to help with crowd control, saying ICE had first asked Tempe police for assistance but the request was declined.

"We went out there, not to facilitate what ICE was doing or get involved in their business, because we don't do that," Sheridan told Latino faith leaders and residents at a February town hall in the suburb of Gilbert. "We were there to keep the peace."

The Tempe Police Department told Arizona Luminaria and ProPublica that it did not receive a request for help from ICE, nor was it notified in advance of the immigration operation. ICE did not respond to a question about local law enforcement participation in the raids.

Latino activists said the episode raised more questions about Sheridan's willingness to collaborate with ICE and whether he would be transparent about his intentions. It would be harder for him to earn back their trust, they said.

Case 2:26-cv-04831-MTL   Document 1-6   Filed 07/09/26   Page 16 of 68

*Gabriel Sandoval* contributed research.

---

© 2026 AZ Luminaria

Powered by Newspack

# EXHIBIT 19

 

January 15, 2014

Charles K. Edwards
Deputy Inspector General
Department of Homeland Security
Office of Inspector General
245 Murray Drive, SW
Building 410
Washington, D.C. 20528

Tamara Kessler
Officer for Civil Rights and
  Civil Liberties
Department of Homeland Security
Office of Civil Rights and Civil Liberties
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

**Re: Complaint and request for investigation of abuses at U.S. Border Patrol interior checkpoints in southern Arizona, including unlawful search and seizure, excessive force, and racial profiling.**

Dear Mr. Edwards and Ms. Kessler:

We write with serious concerns regarding U.S. Border Patrol interior vehicle checkpoints in southern Arizona. This complaint is submitted on behalf of 15 U.S. citizens, aged 6 to 69 years old, whose rights were violated in the course of more than 12 separate incidents over the past 15 months at 6 different Arizona checkpoints, as described in detail below.[1] The ACLU receives frequent reports from Arizona residents regarding unconstitutional searches and seizures, excessive use of force, racial profiling, and other agent misconduct at checkpoints. Residents describe similar patterns of abuse at various checkpoints throughout the state—including searches based on service canines "alerting" to nonexistent contraband[2] and prolonged, unjustified detentions—indicating that these incidents are not anomalous or perpetrated by a few "bad apples," but rather are the result of systemic deficiencies in Border Patrol policies and practices, which are leading to widespread rights violations.

The ACLU is a non-partisan, non-profit, nation-wide organization that works daily in courts, communities, and legislatures across the country to protect and preserve the rights and liberties established by the Bill of Rights and state and federal law. The ACLU has a particular commitment to ensuring that fundamental constitutional protections of due process and equal protection are extended to every person, regardless of citizenship or immigration status, and that government respects the civil and human rights of all people. The ACLU of Arizona is an ACLU state affiliate organization with over 7,000 supporters. The ACLU's Border Litigation Project investigates, documents, and litigates civil and human rights violations in the U.S.-Mexico border region.

---

[1] Five of these incidents occurred in the same week in late November-early December 2013, at three different checkpoints. Though several of the individuals described below have experienced checkpoint-related abuses on multiple occasions, this letter focuses on the most recent incidents.

[2] In at least eight of the incidents documented herein, Border Patrol service canines "alerted" in the absence of contraband. The ACLU recently filed a lawsuit on behalf of a U.S. citizen subjected to a strip search, multiple genital and cavity searches, a forced bowel movement, an X-ray, and a CT scan following a similar false alert by a U.S. Customs and Border Protection service canine. *See Jane Doe v. El Paso County Hospital District, et al.*, No. 3:13-CV-00406-DB (W.D.Tex. *filed* Dec. 18, 2013); Complaint *available at* http://www.aclu-nm.org/wp-content/uploads/2013/12/Complaint-Jane-Doe-v-Various-Defendants-12-18-13.pdf

Residents of southern Arizona are increasingly outraged by Border Patrol checkpoints, and for good reason. Forty years ago, the U.S. Supreme Court condoned immigration checkpoints under the assumption that the stops are "brief," and involve, at most, a "limited inquiry into residence status" and a "visual inspection" of the exterior of the vehicle.[3] In practice, border residents regularly experience extended interrogation and detention not related to establishing citizenship, invasive searches, verbal harassment, and physical assault, among other abuses. As discussed below, Border Patrol checkpoints often appear to be operated as drug interdiction checkpoints, which are unconstitutional,[4] and not for the limited purpose of verifying residence status. Indeed, most of the individuals described herein were never asked about their citizenship, and Border Patrol's own figures show that the vast majority of drug-related arrests at checkpoints do not involve unauthorized immigrants at all, but rather, U.S. citizens.[5]

According to a 2009 U.S. Government Accountability Office (GAO) Report, Border Patrol operates 71 permanent and tactical checkpoints across the southwest.[6] These operations stem from Border Patrol's authority to conduct warrantless seizures within "a reasonable distance"[7] of the border. That distance is defined by outdated regulations to be "100 air miles"[8] from any external boundary, including coastal boundaries, and thus encompasses roughly two-thirds of the U.S. population and the entirety of several states.[9] In practice, Border Patrol ignores that limitation, roaming still further into the interior of the country.[10] In Arizona, most checkpoints are located on rural state highways between 25 and 50 miles north of the border, many of them in the vicinity of southern Arizona towns and cities.

---

[3] *See United States v. Martinez-Fuerte*, 428 U.S. 543, 558–60 (1976), discussed *infra*.

[4] *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), discussed *infra.*

[5] The vast majority of these arrests are for marijuana-related offenses, and the number of arrests in 2011 was triple that in 2005. *See* Andrew Becker, *Four of Five Border Patrol Drug Busts Involve US Citizens, Records Show*, CENTER FOR INVESTIGATIVE REPORTING, Mar. 26, 2013, *available at* http://cironline.org/reports/four-five-border-patrol-drug-busts-involve-us-citizens-records-show-4312. Meanwhile, CBP's data shows that apprehensions of undocumented immigrants are at 40-year lows while deaths of border crossers are at historic highs. *See* Bob Ortega, *Border Apprehensions Up, But Still Near Historic Lows*, ARIZONA REPUBLIC, Jun. 3, 2013 *available at* http://www.azcentral.com/news/politics/articles/20130531mexico-border-apprehensions-up.html

[6] U.S. GOVERNMENT ACCOUNTABILITY OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, BORDER PATROL: CHECKPOINTS CONTRIBUTE TO BORDER PATROL'S MISSION, BUT MORE CONSISTENT DATA COLLECTION AND PERFORMANCE MEASUREMENT COULD IMPROVE EFFECTIVENESS, GAO-09-824, (Aug. 2009) *available at* http://www.gao.gov/products/GAO-09-824.

[7] *See* 8 U.S.C. § 1357(a)(3).

[8] *See* 8 C.F.R. § 287.1(b). The Justice Department published regulations defining "reasonable distance" as 100 miles in 1957. *See* Field Officers: Powers and Duties, 22 Fed. Reg., 236, 9808–09 (Dec. 6, 1957) (to be codified at C.F.R. § 287). There is no public history to indicate *why* the Justice Department chose 100 miles as the "reasonable distance" from the border. It may have been that 100 miles had historically been considered a "reasonable" distance regarding availability of witnesses for examination, responses to subpoenas, and other discovery issues under federal law. *See, e.g.*, 10 U.S.C. § 849; FED. R. CRIM. P. 7; FED. R. CIV. P. 45.

[9] Though immigration checkpoints are mostly confined to the southwest, Border Patrol has operated temporary checkpoints in northern states as well. A recent Freedom of Information Act (FOIA) request uncovered design plans for permanent checkpoints on southbound New England highways. *See* ACLU OF VERMONT, SURVEILLANCE ON THE NORTHERN BORDER, (Sept. 17, 2013), *available at* http://www.acluvt.org/surveillance/northern_border_report.pdf.

[10] *See, e.g.*, Todd Miller, *War on the Border*, NY TIMES, Aug. 18, 2013, *available at* http://www.nytimes.com/2013/08/18/opinion/sunday/war-on-the-border.html?pagewanted=all&_r=0 (describing checkpoint stop of Senator Patrick Leahy 125 miles from the border in New York state: "When Mr. Leahy asked what authority the agent had to detain him, the agent pointed to his gun and said, 'That's all the authority I need.'"); Michelle Garcia, *Securing the Border Imposes a Toll on Life in Texas*, AL JAZEERA AMERICA, Sept. 25, 2013, *available at* http://america.aljazeera.com/articles/2013/9/25/living-under-thelawofbordersecurity.html#mainpar_adaptiveimage_0 ("[W]hen it was pointed out that [Alice, Texas] sits more than 100 miles from the border, [a Border Patrol spokesman] explained that 'the law does not say that we cannot patrol. Our jurisdiction kinda changes.'"); *see also United States v. Venzor-Castillo*, 991 F.2d 634 (10th Cir. 1993) (finding Border Patrol lacked

Border Patrol checkpoints have profoundly negative impacts on border communities. Recently, residents of Arivaca, Arizona[11] began petitioning for the removal of one of three local checkpoints that surround their town, citing ongoing rights violations and harassment as well as harm to property values,[12] tourism, and quality of life resulting from checkpoint operations. Community members have also been documenting examples of checkpoint abuses. One former local business owner (her small business suffered from the decline in tourism caused by the checkpoint and was forced to close its doors at the end of 2013) described being detained on her way to a doctor's appointment following a heart attack, held for over an hour in the hot sun, not permitted to sit down, and denied water. Other Arivacans report that agents at the checkpoint have told them, "You have no rights here," or that all community members are considered suspect simply by virtue of living in Arivaca.[13] The Arivaca petition, recently presented to Border Patrol's Tucson Sector Chief Manuel Padilla Jr., reads in part:

> Residents are intimidated by armed federal agents and subjected to improper questioning and warrantless searches in violation of their 4th, 5th and 14th Amendment rights. It is not possible for Arivaca residents to leave northbound without passing through one of three area checkpoints. Thus, locals must pass through the checkpoint with regularity, sometimes daily, such that these constitutional rights violations are not merely occasional or minor inconveniences but rather frequent and substantial infringements. People of color experience greater scrutiny and longer detentions at the checkpoint; such racial profiling violates the law as well as the federal government's own guidelines prohibiting any consideration of race or ethnicity in such encounters.[14]

The experiences described by the residents of Arivaca—and those listed below—are not unique; rather, they are consistent with numerous reports of rights violations across the state and throughout the southwest, and have become more common as Border Patrol has expanded at an unprecedented rate.[15] The GAO has found numerous problems with checkpoint oversight, including "information gaps and reporting issues [that] have hindered public accountability, and inconsistent data collection and entry [that] have hindered management's ability to monitor the need for program improvement."[16]

---

reasonable suspicion to stop and search vehicle 235 miles from the border where agent had no knowledge regarding the origin of the vehicle).

[11] A town of approximately 700 people, Arivaca is located 11 miles north of the U.S.-Mexico border and within 30 miles of three different Border Patrol checkpoints—one on Arivaca Road in Amado, Arizona, another on State Route 286, south of Three Points, Arizona, and a third on Interstate 19 outside of Tubac, Arizona. Residents must pass through the checkpoints daily to go to work, purchase groceries, or run basic errands.

[12] *See, e.g.*, Judith Gans, THE BORDER PATROL CHECKPOINT ON INTERSTATE 19 IN SOUTHERN ARIZONA: A CASE STUDY OF IMPACTS ON RESIDENTIAL REAL ESTATE PRICES, UNIVERSITY OF ARIZONA, (Dec. 2012), *available at* http://udallcenter.arizona.edu/ucpubs/gans_2012b.pdf

[13] Additional narratives of Arivaca community members, three of which are described in greater detail in this complaint, are available at http://phparivaca.org/?page_id=210

[14] Arivaca Checkpoint Petition, *available at* https://www.change.org/petitions/u-s-border-patrol-remove-the-check-point-on-arivaca-rd-in-amado-az-quite-el-ret%C3%A9n-de-la-carretera-de-arivaca-en-amado-az

[15] From 2004 to 2011, as the ranks of agents doubled to more than 21,000, complaints involving CBP received by the DHS Office of Civil Liberties and Civil Rights nearly tripled. *See* DEP'T OF HOMELAND SEC., OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES, "DEPARTMENT-WIDE DATA ON COMPLAINTS RECEIVED," *available at* http://www.dhs.gov/department-wide-data-complaints-received. Given the many problems with the DHS complaint system, discussed *infra,* it is likely that incidents of abuse are substantially under-reported.

[16] *See* GAO-09-824, *supra* at *28. Those findings were made in 2009, the last time the federal government conducted a thorough review of Border Patrol checkpoint operations and their impact on border residents and local communities. GAO's "community impact" analysis omitted Tucson sector checkpoints on the grounds that, at the time, they were considered "tactical" and not permanent checkpoints. *Id.* at *89.

We request that you promptly investigate and respond appropriately to each of the individual incidents detailed herein, and conduct a comprehensive review of *all* complaints regarding Border Patrol checkpoints over the past five years. Furthermore, a thorough review of Border Patrol checkpoint policies and practices is needed to ensure that operations are in fact limited to briefly verifying citizenship. This review should determine whether agents are receiving direction and instructions regarding the limits of their authority and if they adhere to those guidelines in practice. It should include all policies and procedures related to service canines, in light of widespread reports of "false alerts," a problem that federal courts have long recognized.[17] We believe significant changes in Border Patrol training, oversight, and accountability mechanisms are needed to prevent ongoing and systematic violations of state and federal law, as well as Border Patrol's own guidelines, and to protect the rights of border communities. We urge you to make recommendations for such changes consistent with your mission to prevent further abuses.

Section I of this complaint describes 12 recent examples of unlawful practices at Border Patrol checkpoints in southern Arizona. Section II presents the applicable legal framework.

## I.    Individual Complaints of Border Patrol Abuses at Checkpoints

### 1.    Samaritans of Green Valley (Kathy Zweig, Lyn Nowakowski, & Fawn Brown) - Arivaca Road Checkpoint, Amado, AZ, Dec. 18, 2013.

At approximately 1:45 p.m. on December 18, 2013, Kathy Zweig, 69, Lyn Nowakowski, 68, and Fawn Brown, 59, arrived at the Arivaca Road checkpoint. All three are volunteers with Samaritans of Green Valley ("Samaritans"). The group has been providing humanitarian aid in southern Arizona for the past decade and passes through the Arivaca Road checkpoint daily. On this occasion, the volunteers pulled into the checkpoint in a clearly marked Samaritans vehicle and were met by a Border Patrol agent later identified as John Howard. Agent Howard did not ask any of the women about their citizenship; instead, he asked a series of questions about the contents of their vehicle, which they answered truthfully. Agent Howard was particularly interested in the volunteers' backpacks in the rear of the vehicle, which the volunteers explained were used to carry food, water, and medical supplies for their humanitarian aid work. Agent Howard stated that the backpacks could also be used to carry narcotics and asked the volunteers to open the trunk. When they asked why, Agent Howard stated, "Because I have mere suspicion you could be carrying drugs." Agent Howard then directed them to "pull into secondary."

The volunteers pulled into the secondary inspection area and exited the vehicle. They again asked for an explanation. Agent Howard said, "I pulled you over for due diligence and mere suspicion." When the women asked Agent Howard to articulate what his suspicion was based upon, Agent Howard explained that there could be narcotics in the backpacks "because that's what backpacks are used for. When we see backpacks, we become suspicious." Agent Howard then repeated, "Just pop your trunk." The women again refused and continued to ask for an explanation. Agent Howard replied, "The backpacks." Agent Howard handed the volunteers a small, laminated card bearing U.S. Customs and Border Protection ("CBP") and Border Patrol insignia and titled "Authority as an Agent."[18]

---

[17] *See infra.*

[18] Attached herein as Exhibit A, the card reads in part: "Border Patrol agents may stop and question motorist [sic] at reasonably located checkpoints, even in the absence of individualized or reasonable suspicion." Among other omissions, the card does not specify that questioning must be "brief" and the stop confined to a "limited inquiry into residence status." *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–60 (1976). Neither does it specify that "reasonable suspicion" is required for non-immigration inquiries (the standard is not "mere suspicion," as the agent claimed), or that searches must be based on "probable cause" that a crime has *likely* been committed. *See infra.*

Ms. Zweig, Ms. Nowakowski, and Ms. Brown proceeded to record the names of Agent Howard and the two other agents present, Agent Miguel San Quentin and Agent Alexis Barrios. As they were doing so, Agent Barrios became visibly angry and agitated, and ripped his name tag off his chest and thrust it in Ms. Nowakowski's face in an aggressive and intimidating manner. Agent Howard continued to ask for consent to search the vehicle, and the volunteers continued to refuse. After approximately ten minutes, Agent Howard told them, "We called the dog and it will be here in a few minutes." After another ten minutes had elapsed, a service canine and its handler arrived. Ms. Nowakowski recognized the handler, Agent Ewing, from several prior interactions. Agent Ewing said, "Just let me walk around the car with the dog." Ms. Nowaskowski again objected, and asked if she and the others were free to go. Agent Ewing said that they were. As Ms. Nowaskowski was returning to the vehicle, Agent Howard asked Agent Ewing, "Are you releasing them?" Agent Ewing responded that he was.

Ms. Zweig, Ms. Nowakowski, and Ms. Brown were detained for approximately thirty minutes. They were never asked about their citizenship.

**2. John Forrey – Tombstone Checkpoint, Route 80, Dec. 6, 2013.**

On December 6, 2013, John Forrey arrived at the Tombstone checkpoint located on Arizona State Route 80. Mr. Forrey is a professional photographer and native of Bisbee, Arizona. An agent peered through the back window of his vehicle and asked him to open his trunk. Mr. Forrey did not consent to a search of his trunk. The agent asked Mr. Forrey where he was coming from. Mr. Forrey responded that this was personal information. The agent asked Mr. Forrey if he had a driver's license, and Mr. Forrey said that he did. The agent then directed Mr. Forrey into a secondary inspection area. Mr. Forrey asked why he was being detained. The agent called over another agent, identified as Agent Torres, who asked Mr. Forrey if he was refusing to go to secondary. Mr. Forrey replied that he was not refusing but was asking why he was being detained. Mr. Forrey then pulled into secondary and left the motor running and his foot on the brake.

Agent Torres approached and asked if Mr. Forrey had a weapon. Mr. Forrey did not have a weapon, but because the question was not related to his citizenship, he paused to consider whether or not he was required to answer. Before Mr. Forrey could respond, however, Agent Torres unholstered his gun, and holding it a foot away, pointed it at Mr. Forrey's face, screaming at him not to reach for anything. Other agents approached, pulled Mr. Forrey's left arm through the open window, and began twisting it. The agents opened the door as Agent Torres directed them to pull Mr. Forrey out. Mr. Forrey tried to put the automatic transmission in park so the car would not roll. Agent Torres, still pointing his gun at Mr. Forrey's head, started screaming, "He's reaching for the console!" Mr. Forrey stopped reaching for the transmission. The agents started dragged Mr. Forrey out of the car, causing his foot to come off the brake and the car to roll forward. Agent Torres yelled, "Put it in park, asshole!" Mr. Forrey put the car in park. Agent Torres then holstered his pistol, pulled out his Taser and yelled, "Let's just Taser him!" Instead, the agents handcuffed Mr. Forrey and left him on a bench nearby while they searched his car.

A supervisor approached and accused Mr. Forrey of intentionally trying to harm the agents by allowing his car to roll forward. Mr. Forrey noted that, with a gun pointed at his head, he had been instructed not to reach for anything while being forcibly removed from his vehicle. Mr. Forrey objected strongly to his detention and to the conduct of Agent Torres. The supervisor did not release Mr. Forrey from the handcuffs, but said that he would "talk to Torres."

Agents continued to search the interior of the vehicle over Mr. Forrey's repeated objections. To open the passenger door, which was locked, one of the agents broke the door latch mechanism; as a result, the door now does not open or close securely. The agents called for an Arizona Department of Public

Safety officer, but an officer never arrived. Mr. Forrey was detained for approximately 40 minutes before he was finally taken out of handcuffs and released. He suffered a bruise on his upper left arm and cuts on his left hand. Mr. Forrey was not asked about his citizenship status.

This was not the first time Mr. Forrey has been detained by the Border Patrol. About three months earlier, Mr. Forrey was pulled over while driving approximately 30 miles north of the border. An agent approached him and immediately asked to look in his trunk. The agent did not say why he pulled Mr. Forrey over and did not ask him about his residence status. Mr. Forrey was detained for 30 minutes before being released. The next day, Mr. Forrey arrived at the Tombstone checkpoint. Again an agent asked to look in Mr. Forrey's trunk. Mr. Forrey refused and had to wait while a service canine inspected his car. Mr. Forrey is a professional photographer who travels extensively in southern Arizona. He has been pulled over by Border Patrol dozens of times, sometimes as far as 60 miles from the border.

### 3. Dale Polen – Arivaca Road Checkpoint, Amado, AZ, Dec. 2, 2013.

Dale Polen is a six-year resident of Arivaca, Arizona and a local mechanic. On December 2, 2013, Mr. Polen was on his way to get supplies for work when he arrived at the Arivaca Road checkpoint at approximately 8:45 a.m. An agent slapped the side of his vehicle and told him to "pull into secondary." Mr. Polen asked why, to which the agent responded, "You're driving like an idiot." Mr. Polen objected to the agent's characterization of his driving. The agent then stated that a service canine had "alerted."

Mr. Polen pulled into the secondary inspection area and the agent directed him to exit his vehicle. The agent again stated, "The only reason we pulled you over is because you were driving like an idiot." Mr. Polen objected that traffic enforcement was outside Border Patrol's authority. The agent then claimed that a service canine had "tagged" the vehicle. The agent proceeded to remove Mr. Polen's two dogs from the car and search the interior of Mr. Polen's vehicle. When Mr. Polen objected to the search, one agent said, "You won't be laughing when we find stuff." Another agent remarked, "Arivaca is just a bunch of smugglers." One of the agents kept his right hand on his firearm during his interaction with Mr. Polen. Mr. Polen was detained for approximately 30 minutes before he was released. He was never asked about his citizenship.

Like all Arivaca residents, Mr. Polen must pass through a checkpoint anytime he wishes to leave town, and has had similar encounters with Border Patrol at the Arivaca Road checkpoint in the past. Last year, agents detained Mr. Polen for 30 minutes and searched the interior of his vehicle after claiming that a service canine had alerted. On another occasion, Mr. Polen arrived at the checkpoint on his motorcycle. A service canine alerted, jumping up on Mr. Polen's motorcycle. Agents told Mr. Polen to get off his motorcycle and began to question him about drugs. When Mr. Polen objected to being detained, an agent reached out and grabbed Mr. Polen's arm. The other agents assisted in throwing Mr. Polen to the ground. Agents held Mr. Polen down while his motorcycle was searched. After more than 20 minutes, he was released. Mr. Polen tried to make a complaint to local law enforcement, but officials dismissed his concerns. As a result of these experiences, Mr. Polen feels extremely apprehensive every time he approaches the checkpoint, which he tries as much as possible to avoid.

### 4. Tim Buchanan – Arivaca Road Checkpoint, Amado, AZ, Dec. 2, 2013.

On December 2, 2013, Tim Buchanan arrived at the Arivaca Road checkpoint at approximately 9:30 a.m. Mr. Buchanan is a 61-year-old retiree and 12-year resident of Arivaca. He drives through the checkpoint several times a week, usually on his way to play golf. On this occasion, an agent asked Mr. Buchanan if he was a U.S. citizen, and he confirmed that he is. The agent then directed him to the secondary inspection area. Mr. Buchanan pulled into the secondary inspection area and exited his vehicle.

Page **6** of **17**

An agent who later identified himself as Agent Taylor approached with a service canine, opened the driver's side door, and directed the dog to enter Mr. Buchanan's vehicle. Mr. Buchanan immediately objected that he did not consent to allowing the dog inside his vehicle. Agent Taylor responded by yelling, "Shut your fucking mouth!" Mr. Buchanan repeated his objection to the search. Agent Taylor yelled, "Shut your fucking mouth you fucking asshole and let me do my job!" Mr. Buchanan turned to another agent standing by and asked for an explanation. Agent Taylor interjected, "Shut your fucking mouth!" The other agent directed Mr. Buchanan to sit on a bench. Mr. Buchanan repeated his request for an explanation. Agent Taylor again interrupted him, screaming, "I said shut the fuck up," and placed his right hand on his firearm. Agent Taylor then continued searching Mr. Buchanan's vehicle, muttering loudly to himself, "These fuckers...the fucking cunts." Mr. Buchanan was deeply shaken by Agent Taylor's actions, but he persisted in asking the other agent why his vehicle was being searched. Agent Taylor again interrupted and said, "Because I didn't recognize you."

Mr. Buchanan was detained for approximately 30 minutes before he was released. When he asked Agent Taylor for his name, the agent concealed his badge from view but responded, "Taylor." Mr. Buchanan was deeply traumatized by the encounter; nonetheless, he called a Border Patrol supervisor to report the incident. Approximately one week later, a Border Patrol "community liaison" called Mr. Buchanan. The liaison informed Mr. Buchanan that agents had confirmed his account, and clarified that the abusive agent's name was not "Taylor," but "Haley." The liaison said, "I don't know why he lied to you." The liaison would not say whether Agent Haley faced any consequences for his actions, but tried to reassure Mr. Buchanan that "it won't happen again." Mr. Buchanan later learned that a Border Patrol agent in Arivaca had asked Mr. Polen (whose checkpoint encounter, described above, occurred minutes ahead of Mr. Buchanan's) for information about Mr. Buchanan; Mr. Buchanan does not know why a Border Patrol agent would be asking other Arivaca residents about him.

### 5.   Shirley Stepp – Arivaca Road Checkpoint, Amado, AZ, Dec. 1, 2013.

On the morning of December 1, 2013, Shirley Stepp pulled into the Arivaca Road checkpoint following a run-in with a dead skunk. An agent asked if she was a U.S. citizen, and she confirmed that she is. The agent asked her about the smell of her car, and she explained that she had been at the home of a neighbor who recently killed a skunk. The agent said, "No, that's not what it smells like," and directed Ms. Stepp to the secondary inspection area.

Ms. Stepp pulled into the secondary inspection area and exited the vehicle. The agent indicated that he had called for a service canine. No service canine arrived, however, and after waiting nearly 45 minutes, the agent told Ms. Stepp, "It will save time if we can search your car." In order to be released, Ms. Stepp consented to a search. The agent conducted an extended, invasive search of her vehicle. Ms. Stepp keeps a gas treatment additive in the rear of her vehicle; later, she discovered the container had been opened and flammable liquid was leaking all over the rear of the vehicle. After searching the interior of her car, the agent directed Ms. Stepp to empty her pockets. The agent questioned her at length about drugs and her prescribed medication, refusing to believe that the smell was due to a skunk, even when Ms. Stepp offered to call her neighbor to confirm her story. At one point, the agent claimed that by carrying her prescribed medication, Ms. Stepp had committed "an arrestable offense." The service canine never arrived. Finally, after detaining Ms. Stepp for over an hour, the agents released her.

Ms. Stepp was outraged by this encounter. She felt humiliated watching her friends and neighbors drive by while she was detained. Some people tried to stop to check on her but were waved away by Border Patrol agents who claimed that she was "under investigation." Though she has lived in Arivaca for the past 25 years, Ms. Stepp fears interacting with Border Patrol agents at the checkpoint, which she must drive through several times every week. She hears frequent reports from friends and neighbors about Border Patrol agents harassing and abusing Arivaca residents at the checkpoint.

6.  **Don Tran & Chad Ivey – I-8 Checkpoint, California-Arizona State Line, Nov. 29, 2013.**

On November 29, 2013, Don Tran and Chad Ivey were driving from San Diego to Phoenix on I-8. Mr. Tran, 49, is a law school graduate and Mr. Ivey, 41, is a Marine veteran; both are IT professionals. They arrived at the I-8 Border Patrol checkpoint around 10:30 p.m. An agent asked if they were U.S. citizens, and they confirmed that they are. The agent directed Mr. Tran to pull into the secondary inspection area. Mr. Tran complied. In the secondary inspection area, agents again asked if Mr. Tran and Mr. Ivey were U.S. citizens, and again they stated that they are. An agent then asked Mr. Tran and Mr. Ivey to step out of the vehicle, without explanation. They both complied. As he was exiting, Mr. Tran locked his car.

Mr. Tran spoke with a supervising agent and made clear that he did not consent to a search of his vehicle. Mr. Tran and Mr. Ivey sat on a bench and watched as an agent arrived with a service canine. Mr. Tran and Mr. Ivey observed the dog and its handler, later identified as Agent Danny Ruiz circled their vehicle. The dog did not react to Mr. Tran's vehicle in any way. After passing Mr. Tran's vehicle, the dog alerted to a hand bag in an adjacent vehicle, pulling the bag out of the open trunk. The Border Patrol supervisor then notified Mr. Tran and Mr. Ivey, "We need to search your car. The dog got a hit on your car." Mr. Tran objected that the dog had not alerted on his vehicle but rather on an item in an adjacent vehicle. Nonetheless, both the supervisor and Agent Ruiz asserted that they dog had "hit a positive scent" in Mr. Tran's vehicle, giving Border Patrol probable cause for a search.

An agent tried to open Mr. Tran's vehicle but it was locked. Mr. Tran repeated his objection to any search of his vehicle and suggested they call a judge to obtain a warrant. A group of agents conferred together before notifying Mr. Tran, "It's going to be a while, we need to pat you down and put you in a holding cage while we wait for the magistrate." Mr. Tran was directed to leave his car keys with the agents. Mr. Tran and Mr. Ivey each asked if they were being detained. Both of them were told, "You are being detained." Mr. Tran and Mr. Ivey were taken to a holding area of small, wire cages and placed in separate cells. After approximately 45 minutes, agents returned and released them. After returning to their vehicle, it was apparent from the disarray that agents had searched the interior, including the glove compartment, center console, and trunk.

7.  **The Garcia Family – Route 86 Checkpoint, east of Tohono O'odham Indian Reservation, Aug. 19, 2013.**

On August 19, 2013, Jason and Charlotte Garcia were driving east on State Route 86 from Sells, Arizona with their twin six-year-old foster children. Mrs. Garcia was driving when the family arrived at the checkpoint. Without inquiring about the family's residence status, the agent directed Mrs. Garcia to pull into the secondary inspection area. Mrs. Garcia asked why they were being detained and the agent responded angrily, "Because I told you so." The Garcias again asked for an explanation. A female agent, later identified as K. Riden, approached and directed Mrs. Garcia to pull into secondary. Agent Riden stated that she would forcefully remove the Garcias from their vehicle and drive the car into secondary if they did not comply. The Garcias repeated their request for an explanation. Agent Riden claimed that a service canine had "alerted" to the vehicle. The Garcias stated that they did not have anything in the vehicle that would cause a dog to alert, and no dog was nearby.

Agent Riden then directed another agent to "put it down," shorthand for deploying a tire deflation device to prevent the vehicle from driving away. Mrs. Garcia told the agent that she would go to the secondary inspection area, and Agent Riden instructed her to "hold on." The tire deflation device was removed and Mrs. Garcia drove into secondary, where Agent Riden demanded that the Garcias exit the vehicle. The Garcias had begun recording the incident on a cell phone. When Mrs. Garcia exited the

vehicle with the phone, Agent Riden yelled at her to turn it off, and tried unsuccessfully to grab the phone from Mrs. Garcia's hand, poking her chest. Mrs. Garcia handed the phone to her husband. Agent Riden continued to yell and demanded that Mr. Garcia turn the phone off. Agent Riden stated that Mr. Garcia could not use her phone to record because Border Patrol was searching the vehicle "based on probable cause." Agent Riden continued yelling at Mr. Garcia to turn off the phone.

The Garcia family was escorted to a nearby bench. Several agents stood over them in a threatening manner as the Garcia parents tried to comfort their sons, who were terrified by what was happening. From where they were sitting the Garcias could not see whether or not agents were searching their vehicle. Agent Riden continued yelling at Mr. Garcia to turn off his phone. Another agent told the Garcias they were "setting terrible role models" for their children. Mr. Garcia could see that Agent Riden's behavior was upsetting his children, so he turned the phone off, but not before Agent Riden attempted, again unsuccessfully, to grab the phone out of his hands. Another agent pulled Mr. and Mrs. Garcia aside and told them not to "argue" with Agent Riden which would "just make matters worse" for them. The Garcia parents continued to try to comfort their children, who were visibly upset. Finally, the Garcia family was released. They were never asked about their citizenship.

This incident was extremely traumatic for the Garcia children, who continued to refer to the experience for several weeks. One of the children stated that he was afraid that Border Patrol agents were going to "throw Mom down." The other child said he did not want to visit his cousin in Sells anymore because he did not want to cross the checkpoint again. Several days after the incident, the Garcia children spotted some Border Patrol agents in a local diner and were instantly afraid; the boys clung to their parents and asked if the agents were going to harm them. Both Mr. and Mrs. Garcia work in Sells. It is not possible for them to return from work without passing through one of the four Border Patrol checkpoints surrounding the Tohono O'odham Indian Reservation. Mrs. Garcia often returns from work late at night, sometimes arriving at the checkpoint around midnight, with no other cars around. Agents have repeatedly demanded that she open her trunk for inspection, questioned her about matters unrelated to her immigration status, and refused to provide names and badge numbers when requested.

Mr. Garcia says, "The Reservation has become a police state. It seems like no one can go out in public without being questioned by Border Patrol agents." He says Border Patrol agents do not respect tribal customs or the law, and that abuses of tribal members[19] have become more common because agents "are never held accountable for their actions."

---

[19] *See* Stanley Throssell, *77-year-old woman says Border Patrol agent abused her at AZ 86 checkpoint*, THE RUNNER, Oct. 18, 2013, *available at*, http://oodhamrunner.com/community/77-year-old-woman-says-border-patrol-agent-abused-her-at-az-86-checkpoint/ ("A 77-year-old woman from San Pedro Village says a Border Patrol agent left her with bruises when he grabbed her arm as she went to open the trunk of her car at the checkpoint on Arizona Highway 86 east of the reservation boundary. Mildred Antone said the incident took place Oct. 12, between 5 and 6 p.m. as she was on her way to San Xavier for the celebration of Saint Kateri Tekakwitha…Antone said when she drove up to the checkpoint, an older Border Patrol agent asked her to open her car trunk. She noted that it's not easy for her to get in and out of her car, so she told the agent that there was nothing in her trunk. She said he continued to insist that she open the trunk, and an argument ensued. Antone admitted to letting loose an expletive, and the agent responded by implying that tribal members lie to the agents all the time. Antone said she then pushed her car door open and the agent walked into it. She walked to open up the trunk, and that is when the agent grabbed her by the arm, she said. The incident escalated from there, she said, as the agent accused her of assaulting a federal officer. She was told to pull her car to a secondary checkpoint area, and she said she complied, giving the agent her driver's license. Several agents huddled together, then the agent with whom she had the confrontation came over to her, saying her age was of no consequence, he would throw her in jail and tow away her car, she recalled. He then tossed her driver's license into the front window of her car and told her to leave, she said. Antone said she is now fearful of going to the checkpoint. 'I'm afraid to go down there to the checkpoint. I haven't gone because I'm afraid he might still be there,' she said.")

    **8.  Julia Turner – Tombstone Checkpoint, Route 80, Jan. 1, 2013.**
    **9.  Julia Turner – Tombstone Checkpoint, Route 80, Nov. 8, 2012.**

On the evening of January 1, 2013, Julia Turner, then 19-years-old, was on her way home from work. Ms. Turner is Hispanic and describes her appearance as Hispanic. At the Tombstone checkpoint, Ms. Turner was questioned about her citizenship and asked to hand over her driver's license. An Agent Cooper walked around her vehicle with a service canine. Ms. Turner saw that the dog did not react to her vehicle and had begun to move to the car behind hers when Agent Cooper pulled on the dog and started tapping on the trunk of Ms. Turner's vehicle. Agent Cooper then told Ms. Turner the dog had "hit" on something in the car and directed her to pull into the secondary inspection area.

Ms. Turner pulled into the secondary inspection area, turned off her vehicle, and exited with her purse and phone. Agent Cooper told her to leave her purse and phone in the car. Ms. Turner objected, and Agent Cooper tried to grab her phone out of her hands. She again objected, but Agent Cooper told her it was "part of procedure." Ms. Turner retained her phone and called her father, a retired Sheriff's Deputy with extensive experience with police dogs.[20] Two other agents approached and an Agent Nabity told Ms. Turner that if she did not hang up the phone she would have to "sit there a long time and not be able to leave." Meanwhile, Agent Cooper and another agent searched Ms. Turner's car. Agents removed Ms. Turner's registration as well as her prescription medication. Agent Cooper and Agent Nabity began to question her about the medication at length, even after they were presented with a valid prescription. Ms. Turner was detained approximately 35 minutes before she was released.

Two months earlier, on the evening of November 8, 2012, Ms. Turner was driving home from work when an agent asked her for her driver's license, proof of insurance, and information related to her commute. An agent then notified Ms. Turner that a dog had "alerted," giving Border Patrol probable cause to search her car, and directed her to the secondary inspection area. An agent told Ms. Turner to hand over her cell phone, but she refused and was able to call her father. Agents detained Ms. Turner for approximately 45 minutes while they searched her vehicle before releasing her.

In addition, Ms. Turner faced additional scrutiny on at least three prior occasions at the same checkpoint. In each instance, agents asked Ms. Turner to turn off her engine and open her trunk for inspection. Each time she was asked about her work, where she was going and why, and about her vehicle. Each time, agents asked her to show identification, registration, and proof of insurance. On several occasions, Ms. Turner witnessed other cars being waved through while she was detained. Ms. Turner believes she was subject to additional scrutiny and harassment on account of her ethnicity.

    **10. David Chapman – Huachuca City Checkpoint, Route 90, December 28, 2012.**
    **11. David Chapman – Sunsites Checkpoint, Route 191, Dec. 21, 2012.**
    **12. David Chapman – Sunsites Checkpoint, Route 191, Oct. 24, 2012.**

David Chapman, 45, is a small business owner and 15-year resident of Pearce, Arizona. On December 28, 2012 at approximately 11:45 a.m., Mr. Chapman arrived at the Border Patrol checkpoint located on Route 90 north of Sierra Vista, Arizona. Mr. Chapman was informed that a service canine had alerted to his car, and he was directed to pull into the secondary inspection area. A supervisor named Agent Caspar approached Mr. Chapman's vehicle with an Agent Debusk. Agent Debusk proceeded to

---

[20] Brian Turner has driven through the Tombstone checkpoint and observed the dogs being improperly handled. He believes agents arbitrarily decide whom to question, only subjecting some persons to stops and searches, and that his daughter was repeatedly detained on account of her Hispanic appearance. Mr. Turner, who is Caucasian, has driven his daughter's vehicle through Border Patrol checkpoints without facing similar detention or harassment.

Page **10** of **17**

search the interior of the vehicle and Mr. Chapman's personal effects. Mr. Chapman repeatedly objected to the search, which greatly amused Agent Caspar. Agent Caspar laughed and said, "Go tell Congress, it won't get you anywhere." Mr. Chapman was detained for over ten minutes while his car was searched before he was released. He was not questioned about his residence status.

On December 21, 2012, at approximately 1:30 p.m., Mr. Chapman arrived at the Sunsites checkpoint on Route 191. He was not asked about his citizenship; instead, he was immediately directed to pull into the secondary inspection area. An Officer C. Swanson told him that a service canine had alerted and directed the dog into Mr. Chapman's vehicle. Mr. Chapman objected to the search. Mr. Chapman later discovered the dog had destroyed some business-related paperwork in the front seat. Mr. Chapman was eventually released.

On October 24, 2012 at approximately 9:30 a.m., Mr. Chapman arrived at the Sunsites checkpoints. A service canine jumped onto Mr. Chapman's vehicle. Mr. Chapman objected that the dog was scratching his truck. An Agent M. Torres informed him that his dog had "hit," and directed Mr. Chapman to pull into the secondary inspection area. Agent Torres then told Mr. Chapman that he had probable cause to search the vehicle. Another agent asked Mr. Chapman for identification and asked him to exit his vehicle. Agent Torres proceeded to lead the dog around the vehicle, saying, "Get it boy, get it boy." The dog continued to jump onto the vehicle. Agent Torres returned the dog to its kennel and continued to search Mr. Chapman's truck bed, pausing to confer with an Agent J. Caporale. Agent Torres questioned Mr. Chapman about his use of the vehicle and about drugs. After being detained for approximately fifteen minutes, Mr. Chapman was released. He was not asked about his residence status.[21]

## II.     Constitutional Limitations on Immigration Checkpoints

The Fourth Amendment imposes limits on the government's search-and-seizure powers to prevent "arbitrary and oppressive" interference with the privacy and personal security of individuals. *United States v. Martinez-Fuerte*, 428 U.S. 543, 555 (1976). Accordingly, courts have imposed strict limitations on Border Patrol checkpoint operations; indeed, the legal legitimacy of immigration checkpoints is premised upon those limitations. *Id.* at 556–57. ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.")

In *Martinez-Fuerte*, the Supreme Court found immigration checkpoints to be permissible only insofar as they involve a "brief detention of travelers during which (a)ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558 (citation omitted). The Court specified, "Neither the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search." *Id.* The Court condoned referrals to secondary inspection areas "made for the sole purpose of conducting a routine and *limited inquiry into residence status* that cannot feasibly be made of every motorist *where the traffic is heavy*." *Id.* at 560 (emphasis added). "The objective intrusion of the stop and inquiry thus remains minimal [and] should not be frightening or offensive because of their public and relatively routine nature," the Court observed. *Id.*; *see also United States v. Ortiz*, 422 U.S. 891, 894–95 (1975) ("At traffic checkpoints the motorist can see that other vehicles are being stopped…and he is much

---

[21] This was not Mr. Chapman's last encounter with Agent Torres. On December 16, 2012 at around 11:30 a.m., Mr. Chapman again arrived at the Sunsites checkpoint. The checkpoint was not in operation, but as Mr. Chapman drove through, he made eye contact with Agent Torres before continuing westbound on Route 191. Approximately one quarter mile down the road, a Border Patrol vehicle approached Mr. Chapman from the rear until it was a car's length from his rear bumper. The Border Patrol vehicle tailgated Mr. Chapman at a speed of 65 miles per hour for about half a mile before pulling off the road. Mr. Chapman subsequently called the Wilcox Border Patrol station to submit a verbal complaint, but did not receive a response.

Page **11** of **17**

less likely to be frightened or annoyed by the intrusion.") As for local residents subject to frequent stops, the Court noted, "Motorists whom the officers recognize as local inhabitants…are waved through the checkpoint without inquiry." *Id.* at 550.

That case was decided almost 40 years ago, in 1976.[22] Today, Border Patrol checkpoints diverge in significant respects from those described in *Martinez-Fuerte*. In Arizona, most checkpoints are located in rural areas where local residents are often forced to undergo searches and detentions ranging far beyond "limited" citizenship inquiries and not justified by "heavy traffic."[23] Border residents—including the many individuals who must pass through checkpoints daily to go to work, run errands, or take children to school—describe feelings of anxiety, fear, and anger after being interrogated, harassed, searched, and/or assaulted by federal agents. These individuals are not "waved through the checkpoint without inquiry," as the Supreme Court envisioned. *Id.* Each of the motorists described herein was referred for non-routine, unjustified detentions in a secondary inspection area on at least one occasion. Two of the above complainants were threatened with firearms.[24] Mr. Forrey and Mrs. Garcia were physically assaulted. Ms. Stepp was threatened with imprisonment. Mr. Ivey and Mr. Chan were detained in wire cages for approximately 45 minutes while their car was searched on a pretext and without their consent. The Garcia children fear passing through the checkpoints that surround the Tohono O'odham Indian Reservation where their parents work. While the Supreme Court in *Martinez-Fuerte* condoned immigration checkpoints because they were thought to impose a "minimal," non-offensive intrusion on the rights of motorists, the daily experiences of border residents profoundly undermine that premise, and by extension, the legitimacy of the checkpoints themselves. *Id.*[25]

In many cases, agents appear to be dispensing with any pretext of immigration enforcement, instead conducting generalized criminal investigations, which the Supreme Court has found to be unconstitutional. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) ("We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."); *Delaware v. Prouse*, 440 U.S. 648 (1979); *see also United States v. Ellis*, 330 F.3d 677, 680 (5th Cir. 2003) (allowing Border Patrol to routinely tack on otherwise impermissible drug interdiction questioning was "essentially an attempt to circumvent the [Supreme] Court's holding in *Edmond*…") (quotations omitted). In *Edmond*, the Supreme Court invalidated a checkpoint established for general crime control purposes: "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

---

[22] There were roughly 1,800 Border Patrol agents nationwide in 1976. Today, there are over 21,000.

[23] One of the checkpoints at issue in *Martinez-Fuerte* was located on I-5 in California, and referrals to secondary inspection areas were justified in part by the necessity of managing heavy traffic on "important highways." *Martinez-Fuerte*, 428 U.S. at 556–57. By contrast, the majority of Border Patrol checkpoints are located on rural state highways and county roads where traffic is light and motorists often interact with agents in isolation.

[24] Both of those incidents occurred shortly before The Arizona Republic reported on the absence of known consequences for agents who use deadly force. *See* Rob O'Dell and Bob Ortega, *Deadly Border Agents Incidents Cloaked in Silence*, ARIZONA REPUBLIC, Dec. 16, 2013, *available at* http://www.azcentral.com/news/politics/articles/20131212arizona-border-patrol-deadly-force-investigation.html (noting that 42 individuals have been killed by Border Patrol agents since 2005 and, "In none of the 42 deaths is any agent or officer publicly known to have faced consequences — not from the Border Patrol, not from Customs and Border Protection or Homeland Security, not from the Department of Justice, and not, ultimately, from criminal or civil courts.")

[25] *See also Martinez-Fuerte*, 428 U.S. at 572–73 (Brennan, J., dissenting) ("One wonders what actual experience supports my Brethren's conclusion that referrals 'should not be frightening or offensive because of their public and relatively routine nature.'…[F]or the arbitrarily selected motorists who must suffer the delay and humiliation of detention and interrogation, the experience can obviously be upsetting." (citations omitted))

For many border residents, invasive stops have long since become a "routine part of life." *Id.* In the above cases, three humanitarian aid workers were detained for thirty minutes solely because an agent claimed that backpacks are *per se* suspicious; one motorist was detained over an hour because her car smelled like a skunk; another because he was "driving like an idiot"; and yet another was detained and threatened with a firearm because an agent "didn't recognize" him. Ms. Stepp and Ms. Turner were harassed and questioned about their legitimate prescription medications. The residents of Arivaca have documented similar experiences.[26] Most tellingly, in each of the stops described herein, Border Patrol had either completed or never initiated any immigration-related inquiry when it detained these motorists; ten of the fifteen individuals described above were never asked about residence status at all. Also revealing is the common sight of local law enforcement with no immigration enforcement authority accompanying Border Patrol agents at checkpoints. With so many agents going far beyond—or simply ignoring—the permissible "limited inquiry into residence status," it is difficult to discern what differentiates Border Patrol checkpoints from the general crime control checkpoints held to be unconstitutional more than a decade ago in *Edmond*. *See also United States v. Soyland,* 3 F.3d 1312, 1316 (9th Cir. 1993) (Kozinski, J., dissenting) ("There's reason to suspect the agents working these checkpoints are looking for more than illegal aliens. If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment.")[27]

Additionally, it is clear that Border Patrol agents regularly exceed the lawful limits of their authority in the course of individual stops, resulting in widespread rights abuses. There is no question that agents cannot extend checkpoint stops for *any* length of time for non-immigration purposes, absent "reasonable suspicion" that a crime has been committed. *See United States v. Preciado-Robles*, 964 F.2d 882, 884–85 (9th Cir. 1992) (articulable suspicion is required for detention following immigration questioning and "there *must* be a valid basis for any additional intrusion, and it must be of a brief duration."); *Ellis*, 330 F.3d 677, 680 ("[A]n agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial lawful stop creates reasonable suspicion warranting further investigation."); *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001) ("[T]he scope of an immigration checkpoint is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint.").

---

[26] In one case, "[a]n Arivaca resident and a friend arrived at the checkpoint and identified themselves as U.S. citizens. An agent asked to search their vehicle and they declined. As a result, the agent directed them to the secondary inspection area. When they asked for an explanation, the agent replied that if they would not consent to a search, they would have to wait for a service canine to inspect the vehicle. They waited 20 minutes for the dog to arrive, at which point agents demanded that they exit the vehicle, without explanation, and then opened the door of their car and let the dog in. When they objected, agents yelled at them to remain still and keep their hands visible. They were not allowed to use their phones. One of the agents then claimed that the dog had 'alerted' because it had 'changed its breathing pattern.' After 45 minutes, they were finally released. Agents told them the search was, 'for [their] own protection.'" In another case, an Arivaca resident, "arrived at the checkpoint and notified the agent she was a U.S. citizen. The agent asked if the vehicle she was driving belonged to her. She responded that she was a U.S. citizen. The agent said, 'You can answer a simple question or we can do it the hard way,' and directed her to the secondary inspection area. More agents arrived with a service canine, and claimed that the dog had 'alerted' to the presence of contraband. The agents demanded that the woman exit the vehicle, over her objections, then questioned her about drugs, firearms, and the vehicle's history. The service canine found no drugs or contraband, but agents continued to search her trunk, then rifled through her purse and opened and smelled her water bottle. Before letting her go, the agents told her she had not been 'respectful.'" *See* http://phparivaca.org/?page_id=210

[27] *See also Soyland,* 3 F.3d 1312 at 1320 (Kozinski, J., dissenting) ("Given the strong hints that the Constitution is being routinely violated at these checkpoints, we owe it to ourselves and the public we serve to look into the matter. Even without an order of this court or the district court, the Department of Justice would be well-advised to establish the bona fides of these checkpoints.")

The government itself acknowledges this limitation on its authority. *See* Legal Opinion of INS General Counsel, *Other Agencies Working at Border Patrol Checkpoints*, at 2 (May 9, 1994) ("Referrals to the secondary inspection area that do not involve an immigration based violation must be supported by *at least* reasonable suspicion.") (emphasis added); UNITED STATES BORDER PATROL, SAN DIEGO SECTOR, LEGAL ANALYSIS OF BORDER PATROL CHECKPOINTS 14 (June 1, 2003) ("Where Border Patrol agents seek to detain a vehicle for secondary inspection solely for some non-immigration purpose, the law generally requires the agents to have a 'reasonable suspicion' of criminal wrongdoing."); *see also CBP Inspector's Field Manual*, Section 18.7(b) ("Before an inspector may constitutionally detain a person…the inspector must have reasonable suspicion that the person is an alien and is illegally in the United States.")

By contrast, southern Arizona residents are regularly detained and questioned regarding weapons and drug trafficking, as well as medical history, work and family, their comings and goings, and other subjects in no way related to verifying immigration or residence status or based on reasonable suspicion of a crime. The stops described herein ranged from 15 minutes to over an hour, not the "brief" three to five minute stops and "limited" inquiries contemplated by the Supreme Court—though, as noted, absent reasonable suspicion of criminal wrongdoing, each of these stops would have been unlawful for *any* period of time. *See Martinez-Fuerte*, 428 U.S. at 547, 558-59; *Ellis*, 330 F. 3d at 680 ("[W]hen the purpose of a stop switches from enforcement of immigration laws to drug interdiction, *a Fourth Amendment violation occurs* unless the Border Patrol agent has individualized suspicion of wrongdoing.") (emphasis added).[28]

It is also well-established that Border Patrol agents at permanent checkpoints may not search the *interior* of any vehicle without consent or probable cause. *Ortiz*, 422 U.S. 891; *see also Almedia-Sanchez v. United States*, 413 U.S. 266 (1973). Consent to a search must be knowingly and voluntarily given, and must not be the product of coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Agents routinely ignore this limitation as well. As described above, Mr. Buchanan's vehicle was searched without any lawful basis and over his repeated objections. Ms. Stepp only consented to a search of her vehicle and her person after being forcibly detained and humiliated for 45 minutes. Mr. Forrey's vehicle was searched after he was threatened at gunpoint. Mr. Tran's vehicle was searched on a pretext. Mr. Forrey, Mr. Polen, Mrs. Garcia, Ms. Turner, and Mr. Chapman were all subjected to vehicle searches on multiple occasions. These searches, lacking consent and probable cause, were unlawful. *Id.*

Equally troubling is agents' common practice of asserting that service canines have "alerted" to contraband as a basis for probable cause to conduct a search. A canine alert can provide agents with probable cause for a search only if the reliability of the dog and the handler are established. *United States v. Lingenfelter*, 997 F. 2d 632, 639 (9th Cir. 1994). There are ample grounds, however, to doubt the reliability of Border Patrol's use of service canines, including numerous studies and court decisions questioning the ability of canines to detect contraband accurately. *See, e.g.*, *United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (Border Patrol canine certification records showed marginal performance but were too heavily redacted to afford adequate opportunity to challenge basis for search); *Merrett v. Moore*, 58 F.3d 1547, 1549 (11th Cir. 1995) (noting that narcotics were not found in twenty-seven out of twenty-eight alerts at a temporary checkpoint); *Doe v. Renfrow*, 631 F.2d 91, 95 (7th Cir. 1980) (Fairchild, C.J., dissenting) (noting false alerts in thirty-five out of fifty encounters); *see generally* Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 Ky. L.J. 405, 427, 430 (1997) (noting that "even a very high accuracy rate can produce an unreasonable amount of false positives" and that service canines are "least effective when they survey a random population.")

---

[28] *See also Edmond*, 531 U.S. at 56. (Thomas, J., dissenting) ("I rather doubt that the Framers would have considered 'reasonable' a program of indiscriminate stops of individuals not suspected of wrongdoing.")

The experiences of Arizona motorists raise similar concerns. In the eight examples of false canine alerts documented herein, none resulted in the discovery of contraband. In some instances, agents appeared to be using the service canines as excuses to conduct a search. In the case of Mr. Tran and Mr. Ivey, a canine's alert to *another* motorist's bag was used as a basis for searching their vehicle. Ms. Turner described a similar experience, with agents striking her vehicle to encourage the dog to alert.[29] In the case of Mr. Polen, agents were unclear about the basis for his detention before settling on an alleged canine alert, even though there was no dog nearby. Several of the cases documented by Arivaca residents involved Border Patrol calling for service canines only *after* motorists legitimately declined to consent to a search or answer questions not related to citizenship; in several instances, agents then claimed a service canine "alerted," giving them probable cause for a search. In none of those cases was any contraband discovered. The frequency of false canine alerts at Border Patrol checkpoints indicates either that canines are frequently unreliable, or that agents are using canines fraudulently in order to obtain probable cause where it does not otherwise exist, or both. Whichever the case may be, the result is that border residents are regularly subject to unconstitutional searches and detentions.

Additionally, as we have seen in the context of "roving patrol" stops,[30] Border Patrol continues to rely on race and ethnicity as factors in subjecting certain motorists to additional scrutiny and detention at checkpoints. In addition to Ms. Turner's account of multiple racially-motivated detentions, the ACLU receives reports from Latino and Native American residents who experience additional scrutiny and delay at checkpoints, for no apparent reason other than their perceived race or ethnicity.[31] Such practices are unlawful as well. *See Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000); *Melendres v. Arpaio*, Civ. No. PHX–CV–07–02513–GMS, 2013 WL 2297173, at *69 (D. Ariz. May 24, 2013) ("[T]here is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation, and the requisite 'exact connection between justification and classification,' in focusing on Hispanic persons in immigration enforcement is lacking.") (citation omitted).[32]

***

Border Patrol checkpoints today bear little resemblance to those authorized by the Supreme Court in *Martinez-Fuerte.* Many Border Patrol officials do not understand—or simply ignore—the legal limits of their authority at checkpoints. One of the agents described above resorted to reading legalese from a tiny script that he did not understand, misstating the applicable legal standard, to try to justify the stop. Others claimed, falsely, that motorists could not make phone calls or videotape agents searching vehicles. Multiple citizens have reported being told by agents, "You have no rights here," or that refusal to consent to a search gives agents probable cause for a search. In many cases, agents responded to citizens who legitimately asserted their rights with additional abuses. The Office of Inspector General recently

---

[29] The agent's contact with the vehicle may have in and of itself been unlawful. *See Thomas*, 726 F.3d at 1093 ("[I]t is conceivable that by directing the drug dog to touch the truck and toolbox in order to gather sensory information about what was inside, the border patrol agent committed an unconstitutional trespass or physical intrusion.")

[30] The ACLU submitted a complaint on October 9, 2013, on behalf of five Arizona residents subjected to unlawful roving patrols, at least one of whom appeared to have been racially profiled by Border Patrol. *See* http://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf

[31] One Arivaca resident, a naturalized U.S. citizen, has "repeatedly faced extended questioning and demands for identification at the Arivaca Road checkpoint. Although she is a citizen, agents have demanded that she show proof of naturalization, which she is not required to carry. She believes this scrutiny is based solely on her Hispanic appearance and her accent." *See* http://phparivaca.org/?page_id=210

[32] *See also* U.S. DEP'T OF JUSTICE, GUIDANCE REGARDING THE USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES, (June 2003), *available at* http://www.justice.gov/crt/about/spl/documents/guidance_on_race.pdf

Page **15** of **17**

concluded that Border Patrol agents do not understand agency use of force policies.[33] This profound lack of understanding evidently extends to checkpoint procedures as well. These problems are compounded by the fact that agents at checkpoints do not appear to document their interactions with motorists—including agents' use of force, false alerts by service canines, and prolonged detentions—*not* resulting in arrest. The lack of documentation and oversight makes it impossible to know when Border Patrol agents are exceeding their authority or straying from agency guidelines. This is a recipe for further abuse.

Finally, as we have noted before, the complaint process by which individuals report abuses to Border Patrol and other DHS entities is lacking in consistency and transparency and fails to provide meaningful redress to those whose rights have been violated. Border Patrol and DHS officials often fail to provide accurate information to complainants about the investigatory process or the status of their complaint, and are not responsive to reasonable requests for information. The ACLU is still awaiting response to a complaint filed on April 26, 2012 on behalf of eleven individuals abused by agents at Ports of Entry,[34] and another filed on October 9, 2013 on behalf of five Arizona residents subjected to unlawful roving patrol stops.[35] Unfortunately, the lack of attention by DHS and its agencies to these complaints—involving civil rights abuses by the largest federal law enforcement agency in the nation—is not atypical. As should by now be clear, the entire DHS complaint process is in dire need of reform, and a broader commitment to Border Patrol oversight, accountability, and transparency is long overdue.

### III.    Conclusion

We request that you conduct a prompt investigation of these individual allegations of abuse, along with any known checkpoint-related complaints from the past five years. We also urge a comprehensive review of checkpoint policies and practices to determine whether Border Patrol is complying with its obligations under the U.S. Constitution and agency guidelines—**with particular attention to** the extent to which agents at checkpoints are:

1)  conducting investigations unrelated to verifying immigration status and without reasonable suspicion of criminal activity;
2)  searching vehicles without consent or probable cause;
3)  using service canines to obtain probable cause, either by claiming falsely that a dog has "alerted," or by relying on inadequately trained or unqualified canines, resulting in significant rates of false alerts;
4)  racially profiling motorists at checkpoints; and
5)  using excessive force, making false claims, and/or improperly interrogating, intimidating, and harassing motorists at checkpoints.

---

[33] *See* Brian Bennett, *Many Border Agents Don't Understand Use-Of-Force Rules, Report Says*, LA TIMES, Sept. 18, 2013, *available at* http://articles.latimes.com/2013/sep/18/nation/la-na-nn-border-patrol-use-of-force-20130918 (An audit showed that many agents "do not understand use of force and the extent to which they may or may not use force.") This is in part due to the fact that training and hiring standards were lowered to accomplish the rapid expansion of the Border Patrol from roughly 12,000 agents in 2006 to over 21,000 today. *See* Greg Morgan, *Hiring Practices Questioned after Border Agent's Arrest*, SAN DIEGO UNION TRIBUNE, Apr. 1, 2011, *available at* http://www.utsandiego.com/news/2011/Apr/01/hiring-practices-questioned-after-border-agents-ar/ (quoting a Border Patrol representative, "Pretty much everyone was being pushed through because they needed the bodies.")

[34] *Available at* https://www.aclu.org/files/assets/aclu_2012_cbp_abuse_complaint_2.pdf . DHS sent form responses regarding three of the eleven cases of abuse documented in the ACLU's April 2012 complaint, without commenting on the many allegations of abuse by CBP officials or conducting interviews with any of the complainants.

[35] *Available at* http://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf. To date, DHS has contacted only one of the five individuals whose abuses were documented in the ACLU's October 2013 complaint.

In cases of unlawful conduct, we urge that the agents responsible be appropriately disciplined and that the results of your investigation be made public. Finally, significant changes in Border Patrol training, oversight, and accountability mechanisms are needed, and we again urge you to make substantive recommendations for such changes consistent with your institutional mission in order to prevent further abuses.

Please contact us with any questions or concerns at (602) 650-1854.

Sincerely,

James Lyall
Staff Attorney
ACLU of Arizona

Cc:    Jeh Johnson
       Acting Secretary of Homeland Security
       U.S. Department of Homeland Security
       245 Murray Lane SW
       Washington, D.C.  20528

       Thomas Winkowski
       Acting Commissioner
       U.S. Customs and Border Protection
       1300 Pennsylvania Avenue, N.W.
       Washington, D.C.  20229

       Manuel Padilla, Jr.
       Chief Patrol Agent – Tucson Sector
       U.S. Customs and Border Protection
       2430 S. Swan Road
       Tucson, AZ 85711

       Jocelyn Samuels
       Acting Assistant Attorney General
       Civil Rights Division
       Department of Justice
       950 Pennsylvania Avenue, NW
       Washington, DC 20530

       John S. Leonardo
       United States Attorney
       Department of Justice
       405 W. Congress Street, Suite 4800
       Tucson, AZ 85701

Senator John McCain
U.S. Senator for Arizona
241 Russell Senate Office Building
Washington, DC 20510

Senator Jeff Flake
U.S. Senator for Arizona
B85 Russell Senate Office Building
Washington, DC 20510

Congressman Raúl Grijalva
U.S. House of Representatives
1511 Longworth HOB
Washington, DC 20515

Congressman Ron Barber
U.S. House of Representatives
1029 Longworth HOB
Washington, DC 20515

Page **17** of **17**

# EXHIBIT A



# EXHIBIT 20





























- The vast majority of those arrested at Yuma Sector checkpoints are U.S. citizens, in calendar





















ter failing to look the inspecting Border Patrol agent in the eyes. He was then prosecuted so rightly





approached the individual with a service revolver drawn, ordered him to his knees, and handcuffed



Latinos at the Arivaca Road Checkpoint are 26 times more likely than Caucasians to be detained by agents







No. CBP-1201-1202.



79  Andrew Becker, *Four of Five Border Patrol Drug Busts Involve U.S. Citizens, Records Show*, Ctr For Investigative Reporting, March 26, 2013, available at http://bit.ly/1N68DBW. ("Of nearly 2,000 press releases from the Border Patrol and its parent agency, Customs and Border Protection, between 2005 and 2011 that mentioned a drug-trafficking suspect, 38 percent noted a Mexican national had been arrested. U.S. citizens, meanwhile, were mentioned roughly 30 percent of the time, even though they represent a much higher percentage of those busted, according to the analysis.")

80  *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 005; 023-024; 027-028; 036; 044-045; 603-611; 713-714; 811-823.

81  In 2014, CBP Commissioner R. Gil Kerlikowske promised to review checkpoint data to determine whether the agency is "getting the most bang for the buck" at checkpoints. Alan Gomez, *Border Commissioner, Facing Heat, Promises Changes*, USA Today, Oct. 30, 2014, available at http://usat.ly/1JE7IGG

82  Migrants attempting to evade checkpoints often end up in remote and deadly wilderness areas. As the Texas Observer noted, "The checkpoint—or more precisely its location—is the proximate cause of the crisis  Without the checkpoint, many more migrants would survive." Forrest Wilder, *To Save Lives, Close the Falfurrias Border Patrol Checkpoint*, Texas Observer, May 20, 2015, available at http //bit.ly/1Qc0CLV.

83  *See, e.g.*, Judith Gans, *The Border Patrol Checkpoint on Interstate 19 in Southern Arizona  A Case Study of Impacts on Residential Real Estate Prices*, University of Arizona, Dec  2012, available at http://bit.ly/1VBLgnH

84  In *United States v. Martinez Fuerte*, 428 U S  543 (1976), the Supreme Court held that immigration checkpoints were permissible only insofar as they involve a "brief detention of travelers" during which all that is required of the vehicle's occupants is "a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id*  at 558  Neither vehicles nor occupants should be searched, and referrals to secondary inspection areas should involve "routine and limited inquiry into residence status" only *Id*  at 560. By contrast, the Supreme Court has ruled that general crime control checkpoints are unconstitutional. *City of Indianapolis v. Edmond*, 531 U S  32, 42 (2000) ("Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.").

85  *United States v. Soyland*, F.3d 1312, 1316, 1318 (9th Cir. 1993)(Kozinski, J , dissenting); *See also United States v. Garcia*, 732 F.2d 1221, 1229 (5th Cir. 1984)(Tate, J , dissenting)("Quite unfortunately, we have the opportunity only to review the successful guesses of these agents; we are never presented with the unconstitutionally intrusive stops of Hispanic residents and citizens that do not result in an arrest. Differentiating the United States from police states of past history and the present, our Constitution in its Fourth Amendment prohibition against unreasonable searches protects all our residents, whether middle-class and well-dressed or poor and disheveled, from arbitrary stop by governmental enforcement agents in our travel upon the highways of this nation ").

86  R  Gil Kerlikowske, *At Border Patrol, We Know We're Not Above the Law*, Arizona Republic, June 14, 2015, available at http://bit.ly/1MqCRR3.

87  *See, e.g , United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000)("[A]t this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required ").

88  *See supra* note 49

89  *See supra* note 19

90  Andrew Becker, *Ousted Chief Accuses Border Agency of Shooting Cover ups, Corruption*, Ctr. For Investigative Reporting, Aug. 14, 2014, available at http://bit.ly/1MgOeGt.

91  *See supra* note 19.

92  Nigel Duara, *Border Patrol Agents, Facing Scrutiny, Have Harsh Words for Their Leaders*, L.A. Times, June 17, 2015, available at http://lat.ms/1IoWTdW.