Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT,<br><br>Plaintiff,<br><br>v.<br><br>KRIS MAYES, in her official capacity as the Attorney General of the State of Arizona, *et al.*,<br><br>Defendants. | No.<br><br><br><br>**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiff Florence Immigrant & Refugee Rights Project ("Florence Project"), by and through undersigned counsel, hereby moves this Court for a temporary restraining order and preliminary injunction under Fed. R. Civ. Proc. 65. Florence Project requests that this Court preliminarily enjoin enforcement of Section 5 of Arizona House Concurrent Resolution ("HCR") 2060 (56th Leg. (2nd regular session)), enacted pursuant to Proposition 314 ("Prop. 314") and now codified as Ariz. Rev. Stat. ("A.R.S.") §§ 13-4295 and 13-4295.01-4295.06, against all Defendants during the pendency of this action.[1]

## INTRODUCTION

Only the federal government may regulate immigration. Arizona has nevertheless created a parallel state system to arrest, prosecute, imprison, and remove noncitizens with no federal oversight. State legislators referred this measure to the ballot in November 2024 as Section 5 of Proposition 314 ("Section 5").

Courts across the country have held resoundingly that similar state laws establishing state immigration systems are unconstitutional. *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904 (8th Cir. 2025), *reh'g en banc denied*, 166 F.4th 688 (8th Cir. 2026); *Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) (denying application for stay); *Idaho Org. of Resource Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) ("*IORC*"); *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024), *vacated on other grounds*, 173 F.4th 659 (5th Cir. 2026); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993 (W.D. Okla. 2025); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025); *United States v. Iowa*, 737 F. Supp. 3d 725, 751 (S.D. Iowa 2024). And the Supreme Court declined to

---

[1] Prior to filing this lawsuit, Plaintiff's counsel reached out to counsel for Defendants to notify them of the upcoming lawsuit and request their positions on the motion for temporary restraining order and preliminary injunction and request to exceed the page limit. The Graham County Attorney's Office and the Navajo County Attorney's Office take no position on the motion for TRO/PI. The remaining Defendants have not yet taken a position.

stay the injunction of Florida's version of Section 5's improper entry crime—with no noted dissents. *Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025) (mem.).

This Court should enjoin Section 5 as flagrantly unconstitutional. Section 5 will severely and irreparably harm Florence Project's provision of legal services to detained adults and children facing removal in Arizona.

## BACKGROUND

### A. Congress's Pervasive Regulation of Immigration

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a pervasive system to regulate entry into and removal from the United States. *See generally* 8 U.S.C. §§ 1151–1382. That scheme balances policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see id.* § 1182, including those who enter between ports of entry, *see id.* § 1182(a)(6). To decide whether a person who entered without inspection at a port of entry will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, *id.* § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, *id.* § 1225(b)(1). On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other criminal regulations related to irregular entries. *Id.* §§ 1325, 1326; *see also, e.g.*, *id.* §§ 1321, 1323, 1324 (criminalizing the "unauthorized landing of aliens" and "unlawful bringing of aliens" into the country).

Even as it rendered noncitizens entering between ports of entry "inadmissible" and subject to criminal penalties, Congress enacted a range of protections that are available notwithstanding improper entry. Asylum, a form of humanitarian protection that can lead to permanent residence and eventually citizenship, is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status." *Id.* § 1158(a)(1). Congress also barred federal officials from removing people likely to face persecution or torture, in compliance with the United States' obligations under international treaties. *See id.* § 1231(b)(3); Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). Additionally, individuals in full removal proceedings may apply for other forms of relief Congress has extended, including cancellation of removal. 8 U.S.C. § 1229b(b). Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, *id.* § 1101(a)(15)(U); 1101(a)(15)(T); temporary protected status, *id.* § 1254(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, *id.* § 1101(a)(27)(J).

A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Federal officials "decide whether it makes sense to pursue removal at all." *Id.* Federal officials choose among the several removal processes Congress established. *See Biden v. Texas*, 597 U.S. 785, 792 (2022). Federal officials decide whether to bring the associated criminal immigration charges. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012). And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens. *See, e.g., INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

3

**B.  Arizona Enacts Prop. 314, Section 5, to Regulate Entry into and Removal from the Country.**

Section 5 of Proposition 314 is a blatant attempt to supersede this federal system. It establishes a new state crime that criminalizes irregular entry into the United States and directs state officers to effectuate deportations without any federal discretion or protection from removal.

Section 5 creates a class 1 misdemeanor for a noncitizen to enter or attempt to enter Arizona directly from a foreign nation—which, as a practical matter, means entry across the United States-Mexico border—at any location other than a port of entry. Ariz. Rev. Stat. Ann. ("A.R.S.") § 13-4295.01. A repeat offense is a class 6 felony, punishable by up to two years in prison. *Id.* § 13-4295.01(F). While the law provides affirmative defenses for individuals who have been granted formal asylum under federal immigration laws or what the statute terms "lawful presence," it does not provide an affirmative defense for noncitizens seeking asylum, withholding of removal, or other status or forms of relief from removal. *Id.* § 13-4295.01(B). It also does not provide an affirmative defense for noncitizens who have been "[p]aroled pursuant to a programmatic grant of parole" or who were "[r]equired to be detained under the immigration and nationality act but w[ere] not detained and instead w[ere] paroled into the United States." *Id.* § 13-4295.01(E).

Section 5 also creates a mechanism for the State of Arizona to unilaterally deport individuals from the United States by issuing an "[o]rder to return to foreign nation." *Id.* § 13-4295.03. This is "an order that requires the person to return to the foreign nation from which the person entered or attempted to enter the United States or the person's nation of origin." *Id.* § 13-4295.03(C). A court may also, at any time prior to conviction or adjudication, dismiss a pending charge under § 13-4295.01 and issue such an order, "discharg[ing] the person" and requiring return, so long as certain criteria are met. *Id.* § 13-4295.03(A)-(B). Failure to comply with the court's Order to Return is considered a class 4 felony under the new law and is punishable by Arizona's

4

standard statutory felony penalties, with a maximum sentence of 3 years and an aggravated sentence of 3.75 years for a first-time offender. *Id.* §§ 13-4295.02, 13-702. Repeat offenders may be subject to increased penalties. *Id.* § 13-703.

*No* court has upheld a state immigration system as constitutionally permissible. But the Fifth Circuit Court of Appeals recently held that the plaintiffs challenging Texas's law comparable to Section 5 lacked standing, without reaching the merits, and remanded to the district court for dissolution of the preliminary injunction preventing Texas's law from taking effect. *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026) (en banc).[2] Accordingly, 60 days from the injunction's dissolution, Section 5 will take effect. A.R.S. § 13-4295.04.

As discussed *infra* ARGUMENT II.A, Section 5 will directly affect and interfere with the Florence Project's core activities. *See* Declaration of Roxana Avila-Cimpeanu (hereinafter "Avila-Cimpeanu Decl.") ¶¶ 28-87.

## STANDARD OF REVIEW

Preliminary injunctive relief requires the movant to demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm absent issuance of injunctive relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction is also warranted when a plaintiff raises only "serious questions" on the merits so long as "the balance of hardships tips sharply in [the plaintiff's] favor." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016). The preliminary injunction and temporary restraining order standards are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

---

[2] In subsequent litigation, the district court preliminarily enjoined the illegal entry provision and removal order provision of S.B.4, *L.M.L. v. Martin*, --- F. Supp. 3d ----, 2026 WL 1355237 (W.D. Tex. May 14, 2026), but the Fifth Circuit stayed that injunction in an unreasoned opinion, No. 26-50418, 2026 WL 1617149 (5th Cir. May 29, 2026).

**ARGUMENT**

**I.      Section 5 is Preempted by Federal Law.**

Section 5 regulates entry and removal, a quintessentially and exclusively federal power. Section 5 also conflicts with federal law by eliminating immigration relief and federal discretion, and by interfering with foreign policy and Congress's carefully calibrated regulation of irregular entry.

**A. Section 5 Intrudes on the Exclusively Federal Field of Entry and Removal.**

Section 5 establishes an unprecedented state immigration system that entirely bypasses Congress's comprehensive scheme. Arizona has regulated and criminalized entry into the United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States under threat of severe additional punishment. Immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal. Simply: Section 5 is field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1990)). Here, both alternatives are satisfied.

"Policies pertaining to the *entry* of aliens and their right to remain here are entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (emphasis added) (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)). Ever since Congress began systematically regulating immigration, for 150 years, the Supreme Court has been crystal clear: Regulation of entry into the United States is an exclusively federal matter from which the States are excluded. *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280

6

(1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the Federal Government").[3] The federal interest in immigration, *see id.* at 399, is thus "overwhelmingly dominant." *Ga. Latino All.*, 691 F.3d at 1264.

Considering this unbroken line of precedent, courts within the Ninth Circuit have likewise recognized that entry, exclusion, and deportation are exclusively federal matters. *See*, *e.g.*, *IORC*, 780 F. Supp. 3d 1013 (D. Idaho 2025) (preliminarily enjoining similar law to Section 5 in light of the federal government's "exclusive power over entry into the country"); *United States v. Arizona*, 119 F. Supp. 3d 955 (2014) (holding that federal law preempted Arizona's attempt to criminalize certain immigration-related activities); *cf. In re Chrysler-Dodge-Jeep Ecodiesel Marketing*, 295 F. Supp. 3d 927, 1001 (N.D. Cal. 2018) ("The regulation of immigration is the quintessential example of field preemption." (quoting *United States v. South Carolina*, 840 F. Supp. 2d 898, 913 (D. S.C. 2011)).

---

[3] The federal government's exclusive authority derives from multiple constitutional sources, "including the Federal Government's power 'to establish a uniform Rule of Naturalization,' its power 'to regulate Commerce with foreign Nations,' and its broad authority over foreign affairs." *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (cleaned up, citations omitted); *see also Hines*, 312 U.S. at 62.

7

Other lower federal courts agree that entry, exclusion, and deportation are federal matters. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (because "[p]olicies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted") (cleaned up); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power."); *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (similar). And Arizona's state courts recognize the federal authority to regulate immigration enforcement. *See, e.g., State v. Patel*, 160 Ariz. 86 (1989) (holding that a state trial judge lacks jurisdiction to order deportation because the federal government possesses exclusive authority over deportation matters).

Consistent with this dominant federal interest, Congress's entry-and-removal regime is highly "pervasive." *Arizona*, 567 U.S. at 399. Through the INA, Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the inspection, admission, and removal of noncitizens seeking to enter the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229c, 1229b, 1231; *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal"). Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. 8 U.S.C. § 1229a(a)(3).

Congress has extensively regulated individuals who enter between ports of entry—those whom Arizona attempts to regulate via Section 5. The federal scheme contains a variety of enforcement mechanisms. Congress has created multiple removal pathways with detailed procedures and multiple layers of review by federal officials. These include a special "expedited removal" system specifically for those who arrive at our borders without visas or other valid immigration documents. *See, e.g.*, 8 U.S.C.

8

§§ 1225(b)(1) (expedited removal procedures), 1229, 1229a (regular removal procedures), 1231(a)(5) (reinstatement of removal). Congress has criminalized entry and re-entry between ports of entry, along with efforts to assist or facilitate entry between ports. See id. §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329; *Ga. Latino All.*, 691 F.3d at 1264 (discussing the "larger context of federal statutes" addressing entry). Congress has also provided a detailed set of standards and procedures for when people who enter between ports may be arrested and detained by federal officials. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A).

Conversely, Congress has established numerous forms of relief from removal for people who enter between ports. Asylum is available "whether or not" a noncitizen arrives "at a designated port of arrival," *id.* § 1158(a)(1), and can be accessed through multiple procedural channels, *see id.* §§ 1225(b)(1)(B), 1158(d); 8 C.F.R. § 208.4. Withholding of removal bars a person's removal to any country where they face persecution or torture. *See* 8 U.S.C. § 1231 note. And Congress has given federal officials "broad discretion" to decide whether it makes sense to detain, remove, or prosecute in the first place. *Arizona*, 567 U.S. at 398; 8 U.S.C. § 1103(a)(1), (a)(5).

Through these intricate and interrelated provisions, Congress has established "a full set of standards governing" those who enter between ports, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'" *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72). As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible." *Id*. at 401-02. The Ninth Circuit has accordingly recognized "[t]he comprehensive nature" of federal statutes criminalizing the transportation of noncitizens. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-26 (9th Cir. 2013) (recognizing that "[f]ederal governance of immigration and [noncitizen] status is extensive and complex"). Indeed, the Ninth Circuit has specifically held an Arizona statute field preempted by the federal "scheme governing the crimes associated with the movement of unauthorized [noncitizens] in the United States," including 8 U.S.C.

§§ 1325 and 1326, the federal statutes penalizing improper entry and reentry into the United States. *Valle del Sol*, 732 F.3d at 1023-24. Similar logic applies here, and Section 5 is likewise preempted under *Arizona* and *Valle del Sol*.

In a preempted field like this, even state laws with "the same aim as federal law and adopt[] its substantive standards" are invalid. *Arizona*, 567 U.S. at 402. As a court in this district recognized in *We Are America v. Maricopa Cty. Bd of Sup'rs*, 297 F.R.D. 373 (D. Ariz. 2013), *even if* a policy "could somehow be deemed 'parallel to federal standards' . . . such an argument 'ignores the basic premise of field preemption—that States may not enter, *in any respect*, an area the Federal Government has reserved for itself,' such as the transportation and movement within the United States of unlawfully present aliens." *Id.* at 391 (quoting *Arizona*, 567 U.S. at 402, and holding county policy of charging and prosecuting migrants for conspiring to transport themselves field preempted by "the INA's comprehensive framework to penalize the transportation, concealment, and inducement of unlawfully present aliens"); *see also Valle del Sol*, 732 F.3d at 1026 (holding that Arizona was prohibited from enacting concurrent state legislation related to the "entry, movement and residences of [noncitizens] within the United States"). And here, there is a "further intrusion upon the federal scheme," *Arizona*, 567 U.S. at 402-03, because the penalty for failure to comply with an order to return is more severe than that permitted under federal law. *Compare* §§ 13-4295.02, 13-702 (maximum sentence of 3 years for first-time offender for failure to return) *with* 8 U.S.C. § 1325(a) (maximum sentence of 2 years). This mismatch with federal law "simply underscores the reason[s] for field preemption." *Arizona*, 567 U.S. at 403.

In sum, when it comes to regulating noncitizens' entry into (and removal from) the United States, field preemption is straightforward. Indeed, "[t]he regulation of immigration is the quintessential example of field preemption." *United States v. South Carolina*, 840 F. Supp. 2d 898, 913 (D.S.C. 2011), *aff'd*, 720 F.3d 518 (4th Cir. 2013) (emphasis added). For this reason—and for 150 years of consistent Supreme Court

precedent—states cannot "regulate conduct like immigration, which is not a traditional state power." *IORC*, 780 F. Supp. 3d at 1042. Section 5 is field preempted.

### B.  Section 5 is also an Obstacle to the Federal Immigration System.

Section 5 is conflict preempted in addition because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in multiple respects. *Arizona*, 567 U.S. at 399 (quoting *Hines*, 312 U.S. at 67).

First, Section 5 violates *Arizona*'s core teaching that states cannot act unilaterally to regulate immigration "without any input from the federal government." *Id.* at 408. Letting Arizona unilaterally "decide whether [a noncitizen] should be detained for being removable . . . violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409. The Court in *Arizona* held that the State's law authorizing state and local officers' general arrests of noncitizens based on possible removability was preempted because it allowed "unilateral state action" that disregarded the "significant complexities involved in enforcing federal immigration law" and usurped the federal government's ability to exercise discretion and weigh competing humanitarian, foreign policy, and other considerations. *Id.* at 407-10. And if unilateral *arrests* alone were enough for preemption in *Arizona*, then unilateral arrests, detention, and prosecution under Section 5 must be preempted as well, as many courts around the country have held. *See IORC*, 780 F. Supp. 3d at 1043.

Second, Section 5 obstructs federal law by wresting from the federal government discretion over the immigration processing, prosecution, and removal of noncitizens entering between ports—and thus preventing federal authorities from balancing a range of interests in deciding how to process noncitizens who enter the United States. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (state sanctions law preempted where it was "obstacle to the accomplishment of Congress's full objectives under the

11

federal [statute]," including "its delegation of effective discretion to the President"). Specifically, Congress has provided federal Executive Branch officials with a range of tools to address noncitizens entering between ports. Federal prosecutors may choose to bring criminal charges under 8 U.S.C. § 1325; immigration officials may initiate ordinary removal proceedings, id. § 1229a, or expedited proceedings if applicable, *id.* § 1225(b)(1); and immigration agents or administrative hearing officers may exercise discretion to forego removal proceedings, defer removal, or take other discretionary action to ameliorate the potential harshness of the immigration laws. *See Arizona*, 567 U.S. at 396, 409. Indeed, in a recent case rejecting one of Texas's recent efforts to dictate immigration policy, the Supreme Court emphasized the federal government's broad discretion over questions of arrests, initiating removal proceedings, and removals, explaining that such discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

Under Section 5, the federal government gets no say whether a noncitizen is prosecuted, detained, or removed. The statute thus blatantly "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409. Indeed, the violation is even starker here than in *Arizona*, which involved state police conducting arrests but otherwise leaving the removal process in federal hands. *See id.*

In other words, whereas the "federal law provides federal officials discretion about the removal of [noncitizens]," Arizona's scheme "undermines the discretion of federal officials to decide who will be removed." *Iowa Migrant Movement for Just.*, 157 F.4th at 925. The law casts aside the "federal concerns [and] priorities that Congress has explicitly granted" the Executive to establish with respect to enforcement of the Nation's immigration laws. *Valle del Sol*, 732 F.3d at 1027. "In conflict with" "broad federal discretion," "state officials' enforcement of [Section 5] allows

[noncitizens] to be investigated, arrested, and confined without regard to federal discretionary policies." *IORC*, 780 F. Supp. 3d at 1043.

Here, Arizona has enacted an unprecedented "usurpation of federal power over immigration," leaving no room for federal discretion. *Toll*, 458 U.S. at 29 (Rehnquist, J., dissenting). That "is not a decision for [Arizona] to make." *See, e.g., Alabama*, 691 F.3d at 1295 (statute preempted where state had "taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) (provisions preempted where they "improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *Georgia Latino All.*, 691 F.3d at 1265 (similar, emphasizing discretion of federal prosecutors over immigration crimes); *cf. City of El Cenizo v. Texas*, 890 F.3d 164, 179-80 (5th Cir. 2018) (holding state law did not interfere with federal discretion because it "require[d] a predicate federal request for assistance"). Indeed, "[e]ach time a state enacts its own parallel to the INA, the federal government loses control over enforcement of the INA," and "the uniform application of the INA" is threatened. *We Are America*, 297 F.R.D. at 394.

Third, Section 5 bypasses the defenses to removal that Congress established. Perhaps most notably, Congress carefully enshrined asylum and other protection from persecution and torture as defenses to removal, specifically providing that individuals who enter between ports of entry may still seek relief. See 8 U.S.C. §§ 1158(a)(1) (providing for asylum "whether or not at a designated port of arrival"), 8 U.S.C. § 1231 note; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). When Congress established the expedited removal system to address noncitizens arriving at our borders without valid visas, it took care to provide access to such humanitarian protections through the "credible fear" screening process. *See* 8 U.S.C. §

13

1225(b)(1)(A)(ii), (B); *Grace v. Barr*, 965 F.3d 883, 887, 902 (D.C. Cir. 2020) (discussing credible fear process). Other relief is also available in the federal system, including special protections for unaccompanied minors and victims of crime and trafficking. 8 U.S.C. § 1232; 8 U.S.C. § 1101(a)(15)(T)-(U).

Arizona's new immigration system disregards this entirely. Noncitizens are arrested by state officers, held in state custody, and then ordered deported by state agents. Because this new process entirely sidesteps Congress's removal system, noncitizens will be subject to state removal without the opportunity to seek asylum or other forms of humanitarian protection available under federal law. Although Section 5 provides an affirmative defense for individuals who have already received asylum or lawful presence, it offers no protection for individuals with pending asylum claims, nor does it guarantee individuals the right to initiate other protective applications.

Thus, by enacting Section 5, Arizona impermissibly declares that noncitizens entering between ports "cannot be tolerated within its territory, without regard for any of the [federal] statutory processes or avenues for granting an alien permission to remain lawfully within the country." *Alabama*, 691 F.3d at 1295; *see also Arizona*, 567 U.S. 387 at 409-10 (holding that obstacle preemption bars states from creating separate state-level offenses for immigration violations). But Congress's clear policy is that relief from removal, including asylum, is available to individuals even when they enter the country between ports. Section 5 impermissibly rejects, obstructs, and frustrates that policy, and is accordingly preempted.

Fourth, Section 5 injects the state of Arizona directly into sensitive foreign policy matters reserved exclusively for the federal government. *See Iowa Migrant Movement for Just.*, 157 F.4th at 922-23 (explaining that a state reentry law "complicate[s] U.S. foreign relations"). Determinations regarding the entry into the United States by foreign nationals, and their removal from it, "touch on foreign relations" and therefore "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Jama v. ICE*, 543 U.S. 335, 348 (2005) (similar). Indeed, the obvious danger that

14

unilateral state immigration regulation could "embroil us in disastrous quarrels with other nations" has for 150 years been a cornerstone of the doctrine that "[t]he passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States." *Chy Lung*, 92 U.S. at 280; *see Hines*, 312 U.S. at 63-64 (similar). As in *Crosby*, "Congress clearly intended the federal Act to provide the [Executive] with flexible and effective authority." 530 U.S. at 374. And, just as in that case, Arizona's "unyielding application" of criminal sanctions whenever it sees fit "undermines the [executive's] intended statutory authority by making it impossible" for the federal executive to chart the course it thinks best in particular circumstances. *Id.* at 377; *see Arizona*, 567 U.S. at 396–97, 408. Arizona now proposes to inject its own authority into foreign policy matters.

General interference with federal foreign affairs is heightened because Section 5 can create a direct conflict with national policy towards other countries. Under its terms, state judges order noncitizens—regardless of their nationality—"to return to the foreign nation from which the person entered or attempted to enter the United States or the person's nation of origin" upon penalty of more severe punishment. A.R.S. § 13-4295.03(B). That "undermines the discretion of federal officials to decide who will be removed" and "conflicts with federal regulations over *where* to remove an alien to." *Iowa Migrant Movement for Just.*, 157 F.4th at 925.

As the Supreme Court recently observed, even the federal government "cannot unilaterally return . . . migrants to [other countries]" because of their sovereignty. *Biden v. Texas*, 597 U.S. 785, 806 (2022). The same applies to Arizona. As the Court explained in that case, the federal government's efforts to negotiate such returns with Mexico, for instance, had "'played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.'" *Id.* (internal quotation marks omitted). The Court rejected Texas's proffered statutory interpretation, which would have "tie[d] the hands of the

15

Executive" by allowing a court to supervise such foreign policy negotiations to obtain Mexican agreement. *Id.* Here, the interference with foreign policy is worse. Rather than supervising federal negotiations, Prop. 314 purports to cut the federal government out entirely, as Arizona—not the United States—would require return.

## II.     The Equities Strongly Favor an Injunction.

### A. Florence Project Has Standing and Will Experience Irreparable Harm From Section 5.

Florence Project will experience injury-in-fact caused by Section 5, and that injury is irreparable. The Supreme Court has held "there can be no question" that an organization experiences an injury-in-fact where the defendant's challenged action has "perceptibly impaired" the organization's "ability to provide" direct services to individuals it aids. *Havens*, 455 U.S. at 379. It recently reaffirmed the ongoing force of *Havens* in *Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024) ("*AHM*"), explaining that the organizational plaintiff in *Havens* established injury-in-fact because the defendant "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers" and so the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Id.* at 395.

Here, Florence Project has direct organizational standing similar to that in *Havens* and will be irreparably harmed by Defendants' implementation of Section 5. Section 5 will perceptibly impair Florence Project's ability to provide legal services, including direct representation, to existing and new clients, in turn impairing its ability to achieve its mission of providing free direct legal services to detained adults and children facing removal from the United States in Arizona and its ability to achieve its vision of universal representation for these individuals. Avila-Cimpeanu Decl. ¶¶ 28-87. Section 5 poses significant barriers to Florence Project's provision of legal services to existing and prospective clients facing removal from the United States and to its goal of universal representation for people facing removal regardless of individual circumstances—a goal that Florence Project is working toward with its universal representation pilot project. *Id.*

16

¶ 83. These harms while Section 5 is in effect are irreparable. "[O]ngoing harms to [a plaintiff's] organizational mission[] as a result of [a preempted] statute" constitute irreparable harm. *Valle del Sol*, 732 F.3d at 1029 (citing *Georgia Latino All.*, 691 F.3d at 1269).[4]

      **First,** Section 5 will create significant barriers to Florence Project's representation of existing clients who are released into the community on bond or from ORR custody and then arrested on state charges under Section 5, or who are transferred from federal immigration custody to face state charges. Avila-Cimpeanu Decl. ¶¶ 30, 33, 43. Such clients will already be placed in federal immigration proceedings and facing time-sensitive deadlines. *Id.* ¶ 53. Florence Project attorneys must rapidly locate clients who are arrested and in local custody, which is more challenging than for ICE detention (which has a universal online detainee locator). *Id.* ¶ 51. To work with these clients effectively, Florence Project attorneys must meet with them in person. *Id.* ¶¶ 16-17. This is a more time-intensive process than when they are in the community, requiring arranging jail visits around a patchwork of county jail procedures, increased attorney travel time, and new arrangements for in-person interpreters. *Id.* ¶ 54. This increased time spent serving existing clients due to Section 5 both will jeopardize Florence Project's ability to effectively represent these clients in a timely manner and will decrease the number of individuals whom Florence Project can effectively represent, because Florence Project will be expending more time in representing some individuals than it otherwise would have. *Id.* ¶ 85. These barriers posed by local jail procedures and travel time will similarly impair Florence Project's provision of social services to existing clients. *Id.* ¶ 61.

---

[4] Florence Project serves Arizona's large population of immigrants located throughout the state. *See* Declaration of Grace Choi (hereinafter "Choi Decl."), Exs. 1-2. It is the only pro bono legal service provider for immigration court proceedings in Arizona. *See id.*, Ex. 3.

17

Section 5 will similarly create significant barriers to Florence Project's ability to serve prospective clients in their federal immigration proceedings. *Id.* ¶ 54. Individuals often have just a few weeks to find representation in immigration proceedings. *Id.* ¶ 55. Their movement from federal custody to local custody to face state charges under Section 5 will create barriers to Florence Project effectively timely reaching them to evaluate their cases for representation by Florence Project or pro bono partners and to place them with pro bono partners. *Id.* ¶¶ 54-55, 80. Indeed, Section 5 threatens the ongoing success at current levels of Florence Project's pro bono partner model. *Id.* ¶ 80.

Barriers to effective representation are particularly heightened for mentally incompetent clients in the NQRP program (also described *infra*) and children. NQRP clients face difficulty communicating, so it will be especially difficult to locate such individuals, and timely advance their cases, if they are arrested by state or local officers. *Id.* ¶ 68. The same is true for non-detained children. *Id.* ¶ 77. And the children and youth Florence Project serves frequently face a ticking clock for seeking immigration relief, which will be jeopardized by time lost to locating and effectively serving their legal needs while in local jails—to say nothing of if they are ordered to leave the country during that six-month window. *Id.* ¶¶ 72, 75, 76-77.

And for many of these clients, Florence Project would have been able to seek and secure their relief from removal in federal immigration proceedings but will not be able to do so from state removal under Section 5. *Id.* ¶ 58. This is because Section 5 only provides an affirmative defense for individuals granted asylum or "lawful presence" as defined by state law. *Id.* ¶ 59; A.R.S. § 13-4295.01(B). Thus, for example, a Florence Project client fleeing torture in Mexico but whose federal immigration proceedings are pending can nevertheless be apprehended by Arizona law enforcement and ordered under state law to return to Mexico—with no recourse under state law. Florence Project will be unable to help such individuals who otherwise would be eligible for immigration relief and whom it otherwise would be able to assist in securing such relief. Avila-Cimpeanu Decl. ¶ 60. And for existing clients for whom Florence Project has already begun federal

immigration representation, Florence Project will have expended attorney and organizational resources to no effect—decreasing the number of individuals the organization can effectively represent. *Id.*

**Second,** both to further Florence Project's goal of universal representation and to effectively serve existing clients, particularly in light of the reality that Arizona law does not necessarily guarantee the right to counsel to people facing removal under A.R.S. § 13-4295.01,[5] Florence Project will attempt to seek to represent people charged under Section 5 in their state criminal proceedings. *Id.* ¶ 32. But to do so, Florence Project will need to conduct a major overhaul in its attorney training and expand its representation to state criminal proceedings and serving individuals detained in local jails. *Id.* ¶¶ 33-34. This will require significant attorney time and organizational resources up front for attorney training in state criminal proceedings and state court procedures and attorney admission for practice in state court, meaning that Florence Project's ability to reach the same number of clients that it otherwise would will decrease. *Id.* ¶ 36.

Then, on an ongoing basis, Florence Project will need to expend more time in representing individuals in state criminal proceedings scattered throughout the state than it would on comparable federal removal proceedings. *Id.* ¶ 40. Instead of serving individuals at three federal detention centers within 25 miles of each other and between Phoenix and Tucson, attorneys will need to travel throughout the state—leading to attorney time lost and organizational resources lost to travel. *Id.* ¶¶ 29(b), 40, 46. As a result of these ongoing drains on organizational resources should Florence Project represent individuals in state criminal proceedings under Section 5, it will suffer the cognizable injury of providing direct legal and social services to fewer clients than it

---

[5] Arizona mandates that an individual receive a public defender only where the person is actively facing a jail or prison sentence. *See* A.R.S. Rules Crim. Proc., Rule 6.1(b)(1). Thus, where a prosecutor chooses not to seek jail time for an individual charged under A.R.S. § 13-4295.01 or A.R.S. § 13-4295.02, an individual is not guaranteed a public defender as of right, even when that person may be ordered to depart the United States as a result of that charge or conviction.

otherwise could. *Id.* ¶ 41. The drain on leadership time will also prevent Florence Project from engaging in core activities to further its mission, such as personnel management. *Id.* ¶ 38.

Florence Project will not immediately be able to represent individuals in Section 5 criminal proceedings—including existing clients who may not otherwise have representation—because it does not have staff who can do so. *Id.* ¶¶ 29(a), 36, 42. It also may not be able with its limited resources to do so over the longer term. *Id.* ¶ 43. The barriers created by Section 5 state criminal proceedings therefore risk categorically preventing Florence Project from representing some detained adults, youth, and children in Arizona facing removal from the United States, including people at risk of being unrepresented. *Id.* This jeopardizes the success of Florence Project's representation in federal immigration court of existing clients charged under Section 5, and it impairs Florence Project's ability to achieve its vision of universal representation of individuals facing removal in Arizona. *Id.* ¶¶ 43, 50, 53, 83.

**Third,** a key part of Florence Project's legal services is its provision of pro se services, including know-your-rights programs, workshops, and consultations, to people in federal immigration detention. *Id.* ¶ 11. Florence Project will need to create entirely new pro se materials and programming to aid individuals in Section 5 proceedings and detained in local jails under Section 5. *Id.* ¶¶ 81-82. And, once it does, Florence Project will face significant barriers to reaching such individuals in local jails, all with different procedures for such programs—and which may well not permit Florence Project to provide such programs at all—and which are scattered throughout the state. *Id.* ¶¶ 45, 82. The logistical hurdles in attorney time and organizational resources for travel and obtaining permission to conduct such programs will likely mean that Florence Project is unable to provide such programs for individuals facing removal under state law. *Id.* ¶¶ 45-47, 82. And, again, for some of these individuals who otherwise would have benefited from Florence Project's programs, pathways to relief will likely be entirely foreclosed by

the lack of affirmative defenses to removal under state law for, for example, pending claims for relief. *Id.* ¶ 82.

**Fourth,** provision of direct immigration legal services to mentally incompetent individuals is a core portion of Florence Project's work through the NQRP program. *Id.* ¶¶ 5, 62. Under that program, federal immigration judges identify individuals in need of NQRP services and appoint Florence Project attorneys as their Qualified Representative. *Id.* ¶ 23, 70. In addition to the barriers to serving existing clients described *supra*, with the separate, parallel state removal scheme and the lack of any similar process in state court, Florence Project will need to expend resources to design and implement a new system to attempt to identify and reach individuals whom it would otherwise serve through the NQRP program and reach them to provide direct legal services—rather than the current, automatic process of appointment—and will face informational barriers to doing so due to detention in local jails and this population's difficulties communicating. *Id.* ¶¶ 68, 70-71.

**Fifth,** as Florence Project serves fewer clients due to Section 5—for the reasons described above—Florence Project will lose funding. *Id.* ¶¶ 41, 85, 87. This is particularly true for individuals who otherwise would have been placed in the NQRP program, for which Florence Project receives funding on a per-person basis. *Id.* ¶ 62.

**Sixth,** Section 5 will interfere with Florence Project's Universal Representation Pilot Program, which seeks to represent detained individuals facing removal without regard to their individual circumstances, by creating barriers to individuals accessing the pilot program entirely—through their detention in local custody—and by disrupting representation for existing clients in the program. *Id.* ¶¶ 24(b), 30(a), 83.

**In sum,** Section 5 will require Florence Project to expend significant organizational resources to transform its legal services to serve existing and prospective clients in local custody and criminal proceedings pursuant to Section 5, and to provide legal services to those individuals—both for their federal immigration proceedings and for Section 5 proceedings—on an ongoing basis. *See Immigrant Defs. L. Ctr. v. Noem,*

21

145 F.4th 972, 988 (9th Cir. 2025) (finding plaintiff organization with a similar "core business activit[y] and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings" demonstrated injury sufficient for standing because it faced "increase[d] travel" which "divert[ed] staff resources away from other projects" and had to "adopt[] several initiatives" because prior to the challenged policy, "core activities had never required cross-border work"); *E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-6810, 2026 WL 1256873, at \*4 (N.D. Cal. May 7, 2026) (finding plaintiff organizations "need[ed] to overhaul their screening and intake processes" to accommodate the challenged policy). As a result of Section 5, Florence Project will be able to serve fewer clients and pro se individuals, which will in turn impair its ability to achieve its mission and vision. And, even after expending these resources, Florence Project will not be able to seek and secure relief for some individuals facing removal whom it otherwise could have aided due to the broader avenues for relief under federal immigration law than under Section 5. It will not immediately be able to represent existing clients in state criminal proceedings under Section 5, and it will either need to expend extraordinary resources to be able to do so or forgo doing so—ruling out some representation of individuals in Arizona facing removal categorically.

Again, these harms are irreparable. *See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) ("Plaintiff organizations 'have established a likelihood of irreparable harm' based on their showing of serious 'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding." (quoting *Valle del Sol*, 732 F.3d at 1029)).

**B. The Balance of Equities and Public Interest Support an Injunction.**

Any interest Arizona has in enforcement of Section 5 is far outweighed by the harms to Plaintiff. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (it would not be equitable or in the public's interest to allow the state to violate

22

the requirements of federal law, especially when there are no adequate remedies available); *Valle del Sol*, 732 F.3d at 1029 (same); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (the government cannot suffer harm from an injunction that merely ends an unlawful practice).

The public interest also clearly favors an injunction. States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301. That is particularly so where state action invades federal domains and interferes with federal foreign relations. *See, e.g.*, *Valenzuela v. Ducey*, 329 F. Supp. 3d 982, 998 (D. Ariz. 2018) (holding that the public has little interest in Defendants continuing a policy that violates the Supremacy Clause); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013).

Under Section 5, individuals crossing the United States border—including those fleeing persecution and torture—will face arrest, prosecution, and removal without any opportunity to pursue federal relief. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). That harm is acute because Section 5 directs noncitizens' removal to Mexico, where migrants demonstrably face extraordinary dangers of abduction, rape, torture, and death (as well as to an individual's country of origin). *See* Declaration of Grace Choi (hereinafter "Choi Decl."), Exs. 4-17 (documenting harms to asylum seekers in Mexico); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (pointing to "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico). Section 5 likewise contains no prohibition on enforcement against parents, who would suffer separation from their children once removed. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1148-49 (S.D. Cal. 2018) (enjoining government policy of separating noncitizen families).

Moreover, even those who have status will be at risk of racial profiling. *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-981 (D. Ariz. 2011); Choi

Decl., Exs. 18-20 (documenting racial profiling in state policing of the border). Noncitizens and their families will fear that interaction with officials, to report crimes or obtain assistance, will result in their removal, leading to an erosion of the trust that government agencies have been long working to build with migrant communities.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

Date: July 9, 2026                                    Respectfully submitted,

/s/ *Kathryn Huddleston*
Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

/s/ *John M. Mitchell*
John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

<u>CERTIFICATE OF SERVICE</u>

I certify that on or about July 9, 2026, I filed the foregoing through the Court's CM/ECF system which will serve a true and correct copy of the filing on counsel of record.

/s/ <i>Kathryn Huddleston</i>
Kathryn Huddleston

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

FLORENCE IMMIGRANT & REFUGEE
RIGHTS PROJECT,

                    Plaintiff,

    v.

KRIS MAYES, in her official capacity as
the Attorney General of the State of
Arizona, *et al.*,

                    Defendants.

No.

**[PROPOSED]
ORDER GRANTING
PLAINTIFF'S MOTION FOR A
[TEMPORARY
RESTRAINING ORDER /
PRELIMINARY
INJUNCTION]**

Upon consideration of Plaintiff's Motion for a [Temporary Restraining Order / Preliminary Injunction] and supporting papers (ECF #___), Defendants' opposition thereto and supporting papers, Plaintiffs' Reply in support thereof, any arguments of counsel, and the entire record herein, the Court ORDERS that Plaintiff's Motion for a [Temporary Restraining Order / Preliminary Injunction] is hereby GRANTED. Defendants are enjoined from enforcing Section 5 of Proposition 314.

Entered on _____, 2026.

_____
The Honorable Judge _____

1