Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

|  |  |
|---|---|
| Florence Immigrant & Refugee Rights Project, <br><br> Plaintiff, <br><br> v. <br><br> Mayes, *et al.*, <br><br> Defendants. | No. |

**DECLARATION OF GRACE CHOI**

1

I, Grace Choi, pursuant to 28 U.S.C. § 1746, declare as follows:

I submit this declaration in support of Plaintiff's motion for a temporary restraining order and preliminary injunction. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently as follows:

1. I am over eighteen years of age and am competent to make this Declaration.

2. I am a Skadden Fellow with the American Civil Liberties Union Foundation Immigrants' Rights Project. I am one of the attorneys representing Plaintiff in the instant case.

3. Attached hereto as exhibits are true and correct copies of the following.

**Exhibit Document**

1. Am. Immigr. Council, *Immigrants in Arizona (Data Year 2023)*, https://perma.cc/78NT-SW7X (last visited July 8, 2026).

2. Nat'l Cancer Inst. & Ctrs. for Disease Control & Prevention, *State Cancer Profiles: Demographic Data Report for Arizona by County—Population: Foreign Born*, https://perma.cc/GXR3-5DQB (last visited July 8, 2026).

3. Exec. Off. for Immigr. Rev., U.S. Dep't of Just., *List of Pro Bono Legal Service Providers*, https://perma.cc/87X9-SHBM (last updated July 2026).

4. Stephanie Brewer, Lesley Tejada & Maureen Meyer, WOLA, *Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico* (June 2022), https://perma.cc/4KX7-NAYR.

5. Hum. Rights First, Mexico: Still Not Safe for Refugees and Migrants (Mar. 23, 2018), https://perma.cc/AW52-LCHQ.

6. WOLA, *Situation of Impunity and Violence in Mexico's Northern Border Region*, (Mar. 2017), https://perma.cc/8ZT9-FXY5.

2

7. Ximena Suárez, Andrés Díaz, José Knippen, & Maureen Meyer, WOLA, *Access to Justice for Migrants in Mexico: A Right That Exists Only on the Books* (July 2017), https://perma.cc/LJZ6-9W6Y.

8. Gretchen Kuhner, Women's Refugee Comm'n, *Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021*(Feb. 2, 2022), https://perma.cc/R986-CSKS.

9. José Knippen, Clay Boggs & Maureen Meyer, WOLA, *An Uncertain Path: Justice for Crimes and Human Rights Violations against Migrants and Refugees in Mexico* (Nov. 2015), https://perma.cc/HDA6-P7L5.

10. Tatiana Brofft, Women's Refugee Comm'n, *Migrant and Refugee Caravans: Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid* (May 2019), https://perma.cc/JN5Y-FC62.

11. Hum. Rights Watch, *US: LGBT Asylum Seekers in Danger at the Border* (May 31, 2022), https://perma.cc/5DPK-7TKT.

12. Julia Neusner, Kennji Kizuka, & Eleanor Acer, Hum. Rights First, *Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End – and Never Be Revived* (Dec. 15, 2022), https://perma.cc/3X8X-BTF9.

13. Arturo Castellanos-Canales, Nat'l Immigr. Forum, *Mexico's Asylum System: Good in Theory, Insufficient in Practice* (Mar. 15, 2023), https://perma.cc/J6L2-NAUV.

14. Martina Rapido Ragozzino & Juan Pappier, Hum. Rights Watch, *"This Hell Was My Only Option": Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap* (Nov. 9, 2023), https://perma.cc/X89X-D8ST.

15. U.S. Dep't of State, *Travel Advisories: Mexico Travel Advisory* (May 2026), https://perma.cc/W9W3-9HLE (last visited July 8, 2026).

16. Hum. Rights First, *Trapped, Preyed Upon, and Punished: One Year of the Biden Administration Asylum Ban* (May 7, 2024), https://perma.cc/JJ3Y-L46Q.

17. Amnesty Int'l, *Lives in Limbo: Devastating Impacts of Trump's Migration and Asylum Policies* (Feb. 20, 2025), https://perma.cc/RH27-Y3MP.

18. Rafael Carranza, *Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise.* (Mar. 26, 2026), https://perma.cc/DT3X-AHRJ.

19. ACLU of Arizona, *Complaint and request for investigation of abuses at U.S. Border Patrol interior checkpoints in southern Arizona, including unlawful search and seizure, excessive force, and racial profiling* (Jan. 15, 2014), https://perma.cc/8X7Q-2J9Z.

20. ACLU of Arizona, *Record of Abuse: Lawlessness and Impunity in Border Patrol's Interior Enforcement Operations* (Oct. 2015), https://perma.cc/8UDY-7988.

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 9th of July, 2026 in San Francisco, California.

/s/ *Grace Choi*
Grace Choi
Skadden Fellow
ACLU Foundation Immigrants' Rights Project

4

# EXHIBIT 1

New Americans in

# Arizona




Arizona has a large population of immigrants, over 40% of whom are naturalized citizens. About 13.2 percent of the state's residents are foreign-born, and 8.7 percent of its U.S.-born residents live with at least one immigrant parent. Immigrants make up 16.1 percent of Arizona's labor force, immigrants support the state's economy in many ways. They account for 22.6 percent of entrepreneurs, 19.6 percent of STEM workers, and 29.3 percent of the agriculture workers in the state. As neighbors, business owners, taxpayers, and workers, immigrants are an integral part of Arizona's diverse and thriving communities and make extensive contributions that benefit all.

## OVERVIEW[1]

| | |
|---|---|
| Immigrant residents[2] | 984,200 |
| Immigrant share of population | 13.2% |
| Immigrant taxes paid | $11.1B |
| Immigrant spending power | $33.1B |

## DEMOGRAPHICS

In the United States, immigrants are more likely to be working-age than their U.S.-born counterparts. This means they are more likely to be active in the labor force, allowing them to contribute to the economy not only as consumers but also as taxpayers, helping fund social services and programs like Medicare and Social Security.

| | |
|---|---|
| Share of immigrant women | 52.3% |
| Share of immigrant men | 47.7% |
| Number of immigrant children | 48,900 |
| Share of U.S.-born residents living with at least one immigrant parent | 8.7% |
| Number of U.S.-born residents living with at least one immigrant parent | 558,500 |
| Share of foreign-born that are proficient in English | 75.0% |

| Age Group | Foreign-Born Population | U.S.-Born Population |
|---|---|---|
| 0-15 | 4.0% | 20.8% |
| 16-64 | 77.3% | 59.7% |
| 65+ | 18.7% | 19.4% |

Data Year: 2023

# New Americans in **Arizona**

## Top Countries of Origin for Immigrants

| | |
|---|---|
| Mexico | 51.3% |
| India | 5.4% |
| Canada | 4.0% |
| Philippines | 3.4% |
| China | 2.2% |

## ENTREPRENEURSHIP

It is hard to overstate the importance of entrepreneurship since new businesses are the main driver of job growth in the United States. Immigrants play a particularly important role in this—founding businesses at far higher rates than the U.S. population overall. Today, millions of American workers are employed at immigrant-founded and immigrant-owned companies.

| | |
|---|---|
| Immigrant entrepreneurs | 79,300 |
| Share of entrepreneurs who are immigrants | 22.6% |
| Total business income of immigrant entrepreneurs | $2.5B |
| Number of Fortune 500 companies founded by immigrants or children of immigrants [3] | 3 |

## TAXES & SPENDING POWER

Immigrant households contribute hundreds of billions of dollars in federal, state, and local taxes and hold a tremendous amount of spending power. This gives them significant economic clout, helping support local communities as consumers and taxpayers. Like all residents of the United States, regardless of where they were born, immigrants make use of public services like education, healthcare, and public safety. Even with these costs, however, immigrants' economic contributions far outweigh the cost of additional public services they incur.

| | |
|---|---|
| Immigrant household income | $44.1B |
| Total taxes paid | $11.1B |
| Federal taxes paid [4] | $7.4B |
| State & local taxes paid [5] | $3.7B |
| Total spending power | $33.1B |
| Foreign-born, contributions to Social Security | $3.9B |
| Foreign-born, contributions to Medicare | $1.0B |

# New Americans in **Arizona**

## WORKFORCE

The growth in the immigrant population has helped to strengthen America's labor force. As baby boomers retire, younger immigrants are filling crucial gaps in the labor market. Nationally, immigrants are more likely to hold an advanced degree than the U.S.-born. They are also more likely to have less than a high school education. As such, they are able to fill critical shortages at both ends of the skill spectrum, from high-tech positions to agriculture, hospitality, and service jobs.

| | |
|---|---|
| Number of immigrant workers in the labor force | 590,800 |
| Share of workers in the labor force who are immigrants | 16.1% |

| Education Level | Foreign-Born Population | U.S.-Born Population |
|---|---|---|
| Less than high school | 28.0% | 7.1% |
| High school & some college | 42.6% | 58.5% |
| Bachelor's degree | 17.3% | 21.1% |
| Graduate degree | 12.1% | 13.3% |
| Share of college-educated workers employed in jobs that don't require a college degree | 32.7% | 27.6% |

### Top Industries with Highest Share of Immigrant Workers

| | |
|---|---|
| Agriculture | 29.3% |
| Construction | 27.2% |
| Manufacturing | 21.1% |
| General Services | 19.8% |
| Professional, Scientific, Administrative, and Waste Services | 18.4% |

### Top Occupations with Highest Share of Immigrant Workers

| | |
|---|---|
| Maids and housekeeping cleaners | 57.0% |
| Landscaping and groundskeeping workers | 52.5% |
| Carpenters | 42.3% |
| Construction laborers | 41.3% |
| Janitors and building cleaners | 39.7% |

3

New Americans in **Arizona**

### Science, Technology, Engineering, and Math

Jobs in science, technology, engineering, and math (STEM) fields are some of the most in-demand jobs in the U.S. economy. These jobs are also expected to experience some of the highest growth rates in the next decade, second only to healthcare jobs. While immigrants already play a huge part in maintaining the United States' role as a leading innovator, immigrants will also be instrumental in helping high-tech industries meet their full potential as their needs for high-skilled STEM workers rapidly increases in the future.

| | |
|---|---|
| Share of STEM workers who are immigrants [6] | 19.6% |

### Healthcare

As millions of baby boomers become elderly, the U.S. healthcare system is facing unprecedented demand, adding jobs faster than any other segment of the economy. Many healthcare businesses and providers are struggling to find enough workers, and in some rural areas shortages are particularly acute. Immigrants have already been filling some of our most glaring healthcare needs. They are twice as likely as the U.S.-born to work as home health aides, and twice as likely to work as physicians and surgeons.

| | |
|---|---|
| Nurses who are foreign-born | 14.1% |
| Health aides who are foreign-born | 25.2% |

## HOUSING

Immigrant families have long played an important role in helping to build housing wealth in the United States. In recent decades, the more than 40 million immigrants in the U.S. collectively increased U.S. housing wealth by trillions of dollars. Much of this was possible because immigrants moved into neighborhoods once in decline, thus helping to revitalize communities and make neighborhoods more attractive to U.S.-born residents.

| | |
|---|---|
| Immigrant homeowners | 281,700 |
| Share of recent homebuyers who were foreign-born | 13.4% |
| Housing wealth held by immigrant households | $127.9B |
| Amount paid by immigrant-led households in rent | $2.6B |

New Americans in **Arizona**

## INTERNATIONAL STUDENTS[7]

International students in the United States contribute tens of billions of dollars to the U.S. economy every year and support a significant number of U.S. jobs through their tuition payments and day-to-day spending. Research has also found that increases in the number of international students at American universities boost innovation and patent creation.

| | |
|---|---|
| Students at Arizona's colleges and universities who are international students | 27883 |
| Economic contribution of international students | $917.7M |
| Jobs supported by international students | 8,196 |

## NATURALIZATION & VOTING POWER

As more immigrants naturalize and become eligible to vote, they continue to gain political power. The number of immigrant voters is only projected to rise in the next decade, and in some states foreign-born voters are already capable of deciding elections.

| | |
|---|---|
| Share of immigrants who are naturalized U.S. citizens | 43.2% |
| Number of immigrants who are naturalized U.S. citizens | 425,500 |
| Number of immigrants who are eligible for naturalization | 161,900 |
| Number of immigrants eligible to vote | 412,500 |

New Americans in **Arizona**

## UNDOCUMENTED IMMIGRANTS

The presence of a significant number of undocumented immigrants in the United States poses many legal and political challenges. But these millions of undocumented immigrants, most of whom have lived in the country for more than five years, are working across the country, contributing billions of dollars to the U.S. economy.

| | |
|---|---|
| Number of undocumented immigrants [8] | 286,900 |
| Share of immigrant population who are undocumented immigrants | 29.1% |
| Share of population that is undocumented | 3.9% |
| Share of workforce that is undocumented | 5.4% |
| Share of undocumented immigrants who are working age | 90.8% |
| Undocumented entrepreneurs | 30,400 |
| Undocumented household income | $9.5B |
| Total taxes paid [9] | $2.1B |
| Federal taxes paid | $1.3B |
| State & local taxes paid | $770.3M |
| Total spending power | $7.5B |
| Number of U.S. citizens living with at least one undocumented family member | 274,400 |
| Share of U.S. citizens living with at least one undocumented family member | 4.0% |
| Number of U.S. citizen children living with at least one undocumented family member | 146,400 |
| Share of U.S. citizen children living with at least one undocumented family member | 9.5% |
| Number of U.S. citizen children living with at least one undocumented parent | 116,700 |
| Share of U.S. citizen children living with at least one undocumented parent | 7.6% |

6

# New Americans in **Arizona**

**Top Industries with Highest Share of Undocumented Immigrant Workers**

| | |
|---|---|
| Construction | 16.6% |
| General Services | 7.8% |
| Manufacturing | 7.3% |
| Professional, Scientific, Administrative, and Waste Services | 7.2% |
| Transportation and Warehousing | 6.2% |

## THE DACA-ELIGIBLE POPULATION

DACA-eligible people contribute billions of dollars to the U.S. economy. Removing the protections afforded to DACA recipients would likely upset local economies, communities, and schools, hurting employers and businesses that depend on these young immigrants as workers and customers.

| | |
|---|---|
| Number of DACA-eligible residents | 41,200 |
| Employment rate of DACA-eligible population | 97.6% |
| Number of DACA-eligible entrepreneurs | - |
| DACA-eligible household income [10] | $1.4B |
| Total taxes paid | $307.6M |
| Federal taxes paid | $162.1M |
| State & local taxes paid | $145.5M |
| Total spending power | $1.1B |
| Number of active DACA recipients [11] | 20,230 |
| Number of people with DACA granted [12] | 30,756 |
| Number of additional residents who would satisfy all but the educational requirements for DACA | 11,500 |

7

New Americans in **Arizona**

## REFUGEES[13]

Refugees living in the United States make tremendous contributions to our economy as earners, taxpayers, and consumers. Rather than a drain on communities, refugees, with their high employment rate and entrepreneurial spirit, actually sustain and strengthen their new hometowns.

| | |
|---|---|
| Number of likely refugees | 38,700 |
| Employment rate of likely refugees | 95.3% |
| Share of refugees who are naturalized U.S. citizens | 89.4% |
| Refugee household income | $1.8B |
| Total taxes paid | $450.0M |
| Federal taxes paid | $294.5M |
| State & local taxes paid | $155.5M |
| Total spending power | $1.4B |
| Number of refugee entrepreneurs | - |
| Total business income of refugee entrepreneurs | - |
| Number of refugees resettled in the last fiscal year [14] | 3,776 |

**Top Countries of Origin for Refugees Resettled in the Last Fiscal Year**

| | |
|---|---|
| Democratic Republic of the Congo | 33.7% |
| Afghanistan | 10.6% |
| Myanmar | 10.3% |
| Syria | 9.6% |
| Somalia | 7.4% |

## TEMPORARY PROTECTED STATUS HOLDERS

Recipients of Temporary Protected Status (TPS) have made enormous contributions to various industries and paid a significant amount in federal, state, and local taxes in the United States. Forcing them to leave the country not only risks putting these individuals in danger, but also threatens to significantly disrupt local economies.

| | |
|---|---|
| Number of TPS holders [15] | 2,100 |

# New Americans in **Arizona**

To learn more about Map the Impact, visit  maptheimpact.org.

The American Immigration Council works to empower immigrants from arrival to belonging.
To learn more about the Council's work, visit  americanimmigrationcouncil.org.

## ENDNOTES

1.  Unless otherwise specified, data comes from the American Immigration Council analysis of microdata from the 1-year sample of the 2023 American Community Survey (ACS), downloaded from the Integrated Public Use Microdata Series (IPUMS) https://www.ipums.org/.

2.  Except where otherwise noted, an immigrant refers to anyone born outside the country to non-U.S. citizen parents who is resident in the United States. This includes naturalized citizens, green card holders, individuals holding temporary (nonimmigrant) status, refugees, asylees, and undocumented immigrants, among others.

3.  American Immigration Council analysis of the 2024 Fortune 500 rankings https://fortune.com/ranking/fortune500/.

4.  Congressional Budget Office. 2022. "The Distribution of Household Income and Federal Taxes, 2019." https://www.cbo.gov/publication/58353.

5.  Institute on Taxation and Economic Policy (ITEP). 2024. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States (7th edition)." https://itep.org/whopays-7th-edition/.

6.  U.S. Census Bureau. 2018. "STEM, STEM-related, and Non-STEM Occupation Code List 2018." https://www2.census.gov/programs-surveys/demo/guidance/industry-occupation/ 2018-census-stem-related-and-non-stem-occupation-code-list.xlsx

7.  We use the state-level data of international students in the 2023-24 academic year from the "International Student Economic Value Tool" developed by NAFSA,   www.nafsa.org/economicvalue.

8.  We use data from the ACS to arrive at an estimate of the undocumented immigrant population by applying the methodological approach outlined by Harvard University economist George Borjas in his 2016 NBER working paper, "The Labor Supply of Undocumented Immigrants",   https://ideas.repec.org/p/nbr/nberwo/22102.html.

9.  When estimating the tax contributions of undocumented immigrants, we follow the methodology detailed by Institute on Taxation and Economic Policy (ITEP). ITEP. 2024 "Tax Payments By Undocumented Immigrants." https://itep.org/undocumented-immigrants-taxes-2024/.

10. We treat each DACA-eligible individual as a single taxpaying unit, following the lead of other groups that have also sought to quantify the economic and tax contributions of this population, such as ITEP in its report "State & Local Tax Contributions of Young Undocumented Immigrants",   https://itep.sfo2.digitaloceanspaces.com/2017DACA.pdf.

11. U.S. Citizenship and Immigration Services (USCIS). 2024. "Active DACA Recipients - Fiscal Year 2024, Quarter 4 https://www.uscis.gov/sites/default/files/document/data/active_daca_recipients_fy2024_q4.xlsx.

12. USCIS. 2024. "Deferred Action for Childhood Arrivals (DACA) Quarterly Report (Fiscal Year 2024, Quarter 4)." https://www.uscis.gov/sites/default/files/document/data/daca_performancedata_fy2024_q4.xlsx.

13. To identify cases in microdata from the 2023 ACS that are likely to be refugees, we use an imputation method based on each foreign-born respondent's country of birth and their year of arrival, similar to the work of Kallick and Mathema in "Refugee Integration in the United States," https://www.americanprogress.org/article/refugee-integration-in-the-united-states, as well as Capps et al in "The Integration Outcomes of U.S. Refugees: Successes and Challenges https://www.migrationpolicy.org/research/integration-outcomes-us-refugees-successes-and-challenges.

14. Refugee Processing Center (RPC). 2024. "FY 2024 Refugee Arrivals by State and Nationality." https://www.wrapsnet.org/archives/

15. Congressional Research Service (CRS). 2023. "Temporary Protected Status and Deferred Enforced Departure." https://crsreports.congress.gov/product/pdf/RS/RS20844/70

# EXHIBIT 2

(https://www.cancer.gov/)



(https://www.cdc.gov)

# STATE CANCER PROFILES

## Main Menu

🏠 (http://statecancerprofiles.cancer.gov/index.html) > Demographics (http://statecancerprofiles.cancer.gov/data-topics/demographics.html) > Table

## Demographics Table

Generate Table

**Demographic Data Report for Arizona by County**
**Population: Foreign born**
(http://statecancerprofiles.cancer.gov/dictionary.php#population)
**All Ages, All Races (includes Hispanic), Both Sexes**
**2020-2024 American Community Survey 5-Year Data**
**Sorted by Percent**

| County | 2023 Rural-Urban Continuum Codes Φ | Value (Percent) | People (Foreign Born) | Rank within US (of 3142 counties) |
|---|---|---|---|---|
| **Arizona** | N/A | 13.0 | 957,784 | 16 of 51 |
| **United States** | N/A | 14.1 | 47,349,078 | N/A |
| **Apache County** | Rural | 1.6 | 1,039 | 2,218 |
| **Graham County** | Rural | 2.5 | 973 | 1,720 |
| **Navajo County** | Rural | 2.5 | 2,674 | 1,720 |
| **Gila County** | Rural | 3.6 | 1,914 | 1,324 |
| **Coconino County** | Urban | 5.0 | 7,173 | 968 |

State Cancer Profiles - Demographics Table

| County | 2023 Rural-Urban Continuum Codes Φ | Value (Percent) | People (Foreign Born) | Rank within US (of 3142 counties) |
|---|---|---|---|---|
| **Mohave County** | **Urban** | **6.1** | **13,467** | 779 |
| **Yavapai County** | **Urban** | **6.4** | **15,768** | 738 |
| **Greenlee County** | **Rural** | **7.9** | **745** | 572 |
| **Pinal County** | **Urban** | **9.1** | **42,861** | 459 |
| **La Paz County** | **Rural** | **9.8** | **1,632** | 407 |
| **Cochise County** | **Urban** | **11.3** | **14,221** | 310 |
| **Pima County** | **Urban** | **11.8** | **124,922** | 291 |
| **Maricopa County** | **Urban** | **14.5** | **660,484** | 195 |
| **Yuma County** | **Urban** | **25.1** | **53,166** | 60 |
| **Santa Cruz County** | **Rural** | **34.2** | **16,745** | 14 |

**Notes:** (http://statecancerprofiles.cancer.gov)
Created by statecancerprofiles.cancer.gov on 07/08/2026 11:24 am.

Φ Rural–urban county classifications are based on the [2023 USDA Rural–Urban Continuum Codes](http://statecancerprofiles.cancer.govhttps://www.ers.usda.gov/data-products/rural-urban-continuum-codes/) (except for Connecticut Counties which use 2013 codes). State-level cancer rates for rural areas are calculated using cancer cases registered exclusively in rural counties, while state-level cancer rates for urban areas are calculated using cases registered exclusively in urban counties.

Source: Demographic data provided by the [Census Bureau](http://www.census.gov/) and the [American Community Survey](http://www.census.gov/acs/www/).

For more information about Population: Foreign born, see the dictionary (http://statecancerprofiles.cancer.gov/dictionary.php#population).

Data for United States does not include Puerto Rico.

Return to Top

---

U.S. Department of Health and Human Services (https://www.hhs.gov/) | National Institutes of Health (https://www.nih.gov/) | National Cancer Institute (https://www.cancer.gov/) | USA.gov (https://www.usa.gov/)

NIH... Turning Discovery Into Health®

# EXHIBIT 3

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Table of Contents

ARIZONA
Eloy Immigration Court
Florence Immigration Court
Phoenix Immigration Court
Phoenix Immigration Court Juvenile Docket
Tucson Immigration Court
Tucson Immigration Court Juvenile Docket

CALIFORNIA
Adelanto Immigration Court
Concord Immigration Court
Concord Immigration Court Juvenile Docket
Imperial Immigration Court
Imperial Immigration Court Juvenile Docket
Los Angeles Immigration Courts
Los Angeles Immigration Courts Juvenile Docket
Otay Mesa Immigration Court
Sacramento Immigration Court
San Diego Immigration Court
Santa Ana Immigration Court

COLORADO
Aurora Immigration Court
Denver Immigration Court

CONNECTICUT
Hartford Immigration Court
Hartford Immigration Court Juvenile Docket

FLORIDA
Krome Immigration Court
Miami Immigration Court
Miami Immigration Court Juvenile Docket
Orlando Immigration Court

GEORGIA
Atlanta Immigration Court
Stewart Detention Center Immigration Court

HAWAII
Honolulu Immigration Court

ILLINOIS
Chicago Immigration Court
Chicago Immigration Court Juvenile Docket

INDIANA
Indianapolis Immigration Court

LOUISIANA
LaSalle Immigration Court
New Orleans Immigration Court
Oakdale Immigration Court

MARYLAND
Baltimore Immigration Court
Baltimore Immigration Court Juvenile Docket
Hyattsville Immigration Court

MASSACHUSETTS
Boston Immigration Court
Boston Immigration Court Juvenile Docket
Chelmsford Immigration Court

MICHIGAN
Detroit Immigration Court

MINNESOTA
Fort Snelling Immigration Court
Fort Snelling Immigration Court Juvenile Docket

MISSOURI
Kansas City Immigration Court
Kansas City Immigration Court Juvenile Docket

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Table of Contents

NEBRASKA
> Omaha Immigration Court
> Omaha Immigration Court Juvenile Docket

NEVADA
> Las Vegas Immigration Court

NEW JERSEY
> Elizabeth Immigration Court
> Elizabeth Immigration Court Juvenile Docket
> Newark Immigration Court
> Newark Immigration Court Juvenile Docket

NEW MEXICO
> Otero Immigration Court

NEW YORK
> Buffalo & Batavia Immigration Courts
> New York Immigration Courts
> New York Immigration Courts Juvenile Docket
> Ulster Immigration Court

NORTH CAROLINA
> Charlotte Immigration Court

OHIO
> Cleveland Immigration Court
> Cleveland Immigration Court Juvenile Docket

OREGON
> Portland Immigration Court
> Boise Hearing Location
> Boise Hearing Location Juvenile Docket

PENNSYLVANIA
> Philadelphia Immigration Court
> Philadelphia Immigration Court Juvenile Docket

PUERTO RICO
> Guaynabo (San Juan) Immigration Court

TENNESSEE
> Memphis Immigration Court
> Memphis Immigration Court Juvenile Docket

TEXAS
> Dallas Immigration Court
> Dallas Immigration Court Juvenile Docket
> El Paso Immigration Court
> El Paso Detained Immigration Court
> Harlingen Immigration Court
> Harlingen Immigration Court - Brownsville Hearing Location
> Houston Immigration Courts
> Houston Immigration Courts Juvenile Docket
> Conroe Immigration Court
> Laredo Immigration Court
> Pearsall Immigration Court
> Port Isabel Immigration Court
> San Antonio Immigration Court
> San Antonio Immigration Court Juvenile Docket
> Karnes County Residential Center

UTAH
> Salt Lake City Immigration Court
> Salt Lake City Immigration Court Juvenile Docket

VIRGINIA
> Annandale Immigration Court
> Annandale Immigration Court Juvenile Docket
> Sterling Immigration Court

WASHINGTON
> Seattle Immigration Court
> Tacoma Immigration Court

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# ARIZONA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Eloy Immigration Court

| Eloy, Arizona | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline****<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Florence Immigrant and Refugee Rights Project***<br><br>P.O. Box 32670<br>Phoenix, AZ 85064<br>Tel: (520) 868-0191<br>firrp@firrp.org<br>www.firrp.org<br><br>• Removal defense, orientation materials |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Florence Immigration Court

### Florence, Arizona

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Florence Immigrant and Refugee Rights Project\***

P.O. Box 32670
Phoenix, AZ 85064
Tel: (520) 868-0191
firrp@firrp.org
www.firrp.org

- Removal defense, orientation materials

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Phoenix Immigration Court

| Phoenix, Arizona |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Florence Immigrant and Refugee Rights Project\***

P.O. Box 32670
Phoenix, AZ 85064
Tel: (602) 307-1008
firrp@firrp.org
www.firrp.org

- Children cases only
- No walk-ins
- Please call to make an appointment

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Phoenix Immigration Court Juvenile Docket

| Phoenix, Arizona |
|---|

**Florence Immigrant and Refugee Rights Project\***

P.O. Box 32670
Phoenix, AZ 85064
Tel: (602) 307-1008
firrp@firrp.org
www.firrp.org

- Children cases only
- No walk-ins
- Please call to make an appointment

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Tucson Immigration Court

| Tucson, Arizona | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Florence Immigrant and Refugee Rights Project\***<br><br>P.O. Box 32670<br>Phoenix, AZ 85064<br>Tel: (602) 307-1008<br>firrp@firrp.org<br>www.firrp.org<br><br>• Children cases only<br>• No walk-ins<br>• Please call to make an appointment |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Tucson Immigration Court Juvenile Docket

| Tucson, Arizona |
|---|

**Florence Immigrant and Refugee Rights Project***

P.O. Box 32670
Phoenix, AZ 85064
Tel: (602) 307-1008
firrp@firrp.org
www.firrp.org

- Children cases only
- No walk-ins
- Please call to make an appointment

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# CALIFORNIA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Adelanto Immigration Court

### Adelanto, California (page 1 of 2)

**Esperanza Immigrant Rights Project, Catholic Charities of Los Angeles, Inc. Main Office\***

Catholic Charities of Los Angeles
1530 James M Wood Boulevard
Los Angeles, CA 90015
Tel: (213) 251-3505
Fax: (213) 487-0986
www.esperanza-la.org

- Monday-Friday, 8:30AM-5:30PM
- Assisting immigrants in understanding visas, asylum claims, special immigrant juvenile status (SIJS), cancellation of removal, and other forms of immigration relief
- Representing detained adults in removal proceedings
- Assisting victims of crime such as: victims of domestic violence and victims of human trafficking
- Pro bono (resources permitting and based on grant availability
- We have a hotline service which provides guidance, legal orientations, and referrals to adult detained individuals in removal proceedings
- Languages: English and Spanish (other languages available through interpreter services)

**Immigrant Defenders Law Center\***

634 S. Spring Street, 10th floor
Los Angeles, CA 90014
Tel: (213) 634-0999
Fax: (213) 282-3133
info@immdef.org
www.immdef.org

- Low income detainees
- Priority given to Los Angeles County residents
- Other program requirements may apply
- Languages: Spanish and other languages available upon request

**Human Rights First\*\***

3680 Wilshire Blvd., Suite PO4-414
Los Angeles, CA 90010
Tel: (213) 205-0468
laprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum.asylum-seekers-and-potential-clients

- Represents indigent individuals and families seeking asylum
- No walk-ins accepted
- Languages: Spanish and others as needed

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Adelanto Immigration Court

### Adelanto, California (page 2 of 2)

**Alameda County Public Defender - Immigration Representation Unit***

1401 Lakeside Drive, Suite 400
Oakland, CA 94612
Tel: (510) 272-6611

- Representation limited to individuals with Alameda county residence or convictions
- Languages: English, Spanish, Farsi, and Russian

**International Institute of Los Angeles***

3845 Selig Place
Los Angeles, CA 90031
Tel: (323) 264-6217
Fax: (323) 264-6418
ireception@iilosangeles.org
www.iilosangeles.org

- Open Monday-Friday, 8:30AM-5PM
- Services include removal defense, habeas petitions and bond representation
- No walk-ins
- By appointment only (solo con cita)
- Languages: English and Spanish, other languages available upon request

**San Francisco Public Defender's Office***

555 7th Street
San Francisco, CA 94103
Tel: (628) 271-9898

- We provide removal defense to people in immigration custody. We prioritize people who have lived or worked in San Francisco
- We also offer removal defense to people that are not detained AND who are current or former clients of San Francisco Public Defender's Office
- Languages: English and Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Concord Immigration Court

| Concord, California (page 1 of 2) |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Community Legal Services in East Palo Alto (CLSEPA)\***

1861 Bay Road
East Palo Alto, CA 94303
Tel: (650) 326-6440
Fax: (866) 688-5204
info@clsepa.org

- Representation limited to residents of San Mateo and Santa Clara counties
- Will represent juveniles and adults in removal proceedings
- No collect calls are accepted
- Languages: Spanish, Portuguese

**Low Income Legal Assistance Center\***

345 Franklin Street, 2nd Floor
San Francisco, CA 94102
Tel: (650) 810-6357
info@lilaclegal.org
lilaclegal.org/

San Jose Office:
1576 Story Road
San Jose, CA 95122
Tel: (650) 810-6357

Redwood City Office:
2615 Middlefield Road
Redwood City, CA 94063
Tel: (650) 810-6357

- No walk-ins
- Please call for an appointment
- Intake hours: Monday-Saturday, 8AM-6PM
- Specialize in removal defense
- Languages: English and Spanish

**California Immigration Project\***

1722 J Street, Suite 300
Sacramento, CA 95811
Tel: (916) 241-3355
info@calimm.org

- Please call our office to schedule a consultation

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Concord Immigration Court

| Concord, California (page 2 of 2) | |
|---|---|
| **Kids in Need of Defense (KIND)\*** <br><br> <u>San Francisco Office:</u> <br> 71 Stevenson Street, Suite 1450 <br> San Francisco, CA 94105 <br> Tel: (415) 694-7389 <br> Fax: (415) 694-7397 <br> infosanfrancisco@supportkind.org <br> www.supportkind.org <br><br> • KIND's San Francisco office represents children residing in San Francisco, Alameda, Marin, and Contra Costa counties <br> • La oficina de KIND San Francisco representa a a niños que viven en los condados de San Francisco, Alameda, Marin, Contra Costa <br><br> <u>Fresno Office:</u> <br> 550 E. Shaw Avenue, Suite 210 <br> Fresno, CA 93710 <br> Tel: (559) 573-8404 <br> Fax: (800) 707-8309 <br> infofresno@supportkind.org <br> www.supportkind.org <br><br> • KIND's Fresno office represents children residing in San Joaquin, Kern, Fresno, Kings, Tulare, Madera, Merced, and Stanislaus counties <br> • La oficina de KIND San Francisco representa a niños que viven en los condados de San Joaquin, Kern, Fresno, Kings, Tulare, Madera, Merced, y Stanislaus | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Concord Immigration Court Juvenile Docket

| Concord, California | |
|---|---|
| **Kids in Need of Defense (KIND)\*** <br><br> San Francisco Office: <br> 71 Stevenson Street, Suite 1450 <br> San Francisco, CA 94105 <br> Tel: (415) 694-7389 <br> Fax: (415) 694-7397 <br> infosanfrancisco@supportkind.org <br> www.supportkind.org <br><br> • KIND's San Francisco office represents children residing in San Francisco, Alameda, Marin, and Contra Costa counties <br> • La oficina de KIND San Francisco representa a a niños que viven en los condados de San Francisco, Alameda, Marin, Contra Costa <br><br> Fresno Office: <br> 550 E. Shaw Avenue, Suite 210 <br> Fresno, CA 93710 <br> Tel: (559) 573-8404 <br> Fax: (800) 707-8309 <br> infofresno@supportkind.org <br> www.supportkind.org <br><br> • KIND's Fresno office represents children residing in San Joaquin, Kern, Fresno, Kings, Tulare, Madera, Merced, and Stanislaus counties <br> • La oficina de KIND San Francisco representa a niños que viven en los condados de San Joaquin, Kern, Fresno, Kings, Tulare, Madera, Merced, y Stanislaus | **Global Communication Education & Art (GCEA)\*** <br><br> 4689 Telegraph Avenue <br> Oakland, CA 94609 <br> Tel: (510) 395-2233 <br> info.gcsinc@gmail.com |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Imperial Immigration Court

### Imperial, California

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Casa Cornelia Law Center\***

Post Office Box 12666
San Diego, CA 92112
Tel: (619) 231-7788
Fax: (619) 231-7784
www.casacornelia.org
services@casacornelia.org

- Services include: Asylum, Withholding of Removal, UN Convention Against Torture, Defensive VAWA, U, T Visas, and Bond Hearings.
- Focus on asylum seekers, unaccompanied children, and victims of serious crime.
- Will accept detained and non-detained cases
- Call for assistance
- Languages: Spanish; multilingual interpretation may be available.

**Southern California Immigration Project\***

2534 State Street, Suite 208
San Diego, CA 92101
Tel: (619) 516-8119
socalimmigrationp@gmail.com
www.socalimmigrationproject.org

- Specialize in African countries and LGBTQ from any country
- Asylum cases only
- No hablamos español

**OikosNow Not For Profit\***

332 South Michigan Avenue, Suite #121-Z300
Chicago, IL 60604
Tel: (815) 549-5678
immigration@oikosnow.com
www.oikosnow.org

- Please call for an appointment
- Languages: Mandarin Chinese, Cantonese 中文

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Imperial Immigration Court Juvenile Docket

| Imperial, California |
|---|

**Casa Cornelia Law Center***

Post Office Box 12666
San Diego, CA 92112
Tel: (619) 231-7788
Fax: (619) 231-7784
www.casacornelia.org
services@casacornelia.org

- Services include: Asylum, Withholding of Removal, UN Convention Against Torture, Defensive VAWA, U, T Visas, and Bond Hearings.
- Focus on asylum seekers, unaccompanied children, and victims of serious crime.
- Will accept detained and non-detained cases
- Call for assistance
- Languages: Spanish; multilingual interpretation may be available.

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers
http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

## Los Angeles Immigration Courts

### Los Angeles, California (page 1 of 2)

**Esperanza Immigrant Rights Project, Catholic Charities of Los Angeles, Inc. Main Office\***

Catholic Charities of Los Angeles
1530 James M Wood Blvd.
Los Angeles, CA 90015
Tel: (213) 251-3505
Fax: (213) 487-0986
www.esperanza-la.org

- Monday-Friday, 8:30AM-5:30PM
- Serving EOIR Los Angeles (the counties of: Los Angeles, Orange, Riverside, San Bernardino, Ventura, Kern, and Santa Barbara)
- Assisting immigrants in understanding visas, asylum claims, special immigrant juvenile status (SIJS), and other forms of immigration relief
- Representing both detained and non-detained adult immigrants in removal proceedings
- Representing non-detained minors in removal proceedings
- Assisting victims of crime such as: victims of domestic violence and victims of human trafficking
- Pro bono (resources permitting and based on grant availability
- Languages: English and Spanish (other languages through interpreter services)

**Refugee Support Network\***

2301 Findlay Avenue
Monterey Park, CA 91754
Tel: (626) 323-1495
refugeeunitedstates@gmail.com
www.refugeeunitedstates.com

- No walk-ins, please call for an appointment
- Languages: English, Spanish, and Mandarin

**El Rescate\***

1605 West Olympic Blvd., Suite 516
Los Angeles, CA 90031
Tel: (213) 387-3284
www.elrescate.org

**OikosNow Not For Profit\***

332 South Michigan Avenue, Suite #121-Z300
Chicago, IL 60604
Tel: (815) 549-5678
immigration@oikosnow.com
www.oikosnow.org

- Please call for an appointment
- Languages: Mandarin Chinese, Cantonese 中文

**International Institute of Los Angeles\***

3845 Selig Place
Los Angeles, CA 90031
Tel: (323) 264-6217
Fax: (323) 264-6418
ireception@iilosangeles.org
www.iilosangeles.org

- Open Monday-Friday, 8:30AM-5PM
- Services include: removal defense and affirmative petitions
- No walk-ins
- By appointment only (solo con cita)
- Languages: English and Spanish, other languages available upon request

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Los Angeles Immigration Courts

### Los Angeles, California (page 2 of 2)

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Immigrant Defenders Law Center\***

634 S. Spring Street, 10th floor
Los Angeles, CA 90014
Tel: (213) 634-0999
Fax: (213) 282-3133
info@immdef.org
www.immdef.org

- Low income respondents
- Priority given to Los Angeles County residents
- Unaccompanied minors
- Languages: Spanish and other languages available upon request

**Human Rights First\*\***

3680 Wilshire Blvd., Suite PO4-414
Los Angeles, CA 90010
Tel: (213) 205-0468
laprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum.asylum-seekers-and-potential-clients

- Represents indigent individuals and families seeking asylum
- No walk-ins accepted
- Languages: Spanish and others as needed

**Kids In Need of Defense (KIND) - Los Angeles\***

801 S. Grand Avenue, Suite 550
Los Angeles, CA 90017
Tel: (213) 274-0170
Fax: (213) 274-0169
infolosangeles@supportkind.org
www.supportkind.org

- Children's, juvenile, and UAC cases only
- SIJS, asylum, U/T Visas
- No walk-ins, by appointment only
- Languages: English and Spanish speaking staff

**Community Lawyers, Inc.\***

1216 East Compton Blvd.
Compton, CA 90221
Tel: (310) 635-8181
clinics@community-lawyers.org
www.community-lawyers.org

- No walk-ins
- By appointment only (solo con cita)
- Languages: English, Spanish, and other languages available upon request

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Los Angeles Immigration Courts Juvenile Docket

| Los Angeles, California | |
|---|---|
| **International Institute of Los Angeles\*** <br><br> 3845 Selig Place <br> Los Angeles, CA 90031 <br> Tel: (323) 264-6217 <br> Fax: (323) 264-6418 <br> ireception@iilosangeles.org <br> www.iilosangeles.org <br><br> • Open Monday-Friday, 8:30AM-5PM <br> • Services include: removal defense and affirmative petitions <br> • No walk-ins <br> • By appointment only (solo con cita) <br> • Languages: English and Spanish, other languages available upon request | **Kids In Need of Defense (KIND) - Los Angeles\*** <br><br> 801 S. Grand Avenue, Suite 550 <br> Los Angeles, CA 90017 <br> Tel: (213) 274-0170 <br> infolosangeles@supportkind.org <br> www.supportkind.org <br><br> • Children's cases/UACs only, SIJS, Asylum, U/T visas <br> • Staff is Spanish speaking <br> • No walk-ins, by appointment only |
| | **Immigrant Defenders Law Center\*** <br><br> 634 S. Spring Street, 10th floor <br> Los Angeles, CA 90014 <br> Tel: (213) 634-0999 <br> Fax: (213) 282-3133 <br> info@immdef.org <br> www.immdef.org <br><br> • Unaccompanied minors only <br> • Languages: Spanish |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Otay Mesa Immigration Court

### Otay Mesa, California (page 1 of 2)

**Jewish Family Service of San Diego\***

8788 Balboa Avenue
San Diego, CA 92123
Tel: (858) 637-3365
Fax: (858) 637-3011
immigration@jfssd.org
www.jfssd.org/site/PageServer?pagename=pr
ograms_refugee_main

- Please leave a voicemail any time day or night. Calls returned in the order received. If currently detained and you reach our voicemail, leave your full name and A-number in a voicemail and we will schedule a meeting in person or remote.
- Specialize in Bond Hearings, Removal Defense, Cancellation of Removal, Asylum, Withholding of Removal, UN Convention Against Torture, Adjustment of Status, VAWA, U Visa, SIJS and T visa.
- Languages: Spanish and multilingual interpretation may be available

**La Maestra Community Health Centers\***

4060 Fairmount Avenue
San Diego, CA 92105
Tel: (619) 280-4213
Fax: (619) 961-0805
mportugal@lamaestra.org; ecedillo@lamaestra.org
www.lamaestra.org

- Bond hearings only
- All Ukrainians cases
- All Afghan cases
- All victims of trafficking cases (U-Visa, T-Visa, and VAWAs)
- Languages: Spanish, Dari, and Pashto

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Casa Cornelia Law Center\***

Post Office Box 12666
San Diego, CA 92112
Tel: (619) 231-7788
Fax: (619) 231-7784
www.casacornelia.org
services@casacornelia.org

- Services include: Asylum, Withholding of Removal, UN Convention Against Torture, Defensive VAWA, U, T Visas, and SIJS, Bond Hearings.
- Focus on asylum seekers, and victims of serious crime.
- Will accept detained cases
- Call for assistance
- Languages: Spanish; multilingual interpretation may be available.

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Otay Mesa Immigration Court

| Otay Mesa, California (page 2 of 2) | |
|---|---|
| **Immigrant Defenders Law Center\*** <br><br> 303 A Street, Suite 305 <br> San Diego, CA 92101 <br> Tel: (213) 314-0701 <br> Fax: (213) 282-3133 <br> sdinfo@immdef.org <br><br> • Must be low income <br> • No walk-ins, appointment only <br> • Languages: Spanish and other languages available upon request | **Southern California Immigration Project\*** <br><br> 2534 State Street, Suite 208 <br> San Diego, CA 92101 <br> Tel: (619) 516-8119 <br> socalimmigrationp@gmail.com <br> www.socalimmigrationproject.org <br><br> • Specialize in African countries and LGBTQ from any country <br> • Asylum cases only <br> • No hablamos español |
| **International Institute of Los Angeles\*** <br><br> 3845 Selig Place <br> Los Angeles, CA 90031 <br> Tel: (323) 264-6217 <br> Fax: (323) 264-6418 <br> ireception@iilosangeles.org <br> www.iilosangeles.org <br><br> • Open Monday-Friday, 8:30AM-5PM <br> • Services include removal defense, habeas petitions and bond representation <br> • No walk-ins <br> • By appointment only (solo con cita) <br> • Languages: English and Spanish, other languages available upon request | **Immigrant Rights Legal Defense Program (IRLDP) - San Diego County Public Defender\*** <br><br> 451 A Street, Suite 1450 <br> San Diego, CA 92101 <br> Tel: (619) 446-2883 <br> oac@sdcounty.ca.gov <br><br> • Removal defense cases only |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Sacramento Immigration Court

| Sacramento, California | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Catholic Charities of Northern Nevada\***<br><br>480 E. Moana Ln<br>Reno, NV 89502<br>Tel: (775) 393-3877<br>immigration@ccsnn.org<br>www.ccsnn.org/pages/immigration-legal-services<br><br>• Consultations by appointment only<br>• Only accepts cases heard in the Reno Immigration Court |
| | **California Immigration Project\***<br><br>1722 J Street, Suite 300<br>Sacramento, CA 95811<br>Tel: (916) 241-3355<br>info@calimm.org<br><br>• Please call our office to schedule a consultation |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## San Diego Immigration Court

| San Diego, California (page 1 of 2) | |
|---|---|
| **Immigrant Defenders Law Center\*** <br><br> 1620 5th Avenue, Suite 825 <br> San Diego, CA 92101 <br> Tel: (213) 314-0701 <br> Fax: (213) 282-3133 <br> sdinfo@immdef.org <br><br> • Must be low income <br> • No walk-ins, appointment only <br> • Languages: Spanish and other languages available upon request | **OikosNow Not For Profit\*** <br><br> 332 South Michigan Avenue, Suite #121-Z300 <br> Chicago, IL 60604 <br> Tel: (815) 549-5678 <br> immigration@oikosnow.com <br> www.oikosnow.org <br><br> • Please call for an appointment <br> • Languages: Mandarin Chinese, Cantonese 中文 |
| **Casa Cornelia Law Center\*** <br><br> Post Office Box 12666 <br> San Diego, CA 92112 <br> Tel: (619) 231-7788 <br> Fax: (619) 231-7784 <br> www.casacornelia.org <br> services@casacornelia.org <br><br> • Services include: Asylum, Withholding of Removal, UN Convention Against Torture, Defensive VAWA, U, T Visas, and SIJS, Bond Hearings. <br> • Focus on asylum seekers, unaccompanied minors, and victims of serious crime. <br> • Will accept detained and non-detained cases <br> • Call for assistance <br> • Languages: Spanish; multilingual interpretation may be available. | **Immigrant Rights Legal Defense Program (IRLDP) - San Diego County Public Defender\*** <br><br> 451 A Street, Suite 1450 <br> San Diego, CA 92101 <br> Tel: (619) 446-2883 <br> oac@sdcounty.ca.gov <br><br> • Removal defense cases only |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## San Diego Immigration Court

| San Diego, California (page 2 of 2) | |
|---|---|
| **Jewish Family Service of San Diego\***<br><br>8788 Balboa Avenue<br>San Diego, CA 92123<br>Tel: (858) 637-3365<br>Fax: (858) 637-3011<br>immigration@jfssd.org<br>www.jfssd.org/site/PageServer?pagename=programs_refugee_main<br><br>• Please leave a voicemail at any time day or night. Calls returned in the order received. If you reach our voicemail, leave your full name and phone number in a voicemail and we will return your call as soon as possible<br>• Specialize in Bond Hearings, Removal Defense, Cancellation of Removal, Asylum, Withholding of Removal, UN Convention Against Torture, Adjustment of Status, VAWA, U Visa, SIJS and T visa.<br>• Languages: Spanish and multilingual interpretation may be available | **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Santa Ana Immigration Court

| Santa Ana, California (page 1 of 2) |
|---|

**Human Rights First\*\***

3680 Wilshire Blvd., Suite PO4-414
Los Angeles, CA 90010
Tel: (213) 205-0468
laprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum.asylum-seekers-and-potential-clients

- Represents indigent individuals and families seeking asylum
- No walk-ins accepted
- Languages: Spanish and others as needed

**Immigrant Defenders Law Center\***

634 S. Spring Street 10th floor
Los Angeles, CA 90014
Tel: (213) 634-0999
Fax: (213) 282-3133
info@immdef.org
www.immdef.org

- Low income detainees
- Priority given to Los Angeles County residents
- Other program requirements may apply
- Languages: Spanish - other languages available upon request

**Refugee Support Network\***

2301 Findlay Avenue
Monterey Park, CA 91754
Tel: (626) 323-1495
refugeeunitedstates@gmail.com
www.refugeeunitedstates.com

- No walk-ins, please call for an appointment
- Languages: English, Spanish, and Mandarin

**International Institute of Los Angeles\***

3845 Selig Place
Los Angeles, CA 90031
Tel: (323) 264-6217
Fax: (323) 264-6418
ireception@iilosangeles.org
www.iilosangeles.org

- Open Monday-Friday, 8:30AM-5PM
- Services include: removal defense and affirmative petitions
- No walk-ins
- By appointment only (solo con cita)
- Languages: English and Spanish, other languages available upon request

**Kids In Need of Defense (KIND) - Los Angeles\***

801 S. Grand Avenue, Suite 550
Los Angeles, CA 90017
Tel: (213) 274-0170
Fax: (213) 274-0169
infolosangeles@supportkind.org
www.supportkind.org

- Children's, juvenile, and UAC cases only
- SIJS, asylum, U/T Visas
- No walk-ins, by appointment only
- Languages: English and Spanish speaking staff

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Santa Ana Immigration Court

| Santa Ana, California (page 2 of 2) |
|---|

**Catholic Charities of Los Angeles, Archdiocese of Los Angeles, Inc. Main Office***

1530 James M Wood Boulevard
Los Angeles, CA 90015
Tel: (213) 251-3505
Fax: (213) 487-0986
www.esperanza-la.org

- Monday-Friday 9:00AM-5:30PM
- Serving EOIR: Orange, San Bernadino, and Riverside counties
- Assisting immigrants in understanding visas, asylum claims, special immigrant juvenile status (SIJS), and other forms of immigration relief
- Reduced fee schedule, nominal, or pro bono (resources permitting and based on grant availability)
- Languages: English and Spanish (other languages through interpreter services)

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# COLORADO

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Aurora Immigration Court

| Aurora, Colorado |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Rocky Mountain Immigrant Advocacy Network (RMIAN)\***

7301 N. Federal Blvd., Suite 300
Westminster, CO 80030
Tel: (303) 433-2812
Fax: (303) 433-2823
webforms@rmian.org
www.rmian.org

- To request services for someone who is detained, please go to www.rmian.org/detention-program or leave a message on the detained hotline at (303) 866-9308
- RMIAN offers free legal representation, information, and pro se support for unrepresented individuals detained by Immigration and Customs Enforcement (ICE) in Aurora, Colorado

**Connect Immigration\***

305 McGregor Drive
Gypsum, CO 81637
Tel: (720) 674-1919
immigration@connectchurchcolorado.com
www.connectchurchcolorado.com/immigration

- Please call for an appointment
- Languages: Spanish and English

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Denver Immigration Court

| Denver, Colorado | |
|---|---|
| **Rocky Mountain Immigrant Advocacy Network (RMIAN)*** <br><br> 7301 N. Federal Blvd., Suite 300 <br> Westminster, CO 80030 <br> Tel: (303) 433-2812 <br> Fax: (303) 433-2823 <br> webforms@rmian.org <br> www.rmian.org <br><br> • To request services for someone who is not detained, please go to www.rmian.org/childrens-program or leave a message on the non-detained hotline at (720) 543-8898 <br> • RMIAN offers free legal representation, information, and pro se support for unrepresented children and families who are in removal proceedings before the Denver Immigration Court | **ABA Commission on Immigration Detention Information Hotline**** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/ immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **Colorado Asylum Center*** <br><br> 517 16th Avenue <br> Denver, CO 80203 <br> Tel: (303) 376-9907 <br> www.coasylum.org <br><br> • Asylum applications and Notices of Appeals only <br> • By appointment only <br> • Text (303) 376-9907 once with request for appointment (text only) | **Connect Immigration*** <br><br> 305 McGregor Drive <br> Gypsum, CO 81637 <br> Tel: (720) 674-1919 <br> immigration@connectchurchcolorado.com <br> www.connectchurchcolorado.com/immigration <br><br> • Please call for an appointment <br> • Languages: Spanish and English |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# CONNECTICUT

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Hartford Immigration Court

| Hartford, Connecticut | |
|---|---|
| **Connecticut Institute for Refugees and Immigrants***<br><br>34 Woodland Avenue<br>Stamford, CT 06902<br>Tel: (203) 965-7190<br>www.cirict.org<br><br>410 Colorado Avenue<br>Bridgeport, CT 06605<br>Tel: (203) 336-0141<br>www.cirict.org<br><br>75 Charter Oak Avenue, Suite 2-180<br>Hartford, CT 06106<br>Tel: (860) 692-3085<br>www.cirict.org<br><br>• Representation to individuals in removal proceedings, either in-house or through referrals<br>• Pro Bono representation may be limited by grant and program requirements<br>• Does not provide representation in detained cases | **ABA Commission on Immigration Detention Information Hotline****<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| | **Central West Justice Center - An Affiliate of Community Legal Aid***<br><br>370 Main Street, Suite 200<br>Worcester, MA 01608<br>Tel: (855) 252-5342<br>www.communitylegal.org<br><br>• Serves low-income residents of Central & Western Massachusetts |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# FLORIDA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Krome Immigration Court

### Miami, Florida

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Church World Service\***

200 Congress Park Drive, Suite 201
Delray Beach, Fl 33445
Tel: (561) 266-0624
selegal@cwsglobal.org

**Americans for Immigrant Justice\***

6355 NW 36 Street, Suite 309
Miami, FL 33166
Tel: (786) 454-8554
info@aijustice.org
www.aijustice.org

**MLK Public Interest Law Offices, Inc.\***

27 NW 17th Street
Miami, FL 33125
Tel: (800) 505-0357
Fax: (305) 631-2310
admin@mlkpilo.com

- Haitian detainee cases: Asylum, cancellation of removal, and VAWA cases
- Criminal law specialty
- Call in hours: 12:00PM-1:00PM
- Languages: Spanish, Haitian Creole, and French

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Miami Immigration Court

| Miami, Florida (page 1 of 2) | |
|---|---|
| **Catholic Charities Legal Services Archdiocese of Palm Beach, Inc.*** <br><br> 100 West 20th Street <br> Riviera Beach, FL 33404 <br> Tel: (561) 345-2003 <br> Fax: (561) 202-2310 <br> 1300 East 10th St <br><br> Tel: (772) 463-0445 <br> Fax: (772) 872-0311 <br><br> • Representation limited to Miami Court <br> • Does not represent detained clients <br> • Languages: Spanish and Creole | **ABA Commission on Immigration Detention Information Hotline**** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **MLK Public Interest Law Offices, Inc.*** <br><br> 27 NW 17th Street <br> Miami, FL 33125 <br> Tel: (800) 505-0357 <br> Fax: (305) 631-2310 <br> admin@mlkpilo.com <br><br> • All specialized docket cases: Asylum, cancellation of removal, and VAWA cases <br> • Criminal law specialty <br> • Walk in hours: 8:00AM-10:00AM <br> • Languages: Spanish, Haitian Creole, and French | **Americans for Immigrant Justice*** <br><br> 6355 NW 36th Street, Suite 309 <br> Miami, FL 33166 <br> Tel: (305) 573-1106 <br> info@aijustice.org <br> www.aijustice.org |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Miami Immigration Court

| Miami, Florida (page 2 of 2) | |
|---|---|
| **Church World Service***<br><br>Miami Office:<br>1924 NW 84 Avenue<br>Doral, FL 33126<br>Tel: (305) 774-6770<br>www.cwssoutheast.org<br><br>Palm Beach Office:<br>200 Congress Park Drive, Suite 201<br>Delray Beach, FL 33445<br>Tel: (651) 266-0624<br><br>Broward Office:<br>3215 NW 10th Terr, Suite 209 B<br>Ft. Lauderdale, FL 33309<br>Tel: (954) 689-6466<br><br>• Walk-ins or appointments<br>• Legal Orientation for those in removal proceedings<br>• Asylum, Adjustment of Status, Cancellation of Removal for LPR and non-LPR, waivers, motions, and other applications for relief<br>• All Immigration Matters<br>• Languages: Spanish, Haitian Creole, and other languages arranged | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Miami Immigration Court Juvenile Docket

| Miami, Florida | |
|---|---|
| **Church World Service\*** | **Americans for Immigrant Justice\*** |
| Miami Office:<br>1924 NW 84 Avenue<br>Doral, FL 33126<br>Tel: (305) 774-6770<br>www.cwssoutheast.org | 6355 NW 36 Street, Suite 309<br>Miami, FL 33166<br>Tel: (786) 454-8565<br>clpreferrals@aijustice.org<br>www.aijustice.org |
| Palm Beach Office:<br>200 Congress Park Drive, Suite 201<br>Delray Beach, FL 33445<br>Tel: (651) 266-0624 | • No walk-ins. Must call to make an appointment |
| Broward Office:<br>3215 NW 10th Terr, Suite 209 B<br>Ft. Lauderdale, FL 33309<br>Tel: (954) 689-6466 | |
| • Walk-ins or appointments<br>• Legal Orientation for those in removal proceedings<br>• Asylum, Adjustment of Status, Cancellation of Removal for LPR and non-LPR, waivers, motions, and other applications for relief<br>• All Immigration Matters<br>• Languages: Spanish, Haitian Creole, and other languages arranged | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Orlando Immigration Court

| Orlando, Florida (page 1 of 2) | |
|---|---|
| **Family and Immigration Rights Center (FIRC)\***<br><br>215 E. Fifth Avenue<br>Tallahassee, FL 32303<br><br>P.O. Box 11331<br>Tallahassee, FL 32302<br>Tel: (850) 739-0017<br>info@firclaw.org<br>www.firclaw.org<br><br>• Family and Immigration Rights Center (FIRC) provides no cost representation to unaccompanied children in North Florida, South Georgia, and South Alabama | **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org |
| **Orlando Center for Justice\***<br><br>1300 N. Semoran Boulevard, Suite 120<br>Orlando, FL 32807<br>Tel: (407) 279-1802<br>Fax: (407) 279-1802<br>help@orlandojustice.org<br>www.orlandojustice.org<br><br>• No walk-ins<br>• Call or email to set up an appointment<br>• Unaccompanied children's cases only (under 18 years old at time of referral) | • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| | **Florida Legal Services, Inc.\***<br><br>934 N. Magnolia Avenue, Suite 227<br>Orlando, FL 32803<br>Tel: (855) 573-5225<br>laura.pichardo-cruz@floridalegal.org<br><br>• No walk-ins<br>• Please call to make an appointment |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Orlando Immigration Court

| Orlando, Florida (page 2 of 2) | |
|---|---|
| **Kids In Need of Defense (KIND) - Orlando Field Office***<br><br>121 S. Orange Ave., Suite 1500<br>Orlando, FL 32801<br>Tel: (689) 800-7515<br>infoorlando@supportkind.org<br>www.supportkind.org<br><br>• No walk-ins<br>• Call or email to set up appointment<br>• Unaccompanied children's cases only (under 18 years old at time of referral); SIJS; Asylum; U/T Visas<br>• Languages: Spanish (interpretation for other languages available upon request) | **Catholic Charities of Central Florida***<br><br>1771 North Semoran Boulevard, Suite C<br>Orlando, FL 32807<br>Tel: (407) 658-0110<br>Fax: (407) 601-0738<br>legalservices@cflcc.org<br>www.cflcc.org<br><br>• Representation limited to non-detained persons<br>• We are currently focusing on providing services to persons from Cuba, Haiti, Afghanistan, and Ukraine<br>• Languages: Spanish, Portuguese, Haitian Creole, French |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# GEORGIA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Atlanta Immigration Court

| Atlanta, Georgia | |
|---|---|
| **Family and Immigration Rights Center (FIRC)\*** <br><br> 215 E. Fifth Avenue <br> Tallahassee, FL 32303 <br><br> P.O. Box 11331 <br> Tallahassee, FL 32302 <br><br> Tel: (850) 739-0017 <br> info@firclaw.org <br> www.firclaw.org <br><br> • Family and Immigration Rights Center (FIRC) provides no cost representation to unaccompanied children in North Florida, South Georgia, and South Alabama | **ABA Commission on Immigration Detention Information Hotline\*\*** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **Georgia Asylum and Immigration Network, Inc.\*** <br><br> P.O. Box 56268 <br> Atlanta, GA 30343 <br> Tel: (678) 335-6040 <br> help@georgiaasylum.org <br> www.georgiaasylum.org <br><br> • Please call for an appointment <br> • Affirmative Asylum, Defensive Asylum, VAWA, U-Visa, T-Visa | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Stewart Immigration Court

| Lumpkin, Georgia | |
|---|---|
| **Amica Center for Immigrant Rights***<br><br>(formerly Capital Area Immigrants' Rights (CAIR) Coalition)<br><br>Main Office:<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036<br><br>Baltimore Office:<br>1 North Charles Street, Suite 2305<br>Baltimore, MD 21201<br><br>Tel: (202) 331-3320 (Main Line)<br>Tel: (202) 331-3329 (Detention Line)<br>Fax: (202) 331-3341<br><br>For Help with DETAINED ADULTS:<br>Email: adults@caircoalition.org<br><br>www.amicacenter.org<br><br>• Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia<br>• Languages: Spanish with interpretation available for other languages | **ABA Commission on Immigration Detention Information Hotline***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| | **Immigration Justice Campaign***<br><br>2001 L Street NW, Suite 500 #2026<br>Washington, DC 20036<br>Tel: (202) 946-8271<br>justice@immcouncil.org |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# HAWAII

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Honolulu Immigration Court

| Honolulu, Hawaii |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**The Legal Aid Society of Hawaii\***

245 N. Kukui Street, Suite 206
Honolulu, HI 96817
Tel: (808) 380-5235
contacthijc@legalaidhawaii.org
www.legalaidhawaii.org

- Organization may provide assistance to victims of domestic abuse, victims of human trafficking, victims of serious (U qualifying) crimes, lawful permanent residents, COFA immigrants, asylees, and refugees, those with withholding of removal, and others in accordance with 45 CFR § 1626

**The Legal Clinic\***

1001 Bishop Street, Suite 1120
Honolulu, HI 96813
Tel: (808) 777-7071
www.tlchawaii.org

**Pacific Gateway Center\***

723 C. Umi Street
Honolulu, HI 96819
Tel: (808) 978-4520
ucp@pacificgatewaycenter.org

- Intake hours: 9:00AM-5:00PM Monday-Friday
- No walk-ins
- Please call for an appointment
- Representation limited to juveniles under the age of 18 who have been designated unaccompanied children by the Office of Refugee Resettlement
- Will not represent individuals in detention

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# ILLINOIS

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Chicago Immigration Court

### Chicago, Illinois (page 1 of 2)

**National Immigrant Justice Center***

111 W. Jackson Blvd.
Chicago, IL 60604

110 East Washington Street
Goshen, IN 46528

615 N. Alabama Street, Suite 126
Indianapolis, IN 46204

Tel: (312) 660-1370
nijcild@immigrantjustice.org
www.immigrantjustice.org

- Representation limited to low-income immigrants
- Provides free legal information to unrepresented individuals at court Monday-Wednesday
- Detained adults: call on Tuesdays from 11AM-2PM CT, telephone for detainees: (312) 583-9721, telephone for family members calling about a detainee: (773) 672-6599
- LGBT individuals (detained and non-detained) call on Wednesdays or Fridays from 10AM-12PM CT at: (773) 672-6551
- For free information about the immigration court process, possible legal options, and how to find legal representation, contact the National Immigrant Justice Center's hotline for unrepresented individuals at (312) 660-1328
- Available to assist individuals on the Recent Arrival (RA) docket
- Languages: Spanish and French

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Children's Legal Center***

1100 W. Cermak Road, Suite 422
Chicago, IL 60608
Tel: (312) 722-6642
laura@childrenslegalcenterchicago.org

- Represents detained and non-detained children

**Western Illinois Dreamers***

204 W. Jefferson Street
Macomb, IL 61455
Tel: (217) 391-6860
legal@westernillinoisdreamers.org
www.westernillinoisdremers.org

- No criminal background

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Chicago Immigration Court

| Chicago, Illinois (page 2 of 2) | |
|---|---|
| **Law Office of the Cook County Public Defender\*** <br><br> 69 W. Washington Street, Suite 1600 <br> Chicago, IL 60602 <br> Tel: (312) 603-0636 <br> Fax: (773) 404-3306 <br> pdimmigrationunit@cookcountyil.gov <br> www.cookcountypublicdefender.org <br><br> • Detained: Cook County, IL residents in ICE custody <br> • Non-detained: Prior/current Public Defender clients only <br> • Please contact us on Wednesdays between 9AM and 11AM at (312) 603-0636 <br> • Languages: All staff speak Spanish and have access to an interpreter line | **Migrant & Immigrant Community Action (MICA) Project\*** <br><br> 2650 Cherokee Street <br> St. Louis, MO 63118 <br> Tel: (314) 995-6995 <br> Fax: (314) 735-4359 <br> info@mica-project.org <br> www.mica-project.org <br><br> • Accepts clients from eastern half of MO and Southern IL |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers
http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

## Chicago Immigration Court Juvenile Docket

| Chicago, Illinois |
| --- |
| **Children's Legal Center\***<br><br>1100 W. Cermak Road, Suite 422<br>Chicago, IL 60608<br>Tel: (312) 722-6642<br>laura@childrenslegalcenterchicago.org<br><br><br>• Represents detained and non-detained children |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# INDIANA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Indianapolis Immigration Court

| Indianapolis, Indiana | |
|---|---|
| **National Immigrant Justice Center***<br><br>110 E. Washington Street<br>Goshen, IN 46528<br>Tel: (312) 660-1370<br>nijcild@immigrantjustice.org<br><br>• Detained immigrants may call collect at<br>  (312) 583-9721 or use the pro bono platform and<br>  NIJC's 3-digit code: 565 | **ABA Commission on Immigration Detention Information Hotline***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **Law Office of the Cook County Public Defender***<br><br>69 W. Washington Street, Suite 1600<br>Chicago, IL 60602<br>Tel: (312) 603-0636<br>Fax: (773) 404-3306<br>pdimmigrationunit@cookcountyil.gov<br>www.cookcountypublicdefender.org<br><br>• Cook County, IL residents in ICE custody only | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# LOUISIANA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## LaSalle Immigration Court

### Jena, Louisiana

| ABA Commission on Immigration Detention Information Hotline** | ISLA: Immigration Services and Legal Advocacy* |
|---|---|
| 1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/ | 3801 Canal Street, Suite 210<br>New Orleans, LA 70119<br>Tel: (504) 265-0416<br>admin@islaimmigration.org<br><br>• No walk-ins<br>• Please call for an appointment |
| • Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Advocates for Immigrant Rights***<br><br>815 N. McLean Blvd., Third Floor<br>Memphis, TN 38107<br>Tel: (901) 729-9560<br>Fax: (901) 432-2685<br>advocates@airlegal.org<br>www.airlegal.org<br><br>• For calls from detention, dial: (901) 206-4440 |
| **Immigration Justice Campaign****<br><br>2001 L Street NW, Suite 500 #2026<br>Washington, DC 20036<br>Tel: (202) 946-8271<br>justice@immcouncil.org | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## New Orleans Immigration Court

| New Orleans, Louisiana |
| --- |

**Loyola University New Orleans College of Law,**
Stuart H. Smith Law Clinic*

7214 St. Charles Avenue, Box 902
New Orleans, LA 70118
Tel: (504) 861-5590
Fax: (504) 861-5532
hkusuda@loyno.edu
www.law.loyno.edu/centers/stuart-h-smith-law-clinic

- All matters including asylum, withholding of removal, and relief under UN Convention Against Torture
- Appearance/representation limited to academic semester

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Oakdale Immigration Court

### Oakdale, Louisiana

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**ISLA: Immigration Services and Legal Advocacy\***

3801 Canal Street, Suite 210
New Orleans, LA 70119
Tel: (504) 265-0416
admin@islaimmigration.org

- No walk-ins
- Please call for an appointment

**Advocates for Immigrant Rights\***

P.O. Box 41734
Memphis, TN 38174
Tel: (901) 729-9560
Fax: (901) 432-2685
advocates@airlegal.org

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# MARYLAND

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Baltimore Immigration Court

### Baltimore, Maryland (page 1 of 2)

**Kids In Need of Defense (KIND) - Baltimore Field Office\***

1 South Street, Suite 1100
Baltimore, MD 21202
Tel: (410) 646-8007
Fax: (410) 646-8019
infobaltimore@supportkind.org
www.supportkind.org

- KIND only represents unaccompanied children/ KIND solo representa a niños no acompañados
- No walk-ins; Please call to schedule an appointment
- No se atiende sin cita; Favor de llamar para hacer una cita

**Human Rights First\*\***

825 21st Street NW, PMB 253
Washington, DC 20006
Tel: (202) 370-3313
Dcprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients

- Represents indigents individuals and families seeking asylum
- By appointment only. Please note we do not accept walk-ins
- Languages: Spanish, French, and other languages as needed

**HIAS (Silver Spring)\***

1300 Spring Street, Suite 500
Silver Spring, MD 20910
Tel: (301) 844-7248
www.hias.org

- Must fear return to country of origin
- No walk-ins
- Schedule a consultation by calling (301) 844-7248 on the first Friday of each month
- Languages: Spanish, Farsi/Dari, Pashto, and interpreters available

**Center for Applied Legal Studies, Georgetown Law\***

600 New Jersey Avenue NW
Washington, DC 20001
Tel: (202) 622-9100
Lawcalsclinic@georgetown.edu

- Asylum cases only

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Baltimore Immigration Court

| Baltimore, Maryland (page 2 of 2) | |
|---|---|
| **Amica Center for Immigrant Rights***<br>(formerly Capital Area Immigrants' Rights (CAIR) Coalition)<br><br><u>Main Office:</u><br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036<br>Tel: (202) 331-3320 (Main Line)<br>Tel: (202) 331-3329 (Detention Line)<br>Fax: (202) 331-3341<br>www.amicacenter.org<br><br>To refer someone who is DETAINED:<br>Complete this form: www.amicacenter.org/get-help<br>Spanish: www.amicacenter.org/es/obtenga/ayuda<br><br>• Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia | **Immigration Legal Services, Esperanza Center, Catholic Charities of Baltimore***<br><br>430 S. Broadway<br>Baltimore, MD 21231<br>Tel: (667) 600-2922<br>Fax: (667) 600-4026<br>ilsinfo@cc-md.org<br>www.cc-md.org/esperanza<br><br>• Pro bono services for victims of crime and most unaccompanied minors<br>• Family and humanitarian-based immigration legal services for nominal fee, with fee waiver available<br>• Pro bono case placement and mentorship |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Baltimore Immigration Court Juvenile Docket

| Baltimore, Maryland | |
|---|---|
| **Kids In Need of Defense (KIND) - Baltimore Field Office\***<br><br>1 South Street, Suite 1100<br>Baltimore, MD 21202<br>Tel: (410) 646-8007<br>Fax: (410) 646-8019<br>infobaltimore@supportkind.org<br>www.supportkind.org<br><br>• KIND only represents unaccompanied children/ KIND solo representa a niños no acompañados<br>• No walk-ins; Please call to schedule an appointment<br>• No se atiende sin cita; Favor de llamar para hacer una cita | **Amica Center for Immigrant Rights\***<br>(formerly Capital Area Immigrants' Rights (CAIR) Coalition)<br><br>Main Office:<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036<br>Tel: (202) 331-3320 (Main Line)<br>Tel: (202) 331-3329 (Detention Line)<br>Fax: (202) 331-3341<br>www.amicacenter.org<br><br>To refer someone who is DETAINED:<br>Complete this form: www.amicacenter.org/get-help<br>Spanish: www.amicacenter.org/es/obtenga/ayuda<br><br>• Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia |
| **Immigration Legal Services, Esperanza Center, Catholic Charities of Baltimore\***<br><br>430 S. Broadway<br>Baltimore, MD 21231<br>Tel: (667) 600-2922<br>Fax: (667) 600-4026<br>ilsinfo@cc-md.org<br>www.cc-md.org/esperanza<br><br>• Pro bono services for victims of crime and most unaccompanied minors<br>• Family and humanitarian-based immigration legal services for nominal fee, with fee waiver available<br>• Pro bono case placement and mentorship | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Hyattsville Immigration Court

### Hyattsville, Maryland (page 1 of 2)

**Amica Center for Immigrant Rights***

(formerly Capital Area Immigrants' Rights (CAIR) Coalition)

Main Office:
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036

Baltimore Office:
1 North Charles Street, Suite 2305
Baltimore, MD 21201

Tel: (202) 331-3320 (Main Line)
Tel: (202) 331-3329 (Detention Line)
Fax: (202) 331-3341

For Help with DETAINED ADULTS:
Email: adults@caircoalition.org

For Help with DETAINED CHILDREN:
Email: children@caircoalition.org

www.amicacenter.org

- Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia
- Languages: Spanish with interpretation available for other languages

**Kids In Need of Defense (KIND) - Baltimore Field Office***

1 South Street, Suite 1100
Baltimore, MD 21202
Tel: (410) 646-8007
Fax: (410) 646-8019
infobaltimore@supportkind.org
www.supportkind.org

- KIND only represents unaccompanied children/ KIND solo representa a niños no acompañados
- No walk-ins; Please call to schedule an appointment
- No se atiende sin cita; Favor de llamar para hacer una cita

**Human Rights First***

825 21st Street NW, PMB 253
Washington, DC 20006
Tel: (202) 370-3313
Dcprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients

- Represents indigents individuals and families seeking asylum
- By appointment only. Please note we do not accept walk-ins
- Languages: Spanish, French, and other languages as needed

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Hyattsville Immigration Court

| Hyattsville, Maryland (page 2 of 2) | |
|---|---|
| **Kids In Need of Defense (KIND)\***<br><br>Washington, DC Office:<br>1411 K Street, Suite 200<br>Washington, DC 20005<br>Tel: (202) 670-3585<br>Fax: (202) 640-2609<br>infodc@supportkind.org<br>www.supportkind.org<br><br>• KIND only represents minors and unaccompanied children/KIND ayuda a menores de edad y niño/as no- acompañados<br>• KIND's Washington, DC office provides legal services to children living in Washington, DC | **HIAS (Silver Spring)\***<br><br>1300 Spring Street, Suite 500<br>Silver Spring, MD 20190<br>Tel: (301) 844-7248<br>www.hias.org<br><br>• Must fear return to country of origin<br>• No walk-ins. Contact legal intake line at (301) 844-7248 on the first Friday of each month between 9AM and 3PM<br>• Languages: Interpreters available |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# MASSACHUSETTS

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Boston Immigration Court

| Boston, Massachusetts (page 1 of 2) | |
|---|---|
| **Political Asylum/Immigration Representation Project (PAIR)\*** <br><br> 98 North Washington Street, Suite 106 <br> Boston, MA 02114 <br> Tel: (617) 742-9296 <br> Fax: (617) 742-9385 <br> info@pairproject.org <br> www.pairproject.org <br><br> • Clients must meet income eligibility guidelines <br> • Asylum applicants, unaccompanied minors, U/T Visa, and detained asylum seekers on a limited basis <br> • Phone intake for detainees, asylum seekers, and families from 1PM-3PM, Monday-Thursday <br> • Detained individuals can email PAIR at detention@pairproject.org <br> • Legal presentation and intake conducted at local correctional facilities with ICE units from the Plymouth County Correctional Facility, MA and Donald W. Wyatt Detention Facility, RI | **Kids In Need of Defense (KIND) - Boston Field Office\*** <br><br> Boston Field Office: <br> 11 Beacon Street, Suite 820 <br> Boston, MA 02108 <br> Tel: (617) 207-4138 <br> Fax: (617) 336-7438 <br> infoboston@supportkind.org <br> www.supportkind.org <br><br> • KIND only represents unaccompanied children <br> • KIND solo representa a ninos y ninas no-acompanados/as <br> • No walk-ins, please call to schedule an appointment <br> • No se atiende sin cita; favor de llamar para hacer una cita |
| **De Novo Center for Justice and Healing\*** <br><br> 47 Thorndike Street, SB-LL-1 <br> Cambridge, MA 02141 <br> Tel: (617) 661-1010 <br> Fax: (617) 661-1011 <br> jfroio@denovo.org <br> www.denovo.org | **Mabel Center for Immigrant Justice\*** <br><br> 200 Portland Street 5th Floor <br> Boston, MA 02114 <br> Tel: (617) 417-4325 <br> www.mabelcenter.org <br><br> • Language: Spanish; Se habla español <br> • Non-detained & Defensive Asylum cases only <br> • Call (617) 417-4325 for an intake |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Boston Immigration Court

| Boston, Massachusetts (page 2 of 2) |
|---|

| ABA Commission on Immigration Detention Information Hotline** | IFSI - USA (Immigrant Family Services Institute, Inc.)* |
|---|---|
| 1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | 1626 Blue Hill Avenue<br>Mattapan, MA 02126<br>Tel: (617) 322-1348<br>info@ifsi-usa.org<br><br>• Pro se asylum applications<br>• Languages: Haitian Creole, French, English, and Spanish |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Boston Immigration Court Juvenile Docket

| Boston, Massachusetts | |
|---|---|
| **Kids In Need of Defense (KIND) - Boston Field Office***<br><br>Boston Field Office:<br>11 Beacon Street, Suite 820<br>Boston, MA 02108<br>Tel: (617) 207-4138<br>Fax: (617) 336-7438<br>infoboston@supportkind.org<br>www.supportkind.org<br><br>• KIND only represents unaccompanied children<br>• KIND solo representa a ninos y ninas no-acompanados/as<br>• No walk-ins, please call to schedule an appointment<br>• No se atiende sin cita; favor de llamar para hacer una cita | **De Novo Center for Justice and Healing***<br><br>47 Thorndike Street, SB-LL-1<br>Cambridge, MA 02141<br>Tel: (617) 661-1010<br>Fax: (617) 661-1011<br>jfroio@denovo.org<br>www.denovo.org |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Chelmsford Immigration Court

### Chelmsford, Massachusetts (page 1 of 2)

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Immigrant Legal Advocacy Project (ILAP)\***

489 Congress Street, 3rd Floor
Portland, ME 04101
Tel: (207) 780-1593
Fax: (207) 699-2313
info@ilapmaine.org
www.ilapmaine.org

- Representation in asylum, U/T, SIJ, VAWA
- Representation in removal proceedings
- Pro se immigration forms assistance and consultations
- Representation limited to residents of Maine

**Political Asylum/Immigration Representation Project (PAIR)\***

98 North Washington Street, Suite 106
Boston, MA 02114
Tel: (617) 742-9296
Fax: (617) 742-9385
info@pairproject.org
www.pairproject.org

- Clients must meet income eligibility guidelines
- Asylum applicants, unaccompanied minors, U/T Visa, and detained asylum seekers on a limited basis
- Phone intake for detainees and families from 1PM-3PM, Monday-Thursday
- Know your rights presentations conducted at local correctional facilities with ICE units from the Plymouth County Correctional Facility, MA and Donald W. Wyatt Detention Facility, RI

**Central West Justice Center - An affiliate of Community Legal Aid\***

370 Main Street, Suite 200
Worcester, MA 01608
Tel: (855) 252-5342
www.communitylegal.org

- Serves low-income residents of Central & Western Massachusetts

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Chelmsford Immigration Court

| Chelmsford, Massachusetts (page 2 of 2) |
| --- |

### Kids In Need of Defense (KIND) - Boston Field Office\*

Boston Field Office:
11 Beacon Street, Suite 820
Boston, MA 02108
Tel: (617) 207-4138
Fax: (617) 336-7438
infoboston@supportkind.org

Providence Field Office:
225 Dyer Street, 2nd Floor
Providence, RI 02903
Tel: (401) 259-0353
infoprovidence@supportkind.org

- KIND only represents unaccompanied children
- KIND solo representa a ninos y ninas no-acompanados/as
- No walk-ins, please call to schedule an appointment
- No se atiende sin cita; favor de llamar para hacer una cita

### IFSI - USA (Immigrant Family Services Institute, Inc.)\*

1626 Blue Hill Avenue
Mattapan, MA 02126
Tel: (617) 322-1348
info@ifsi-usa.org

- Pro se asylum applications
- Languages: Haitian Creole, French, English, and Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# MICHIGAN

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Detroit Immigration Court

| Detroit, Michigan |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Michigan Immigrant Rights Center\***

7700 Second Avenue, Suite 603
Detroit, MI 48202
Tel: (734) 239-6863
Fax: (734) 998-9125
www.michiganimmigrant.org/

- No walk-in intake available
- Please call for an appointment
- Instructions for detained callers on MIRC website and posted in jails
- Intake hours: 9AM-5PM (Monday - Thursday)
- Detainees call (734) 794-9963 9AM-5PM (Monday - Friday)

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# MINNESOTA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Fort Snelling Immigration Court

| Fort Snelling, Minnesota |
|---|

**South Dakota Voices for Peace***

P.O. Box 600
Sioux Falls, SD 57101
Tel: (605) 782-9560
Fax: (612) 341-2971
info@southdakotavoicesforpeace.org
www.sdvfpeace.org

• Will assist UAC and victims of crimes
• Will not represent individuals in detention
• No criminal cases
• Intake hours Monday-Friday, 9AM-5PM
• Primary residence must be located in South Dakota
• Languages: Spanish, interpreters for other languages available upon request

**The Advocates for Human Rights***

330 Second Avenue South, Suite 800
Minneapolis, MN 55401
Tel: (612) 341-3302
hrights@advrights.org
www.theadvocatesforhumanrights.org

• No walk-ins
• Intake hours: Tuesday 10AM-12PM and Thursday 12PM-2PM by phone (612) 341-9845 or online at www.theadvocatesforhumanrights.org
• Asylum, Survivors of Trafficking, Unaccompanied Minors, Detention
• Limited to residents of MN, ND, and SD

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

• Pro se case assistance for detained respondents only
• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Immigrant Law Center of Minnesota***

450 North Syndicate, Suite 200
St. Paul, MN 55104
Tel: (651) 641-1011
Fax: (651) 641-1131
oficinalegal@ilcm.org
www.ilcm.org

• Represent low-income immigrants of any nationality detained or residing in MN
• ICE detainees can check website or call (651) 641-1011 for detention line schedule
• Limited capacity
• Languages: Spanish and Karen

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Fort Snelling Immigration Court Juvenile Docket

| Fort Snelling, Minnesota |
|---|

**South Dakota Voices for Peace***

P.O. Box 600
Sioux Falls, SD 57101
Tel: (605) 782-9560
Fax: (612) 341-2971
info@southdakotavoicesforpeace.org
www.sdvfpeace.org

- Will assist UAC and victims of crimes
- Will not represent individuals in detention
- No criminal cases
- Intake hours Monday-Friday, 9AM-5PM
- Primary residence must be located in South Dakota
- Languages: Spanish, interpreters for other languages available upon request

**Immigrant Law Center of Minnesota***

450 North Syndicate, Suite 200
St. Paul, MN 55104
Tel: (651) 641-1011
Fax: (651) 641-1131
oficinalegal@ilcm.org
www.ilcm.org

- Represent low-income immigrants of any nationality detained or residing in MN
- ICE detainees can check website or call (651) 641-1011 for detention line schedule
- Limited capacity
- Languages: Spanish and Karen

**The Advocates for Human Rights***

330 Second Avenue South, Suite 800
Minneapolis, MN 55401
Tel: (612) 341-9845
www.theadvocatesforhumanrights.org

- No walk-ins
- Intake hours: Tuesday 10AM-12PM and Thursday 12PM-2PM by phone (612) 341-9845 or online at www.theadvocatesforhumanrights.org
- Asylum, Survivors of Trafficking, Unaccompanied Minors, Detention
- Limited to residents of MN, ND, and SD

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# MISSOURI

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Kansas City Immigration Court

### Kansas City, Missouri

**St. Francis Community Services / Catholic Legal Assistance Ministry (SFCS/CLAM)***

100 N. Tucker Blvd., Suite 726
Saint Louis, MO  63101-1915
Tel: (314) 977-2775
Fax: (314) 977-3334
sfcsstl.org

• Limited to low-income individuals living in counties of the Archdiocese of Saint Louis
• Languages: Spanish and Arabic

**Migrant & Immigrant Community Action (MICA) Project***

2650 Cherokee Street
Saint Louis, MO 63118
Tel: (314) 995-6995
Fax: (314) 735-4359
info@mica-project.org
www.mica-project.org

• Accepts clients from eastern half of MO and Southern IL

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

• Pro se case assistance for detained respondents only
• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers
http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

## Kansas City Immigration Court Juvenile Docket

| Kansas City, Missouri |
| --- |
| **St. Francis Community Services / Catholic Legal Assistance Ministry (SFCS/CLAM)\***<br><br>100 N. Tucker Blvd., Suite 726<br>Saint Louis, MO  63101-1915<br>Tel: (314) 977-2775<br>Fax: (314) 977-3334<br>sfcsstl.org<br><br>• Limited to low-income individuals living in counties of the Archdiocese of Saint Louis<br>• Languages: Spanish and Arabic |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# NEBRASKA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Omaha Immigration Court

### Omaha, Nebraska

| ABA Commission on Immigration Detention Information Hotline** | Nebraska Immigration Legal Assistance Hotline** |
|---|---|
| 1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | 4223 Center Street<br>Omaha, NE 68105<br>Tel: 1 (855) 307-6730<br>www.ciraconnect.org/contact-us/<br><br>• NILAH is a centralized hotline for low-income individuals seeking immigration legal assistance<br>• NILAH access specialists are bilingual in English and Spanish and they have access to the Language Line to communicate with callers who speak other languages<br>• NILAH screens callers who may need representation in removal proceedings, humanitarian or family-based immigration applications<br>• Languages: Spanish and English, and 240+ languages through the Language Line |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Omaha Immigration Court Juvenile Docket

| Omaha, Nebraska |
|---|
| **Nebraska Immigration Legal Assistance Hotline\*\***<br><br>4223 Center Street<br>Omaha, NE 68105<br>Tel: 1 (855) 307-6730<br>www.ciraconnect.org/contact-us/<br><br>• NILAH is a centralized hotline for low-income individuals seeking immigration legal assistance<br>• NILAH access specialists are bilingual in English and Spanish and they have access to the Language Line to communicate with callers who speak other languages<br>• NILAH screens callers who may need representation in removal proceedings, humanitarian or family-based immigration applications<br>• Languages: Spanish and English, and 240+ languages through the Language Line | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# NEVADA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Las Vegas Immigration Court

| Las Vegas, Nevada | |
|---|---|
| **UNLV Immigration Clinic***<br><br>Physical Address:<br>1212 Casino Center Blvd.<br>Las Vegas, Nevada 89104<br><br>Mailing Address:<br>P.O. Box 71075<br>Las Vegas, NV 89170-1075<br><br>Tel: (702) 895-3000<br>immigrationclinic@unlv.nevada.edu<br>www.law.unlv.edu/clinics/immigration<br><br>• Unaccompanied children<br>• People in immigration (ICE) detention<br>• Members of the University of Las Vegas Community | **ABA Commission on Immigration Detention Information Hotline****<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **Catholic Charities of Southern Nevada, Immigration Services***<br><br>1511 Las Vegas Blvd. North<br>Las Vegas, NV 89101<br>Tel:  (702) 383-8387<br>Fax: (702) 436-1579<br>immigration@catholiccharities.com<br>www.catholiccharities.com<br><br>• Will represent respondents in asylum proceedings | **Legal Aid Center of Southern Nevada***<br><br>725 E. Charleston Blvd.<br>Las Vegas, NV 89104<br>Tel: (702) 386-1070 ext. 1443<br>info@lacsn.org<br>www.lacsn.org<br><br>• Specializes in children's cases |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# NEW JERSEY

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Elizabeth Immigration Court

### Elizabeth, New Jersey (page 1 of 2)

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Legal Services of New Jersey\***

100 Metroplex Drive, Suite 101
Edison, NJ 08817
Tel: (732) 572-9100 ext. 8782
Fax: (732) 777-7070
www.lsnj.org or lsnjlawhotline.org

- Criminal law specialty (42A, 212(c), 212(h), challenging charges, etc.)
- Initial intake by phone or in person at detention center only
- No walk-ins
- Interpreters available
- Advice and relevant pro se assistance provided, at a minimum
- Habeas matters

**Human Rights First\*\***

121 W 36th Street, PMB 520
New York, NY 10018
Tel: (917) 320-9601
Nyprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients

- Represents indigent individuals and families seeking asylum
- Please note we do not accept walk-ins
- Languages: Spanish, French, Arabic, and others as needed

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Elizabeth Immigration Court

| Elizabeth, New Jersey (page 2 of 2) |
|---|

**Amica Center for Immigrant Rights\***

(formerly Capital Area Immigrants' Rights (CAIR) Coalition)

Main Office:

1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036

Baltimore Office:

1 North Charles Street, Suite 2305
Baltimore, MD 21201

Tel: (202) 331-3320 (Main Line)
Tel: (202) 331-3329 (Detention Line)
Fax: (202) 331-3341

For Help with DETAINED ADULTS:
Email: adults@caircoalition.org

www.amicacenter.org

- Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia
- Languages: Spanish with interpretation available for other languages

**American Friends Service Committee New Jersey Immigrant Rights Program\***

570 Broad Street, Suite 1001
Newark, NJ 07102
Tel: (973) 474-9861  (detained cases)
Tel: (973) 643-1924  (non-detained cases)
Fax: (973) 643-8924
www.afsc.org/programs/new-jersey-immigrant-rights

- Non-detained NJ removal cases
- No walk-ins please/Por favor no venga a la oficina en persona sin cita
- Languages: English, Spanish, French

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Elizabeth Immigration Court Juvenile Docket

| Elizabeth, New Jersey |
|---|

**American Friends Service Committee New Jersey Immigrant Rights Program***

570 Broad Street, Suite 1001
Newark, NJ 07102
Tel: (973) 474-9861  (detained cases)
Tel: (973) 643-1924  (non-detained cases)
Fax: (973) 643-8924
www.afsc.org/programs/new-jersey-immigrant-rights

- Non-detained NJ removal cases
- No walk-ins please/Por favor no venga a la oficina en persona sin cita
- Languages: English, Spanish, French

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Newark Immigration Court

| Newark, New Jersey (page 1 of 3) | |
|---|---|
| **Legal Services of New Jersey***<br><br>100 Metroplex Drive, Suite 101<br>Edison, NJ 08817<br>Tel: (732) 572-9100 ext. 8782<br>Fax: (732) 777-7070<br>www.lsnj.org or lsnjlawhotline.org<br><br>• Criminal law specialty (42A, 212(c), 212(h), challenging charges, etc.)<br>• Initial intake by phone or in person at detention center only<br>• No walk-ins<br>• Interpreters available<br>• Advice and relevant pro se assistance provided, at a minimum<br>• Habeas matters | **Human Rights First***<br><br>121 W 36th Street, PMB 520<br>New York, NY 10018<br>Tel: (917) 320-9601<br>Nyprobono@humanrightsfirst.org<br>www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients<br><br>• Represents indigent individuals and families seeking asylum<br>• No walk-ins accepted<br>• Languages: Spanish, French, Arabic, and others as needed |
| **American Military Families Immigration Services, Inc. (AMFIS)***<br><br>1177 Clinton Avenue, Suite 100<br>Irvington, NJ 07111<br>Tel: (973) 264-1111<br>Fax: (973) 264-1183<br>amfisinfo@gmail.com<br><br>• American Military Families Immigration Services, Inc. (AMFIS) is available to provide free legal services for individuals scheduled for Credible Fear Interviews and/or Asylum Merits Interviews | **Catholic Charities of the Archdiocese of Newark***<br><br>976 Broad Street<br>Newark, NJ 07102<br>Tel: (973) 733-3516<br>Fax: (973) 733-9631<br>immigration@ccannj.org<br>www.ccannj.org<br><br>• **Families** on dedicated dockets may contact Catholic Charities of Newark at (973) 733-3516 for **free information** about the immigration court process, possible legal options, and how to find legal representation.<br>• Languages: Spanish, French, Haitian Creole, and Portuguese |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Newark Immigration Court

### Newark, New Jersey (page 2 of 3)

**New Jersey Consortium for Immigrant Children***

Tel: (201) 305-9217

legal@njcic.org

www.njcic.org

- Services are limited to children under age 21
- We strongly encourage referrals using our web form at www.njcic.org. If unable to use the web form, you may contact us by phone on Mondays 1PM-4:30PM, Wednesdays 1PM-4:30PM, and Fridays 9:30AM-1PM
- No walk-ins
- Languages: Spanish, Portuguese, telephonic interpretation for other languages
- Los servicios estan limitados a ninos menores de 21 anos
- Recomendamos que usen nuestro formulario en linea para enviar un referido. Si no pueden enviar un refirado en linea, se pueden comunicar con nostros por telefono los lunes 1PM-4:30PM, miercoles 1PM-4:30PM, y viernes 9:30AM-1PM
- No se aceptan visitas sin cita previa
- Idiomas: Espanol y Portugues, interpretacion telefonica para otros idiomas

**American Friends Service Committee New Jersey Immigrant Rights Program***

89 Market Street, 6th floor

Newark, NJ 07102

Tel: (973) 474-9861  (detained cases)

Tel: (973) 643-1924  (non-detained cases)

Fax: (973) 643-8924

www.afsc.org/programs/new-jersey-immigrant-rights

- Non-detained NJ removal cases
- No walk-ins please/Por favor no venga a la oficina en persona sin cita
- Languages: English, Spanish, French

**Dream Alive Foundation of NJ***

101 Rte. 130 S, Suite 106 Adams Building

Cinnaminson, NJ 08077

Tel: (856) 314-8435

dreamalivefoundationofnj@gmail.com

- Will not represent individuals in detention
- Will not represent individuals with criminal cases
- No walk-ins, please call for an appointment

**Camden Center for Law and Social Justice***

126 N. Broadway

Camden, NJ 08102

Tel: (856) 583-2950

Fax: (856) 583-2955

info@cclsj.org

www.cclsj.org

- Spanish Speaking staff
- Please call to schedule an appointment as we can only meet with clients who have an appointment scheduled

**Kids In Need of Defense (KIND) - Newark***

50 Park Place, Suite 1401

Newark, NJ 07102

Tel: (862) 304-5680

infonewark@supportkind.org

www.supportkind.org

- KIND provides free legal services to unaccompanied children who live in the state of New Jersey
- Services by appointment only
- Languages: English and Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Newark Immigration Court

| Newark, New Jersey (page 3 of 3) | |
|---|---|
| **Casa de Esperanza\***<br><br>213 West Union Avenue<br>Bound Brook, NJ 08805<br>Tel: (732) 748-1111<br>frontdesk1@casaesperanzanj.com<br>www.casaesperanzanj.org<br><br>• Please call for an appointment<br>• Representation limited to residents of New Jersey<br>• Will not represent persons with criminal cases nor those in detention<br>• Specialize in: Removal Proceedings, Special Immigrant Juvenile Status, TPS, DACA, Family, Naturalization<br>• Languages: English, Spanish, and ASL/Signed English | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Newark Immigration Court Juvenile Docket

| Newark, New Jersey (page 1 of 2) | |
|---|---|
| **Catholic Charities of the Archdiocese of Newark***<br><br>976 Broad Street<br>Newark, NJ 07102<br>Tel: (973) 733-3516<br>Fax: (973) 733-9631<br>immigration@ccannj.org<br>www.ccannj.org<br><br>• **Families** on dedicated dockets may contact Catholic Charities of Newark at (973) 733-3516 for **free information** about the immigration court process, possible legal options, and how to find legal representation.<br>• Languages: Spanish, French, Haitian Creole, and Portuguese | **American Friends Service Committee New Jersey Immigrant Rights Program***<br><br>89 Market Street, 6th floor<br>Newark, NJ 07102<br>Tel: (973) 474-9861  (detained cases)<br>Tel: (973) 643-1924  (non-detained cases)<br>Fax: (973) 643-8924<br>www.afsc.org/programs/new-jersey-immigrant-rights<br><br>• Non-detained NJ removal cases<br>• No walk-ins please/Por favor no venga a la oficina en persona sin cita<br>• Languages: English, Spanish, French |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Newark Immigration Court Juvenile Docket

| Newark, New Jersey (page 2 of 2) | |
|---|---|
| **New Jersey Consortium for Immigrant Children\*** <br><br> Tel: (201) 305-9217 <br> legal@njcic.org <br> www.njcic.org <br><br> • Services are limited to children under age 21 <br> • We strongly encourage referrals using our web form at www.njcic.org. If unable to use the web form, you may contact us by phone on Mondays 1PM-4:30PM, Wednesdays 1PM-4:30PM, and Fridays 9:30AM-1PM <br> • No walk-ins <br> • Languages: Spanish, Portuguese, telephonic interpretation for other languages <br> • Los servicios estan limitados a ninos menores de 21 anos <br> • Recomendamos que usen nuestro formulario en linea para enviar un referido. Si no pueden enviar un refirado en linea, se pueden comunicar con nostros por telefono los lunes 1PM-4:30PM, miercoles 1PM-4:30PM, y viernes 9:30AM-1PM <br> • No se aceptan visitas sin cita previa <br> • Idiomas: Espanol y Portugues, interpretacion telefonica para otros idiomas | **Camden Center for Law and Social Justice\*** <br><br> 126 N. Broadway <br> Camden, NJ 08102 <br> Tel: (856) 583-2950 <br> Fax: (856) 583-2955 <br> info@cclsj.org <br> www.cclsj.org <br><br> • Spanish Speaking staff <br> • Please call to schedule an appointment as we can only meet with clients who have an appointment scheduled |
| | **Kids In Need of Defense (KIND) - Newark\*** <br><br> 50 Park Place, Suite 1401 <br> Newark, NJ 07102 <br> Tel: (862) 304-5680 <br> infonewark@supportkind.org <br> www.supportkind.org <br><br> • KIND provides free legal services to unaccompanied children who live in the state of New Jersey <br> • Services by appointment only <br> • Languages: English and Spanish |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# NEW MEXICO

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Otero Immigration Court

| Otero, New Mexico | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/<br>immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **New Mexico Immigrant Law Center\***<br><br>625 Silver Avenue SW, Suite 410<br>Albuquerque, NM 87102<br>Tel: (505) 247-1023<br>Fax: (505) 633-8056<br>info@nmilc.org<br>www.nmilc.org |
| | **Las Americas Immigrant Advocacy Center\***<br><br>1500 E. Yandell Drive<br>El Paso, TX 79902<br>Tel: (915) 544-5126<br>Fax: (915) 544-4041<br>administrator@las-americas.org<br>www.las-americas.org<br><br>• Asylum, Withholding of Removal, Convention Against Torture |
| **Estrella del Paso\***<br><br>2400 E. Yandell Dr.<br>El Paso, TX 79903-3617<br>Tel: (915) 532-3975<br>Fax: (915) 532-4071<br>info@estrella.org<br>www.estrelladelpaso.org | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# NEW YORK

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Buffalo & Batavia Immigration Courts

| Buffalo & Batavia, New York | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\*** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Prisoners' Legal Services of New York, Immigration Unit\*** <br><br> 41 State Street, Suite M112 <br> Albany, NY 12207 <br> Tel: (518) 694-8699 <br> Fax: (518) 694-4281 <br><br> 14 Lafayette Square, Suite 510 <br> Buffalo, NY 14203 <br> Tel: (716) 844-8266 <br> Fax: (716) 854-1008 <br><br> www.plsny.org <br><br> • Represents detained and non-detained individuals <br> • Minors and unaccompanied children residing in Upstate New York <br> • Handles all types of immigration cases <br> • Multilingual staff <br> • Criminal immigration expertise |
| **Erie County Bar Association Volunteer Lawyers Project, Inc.\*** <br><br> Buffalo Office: <br> 438 Main Street, Suite 7 <br> Buffalo, NY 14202 <br> Tel: (716) 847-0662 ext. 301 (non-detained & women) <br><br> Batavia Office: <br> 45 Ellicott Street, Suite 1 <br> Batavia, NY 14020 <br> Tel: (716) 847-0752 (men detained at BFDF) <br><br> • Representation is limited to those that fall within our funding guidelines <br> • Representation of detention cases is limited to Buffalo Federal Detention Facility in Batavia, NY | **The Legal Aid Society of Rochester, NY\*** <br><br> One West Main Street <br> Rochester, NY 14614 <br> Tel: (585) 232-4090 <br> Fax: (585) 232-2352 <br> www.lasroc.org <br><br> • Assist in various immigration matters including affirmative and defensive asylum, VAWA, SIJS, Naturalization, Citizenship, Green Card renewal, and Removal Defense |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## New York Immigration Courts

| New York, New York (page 1 of 2) |
|---|

**Human Rights First\*\***

121 W 36th Street, PMB 520
New York, NY 10018
Tel: (917) 320-9601
Nyprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients

- Represents indigent individuals and families seeking asylum
- Please note we do no accept walk-ins
- Languages: Spanish, French, Arabic, and others as needed

**Central American Legal Assistance (CALA)\***

240 Hooper Street
Brooklyn, NY 11211
Tel: (718) 486-6800
cala@igc.org
www.centralamericanlegal.info

- Call for appointment
- No walk-ins
- Removal defense for Central and South American asylum cases

**The Door\***

121 Avenue of the Americas
New York, NY 10013
Tel: (212) 941-9090 ext. 3280
legalhelp@door.org
www.door.org

- Services limited to individuals between the ages of 12-24 years old

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**La Victoria Foundation\***

3753 90th Street, Suite 13B
Jackson Heights, NY 11372
Tel: (347) 985-4079
recepcion@lavictoriafoundation.org
www.lavictoriafoundation.org

- Languages: Bilingual, staff speaks Spanish

**Council of Peoples Organization (COPO)\***

1077 Coney Island Avenue
Brooklyn, NY 11230
Tel: (718) 434-3266
Fax: (718) 859-2266
info@copo.org

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## New York Immigration Courts

| New York, New York (page 2 of 2) |
|---|

**Safe Horizon\***

2 Lafayette Street, 3rd Floor
Brooklyn, NY 10007
Tel: (212) 577-7700
www.safehorizon.org

- No walk-ins. By appointment only
- Representation limited to residents of New York City (the 5 boroughs)
- Represent survivors of violence, abuse, and exploitation
- Non-detained cases only
- Staff is bilingual Spanish/English with access to interpreter services for all other languages.

**Sisters of St. Joseph - Long Island Immigration Clinic\***

164 3rd Avenue
Brentwood, NY 11717
Tel: (631) 966-4148
info@liimmigrationclinic.org
www.brentwoodcsj.org/liimmigrationclinic

- EOIR defensive removal representation (detained and non-detained), asylum/withholding/CAT, and all necessary motion practice
- We also handle SIJ matters, I-360/I-485, and related family-based petitions
- Languages: Spanish and Haitian Creole

**HIAS (New York)\***

1359 Broadway, Suite 810
New York, NY 10018
Tel: (212) 613-1341
www.hias.org

- Must fear return to country of origin
- Contact Legal Intake Line: (212) 613-1341 first Friday of the month only
- Languages: Spanish and Russian, other languages via interpretation Services

**Catholic Migration Services\***

Queens Office:
47-01 Queens Blvd., Suite 203
Sunnyside, NY 11104
Tel: (347) 472-3500
Fax: (347) 472-3501
www.catholicmigration.org

Brooklyn Office:
191 Joralemon Street
Brooklyn, NY 11201
Tel: (718) 236-3000
Fax: (718) 256-9707
www.catholicmigration.org

- By appointment only, please call to schedule
- Non-detained cases only

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## New York Immigration Courts Juvenile Docket

| New York, New York (page 1 of 2) | |
|---|---|
| **Kids In Need of Defense (KIND) - New York***<br><br>New York Office:<br>252 West 37th Street, Suite 1500<br>New York, NY 10018<br>Tel: (646) 970-2915<br>infonewyork@supportkind.org<br>www.supportkind.org<br><br>• KIND provides free legal services to unaccompanied children who live in the New York City area<br>• Specific counties served: Bronx, Kings, Queens, Richmond (Staten Island), New York (Manhattan), Nassau, Suffolk, Westchester<br>• Services are by appointment only<br>• Languages: English, Spanish, French. Telephonic interpretation available in all other languages | **The Legal Aid Society***<br><br>49 Thomas Street, 5th Floor<br>New York, NY 10013<br>Tel: (212) 577-3300<br>www.legalaidnyc.org<br><br>• Represents those with criminal convictions and all forms of immigration relief<br>• Only accepting referrals for detained adults and those under 18 years old and in removal proceedings |
| **Council of Peoples Organization (COPO)***<br><br>1077 Coney Island Avenue<br>Brooklyn, NY 11230<br>Tel: (718) 434-3266<br>Fax: (718) 859-2266<br>info@copo.org | **The Door***<br><br>121 Avenue of the Americas<br>New York, NY 10013<br>Tel: (212) 941-9090 ext. 3280<br>legalhelp@door.org<br>www.door.org<br><br>• Services limited to individuals between the ages of 12-24 years old |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## New York Immigration Courts Juvenile Docket

| New York, New York (page 2 of 2) | |
|---|---|
| **Sisters of St. Joseph - Long Island Immigration Clinic***<br><br>164 3rd Avenue<br>Brentwood, NY 11717<br>Tel: (631) 966-4148<br>info@liimmigrationclinic.org<br>www.brentwoodcsj.org/liimmigrationclinic<br><br>• EOIR defensive removal representation (detained and non-detained), asylum/withholding/CAT, and all necessary motion practice<br>• We also handle SIJ matters, I-360/I-485, and related family-based petitions<br>• Languages: Spanish and Haitian Creole | **Immigrant Children Advocates' Relief Effort (ICARE)***<br><br>legalhelp@icarecoalition.org<br>www.icarecoalition.org/getlegalhelp<br><br>• ICARE connects young immigrants facing deportation in NYC with free lawyers<br>• Complete the form on our website if you meet the following: you entered the US as an unaccompanied minor, currently reside in NYC, and are in deportation proceedings or were in an ORR shelter<br>• Non-detained cases only<br>• Languages: interpretation available in all languages |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Ulster Immigration Court

### Napanoch, New York

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Prisoners' Legal Services of New York, Immigration Unit***

41 State Street, Suite M112
Albany, NY 12207
Tel: (518) 694-8699
Fax: (518) 694-4281
www.plsny.org

- Handles all types of immigration cases
- Multilingual staff
- Criminal immigration expertise

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# NORTH CAROLINA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Charlotte Immigration Court

| Charlotte, North Carolina | |
|---|---|
| **North Carolina Justice Center***<br><br>P.O. Box 28068<br>Raleigh, NC 27611<br>Tel: (919) 856-2570<br>Fax: (919) 856-2175<br>contact@ncjustice.org / ncjc-irrp@ncjustice.org<br>www.ncjustice.org/<br><br>• Will not represent individuals in detention<br>• Representation limited to residents of North Carolina<br>• Limited capacity for representation<br>• Languages: English and Spanish | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# OHIO

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Cleveland Immigration Court

| Cleveland, Ohio (page 1 of 2) | |
|---|---|
| **Cleveland Catholic Charities - Immigration Legal Services\***<br><br>7800 Detroit Avenue<br>Cleveland, OH 44102<br>Tel: (330) 939-3769<br>immigration@ccdocle.org<br>www.ccdocle.org/programs/immigration-legal-services<br><br>• Must live in one of the following counties: Ashland, Ashtabula, Columbiana, Cuyahoga, Geauga, Lake, Lorain, Mahoning, Medina, Portage, Trumbull, Stark, Summit, or Wayne<br>• Debe vivir en uno de los siguientes condados: Ashland, Ashtabula, Columbiana, Cuyahoga, Geauga, Lake, Lorain, Mahoning, Medina, Portage, Trumbull, Stark, Summit, or Wayne<br>• No cases involving complex criminal histories<br>• No hay casos que involucren antecendentes penales complejos | **International Institute of Akron\***<br><br>530 S. Main Street, Suite 1762<br>Akron, OH 44311<br>Tel: (330) 376-5106<br>Fax: (330) 376-0133<br>info@iiakron.org<br>www.iiakron.org<br><br>• Family-based and humanitarian-based immigration legal services<br>• Representation limited to the Cleveland Immigration Court<br>• Our office handles Asylum, Adjustment of Status, Cancellation of Removal for LPR and non-LPR, waivers, motions, and other applications for relief<br>• Please call or email our office to schedule an appointment<br>• Languages: Any |
| **The Legal Aid Society of Cleveland\***<br><br>1223 West Sixth Street<br>Cleveland, OH 44113<br>Tel: (888) 817-3777<br>www.lasclev.org<br><br>• We serve individuals with low income who reside in Ashtabula, Cuyahoga, Geauga, Lake, or Lorain counties<br>• Languages: Any | **Advocates for Basic Legal Equality (ABLE)\***<br><br>525 Jefferson Avenue<br>Toledo, OH 43604<br>Tel: (419) 930-2555 / (937) 535-4489<br>Fax: (419) 259-2880 / (937) 535-4600<br>immigration@ablelaw.org<br>www.immigration.ablelaw.org<br><br>• Contact via email or call listed numbers. If no answer, leave voicemail and callback number<br>• Intake hours by phone M-F, 9AM-5PM<br>• No walk-ins |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Cleveland Immigration Court

| Cleveland, Ohio (page 2 of 2) |
| --- |

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Cleveland Immigration Court Juvenile Docket

| Cleveland, Ohio | |
|---|---|
| **The Legal Aid Society of Cleveland\*** <br><br> 1223 West Sixth Street <br> Cleveland, OH 44113 <br> Tel: (888) 817-3777 <br> www.lasclev.org <br><br> • We serve individuals with low income who reside in Ashtabula, Cuyahoga, Geauga, Lake, or Lorain counties <br> • Languages: Any | **International Institute of Akron\*** <br><br> 530 S. Main Street, Suite 1762 <br> Akron, OH 44311 <br> Tel: (330) 376-5106 <br> Fax: (330) 376-0133 <br> info@iiakron.org <br> www.iiakron.org <br><br> • Family-based and humanitarian-based immigration legal services <br> • Representation limited to the Cleveland Immigration Court <br> • Our office handles Asylum, Adjustment of Status, Cancellation of Removal for LPR and non-LPR, waivers, motions, and other applications for relief <br> • Please call or email our office to schedule an appointment <br> • Languages: Any |
| **Advocates for Basic Legal Equality (ABLE)\*** <br><br> 525 Jefferson Avenue <br> Toledo, OH 43604 <br> Tel: (419) 930-2555 / (937) 535-4489 <br> Fax: (419) 259-2880 / (937) 535-4600 <br> immigration@ablelaw.org <br> www.immigration.ablelaw.org <br><br> • Contact via email or call listed numbers. If no answer, leave voicemail and callback number <br> • Intake hours by phone M-F, 9AM-5PM <br> • No walk-ins | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# OREGON

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

**List of Pro Bono Legal Service Providers**

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Portland Immigration Court

### Portland, Oregon

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Equity Corps of Oregon\*\***

333 SW Fifth Avenue, Suite 250
Portland, OR 97204
Tel: (888) 274-7292
info@equitycorps.org

- Walk-ins welcome
- Call center open M-F 9AM-6PM

**Catholic Charities of Oregon\***

2740 SE Powell Blvd., #2
Portland, OR 97202
Tel: (503) 542-2855
Fax: (503) 688-2705
ils-intakes@ccoregon.org
www.catholiccharitiesoregon.org

- No walk-in appointments
- Please call for more information
- Asylum and Cancellation of Removal (LPR and non-LPR) with a focus on survivors of crimes and domestic violence
- Languages: Spanish; Limited capacity to provide assistance in other languages

**SOAR Immigration Legal Services\***

7931 NE Halsey Street, Unit 304
Portland, OR 97213
Tel: (503) 384-2482
soarlegal@emoregon.org
www.soarlegal.org

- Asylum and Cancellation (LPR and non-LPR)
- Languages: Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

## List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# PENNSYLVANIA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Philadelphia Immigration Court

| Philadelphia, Pennsylvania (page 1 of 2) |
|---|

**Catholic Social Services, Archdiocese of Philadelphia***

222 N. 17th Street, Suite 901
Philadelphia, PA 19103
Tel: (215) 854-7019
Fax: (215) 854-7021
immigrationlegalservices@chs-adphila.org
www.cssphiladelphia.org/immigration-legal-services/

- Telephone intake hours: Monday-Wednesday, 9AM-1PM at (215) 854-7018 or 24/7 at www.cssimmigration.org
- No walk-ins, by appointment only
- Detention cases handled on a limited basis

**Equal Access Legal Services***

6703 Germantown Avenue, Suite 200/210-4
Philadelphia, PA 19119
Tel: (267) 888-6703
info@eqaulaccesslegal.org
www.equalaccesslegal.org

- No walk-ins, by appointment only
- Languages: Spanish and other languages available upon request

**Jewish Family & Children's Service***

5743 Bartlett Street
Pittsburgh, PA 15217
Tel: (412) 422-7200
Tel: (412) 742-4216 (Spanish)
Fax: (412) 422-1162
info@jfcspgh.org
www.jfcspgh.org

- No Asylum or Employment cases

**HIAS (Pennsylvania)***

P.O. Box 8688
Philadelphia, PA 19101
Tel: (215) 832-0900
Tel: (833) 344-2772 (AOP Hotline for individuals granted asylum)
www.hiaspa.org

- Priorities include asylum, youth, interpersonal violence, naturalization, and family petitions
- No walk-ins
- By appointment only
- Intake hours (subject to change): Wednesday 9:30AM-12:00PM; Thursday 2:00PM-4:30PM

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Philadelphia Immigration Court

| Philadelphia, Pennsylvania (page 2 of 2) | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/<br>immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Aldea - The People's Justice Center\***<br><br>532 Walnut Street<br>Reading, PA 19601<br>Tel: (484) 877-8002<br>Fax: (484) 930-0655<br>coordinator@aldeapjc.org<br>www.aldeapjc.org<br><br>• Free legal services for unaccompanied children<br>• Servicios gratuitos para ninos no acompanados<br>• Languages: Spanish |
| | **Franklin County Legal Services\***<br><br>336 Lincoln Way East, Suite B<br>Chambersburg, PA 17201<br>Tel: (717) 262-2326<br>Fax: (717) 262-2360<br>www.fcls.net<br><br>• Provides representation for persons who reside in Franklin, Fulton, Juniata,  Huntingdon, Perry, Cumberland, and Adams counties<br>• Apply on our website or call the office<br>• Languages: Spanish speaking staff and translation in other languages available |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Philadelphia Immigration Court Juvenile Docket

### Philadelphia, Pennsylvania (page 1 of 2)

**Catholic Social Services, Archdiocese of Philadelphia\***

222 N. 17th Street, Suite 901
Philadelphia, PA 19103
Tel: (215) 854-7019
Fax: (215) 854-7021
immigrationlegalservices@chs-adphila.org
www.cssphiladelphia.org/immigration-legal-services/

- Telephone intake hours: Monday-Wednesday, 9AM-1PM at (215) 854-7018 or 24/7 at www.cssimmigration.org
- No walk-ins, by appointment only
- Detention cases handled on a limited basis

**Equal Access Legal Services\***

6703 Germantown Avenue, Suite 200/210-4
Philadelphia, PA 19119
Tel: (267) 888-6703
info@eqaulaccesslegal.org
www.equalaccesslegal.org

- No walk-ins, by appointment only
- Languages: Spanish and other languages available upon request

**Jewish Family & Children's Service\***

5743 Bartlett Street
Pittsburgh, PA 15217
Tel: (412) 422-7200
Tel: (412) 742-4216 (Spanish)
Fax: (412) 422-1162
info@jfcspgh.org
www.jfcspgh.org

- No Asylum or Employment cases

**HIAS (Pennsylvania)\***

P.O. Box 8688
Philadelphia, PA 19101
Tel: (215) 832-0900
Tel: (833) 344-2772 (AOP Hotline for individuals granted asylum)
www.hiaspa.org

- Priorities include asylum, youth, interpersonal violence, naturalization, and family petitions
- No walk-ins
- By appointment only
- Intake hours (subject to change): Wednesday 9:30AM-12:00PM; Thursday 2:00PM-4:30PM

**Aldea - The People's Justice Center\***

532 Walnut Street
Reading, PA 19601
Tel: (484) 877-8002
Fax: (484) 930-0655
coordinator@aldeapjc.org
www.aldeapjc.org

- Free legal services for unaccompanied children
- Servicios gratuitos para ninos no acompanados
- Languages: Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Philadelphia Immigration Court Juvenile Docket

| Philadelphia, Pennsylvania (page 2 of 2) | |
|---|---|
| **Church World Service - Lancaster***<br><br>158 E. King Street<br>Lancaster, PA 17602<br>Tel: (717) 300-0351<br>cwslancasterils@cwsglobal.org<br>www.cwslancaster.org/immigration-legal-services/<br><br>• No walk-ins<br>• Please call for an appointment<br>• Specialize in representation of unaccompanied minors<br>• CWS-Lancaster covers youth residing in the following counties in Pennsylvania: Berks, Chester, Cumberland, Dauphin, Franklin, Lancaster, Lebanon, and York counties<br>• Languages: English and Spanish | **Franklin County Legal Services***<br><br>336 Lincoln Way East, Suite B<br>Chambersburg, PA 17201<br>Tel: (717) 262-2326<br>Fax: (717) 262-2360<br>www.fcls.net<br><br>• Provides representation for persons who reside in Franklin, Fulton, Juniata, Huntingdon, Perry, Cumberland, and Adams counties<br>• Apply on our website or call the office<br>• Languages: Spanish speaking staff and translation in other languages available |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# PUERTO RICO

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Guaynabo (San Juan) Immigration Court

| Guaynabo, Puerto Rico |  |
| --- | --- |
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/ immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |  |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# TENNESSEE

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Memphis Immigration Court

| Memphis, Tennessee | |
|---|---|
| **Advocates for Immigrant Rights*** <br><br> 815 N. Mclean Blvd., Third Floor <br> Memphis, TN 38107 <br> Tel: (901) 729-9560 <br> Fax: (901) 432-2685 <br> advocates@airlegal.org <br> www.airlegal.org/ | **Latino Memphis, Inc.*** <br><br> 6041 Mount Moriah Road, Suite 16 <br> Memphis, TN 38115 <br> Tel: (901) 366-5882 <br> Fax: (901) 255-0625 <br> hola@latinomemphis.org <br> www.latinomemphis.org |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Memphis Immigration Court Juvenile Docket

| Memphis, Tennessee |
|---|

**Advocates for Immigrant Rights***

815 N. Mclean Blvd., Third Floor
Memphis, TN 38107
Tel: (901) 729-9560
Fax: (901) 432-2685
advocates@airlegal.org
www.airlegal.org/

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# TEXAS

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Dallas Immigration Court

| Dallas, Texas | |
|---|---|
| **Human Rights Initiative of North Texas\*\***<br><br>2801 Swiss Avenue<br>Dallas, TX 75204<br>Tel: (214) 855-0520<br>info@hrionline.org<br>www.hrionline.org<br><br>• Represent non-detained asylum seekers<br>• Represent non-detained unaccompanied children<br>• Will take in person walk-in inquiries or phone inquiries<br>• Language: Spanish | **RAICES\***<br>Refugee and Immigrant Center for Education and Legal Services<br><br>Dallas:<br>1420 W. Mockingbird Ln., Suite 840<br>Dallas, TX 75247<br><br>Mailing address:<br>P.O. Box 565928<br>Dallas, TX 75356-5928<br>Tel: (833) 372-4237<br>www.raicestexas.org |
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/ | Fort Worth:<br>4200 South Fwy., Suite 704<br>Fort Worth, TX 76115<br>Tel: (817) 717-9377<br>fortworth@raicestexas.org<br><br>• Will take all types of cases, including asylum<br>• Will accept cases for those detained at Prairieland Detention Facility |

• Pro se case assistance for detained respondents only
• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Dallas Immigration Court Juvenile Docket

| Dallas, Texas | |
|---|---|
| **Human Rights Initiative of North Texas\*\***<br><br>2801 Swiss Avenue<br>Dallas, TX 75204<br>Tel: (214) 855-0520<br>info@hrionline.org<br>www.hrionline.org<br><br>• Represent non-detained asylum seekers<br>• Represent non-detained unaccompanied children<br>• Will take in person walk-in inquiries or phone inquiries<br>• Language: Spanish | **International Rescue Committee\***<br><br>6500 Greenville Avenue, Suite 500<br>Dallas, TX 75206<br>Tel: (214) 461-9781<br>dallas.imm@rescue.org<br>www.rescue.org<br><br>• Unaccompanied minor cases only |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## El Paso Immigration Court

| El Paso, Texas |
|---|

**ABA Commission on Immigration Detention Information Hotline****

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**New Mexico Immigrant Law Center***

625 Silver Avenue SW, Suite 410
Albuquerque, NM 87102
Tel: (505) 247-1023
Fax: (505) 633-8056
info@nmilc.org
www.nmilc.org

- Respondents must reside in New Mexico

**Estrella del Paso***

2400 E. Yandell Drive
El Paso, TX 79903-3617
Tel: (915) 532-3975
Fax: (915) 532-4071
info@estrella.org
www.estrelladelpaso.org

- Families on dedicated dockets may contact Estrella del Paso at (915) 532-3975, ext. 8501 for free information about the immigration court process, possible legal options, and how to find legal representation

**Las Americas Immigrant Advocacy Center***

1500 E. Yandell Drive
El Paso, TX 79902
Tel: (915) 544-5126
Fax: (915) 544-4041
administrator@las-americas.org
www.las-americas.org

- Asylum, Withholding of Removal, Convention Against Torture

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## El Paso Detained Immigration Court

| El Paso, Texas | |
|---|---|
| **Estrella del Paso\***<br><br>2400 E. Yandell Dr.<br>El Paso, TX 79903-3617<br>Tel: (915) 532-3975<br>Fax: (915) 532-4071<br>info@estrella.org<br>www.estrelladelpaso.org | **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/ |
| **Las Americas Immigrant Advocacy Center\***<br><br>1500 E. Yandell Drive<br>El Paso, TX 79902<br>Tel: (915) 544-5126<br>Fax: (915) 544-4041<br>administrator@las-americas.org<br>www.las-americas.org<br><br>• Asylum, Withholding of Removal, Convention Against Torture | • Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Harlingen Immigration Court

| Harlingen, Texas | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\*** | **ProBAR - South Texas Pro Bono Asylum Representation Project\*** |
| 1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | 202 South 1st Street, Suite 300<br>Harlingen, TX 78550<br>Tel: (956) 365-3775<br>Fax: (956) 365-3789<br>probar@abaprobar.org<br>www.americanbar.org/probar<br><br>• Will represent people in removal proceedings |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Harlingen Immigration Court - Brownsville Hearing Location

| Harlingen, Texas |
|---|
| **ProBAR - South Texas Pro Bono Asylum Representation Project\***<br><br>202 South 1st Street, Suite 300<br>Harlingen, TX 78550<br>Tel: (956) 365-3775<br>Fax: (956) 365-3789<br>probar@abaprobar.org<br>www.americanbar.org/probar<br><br>• Will represent people in removal proceedings |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Houston Immigration Courts

| Houston, Texas (page 1 of 2) | |
|---|---|
| **Galveston-Houston Immigrant Representation Project\*** <br><br> Houston Office: <br> 6001 Savoy Drive, Suite 400 <br> Houston, TX 77036 <br> Tel: (713) 561-3059 <br> info@ghirp.org <br> www.ghirp.org <br><br> Galveston Office: <br> 4700 Broadway, Suite C101 <br> Galveston, TX 77551 <br> Tel: (713) 561-3059 <br> info@ghirp.org <br> www.ghirp.org <br><br> • Please call for an appointment | **ABA Commission on Immigration Detention Information Hotline\*\*** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/ immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **RAICES Texas\*** <br> Refugee and Immigrant Center for Education and Legal Services <br><br> 131 Interpark Blvd. <br> San Antonio, TX 78216 <br> Tel: (833) 372-4237 <br> Fax: (832) 669-6942 <br> legalinquiries@raicestexas.org <br> www.raicestexas.org/ <br><br> Mailing address: <br> P.O. Box 786100 <br> San Antonio, TX 78278 | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Houston Immigration Courts

| Houston, Texas (page 2 of 2) | |
|---|---|
| **Kids In Need of Defense (KIND)\*** <br><br> Houston Office: <br> 1000 Main Street, Suite 2300 <br> Houston, TX 77002 <br> Tel: (832) 779-4030 <br> infohouston@supportkind.org <br> www.supportkind.org <br><br> • KIND only represents unaccompanied children residing in Harris and Montgomery County <br> • No walk-ins; please call to schedule an appointment | **OikosNow Not For Profit\*** <br><br> 332 South Michigan Avenue, Suite #121-Z300 <br> Chicago, IL 60604 <br> Tel: (815) 549-5678 <br> immigration@oikosnow.com <br> www.oikosnow.org <br><br> • Please call for an appointment <br> • Languages: Mandarin Chinese, Cantonese 中文 |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Houston Immigration Courts Juvenile Docket

| Houston, Texas |
|---|
| **Kids In Need of Defense (KIND)\***<br><br>Houston Office:<br>1000 Main Street, Suite 2300<br>Houston, TX 77002<br>Tel: (832) 779-4030<br>infohouston@supportkind.org<br>www.supportkind.org<br><br>• KIND only represents unaccompanied children residing in Harris and Montgomery County<br>• No walk-ins; please call to schedule an appointment |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Conroe Immigration Court

**Conroe, Texas**

| | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\***<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **Galveston-Houston Immigrant Representation Project\***<br><br>Houston Office:<br>6001 Savoy Drive, Suite 400<br>Houston, TX 77036<br>Tel: (713) 561-3059<br>info@ghirp.org<br>www.ghirp.org<br><br>Galveston Office:<br>4700 Broadway, Suite C101<br>Galveston, TX 77551<br>Tel: (713) 561-3059<br>info@ghirp.org<br>www.ghirp.org<br><br>• Please call for an appointment |
| **RAICES Texas\***<br>Refugee and Immigrant Center for Education and Legal Services<br><br>131 Interpark Blvd.<br>San Antonio, TX 78216<br>Tel: (833) 372-4237<br>Fax: (832) 669-6942<br>legalinquiries@raicestexas.org<br>www.raicestexas.org/<br><br>Mailing address:<br>P.O. Box 786100<br>San Antonio, TX 78278 | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Laredo Immigration Court

### Laredo, Texas

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**RAICES\***

Refugee and Immigrant Center for Education and Legal Services

Laredo Hotline: 1 (800) 296-9162
www.raicestexas.org
laredo@raicestexas.org

- Please note: Hotline goes straight to voicemail so respondents must leave a message

**Border Project\*\***

Tel: (956) 625-0907
bp.legal/lp1

- Provides services to non-detained migrants seeking asylum

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Pearsall Immigration Court

| Pearsall, Texas (page 1 of 2) | |
|---|---|
| **American Gateways***<br><br>American Gateways – Austin:<br>314 E. Highland Mall Blvd., Suite 501<br>Austin, TX 78752<br>Tel: (512) 478-0546<br>Fax: (512) 387-2650<br><br>American Gateways – San Antonio Extension Office:<br>2300 W. Commerce Street, Suite 313<br>San Antonio, TX 78207<br>Tel: (210) 521-4768<br>Fax: (210) 625-6797<br><br>American Gateways – Waco Extension Office:<br>2323 Columbus Avenue, Suite C<br>Waco, TX 76701<br>Tel: (254) 230-0382, Ext. 264 or (737) 837-7016<br>Fax: (512) 387-2650<br><br>www.americangateways.org<br><br>• No walk-ins<br>• Will represent detained individuals<br>• Hotline: (210) 864-2937<br>• Representation limited to residents of Central Texas | **ABA Commission on Immigration Detention Information Hotline****<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| | **St. Mary's University School of Law Immigration and Human Rights Clinic***<br><br>2507 NW 36th Street<br>San Antonio, TX 78228<br>Tel: (210) 431-5714<br>Fax: (210) 431-5700 |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Pearsall Immigration Court

| Pearsall, Texas (page 2 of 2) | |
|---|---|
| **RAICES***<br>Refugee and Immigrant Center for Education and Legal Services<br><br>131 Interpark Blvd.<br>San Antonio, TX 78216<br>Tel: (833) 372-4237<br>Fax: (832) 669-6942<br>legalinquiries@raicestexas.org<br>www.raicestexas.org<br><br>Mailing address:<br>P.O. Box 786100<br>San Antonio, TX 78278<br><br>• Will represent individuals in asylum cases<br>• RAICES Pearsall Hotline: 1 (833) 372-4237<br>• RAICES Hotline for individuals and families detained at Dilley: 1 (855) 672-4237 | **University of Texas School of Law Immigration Clinic***<br><br>727 East Dean Keeton Street<br>Austin, TX 78705-3299<br>Tel: (512) 232-1292<br>Fax:(512) 232-0800<br>www.law.utexas.edu/clinics/immigration<br><br>• Limited to services for individuals detained at the T. Don Hutto Detention Center<br>• Asylum law and other relief<br>• Bond proceedings |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Port Isabel Immigration Court

| Los Fresnos, Texas | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline\*\*** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/ immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | **ProBAR - South Texas Pro Bono Asylum Representation Project\*** <br><br> 202 South 1st Street, Suite 300 <br> Harlingen, TX 78550 <br> Tel: (956) 365-3775 <br> Fax: (956) 365-3789 <br> probar@abaprobar.org <br> www.americanbar.org/probar <br><br> • Will represent people in removal proceedings |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## San Antonio Immigration Court

| San Antonio, Texas (page 1 or 2) | |
|---|---|
| **American Gateways***<br><br>American Gateways – Austin:<br>314 E. Highland Mall Blvd., Suite 501<br>Austin, TX 78752<br>Tel: (512) 478-0546<br>Fax: (512) 387-2650<br><br>American Gateways – San Antonio Extension Office:<br>2300 W. Commerce Street, Suite 313<br>San Antonio, TX 78207<br>Tel: (210) 521-4768<br>Fax: (210) 625-6797<br><br>American Gateways – Waco Extension Office:<br>2323 Columbus Avenue, Suite C<br>Waco, TX 76701<br>Tel: (254) 230-0382, Ext. 264 or (737) 837-7016<br>Fax: (512) 387-2650<br><br>www.americangateways.org<br><br>• No walk-ins<br>• Will represent detained individuals<br>• Hotline: (210) 864-2937<br>• Representation limited to residents of Central Texas | **RAICES - San Antonio***<br><br>131 Interpark Blvd.<br>San Antonio, TX 78216<br><br>Mailing Address:<br>P. O. Box 786100<br>San Antonio, TX 78278<br>Tel: (833) 372-4237<br>legalinquiries@raicestexas.org<br>www.raicestexas.org |
| | **C T Lobos Y A Inc.***<br><br>2180 Woodward Street<br>Austin, TX 78744<br><br>P.O. Box 40286<br>Austin, TX 78704<br>Tel: (512) 409-5263<br>immigration@centexlobos.com<br><br>• Will not represent individuals in detention<br>• Will not represent individuals with criminal cases<br>• No walk-ins<br>• Specialize in Special Immigrant Juvenile<br>• Representation limited to residents of Bexar, Caldwell, Comal, Hays, and Travis |
| **University of Texas School of Law Immigration Clinic***<br><br>727 East Dean Keeton Street<br>Austin, TX 78705-3299<br>Tel: (512) 232-1292<br>Fax:(512) 232-0800<br>www.law.utexas.edu/clinics/immigration<br><br>• Asylum law and other relief<br>• Bond proceedings | **St. Mary's University School of Law Immigration and Human Rights Clinic***<br><br>2507 NW 36th Street<br>San Antonio, TX 78228<br>Tel: (210) 431-5714<br>Fax: (210) 431-5700 |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## San Antonio Immigration Court

| San Antonio, Texas (page 2 of 2) |
|---|

**ABA Commission on Immigration Detention Information Hotline**\*\*

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/
immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## San Antonio Immigration Court Juvenile Docket

| San Antonio, Texas | |
|---|---|
| **RAICES\*** <br><br> Refugee and Immigrant Center for Education and Legal Services <br><br> 131 Interpark Blvd. <br> San Antonio, TX 78216 <br> Tel: (833) 372-4237 <br> Fax: (210) 212-4856 <br> www.raicestexas.org <br><br> • Will represent individuals in asylum cases | **C T Lobos Y A Inc.\*** <br><br> 2180 Woodward Street <br> Austin, TX 78744 <br><br> P.O. Box 40286 <br> Austin, TX 78704 <br> Tel: (512) 409-5263 <br> immigration@centexlobos.com <br><br> • No walk-ins <br> • Specialize in Special Immigrant Juvenile and UAC Asylum |
| **University of Texas School of Law Immigration Clinic\*** <br><br> 727 East Dean Keeton Street <br> Austin, TX 78705-3299 <br> Tel: (512) 232-1292 <br> Fax:(512) 232-0800 <br> www.law.utexas.edu/clinics/immigration <br><br> • Asylum law and other relief <br> • Bond proceedings | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Karnes County Residential Center

| Karnes City, Texas | |
|---|---|
| **American Gateways\*** <br><br> American Gateways – Austin: <br> 314 E. Highland Mall Blvd., Suite 501 <br> Austin, TX 78752 <br> Tel: (512) 478-0546 <br> Fax: (512) 387-2650 <br><br> American Gateways – San Antonio Extension Office: <br> 2300 W. Commerce Street, Suite 313 <br> San Antonio, TX 78207 <br> Tel: (210) 521-4768 <br> Fax: (210) 625-6797 <br><br> American Gateways – Waco Extension Office: <br> 2323 Columbus Avenue, Suite C <br> Waco, TX 76701 <br> Tel: (254) 230-0382, Ext. 264 or (737) 837-7016 <br> Fax: (512) 387-2650 <br><br> www.americangateways.org | **ABA Commission on Immigration Detention Information Hotline\*\*** <br><br> 1050 Connecticut Avenue, NW, Unit 400 <br> Washington, DC 20036 <br> immcenter@americanbar.org <br> www.americanbar.org/groups/public_interest/ immigration/ <br><br> • Pro se case assistance for detained respondents only <br> • Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150# <br> • To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org <br> • Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 |
| **RAICES\*** <br> Refugee and Immigrant Center for Education and Legal Services <br><br> 131 Interpark Blvd. <br> San Antonio, TX 78216 <br> Tel: (833) 372-4237 <br> Fax: (832) 669-6942 <br> legalinquiries@raicestexas.org <br> www.raicestexas.org <br><br> Mailing Address: <br> P.O. Box 786100 <br> San Antonio, TX 78278 <br><br> • Will represent asylum seekers <br> • RAICES Karnes Hotline: 1 (855) 672-4237 | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

**List of Pro Bono Legal Service Providers**

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

Updated July 2026

# UTAH

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Salt Lake City Immigration Court

**Salt Lake City, Utah**

| ABA Commission on Immigration Detention Information Hotline** | Catholic Community Services of Utah* |
|---|---|
| 1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/ | 224 N 2200 W<br>Salt Lake City, UT 84116<br>Tel: (801) 977-9119<br>ejohnson@ccsutah.org<br>www.ccsutah.org<br><br>• Languages: Staff speaks Spanish |

• Pro se case assistance for detained respondents only
• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Salt Lake City Immigration Court Juvenile Docket

| Salt Lake City, Utah |
|---|

**Catholic Community Services of Utah***

224 N 2200 W
Salt Lake City, UT 84116
Tel: (801) 977-9119
ejohnson@ccsutah.org
www.ccsutah.org

- Languages: Staff speaks Spanish

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

**List of Pro Bono Legal Service Providers**

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# VIRGINIA

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Annandale Immigration Court

| Annandale, Virginia (page 1 of 2) |
|---|

**Human Rights First\*\***

825 21st Street NW, PMB 253
Washington, DC 20006
Tel: (202) 370-3313
Dcprobono@humanrightsfirst.org
www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients

- Represents indigents individuals and families seeking asylum
- By appointment only. Please note we do not accept walk-ins
- Languages: Spanish, French, and other languages as needed

**HIAS (Silver Spring)\***

1300 Spring Street, Suite 500
Silver Spring, MD 20910
Tel: (301) 844-7248
www.hias.org

- Must fear return to country of origin
- No walk-ins
- Schedule a consultation by calling (301) 844-7248 on the first Friday of each month
- Languages: Spanish, Farsi/Dari, Pashto, and interpreters available

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

**Amica Center for Immigrant Rights\***
(formerly Capital Area Immigrants' Rights (CAIR) Coalition)

Main Office:
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Tel: (202) 331-3320 (Main Line)
Tel: (202) 331-3329 (Detention Line)
Fax: (202) 331-3341
www.amicacenter.org

To refer someone who is DETAINED:
Complete this form: www.amicacenter.org/get-help
Spanish: www.amicacenter.org/es/obtenga/ayuda

- Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Annandale Immigration Court

| Annandale, Virginia (page 2 of 2) | |
|---|---|
| **The George Washington University Law School Immigration Clinic\*** <br> 2000 G Street NW <br><br> Washington, DC 20052 <br> Tel: (202) 994-7463 <br> www.law.gwu.edu/immigration-clinic <br><br><br> • By appointment only at the contact number listed <br> • We accommodate all languages | **Center for Applied Legal Studies, Georgetown Law\*** <br><br> 600 New Jersey Avenue NW <br> Washington, DC 20001 <br> Tel: (202) 622-9100 <br> Lawcalsclinic@georgetown.edu <br><br><br> • Asylum cases only |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Annandale Immigration Court Juvenile Docket

| Annandale, Virginia | |
|---|---|
| **Amica Center for Immigrant Rights\*** (formerly Capital Area Immigrants' Rights (CAIR) Coalition)<br><br>Main Office:<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036<br>Tel: (202) 331-3320 (Main Line)<br>Tel: (202) 331-3329 (Detention Line)<br>Fax: (202) 331-3341<br>www.amicacenter.org<br><br>To refer someone who is DETAINED:<br>Complete this form: www.amicacenter.org/get-help<br>Spanish: www.amicacenter.org/es/obtenga/ayuda<br><br>• Provides immigration legal services to detained adults and children in DC, Maryland, and Virginia | **Restoration Immigration Legal Aid (RILA)\***<br><br>1815 N. Quincy Street<br>Arlington, VA 22207<br>Tel: (571) 429-5410<br>rila@restorationimmigration.org<br>www.restorationimmigration.org<br><br>• No walk-ins<br>• Please call for an appointment<br>• Will not represent individuals in detention<br>• Will not represent individuals with criminal cases<br>• Specialize in Special Immigrant Juvenile Status, Removal Defense<br>• Limited to residents of: Arlington, Alexandria, Fairfax, Prince William and Loudoun Counties<br>• Languages: Spanish |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Sterling Immigration Court

| Sterling, Virginia | |
|---|---|
| **Human Rights First\*\*** <br><br> 825 21st Street NW, PMB 253 <br> Washington, DC 20006 <br> Tel: (202) 370-3313 <br> dcprobono@humanrightsfirst.org <br> www.humanrightsfirst.org/asylum/asylum-seekers-and-potential-clients <br><br> • By appointment only. Please note we do not accept walk-ins <br> • To receive assistance, please call our front desk at (202) 370-3313 <br> • Represents indigent individuals and families seeking asylum <br> • Languages: Spanish, French, and other languages as needed | **The George Washington University Law School Immigration Clinic\*** <br><br> 2000 G. Street NW <br> Washington, DC 20052 <br> Tel: (202) 994-7463 <br> www.law.gwu.edu/immigration-clinic <br><br> • By appointment only at the contact number listed <br> • We accommodate all languages |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

# WASHINGTON

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

\* Non-Profit Organization
\*\* Referral Service
\*\*\* Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Seattle Immigration Court

### Seattle, Washington (page 1 of 2)

**The Northwest Immigrant Rights Project\***

Seattle Office:
615 2nd Avenue, Suite 400
Seattle, WA 98104
Tel: (206) 587-4009
Toll Free: (800) 445-5771
info@nwirp.org / seattlefrontdesk@nwirp.org
www.nwirp.org

- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Island, King, San Juan, Skagit, Snohomish, and Whatcom counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Granger Office:
121 Sunnyside Avenue, P.O. Box 270
Granger, WA 98932
Tel: (509) 854-2100
Toll Free: (888) 756-3641
grangerintake@nwirp.org

- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Adams, Asotin, Benton, Columbia, Franklin, Garfield, Kittitas, Klickitat, Yakima, Walla Walla, and Whitman counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Wenatchee Office:
620 N. Emerson Avenue, Suite 201
Wenatchee, WA 98801
Tel: (509) 570-0054
Toll Free: (866) 271-2084
wenatcheeintake@nwirp.org

**The Northwest Immigrant Rights Project\* (cont.)**

Wenatchee Office (cont.):
- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Adams, Chelan, Douglas, Ferry, Grant, Lincoln, Okanogan, Pend Oreille, Spokane, and Stevens counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Tacoma Office:
2209 N. Pearl Street, Suite 200
Tacoma, WA 98406
Tel: (253) 383-0519 or (877) 814-6444 (Detained)
Tel: (253) 235-9279 (Non-detained)
detainedreferrals@nwirp.org /tsunintake@nwirp.org

- Leave a message with your name and A number
- Provides intakes and possible referrals to pro bono attorneys
- All immigration matters
- All languages welcome
- Walk-ins welcome

**Kids In Need of Defense (KIND) - Seattle Field Office\***

1215 Fourth Avenue, Suite 1925
Seattle, WA 98161
Tel: (206) 338-3227
Fax: (206) 338-3406
infoseattle@supportkind.org
www.supportkind.org

- KIND represents unaccompanied children and youth under the age of 21

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

* Non-Profit Organization
** Referral Service
*** Private Attorney

# List of Pro Bono Legal Service Providers

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Seattle Immigration Court

| Seattle, Washington (page 2 of 2) |
|---|

**ABA Commission on Immigration Detention Information Hotline\*\***

1050 Connecticut Avenue, NW, Unit 400
Washington, DC 20036
immcenter@americanbar.org
www.americanbar.org/groups/public_interest/immigration/

- Pro se case assistance for detained respondents only
- Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#
- To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org
- Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

* Non-Profit Organization
** Referral Service
*** Private Attorney

Updated July 2026

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Tacoma Immigration Court

### Tacoma, Washington (page 1 of 2)

**The Northwest Immigrant Rights Project***

Seattle Office:
615 2nd Avenue, Suite 400
Seattle, WA 98104
Tel: (206) 587-4009
Toll Free: (800) 445-5771
info@nwirp.org / seattlefrontdesk@nwirp.org
www.nwirp.org

- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Island, King, San Juan, Skagit, Snohomish, and Whatcom counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Granger Office:
121 Sunnyside Avenue, P.O. Box 270
Granger, WA 98932
Tel: (509) 854-2100
Toll Free: (888) 756-3641
grangerintake@nwirp.org

- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Adams, Asotin, Benton, Columbia, Franklin, Garfield, Kittitas, Klickitat, Yakima, Walla Walla, and Whitman counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Wenatchee Office:
620 N. Emerson Avenue, Suite 201
Wenatchee, WA 98801
Tel: (509) 570-0054
Toll Free: (866) 271-2084
wenatcheeintake@nwirp.org

**The Northwest Immigrant Rights Project* (cont.)**

Wenatchee Office (cont.):
- Hours: Monday-Friday, 9:30AM-12PM/1PM-4:30PM
- Serving individuals living in Adams, Chelan, Douglas, Ferry, Grant, Lincoln, Okanogan, Pend Oreille, Spokane, and Stevens counties
- All immigration matters
- All languages welcome
- Walk-ins welcome

Tacoma Office:
2209 N. Pearl Street, Suite 200
Tacoma, WA 98406
Tel: (253) 383-0519 or (877) 814-6444 (Detained)
Tel: (253) 235-9279 (Non-detained)
detainedreferrals@nwirp.org /tsunintake@nwirp.org

- Leave a message with your name and A number
- Provides intakes and possible referrals to pro bono attorneys
- All immigration matters
- All languages welcome
- Walk-ins welcome

**Legal Immigration Services of Olympia (LISO)***

203 4th Avenue, Suite 406
Olympia, WA 98501
Tel: (360) 485-4488
contact@lisowa.org
www.lisowa.org

- Detained cases at Northwest ICE Processing Center only

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# List of Pro Bono Legal Service Providers

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Tacoma Immigration Court

| Tacoma, Washington (page 2 of 2) | |
|---|---|
| **ABA Commission on Immigration Detention Information Hotline****<br><br>1050 Connecticut Avenue, NW, Unit 400<br>Washington, DC 20036<br>immcenter@americanbar.org<br>www.americanbar.org/groups/public_interest/immigration/<br><br>• Pro se case assistance for detained respondents only<br>• Respondents detained at Immigration and Customs Enforcement (ICE) or Bureau of Prisons (BOP) facilities should contact our speed dial at 2150#<br>• To contact on behalf of an individual detained by ICE or BOP, email immcenter@americanbar.org<br>• Respondents detained at Department of Defense (DOD) military facilities (including Guantanamo) should contact our toll-free hotline at 1 (855) 641-6081 | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

Disclaimer: As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of Policy, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

# EXHIBIT 4

# Struggling to Survive: the Situation of Asylum Seekers in Tapachula, Mexico

By: Stephanie Brewer, Lesly Tejada, and Maureen Meyer

## JUNE 2022

RESEARCH
**REPORT**



Advocacy for Human Rights in the Americas

# TABLE OF CONTENTS

**Key Findings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Introduction and Acknowledgements** . . . . . . . . . . . . . . . **3**

**Background on Mexico's Asylum System** . . . . . . . . . . . . **5**

Legal and institutional framework . . . . . . . . . . . . . . . . . . . . . . . . . **5**

Trends in asylum claims and approvals . . . . . . . . . . . . . . . . . . . . . **6**

Migration enforcement role of the armed forces, including the National
Guard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

The role of Tapachula in the asylum process . . . . . . . . . . . . . . . . . **8**

**Findings from WOLA's 2022 Visit to Tapachula** . . . . . . **10**

Lack of immediate access to asylum at Mexico's southern border puts
families and individuals at risk . . . . . . . . . . . . . . . . . . . . . . . . . **10**

Diverse factors have caused drastic increases in asylum claims,
overwhelming COMAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

Asylum seekers' and institutions' responses, 2021-2022 . . . . . . . . . **15**

The importance of resettlement and integration support to stabilize
forced migration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**Asylum intake patterns in 2022.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

**The "prison city": migrants and asylum seekers caught between a rock and a hard place** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

# U.S. government engagement with Mexico on access to protection for refugees. . . . . . . . . . . . . . . . . . . . . . . . 27

**U.S. government support to Mexico's asylum system and efforts to address root causes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**U.S. migration policies and Mexico: a failed attempt to deter largely forced migration.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

# Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# KEY FINDINGS

- **Migrants and asylum seekers arriving in Tapachula—the city in southern Mexico where the vast majority of asylum claims are made—face what service providers repeatedly described to us as a "system to wear people down" (*política de desgaste*).** This refers not to a written policy, but rather to the combined effects of a series of government actions and omissions that leave people struggling to survive and vulnerable to abuse and arbitrary treatment as they navigate multiple backlogged legal processes. These conditions do not contribute to addressing forced migration to or through Mexico; rather, they increase the suffering and risks faced by people on the move.

- **Skyrocketing asylum claims in Mexico reflect growing forced displacement and protection needs in the region and worldwide. They also reflect a failure to respond adequately to the different needs of the migrant population, including people who migrate in search of economic opportunities or for other reasons that fall outside the recognized grounds for seeking asylum.** Asylum claims in Mexico have grown a hundredfold since 2013 to reach over 130,000 in 2021. Mexico's asylum system is overwhelmed and under-resourced, with prolonged delays in case processing times. In addition to large numbers of people in need of international protection, Mexican migration authorities' reticence to facilitate access to other legal pathways has the effect of channeling people into Mexico's asylum system as though it were the only option to seek a documented status in the country, creating an even more acute situation.

- **Those needing protection are almost never able to request it at ports of entry. This puts people at further risk and constitutes an undue barrier to seeking asylum.** People displaced from their homes by violence, repression, or other threats to their survival arrive at Mexico's border with protection needs, generally after additional violence and trauma on the journey north. Yet even if they are prepared to claim asylum, protection-seeking families and individuals have found themselves blocked from doing so at ports of entry, where agents of the National Migration Institute (*Instituto Nacional de Migración*, INM) may instead tell them that this is not the right place to seek asylum or instruct them to cross between ports of entry without documentation. Migrants who are able to request asylum at ports of entry will generally be detained by the INM and held for at least a few days for processing. As a result, asylum seekers are often forced to cross between ports and try to reach the offices of Mexico's refugee agency (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) to claim asylum without being

detained by enforcement authorities or victimized by criminals.

- **While trapped in Tapachula, asylum seekers struggle to survive. Mexican authorities' efforts to contain them there are both arbitrary and untenable.** Mexican asylum law requires asylum seekers to wait out their cases in the state where they made their claim. In reality, security forces generally block them from leaving Tapachula itself. Asylum seekers in Tapachula face scarce employment opportunities, obstacles to healthcare, and a dearth of affordable housing, with government, United Nations, and civil society support programs insufficient to meet overwhelming levels of demand. Tapachula's close proximity to Central America puts some people at risk of encounters with their persecutors. Asylum seekers also face abuses by authorities ranging from arbitrary detention to extortion to other forms of violence. Women and Afro-descendant migrants face particular situations of risk and discrimination. All of these factors point to the need to end Mexico's containment policy for asylum seekers.

- **Deterrence-based tactics that only serve to put more suffering and danger in migrants' paths will not decrease forced migration to and through Mexico.** Closing off legal paths to migration forces the displaced population into hiding along dangerous migratory routes, while the growing list of visa restrictions for South American countries that prevent people from flying into Mexico force more people to cross north by land. These inescapable realities highlight the need to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula, and developing sustainable solutions for the migrant population.

- **Initiatives to support migrants' and asylum seekers' integration into other parts of Mexico, such as those currently led by the UN Refugee Agency (UNHCR), are crucial to preventing humanitarian crises in Tapachula and providing solutions and stability to the migrant population.** As desperation, overcrowding, and marches by migrants increased over 2021, the INM sporadically transported migrants and asylum seekers to other states, but it did so without clear criteria or coordination with other institutions. A regularized relocation system, more resources for Mexico's refugee agency, and additional efforts to provide legal status to migrants seeking better opportunities would be important measures to address the growing number of migrants arriving at Mexico's southern border.

# Introduction and acknowledgements



*WOLA staff and partners at the Mexico-Guatemala border in Cuidad Hidalgo, a crossing point for many asylum seekers bound for Tapachula*

This report is based on a visit by WOLA staff to Mexico City and Tapachula, Chiapas state, in late February and early March 2022.

As part of WOLA's work on regional migration patterns, access to asylum, and the impact of border enforcement measures, in recent years we have closely monitored and visited the city of Tapachula on Mexico's southern border, a crucial crossing point where the vast majority of Mexico's asylum requests are filed. Tapachula provides both a relevant snapshot of northward migration trends and a paradigmatic example of the consequences of containment policies on asylum seekers. The present report fits within our reporting from the Mexico-Guatemala border over the past decade and our overall analysis of the impacts of U.S. and regional migration policies on the movement and rights of migrants throughout the hemisphere.

On this occasion, the WOLA delegation met with asylum seekers, government officials, UN agencies, and civil society partners providing services to people on the move in southern Mexico. We particularly acknowledge the support of the Fray Matías de Córdova Human Rights Center, a 2020 WOLA Human Rights Award recipient organization, whose staff generously helped us to convene meetings with civil society organizations and asylum seekers, as well as providing information on the trends and practices they are documenting in their day-to-day work with the asylum-seeking population. We are also especially grateful to the three asylum seekers who agreed to be interviewed on video by the WOLA team so that their stories could be quoted in this report and shown in the videos that accompany it.

During our visit, we also met with officials of the Tapachula and national offices of Mexico's refugee agency, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR); the Tapachula and national offices of the UN Refugee Agency

(UNHCR); the Tapachula office of Mexico's Welfare Ministry (*Secretaría de Bienestar*); and the U.S. Embassy in Mexico City. We spoke with representatives of legal service providers and civil society organizations including *Formación y Capacitación* (FOCA), American Friends Service Committee (AFSC), the Migration Program (*Programa de Asuntos Migratorios*, Prami) of the Universidad Iberoamericana Mexico City, *Una Mano Amiga en la Lucha contra el SIDA*, *Iniciativas para el Desarrollo Humano*, Coalition for Humane Immigrant Rights (CHIRLA), Jesuit Refugee Service, and the Institute for Women in Migration (*Instituto para las Mujeres en la Migración*, IMUMI). Most of these organizations form part of the Southeast Mexico Human Rights Observation and Monitoring Collective (*Colectivo de Observación y Monitoreo de Derechos Humanos en el Sureste Mexicano*), which documents human rights abuses against migrants and asylum seekers. Despite our attempts to obtain a meeting with the National Migration Institute (*Instituto Nacional de Migración*, INM), we were unable to meet with representatives of this agency.

The information provided in these meetings, our observations in different parts of Tapachula and at the Mexico–Guatemala border, as well as our ongoing written research and monitoring have led to the present report, which aims to present an updated window into the situation of asylum seekers arriving and seeking protection in Tapachula. Our analysis leads us to set out recommendations for the Mexican and U.S. governments, focusing both on domestic policies and regional collaboration to respond to forced migration.

# BACKGROUND ON MEXICO'S ASYLUM SYSTEM

### Legal and institutional framework

In 2000, Mexico became a party to the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, the cornerstone United Nations (UN) agreements that provide for the right to seek asylum from persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Mexico's Law on Refugees, Complementary Protection and Political Asylum (*Ley Sobre Refugiados, Protección Complementaria y Asilo Político*, "Law on Refugees") incorporates this protection framework as well as gender-based persecution. It further incorporates additional grounds for protection outlined in the Cartagena Declaration.[1] Thus, Mexican law recognizes refugee status for people who have fled their country of origin "because their lives, security, or freedom have been threatened by generalized violence, foreign aggression, internal conflicts, massive human rights violations, or other circumstances that have seriously disturbed public order[.]"[2]



*Mural near the Mexico-Guatemala border*

Mexico's refugee law also provides for "complementary protection" to people who are not recognized as refugees but whose life would be in danger or who would be at risk of torture or ill treatment if returned to another country.[3] Complementary protection applies to the person who requested protection, but it is not extended to their family members. These different forms of protection do not cover all people forcibly displaced from their countries of origin: in particular, disasters provoked by climate change and other environmental factors are increasingly relevant drivers of forced migration, but families and individuals displaced by climate disasters were not understood to be refugees at the time the aforementioned international and national legal instruments were drafted. However, Mexico's legal framework protects a decidedly broader class of refugees than U.S. law does.

The Mexican Commission for Refugee Assistance (COMAR), housed within the Ministry of the Interior (*Secretaría de Gobernación*, SEGOB) is the government agency charged with processing asylum claims. COMAR has central offices in Mexico City, as well as offices in the south and north of the country (two in Chiapas and one each in the states of Tabasco, Veracruz, Coahuila, Nuevo León, Baja California, and the central state of Jalisco).

The National Migration Institute (INM), also within SEGOB, is in charge of overseeing migrant arrivals at ports of entry, granting visas and legal residency, and migration enforcement. One of the INM's functions as outlined by the Law on Refugees' implementing regulations is to detect individuals in need of international protection and assist and coordinate with COMAR in facilitating their access to the asylum system.[4]

Families and individuals seeking asylum must submit their application no later than 30 business days after entering the country.[5] After the application has been received, COMAR issues a document (*constancia*) that serves as proof of an open asylum case. Once someone has requested refugee protection, legally they cannot be returned back to their country of origin during the processing of their case.[6]

With their *constancia* from COMAR, asylum seekers can apply with the INM to receive a humanitarian visa, known as a Visitor Card for Humanitarian Reasons (*Tarjeta de Visitante por Razones Humanitarias*, TVRH), which confers legal permission for people to live and work in Mexico for a year.

To determine refugee status, COMAR will interview applicants about the reason for leaving their country (with the participation of interpreters when an asylum seeker does not speak Spanish).[7] By law, COMAR has 45 business days to process applications, which may be extended up to 90 days.[8] These limits are not currently observed, as will be discussed below. Crucially, while a claim is being processed, asylum seekers are required by the Law on Refugees' current regulations to remain in the state where they filed their asylum request,[9] unless they receive special permission to relocate and continue their case from a different state.[10]

### Trends in asylum claims and approvals

In 2021 Mexico received a record-breaking 130,627 asylum requests, more than 100 times the number received just eight years ago in 2013.[11] The top three nationalities that applied for asylum in Mexico in 2021 were Haitians, Hondurans, and Cubans. The number of Haitian asylum seekers saw the most dramatic increase from 2020 to 2021, from 5,917 to 51,337. Children born to Haitian parents also accounted for a large percentage of 2021 asylum seekers from Chile and Brazil, who increased from a combined total of 1,170 in 2020 to 10,749 in 2021.



In 2021, COMAR resolved 38,054 asylum cases, with an overall asylum grant rate of 72 percent (74 percent counting complementary protection), considerably higher than the average U.S. asylum approval rate of roughly 37 percent in FY2021. There were significant disparities in approval rates for applicants of different nationalities. The major nationalities that saw the highest percentage of approval rates last year were Venezuelans (97 percent), Hondurans (85 percent), and Salvadorans (85 percent). COMAR regularly evaluates applications from nationals of these countries under the broader criteria of the Cartagena Declaration. Of the top asylum-seeking nationalities, Haitians had the lowest approval rate at 23 percent.



**7  Struggling to Survive** *June 2022*

Asylum claims in Mexico continue to rise and may be on track to break new records, with 40,026 requests filed in the first four months of 2022—the highest number in the January-April period in the past three years.

### Migration enforcement role of the armed forces, including the National Guard

While not officially responsible for the asylum process, Mexico's armed forces currently play a leading role in migration enforcement, bringing them into direct contact with arriving families and individuals, with consequences that can impact people's access to asylum. As of late April 2022, 28,542 military troops were deployed in a migration enforcement role at Mexico's borders. Available data suggest that military forces, in particular the army and the National Guard,[12] carry out or collaborate in the majority of migratory detentions in Mexico, depriving hundreds of thousands of migrants of their liberty in recent years.

Military troops are primarily trained to combat enemy forces, a background that raises obvious concerns when assigning troops to be potential first contact points for migrant and asylum-seeking families, children, and adults. The deployment of the armed forces to intercept migrants is a clear example of an official response that treats migration—including forced migration and those seeking protection—as though it were a national security threat rather than a movement of people who have disproportionately high levels of vulnerability, trauma, and humanitarian needs. Concerns regarding militarization of border and migration tasks in Mexico are not just theoretical: in 2021, army and National Guard troops shot and killed two migrants in separate incidents in Chiapas, while the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) has issued recommendations finding National Guard troops responsible for other violations against migrants at Mexico's southern border. In 2021, the CNDH received complaints against the National Guard in Chiapas for cruel and inhumane treatment, arbitrary detention, and torture.

While a detailed analysis of border militarization is beyond the scope of this report, this remains one of the most concerning aspects of the armed forces' multiplying roles in Mexico. It is also an area in which the U.S. government has negatively influenced migrant rights and access to protection in Mexico in recent years by pressuring Mexican authorities to crack down on northward migration, including through the threat of tariffs on Mexican exports during the Trump administration and by praising Mexico's efforts to stop migrant caravans, which translates into the deployment of military troops.

### The role of Tapachula in the asylum process

Due to its location just inland of the Mexico-Guatemala border, size, and connectivity to main highways from Central America, Tapachula is the main point of arrival for a significant portion of migrants and asylum seekers coming by land to Mexico. A large majority of asylum claims—89,613 in 2021—were filed in COMAR's Tapachula office, creating an enormous strain on this office and prolonged delays in case processing, stretching into wait times of many months for asylum applicants.

*Map showing Tapachula/southern border*



Since asylum seekers are generally required to wait out their cases in the state where they file their claims, tens of thousands of asylum seekers are currently expected to live in Chiapas, the southern border state where Tapachula is located (and Mexico's poorest state, with a poverty rate of 75.5 percent in 2020). In practice, Mexican authorities seek to confine these families and individuals not just to Chiapas state, but to the city of Tapachula itself. For this reason, Tapachula is known as the "prison city" (*ciudad cárcel*) for asylum seekers. As we will discuss below, this containment policy has led to a series of negative consequences including lack of access to basic services and the means to survive, pushing asylum seekers to try to find ways to leave the city.



*Bicentennial Park in Tapachula, where migrants and asylum seekers without a place to stay often spend the night*

# FINDINGS FROM WOLA'S 2022 VISIT TO TAPACHULA

*Lack of immediate access to asylum at Mexico's southern border puts families and individuals at risk*

While Mexico continues to experience mixed migration flows, a large number of people arriving in Tapachula have international protection needs after fleeing life-threatening circumstances in their home countries.

Migrants and asylum seekers generally arrive in Mexico after living through different forms of violence, trauma, and exploitation during their journey north. As numerous people told us, every step along the migratory route to Mexico costs money, whether due to criminal extortion, bribes demanded by authorities, fees to secure guides, or other payments necessary to move from one place to another with as little violence as possible. Even those able to muster resources through their family and social networks are still vulnerable to violence and repeated criminal attacks, including kidnapping and rape, while people forced to flee their homes with little prior notice are likely to travel with even fewer resources and thus have even less of an opportunity to fend off detention and violent attacks. Regardless of their circumstances, arriving migrants and asylum seekers in Tapachula, especially those in a heightened situation of vulnerability such as children, are likely to arrive in need of physical, psychological, and other humanitarian attention after their journey, as well as with the right to request international protection or to pursue other pathways for temporary or permanent legal status.

**"It's impossible to live in Honduras. It's so dangerous now. The gangs see 12-year-olds, 13-year-olds, and they already want to recruit them… I have a 10-year-old daughter and a 14-year-old daughter, that's why I had to leave my country, leave my family and everything behind, because the gangs came… they said they were going to recruit my daughters… and that if I didn't let them, they were going to kill us all, my children and me…"**

**–"Maria," Honduran asylum seeker**

Families and individuals face severe obstacles in requesting asylum when they arrive at Mexico's border because COMAR does not have a regular presence at ports of entry, which are instead manned by INM agents. Despite the INM's legal mandate to assist and collaborate with COMAR, according to multiple service providers in Tapachula, INM agents at ports of entry are known to tell asylum seekers that they cannot seek asylum at the border and cannot enter Mexico without documents.

Paradoxically, rather than seeking truly to block the path of asylum seekers into Mexico, the

INM agents themselves may also instruct people to cross between ports of entry in order to make their way to COMAR's Tapachula office to claim asylum. Only in certain cases, such as when a service-providing organization has contacted authorities to request entry for an asylum-seeking person or group, are there greater guarantees of asylum seekers' being able to cross at a port of entry and to avoid detention in the INM's migration stations (detention centers) while their paperwork is being processed.



*The Suchiate River, which divides Tecún Umán, Guatemala from Ciudad Hidalgo, Mexico*

The result of this approach by the INM is that many asylum-seeking families and individuals must cross Mexico's border in hiding and try to make it from the border to the COMAR office or an NGO or other service provider without documentation that authorizes their presence in Mexico. These journeys put asylum seekers at risk of attacks and extortion by criminal groups who prey on migrants and of detention or extortion by INM agents, state and local police, and military forces.

**"When you're an immigrant and you're on the move… the authorities, instead of helping you because they're authorities, no, what they do is take what little you have… even if you have children, they don't care, they take their papers, and it's, 'either give me what you have or I'll send you back or I'll imprison you…' As a migrant, you're afraid, so you agree to whatever they ask of you… you just say, 'yes.'"**

**–"Maria," Honduran asylum seeker**

WOLA staff heard accounts of detentions and abuses by the INM, police agents, and the military even against migrants with official permission to be in Mexican territory; for arriving asylum seekers with no documentation who are forced to cross irregularly into the country,

the risks are even higher. According to data collected from 2,742 asylum seekers in Tapachula between October 2020 and October 2021 by the Danish Refugee Council (DRC) and the Jesuit Refugee Service Mexico (JRS), 98.3 percent of respondents affirmed having entered Mexico irregularly, and 34.3 percent of these respondents "describe incidents of extortion, violence, threats, and other abuses, compared with only 9.1% of respondents who indicate having entered the country regularly."

Detention by authorities may lead to extortion and/or temporary imprisonment in the INM's detention centers. According to international standards and guidelines, detention of asylum seekers should be exceptional and based on an evaluation of the specific need for detention in each case. In Mexico, such detention tends to respond to few criteria other than migratory status and may be prolonged for months. While an alternatives-to-detention program exists in Mexico, which releases asylum seekers from detention and refers them to shelters in coordination with COMAR and support from the UN Refugee Agency, the INM has curtailed its use in recent years. Interviews conducted during our visit and reporting from organizations working with asylum seekers suggest that the INM has become less responsive to requests for migrants to be released from detention.

Once detained, many asylum seekers are told that if they make a protection claim, they will remain locked up while their case moves forward. This factor alone makes it much more difficult for people to prepare their asylum case, as they face obstacles such as inadequate access to information, legal assistance, and healthcare, overcrowding, or safety issues. This leads some people with protection needs to desist from their claims in order to be released from detention.

A 2020 reform to Mexico's migration and refugee framework established that children (unaccompanied and those with their families) should not be held in detention by the INM.[13] Children and their families should instead be referred to the National System for Integral Family Development *(Sistema Nacional para el Desarrollo Integral de la Familia*, DIF). However, service providers told WOLA that this sometimes amounts to little more than a change of detention setting for individuals and families sent to DIF shelters. Civil society counterparts also told WOLA of the INM's practice of separating families, for instance by detaining a father in a migration station and sending a mother and children to a DIF facility.

**"At the first checkpoint... [the authorities] took me; they brought me to the *Siglo XXI* migrant detention center... I was scared when I got there, I've never been detained... after three and a half months, I couldn't stand it there anymore... I decided not to continue [with that asylum request], because I wasn't sleeping, I wasn't eating well by then... it got to the point where I would talk to myself..."**

**-Nelson, Nicaraguan asylum seeker**

*Diverse factors have caused drastic increases in asylum claims, overwhelming COMAR*

Mirroring global trends, there has been a dramatic increase in people displaced from their homes throughout the Western Hemisphere. Mexico, which in 2021 became the third country

worldwide in the number of asylum requests received, has become a significant destination country for a growing number of people.

Latin America has witnessed an increase in human mobility in recent years as both long-standing and emerging causes of displacement force more people to flee their homes. Latin American and Caribbean countries consistently lead the world in homicide rates, with gang violence in Central America and organized crime in Mexico continuing to be significant causes of displacement. Repression and political and humanitarian crises, exemplified in different forms in countries such as Venezuela, Nicaragua, and Cuba, add to forced displacement. The devastation caused by Hurricanes Eta and Iota in Central America in 2020 highlighted the increasing percentage of people on the move who can be considered climate refugees. Violence, poverty, and other already life-threatening crises have now been aggravated by the Covid-19 pandemic.

In addition to people fleeing directly from their countries of origin, a large percentage of 2021 asylum requests in Mexico came from people of Haitian origin who had previously fled Haiti following its devastating 2010 earthquake, resettled for a time in South American countries (notably Brazil and Chile), but once again found themselves on the move due to shrinking visa availability, scant labor opportunities, and racism and discrimination in South America, with fewer possibilities than ever of returning to Haiti as gang violence, political crises, and natural disasters engulfed the country in 2021.

In this context, the modern face of northward migration through Latin America includes a significant percentage of women and children, with many families migrating and seeking asylum together.



**Asylum seekers in Mexico, 2021**

Girls 11.8%
Boys 12.4%
Adult men 46.5%
Adult women 29.3%

Source: COMAR • Created with Datawrapper

In addition to these trends, both authorities and civil society counterparts agree that people on the move are currently funneled into Mexico's asylum system even though Mexican law has some other paths available to those seeking a legalized status in the country. In particular, while

Mexican law makes TVRH humanitarian visas available to migrants who have been victims of or witnessed a crime in Mexico, children, or for other humanitarian purposes or public interest reasons,[14] in practice these visas have not been made widely available to migrants. Even asylum seekers face steep obstacles in obtaining a TVRH. In 2021, the INM issued 87,174 TVRHs. However, only 35,397 were provided to asylum seekers, contributing to the obstacles WOLA staff witnessed in Tapachula with asylum seekers unable to access employment because they lacked this visa. At the same time, the fact that more than half (48,611) of these visas were issued for humanitarian reasons, including 30,057 to Haitians (and another 6,547 to Brazilians and Chileans, many of whom are likely children of Haitians born in these countries), illustrates that in the context of high levels of forced migration and significant pressure as a result of the tens of thousands of migrants and asylum seekers trapped in Tapachula in the fall of 2021, the Mexican government more broadly used TVRHs as a tool to provide temporary status in Mexico. In contrast, the INM issued only 25,414 TVRHs in 2020, with less than a thousand, 862, provided for humanitarian reasons.

Given the INM's reticence to offer alternatives to migrants arriving at Mexico's southern border, seeking asylum is seen as the necessary route to obtain a TVRH for most arriving migrants, contributing to COMAR's increased caseload. This also means that an unknown number of people who intend to reach the United States to reunite with family or for other reasons find themselves channeled into applying for asylum in Mexico to regularize their presence in the country, even though Mexico is not their final destination.

Finally, with the U.S. border closed to many arriving asylum seekers under Title 42 since March 2020, some asylum seekers may have requested protection from COMAR even if they do not feel safe in Mexico, following expulsion or being blocked at U.S. ports of entry. If the Title 42 policy is lifted, part of this population will likely move to the U.S. border in the hope of being able to request asylum in the United States. These asylum seekers would join a growing number of other foreign nationals who have been bottled up along the U.S.-Mexico border awaiting their chance to approach a port of entry and request asylum in the United States, with U.S. authorities estimating this number could be around 25,000.

The record-breaking rise in asylum requests in Mexico has meant that those arriving find themselves navigating an asylum system that is overwhelmed, under-resourced, and severely backlogged. Nowhere is this reality more evident than in Tapachula.

**"I came here, not because I had some American dream, but because I was fleeing so that [the authorities] wouldn't hurt my family, first of all, and secondly to protect my own life…**

**[This has been] an emotional and economic change that hit me hard, believe me… I don't wish this on anyone. That's what I can tell you: I don't wish this on anyone."**

**-Nelson, Nicaraguan asylum seeker**

As has been evident in the images of hundreds of asylum seekers waiting outside of COMAR's offices in Tapachula, the agency has yet to secure enough resources to process current caseloads. In response to rising numbers of claims, COMAR has expanded in recent years with support from the UN Refugee Agency; today, COMAR has nine offices throughout the country and plans to open more, including a coordinating office in Chiapas state to oversee the work of the multiple Chiapas COMAR offices. With UNHCR support, COMAR increased its processing capacity by 116 percent between 2020 and 2021, and has gone from 20,466 case determinations in 2019 to 38,054 in 2021. In December 2021, COMAR signed a new agreement with UNHCR that will allow COMAR to directly hire 230 staff members (under Mexican law, government officers must be the ones to make asylum determinations; that is, staff directly paid by UNHCR cannot substitute COMAR in this role).



However, even with this additional support, the resources afforded to COMAR are still far from sufficient to enable prompt processing of incoming asylum requests, with the agency's overall domestic budget remaining essentially stable from 2021 to 2022 despite skyrocketing levels of asylum claims.[15]

### Asylum seekers' and institutions' responses, 2021-2022

As mentioned, delays of many months in refugee determinations, coupled with Mexico's containment policy, have effectively trapped tens of thousands of foreign nationals in

untenable conditions in Tapachula. As this situation reached crisis levels in 2021, lack of access to job opportunities, housing, healthcare, and other necessities in Tapachula; safety concerns; discrimination; and desperation at seemingly never-ending legal processes led large groups of asylum seekers to try to leave the city.

In perhaps the best-known example, hundreds of foreign nationals sought to leave Tapachula by marching north together in "caravans" in the second half of 2021, particularly beginning at the end of August. However, the caravans met with blockades, detention, and sometimes violent repression from INM agents and the National Guard. Since then, multiple caravans have left Tapachula, with some reaching other states, though none remaining intact beyond the center of the country.



*Mexican immigration agents detain a Haitian migrant in Escuintla, Chiapas state, Mexico in September 2021 (AP Photo/Marco Ugarte)*

For its part, COMAR's Tapachula office tried several strategies throughout 2021 to increase its capacity to process asylum claims. At the beginning of the year, unable to keep up with case intake, the office began issuing appointment notices (*citatorios*), which stipulate a later date for the formalization of a family's or individual's asylum application. In mid-2021, COMAR set up an online platform for use in Tapachula to request asylum appointments. However, WOLA staff was told, the system received tens of thousands of online requests in a single week, grew to include people who had not yet arrived in Mexico, and led to large numbers of case inquiries. Service providers pointed out that the online system also created challenges for asylum seekers unfamiliar with navigating the internet or unable to access the online platform.

Changing tactics, from late September to late November COMAR convened asylum seekers to come in person to Tapachula's stadium to confirm their appointment requests, in an unprecedented strategy in which UN agencies and other Mexican institutions collaborated. Approximately 55,000 asylum seekers participated, allowing COMAR to reorganize and open up appointment times.

These efforts were disrupted, however, by the INM's own parallel response strategies. As growing numbers of desperate asylum seekers sought to leave Tapachula on foot, producing high-level news coverage including images of caravans and repression, the INM began offering caravan participants or would-be participants humanitarian visas and relocation by bus to a series of other Mexican states. In this context, the INM announced that it too would use Tapachula's stadium at the end of November 2021 to program transportation to other states. INM's announcement prompted families and individuals to abandon jobs, housing, and other activities in Tapachula to camp out around the stadium, awaiting what they believed would be their turn to leave. Given Tapachula's extremely hot conditions, the situation for families and children in particular was often unbearable according to service providers who sought to assist asylum seekers at the time.

Not everyone waiting at the stadium received transportation, however. In December, the INM began issuing QR codes to migrants and asylum seekers, instructing them to pay their own way to one of a list of different states (determined in each case by the QR code) and then report to an INM office within 30 days to regularize their status. It is estimated that some 35,000 people were relocated to 17 central and northern Mexican cities through the INM programs. The long list of states in which the INM issued over 1,000 humanitarian visas in December 2021 (44,425 TVRHs in total) is one indicator of the application of this program.

While the initiative to move people out of Tapachula points to recognition of the failure of the containment policy, the INM has implemented this plan in a piecemeal and reactive manner, and it is not permanently or universally available. The main criterion for busing seems to be a desire to break up caravans, deactivate protests, and diminish the crisis of overcrowding in Tapachula.

The INM also failed to adequately coordinate its busing project with COMAR, and asylum seekers were sometimes unwittingly considered to have abandoned their claims by virtue of no longer being able to show up at Tapachula's COMAR office. Some, having struggled to leave Tapachula, even found themselves returning there once they realized they could not follow up on their cases from other states. WOLA was told that the INM eventually began providing more complete data to COMAR on which asylum seekers were transported to what destinations, which would allow COMAR to re-open their cases. However, it is unclear what will happen to many of the transported migrants who wish to pursue their asylum claims.

**"Abuses by authorities, corruption, and impunity are very severe problems… and they're aggravated when the victim is a person who isn't perceived as a person… they're perceived as the other."**

**-Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

### *The importance of resettlement and integration support to stabilize forced migration*

Stakeholders interviewed by WOLA emphasized that the extent to which resettlement and integration is available and supported in Mexico, giving refugees access to services and the ability to live and work throughout the country, influences the number of people who will opt to resettle in Mexico and the stability of that resettlement. In this vein, while many counterparts spoke of the need to facilitate immediate humanitarian visas to asylum seekers and other migrants who qualify for them, several also signaled the need to think beyond short-term solutions and to recognize that without permanent resident status, people on the move will live in a more vulnerable situation in which they must constantly renew their documentation.

Positive examples of integration support exist and can provide guidance for expanding such efforts. In particular, UNHCR has led an integration program (Local Integration Program, *Programa de Integración Local*,  PIL) that has helped more than 10,000 refugees relocate within Mexico and start their lives in their new communities since 2016. The program has helped move refugees from the southern part of the country to eight cities in the center and north of Mexico. A UN study demonstrates the success of the program: while in southern Mexico, only 10 percent of refugees were employed and 17 percent had sporadic informal jobs, but after their relocation, 92 percent were in formal employment with earnings that were on average 60 percent higher than in the south.

In December 2021, the International Organization for Migration (IOM) and UNHCR presented a pilot project that aims to support the stabilization and integration of Haitians in Mexico. The program will allow Haitian families who have not applied for asylum to participate in the PIL program. It will be important to monitor the success of this new initiative, including the extent to which it is able to facilitate access to work for women as well as men.

Initiatives such as this one fit within the overall, recognized need for countries to expand legal pathways to resettlement for people who need to leave their homes. For example, UNHCR has emphasized the importance of complementary pathways, or safe and regulated avenues that complement refugee resettlement, which offer alternatives to resorting to irregular and dangerous movement and facilitate the acquisition of a sustainable and durable migration status. Complementary pathways for admission are diverse and can include humanitarian visas, family reunification, and education and labor opportunities, among others.

### *Asylum intake patterns in 2022*

During our visit, COMAR's Tapachula offices were intaking some 250 asylum seekers per day, although that number is sometimes several times higher on Mondays. Stakeholders were unanimous in telling us of an increase in the number of Venezuelans, Cubans, and Nicaraguans arriving by land this year. They also noted an increase in extra-continental migrants and asylum seekers, largely from African countries.

In part, these movements reflect trends apparent in 2021, which saw significant increases in the number of Venezuelans, Cubans, and Nicaraguans requesting asylum in Mexico and detained in Mexico (a total of 26,705 people of these nationalities were apprehended by Mexican authorities in 2021, a more than tenfold increase from the 2,204 Venezuelans, Cubans,

and Nicaraguans detained in 2020). However, more recent reported upticks in the number of Venezuelans arriving in Tapachula in particular would seem also to be a consequence of Mexico's new visa requirements for Venezuelans, imposed in January 2022 following reported requests from the United States, which block air travel to many Venezuelan migrants and hence drive more Venezuelans to migrate north by land through Central America and Mexico. Mexico similarly imposed visa requirements on nationals of Brazil and Ecuador in 2021 in response to increasing arrivals from those countries at the U.S. southern border.

More Cubans are also arriving in Mexico, in part due to Nicaragua's lifting of visa requirements for Cubans in November 2021, enabling them to fly to Nicaragua to continue their journey north. COMAR's asylum applications reflect these shifts in nationalities, with more Cubans requesting asylum in Mexico in the first four months of 2022 (8,445) than in all of 2021 (8,298), while 4,270 Venezuelans requested protection in this same period, as compared to 6,192 in all of 2021. In the first four months of 2022, 841 people from Senegal also requested protection in Mexico.



The land route from South America to Mexico passes through the notorious Darién Gap that connects Colombia to Panama, a migratory corridor known for extreme levels of lawlessness and violence (including rape), robbery and extortion, deaths from exposure to extreme conditions, and other life-threatening and trauma-inducing conditions. In November 2021, Doctors without Borders reported that since April of that year they had attended 288 victims of sexual violence in the Darién Gap in their reception centers and with the Panamanian Ministry of Health, estimating that this represented only a quarter of the actual cases. U.S., Mexican, or other regional migration policies that channel larger numbers of people through this route thus will necessarily have extremely severe negative effects on the lives of migrants and asylum seekers.

**"In our group [of migrants crossing the Darién Gap], one man fell… I don't know how he managed to grab onto something, because if he had fallen to the bottom there, he would have died. […] [On the path] you see things, you see dead bodies, you see everything people have left behind, because you get to a point where even your own clothes weigh you down from the sweat. […] At a certain point, I couldn't breathe… I said, 'go on ahead, I'm going to stay here a while…' […] And when I woke up, there were only two people there… they said they hadn't left because they saw that I was still breathing. Because I had lost consciousness completely. […] We walked and walked and walked and walked and walked and walked…"**

**-Frantz, Haitian asylum seeker**

Finally, we note that COMAR may acquire a large new portfolio of work stemming from a proposed General Law on Forced Displacement that has passed in Mexico's House of Representatives and is now under consideration in the Senate. This law would recognize and create a system for attending to Mexico's own large population of internally displaced people (IDPs), with tens of thousands of people displaced in large-scale movements in 2021 alone and potentially hundreds of thousands displaced in total in recent years. Under the proposed legislation, COMAR will become the institution in charge of implementing the law and supporting the IDP population. However, WOLA was told that the agency's plan is to keep its refugee and IDP functions as separate as possible, ensuring separate structures and budgets to cover both. It remains to be seen if the law passes in its current form and how implementation and funding of the law will play out in practice. The Mexican Senate ended its normal legislative session in late April 2022 without moving forward with the legislation.

### The "prison city": migrants and asylum seekers caught between a rock and a hard place

Recalling that Chiapas is Mexico's poorest state and Tapachula is a city of some 350,000 residents, it is unsurprising that foreign nationals' need for jobs surpass Tapachula's labor market. As was described to us repeatedly during our visit, migrants and asylum seekers in Tapachula also tend to face obstacles to accessing healthcare, education, and housing, as well as experiencing racial discrimination and abuses by authorities, including arbitrary detention. Language barriers and racism faced by Haitian and other Afro-descendant and indigenous migrants have further impeded their access to public services. WOLA staff conversations with a Spanish-speaking Haitian asylum seeker also made clear that language barriers impact Haitians' ability to access and understand Mexico's asylum system, as has been documented by several civil society organizations. These circumstances make clear that, as thousands of people continue to arrive and ask for protection, authorities must remove existing obstacles to dignified living conditions in the city, improve access to services for non-Spanish-speaking

migrants, address institutional racism, and reform the containment policy so that Tapachula is no longer a prison city for people on the move.

A migrant or asylum seeker's stay in Tapachula is marked by arbitrary rules and long wait times that leave them in a constant state of uncertainty. INM agents and the National Guard operate fixed and moving checkpoints in and around the city, as well as conducting raids, particularly at night, in which they detain migrants for alleged failure to demonstrate their permission to be in Mexico. In reality, detentions have swept up people with legal permission to be in Mexico, including asylum seekers. Service providers told us that security forces will target a certain park or hotel to raid, and sometimes ask to see even bystanders' identifications; we heard accounts of such authorities destroying asylum seekers' documents that proved that they were lawfully present or had ongoing cases.

**"In the raids [to detain migrants], authorities commit serious abuses, there is a lot of violence even against women, girls, boys, adolescents…"**

**-Brenda Ochoa, Director of the Fray Matías de Córdova Human Rights Center**

Those detained may be imprisoned for weeks or more in INM detention centers, where, according to civil society investigations, INM agents regularly pressure asylum seekers to abandon their cases—and some, desperate to be released from detention, opt to do so. As mentioned, an alternatives-to-detention program, albeit an imperfect one, has existed since 2016, but the INM has greatly curtailed access to the program since 2020. Detention of asylum seekers deprives them of a wide variety of rights, separates families, exacerbates trauma, and makes it much more difficult for them to continue their asylum cases with due process.

Even the many asylum seekers who are able to avoid detention and live in Tapachula face safety risks that include extortion by authorities and attacks by criminals. Tapachula's close proximity to Guatemala means that gang members can easily show up there, and service providers told us of cases in which asylum seekers had been found by members of the Central American gangs from which they had fled in the first place. Although a request can be made for COMAR to transfer cases to a COMAR office in another state for security reasons, it is a cumbersome process requiring the asylum seeker to present detailed documentation of the risk.

Beyond safety concerns, day to day living conditions are often untenable, aggravated by the bureaucracy of the processes required to regularize one's migratory status. Desperation was palpable the day that members of WOLA and the Fray Matías Center visited the overflowing line of migrants waiting all day in direct sunlight and sweltering heat outside an INM office for a chance at an appointment, a pattern often repeated day after day.



*Migrants and asylum seekers waiting for appointments outside the National Migration Institute*

Most asylum seekers need income to survive. However, existing employment opportunities in the formal sector are <u>insufficient</u> and require that people have documentation showing their permission to work in Mexico—though employers may balk at hiring migrants even when presented with humanitarian visas. Some asylum seekers set up stands or other informal businesses to provide goods and services to the population, but municipal authorities sometimes clear them out of certain parks or areas, making it harder for them to earn income.



*Sign that prohibits migrants from selling their wares in a plaza in Tapachula*

Mexico's Welfare Ministry (*Secretaría de Bienestar*) runs a program for asylum seekers and other migrants seeking regularization in which it provides them with cash support in exchange for several hours of volunteer work through its Social Emergency Program (*Programa de Emergencia Social*). Participating migrants take part in construction, planting, cleaning, translating, and other jobs. Officials in charge of the program in Tapachula told WOLA that enrolled migrants generally remain in Tapachula throughout the duration of their regularization processes. However, the program does not have the capacity to include all the asylum seekers and migrants who seek to participate: we were told in March 2022 that it covered approximately 1,400 people in Tapachula. The day of our visit, a crowd of people was lined up at the door of the program's headquarters, seeking to enroll.

Asylum seekers face steep obstacles in access to housing. Shelters in Tapachula lack the capacity to house the arriving population, and local landlords have taken advantage of increased migration levels to charge usurious rates to rent apartments or rooms, including charging per person for renting shared rooms between groups of people.

Healthcare is another right that many migrants and asylum seekers are prevented from accessing. Service providers and asylum seekers told WOLA that hospitals and other healthcare providers require identification and ask for documentation that asylum seekers may not have, especially if they have arrived recently. Service providers expressed particular concern for the situation of women, including pregnant women and non-Spanish speakers. Those who require care unavailable in Tapachula face difficulties in accessing it; partners told us that it is complicated to obtain permission to bring a migrant even as far as the capital city of Chiapas state. In addition to physical ailments or injuries, migrants and asylum seekers frequently need psychological healthcare after surviving trauma along the migratory route.

**"My 6-year-old daughter had an accident… Here at the hospital, they didn't want to perform surgery on her; they said that they couldn't send her to a different hospital because I was an immigrant…"**

**-"Maria," Honduran asylum seeker**

To help address asylum seekers' need for services in Tapachula, UNHCR provides direct assistance to them after an initial interview to identify their needs, a process facilitated by the opening in March 2021 of the Center to Support Refugees (*Centro de Atención a Refugiados*, CAR), which operates next to COMAR's registration center. However, the scope of this program depends on the availability of resources, which are currently insufficient. UNHCR seeks to support asylum seekers with school inscription, protection against threats to their safety, psychosocial attention, access to healthcare and medicines, and orientation about available migrant shelters and other support mechanisms.

Certain migrant and asylum-seeking groups face particularly acute situations, especially as migrants have become more visible and vulnerable to local xenophobia. It is not uncommon for longstanding Tapachula residents to reject the presence of migrants in the city because of the perception that they are taking jobs from the local people.

There is an insufficient offer of adapted public services for migrants who do not speak Spanish. In the case of families from countries where Spanish is not a common language, women are especially likely to face language barriers that further reduce their access to services. This leads to patterns in which women's access to services is dependent on male relatives' liaising with authorities.

As mentioned, Haitian migrants and asylum seekers face anti-Black discrimination as well as frequent language barriers. An investigation by the Center for Gender and Refugee Studies, IMUMI, and Haitian Bridge Alliance found that "[f]ew to none of the immigration officials or non-governmental service providers in Tapachula speak Kreyol, and as a result, Haitian migrants have difficulty understanding the immigration system and how to access the networks of legal and humanitarian services available to them." By December 2021, COMAR's Tapachula office had increased its number of Haitian Creole interpreters from two to eight, but concerns persist about how Haitian cases are processed. Legal service providers signal that the notably low rates of asylum grants for Haitians bely insufficient analysis of their cases, especially given the high rates of approvals for other nationalities whose countries of origin suffer from generalized violence or crises. Beyond the asylum process itself, Haitian migrants report experiencing racism from both authorities and the local population.

During WOLA's visit, we were struck by the fact that multiple institutional actors expressed that asylum seekers of Haitian nationality or descent were unlikely to qualify for asylum. While we understand that they were referencing a pattern of secondary movements by Haitians who had previously migrated to South American countries (which differs from a 'typical' asylum case in which a person flees directly from their country of persecution), we recall that domestic and international asylum law require an individualized evaluation of each person's case. We also note that growing numbers of Haitians are now arriving directly from Haiti following that country's 2021 security, political, and natural crises. Furthermore, unlike asylum claims from Honduras, Venezuela, and El Salvador, which are generally processed using the standards outlined in the Cartagena Declaration, COMAR has not designated Haiti as a country whose nationals have access to this differentiated asylum procedure.

Given all of the conditions described above, migrants and asylum seekers in Tapachula increasingly protest in a variety of ways to call for permission to leave Tapachula and regularize their migratory status; the caravans attempting to leave the city are one clear expression of this. In order to bring attention to the desperate situation they are facing, migrants have sewn their lips together, gone on hunger strikes, chained themselves, and marched with crosses. On March 11, 2022, during president Andrés Manuel López Obrador's visit to Tapachula, migrants protested outside a military base where the president held his daily news conference. Those 150 migrants were told they would receive humanitarian visas by the end of the day, in addition to approximately 800 migrants who were given documents in the days leading up to the president's visit, according to immigration authorities. These numbers are just a small fraction of the tens of thousands of foreign nationals waiting in Tapachula.

**"The paperwork… they keep you going round in circles to see if you get tired."**

**-Frantz, Haitian asylum seeker**

Asylum seekers and migrants defend their rights not just by protesting, but also by providing direct assistance to other asylum seekers and migrants and by advocating with relevant authorities. As always, non-governmental organizations and migrant shelters also continue to be on the front lines of providing migrants with legal representation and humanitarian assistance, as well as documenting abuses against them. Throughout 2020 and 2021, the organizations that form part of the Southeast Mexico Human Rights Observation and Monitoring Collective have been documenting abuses against migrants and asylum seekers throughout the region and monitoring INM and National Guard actions during caravans and other moments of mass movements of migrants.

**"[The police] arrived, they broke open the door, and they said, 'down,' pointing at us with guns, anti-gang police they're called here… They took us to an empty lot and they started beating us… and asking us what gang we belonged to, what cartel, what organization…"**

**-Nelson, Nicaraguan asylum seeker**

The inspiring work done by partners on the ground in Tapachula and elsewhere in Chiapas, and the tireless struggle of migrants and asylum seekers themselves, have led to growing recognition of the crisis caused by Mexico's attempts to contain tens of thousands of vulnerable people at its southern border. Until reforms are made, however, asylum seekers in Tapachula will continue to face what multiple interviewees described to us as a "system to wear people down" *(política de desgaste)*—a combination of norms, arbitrary actions, inefficiencies, and lack of capacity that traps people in a prolonged limbo of uncertainty, risk, and precarious conditions. This situation represents the worst of all worlds: it increases the suffering and vulnerability of asylum seekers while doing nothing to sustainably or constructively manage migratory flows or advance a regionally shared plan to provide protection to those who need it.



*Patio of the Fray Matías de Córdova Human Rights Center*

"I went to the park and I could identify the people who didn't speak Spanish. And I said to them, 'what do you need?' Like one patient asking another patient, 'what do you need?' And one says, 'I don't understand the paperwork,' because sometimes [the authorities] give you a document and you have to read it and you don't understand. 'Oh, no? I'll translate for you.' Pretty soon, I had 20, 30 people waiting for me to translate for them… So, I started helping people… […] And soon, every day I would get up… and go to the park… to Fray Matías [Human Rights Center]… to COMAR… Sometimes I would lose my voice by the time I got home. Because I was so hoarse from the work that we had done."

-Frantz, Haitian asylum seeker

# U.S. GOVERNMENT ENGAGEMENT WITH MEXICO ON ACCESS TO PROTECTION FOR REFUGEES

U.S. influence on people's access to protection in Mexico stems from both U.S. support for Mexico's asylum system and overall U.S. migration policy—two frameworks that do not necessarily align with one another.

### U.S. government support to Mexico's asylum system and efforts to address root causes

The State Department's Bureau of Population, Refugees, and Migration (PRM) manages U.S. support for access to asylum in Mexico and Central America, focusing on humanitarian assistance, capacity-building, and diplomatic engagement.[16] The U.S. government is the largest financial supporter of UNHCR activities in Mexico: in 2021, UNHCR Mexico reported a U.S. contribution of $38,715,766, which constituted 77 percent of total UNHCR contributions earmarked for Mexico in 2021. In turn, UNHCR funds a large share of COMAR's work, enabling it to operate with significantly more staff than it could with its domestic budget.

While such U.S. support has been ongoing over a number of years, the U.S. Congress has recently reinforced the need to invest in Mexico's asylum processing capacity in the face of its overwhelming caseload, including language linked to U.S. foreign assistance specifying the need to support COMAR and INM "to improve intake facilities and asylum case management and processing."[17]

In a letter sent to Secretary of State Antony Blinken in March 2021, 19 members of Congress stated that Mexico's asylum system "merits priority attention":

> While Mexico's refugee agency, Comisión Mexicana de Ayuda a Refugiados (COMAR), has improved its processing capacity, asylum seekers continue to face inadequate screening for protection concerns by migration enforcement officials, poor conditions in detention centers, and long processing times. […] U.S.-Mexico cooperation should seek to improve access to protection in Mexico, in coordination with the United Nations High Commissioner for Refugees (UNHCR) and civil society organizations, by increasing COMAR's presence throughout the country, supporting alternatives to detention for asylum seekers, and further improving COMAR's capacity.

In July 2021, the White House published its Collaborative Migration Management Strategy (CMMS), which lays out eight lines of action through which the U.S. government seeks a comprehensive regional approach to migration. One of these is "Expand Access to International Protection," an area in which the Biden administration specifically cites cooperation with Mexico, stating:

> The United States will support regional government efforts to strengthen and expand their asylum systems to provide vulnerable individuals with

protection... [...] For example, since 2016, the Mexican Commission for Refugee Assistance has expanded dramatically with U.S. support, opening new field offices and tripling its annual case processing capacity. The United States will continue to work with Mexico to build on this success and with other regional governments to help expand their asylum systems.

The CMMS also points to Mexico as an example of the need for strong internal relocation and resettlement programs:

> The United States will support inclusion and integration programs that ensure individuals can access livelihood opportunities, services, healthcare, and education, and can develop roots in their new communities. The United States will look to expand successful ongoing integration efforts, such as a program that relocates protection recipients from southern Mexico to industrial belt municipalities in Mexico with labor needs.

In line with the CMMS, U.S. embassy officials in Mexico City told WOLA that the embassy, led by U.S. Ambassador Ken Salazar, advocates with Mexican authorities for migration management that includes, among other components, addressing the root causes of migration, attending to the displaced population, effective asylum processing, and modernized border infrastructure.

The Biden administration has made especially clear that it seeks to address the root causes of forced migration, particularly from Central America. The White House published its multifaceted Root Causes Strategy along with the CMMS in July 2021. For its part, Mexico's federal government is implementing social programs in northern Central America through its international development agency, AMEXCID (*Agencia Mexicana de Cooperación Internacional para el Desarrollo*). These programs largely replicate the Mexican government's signature domestic social programs "Sowing Life" (*Sembrando Vida*, a program that pays participants to plant trees) and Youth Constructing the Future (*Jóvenes Construyendo el Futuro*, a paid internship program for young people). AMEXCID reports that its programs dramatically decrease Central American participants' plans to emigrate, although investigations have denounced irregularities in the implementation of these programs in Mexico. USAID and AMEXCID are coordinating certain assistance in Honduras, Guatemala, and El Salvador within a framework known as "Sowing Opportunities" (*Sembrando Oportunidades*).

Beyond the actions described above, there is a need to improve U.S.–Mexico collaboration to protect specific groups of people who arrive in Mexico with protection needs but whose safe and sustainable resettlement warrants relocation to the United States. This is the case, for example, of unaccompanied asylum-seeking children trying to reunite with U.S.-based family members. Such children should not be forced either to seek asylum in Mexico or to migrate north in hiding when it is clearly in their best interest to join their relatives in the United States. In other cases, families or individuals may have compelling safety reasons to seek protection in the United States rather than in Mexico. Identifying such cases and facilitating a pathway to request protection in the United States would avoid the need for these groups to be processed by Mexico's asylum system when ultimately Mexico will not be a viable destination for them.

*U.S. migration policies and Mexico: a failed attempt to deter largely forced migration*

Despite its financial support for Mexico's asylum system, overall U.S. migration policy under the Biden administration has followed that of previous administrations and prioritized reducing the number of migrants and asylum seekers crossing the Mexico-U.S. border. U.S. actions have included prolonging Title 42, the Trump-era anti-asylum policy that blocks or expels asylum seekers back into Mexico without a chance to request protection; asking Mexican authorities to crack down on northward-bound migration through Mexico; and requesting Mexico to implement increased visa requirements for other nationalities. This overall context helps to explain Mexico's harsh and arbitrary enforcement of its asylum seeker containment policy in Tapachula, failure to facilitate a greater number of humanitarian visas to migrants, large numbers of migrant detentions (with a record 307,679 in 2021), and continued militarization of migration enforcement along its borders.

Such U.S. strategies are not new. As WOLA has reported previously, in response to the surge of unaccompanied minors from Central America in 2014 (during the administration of president Barack Obama), the U.S. government backed Mexico's Southern Border Program, which increased apprehensions and deportations of migrants traveling through Mexico's southern border region. In 2019, when migrant arrivals increased at the U.S. border once more, then-president Trump threatened to impose tariffs on Mexican goods if Mexican authorities did not tighten migration enforcement, which resulted in the Mexican government's agreement to deploy the National Guard at its borders to crack down on migration (a policy in place in Mexico today). In addition to this containment role centered on blocking migrants' paths through Mexico, Mexico's federal government under López Obrador has accepted unlawful and counterproductive U.S. anti-asylum programs in its territory, including Title 42 expulsions and the Remain in Mexico program, which forces select U.S.-bound asylum seekers to wait in Mexico for their immigration hearings. The Biden administration even flew Central American nationals on expulsion flights to Tapachula and Villahermosa, Tabasco state during several months in 2021, where Mexican immigration agents and National Guard troops forced them to cross into Guatemala without the opportunity to request asylum in Mexico, violating international law and placing people in danger of what the UN has termed "chain refoulement."

These sorts of policies increase risks to asylum seekers and create obstacles and delays in their access to protection in either Mexico or the United States. What they do not do is end forced migration. As shown by WOLA's analysis of trends in U.S. Customs and Border Protection (CBP) southwest border encounters over the past decade, crackdowns do not lead to sustainable reductions in migration. As pointed out by the American Immigration Council, U.S. government strategies centered on deterrence, blocking, family separation, and detention of migrants and asylum seekers follow a cyclical pattern in which they have "temporarily suppressed arrivals, but the push factors in home countries and drivers of migration have remained. Within a few years of each punitive policy's implementation, there was another increase in people coming to the border."



*\*Note that FY2020 and FY2021 data, in particular, overestimate total migrants encountered. This occurs due to increased repeat crossings prompted by Title 42 border expulsions. For instance, the total number of individuals encountered in FY2021 is likely just over <u>one million</u>. Source of FY2021 data: <u>https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters</u>.*
*Source of FY2006-FY2020 data: <u>https://www.cbp.gov/newsroom/media-resources/stats</u>.*

During our visit to Tapachula, numerous counterparts stated that Mexican authorities' reluctance to expand access to legal migration pathways outside the asylum system, such as visas for humanitarian or public interest reasons, has stemmed in part from <u>opposition</u> by the U.S. government, as temporary legal status for migrants in Mexico has been viewed as a factor that would increase arrivals at the U.S. border. Ironically, however, to the extent that current practices make it difficult to obtain legal status in Mexico (and hence to resettle in Mexico with access to work, school, and other services), migrants who otherwise would seek to make their lives in Mexico may instead be pushed to continue north to the United States. At the same time, migrants and asylum seekers determined to set out for the United States due to family connections or other needs will continue to do so both on their own and through the networks of smugglers who fill this demand.

Against this backdrop, it is urgent for the U.S. and Mexican governments, as well as other governments of the region, to recognize the counterproductive nature of deterrence and containment policies as responses to forced migration—and especially as responses to families and individuals fleeing life-threatening conditions in their home countries.

A concrete opportunity to do so will occur shortly after the publication of this report at the Ninth Summit of the Americas, hosted by the U.S. government in June 2022 in Los Angeles. While not one of the Summit's official themes, regional cooperation on migration will be one of the focus issues of the Summit, which comes after Biden administration officials' participation in ministerial meetings on regional migration management in <u>Colombia</u> in October 2021 and <u>Panama</u> in April 2022, as well as numerous bilateral meetings with Mexican and other officials, including the signing of bilateral arrangements on migration and protection with <u>Panama</u> and <u>Costa Rica</u>. Ahead of the Summit, a coalition of civil society organizations, including WOLA, have laid out a set of <u>guiding principles</u> for regional migration cooperation, centering human rights, access to protection, and sustainable solutions to forced displacement.

# CONCLUSIONS

Like regional forced migration in general, migration to and through Tapachula will not diminish anytime soon, and certainly will not decrease through deterrence-based tactics that only serve to put more suffering and danger in migrants' and asylum seekers' paths. On the contrary, policies designed to block migration through Mexico, such as the growing list of visa restrictions for South American countries that prevent people from flying into Mexico, force more people from these countries to cross north by land through treacherous routes. This inescapable reality highlights the need to make good on government pledges to prioritize access to protection in regional migration management, alleviating the human suffering in places like Tapachula and developing sustainable solutions for the migrant population.

In the case of Tapachula, guaranteeing access to asylum requires ensuring that arriving families and individuals can safely and immediately file their asylum claims and that authorities in charge of border crossing points, intake, and processing are from appropriate agencies and attend to the needs of this population as required by Mexican and international law. It also requires diversifying responses to the migrant population, recognizing that arriving people have different needs and that Mexican law provides for regularization for a number of reasons—not just due to filing an asylum claim.

Mexican authorities must take decisive steps to end abuses and discrimination by authorities against the asylum-seeking and migrant population. This includes curbing arbitrary detentions by the INM and the military, investigating allegations of abuse against migrants and asylum seekers and sanctioning those agents found responsible, and ensuring access to basic services. Finally, in addition to taking needed steps to promptly resolve asylum claims, the Mexican government should cease holding asylum seekers in Tapachula and reform its state-based containment policy to allow asylum seekers to access work and dignified living conditions in other parts of Mexico.

# RECOMMENDATIONS

*To the Mexican government:*

- **Guarantee that asylum-seeking families, children, and adults arriving at Mexico's southern border can request protection at official ports of entry.** This could be done by stationing COMAR personnel at ports of entry to register asylum claims. To the extent that ports of entry continue to be manned by INM agents, these agents should be instructed to admit asylum seekers and facilitate their access to COMAR without automatic detention, and mechanisms should be established to monitor and guarantee compliance with these obligations. Arriving asylum seekers should immediately receive documents indicating that they have permission to be in Mexico, avoiding scenarios in which people are forced to cross irregularly and make their way to COMAR.

- **End the practice of containing asylum seekers in Tapachula.** It is illegal and untenable to forcibly contain tens of thousands of asylum seekers in a single city for months or years, much less one that is ill-equipped to provide them with adequate public services and employment opportunities. The federal government should reform the official state-based containment policy currently established in administrative regulations, promptly allowing asylum seekers to move to different states in order to find work, reunite with family, and otherwise begin integration processes. COMAR should strengthen its ability to transfer asylum cases between its offices.

- **End detention of asylum seekers** except where compelling reasons exist for such a measure, as foreseen in international law. Detention should be exceptional and based only on an analysis of the need for such a measure in the individual case. Unnecessary detention dissuades asylum claims, causes people to desist from existing requests, makes it more difficult to pursue ongoing cases, and causes needless suffering, economic impacts, and health consequences for the detained people and their family members. (We define "detention" as housing people inside government or other facilities from which they are not free to leave, regardless of the institution in charge of such facilities or the terms used under Mexican law to describe such deprivation of liberty.)

- **Provide humanitarian and other visas as foreseen in Mexican law.** The National Migration Institute should make available humanitarian and other visas to those who qualify for them based on any of the grounds set out in domestic law. Asylum seekers who have submitted their claim before COMAR should be promptly provided with a humanitarian visa (TVRH).

- **Develop a coordinated system amongst Mexican agencies for the asylum process.** Instead of pursuing legal processes before COMAR and the INM, asylum seekers should only have to provide their information once. Since applying for asylum entitles the applicant to a TVRH, this should automatically be processed and issued based on the asylum application filed with COMAR.

- **Ensure access to healthcare, schools, and other basic services.** Authorities in these sectors should receive all necessary guidelines on guaranteeing registration and access of migrant children, families, and adults to vital services, and officials should promptly investigate reports of exclusion from such services and implement corrective measures. In particular,

accusations of discrimination by Mexican officials against women, Afro-descendant, indigenous, or other migrants should be investigated and adequately addressed.

- **Maximize integration and resettlement programs.** This crucial component of the migration and refugee process is the subject of ongoing and pilot programs coordinated by UNHCR. Mexican authorities should continue to collaborate with these efforts as well as strengthening their domestic inter-agency coordination and programming to ensure that growing numbers of asylum seekers, refugees, and other migrants are able not only to relocate, but also to integrate into a range of Mexican cities and states, providing a sustainable response to forced migration.

- **Increase government funding and support for COMAR.** Mexico received the third highest number of asylum requests worldwide for 2021. In spite of this, COMAR's 2022 budget remains essentially unchanged. While UNHCR provides crucial support and resources for COMAR, the Mexican government must also do its part. Insufficient resources contribute to long processing times, overworked staff, a lack of interpreters to support asylum seekers who speak indigenous languages and Haitian Creole, and limits on COMAR's presence along Mexico's southern border.

- **Hold Mexican migration agents and security forces accountable for abuses against migrants and asylum seekers.** Mexican and international civil society organizations have documented widespread abuses against migrants and asylum seekers in southern Mexico by INM agents, members of the military and National Guard, and police forces, as has the CNDH in a growing number of cases. Afro-descendant migrants, particularly Haitian migrants, have also faced racism and discrimination by Mexican authorities. The failure to hold agents accountable for their actions facilitates the perpetration of further abuses.

*To the U.S. government:*

- **Ensure that migration cooperation with Mexico and other countries prioritizes access to protection and solutions for the forcibly displaced population, rather than a counterproductive focus on blocking the paths of migrants and asylum seekers.** Measures such as border militarization, increases in detentions, and visa requirements produce changes in migration patterns, but a sustainable reduction in forced migration is not one of these changes. Approaches centered on deterrence and detention push migrants and asylum seekers to dangerous and hidden routes, increase demand and profits for human smugglers, and increase suffering and loss of life among people on the move. Families, children, and adults will continue to be displaced and to migrate as long as violence, extreme poverty, climate disasters, and other factors leave them no realistic path to safety and survival at home. Only by offering options for short- and long-term resettlement can the governments of the region stabilize the crisis of forced displacement, bring migrants and asylum seekers out of hiding, cut profits to organized criminal groups, and ensure protection for vulnerable families and individuals.

- **Work with Mexican authorities to identify and facilitate access to the United States for unaccompanied children seeking to reunite with U.S.-based family members and for people who cannot resettle in Mexico due to risks deriving from their concrete situation.** Even with improvements to its asylum system, Mexico is not a logical destination for all individuals. People arriving in Mexico who identify the United States as their destination

and who have compelling reasons to seek protection there, such as reunification with adult family members, should be supported in doing so.

- **Continue to provide robust funding to support access to protection in Mexico, while upholding national and international law on the ability to access asylum in the United States.** The United States continues to be the largest donor for UNHCR in Mexico, providing almost $39 million in assistance in 2021. Additional support to COMAR and international organizations operating in Mexico has been provided through the State Department's Bureau of Population, Refugees and Migration.

# ENDNOTES

1    The Cartagena Declaration is a regional agreement on refugees specific to Latin America. It delineates broader grounds for refugee status that include threats of generalized violence and disturbance of public order.

2    Law on Refugees, art. 13.II.

3    Law on Refugees, art. 28.

4    Regulations of the Law on Refugees, art. 16.

5    Law on Refugees, art. 18.

6    Law on Refugees, art. 7; Regulations of the Law on Refugees, art. 22.

7    Law on Refugees, art. 23.

8    Law on Refugees, art. 24.

9    Regulations of the Law on Refugees, art. 38.

10    Regulations of the Law on Refugees, art. 23.

11    These and all asylum statistics quoted subsequently come from COMAR's monthly information bulletin, as updated through May 1, 2022, at: https://www.gob.mx/cms/uploads/attachment/file/722490/Cierre_Abril-2022__1-Mayo_.pdf, except for data on women and children, which are updated as of February 2022 and are available here: https://www.gob.mx/cms/uploads/attachment/file/707121/02_MUJERES_NNA_Febrero-2022.pdf and here: https://www.gob.mx/cms/uploads/attachment/file/706715/Cierre_Febrero-2022__1-Marzo_.pdf.

12    The National Guard is a militarized security force proposed by Mexican president Andrés Manuel López Obrador and created by law in 2019. It replaced the Federal Police and was announced as a new force to prevent crime and maintain public security, formally housed within the Ministry of Security and Citizen Protection (*Secretaría de Seguridad y Protección Ciudadana*, SSPC). Despite formally belonging to a civilian ministry, the National Guard is under the operational control of the Ministry of Defense (*Secretaría de la Defensa Nacional*, SEDENA) and is composed primarily of members of the armed forces. President López Obrador has announced that he will propose the formal incorporation of the National Guard into SEDENA, which would constitute the final step in the militarization of federal policing tasks in Mexico. The deployment of the National Guard to Mexico's border with Guatemala began in 2019, as part of the Mexican government's June 2019 agreement with the Trump administration to increase immigration enforcement.

13    See, for example, Law on Refugees, art. 20.

14    Migration Law (*Ley de Migración*), art. 52.V.

15    COMAR's annual budget can be viewed at line N00 of the Ministry of the Interior's annual budget, available at: https://www.pef.hacienda.gob.mx/work/models/aVbnZty0/PEF2022/kgp8I9cM/docs/04/r04_aae.pdf (2022) and https://www.pef.hacienda.gob.mx/work/models/PEF2021/docs/04/r04_aae.pdf (2021).

16    According to the PRM website: "PRM support in the region aims to address the humanitarian needs of vulnerable migrants, internally displaced persons, asylum seekers, and refugees, in support of national government responses. PRM funding supports programming in the following sectors: protection (including child protection and GBV prevention and response); emergency and cash based initiatives; shelter; water, health, and sanitation; and livelihood programming. The Bureau funds its traditional partners, including the United Nations High Commissioner for Refugees (UNHCR), the International Committee of the Red Cross (ICRC), the International Organization for Migration (IOM), and NGOs (in limited locations)."

17    The joint explanatory statement accompanying the FY2022 omnibus appropriations legislation incorporates these instructions set out on page 119 of House Report 117-84. The same document notes troubling reports "that agents in Mexico's National Migration Agency have committed human rights violations and have not been held accountable." Ibid.

## ABOUT THE AUTHORS

Stephanie Brewer is the Director for Mexico and Migrant Rights at WOLA. Lesly Tejada is the Program Assistant for the Mexico and Migration & Border Security programs at WOLA. Maureen Meyer serves as WOLA's Vice President for Programs.

## ACKNOWLEDGEMENTS

This report would not have been possible without the generous support of the Open Society Foundations.

## ABOUT WOLA

WOLA is a leading research and advocacy organization advancing human rights in the Americas. We envision a future where public policies in the Americas protect human rights, recognize human dignity, and where justice overcomes violence.

**WOLA.ORG** | 1666 CONNECTICUT AVE NW, SUITE 400, WASHINGTON DC 20009| 202-797-2171

# EXHIBIT 5

Donate

# Mexico: Still Not Safe for Refugees and Migrants

Refugee and Immigrant Rights

Fact Sheet

Published on March 23, 2018

The Trump Administration seeks to prevent refugees who pass through Mexico from receiving asylum in the United States. In addition to pushing for legislative change that would allow the U.S. Secretary of Homeland Security to unilaterally declare Mexico a "safe third country," recent reports also indicate the administration aims to press Mexico to agree to a safe third country agreement.

In a July 2017 report Human Rights First found that Mexico was not a safe third country for refugees. The organization's findings included that refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico; that Mexican migration officers deport Central Americans who have expressed fear of return despite the country's *nonrefoulement* and human rights obligations;

and that deficiencies, barriers, and flaws in the Mexican asylum system leave many refugees unprotected.

Since July 2017, the dangers facing refugees and migrants in Mexico have escalated. Recent reports confirm that Mexican authorities continue to improperly return asylum seekers to their countries of persecution and that the deficiencies in the Mexican asylum system have grown.

**Increasing Violence in Mexico**

Human Rights First's July 2017 report found that migrants and refugees face grave risks of kidnapping, disappearance, sexual assault, trafficking, and other harms in Mexico. They are targeted not only due to their inherent vulnerabilities as refugees and migrants, but also due to their nationality, race, gender, sexual orientation and gender identity. Some have been trafficked into forced labor, while refugee and migrant women and girls have been trafficked to Mexico's southern border where they have been exploited in bars and night clubs that cater to police, military and other forces in the area.

In the last year, violence in Mexico has increased; 2017 was the deadliest year in Mexico, with a record 29,168 homicide victims, a 27 percent increase from 2016. In January 2018, the U.S. State Department even issued its highest level of travel warning for five Mexican states—Sinaloa, Colima, Michoacán, Guerrero, and Tamaulipas—due to high crime levels.

In September 2017, the U.N. Committee on the Protection of the Rights of All Migrant Workers and their families expressed concern at "the significant increase in crimes against migrants" in Mexico and at increasing reports of xenophobia towards migrants. Migrants shelters have reported increases in crimes against migrants, including robbery, kidnapping, and extortion, as detailed in the Washington Office on Latin America (WOLA)'s 2017 report. WOLA also reported exceedingly high impunity rates for

crimes against migrants and asylum seekers, and the Kino Border Initiative reported in September 2017 that crimes against asylum seekers and migrants—including assault, extortion, kidnapping, rape, and murder—largely go uninvestigated and unpunished.

### *Refoulement* and Suppression of Asylum Claims

As party to both the 1951 Convention Relating to the Status of Refugees and the Convention Against Torture, the Mexican government is obligated to prevent the return (*refoulement*) of any person to a country where they would face ongoing threats of persecution or torture. Human Rights First found that Mexico deports many refugees who are blocked or discouraged from seeking asylum in Mexico, or who do not even know they can apply for asylum. Subsequent reports indicate that these practices, which lead to the return of refugees to their countries of persecution, continue.

A 2018 report by Amnesty International found that 75 percent of migrants and asylum seekers surveyed who were detained by the National Institute of Migration (INM)—Mexico's immigration enforcement agency—were not informed of their right to seek asylum, even though this is required by Mexican law. Additionally, testimony of 120 of the asylum seekers surveyed by researchers indicated that *refoulement* had occurred.

Human Rights First's report found that Mexican INM officers who work at detention facilities encourage asylum seekers to accept deportation and to not pursue asylum applications. This occurs through various forms of coercion, including INM officers telling asylum seekers that they will be held in detention for three months or longer if they pursue asylum. Amnesty International's report also concluded that the INM's default process of requiring all migrants and asylum seekers to sign "voluntary return" paperwork during their initial INM interviews often prevents

asylum seekers from pursuing asylum. Many people signed these forms under coercion or without knowledge of their contents.

## Mexican Asylum System Lacks Capacity to Timely and Fairly Adjudicate Cases

As Human Rights First has detailed, despite the steep rise in asylum filings in Mexico, the Mexican asylum system lacks effective national reach and capacity. These deficiencies have grown worse since July 2017 and in the wake of the October 2017 suspension of the Mexico City office of the Mexican Commission for Refugee Assistance (COMAR). Many of the functions performed in that office were suspended following the September 2017 earthquake; the suspension has not yet been lifted as of March 2018.

The number of asylum applications filed in Mexico has risen sharply in recent years and so too has the number of asylum applications. Between 2013 and 2016, the number of asylum applications rose by 1226 percent. In 2017, 14,596 people applied for asylum. However, 7,719 of those cases remain unresolved. Only 4,475 of these applicants, or 30.7 percent, concluded their proceedings. In comparison, 71 percent of asylum applicants concluded their proceedings in 2016. Moreover, 2,233 cases were abandoned and 167 were withdrawn. The National Human Rights Commission (CNDH) in Mexico has indicated that this high number of abandoned cases is likely the result of the long processing delays. Legal groups working with asylum seekers in Mexico have reported to Human Rights First that the suspension of the Mexico City COMAR office has contributed to long delays in interviewing asylum applicants and recognizing claims.

On February 25, 2018, the National Human Rights Commission (CNDH) in Mexico issued an urgent call to the federal government warning of the possible collapse of the refugee protection system and urging the government to send a clear signal of its commitment to honor its asylum and

refugee obligations. The Commission also warned that the long delays and associated deficiencies constitute a denial of international protection.

While Human Rights First's prior report had noted an improvement in recognition rates, more recent reports of declines and disparities in recognition rates raise concerns that refugees from the Northern Triangle are being denied protection in Mexico. Statistics show that asylum recognition rates for 2017 are far below 2016 recognition rates.

In addition, non-profit legal organizations in Mexico City reported concerns to Human Rights First about variations in asylum recognition rates based on nationality. The statistics provided by the Mexican government confirm these concerns. For example, while 907 of the 4,042 Venezuelans (22.4 percent) who applied for asylum in 2017 were granted asylum, only 378 of the 4,272 Hondurans (8.9 percent) and 525 of the 3,708 Salvadorans (14.2 percent) who applied for asylum in 2017 were granted protection. Grant rates are further reduced for other countries, including Cuba and Somalia. Therefore, statistics that had previously indicated an improvement in Mexico's over-all recognition rate may have instead reflected the higher approval rate for the increased number of asylum applications from Venezuelans.

## Downloads:

Download 1 →

Download 2 →

Download 3 →

## Download 4



‹ BACK TO LIBRARY

# Get Involved

Enter email address

SUBSCRIBE

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

| | | |
|---|---|---|
| Press Room | Instagram ↗ | Human Rights First is a nonpartisan, 501(c)(3) |
| Careers | LinkedIn ↗ | charitable organization (EIN # 13-3116646). We do |
| Contact | Bluesky ↗ | not favor or oppose any candidate for public office. |
| Financials | X ↗ | Privacy Policy |

# EXHIBIT 6

## Situation of Impunity and Violence in Mexico's Northern Border Region

## March 2017

**Introduction**

The situation of insecurity and violence along Mexico's northern border and the government's failure to effectively investigate and prosecute these crimes poses dangers for migrants and asylum seekers, in particular unaccompanied children and women who are attempting to reach the United States. Asylum seekers who are forcibly turned back after claiming fear with U.S. migration officials at the U.S.-Mexico border and left to seek protection through clandestine means are particularly at risk.

Violence and crimes against migrants in Mexico's northern border states have long been documented to include cases of disappearances, kidnappings, rape, trafficking, extortion, executions, and sexual and labor exploitation by state and non-state actors. The situation is compounded by ineffective responses by Mexican authorities to investigate and prosecute crimes against migrants and other human rights violations. While the sparse civil society actors, including several migrant shelters often operating well above their capacity, do what they can to offer protection to migrants in transit and repatriated Mexican nationals, they too suffer attacks due to their work and the generalized situation of violence in the region. The  2015 Inter-American Commission on Human Rights (IACHR) report on the situation of human rights in Mexico identified violence as being particularly acute in the Mexican states of Baja California Norte, Sonora, Chihuahua, Coahuila, Nuevo León, and Tamaulipas due to the effects of drug trafficking and organized crime in this area.[i] A recent study states that in 2016, the border cities of Tijuana and Ciudad Juarez were among the top five Mexican cities with the highest level of homicides in the country.[ii] The Inter-American Commission has noted with great concern that that the disappearance of persons had become common practice in several states in northern Mexico, severely impacting migrants and Mexicans crossing Mexico on their way to the United States, as well as Mexicans deported from the United States to certain areas of the border region.[iii]

The U.S. State Department has issued travel advisories for all six of Mexico's northern states sharing a border with the United States, noting the dangers of transiting through them, the prevalence of organized crime, and the high rates of crimes.[iv] The 2016 State Department Human Rights report on Mexico noted the persistence of the involvement of the police and military in serious abuses across the country, including in executions, torture, and disappearances alongside impunity and corruption among Mexican law enforcement and in the justice system.[v] The same report highlighted the role of organized criminal groups in murdering, kidnapping, extorting, and intimidating individuals and in particular women, migrants, journalists, and human rights defenders. Violence against migrants and trafficking in persons were noted as particular problems in Mexico.

This situation confirms that the increasing of Customs and Border Protection agents refusing entry to asylum-seekers and turning back others without proper documents at the U.S. Ports of Entry at the border places only returns individuals, families, and children at risk, exposing them to organized crime and smugglers as well as corrupt state authorities unable to protect them or investigate the crimes they have suffered.  Furthermore, the proposal in the U.S. government executive order "*Border Security and Immigration Enforcement Improvements,*" issued January 25, 2017, and accompanying implementation memo to return to non-Mexican individuals to Mexico while they await a final resolution of their

1

immigration proceedings would further the practice of sending vulnerable migrants and asylum seekers back to danger in Mexico.[vi] It should be noted that the Mexican government has made clear that it will not receive from the U.S. deported migrants from any other country.[vii]

## Crimes against Migrants, Shelters and Violence by Geographical Area

### Baja California: Tijuana and Mexicali

Official statistics from the Baja State Secretariat for Public Security evidence an increase in homicide rates in the state of Baja California from January 2016 to July 2016, compared to the same period in the previous year.[viii] The U.S. State Department travel warning notes "violent crime areas" and "targeted criminal assassinations" throughout the state.[ix] According to an article by the *Los Angeles Times*, 2016 was on track to be the most violent year in Tijuana since 2010. Through the end of September 2016 there were 636 killings.[x]

Recently, the Tijuana port of entry area has been overwhelmed by the number of migrants and asylum seekers who have arrived, a large portion of them Haitians. The local Mexican government has been unable to support this population. NGO service providers have documented cases of extortion and kidnapping against migrants, reporting that the level of violence has increased recently.[xi] In Mexicali, local migrant shelters have been operating far above capacity given the numbers of migrants arriving. For example, one shelter has capacity for 100 individuals but at times in fall 2016 it received around 500.[xii] The security situation of shelters is also tenuous; shelters have identified instances where organized crime operatives have infiltrated their spaces.[xiii] Here, too, the local city government has not been responsive to complaints of crimes against migrants.

Violence against migrants in this part of the border is not new. In 2012, a WOLA report included accounts from Mexican officials and civil society about frequent kidnappings of migrants in the mountain region between Tijuana and Mexicali.[xiv] A 2006 study focusing on the areas of Tijuana and Mexicali reported that migrants traveling through these areas experience high rates of verbal, psychological, and physical violence perpetrated by local police and judges, along with high rates of sexual violence perpetrated by members of organized crime and the military.[xv]

### Sonora: Nogales, Caborca and Altar

The U.S. State Department includes a travel advisory for the state of Sonora, noting that "Sonora is a key region in the international drug and human trafficking trades."[xvi]

According to NGO reports, kidnapping and extortion continue with impunity in the city of Nogales. From 2014 to the present, the Kino Border Initiative has assisted migrants in filing 95 police reports, primarily for victims of kidnapping. None of the crimes have been adequately investigated and the majority of people who are victims of crime do not want to file a police report. In September 2016, the Kino Border Initiative soup kitchen was vandalized and electronics were stolen, possibly by organized crime, after the staff had received death threats.[xvii] The attacks were thought to be a reprisal against staff for their work reporting complaints of migrant kidnappings in the area.

2

In Caborca, Sonora the local community is hostile to migrants and Mexican authorities regularly violate the rights of migrants. NGOs have documented ongoing raids by the Mexican National Migration Institute (*Instituto Nacional de Migración*, INM) including targeting migrants inside private residences.[xviii]

In Altar, Sonora organized crime regularly attacks and commits crimes against migrants, including homicides.[xix] Municipal police also regularly detain, extort, and rob migrants. The local community is hostile to migrants here as well.

### Chihuahua: Ciudad Juárez and Chihuahua

The U.S. State Department includes a travel advisory for the state of Chihuahua, stating "criminal activity and violence remains an issue throughout the state of Chihuahua and its major cities." The warning urges individuals to exercise caution in all areas of Ciudad Juarez and prohibits U.S. employees from traveling after dark to certain areas.[xx]

After reporting a decrease in homicides in the state of Chihuahua, Mexico from 2011 to 2015, the U.S. Department of State 2017 Crime and Safety report documents a significant increase in 2016, with murders increasing from 1,151 in 2015 to 1,470 in 2016.[xxi]

Likewise, the cities of Ciudad Juarez and Chihuahua experienced an increase in reported murders in 2016, after a decrease from 2014 to 2015. In Ciudad Juarez, numbers fluctuated from 438 murders in 2014, to 312 in 2015, and peaked at 545 murders in 2016. There were over 150 homicides in Ciudad Juarez in the first two months of 2017.[xxii] In the city of Chihuahua, there were 219 reported murders in 2014, 158 reported murders in 2015, and 236 reported murders in 2016.[xxiii] *InSight Crime* reports that in October 2016 alone, the state of Chihuahua had 186 homicides, with 90 homicides occurring in Ciudad Juarez.[xxiv] Violence against women is historically a cause of grave concern in the area around Ciudad Juarez and in greater Mexico. Chihuahua is still the only state that has not incorporated femicide into its criminal code, despite the 2,318 women that have been murdered in Mexico over the course of nine years as reported by the National Citizen Femicide Observatory. [xxv]

The State Department reported kidnappings have increased in the state of Chihuahua; reporting nine in 2016, six in 2015, and eight in 2014. The report analyzes that these numbers may be artificially low due to under-reporting because of fear of retribution as well as differences in recording based on if the kidnappings relate to drug trafficking. [xxvi] Migrant shelters have likewise reported frequent kidnappings.

There is only one migrant shelter in the city of Chihuahua which recently opened on November 28th, 2016.[xxvii] Civil society presence here is not as developed as in other cities along the Mexican side of the border. The migrant population in the city is often mixed with other indigent groups, which has led to discrimination and criminalization of migrants.

### Coahuila: Saltillo, Piedras Negras

The U.S. State Department issued a travel warning for the state of Coahuila, noting "violence and criminal activity, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault, pose significant and continuing security concerns, particularly along the highways between Piedras Negras and Nuevo Laredo."[xxviii]

The state of Coahuila has been notorious for crimes against migrants and a lack of response by local government authorities to these abuses. Organized crime controls the border region and it is unsafe for migrants to proceed beyond Saltillo. This is one factor that causes groups of migrants to be stranded in the city. The situation of violence is ongoing and continues to increase. The migrant shelter in Saltillo, *Frontera con Justicia*, in documented more crimes against migrants: kidnapping, extortion, robbery and other abuses in the first seven months of 2016 than in all of 2015.[xxix] The border town of Piedras Negras also continues to experience violence. In November 2016, five Salvadoran migrants, including a woman and child, were rescued by Mexican authorities after having been kidnapped there.[xxx]

Migrant shelters and their staff have also been impacted by violence and impunity. The director and other staff from the Casa del Migrante shelter in Saltillo have been threated organized criminal organizations on multiple occasions[xxxi] The most recent incident occurred in October 2016. As a result of the harassment and threats they have experienced, the director and staff have been beneficiaries of precautionary measured by the IACHR since 2010.[xxxii] When migrants are detained by Mexican migration agents human rights defenders are often not given access to them and the migrants themselves are not informed of their rights.

### Nuevo Leon: Monterrey

The U.S. State Department travel advisory notes that U.S. government personnel should travel outside of the city of Monterrey only during daylight hours. The 2016 Crime and Safety Report released by the U.S. Department of State categorizes Monterrey's consular district as a high crime area. Violent crime in the forms of kidnappings, extortions, homicides, as well as non-violent crimes of vehicle threats and others, remain serious concerns for the area. Police and cartel confrontations can at times put the public at risk through shootouts, or via the weapons and explosives discovered after a confrontation.

In Monterrey, shelters have reported violence against migrants perpetuated by organized crime as well as local police. Kidnappings of migrants are ongoing. The municipal police has also forcibly disappeared migrants, not just on the streets but also from houses. Police extort migrants and have even detained volunteers from the migrant shelters. In a recent survey, the *Casa Monarca* migrant shelter found that 82% of migrants who have experienced threats report that they were threatened by the police. The INM claims to be rescuing migrants from situations of insecurity when it is in fact detaining and deporting them.[xxxiii]

Crimes committed against migrants are also not new in this state. In 2012, forty-nine migrants were kidnapped and executed by organized crime in the city of Cadereyta, Nuevo Leon. Five years later, the identification of all of their remains is still pending.[xxxiv]

### Tamaulipas: Matamorros, Nuevo Laredo & Reynosa

The U.S. State Department's December 2016 travel advisory warns: "U.S. citizens should defer all non-essential travel to the state of Tamaulipas due to violent crime, including homicide, armed robbery, carjacking, kidnapping, extortion, and sexual assault. State and municipal law enforcement capacity is limited to nonexistent in many parts of Tamaulipas. Violent criminal activity occurs more frequently along the northern border and organized criminal groups may target public and private passenger buses traveling through Tamaulipas. These groups sometimes take all passengers hostage and demand ransom

4

payments. Matamoros, Reynosa, Nuevo Laredo, and Ciudad Victoria have experienced numerous gun battles and attacks with explosive devices in the past year."[xxxv]

The 2016 Crime and Safety Report issued by the U.S. Department of State on Nuevo Laredo, Tamaulipas demonstrated the continued absence of police in regulating crimes in the area. The violence primarily stems from organized crime. Kidnapping and other violence statistics have not improved from 2015. U.S. government statistics list Tamaulipas as the highest state for kidnappings in the country, a record held for 2015 and 2016. [xxxvi] Similarly, Tamaulipas has the third highest missing person's rate in Mexico due to major migrant routes that traverse the border state and an ongoing territorial battle between organized crime groups.[xxxvii]

Nuevo Laredo has also long presented a danger for migrants in transit, as well as those who are returned. The *Casa del Migrante* Nuevo Laredo reports that it is dangerous for migrants to be on the street or in the bus stations. NGOs have requested that Mexican marines or army position themselves at the bus station in Nuevo Laredo to provide security, but the government has not taken action. There is almost no government support even for deported Mexican migrants in this border town. The government only brings migrants from the point of deportation to the migrant shelter. There is no support from the local government for migrants to return to their place of origin and the burden falls to the migrant shelters.[xxxviii]

Migrants continue to be victims of crime in Reynosa as well. In December 2016 it was reported that a Guatemalan migrant women in Reynosa approached U.S. authorities at the Port of Entry to request asylum and she was turned away only to be kidnapped by smugglers.[xxxix] In April 2016, Mexican marines rescued 49 Central American migrants who had also been kidnapped in Reynosa.[xl]

In 2010 and 2011, some of the most egregious cases of mass kidnapping and execution of migrants were committed in the city of San Fernando, Tamaulipas. While organized crime was the main perpetrator behind the massacres, additional evidence since then has confirmed the collusion of municipal police forces in disappearing and handing the migrants over to organized crime for execution.[xli]

**Contact:**

Daniella Burgi-Palomino, Senior Associate, Mexico, Migrant Rights and Border Issues, Latin America Working Group (LAWG), dburgipalomino@lawg.org

Maureen Meyer, Senior Associate, Mexico, Migrant Rights and Border Issues, Washington Office on Latin America (WOLA), mmeyer@wola.org

Joanna Williams, Director of Education and Advocacy, Kino Border Initiative, jwilliams@kinoborderinitiative.org

---

[i] IACHR, Country Report México: Situation of Human Rights in Mexico, December 31, 2015 http://www.oas.org/en/iachr/reports/pdfs/Mexico2016-en.pdf.

[ii] Ferreira, Octavio Rodríguez, "Resurgence of Violence in Tijuana," University of San Diego, February 3, 3017 https://www.wilsoncenter.org/event/the-state-security-mexico-why-are-homicides-increasing-how-to-reduce-the-violence.

[iii] IACHR, pg. 89.

[iv] "Mexico Travel Warning," U.S Passports and International Travel, U.S. Department of State, Bureau of Consular Affairs, last updated December 8, 2016, https://travel.state.gov/content/passports/en/alertswarnings/mexico-travel-warning.html.

[v] Mexico Human Rights Report, Country Reports on Human Rights Practices for 2016, United States Department of State Bureau of Democracy, Human Rights, and Labor  https://www.state.gov/documents/organization/265812.pdf

[vi] Department of Homeland Security, Memo, "Implement e President's Border Security and Immigration Enforcement Improvements Policies", February 20, 2017, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf

[vii] El Universal, "México no aceptará deportados de otros países: Videgaray, February 22, 2017, http://www.eluniversal.com.mx/articulo/nacion/politica/2017/02/22/mexico-no-aceptara-migrantes-de-otros-paises-videgaray

[viii] "Mexico Travel Warning

[ix] Ibid.

[x] Dibble, Sandra, "Killings Rise Anew in Tijuana, a City Haunted by Years of Violence," *Los Angeles Times*, October 9, 2016, http://www.latimes.com/world/mexico-americas/la-fg-mexico-tijuana-crime-20161005-snap-story.html.

[xixi] Casa del Migrante en Tijuana, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

[xii] Centro Comunitario de Ayuda a Migrantes (C-CAM), "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

[xiii] Casa del Migrante Mexicali, Módulo de Atención al Migrante Deportado, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México. .

[xiv] Isacson, Adam and Meyer, Maureen, "Beyond the Border Buildup Security and Migrants Along the U.S.-Mexico Border", April 2012 https://www.wola.org/files/Beyond_the_Border_Buildup_FINAL.pdf

[xv] Infante, C., Idrovo, A.J., Sánchez-Domínguez, M.S. et al, J Immigrant Minority Health (2012), http://rdcu.be/pUG5.

[xvi] "Mexico Travel Warning."

[xvii] Centro Prodh "Agresiones contra Iniciativa Kino, refugio de migrantes en Sonora," September 29, 2016, http://centroprodh.org.mx/sididh_2_0_alfa/?p=47201

[xviii] Centro Comunitario de Ayuda a Migrantes (C-CAM).

[xix] Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN).

[xx] "Mexico Travel Warning."

[xxi] "Mexico 2017 Crime & Safety Report: Ciudad Juarez ," OSAC, United States Department of State, Bureau of Diplomatic Security, February 14, 2017, https://www.osac.gov/pages/ContentReportDetails.aspx?cid=21251.

[xxii] Woody, Christopher, Business Insider, "Mexico's ascendant cartel is making a deadly addition to a trafficking hub on the US border", March 4, 2017, http://www.businessinsider.com/jalisco-cjng-sinaloa-cartel-violence-in-ciudad-juarez-mexico-2017-3

[xxiii] Ibid.

[xxiv] Alonso, Luis Fernando, "Rising Violence in Juárez, Mexico May Signal Return of Cartel War," *InSight Crime*, October 31, 2016, http://www.insightcrime.org/news-briefs/rising-violence-in-juarez-mexico-may-signal-return-of-cartel-war.

[xxv] Gallegos, Zorayda, "Mexican Deputies Toughen up Femicide Legislation," *El Pais*, February, 6, 2017 http://elpais.com/elpais/2017/02/06/inenglish/1486380569_447772.html

[xxvi] Ibid.

[xxvii] Casa del Migrante 1 de 7 migrando, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México.

[xxviii] "Mexico 2017 Crime & Safety Report: Ciudad Juarez."

[xxix] Meyer, Maureen, "Migrants in Transit Face Crimes and Human Rights Abuses," WOLA, November 15, 2016, https://www.wola.org/analysis/migrants-transit-face-crimes-human-rights-abuses-mexican-government-prioritizes-detention-deportation-protection/.

[xxx] Ramos, Leopold, La Jornada, "Rescatan a migrantes secuestrados en Piedras Negras", Nov. 11, 2016, http://www.jornada.unam.mx/ultimas/2016/11/11/rescatan-a-migrantes-secuestrados-en-piedras-negras

[xxxi] Casa Monarca, Casa Nicolás, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Kino Border Initiative.

xxxii Inter-American Commission of Human Rights, Precautionary Measures, PM 270/10 − PM 312-09 - Father Pedro Pantoja Arreola and his Team of Collaborators at the Belén Migrant Shelter, Mexico, http://www.oas.org/es/cidh/defensores/proteccion/cautelares.asp

xxxiii Ibid.

xxxiv "El caso de 49 torsos encontrados en la carretera de Cadereyta, Nuevo León," Fundación Para la Justicia y el Estado Democrático de Derecho, http://fundacionjusticia.org/el-caso-de-49-torsos-encontrados-en-la-carretera-de-cadereyta-nuevo-leon/.

xxxv "Mexico Travel Warning."

xxxvi "Mexico 2016 Crime & Safety Report: Nuevo Laredo," OSAC, United States Department of State, Bureau of Diplomatic Security, April 12, 2016, https://www.osac.gov/Pages/ContentReportDetails.aspx?cid=19475.

xxxvii Estadísticas Fuero Federal, Secretaria de Gobernación, 28 de febrero de 2017 http://secretariadoejecutivo.gob.mx/rnped/estadisticas-fuerofederal.php.

xxxviii Casa del Migrante Nuevo Laredo, "Reports from Mexican Border Shelters: Insecurity and Lack of Mexican Governmental Support," Iniciativa Frontera Norte de México.

xxxix Nelson, Aaron, San Antonio Express News, Dec. 29, 2016, "Asylum-seeking immigrants flood international bridges, many sent back to Mexico", http://www.expressnews.com/news/local/article/Asylum-seeking-immigrants-flood-international-10825675.php?t=01c86173346a5efc77&cmpid=fb-premium&cmpid=twitter-premium

xl De Llano, Pablo, El País, "Un operativo militar rescata en Reynosa a 49 centroamericanos secuestrados", April 23, 2016,  http://internacional.elpais.com/internacional/2016/04/22/mexico/1461333055_498254.html

xli "Fosas clandestinas en San Fernando, Tamaulipas," Fundación Para la Justicia y el Estado Democrático de Derecho, http://fundacionjusticia.org/47-fosas-con-193-restos-en-san-fernando-tamaulipas/.

# EXHIBIT 7

# ACCESS TO JUSTICE FOR MIGRANTS IN MEXICO

## A Right that Exists Only on the Books

### JULY 2017

RESEARCH REPORT

*AP Photo/Felix Marquez*









## IN MEMORY OF



*Ricardo Ramírez Arriola / 360°*

This report is dedicated to the life and work of Alberto Donis, migrants' rights defender and coordinator of the shelter Hermanos en el Camino in Oaxaca, who died in June 2017. Beto always demanded justice for crimes and abuses committed against migrants in Mexico.
We will never forget you, Beto.

# FINDINGS

- **ACCORDING TO ALL OF THE MIGRANT SHELTERS THAT COLLABORATED IN THIS REPORT, THE NUMBER OF KIDNAPPINGS, FORCED DISAPPEARANCES, AND OTHER TYPES OF FALSE IMPRISONMENT OF MIGRANTS REMAINS HIGH IN MEXICO.** The data and testimonies collected show that organized criminal groups are involved in these cases and are often in collusion with authorities from different levels of government.

- **BETWEEN 2014 AND 2016, THERE WAS A 575 PERCENT INCREASE IN THE NUMBER OF MIGRANTS WHO REGULARIZED THEIR MIGRATION STATUS IN MEXICO BECAUSE THEY WERE VICTIMS OR WITNESSES OF GRAVE CRIMES IN THE COUNTRY. THIS CONFIRMS THAT CRIMES AGAINST MIGRANTS ARE ON THE RISE.**

- **IMPUNITY FOR CRIMES AGAINST MIGRANTS IN MEXICO IS AT ALARMING LEVELS.** According to official figures for the 2014-2016 period, of 5,824 crimes against migrants reported in Chiapas, Oaxaca, Tabasco, Sonora, Coahuila and at the federal level, there is evidence of only 49 sentences, leaving 99 percent of the cases in impunity.

- **MEXICO HAS DRASTICALLY INCREASED ITS CAPACITY TO DETAIN AND DEPORT MIGRANTS, BUT IT HAS NOT GIVEN THE SAME PRIORITY TO, NOR TREATED WITH THE SAME URGENCY, THE NEED TO DEVELOP MECHANISMS FOR INVESTIGATING CRIMES AGAINST THEM.** The creation of specialized local prosecutor's offices and a federal unit within the federal Attorney General's Office (*Procuraduría General de la República, PGR*) is important, but not enough to ensure justice. In practice, reporting crimes is difficult and the offices in charge of investigations do not have sufficient human and financial resources, nor do they have comprehensive and clear strategies for investigating the crimes. Effective procedures to allow migrants to denounce crimes and abuses while held at migrant detention centers are also lacking.

- **MANY STATE OFFICIALS IN MEXICO SHOW A CLEAR LACK OF WILL TO INVESTIGATE CRIMES COMMITTED AGAINST MIGRANTS.** Mexican authorities commonly justify the lack of results saying that if victims do not stay in the country, investigations cannot move forward.  However, we found that authorities do not adequately use the two main resources available for investigating these cases: the production of evidence before a trial (*"pruebas anticipadas"*) and the regularization of the migration status of migrants who are victims of or witnesses to crimes.

# FINDINGS

- **THE MECHANISM FOR FOREIGN SUPPORT (*MECANISMO DE APOYO EXTERIOR, MAE*) THAT PERMITS CRIMES COMMITTED AGAINST MIGRANTS IN MEXICO TO BE DENOUNCED FROM ABROAD, WORKS THANKS TO THE EFFORTS OF CENTRAL AMERICAN GROUPS WHOSE FAMILY MEMBERS HAVE BEEN VICTIMS OF THESE CRIMES, HUMAN RIGHTS ORGANIZATIONS ACCOMPANYING MIGRANTS, AND SPECIFIC ACTIONS OF SOME GOVERNMENT OFFICIALS.** However, Mexico's Ministry of Foreign Affairs (*Secretaría de Relaciones Exteriores, SRE*) and Attorney General's Office have not yet shown the will to make the Mechanism work adequately, facilitate case intake, and educate Mexico's consular network about it. Significant challenges exist to keep families in their country of origin or residency informed about their cases and to facilitate family travel to Mexico when they have to participate directly in the investigation.

- **THE CENTRAL AMERICAN CONSULATES IN MEXICO DO NOT MAKE THE NECESSARY EFFORTS TO ASSIST THEIR CITIZENS WHEN THEY FALL VICTIM TO CRIME IN MEXICO, SUCH AS THROUGH ACTIVELY PARTICIPATING IN THE INVESTIGATION OF ABUSES AGAINST MIGRANTS OR BY FACILITATING INFORMATION THAT IS NEEDED FROM THE VICTIMS DURING INVESTIGATIONS.** In Coahuila, for instance, the Honduran consul has been recognized for the strong support he provides to migrants who are crime victims. In other states, such as Oaxaca, consular support to Central American migrants is insufficient.

- **ALTHOUGH THE NATIONAL HUMAN RIGHTS COMMISSION (*COMISIÓN NACIONAL DE LOS DERECHOS HUMANOS, CNDH*) REGULARLY VISITS MIGRANT DETENTION CENTERS TO DOCUMENT THE CONDITIONS AND TREATMENT OF MIGRANTS, IT HAS MADE FEW RECOMMENDATIONS TO THE NATIONAL MIGRATION INSTITUTE (*INSTITUTO NACIONAL DE MIGRACIÓN, INM*) ON HOW TO IMPROVE THE SITUATION.** The number of recommendations issued by the CNDH on abuses in the detention centers and against migrants is surprisingly low compared to the accounts of migrants, who identify migration enforcement operations and their stay in detention centers as sources of abuse and human rights violations, and INM agents as perpetrators.

- **OFFICIAL STATISTICS SHOW AN INCOMPLETE STORY −FAR LESS VIOLENT AND HARMFUL− THAN MIGRANTS' TESTIMONIES ON THE CRIMES AND ABUSES THEY SUFFER IN MEXICO.** In some cases, there is not disaggregated data on crimes against migrants. In others, the attorney general or specialized prosecutor's offices do not have information on how many of their investigations resulted in sentences. Statistics on violence against migrants are not gathered at the national level even though many federal and local cases may be related, making it difficult to

# FINDINGS

obtain information on criminal networks that target migrants and operate throughout the country. Shelters and organizations supporting migrants who have been victims of crimes are an essential source of information and have better statistics than the government.

- **MIGRANTS' RIGHTS DEFENDERS ARE VICTIMS OF THREATS AND INTIMIDATION FOR THEIR WORK.** Similar to crimes against migrants, attacks on migrants' rights defenders go unpunished. Furthermore, there have been attempts to discredit, limit, and halt the work of defenders supporting the identification of victims' remains in the San Fernando and Cadereyta massacres.

# CONCLUSIONS AND RECOMMENDATIONS

The creation of special prosecutors or units for investigating crimes against migrants and the Mechanism for Foreign Support (MAE) to denounce crimes from abroad are an official acknowledgment of the need for concrete measures to guarantee access to justice for migrants who are victims of crime in Mexico. However, fundamental obstacles remain —most of them due to authorities' lack of will or negligence— that impede these bodies from fulfilling their duty. Currently, an overwhelming number of crimes against migrants in the country go uninvestigated or unpunished.

To address this situation, Mexican authorities must take bold measures to produce measurable and public results, including:

## ELIMINATE OBSTACLES SO THAT MIGRANTS CAN REPORT CRIMES COMMITTED AGAINST THEM IN MEXICO

- The specialized prosecutors or offices to investigate crimes against migrants and the Unit for the Investigation of Crimes Involving Migrants (*Unidad de Investigación de Delitos para Personas Migrantes, UIDPM*) of the federal Attorney General's Office (*Procuraduría General de la República, PGR*) should facilitate the reporting of crimes against migrants. Measures to do so could include conducting regular visits to migrant shelters or human rights organizations to receive crime reports and creating new specialized prosecutor's offices in other states where there is a high number of crimes against migrants, such as Sonora and Tamaulipas. Public officials should have presence in well-known transit points and migration detention centers to receive crime reports from migrants. Implementing mobile Public Prosecutor's units to be able to receive complaints where they are needed could contribute to addressing this situation.

- Reform Article 133 of the Migration Law, and Article 144, section 2 and Article 180, section 1, paragraph b) of the Regulations to the Migration Law that only permits the regularization of migrants that have been victims of "grave crimes". This requirement is an obstacle to justice and due process during regularization procedures, and opens the door to arbitrary decisions by authorities on who is or is not a victim of a grave crime. Keeping this requirement may also prevent officials from the Public Prosecutor's Office from gathering information from crime victims and witnesses that may be relevant to other investigations.

- Hold regular meetings with the INM's Beta Groups, federal and state-level prosecutors that investigate crimes against migrants, the CNDH, public human rights bodies, migrant shelters, and organizations that accompany cases, to discuss statistics and crime reports and ways to increase their capacity to receive crime reports from migrants, instead of

waiting for them to go to the authorities. The Ministry of the Interior (*Secretaría de Gobernación, Segob*) should produce and publicize annual statistics that concentrate data on crimes against migrants as a way to comply with the fifth objective of the Special Migration Program on security and access to justice for migrants and migrants' rights defenders.

• Because the Mechanism for Foreign Support permits reporting crimes committed against migrants in Mexico from abroad, Mexico's Ministry of Foreign Affairs (*Secretaría de Relaciones Exteriores, SRE*) and the PGR must officially clarify - for instance, by issuing guidelines - the role of each institution in receiving complaints and evidence.  The Mexican government must have a sufficient number of trained and permanent staff in Central America and the United States – either legal attachés or officials from the public prosecutor's office – to receive crime reports, channel them to authorities in Mexico, and to keep families informed in real time of progress in their cases in the countries where they reside, including a mechanism to consult relevant documents remotely. Furthermore, they must facilitate the visa process so that families and victims who are in Central America can travel to Mexico when their participation in investigations is required.

## CONDUCT SERIOUS INVESTIGATIONS INTO CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN MEXICO AND DELIVER CONCRETE RESULTS

• Provide the UIDPM and the specialized state-level prosecutor's offices with the financial and human resources they need to carry out their work. To this end, federal and state congresses must allocate sufficient resources to the prosecutor's offices and units that investigate these cases. The attorney general and public prosecutor's offices must have autonomy to conduct investigations and to appoint or hire personnel with the necessary professional and technical capacities, including agents of the Public Prosecutor's Office, experts, and investigative police.

• The UIDPM and specialized prosecutor's offices should establish a policy to investigate and prosecute crimes against migrants. The plan should be made public, specify investigative priorities for each prosecutor's office, the cases under investigation, and the results, which should also be made public. The plan should also explicitly promote producing evidence before trial ("*pruebas anticipadas*") and the regularization of the migration status of migrants who have been victims of or witnesses to crimes so that criminal investigations can be pursued. These public policy documents will facilitate communication among prosecutors and among PGR offices that investigate crimes against migrants.

• The federal and state congresses should establish procedures with clear criteria for appointing and removing the heads of the prosecutor's offices specialized in investigating

crimes against migrants. The nomination process should be public and transparent, with participation from civil society. The head of these prosecutors' offices should have a background relevant to the position, with experience in providing adequate assistance to migrants who are victims of crime, and the appropriate professional experience for the position.

- The PGR should establish transparent and accessible procedures for keeping the families, or the migrants who are crime victims and who live abroad, up-to-date on the progress of their case in their country of residence. For example, authorities could take advantage of already existing working groups (such as the Forensic Commission created in 2013 to identify the remains of victims from the San Fernando and Cadereyta massacres) to report on progress made in investigating crimes reported through the Foreign Support Mechanism.

- In addition to its important work to document the situation in migrant detention centers, the CNDH should make recommendations to the INM, the Federal Police and other federal authorities based on migrants' complaints, including specific recommendations on crimes and irregular conduct that should be investigated. We also urge the CNDH to produce reports or general recommendations on the human rights of migrants in Mexico, such as on migration enforcement operations carried out by the INM together with other security forces and on access to justice for migrants who have been victims of crime. Furthermore, the Commission should publish reports on a regular basis with recommendations to the INM based on the CNDH's work in migrant detention centers.

## INCREASE REGIONAL COOPERATION

- Through their consular services, the Central American governments should increase their presence in places where crimes against their citizens are common, as well as the protection of their citizens when they are victims of crimes or human rights violations in Mexico. They should also strengthen dialogue with their Mexican counterparts on the transnational investigation of crimes against migrants.

- This may include enhancing communication with attorney general offices and other bodies of the Mexican government, validating and issuing identity papers for victims of crimes, and providing legal advice. It is fundamental that they request information from the Mexican government on the progress of investigations or submit letters supporting migrants' complaints or reports on abuses, as the Honduran consul has done in Coahuila. The consulates must also provide information to migrants who live abroad on how to access and use the MAE to report crimes they suffered in Mexico from their countries of origin and the United States.

- The prosecutors from Mexico, Central America, and the United States as a destination country, should hold regular meetings to address from a regional perspective the crimes and human rights violations committed against migrants. They should also agree on efficient ways of collaborating and reducing impunity in these cases.

## ABOUT THE AUTHORS

Ximena Suárez is WOLA's Associate for Mexico. Andrés Diaz is a Researcher on Fundar's Human Rights and Anti-Impunity program. José Knippen is a migration project coordinator at Fundar. Maureen Meyer is WOLA's Senior Associate for Mexico and Migrant Rights.

## ACKNOWLEDGEMENTS

We would like to thank the following people for their contributions to this report: Hannah Smith, WOLA Program Officer, contributed to the research, writing, and production of this report. Kristen Muciño, WOLA's Communications Director, offered valuable suggestions to the text. José Benjamin Montaño, WOLA intern, contributed to the data and information analysis for this report.

*This report would not have been possible without the generous support of the Ford Foundation, the MacArthur Foundation, and CAMMINA-the Central America and Mexico Migration Alliance.*

## ABOUT THE ORGANIZATIONS

**CASA DEL MIGRANTE DE SALTILLO "FRONTERA CON JUSTICIA", AC**, in Saltillo, Coahuila, provides comprehensive humanitarian assistance as well as case documentation and legal services to migrants.

**LA RED MIGRANTE SONORA** is a network of five organizations based in the state of Sonora dedicated to defending and providing humanitarian assistance to migrants in Mexico.
- **Kino Border Initiative** is an organization based in Nogales, Sonora and Nogales, Arizona that works in support of migrants and refugees in the United States and Mexico.
- **Centro de Recursos para Migrantes (CRM)**, in Agua Prieta, works to provide humanitarian assistance to migrants and document abuses.
- **Centro de Atención al Migrante Exodus (CAME)** provides shelter to traveling or deported migrants in Agua Prieta.
- **Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN)** is a migrant shelter in Altar directed by the Church of Nuestra Señora de Guadalupe.
- **Centro Comunitario de Ayuda a Migrantes (C-CAM)** is a group of volunteers organized to help migrants crossing through the city of Caborca; they give out food along the train tracks and belong to the local parish of Nuestra Señora de Guadalupe.

**ALBERGUE DE MIGRANTES "HERMANOS EN EL CAMINO"**, in Ixtepec, Oaxaca, provides comprehensive humanitarian assistance to migrants in transit in Mexico.

**LA 72, HOGAR-REFUGIO PARA PERSONAS MIGRANTES** is a Franciscan project dedicated to providing comprehensive assistance to migrants and refugees traveling through Tenosique, Tabasco.

**FUNDACIÓN PARA LA JUSTICIA Y EL ESTADO DEMOCRÁTICO DE DERECHO** is an organization based in Mexico City with offices in Honduras, El Salvador, and Guatemala, dedicated to promoting access to justice and truth for victims of crimes and human rights violations as a way of strengthening the rule of law and combating impunity.

**FUNDAR, CENTRO DE ANÁLISIS E INVESTIGACIÓN, AC** is civil society organization based in Mexico City that works toward a substantive democracy.

**WASHINGTON OFFICE ON LATIN AMERICA (WOLA)** is a research and advocacy organization based in Washington, DC that promotes human rights in the Americas.

# EXHIBIT 8





# Stuck in Uncertainty and Exposed to Violence: The Impact of US and Mexican Migration Policies on Women Seeking Protection in 2021

## Introduction

In 2021, policies on both sides of the US-Mexico border negatively affected women seeking protection. As we head into 2022, marking the first year of the Biden administration, Trump-era restrictive policies remain in place at the US-Mexico border, exacerbating the situation for women forced to wait at Mexico's northern border for the opportunity to seek asylum in the US. In addition, under pressure from the Biden administration, the Mexican government continues to intensify enforcement to deter migrants and individuals seeking protection at Mexico's southern border, worsening the situation for women stuck there.

In the fall of 2021, the Instituto para las Mujeres en la Migración (IMUMI) and the Women's Refugee Commission (WRC) monitored events and carried out interviews with women seeking protection to understand the challenges and the dangers they face in Mexico.[1] This report outlines those challenges and provides recommendations for the US and Mexican governments.

## US Policies in 2021

Early on, the Biden administration committed to building a fair, orderly, and humane immigration system and reversing illegal Trump-era policies that endangered the lives of people seeking protection at the US-Mexico border. In its first few months in office, it made positive strides on several promises, including creating initiatives to provide reparative justice for those harmed by Trump-era policies. In February 2021, President Biden created the Interagency Task Force on the Reunification of Families to reunify the nearly 4,000 children who were separated from their parents under Trump's "zero tolerance" policy, which aimed to criminally prosecute all migrants crossing into the US between ports of entry. That month, the administration also announced the creation of a process—in collaboration with international organizations, regional task forces, and local NGOs—that would allow individuals returned to Mexico under the Trump-era "Remain in Mexico" (RMX) policy to return to the US and continue their immigration cases in the US rather than continuing to wait in Mexico. It also reversed the Trump-era legal decisions that made it nearly impossible for survivors of domestic and gang violence to qualify for asylum.

In addition, the administration's strategies included a focus on protection and a gender lens. In summer 2021, the administration launched a whole-of-government blueprint of strategies to reform the US immigration system. One of the strategies that aimed to address the root causes of migration in Central

---

[1] This report draws on interviews from IMUMI and WRC, cases from IMUMI's legal clinic, as well as media reports and research publications. IMUMI interviewed women in shelters in Mexico City between September and December 2021. On November 2, 2021, WRC staff visited two shelters in Mexico City and interviewed individuals from Haiti, Venezuela, El Salvador, Guatemala, and other countries. On December 3, 2021, WRC staff visited two migrant shelters in Tijuana and interviewed individuals from Mexico, Honduras, El Salvador, Guatemala, Cameroon, and other countries. IMUMI and WRC obtained informed consent from all individuals interviewed.

1

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



America included a pillar "to combat sexual, gender-based, and domestic violence."[2] Another strategy laid out a comprehensive approach to regional migration management. Yet, in practice, the Biden administration has largely focused on enforcement and deterrence in its engagement with countries in the region. Notably, it reportedly has requested that the Mexican government sign a "safe third country" agreement, requiring most non-Mexican individuals to first seek protection in Mexico before requesting asylum in the US.

The Biden administration's positive actions and strategies have been profoundly overshadowed by its failure to restore access to asylum at the border, including at ports of entry, for most arriving migrants and people seeking asylum. In December 2021, the Biden administration announced the reinstatement (pursuant to a court order) and expansion of RMX[3] and extended the Trump-era Title 42 CDC public health order that summarily blocks and expels people from the US-Mexico border, often repeatedly, to danger in Mexico and countries of origin. Since President Biden took office, people have been expelled more than 1.1 million times, including more than 187,000 expulsions of parents and children,[4] who were denied the opportunity to seek protection. In August 2021, the administration began expulsion flights to southern Mexico, where Mexican authorities forcibly returned people across the border to Guatemala or sent them on buses to Honduras, in an act of chain *refoulement*.[5] In clear violation of *non-refoulement*, the Biden administration also sent individuals on Title 42 expulsion flights directly to back to Haiti, Guatemala, Honduras, and other countries of origin, without screening them for risk of harm upon return or otherwise providing them an opportunity to seek protection.

## Mexican Policies in 2021

Over the course of 2021, under pressure from the White House, the Mexican government took a number of measures to step up its immigration enforcement to deter migrants and asylum seekers from accessing protection at the US-Mexico border. In 2021, authorities from Mexico's National Migration Institute (INM) worked with the Mexican National Guard and security forces to carry out a record number of migrant apprehensions; approximately 30 percent of those apprehended were women, and 27 percent were children. These figures include families and unaccompanied children who were initially apprehended by INM or the National Guard and then referred to state or civil-society shelters, a requirement of Mexico's new children protection reform implemented in 2021. The reform requires that after referral, the protection offices determine the child's best interests, whether that means deportation, remaining in Mexico with humanitarian legal status, or being reunited with family in another country. While this reform is a big step

---

2 In addition to its immigration blueprint, in November 2021, the administration launched the first National Strategy on Gender Equity and Equality. Through this whole-of-government approach, the administration committed to work to build "a fair and humane immigration system that welcomes immigrants [and] keeps families together" and create improved protection pathways for those fleeing persecution, including victims of gender-based violence.

3  The restart of Remain in Mexico was pursuant to a court order; however, prior to the ruling in early August 2021, the Biden administration reportedly was already considering implementing a supposedly more "humane" version of RMX. In August 2021, a Texas judge ordered the administration to restore RMX "in good faith." The administration appealed that order and issued a new memo terminating RMX in October 2021. The Biden administration has committed to ending RMX eventually, but said that it planned to comply with the court's order to restart RMX. In the new iteration, the administration expanded the program to all non-Mexicans from the Western Hemisphere.

4  This includes Customs and Border Protection Title 42 expulsion statistics from February to December 2021.

5  The principle of non-refoulement in international law prohibits countries that are receiving asylum seekers from removing them or returning them to a country where there is reason to believe that they would be at risk of irreparable harm or human rights violations. Chain refoulement occurs when individuals are sent back to a country that will not protect people from the onward transfer in violation of non-refoulement. In this case, the US expelled asylum seekers back to southern Mexico by plane and the Mexican government bussed them to Guatemala. This occurred with Guatemalan, Salvadoran, and Honduran nationals in 2021.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 236 of 399



forward for the rights of families and children, implementation across <u>Mexico has been uneven[6] and many challenges remain</u>, including the need for better funding and training to ensure the best interests of children are consistently upheld.

The Andrés Manuel Lopez Obrador administration also took greater measures to restrict travel by migrants and individuals seeking protection, pushing many people to hire smugglers and risk dangerous travel routes. It also created new <u>travel regulations</u> requiring proof of immigration status to purchase a bus ticket, leading to discrimination and racial profiling of both migrants in transit and Mexicans, especially Indigenous and Afro-descendent Mexicans. In addition, <u>the US requested</u> that the Mexican government put into place new travel requirements to make it more difficult for the citizens of countries who have been arriving at the US southern border in high numbers to transit through Mexico. Since August 2021, the Mexican government announced new requirements that <u>Ecuadorians</u>, <u>Brazilians</u>, and Venezuelans, some of whom are fleeing danger, acquire a visa to travel to Mexico as tourists. Mexican immigration authorities also stepped up <u>restrictive tactics at Mexican airports</u>, where they denied entry to a record 72,895 foreigners in 2021, more than double the number of denials in 2019 (31,008). Officials at airports turned around individuals aiming to seek protection in Mexico, who were unlawfully denied the opportunity to present their claim to COMAR (Mexico's agency responsible for asylum processing and adjudications) and instead <u>detained in isolation for weeks</u>. Furthermore, Mexico continued to coordinate with the US on the Biden administration's expulsions under Title 42, <u>agreeing to receive expelled individuals from Guatemala, Honduras, and El Salvador</u>, and <u>worked with the Biden administration to re-implement and expand RMX</u>.

Meanwhile, as Mexican authorities increased enforcement and US restrictive policies persisted, last year <u>Mexico became one of the top destinations worldwide</u> for individuals seeking protection. In 2021, COMAR received a historic high of <u>131,448 applications</u>, with women representing 41 percent of applicants[7] and children representing 24 percent. This record number of applicants is an 87 percent increase from the prior high of 70,351 applications in 2019. Underfunded despite the critical need, COMAR has been unable to keep up with the increase in claims, leaving many people in southern Mexico—where the vast majority submit their applications[8]—to wait for decisions on their protection claims in precarious conditions for months or even up to two years in some cases. Mexican refugee law requires that applicants remain in the jurisdiction where they applied throughout the adjudication process, which prevents individuals applying for protection from reuniting with family and community networks in safer regions of the country with better employment opportunities.

***Note that the following section of the report contains graphic descriptions of sexual violence.***

## The Impact of US and Mexican Policies on Women

Taken together, the US and Mexican governments' policies and practices forced women seeking protection to wait for extended periods, often in precarious and dangerous circumstances, at Mexico's northern and southern borders. Throughout 2021, IMUMI and WRC carried out interviews with women and monitored events to understand the challenges and dangers they were facing.

---

6  There has been less progress in some Mexican states on the reform implementation than others due to a lack of training, funding, and political will of local authorities. As a result, despite the reform, some children may continue to be detained by immigration authorities or deported without a proper best interest determination. In fall 2021, <u>a panel featuring IMUMI</u> and other civil society organizations discussed some of the challenges with implementation.

7   Since 2016, women have represented approximately 40 percent of applicants to COMAR.

8   Approximately 68 percent of applications were filed in the state of Chiapas and 5 percent in Tabasco.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 237 of 399



1. **Women seeking protection experience violence in Mexico that exacerbates prior traumas that forced them to flee their countries of origin in the first place.** A 2015 UN report found that approximately 60 percent of surveyed women seeking asylum from Honduras, Guatemala, and El Salvador were fleeing gender-based violence, which includes any form of sexual, physical, mental, and economic harm directed at an individual due to their gender. A recent 2021 report by Kids in Need of Defense (KIND) found that violence against women in Central America drastically increased during the COVID-19 pandemic due to lockdowns that confined women with their perpetrators and to gangs gaining greater control over local communities.

   The violence that women seeking protection experience in transit in Mexico and while waiting at Mexico's northern border cities—including kidnapping, rape, trafficking, and other forms of harassment—compounds their previous traumatic experiences. For example, a Guatemalan woman, Liliana,[9] shared with IMUMI that after fleeing from a violent relationship with her husband who served in the military, she was kidnapped by a group of men in Tijuana. While she was being held by her kidnappers, she heard the men making arrangements on the phone to sexually exploit her. This experience was so traumatizing that after Liliana was released, she decided to travel to Mexico City to seek asylum while staying in a safe shelter instead of waiting to request asylum at the US-Mexico border.

2. **Women seeking protection do not feel safe in Mexico's southern and northern border cities and worry that they can be tracked down by their persecutors.** IMUMI documented various cases of Central American women who have been tracked down by their perpetrators in Mexico. A Guatemalan woman, Cristina, traveling with her husband and three children, described to WRC staff the "terror of being forced to wait in Tijuana where our persecutors can find us." In southern Mexico, a Honduran woman, Sara, described to IMUMI that she and her family were kidnapped by members of the Mara Salvatrucha gang. After Sara fled Honduras, one of the perpetrators found her in Tapachula, Chiapas, forcing her and her family to flee to another city and give up their asylum claim in Mexico.

3. **Women seeking protection are subjected to violent gender-based crimes in Mexico, including rape and sexual assault, and face heightened barriers to report these crimes and receive support services**. Women who are returned to Mexico alone or with their families experience many types of violent attacks. A 2017 Doctors Without Borders survey found that 31.4 percent of women seeking protection had been abused during their transit through Mexico. Some women are kidnapped and raped by their captors, often in front of their children. Many assaults involve Mexican authorities. A Honduran woman, Jessica, in the Mexico City detention center described to IMUMI how she and a friend were detained by the National Guard in Ciudad Juarez after being expelled from the US. The agents sexually abused both women, who remained in detention in Ciudad Juarez for two months before being transferred to the Mexico City detention center. The women were deported from Mexico before they had the chance to file a complaint against the agents.

   In another case documented by IMUMI, a Honduran woman was offered a job in Chiapas, Mexico, that turned out to be a ploy to traffic her. After six months of being routinely sexually abused, she escaped, but despite her reporting the crime, authorities did not protect her or investigate the crime, forcing her to leave the state and look for protection on her own.

   Many sexual violence crimes are not reported or investigated in Mexico. According to the National Survey for Urban Public Security, between July and December 2020, 98.6 percent of sexual crimes were

---

9   All names have been changed to protect the privacy of the women interviewed.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

 

not reported or not investigated. Women who lack migration status and those detained face additional risks of being the victim of a sexual crime and heightened barriers to accessing justice and support services, including psychological support and medical care.

4. **Women seeking protection are separated from their children as a result of restrictive policies**. In some cases, parents are victims of crimes, such as kidnapping, and their children are left alone to cross to safety into the US. Several months after being returned to Mexico, Sandra, a Black woman from Honduras, went to look for a job in downtown Piedras Negras, where she was kidnapped and held for three days. Her four children crossed the border on their own because they did not know what had happened to their mother and were frightened. In other cases, due to the danger in Mexican border cities, coupled with US policies preventing many families and adults from seeking asylum, parents are forced to make the heartbreaking decision to send their children alone to safety in the US.

5. **Women continue to wait in squalid conditions in Mexican northern and southern border cities.** Limited shelter capacity in Mexico's northern border cities has left many women sleeping on the streets and in precarious conditions, including at the informal tent encampments in Tijuana and Reynosa. WRC staff spoke with a Honduran woman, Eleana, in Tijuana who tried to secure accommodations in Tijuana shelters after being expelled from the US, but was turned away due to limited capacity. She was forced to stay in squalid conditions in a house far away from the city center. A mere 15 days after Eleana and her family attempted to seek protection after crossing into the US and were expelled by Border Patrol to the streets of Tijuana, a rabid dog attacked and killed her 20-month-old toddler. In Tapachula, Chiapas, women asylum seekers and their families waited months for their Mexican asylum cases to be resolved while living in shelters, rented rooms on the outskirts of the city, or camped in the city's central plaza, with limited access to bathrooms or showers.

6. **Women seeking protection struggle to find child care and enroll their children in school in Mexico.** According to Mexican law, all children—regardless of their immigration status—should be able to enroll in public school. However, many barriers to enrollment in schools remain, such as discrimination and misinformation from local school administrators. One woman, Karina, recounted to WRC how she had not been able to enroll her two young children in local public schools because administrators (falsely) told her she would have to pay a sizable enrollment fee for each child. Women asylum seekers in Tapachula, Chiapas, told IMUMI that some schools require certified translations of birth certificates and vaccination records, making it impossible to enroll their children as they either do not have the documents, or cannot afford to have them translated.

   Child care responsibilities and barriers enrolling children in school made it difficult for women to find part- or full-time work, while they wait to access asylum in the US or in Mexico. A number of women expressed to WRC fear of leaving their children alone due to the dangers in border cities, and worries over being unable to support themselves and their families since they could not work.

7. **Women seeking protection struggle to access vital health services, including reproductive health services.** Mexico's 2011 Migration Law guarantees access to health services to people regardless of their immigration status in Mexico. Despite this, pregnant people expelled to Mexico by US authorities under Title 42 have been turned away by local hospitals and denied medical care. A Salvadoran woman, Brenda, told WRC she was denied prenatal care in Tijuana, where local hospital workers told her, "We can't help you because you aren't Mexican." A Honduran woman, Marina, represented by IMUMI, was turned away from a public hospital because she did not have the required documents to prove financial

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 2:26-cv-04831-MTL     Document 19-1     Filed 07/13/26     Page 239 of 399



need. A lawyer resolved the situation, but shared with IMUMI that almost all of her clients require legal assistance to access basic reproductive health services in Mexico.

8. **LGBTQI+, Black, Indigenous, and non-Spanish speaking women seeking protection face additional dangers in Mexico.** In particular, Black asylum seekers face anti-Black racism, discrimination, and targeting from Mexican authorities. Several Haitian asylum seekers in Mexico City told WRC that they did not even try to look for employment opportunities because of the discrimination they were certain they would face by employers. Restrictive US border policies force individuals to wait in Mexico where they often are vulnerable to the same risks, discrimination, and dangers that they fled in their countries of origin. For example, Laura, a trans woman who fled Honduras due to death threats and her house being burned down, told WRC she was threatened at gunpoint by Mexican authorities during her journey to Tijuana. She did not feel safe in Mexico and struggled to secure housing due to discrimination. A Guatemalan asylum seeker in Mexico City, Karen, described to IMUMI staff that a teacher discriminated against her daughter for being "darker" and wearing Indigenous clothing.

9. **Due to Mexico's increased enforcement and travel restrictions, women seeking protection are forced to look for ways to evade immigration and military checkpoints by traveling in caravans for safety or relying on smugglers.** In 2021, the situation was particularly harrowing in Tapachula, Chiapas, where 89,668 asylum seekers (approximately 68 percent of all applicants) awaited adjudication of their protection claims. Many families attempted to move from Tapachula to other cities with better job opportunities and safer conditions. However, INM and National Guard checkpoints and increased enforcement in southern Mexico made transit difficult.

One Honduran woman, Veronica, told IMUMI that she and her family decided to join a migrant caravan in August 2021. INM officials stopped them, told them that the letter proving their pending asylum application was not valid, and tore up the documents. When she tried to film the incident with her telephone, agents took it away from her. During a press conference in September 2021, a Haitian woman in Tapachula described how Haitians are racially profiled by Mexican authorities and removed from buses. "We can barely get around Tapachula even though we are asylum seekers with a letter from COMAR. It is practically impossible to get on a bus to go to another city without paying smugglers a fee to get through the checkpoints."

In the bus terminals in Tapachula and throughout Mexico, private bus companies began checking immigration status as a prerequisite for buying a bus ticket. Two women in the Mexico City detention center told IMUMI in September 2021 that they had been detained in a Mexico City bus station even though they had letters proving their immigration status.[10]

10. **Women seeking protection are subjected to use of force and violence by Mexican and US authorities.** In August 2021, Mexican immigration authorities and the Mexican National Guard were filmed kicking migrants, violently pushing women and children into vehicles, and threatening family separation as tactics to break up large groups. In one video, a woman who had been detained could be seen screaming that she had been separated from her two-year-old son during the raid. While she screamed and tried to get out of the INM van, an agent could be seen pushing her on the breasts back into the van. In October 2021, a Haitian woman was found dead along a highway in Chiapas. Her clothes had

---

10 Since bus ticket agents have neither the authority nor the training to verify immigration status, they have begun sending anyone they deem suspicious to talk to INM officials stationed in the bus stations, who would then detain the individual.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021



been removed and she had been raped and strangled. Four municipal police officers were detained in relation to the crime. In September 2021, armed US Border Patrol agents in Del Rio, Texas were photographed abusing Black migrant families and driving them back across the border to Mexico.

**Many women seeking protection who transit through Mexico are subjected to more than one of the above risks during their stay, which often lasts months or even years due to restrictive policies**. A Honduran woman, Mariana, recounted to IMUMI her misfortunes over the past two years waiting in Mexico, and how the Biden administration's policies—following on the Trump administration's attacks on the asylum system—have resulted in her ongoing inability to seek asylum in the US:

*"I fled Honduras with my two children in 2019 because my husband beat us and he was involved in a criminal gang that protected him. After several months in Mexico, we arrived at the US-Mexico border to request protection and we were sent back under [Remain in Mexico] through Nuevo Laredo. Since I had my two small children, we made our way to Monterrey, Mexico [a city several hours to the south], where we were living on the street. I was raped and became pregnant.*

*"A kind Mexican woman took us in and allowed us to live with her until the baby was born in October 2020. My kids didn't go to school in all of 2020. I still had a dream to live with my sister in the US and be safe, but things were really difficult. Then in April 2021, I learned that I could sign up for the [RMX wind-down process] even though I had never had my hearing, so I signed up for Conecta.[11] I got help to register my baby so he would have a birth certificate. Then I got an email stating that Conecta had closed and that I would have to wait again.*

*"I don't understand what I am supposed to do, where I am supposed to go. I have been trying for two years to follow the rules, but my kids are two years older now, I have a baby, and I don't know what to do. I can't go back to Honduras, I am afraid to be in Mexico, and I'm not allowed to request protection at the border. I feel lost."*

## Conclusion and Recommendations

Both President Biden and President Andrés Manuel López Obrador recognize that many women are fleeing gender-based violence and persecution in their countries of origin and need access to protection in both countries. IMUMI and WRC are deeply concerned about practices by both governments that normalize human rights violations, including the violation of the right to request asylum. Instead of restrictive policies and enforcement actions that put women and children seeking protection in harm's way, the US and Mexican governments should strengthen asylum systems in both countries and broaden complementary pathways for protection. We urge the Biden and López Obrador administrations to implement the following recommendations to ensure that the rights of women—including the right to access protection—are upheld.

---

11  Conecta was a web platform run by the United Nations High Commissioner for Refugees (UNHCR) where individuals who were subjected to the first iteration of RMX could enroll to access the RMX wind-down process and continue their immigration cases within the US. This platform was operational between February and August 2021. It was suspended due to the court order regarding the reinstatement of RMX.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 2:26-cv-04821-MTL    Document 19-1    Filed 07/13/26    Page 241 of 399

 

## Recommendations for the Biden administration

- » End the use of Title 42 to expel adults and families to Mexico and their countries of origin via land expulsions and expulsion flights.

- » Restore access to asylum at ports of entry, so that individuals can approach a port of entry and request protection and other relief from inside the United States.

- » Refrain from pressuring Mexico to increase enforcement by immigration and security forces or implementing new visa restrictions for nationalities arriving in large numbers. Focus the Collaborative Migration Management Strategy (CMMS) on expanding access to protection in the region and complementary pathways to protection, without sacrificing access to asylum at the US southern border.

- » Reverse the expansion and stop further implementation of RMX.

- » Release monthly Customs and Border Protection (CBP) data that is disaggregated by gender on encounters, expulsions, returns under RMX, and other statistics relating to US asylum processing.

## Recommendations for the Mexican government

- » Allocate adequate funding to COMAR to decrease wait times, open more offices, and hire additional protection officers.

- » Reform the Mexican Refugee Law to allow people to continue their asylum procedures from different parts of the country where they have family and community networks, better employment opportunities, and safer conditions.

- » Ensure that women who have suffered or who remain in danger of violence in Mexico have access to relocation programs and services where they can safely wait for their asylum process.

- » Expedite humanitarian visitor cards for asylum seekers, victims and witnesses of crimes, migrant children, and other vulnerable populations.

- » Refuse to collaborate with the US government on the implementation of policies such as Title 42 and RMX that violate US, Mexican, and international law.[12]

- » Eliminate the use of the National Guard and all armed forces in migration enforcement in compliance with the Mexican Constitution and international law.

- » Eliminate unconstitutional internal enforcement revisions and checkpoints that result in illegal racial profiling.

- » Rescind the provision that requires foreigners to show proof of migration status to purchase a bus ticket in Mexico.

- » Ensure access to public education for all migrant and refugee children.

- » Ensure access to health services for migrant and refugee women and girls, especially reproductive health services.

---

12  Mexican organizations have pending litigation and complaints with the National Human Rights Commission against the bus travel restrictions, Mexico's participation in Remain in Mexico 1.0 and Remain in Mexico 2.0, Mexico´s implementation of internal Title 42 expulsion flights, discriminatory enforcement practices at internal checkpoints, and the participation of the National Guard in migration enforcement. For additional information about the lawsuits: 1. RMX 1.0 (Instituto para las Mujeres en la Migración (IMUMI), A.C. vs. SEGOB, SRE, INM, INMUJERES) - Mexican Supreme Court - 302/2020. 2. RMX2 - Mexico City District Court - exp. 1887/2021 3. Tit. 42 Expulsions - Mexico City Circuit Court - 153/2021. 4. Bus Travel Migration Status Restriction - Mexico City District Court - 1647/21 5. Discriminatory Migration Enforcement Practices - Mexican Supreme Court (E, A y J VM vs. INM, Cámara de Diputados y otros) -- 275/2019 6. National Guard Participation in Migration Enforcement -- (Gretchen Louise Kuhner Vs. Congreso de la Unión y Presidente de los Estados Unidos Mexicanos), Mexican Supreme Court, 73/2020.

Stuck in Uncertainty and Exposed to Violence:
The Impact of US and Mexican Migration Policies
on Women Seeking Protection in 2021

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 242 of 399



» Increase access to housing for asylum seekers through ongoing support to civil society shelters, including safe spaces for vulnerable groups such as women, families, and LGTBQI+ individuals.

## Additional resources

» Analysis of Gender Violence: Women Seeking International Protection in Mexico, IMUMI, 2021.

» Asylum Denied: Remain in Mexico 2.0, Women's Refugee Commission, 2021.

» Dual Crises: Gender-Based Violence and Inequality Facing Children and Women During the COVID-19 Pandemic in El Salvador, Guatemala, and Honduras, KIND, 2021.

» Pathways to Justice: Gender-Based Violence and the Rule of Law, Wilson Center, 2021.

» Center for Gender and Refugee Studies (CGRS) Publications.

_____

This report was written by Gretchen Kuhner of the Instituto para las Mujeres en la Migración (IMUMI) and Savitri Arvey of the Women's Refugee Commission (WRC). It was reviewed by Katharina Obser, Ursela Ojeda, and Dale Busher from WRC. Patricia Arroyo reviewed statistics, Sara Velasco helped with fact checking, and Miriam Gonzalez reviewed the Spanish translation on behalf of IMUMI. It was edited by Joanna Kuebler and Diana Quick from WRC, and designed by Diana Quick.

IMUMI and WRC extend deep thanks to the women who generously shared their time and experiences, as well as the migrant shelters and organizations that provided information and facilitated the interviews with women.

This report was made possible by the generous support of the Open Society Foundations.

For additional information, please contact Gretchen Kuhner, director, IMUMI (gretchenk@imumi.org) or Savitri Arvey, policy advisor, WRC (SavitriA@wrcommission.org).

**Women's Refugee Commission**
The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth who have been displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice. Since our founding in 1989, we have been a leading expert on the needs of refugee women, children, and youth and the policies that can protect and empower them. womensrefugeecommission.org.

**IMUMI**
The Institute for Women in Migration, AC (IMUMI) is a civil society organization based in Mexico City that promotes the rights of women and their families in migration. IMUMI provides legal support to women and their families, collaborates with civil society organizations, academic institutions, and government bodies to ensure issues relevant to women are included in regional migration policy. imumi.org.

February 2022

9

# EXHIBIT 9

# AN UNCERTAIN PATH

## Justice for Crimes and Human Rights Violations against Migrants and Refugees in Mexico

By: José Knippen, Clay Boggs, and Maureen Meyer  |  **NOVEMBER 2015**

RESEARCH
**REPORT**












# TABLE OF CONTENTS

**KEY FINDINGS** ........................................................... 3

**ACRONYMNS** ............................................................. 4

**INTRODUCTION** ......................................................... 5
- Methodology and collaboration with migrant shelters and defenders in the production of this report

**THE SOUTHERN BORDER PROGRAM AS A FRAMEWORK FOR INCREASING MIGRATION ENFORCEMENT** ......................... 8
- The Southern Border Program
- The participation of security forces in migration enforcement operations
- Budget
- Cooperation with the United States

**HUMAN RIGHTS VIOLATIONS AND CRIMES AGAINST MIGRANTS** ......... 18
- Kidnappings
- Human trafficking
- Summary executions
- Enforced disappearances
- Sexual violence
- Robbery, assault, and extortion, accompanied by physical and psychological abuse
- Detention and access to the right to asylum

**INVESTIGATING AND SANCTIONING CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS** ...................... 34
- Data on investigations into crimes against migrants
- Obstacles to reporting crimes and human rights violations
- Specialized prosecutors: An effective response?
- The National Human Rights Commission and State Human Rights Commissions
- The Responsibility of the National Migration Institute

**CONCLUSIONS AND RECOMMENDATIONS** ........................... 46

**REFERENCES** .......................................................... 49

# KEY FINDINGS

- **THE SOUTHERN BORDER PROGRAM HAS SIGNIFICANTLY INCREASED MIGRATION ENFORCEMENT OPERATIONS, AS WELL AS MIGRANT DETENTIONS AND DEPORTATIONS.** From July 2014 to June 2015, detentions of migrants rose 73 percent compared to the same period the year before; between July 2013 and June 2014, 97,245 migrants were detained, while 168,280 were detained between July 2014 and June 2015. Furthermore, government data indicates there has been an increase in migration enforcement operations; however, more reliable data is needed.

- **THIS INCREASED ENFORCEMENT HAS PROMPTED AN UPTICK IN HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS.** Abuses have been documented in these migration operations, which are increasingly conducted in conjunction with security forces. Migrant shelters have documented kidnappings, extortions, robberies, and abuses throughout the country.

- **GIVEN THIS CONTEXT, THE MEXICAN GOVERNMENT'S EFFORTS TO STRENGTHEN ITS CAPACITY TO PROTECT MIGRANTS HAVE FALLEN SHORT OF WHAT IS NEEDED.** For example, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR) only has 15 protection officers in the entire country to ensure access to international protection for the more than 100,000 migrants detained during the course of a year. Moreover, COMAR's budget did not increase in real terms from 2014 to 2015.

- **THERE IS NO EVIDENCE THAT VICTIMS OF CRIMES AND HUMAN RIGHTS VIOLATIONS HAVE EFFECTIVE ACCESS TO JUSTICE, DESPITE THE CREATION OF NEW SPECIALIZED PROSECUTORS' OFFICES.** There is a lack of conclusive data regarding justice for migrants in Mexico. The most detailed data are from the specialized prosecutor's office in Oaxaca, which reports that, of the 383 complaints received over four years, only 96 resulted in a preliminary investigation being opened and only four resulted in sentences for the perpetrators. Additionally, of the 1,617 complaints of human rights violations against migrants that the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) received from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institution implicated in the complaint.

- **THE SOUTHERN BORDER PROGRAM HAS FOCUSED ON ENFORCEMENT ACTIVITIES AND THIS FOCUS IS REFLECTED IN THE BUDGET OF THE NATIONAL MIGRATION INSTITUTE (*INSTITUTO NACIONAL DE MIGRACIÓN*, INM). INDEED, IN 2014 THE INM SPENT THE LARGEST BUDGET IN ITS HISTORY.** For its part, the United States government has offered the Mexican government political and financial support for migration enforcement, especially following the drastic increase in the number of unaccompanied minors and migrant families—primarily from Central America—arriving at the United States' southwest border.

# ACRONYMS

| | |
|---|---|
| **CAIMFS** | Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur*) |
| **CCAMYN** | Centro Comunitario de Atención al Migrante y Necesitado |
| **CEDH** | State Human Rights Commission (*Comisión Estatal de Derechos Humanos*) |
| **CNDH** | National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*) |
| **COMAR** | Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*) |
| **CUSAEM** | Auxiliary and Urban Security Forces of the State of Mexico (*Cuerpos de Seguridad Auxiliar Urbana del Estado de México*) |
| **DHS** | Department of Homeland Security |
| **FEVIMTRA** | Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*) |
| **GATES** | Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*) |
| **GROMS** | Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*) |
| **IACHR** | Inter-American Commission on Human Rights |
| **INAI** | National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales*) |
| **INCLE** | International Narcotics Control and Law Enforcement |
| **INM** | National Migration Institute (*Instituto Nacional de Migración*) |
| **OPI** | Child Protection Officer (*Oficial de Protección a la Infancia*) |
| **PEF** | Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*) |
| **PEM** | Special Migration Program (*Programa Especial de Migración*) |
| **PGJE** | State Attorney General's Office (*Procuraduría General de Justicia del Estado*) |
| **PGR** | Federal Attorney General's Office (*Procuraduría General de la República*) |
| **PPTM** | Municipal Preventive and Transit Police (*Policía Preventiva y Tránsito Municipal*) |
| **REDODEM** | Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*) |
| **SAT** | Tax Administration Service (*Servicio de Administración Tributaria*) |
| **SEDENA** | Army (*Secretaría de la Defensa Nacional*) |
| **SEGOB** | Ministry of the Interior (*Secretaría de Gobernación*) |
| **SEIDO** | Deputy Attorney General's Office for Special Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*) |
| **SEMAR** | Navy (*Secretaría de Marina*) |
| **UNHCR** | United Nations High Commissioner for Refugees |
| **UPM** | Migration Policy Unit (*Unidad de Política Migratoria*) |

# INTRODUCTION

On June 2, 2015, armed men opened fire on five vehicles that had stopped on a roadway close to Caborca, Sonora. Between 100 and 120 undocumented men, women, and children were inside the vehicles; they were traveling through Mexico with the hope of crossing the border into the United States. At least three people died in the attack and several migrants fled toward the United States.[1] Two days later, the state Attorney General's Office (*Procuraduría General de Justicia del Estado*, PGJE) in Sonora reported that it had rescued 15 survivors (two Mexicans and 13 Central Americans) and recovered three bodies. The 13 Guatemalans and Salvadorans were deported to their countries by the National Migration Institute (*Instituto Nacional de Migración*, INM) in mid-June. Prior to this, the survivors had told members of civil society organizations that likely between 30 and 40 migrants were murdered during the attack.[2]

This attack demonstrates the persistence of a pattern of crime and human rights violations against migrants in Mexico. The events in Caborca took place nearly a year after Mexican President Enrique Peña Nieto launched the Southern Border Program, which promised a comprehensive approach to promoting development, security, and human rights on the Mexican border with Guatemala and Belize.[3] The most obvious and consistent measure under the Southern Border Program has been the intensification of migration enforcement operations throughout Mexico, especially in the southern states of Chiapas, Tabasco, and Oaxaca. Authorities have taken measures to prevent migrants from traveling by train;[4] set up new checkpoints in the southern border region; relocated between 10 and 15 percent of INM personnel from their regular assignments to strengthen the southern border; and conducted more frequent raids on hotels where migrants are known to stay. Migrant detentions have skyrocketed: between July 2014 and June 2015, detentions of migrants rose 73 percent compared to the same period in the previous year; between July 2014 and June 2015, authorities detained 168,280 migrants, up from 97,245 detained between July 2013 and June 2014. In fact, from October 2014 to May 2015, the INM detained more Central American migrants than the US Border Patrol (the INM's 110,043 versus the Border Patrol's 85,131).[5]

## TERMINOLOGY

*This report uses the term "migrant" to refer to individuals traveling through Mexico en route to the United States. It is important to acknowledge that this is a mixed flow of migrants that includes persons who leave their countries principally to improve their living conditions, whether for economic reasons or for family reunification, as well as persons who are fleeing persecution and/or violence, and victims of human trafficking. Furthermore, although many are from Guatemala, El Salvador, or Honduras, Mexican migrants may also be victims of the same patterns of violence and human rights abuses, even when they are in Mexico.*

These migration enforcement efforts are significant, but they are not without precedent. For years authorities have conducted raids and set up checkpoints throughout the country—primarily in the south—and each year they have detained and deported thousands of migrants: Mexico deported 79,643 migrants in 2012; 80,902 in 2013; and 107, 814 in 2014.[6]

As of the writing of this report, the facts of the Caborca case and the whereabouts of all the victims had not been clarified. The case illustrates migrants' absolute defenselessness against the organized crime networks that control significant portions of Mexican territory. Policy changes like the Southern Border Program have not only failed to alter this situation, to a certain extent they have even exacerbated the patterns of crimes and human rights violations against migrants. Migration is more clandestine than ever, as migrants and smugglers have sought to avoid the checkpoints and raids that have proliferated in the southern states, and to some degree, all over the country. This has had an impact on the routes migrants use, inasmuch as they have had to look for alternatives, including traveling on foot, which makes them easy prey for criminal gangs. These new routes mean they have less contact with shelters, most of which are run by clergy, and which were established to assist migrants along the route of the cargo train, known as "The Beast" ("*La Bestia*").[7] As a result, the Southern Border Program has made it more difficult for human rights advocates and organizations to identify and report crimes and human rights violations against migrants.[8]

Although the Mexican government has spoken a great deal about the need to protect migrants crossing through the country, there is no meaningful evidence that authorities have made significant progress in investigating or punishing the criminal groups or the police officers, soldiers, and INM agents that take advantage of vulnerable migrants. Despite the creation of several state-level specialized prosecutors' offices whose principal duty is to investigate and

prosecute crimes against migrants, punishment for these crimes continues to be extremely rare. In the state of Oaxaca, there have only been four sentences handed down for crimes against migrants in four years. Likewise, the presence of human rights commissions (federal and state) in the states through which migrants travel has led to few recommendations being issued to the institutions involved in migration enforcement. For example, of the 1,617 complaints received by the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH) from December 1, 2012 to June 15, 2015, only four resulted in a formal recommendation issued to the institutions implicated in human rights violations.

While there has been little progress in fighting impunity, enforcement activities have escalated. Officials are detaining and deporting migrants rapidly; as a result, civil society organizations, human rights advocates, and asylum attorneys have few opportunities to hear migrants' stories about what they have experienced in Mexico or reasons why they have left their home countries. Furthermore, the increase in operations along train tracks and roadways has led to changes in traditional migration routes, especially for the most vulnerable migrants, who travel without human smugglers and are most dependent on the train to travel northward. Migrants and smugglers have gone back to clandestine routes that have now become more dangerous, including travel on foot or by sea. Therefore, a growing number of migrants that cross Mexico are practically invisible. If the Mexican government continues conducting migration enforcement under the same policy framework, using the same methods, and relying on the same corrupt and deficient authorities, it is likely we will know less and less about the migrant population's fate.

This report aims to assess the Mexican government's performance in investigating and punishing crimes and human rights violations against migrants traveling in an irregular situation, as well as against Mexican migrants crossing Mexico or who are deported from the United

States. Based on this analysis, the report sets out a series of recommendations for concrete and realistic policy changes that the Mexican government, and, where appropriate, the United States government, can make to prevent crimes and human rights violations against migrants.

In the long term, if the Mexican government truly intends to implement a migration policy that respects human rights, it is important that authorities more effectively investigate and sanction crimes and human rights violations against migrants, regardless of whether they have been committed by individuals, gangs, large organized crime networks, or public servants. Doing so would not only help protect one of the most vulnerable populations within Mexico's borders, but it would also strengthen the institutions responsible for enforcing migration policy in Mexico.

## METHODOLOGY AND COLLABORATION WITH MIGRANT SHELTERS AND DEFENDERS IN THE PRODUCTION OF THIS REPORT

This report is the result of close collaboration between the Washington Office on Latin America (WOLA), *Fundar, Centro de Análisis e Investigación*, and seven shelters and organizations that advocate for migrants' rights in five areas of Mexico:

- *Casa del Migrante de Saltillo "Frontera con Justicia," AC* in Saltillo, Coahuila;

- *Red Sonora*, a network of organizations located in the northern state of Sonora: Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado (CCAMYN)* in Altar;

- *Albergue de Migrantes "Hermanos en el Camino"* in Ixtepec, Oaxaca;

- *La 72, Hogar—Refugio para Personas Migrantes* in Tenosique, Tabasco;

- *Un Mundo, Una Nación* in Apizaco, Tlaxcala; and

- The migrants' rights advocate, Irazú Gómez.

The document is based on a series of visits to the abovementioned shelters and organizations, interviews with personnel and the migrant population, interviews with local authorities, and an exhaustive review of the shelters' case documentation. A total of 30 interviews were conducted during the research for this report.[9]

The work of migrant shelters in Mexico is of the utmost importance in advocating for and defending migrants' human rights. These shelters, most of which are run by or in coordination with the Catholic Church, operate with minimal funds and few personnel. They represent the first line of defense for vulnerable migrants. They provide food, temporary refuge, clothes, and medical attention, in addition to making it possible for migrants to contact their families. Furthermore, they take statements and report crimes and human rights violations to authorities. In many cases, migrant shelter personnel have directly confronted corrupt or indifferent officials, or even members of organized crime groups. All too frequently, migrant shelter personnel throughout Mexico have been harassed and threatened as a result of their work.[10]

# THE SOUTHERN BORDER PROGRAM
## AS A FRAMEWORK FOR INCREASING MIGRATION ENFORCEMENT

**THE SOUTHERN BORDER PROGRAM**

*Under Peña Nieto, these agents are violating rights under the cover of law, operations have resumed, and INM agents are being implicated as perpetrators—now, together with the Federal Police. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

With the Southern Border Program (*Programa Frontera Sur*), Mexico appears to be responding to pressure from the U.S. government following the mid-2014 "humanitarian crisis" of migrant children arriving at the U.S. border. The statement from the Office of the President of Mexico announcing the program indicates that the program aims to "protect and safeguard the human rights of migrants who enter and pass through Mexico, as well as establish order at international crossings to boost development and security in the region."[11] However, in its implementation, the Southern Border Program has focused mostly on migration enforcement, and, at its outset, on preventing migrants from using the cargo trains, known as "The Beast," as a means of transportation. Since then, the number of checkpoints and operations has continued to climb, resulting in large numbers of detentions and deportations.

## TABLE 1
# DETENTIONS AND DEPORTATIONS IN MEXICO
## BEFORE AND AFTER THE SOUTHERN BORDER PROGRAM

|  | JULY 2013 TO JUNE 2014 | JULY 2014 TO JUNE 2015 | PERCENT INCREASE |
|---|---|---|---|
| **TOTAL DETENTIONS** | 97,245 | 168,280 | 73 |
| **DETENTIONS OF CENTRAL AMERICANS** | 91,905 | 156,992 | 71 |
| **DETENTIONS OF MINORS (FROM ALL COUNTRIES)** | 17,092 | 27,513 | 61 |
| **TOTAL DEPORTATIONS** | 86,692 | 141,290 | 63 |
| **DEPORTATIONS OF CENTRAL AMERICANS** | 84,457 | 138,451 | 64 |
| **DEPORTATIONS OF MINORS (FROM ALL COUNTRIES)** | 13,925 | 21,935 | 58 |

*Source:  Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias 2013, 2014, 2015, http://bit.ly/1jMKo18.*

On July 8, 2014, one day after President Peña Nieto announced the Southern Border Program, the "Decree creating the Coordinating Office for Comprehensive Attention to Migration at the Southern Border" (*Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur*) was published in Mexico's Official Federal Gazette (*Diario Oficial de la Federación*). This document revisits the 2014-2018 National Security Program's "consolidation of the Comprehensive Strategy for Attention at the Southern Border." Nevertheless, no public policy document exists to substantiate the Decree.[12]

The shelters and organizations involved in the production of this report are located in places that were traditionally "obligatory" on the route taken by migrants passing through Mexico, as they are locations through which the cargo train passes and where migrants may get off or on the train. Since late 2014, some shelters have seen a decrease in the flow of migrants arriving at their doors, as is the case of the shelters in Ixtepec and Saltillo. For example, the shelter in Ixtepec, which once received approximately one thousand migrants per month, now sees no more than an average of 100 migrants per week.[13] In Tlaxcala, an increase in the presence of security agents on the train (Auxiliary and Urban Security Forces of the State of Mexico, *Cuerpos de Seguridad Auxiliar Urbana del Estado de México*, CUSAEM), in addition to the barriers ("*barrotes*") put up on one side of the train tracks that traverse Apizaco mean fewer and fewer migrants are now using the train.[14]

In its first report, the Coordinating Office for Comprehensive Attention to Migration at the Southern Border (*Coordinación para la Atención Integral de la Migración en la Frontera Sur,* CAIMFS) notes that:

> The government of the Republic, via the different federal agencies responsible for handling migration, has taken actions designed to implement the provisions of that strategy; such is the case of the operations launched on August 1, 2014 to afford safety to migrants who were using the train from the Isthmus of Tehuantepec to travel within the country. This operation is being successfully coordinated by the National Migration Institute (*Instituto Nacional de Migración*, INM) (…). In it, the INM is joined by different federal government agencies such as (…) [the] federal Attorney General's Office (*Procuraduría General de la República*, PGR), the Army (*Secretaría de la Defensa Nacional*, SEDENA), the Federal Police, the Navy (*Secretaría de Marina*, SEMAR), in addition to the Government of the State of Chiapas and representatives of the Isthmus of Tehuantepec Railroad.[15]

One consequence of the Southern Border Program has been an escalation in human rights violations against migrants during operation, detention, and deportation processes, including in the methods used to detect undocumented migrants (particularly the use of allegedly discriminatory criteria, such as physical appearance), the use of force in arrests, the difficulty in accessing humanitarian visas and asylum, and poor conditions in the migration detention centers.

> *Many migrants report being chased by the INM for two hours through the woods, (with agents) running behind them, shouting things at them, physical aggressions, sometimes blows, sometimes they are robbed or their documents are taken from them, theft or extortion directly by the police and military, meaning they have to pay in order to pass through.* —Emilie Viklund, La 72

During migration enforcement operations, physical and psychological aggressions occur; in addition, migrants are stripped of their money and belongings. These operations have ironically been named "rescues" by the government, though most times this is not the case. Such operations have proliferated since mid-2014, but official figures about how often they occur are not consistent.

In response to an appeal for review of an information request filed with the National Institute for Transparency, Access to Information and Personal Data Protection (*Instituto Nacional de Transparencia, Acceso a la Información y Protección de Datos Personales,* INAI), the INM provided the following information about the number of migration enforcement operations carried out. In 2013, 14,246 operations were conducted nationwide. In 2014, the number of operations surged to 20,074, that is, it grew by 41 percent. The increases were concentrated in the states of Chiapas, Tabasco, Oaxaca, and Guerrero, but there were also significant increases in Baja California,

Baja California Sur, Coahuila, and Sonora.[16] However, in response to another appeal for review of an information request filed with the INAI, the INM provided different figures: 16,181 operations in 2013 and 27,992 in 2014 (a 73 percent increase). The increases appear to be concentrated in the same states, but the change in Chiapas is far more pronounced (rising from 1,297 to 8,192).[17]

According to statistics published on the Migration Policy Unit's (*Unidad de Política Migratoria,* UPM) website, the INM detained approximately 60,000 foreigners between August and December 2014. This figure comes close to the one mentioned by INM Commissioner Ardelio Vargas Fosado during a press conference on March 3, 2015: 64,215 individuals were purportedly "rescued" by the INM during that same period.  If the problems related to the operations and subsequent detentions and deportations were already known, it is likely that these problems have worsened due to the increase in operations, detentions, and deportations, and the speed with which they are occurring.

## THE PARTICIPATION OF SECURITY FORCES IN MIGRATION ENFORCEMENT OPERATIONS

Only the INM can verify the immigration status of foreigners in Mexican territory. The Migration Law, however, provides that other authorities may assist the INM in its control, verification, and enforcement functions (but they may not carry out such functions on their own).[20] In particular, the law states that the Federal Police shall act in support of and in coordination with the INM in its migration enforcement activities. The Migration Law Regulations specify that the INM should request the Federal Police's support when there is a presumed risk in the migration enforcement or verification operation to be conducted. The involvement of different security forces, such as the Federal Police and the Army (*Secretaría de la Defensa Nacional,* SEDENA), as well as the federal Attorney General's Office (*Procuraduría General de la República,* PGR), has become more frequent in migration enforcement operations since mid-

2014. From 2013 through July 2014—the month in which the Southern Border Program was announced—the average number of operations in which another authority participated alongside the INM was 125.8 per month. From July 2014 to April 2015, this number climbed to an average of 429 per month (see graphic 1).

Moreover, in June 2014, the INM and the Federal Police signed a cooperation agreement to provide support in the control, verification, search, and transfer of migrants, as well in securing the perimeters of migrant detention centers (Convenio de Colaboración para brindar apoyo en el control, verificación, revisión y traslado de migrantes, así como resguardo perimetral de Estaciones Migratorias); such agreement facilitates the involvement of the Federal Police in migration enforcement operations.[21]

## GRAPHIC 1

# PARTICIPATION OF SECURITY AND JUSTICE AGENCIES IN MIGRATION ENFORCEMENT OPERATIONS



**Source:** Prepared by the authors with data from the Instituto Nacional de Migración's response to Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1RA3kuy.

*In the military zone in Tenosique, the local battalion has a hand in causing harm to migrants: at checkpoints they commit violations to the right of free transit, they ask for identification, commit sexual assault, we've also learned of the participation of soldiers in migrant smuggling, something that cannot be reported because of everything that it signifies. —Brother Tomás González, La 72*

In practice, it is very difficult to monitor the conduct of other authorities during migration enforcement operations with the INM because no clear regulations exist, nor are there control mechanisms in place. Statements from migrants and defenders reveal that the INM as well as other authorities, such as police and soldiers, commit human rights violations during the operations.

The operation conducted on May 1, 2015 in Tenosique, Tabasco illustrates a recurring pattern: agents used excessive force and threatened, pushed, and beat the migrants. Both INM and police agents were identified as perpetrators.

> The cargo train arrived at the Tenosique station at 6 p.m., where it stopped indefinitely; this made it possible for more than 100 migrants to climb aboard. Among this group of individuals were several families, women, children, and a 12 year-old girl. In this case, La 72 documented the presence of two vehicles, one from the Beta Group [Grupo Beta] and the other from the municipal police. Thereafter, you could hear how one of the train's operators said over the radio that [the train] was not going to move until the authorities arrived. At around 8 p.m. the federal assistant delegate and local delegate of the INM led an intense pursuit of the migrants who were on the train tracks and in the surrounding areas. Also involved were at least three Federal Police vehicles, two "volantas" [mobile checkpoints], two INM pickup trucks,

one Beta Group vehicle, and the federal assistant delegate's private vehicle. The La 72 team, exercising its right to observe, monitor, and document, witnessed the following: multiple detentions were made using verbal and physical aggression; one migrant who managed to escape the operation confirms that he was threatened with a firearm. The authorities involved in the operation used force to get people off the train by violently pulling them while the cargo train was in motion, thereby unnecessarily risking their physical integrity.[22]

The Migration Law and its regulations are not clear as to the objective and scope of the involvement of other authorities and there are no specific guidelines that regulate or limit the use of force. There are general agreements in place and the INM requests support for each operation through official letters. Nonetheless, all of the aforementioned authorities have their own different internal rules, practices, and issues. Hence, it is important that the Ministry of the Interior (*Secretaría de Gobernación,* SEGOB) develop clear regulations for the conduct of such operations that take into account the complaints of excessive use of force by the INM and other authorities.

It is likewise important to point out that, in addition to the migration enforcement operations coordinated by the INM, other authorities also conduct migration enforcement operations separately, despite the fact that such operations fall exclusively within the jurisdiction of the INM.

This pattern is illustrated by the June 14, 2015 testimony from "Antonio" (pseudonym), a deported Mexican migrant:

> I was in the DeConcini [Nogales] station four days after the last time they deported me. I was seated on the benches in the hallway where you go into immigration. It was 7:00 in the morning. Two officers arrived by bike wearing green vests [tourist police] and asked me where I was from. I told them from Chihuahua. They didn't believe me, they handcuffed me, and took me away by force, kicking me in the shin; I wasn't drunk or high or anything, nothing. They called for a patrol car and put me in. The judge told me I wasn't Mexican, that I was from Honduras. He made me sing the national anthem to him three times and tell him the names of two presidents we've had. I did, and even so, he locked me up and told me they were going to keep me detained for 36 hours. I was locked up. After 15 hours I began to pound on the bars so the judge would come. They came and handcuffed me to the bars and started slapping me.

> They left me there and about five hours later, the judge arrived. And he told me he was going to let me go. And he did, but very beaten up.[23]

Operations that consist of pursuits on public streets jeopardize the lives and safety of migrants. We became aware of several cases in which this type of pursuit of migrants resulted in migrants getting hurt, or in some cases killed.[24]

It is clear that the number of migration enforcement operations conducted by the INM with the support of other authorities has increased very rapidly since the Southern Border Program was launched. Without clear guidelines to regulate and limit the use of force and the role of the different authorities involved, it is difficult to monitor whether the operations are being conducted properly. In light of the multiple reports of human rights violations committed during operations, and the documentation of several incidents in which migrants have been hurt or have lost their lives because of them, the intensification of operations aimed at enforcement and detention is concerning.



*INM van in Nogales, Sonora*

## BUDGET

The Mexican government executes its budget through budget programs. Proposed spending for a fiscal year is published in the Federal Expenditures Budget (*Presupuesto de Egresos de la Federación*, PEF). After the necessary adjustments and execution of the PEF, the Public Account is published the following year. It is revealing to see the amounts approved by Mexico's Chamber of Deputies for some budget programs related to migrants, in particular, those of the INM, the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados*, COMAR), the UPM,[25] and the CAIMFS (see table 2). This, bearing in mind that public policies without adequate resources for their implementation are nothing more than demagogy.

### TABLE 2
# FEDERAL EXPENDITURES BUDGETS (PEF)
## BY BUDGET PROGRAM AND RECIPIENT UNIT

| BRANCH / BUDGET PROGRAM (ADMINISTRATIVE UNIT IN CHARGE) | PEF 2012 | PEF 2013 | PEF 2014 | PEF 2015 |
|---|---|---|---|---|
| BRANCH: 04 INTERIOR | – | – | – | – |
| E006 REFUGEE ASSISTANCE SERVICES (COMAR) | 22,256,164 | 24,618,444 | 25,661,594 | 25,308,083 |
| E008 MIGRATION SERVICES AT BORDERS, PORTS, AND AIRPORTS (INM) | 1,997,490,727 | 2,024,924,785 | 2,173,783,360 | 1,966,084,661 |
| P019 COORDINATE MIGRATION POLICY (UPM) | 16,910,321 | 13,043,403 | 63,014,070 | 62,876,173 |
| P019 COORDINATE MIGRATION POLICY (CAIMFS) | - | – | – | 102,011,743 |

Source:  Prepared by Rodolfo Córdova, Fundar researcher, using data from the *Secretaría de Hacienda y Crédito Público*. Data from 2015 can be found in the 2015 PEF: http://bit.ly/1L8WMCT. The values for 2012, 2013, and 2014 taken from the corresponding PEFs: http://bit.ly/1aEFG0g. However, they were adjusted for inflation (meaning that they are real, not nominal, amounts). 2015 is the base year (=100) and all of the amounts are in Mexican pesos.

Table 2 shows the evolution of the budgets for COMAR (which has remained the same over the past three years), of the INM (which has remained high), and of the UPM (which shows a clear increase), and we can see the creation of the CAIMFS (which has a higher budget than that of the UPM).

It is worthwhile to note what was actually spent in the specific case of the INM (see table 3). What is striking is the difference between the approved budget and the actual expenditures by the INM.

This is because the Chamber of Deputies approves only current expenditures (salaries and wages) and operations costs for the first quarter.  The INM generates some of its own revenues, including from the collection of fees and fines. The actual expenditures by the INM have increased year after year and have never been as high as they were 2014: in that year, the difference between the approved budget and the INM's expenditures reached 70 percent.

## TABLE 3
# INM APPROVED BUDGET VS. EXPENDITURES

| YEAR | APPROVED BUDGET (PEF) | EXPENDITURES (PUBLIC ACCOUNT) | DIFFERENCE (EXPENDITURES VS. BUDGET) | PERCENT INCREASE |
|---|---|---|---|---|
| 2009 | 1,956,019,701 | 3,037,482,050 | 1,081,462,348 | 55 |
| 2010 | 2,096,784,055 | 3,312,537,612 | 1,215,753,558 | 58 |
| 2011 | 1,982,853,338 | 3,314,831,343 | 1,331,978,006 | 67 |
| 2012 | 1,996,619,411 | 3,358,490,502 | 1,361,871,091 | 68 |
| 2013 | 2,025,574,493 | 3,363,374,620 | 1,337,800,127 | 66 |
| 2014 | 2,173,783,360 | 3,701,746,413 | 1,527,963,053 | 70 |
| 2015 | 1,966,084,661 | – | – | – |

*Source:  Prepared by Rodolfo Córdova, Fundar researcher, with data from the Secretaría de Hacienda y Crédito Público. The 2015 data are available in the 2015 PEF: http://bit.ly/1L8WMCT. The amounts from 2009-2014 were taken from the corresponding PEFs, available at: http://bit.ly/1aEFG0g, and were adjusted for inflation (the amounts are real not nominal). 2015 is the base year (=100) and all amounts are in Mexican pesos.*

When we study the expenditures authorized each quarter by the Ministry of Finance and Public Credit (*Secretaría de Hacienda y Crédito Público*), we see that as of the first quarter of 2014 expenditures rise in lock step with the increase in migrant detentions (see graphic 2).[26]



## GRAPHIC 2
# INM BUDGET VS. APPREHENSIONS

*Source:  Prepared by Rodolfo Córdova based on the quarterly reports of the Secretaría de Hacienda y Crédito Público, available at: http://bit.ly/1FLxfiM.*

The parallel increase in the budget and the number of detentions confirms that the INM has indeed intensified its enforcement, despite the adverse impacts these processes have on migrants' human rights. In order to track such trends for the entire federal public administration, there must be progress in developing a cross-cutting annex in the PEF for migrants, a tool that would identify the resources allocated to migration-related agencies. This would increase transparency and could be a solid foundation for redistributing resources in order to protect human rights. In addition to the SEGOB, INM, and COMAR, it goes without saying that the Federal Police, the PGR, and the CNDH should also be included in said exercise. The annex is an important commitment included in the Special Migration Program (*Programa Especial de Migración*, PEM), a recently created program that was prepared with extensive involvement of civil society.  In contrast, neither the basic program budget nor the budgetary structure of the Southern Border Program and the CAIMFS is known, which casts a shadow over what the PEM could have achieved for migrants and their families.

## COOPERATION WITH THE UNITED STATES

Mexico's Southern Border Program followed a dramatic spike in the number of unaccompanied minors and families arriving at the United States' southern border from Central America. The Obama administration's response to this crisis is at least in part responsible for Mexico's new focus on migration enforcement, particularly the expedited deportation of Central American migrants, including unaccompanied minors. During the first months of 2014, the number of Central American children, whether accompanied or not, who arrived at the U.S. border grew markedly. In January 2014, the U.S. Border Patrol, an agency of the Department of Homeland Security (DHS), detained 3,711 children; in June 2014 that figure had reached 10,631, more than double the number of detentions in June 2013.[28]

The U.S. government has provided assistance to the Mexican government for border security and migration enforcement principally through the Merida Initiative, a security aid package. Congress has approved US$2.4 billion in Merida aid since 2008; approximately US$1.5 billion has been delivered.[29] As part of this support, the government of the United States delivered more than US$90 million to the INM through fiscal year 2012, primarily in equipment and training.[30]

The Merida Initiative is organized in four "pillars," the third of which is to "create a 21st century border structure," further described by the Department of State as facilitating "legitimate commerce and movement of people, while curtailing the illicit flow of drugs, people, arms, and cash."[31] While this third pillar of the Merida Initiative initially focused on the border between the United States and Mexico, much of the cooperation has clearly moved to Mexico's border with Guatemala and Belize. In July 2014, Ambassador Tom Shannon, Counselor of the State Department, revealed that the State Department was working with the government of Mexico on enforcement at its southern border, providing some US$86 million in funds already included in Merida through the International Narcotics Control and Law Enforcement (INCLE) account. Furthermore, Congress allocated up to US$79 million in additional funds in fiscal year 2015 for this same purpose.[32] It is important to keep in mind that U.S. assistance to Mexico for migration enforcement and border security has been provided not only to the INM, but also to Mexico's customs agency (*Servicio de Administración Tributaria*, SAT), Navy (*Secretaría de Marina*, SEMAR), Army, and the Federal Police. This support ranges from non-intrusive scanning equipment, to helicopters, patrol boats, information technology, biometric kiosks, workshops, and training sessions.[33]

It is clear that this type of assistance will continue and will likely be expanded due to the concern

about Central American migration expressed by members of the U.S. Congress and by executive branch officials. Such concern has continued to grow since the "surge" in the number of Central American children arriving at the United States' southern border in the summer of 2014. Members of the U.S. Congress have expressed their support for the Southern Border Program on several occasions over the past year. In fact, some members of Congress have made statements in which they call on Mexico—and in some cases on the countries of Central America—to take

additional measures to stem the flow of Central Americans through Mexico.[34]

Conversely, few members of Congress have expressed concern over how vulnerable migrants in Mexico are.[35] They have more often expressed doubts over whether Mexico is doing enough to detain migrants who cross through the country. Statements of that kind were heard particularly frequently in the months after the "crisis" of unaccompanied children reached its climax in the summer of 2014.[36]



*Fray Tomás González, Director of La 72, Hogar—Refugio para Personas Migrantes*

# HUMAN RIGHTS VIOLATIONS
## AND CRIMES AGAINST MIGRANTS

This section provides an overview of the current situation regarding human rights violations and crimes against migrants. Existing documentation makes clear that migrants in transit through Mexico are victims of multiple crimes and human rights violations, such as kidnapping, human trafficking, enforced disappearance, sexual violence, assault, and aggravated robbery. Despite various efforts to quantify these incidents, it is not precisely known how frequently they occur. As a result of the challenges mentioned in this section, there is likely a significant under-reporting of human rights violations and crimes against migrants.

There have been several studies on the subject of crimes and human rights violations against migrants, including two special CNDH reports on migrant kidnappings from 2009 and 2011[37] and two recent reports from the Documentation Network of Migrant Defense Organizations (*Red de Documentación de Organizaciones Defensoras de Migrantes*, REDODEM) from 2013 and 2015.[38] Additional data and information has been made

available by Mexican authorities (the federal and state attorneys general offices) in their responses to several information requests. Nevertheless, all these sources have their own limitations. The CNDH data, for example, are limited to kidnappings and are from 2009 to 2011. The REDODEM data, for its part, only include the cases of migrants who arrived at one of the network's shelters and decided to share their experiences, while government data only include the few cases in which migrants made the decision to file a complaint.

This report does not seek to provide definitive estimates about the frequency of crimes against migrants in Mexico. However, it does include recent data and experiences documented by migrant shelters, alongside previously unreleased government data and data from other sources, underscoring the need to generate, systematize, and publically disseminate greater information about patterns of crimes and human rights violations against migrants.

## KIDNAPPINGS

The kidnapping of migrants was widely documented in the 2009 Special Report prepared by the CNDH, which included migrant testimony taken during a series of visits to migrant shelters and detention centers. In 2011, the CNDH updated this information in a second Special Report, which estimated that 20,000 migrants were kidnapped in a single year. It is not known whether kidnappings have increased or decreased since then; data from migrant shelters appear

to indicate an increase from 2013 to 2014, but the evidence is not sufficient to draw definitive conclusions or to make projections about trends on a national level. (It should be further noted that the data from the shelters reflect cases documented in a single location, even though the events may have transpired elsewhere.) Other sources have broader geographic coverage (the CNDH reports are based on case documents that include information from the entire country).[39]

TABLE 4

# MIGRANT KIDNAPPING CASES
## DOCUMENTED BY MIGRANT SHELTERS

| YEAR | LA 72, TENOSIQUE, TABASCO | CASA DEL MIGRANTE DE SALTILLO, COAHUILA | RED SONORA |
|---|---|---|---|
| 2013 | 10 | 7 | – |
| 2014 | 33 | 15 | 31 |
| 2015 (JAN-APR) | 3 | – | 3 |

*Source: Cases documented by La 72, Casa del Migrante de Saltillo, and the Red Sonora.*

Documentation carried out by migrant shelters and organizations also makes it possible to identify trends and changes in the pattern of kidnappings. Migrant kidnappings in Mexico have long been known to occur along the train route; organized crime groups have occasionally worked with corrupt train operators to stop the train and force the migrants off, sometimes in large groups. There have also been cases in which migrants have been taken off of buses or taken away from bus stations or hotels using force or deceit. Now that fewer migrants are traveling by train, migrant shelters report that this latter form of kidnapping appears to be more common. Mass kidnappings seem to occur less frequently; migrants tend to be abducted in small groups or one by one. In some cases, criminals force smugglers to turn migrants over to them once they reach a certain point along the route.[40]

Victims are taken to "safe houses" for several days and are forced, by means of threats, beatings, and sometimes even torture, to provide the phone numbers of their relatives in the United States or in Central America, who they then contact to request money, sometimes thousands of dollars, via money transfer services such as Western Union or MoneyGram. Once kidnapped, migrants may also be forced to work on an ongoing basis or until the criminals decide the migrants have worked enough to be taken across the border into the United States. In other cases, they may be killed if their relatives fail to pay the ransom.

The principal reason that criminal groups abduct migrants is to hold them for ransom, but there have also been reports of migrants who were kidnapped in an apparent attempt to deter them from traveling within a certain area that is important for drug trafficking.

*Regarding kidnappings, they've been happening in groups, with Central Americans. People were tortured not so much to demand money but to send a message. In two of the kidnappings, the messages were that they didn't want Central Americans passing through the area. —Perla Del Angel, Centro de Recursos para Migrantes*

## HUMAN TRAFFICKING

Migrants in Mexico, both Mexicans and foreigners, have been identified as being particularly susceptible to human trafficking. Most foreign victims of human trafficking in Mexico hail from the Americas, especially Guatemala, El Salvador, and Honduras.  In a number of cases, migrants become victims of human trafficking because they are unable to pay their smugglers and are therefore forced into labor or into performing sex work to pay off their debts. In other cases, criminal groups kidnap migrants not only to ask for ransom, but also to force the migrants to work in drug trafficking as "mules" or in marijuana or poppy fields.[42]

The testimony given by "Hugo" (pseudonym), a 23-year-old Mexican who was deported after living nearly all his life in the United States, provides a detailed description of the horror of experiencing human trafficking first hand.

> I was deported to Nogales, Sonora and started looking for work. A man offered me work and I went to work at his house. After a few days of work he refused to pay me and told me I had to work for him and if I didn't, that they were going to kill me. Several armed men arrived and beat me and put me in the trunk of a car where they kept me for 12 hours. They took me to a room where there were about 7 or 8 other people. They took us to work in a covered truck and made us dig tunnels.

## SUMMARY EXECUTIONS

The most infamous and horrendous crime committed against migrants in transit through Mexico is the massacre of 72 migrants on a ranch in the municipality of San Fernando in the state of Tamaulipas. The migrants, the vast majority of whom were from Central and South America, were taken off buses and murdered between August 22 and 23, 2010. Their bodies were discovered on August 24, 2010[45] after one of the three survivors—an Ecuadorian who had

> I would remove the bags of dirt and haul them to the truck. We would work all night long and they would take us back to the room in the morning. They wouldn't let us sleep. If we fell asleep they would throw cold water in our faces or kick us in the stomach. They beat us whenever we asked for food or water and threatened to kill us if we refused to cooperate. They took away some of the abductees when they became weak from hunger and had gone crazy, saying "their time has come." Twice they made me clean the bathroom and it was full of blood. I didn't know if they had killed the people they took away, but those people never returned. I was held hostage and forced to work for nearly a month. I was finally able to escape with some others and we came across the municipal police. We asked for their help, but they ignored us and drove away in their car. Since then, I have felt like they were after me.[43]

There have also been reports that some government officials are directly involved in human trafficking networks. For example, in 2013, the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia contra las Mujeres y Trata de Personas*, FEVIMTRA) detained INM officials and other public servants in connection with human trafficking.[44]

been shot in the face and neck—escaped and walked several miles to alert the authorities, who, when they arrived at the ranch, found that the 72 migrants had been summarily executed and their bodies tossed in the ground.[46]

A number of theories exist as to why the migrants were killed: the most widely accepted is that they had refused to work for an organized crime group.[47] Declassified documents from the Mexican

government regarding the massacre include the testimony of a member of the *Los Zetas* criminal organization in which he alleges that the local municipal police were accomplices in the crime.[48] Less than one year later, in April 2011, the remains of 193 individuals were discovered in clandestine mass graves in that same town in Tamaulipas,

and in May 2012, the remains of 49 others were found in Cadereyta, Nuevo León. In the latter two cases, the victims were both Mexicans and Central Americans (though there continue to be unidentified remains) who were heading to the U.S.-Mexico border.[49]

## ENFORCED DISAPPEARANCES

The United Nations Committee on Enforced Disappearances, in its recommendations to the Mexican government in February 2015, expressed concern for the vulnerability of migrants in Mexico, especially minors, given the problem of enforced disappearances.[50] Several Mexican civil society organizations and migrant shelters work directly with committees of Central American families established to search for disappeared migrants. Furthermore, for the last ten years a caravan has been organized every year for Central American mothers searching for their children who disappeared in Mexico.[51]

Nevertheless, as is the case with other human rights violations , it is a challenge to quantify disappearances of migrants in Mexico. In the Inter-American Commission on Human Rights (IACHR) 2013 report on the human rights of migrants in Mexico, the IACHR highlights that there is no single registry of disappeared migrants and that authorities do not keep consistent figures. Furthermore, the *Fundación para la Justicia y el Estado Democrático de Derecho*, a civil society organization with expertise in the topic, underscores that there is no certainty about number of disappeared persons in Mexico, and even less so in the case of migrants.[52]

## SEXUAL VIOLENCE

According to the information collected by migrant shelters, migration flows through Mexico have always included women, even if male migrants remain the majority. The likelihood that women and girls will be victimized during their transit through Mexico is high. Sexual violence has become a part of the journey through Mexico, especially for female migrants; indeed, it is well known that Central American women inject contraceptives to avoid becoming pregnant from their potential rapists. It has also been reported that men have been victims of this kind of violence.[53] The IACHR, in its 2013 report, documented different cases of sexual violence, assaults during kidnappings, and sexual exploitation. It also reported on the case of a 15-year-old Honduran girl who was sexually assaulted by an INM official in Tenosique, Tabasco. With regard to this case, the CNDH issued "Recommendation No. 54/2012, On the sexual assault case involving the migrant minor V1," on

September 28, 2012, so that the INM would take measures against the local delegate and four other officials.[54]

It is difficult to document cases of sexual violence because the victims may be afraid, feel embarrassed, or have internalized what they suffered. In Tabasco, there has been an increase in the lesbian, gay, bisexual, and transgender population, which are also sometimes victims of sexual violence.[55]

"Natalia" (pseudonym), a Honduran woman who was staying at the *La 72* shelter decided to file a sexual assault complaint with the Specialized Prosecutor for Attention to Migrants (*Fiscalía Especializada para la Atención a Migrante)* in Tenosique, Tabasco. A month before, the young woman was threatened at gunpoint and forced to have sexual relations with a human smuggler in a hotel in Tapachula, Chiapas. Several days

after she managed to escape, she was detained by the INM and deported to Honduras without anyone confirming her status as a victim. When she crossed the southern border of Mexico for the second time and reached *La 72* in Tenosique, Tabasco, she was provided legal assistance and decided to report these events. The only result she obtained was that the prosecutor's office decided to give jurisdiction of the case to the state of Chiapas, so that it could be investigated there. Natalia is awaiting a decision on her application for a humanitarian visa.[56]

## ROBBERY, ASSAULT, AND EXTORTION, ACCOMPANIED BY PHYSICAL AND PSYCHOLOGICAL ABUSE

Robbery, assault, and extortion are among the most frequent crimes committed against migrants. The number of reported crimes indicates that there was an increase in robberies committed from 2014 to 2015 in the states of Chiapas, Oaxaca, and Tabasco. The Tabasco prosecutor's office, for example, reported that there were 26 reports of robbery between July 2013 and May 2014, while there were 35 in the same period from 2014 to 2015.[57] Documentation by migrant shelters reveals a proliferation of perpetrators since the implementation of the Southern Border Program. Common criminals and members of organized crime, as well as public officials, commit these offenses, which in the first place constitute property crimes, but are also routinely accompanied by torture, cruel treatment, or in the worst case, loss of life.

When public officials commit these crimes, however, they are also commiting human rights violations, as these authorities are harming an individual's security. Furthermore, it should be noted that, almost invariably, multiple violations are committed as part of what might seem to be a single incident: for example, a migrant may be threatened or beaten when robbed, just as a migrant that is kidnapped may be forced to work (trafficked).

In 2014 authorities participated in one out of every five crimes against migrants (20.16 percent) that were documented by REDODEM members. The most frequent crimes were robbery and extortion. Among the authorities who are most often implicated as perpetrators in these cases, the involvement of the Federal Police, in 41 percent of the cases, and of the municipal police, in 23 percent, is striking.[58]

It is important to distinguish between larceny, aggravated robbery, assault, and extortion. All of these acts involve taking possession of the victim's property. What changes is the seriousness of the crime according to the kind of harm inflicted on the victim and society. In cases of extortion, the migrants are forced (by intimidation, for example) to surrender their property. In cases of robbery or assault, property is taken violently and by force (the harm always goes beyond the victim's property and is therefore considered serious). Extortion also involves harm that surpasses property because it is an attack on the integrity and freedom of the victim who is forced to do something prohibited by law or to allow the official in question to omit doing something he or she should do in the performance of his or her duties. Article 164 of the Mexican Federal Criminal Code provides that extortion is aggravated when it is committed by public officials, particularly by law enforcement or the armed forces.[59]

Both robbery and extortion are committed by individuals, as well as by authorities, including the Federal Police, the INM, and local police. A common pattern in the case of migrants is that an individual or official will demand money in order to let migrants continue their journey. Thus, the journey carries a price above and beyond the fee that in many cases they have already paid to a coyote to leave their countries. These acts go hand in hand with threats and attacks which, when

committed by public officials, constitute cruel treatment, and in some cases torture.

We were having dinner in the Federal District, there in Lechería opposite the metro station. Some 10 minutes after dinner a Mexican man came and began to chat. He began asking whether we had crossed [the border], whether it was the first time, and we fell into the trap of listening to him and chatting. After 15 minutes of chatting a private passenger car—a Chevy—arrived. A screech of brakes could be heard. The driver got out, as well as the passenger, and came over to us and told us, "We are the state police and I'm going to take you in." He had a uniform on, but it was under his jacket. One of them had an earring. "Get in," he ordered. They were threatening me with an Uzi. They put me in the car. Another fellow traveler ran. In the truck there was a civilian and two police officers. The driver was not a police officer. They took me about a kilometer and a half south of the station. There they asked us for money; otherwise, they were going to kidnap us for a long time until we paid the ransom. They asked us to hand over what we had, otherwise the ransom would be US$10,000. Behind the car a seven-man patrol arrived in a state police car. They took our clothes, all of them, so we wouldn't escape. There were two of us. The third guy had run. We gave them the MXN$2,000 we had on us. They left us naked and without shoes, without anything. The police officers from the patrol car were guarding the area. My fellow traveler was from Durango. We saw a Federal Police car approaching. We took advantage of that moment to run and flee. We headed for the woods. I covered myself with a shirt that I found.

When a man saw that we were bound for the woods, he helped us. He took us to his house and gave us clothes and shoes because he said, "Here all the police rob you." And he told us to be very careful because if they did find us, they would kill us for having escaped. We waited until dawn and went to the train station. I filed a complaint in Guadalajara, Jalisco, at the FM4 [*FM4 Paso Libre*, a civil society organization] but I didn't want to wait six months to follow through on it.[60]

The shelters and organizations involved in this report have documented many cases and testimonies regarding robbery, assault, and extortion, and have established some clear patterns. In Tabasco and the Isthmus of Oaxaca, the pattern of assaults has changed since the end of 2014 because migrants can no longer reliably use the cargo train for transportation. Local authorities, as well as the staff of the migrant shelters *Hermanos en el Camino* in Ixtepec and *La 72* in Tenosique, have identified some very specific places where these attacks take place. The migrants recount in their testimonies that they are assaulted by groups of individuals with Mexican accents that seem to know the area well. Sometimes these individuals even offer food and lodging, only to later attack them with machetes or other weapons and take everything from them. In these cases, certain locations are repeatedly mentioned: the area between Arriaga, Chiapas and Ixtepec, Oaxaca (in particular Corazones), as well as the area surrounding Tenosique, Tabasco.

In Tenosique, the data from the shelter *La 72* shows that the majority (89 percent) of the cases documented in 2013 were assaults or extortions. In 2014, in addition to a high number of assaults and extortions, other crimes, including abuse of authority linked to migration raids, became increasingly common (see table 5).

## TABLE 5
# CASES OF ASSAULT AND EXTORTION OF MIGRANTS
## DOCUMENTED BY LA 72

| YEAR | VICTIMS (TOTAL) | ASSAULTS | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 | 1,108 | 745 | 236 | 127 |
| 2014 | 1,497 | 595 | 218 | 684 |
| 2015 (JAN–APR) | 476 | 189 | 60 | 227 |

Source:   Documentation records from La 72. The column labeled "victims" refers to the number of cases La 72 documented and accompanied. The total number of crimes committed may actually be even higher.

Both shelters, as well as prosecutors from Ixtepec and Tenosique, mentioned in interviews that despite the frequency of the robberies, assaults, and extortion in the area, authorities' response to reports filed has been limited. Surveillance operations were conducted in the areas identified by migrants, but investigative police have not found any suspects. Three Honduran migrants identified the INM as the perpetrators of robbery and intimidation.

> We filed a report of our robbery; it was committed by INM agents. We entered in Mexico via el Ceibo, and when we were 11 kilometers from Tenosique we were already tired and our feet were very sore. We encountered an INM patrol but we didn't run. Four migrants who were with us did run. Four INM agents got out of the car, searched our bodies, our things, and then asked if we had dollars. They took the backpack and MXN$500 from one of us. Afterwards we went into the reed bed and an agent yelled: "Fire away at those bastards!" We took off. We hid for a while, and when we came out, we continued our journey. When we got to Tenosique, we filed a report with the PGR but it wasn't handled well.[61]

In the north of Mexico, in particular in Saltillo, Coahuila and the border zone of Sonora, cases of robbery and extortion committed by authorities have been documented and the involvement of police forces is striking. In 2014, the Federal Police was accused of being responsible in 37 of the 66 cases of extortion documented by the *Casa del Migrante de Saltillo.*

## TABLE 6
## CASES OF ROBBERY AND EXTORTION OF MIGRANTS COMMITTED BY AUTHORITIES
### DOCUMENTED BY THE CASA DEL MIGRANTE DE SALTILLO

| YEAR | TOTAL CASES | ROBBERY | EXTORTION | OTHER CRIMES |
|---|---|---|---|---|
| 2013 (JUL–DEC) | 113 | 26 | 38 | 49 |
| 2014 | 149 | 37 | 66 | 46 |

Source:  Documentation records from the Casa del Migrante de Saltillo.

The cases systematized by the three organizations that make up the *Red Sonora* reveal that the cases of extortion are crimes against property, but also against liberty. For example, State agents detain migrants for purposes of extorting them at a checkpoint on the road. Sometimes they put them in patrol cars, take them to other places, and bring them back by bus, in something akin to an express kidnapping. In Sonora, the cases of both extortion and robbery involve restrictions on free transit, arbitrary detentions, threats, and cruel treatment.

The authorities that are most frequently accused of being perpetrators are the Federal Police and the Municipal Preventive and Transit Police, but also noteworthy is the involvement of the State Security Police, Federal Protection, and the INM. Testimonies recount the collusion of some authorities in organized crime. These cases are difficult to document because migrants often fear reprisal.

## TABLE 7
## CASES OF ROBBERY, EXTORTION, TORTURE, CRUEL TREATMENT, AND THREATS AGAINST MIGRANTS
### DOCUMENTED BY THE RED SONORA

| YEAR | ROBBERY | EXTORTION | TORTURE | CRUEL TREATMENT | THREATS |
|---|---|---|---|---|---|
| 2014 | 35 | 49 | 15 | 43 | 11 |
| 2015 (JAN–JUN) | 8 | 25 | 6 | 18 | 9 |

Source:  Red Sonora case registry.

From the point of view of migrant rights advocates, robbery, assault, and extortion of migrants have always been frequent and persist to date. However, now that flows are not concentrated on trains, the places where the crimes occur and the perpetrators have proliferated. As highlighted previously, since the Southern Border Program was announced in July 2014, there has been a deployment of migration and security authorities nationwide and there seems to be greater coordination between the INM, Federal Police, and local police. The number of migration operations carried out has risen in general, as has the number of operations in which an authority other than the INM, like the Federal Police, is involved. This has led to an increase in migrant detentions. This same deployment and coordination, in addition to offending the dignity of those individuals subject to the verification and detention processes, may have led to a mushrooming of actors who abuse and take advantage of migrants. Furthermore, as will be described later, the fact that prosecutors' offices, in particular specialized prosecutors' offices, report meager results in investigating these cases, underscores an implicit message: it is extremely unlikely that those who rob, assault, extort, threaten, or torture a migrant will be punished.



*Mural at the migrant shelter Hermanos en el Camino in Ixtepec, Oaxaca*

## UNDER THE MICROSCOPE:

# DOCUMENTATION OF HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN SONORA

The organizations that make up the *Red Sonora* ("Sonora Network")—Kino Border Initiative in Nogales, *Centro de Recursos para Migrantes* in Agua Prieta, and *Centro Comunitario de Atención al Migrante y Necesitado* (CCAMYN) in Altar—have devoted themselves to providing assistance to migrants in the Sonora desert region that borders the state of Arizona. The migrants they help are mostly Mexicans and Central Americans. Having seen how violence and abuse committed by authorities was becoming increasingly common, these organizations decided to strengthen their documentation and advocacy efforts. About two years ago the organizations began documenting cases of human rights violations against migrants because clear patterns had emerged of authorities' involvement in the abuse of migrants in a context of almost complete impunity.

> *Abuses happen and nothing happens. The authorities then take advantage to diminish resources. There is no intention of wanting to help. The treatment we give our brothers is shameful. A trip from Hermosillo to Los Angeles by plane costs US$1,000 and migrants pay up to US$8,000 without any assurances and they are treated inhumanely. You can't even compare. —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado*

Documentation is a process by which the collection of key data about cases (in this instance, migrants and their experience during transit through or deportation to Mexico) enables the identification of patterns of abuse and the monitoring of cases. It entails the creation of a methodology and system that, in addition to recording migrants' personal data and the types of assistance provided to them, such as meals or lodging, includes variables about human rights violations and the authorities identified as responsible by the migrants. The system of the *Red Sonora* is special because it is shared in real time.

**THE MOST IMPORTANT FINDINGS THAT HAVE EMERGED FROM THIS EFFORT, WHICH INCLUDE 215 CASES (151 CASES DOCUMENTED IN 2014 AND 64 CASES FROM JANUARY TO JUNE 2015) ARE THE FOLLOWING:**

1. The Federal Police is the authority that is most frequently singled out as responsible for the human rights violations against migrants documented by the *Red Sonora*: 64 of the 215 cases (29.8 percent). It is followed by the Municipal Transit and Preventive Police (*Policía Preventiva y Tránsito Municipal*, PPTM) with 49 cases (22.8 percent). The

involvement of the PGR and the State Security Police also stands out (both at 16 cases or 7.4 percent). Finally, Federal Protection (which provides surveillance and security for federal government officials, assets, and buildings) is implicated in 15 cases (seven percent).

The patterns of human rights violations that the Federal Police and the PPTM commit against migrants are very similar. First of all, they violate the right to personal liberty (through the restriction of free transit, arbitrary detention, and kidnapping); secondly, they violate property rights (through extortion and robbery); and thirdly, they violate humane treatment (through cruel treatment, torture, and threats). This shows that these authorities first detain migrants and use excessive force or physical or psychological violence in order to then take their money and belongings. Although the patterns are similar, there are important differences.

## GRAPHIC 3
# AUTHORITIES IMPLICATED AS PERPETRATORS
## CASES DOCUMENTED FROM JANUARY 2014 TO JUNE 2015



**MUNICIPAL TRANSIT AND PREVENTIVE POLICE 22.8%**

**STATE SECURITY POLICE 7.4%**

**FEDERAL ATTORNEY GENERAL'S OFFICE 7.4%**

**POLICE 7.0%**

**FEDERAL PROTECTION SERVICE 7.0%**

**INM 4.6%**

**OTHER ACTOR / GANG 4.2%**

**OTHER ACTOR / PRIVATE SECURITY 1.9%**

**STATE INVESTIGATIVE POLICE 1.9%**

**TOURISM POLICE 1.9%**

**OTHER ACTOR / SMUGGLER 0.9%**

**FEDERAL POLICE 29.8%**

**UNIDENTIFIED 0.5%**

**NAVY 0.9%**

**ARMY 0.9%**

**U.S. BORDER PATROL 0.9%**

**215 CASES TOTAL**

*Source: Red Sonora case registry.*

2. Regarding the physical location where documented abuses occurred, there are differences in the authorities' conduct. In cases where migrants were assaulted during their journey by bus on the roadway, the involvement of the Federal Police is singled out in 36 of the 64 cases (56.3 percent, the majority in Sonora, close to where the organizations are located). While walking down the street, for example in Nogales, migrants are more often victimized by local authorities such as the PPTM (24 out of 49 cases, or 49 percent). Cases

of abuses also occurred frequently in specific places where authorities had identified the presence of migrants, including near government offices, on the train tracks, or in bus terminals. In these cases, which have been primarily documented in Nogales, both Federal Police and municipal police have been singled out as perpetrators.

3. The specific situation or circumstance that led to the human rights violation in 30.2 percent of all cases was a checkpoint on the roadway. In another 16.7 percent of the cases, the catalyst was that authorities identified an individual on the street as having "the appearance of a migrant." The latter reveals the problem of discrimination, especially on the part of the PPTM.

The importance of these findings lies in the identification of clear patterns of abuse on the part of authorities and in well-identified places. Nearly all migrants mention the same checkpoint on the roadway close to the Santa Anna crossroads in their testimony. There is also a strong presence of organized crime in the area, which may conceal even more abuses that migrants are reluctant to share. Collusion between organized crime and authorities is also a real possibility; as a result, the total number of abuses in which public officials have been involved is impossible to determine.

Finally, the Kino Border Initiative has discovered that migrants have suffered gross human rights violations at the Nogales train station. From April 2014 to February 2015, more than 60 migrants reported having suffered torture, cruel treatment (beatings, threats, and insults), as well as discrimination, at the hands of Federal Protection. For this reason, on February 18, 2015, the Kino Border Initiative filed a complaint with the CNDH, requesting an investigation and precautionary measures.



*Inside Centro Comunitario de Atención al Migrante y Necesitado in Altar, Sonora*

## DETENTION AND ACCESS TO THE RIGHT TO ASYLUM

Migrants, in their journey through Mexico, can be detained by the INM and "housed" at migrant detention centers or provisional holding facilities. Official Mexican government documents make no mention of migrant detentions, rather of "appearances" (*presentaciones*) and "housing" (*alojamiento*). Thus, the person detained is not immediately made available to the competent authority or brought before a judge. Detention is illegal if it is carried out without cause and it is arbitrary if, even where there is cause, it is carried out using methods that are inconsistent with human rights. It is important to point out that detained migrants must be immediately informed of the reason for their detention and the crimes they are accused of in simple language (only mentioning the legal grounds is insufficient), as well as their rights, including that of consular and linguistic assistance. It is likewise important that migrants be informed of their right to request asylum.[62]

The migrant population in Mexico comes mainly from countries in which conditions of generalized violence prevail, especially El Salvador, Honduras, and Guatemala. Indeed, of the 107,814 migrants returned by Mexican migration authorities in 2014, 104,269 (96.7 percent) came from those three countries.[63] In 2014, Honduras had a homicide rate of 68 per 100,000 people.[64] Meanwhile, the violence in El Salvador is increasing, and in the month of August there were 907 homicides, which is the highest figure on record since the end of the civil war in 1992.[65]

The INM has 32 migrant detention centers, where as general rule migrants are held for 15 days, although in some cases they are held for longer periods. There are 14 "Type A" provisional holding facilities, where migrants may be detained for up to 48 hours, and 12 "Type B" provisional facilities, where they can be held for up to seven days, although in practice these limits are frequently exceeded.[66] Although the focus of this report is not the human rights situation of individuals in migration detention, it is pertinent to note that detention should be used only as an exceptional measure, and alternatives should be applied as a rule. There is a wide array of documentation regarding conditions in detention centers, including the reports *La ruta del encierro* (2014) and *Derechos cautivos* (2015) by several civil society organizations, and the Inter-American Commission on Human Rights' 2013 report, *Human Rights of Migrants and other Persons in the Context of Human Mobility in Mexico*. These reports emphasize the lack of information provided to migrants, the excessive duration of detention, the lack of specialized assistance for children and adolescents, access to justice, and the poor conditions in migrant detention centers.

*Families with two to four children arrive from Honduras and El Salvador. Many of them are single mothers whose husbands have been killed and they are fleeing and seeking asylum. One girl married a former gang member who had distanced himself from the gang, but they killed his brother and his first wife. They requested asylum in Guatemala and obtained it, but when they found out he was a gang member they began to harass them and make their life hell. She decided to go to the U.S. to seek asylum. She entered through Tenosique but the INM detained her. —Alberto Donis, Albergue de Migrantes "Hermanos del Camino"*

It is important to reiterate that since the Southern Border Program began, the number of migrants detained and deported has risen dramatically; from July 2014 to June 2015, detentions rose 73 percent compared to the same period in the previous year. This new agility in the detention-deportation process means it is unlikely that during this process individuals obtain enough information and are provided with an opportunity to assert their right to asylum or their rights as victims of crime. Migrant testimonies documented by the organizations involved in this report make clear that when migrants do decide to file a complaint, it is not always done in their first attempt to cross Mexico, but rather after being deported or with support from shelter staff. It is therefore even more important to allow civil society organizations, legal counsel, and other trusted persons access to migrant detention centers and provisional holding facilities, and to make procedures to enter more flexible.

The Mexican government's refusal to recognize the detention of migrants as such and its insistence on using euphemistic terms puts detained migrants in legal limbo. Because they are not technically detained, migrants do not enjoy the same rights as detained persons, namely, access to legal representation; however, they are deprived of their liberty. This is particularly harmful for potential asylum seekers who are often detained and deported without being informed of their rights or afforded a fair opportunity to tell their stories to a competent authority. Mexico only recognized 451 individuals' refugee status in 2014, of which 413 were from the northern triangle, according to COMAR.[68] The number of individuals with recognized refugee status is very small when compared to the number of deportations.[69] It is likely that many of these individuals were potentially eligible for asylum. In 2014, the United Nations High Commissioner for Refugees (UNHCR) conducted a survey of 200 unaccompanied minors detained in Mexico City and Chiapas and found that nearly half (48.6 percent) could have qualified for international protection.[70]

## TABLE 8
## ASYLUM APPLICATIONS
## 2013–FIRST HALF OF 2015

|  | 2013 | 2014 | 2015 (FIRST HALF OF THE YEAR) |
|---|---|---|---|
| APPLICATIONS | 1,296 | 2,137 | 1,383 |
| GRANTED | 270 | 451 | 289 |
| DENIED | 455 | 840 | 618 |
| ABANDONED | 543 | 767 | 438 |
| COMPLEMENTARY PROTECTION | 28 | 79 | 37 |

Source: Comisión Mexicana de Ayuda a Refugiados, Estadísticas, www.comar.gob.mx/es/COMAR/Estadisticas_COMAR.

It is important to highlight that Mexico has ratified the Cartagena Declaration on Refugees, which recognizes the right to asylum in cases of "generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances which have seriously disturbed public order."[71] Furthermore, the Mexican government has enshrined this broader definition of "refugee" in the 2011 Law on Refugees, Complementary Protection, and Political Asylum (*Ley sobre Refugiados, Protección Complementaria y Asilo Político*).[72] Therefore, there are grounds for the government to recognize the status of a large number of refugees who are clearly fleeing Central America. In contrast, the United States has not ratified the Cartagena Declaration on Refugees; the U.S. government only grants asylum to those individuals who show that they "were persecuted or fear persecution due to race, religion, nationality, political opinion, or membership in a particular social group."[73]

Among the various reasons why Mexico has so many potential refugees and so few recognized refugees is that few migrants identify themselves as potential refugees and apply for asylum. In 2014, only 2,137 people applied for asylum in Mexico, including 1,769 Hondurans, Guatemalans, and Salvadorans.[74] The limited number of asylum applicants also reflects the fact that in many cases migrants do not know their rights or are poorly informed. According to the UNHCR report *Arrancados de Raíz*, only 27 percent of children interviewed at migrant detention centers in Tapachula and the Federal District knew of their right to asylum.[75] The problem is exacerbated by the lack of access to legal representation: there are few pro bono asylum attorneys in Mexico, and the civil society organizations that are involved in representing asylum seekers report difficulties in entering the detention centers.[76] *La 72*, which has provided assistance to asylum seekers, reports significant delays in obtaining interviews for asylum seekers with COMAR officials (the interviews must be requested through the INM), as well as delays throughout the asylum process. As a result, many asylum seekers abandon or desist from the process.[77]

It is likewise important to mention that the increase in detentions by the INM has not been accompanied by a significant increase in COMAR's capacity. This is significant because now that the INM has intensified its enforcement actions, it is in contact with a greater number of migrants who may be eligible to obtain refugee status.[78] Therefore, there is a growing need for agents who are trained to identify vulnerable individuals who require international protection, conduct asylum interviews, and process applications. Despite this uptick in detentions, COMAR's budget did not increase in real terms from 2014 to 2015,[79] and the agency only has 15 agents throughout the entire country to conduct asylum interviews.[80]

## SCAPEGOATS:
# THE CRIMINALIZATION OF MIGRANTS

It is true that some migrants commit crimes; in fact, in some cases, crimes against migrants have even been committed by other migrants. However, it is just as true that there is a worrisome pattern of falsely accusing migrants of having committed crimes. According to a 2014 report by the *Centro de Derechos Humanos Miguel Agustín Pro Juárez* (Centro Prodh), between May and October 2013, there were 1,219 people of Central American origin in Mexico's state and federal prisons.[81] They are far from their families and support networks and many lack legal representation. It is not known how many have been falsely accused, and/or how many have been victims of torture. Coverage in some media outlets of criminality in areas where migrants transit also fosters the perception that migrants are criminals or are a danger to residents.[82]

Between 2013 and 2014, the migrant shelter *Casa del Migrante de Saltillo* documented 35 cases of torture of migrants by municipal police and elite forces such as the Saltillo Municipal Operational Reaction Group (*Grupo de Reacción Operativa Municipal de Saltillo*, GROMS) and Saltillo Special Tactical and Weapons Group (*Grupo de Armas y Tácticas Especiales de Saltillo*, GATES). The case of "Carlos" (pseudonym), a young Honduran, is illustrative.

> On May 14, 2013, Carlos was traveling by taxi to a hotel in Saltillo, where he was to meet three fellow travelers from Honduras. As the taxi approached the hotel, there were several patrol cars surrounding it. A hooded officer came over to the taxi, detained him, and asked him what nationality he was. When Carlos said that he was Honduran, the officer took him out of the cab, put his t-shirt over his head, took him by the feet and cuffed him. He grabbed him by the shoulders and put him in the patrol car where his fellow travelers were. After 15 minutes they arrived at a place where the migrants were tortured. They destroyed Carlos' documents, pointed a weapon at him, and put it in his mouth. They ordered them to write out a list of drugs on a piece of paper while they had a dog that attacked them. When they arrived at the municipal jail, they placed Carlos in an area for children and adolescents. [However,] they forced him to say he was an adult so they would transfer him to the state prison [*Centro de Rehabilitación Social*, CERESO] (...) Before meeting with the medical examiner, officers threatened them and told them to say that they had fallen from the train. A policewoman took photos and video footage of them.[83]

The victims filed a complaint with the Coahuila State Human Rights Commission (*Comisión Estatal de Derechos Humanos*, CEDH) against the GROMS elite corps, in which they specified the kinds of threats and injuries received (blows to the hand with a bat, blows to the face, chest, back, and legs, electric shocks, and waterboarding). The CEDH issued "Recommendation No. 114/2014" on October 9, 2014 (a year and four months after receiving the complaint) for violation of the right to privacy due to the illegal searches and domiciliary visits, violation of the right to humane treatment and personal safety due to the injuries, and violation of the right to legality and legal certainty due to wrongful exercise of public duties. They refused to investigate additional acts, including torture or forced confession.[84]

# INVESTIGATING AND SANCTIONING
## CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS

*Unfortunately, one thing is the facts, and another thing is the law. —Father Prisciliano Peraza, Centro Comunitario de Atención al Migrante y Necesitado*

The context in which crimes are committed against migrants requires special attention, as well as a forceful response from the State to investigate, sanction, and prevent the repetition of these acts. Such crimes constitute human rights violations when they are committed by public officials. The data we obtained regarding authorities' performance in investigating and sanctioning these acts, combined with the migrant shelters' firsthand accounts, indicate that efforts to address human rights violations and crimes against migrants continue to fall short.

## DATA ON INVESTIGATIONS INTO CRIMES AGAINST MIGRANTS

*There are no real investigative proceedings. I accompanied a complaint in 2014, a man was assaulted by municipal police; they beat him. Because he did not have any information on the patrol car's number or the names of individuals, the public prosecutor told him that the complaint would not move forward, that it was in vain. —Diana Castillo, Casa del Migrante de Saltillo*

Currently, there are several reasons why it is challenging to collect data on investigations of crimes committed against migrants in Mexico. One of them is that investigating such crimes involves many agencies, including the PGR—especially the Special Prosecutor's Office for Crimes of Violence against Women and Human Trafficking (*Fiscalía Especial para los Delitos de Violencia Contra Mujeres y Trata de Personas*, FEVIMTRA) and the Deputy Attorney General Specialized in Investigations on Organized Crime (*Subprocuraduría Especializada en Investigación de Delincuencia Organizada*, SEIDO)—as well as state attorneys general offices, including the offices of specialized prosecutors for crimes against migrants that have been created in several states. Furthermore, not all prosecutors and attorneys general offices record data on the results of investigations, including whether the cases were successfully prosecuted and whether there was a judgment handed down by the courts. The problem of data fragmentation is exacerbated by the inconsistent manner in which these different agencies document and categorize their data. In some cases, the crimes are not classified in the same way, and moreover, not all agencies specify whether the victim was a migrant.

Despite these challenges, the authors of this report requested and obtained data from some agencies that shed light on the frequency of investigations of crimes against migrants in Mexico and, in some cases, the stage of the investigative proceedings. These data reveal that despite multiple obstacles and dangers, there are indeed hundreds of migrants who have had the courage to file a complaint with federal and state

authorities. Nonetheless, the authors have not found information that points to a real effort on the part of Mexican authorities to ensure that these complaints lead to effective investigations, and even less, convictions of the perpetrators.

At a federal level, the data on crimes against migrants are especially sparse. In a response to an information request, the PGR stated that all its documents are in its Institutional System for Statistical Information (*Sistema Institucional de Información Estadística*), but that "its databases lack the variables that allow for knowing or identifying information involving migrants as victims and State agents as perpetrators of unlawful acts under federal jurisdiction."[85] If it is true that the PGR is currently unable to disaggregate its data according to victims or perpetrators, this lack of capacity

constitutes a fundamental obstacle to conducting a thorough assessment of the PGR's performance in investigating crimes against migrants.

The PGR stated that SEIDO does have some data about crimes against migrants in Mexico. Without providing a breakdown by offense, the PGR explained that between 2011 and 2014, it had initiated 397 preliminary investigations for crimes against migrants. Opening these investigations could be considered a positive step by the government to investigate the criminal networks that commit such crimes. However, the fact that SEIDO failed to provide information about the results of these preliminary investigations, particularly the number of convictions, makes it difficult to evaluate the seriousness or efficacy of such efforts.[86]

> *The PGJE does not have qualified personnel. For example, for sex crimes, they take statements in front of everyone, the doctor is a man, and they encourage the survivors to minimize the events. With regard to the expert analysis, practically the only thing they do is a reconstruction of the events; they take them to the scene; there are no technical elements. — Salvador Leyva, La 72*

## OBSTACLES TO REPORTING CRIMES AND HUMAN RIGHTS VIOLATIONS

Victims of crime in Mexico, whether they are Mexican citizens, migrants in transit, or other foreigners, are unlikely to see justice done in their cases. There are many obstacles in the long road to justice in Mexico, including a lack of trust in the authorities, the fear of retaliation, slow proceedings, and authorities' lack of investigative capacity. Such obstacles and dangers affect all victims regardless of their nationality; however, migrants, and particularly migrants in transit, face additional challenges.

It is important to recognize the critical role played by migrant shelters in informing migrants of their rights, including their right to initiate proceedings to regularize their migration status and/or file a report or complaint regarding crimes or human rights abuses to which they have been victim. Migrant shelter staff members draw on their significant experience accompanying cases to analyze the shortcomings of official investigations and procedures. Such analysis facilitates the identification of opportunities for improving the government's response to crimes and human rights violations against migrants.

*Violence has become normalized to such an extent that people cannot identify the violations of their rights or crimes. They take it as if it were a part of life, especially women [with regard to] sexual violence. So that violence is covered up with the economic argument. How you experience the violence determines whether you file a report or complaint. When they enter Mexico, they already know what lies ahead, that they may be robbed, kidnapped, raped. That is why they don't file a complaint and [think] it is better to just continue, otherwise their family will stop helping them. Out of 100 cases, only five stay behind to file a complaint. Those are the people who come by themselves and can wait for a humanitarian visa. This is increasing; more people are coming who have no one to help them, but they decide to take the risk and try it alone. —Diana Castillo, Casa del Migrante de Saltillo*

Migrants and their defenders underscore that one of the main problems is the scant probability that any given complaint will lead to results. These low expectations are due to the lengthy nature of the proceedings and the superficial nature of the investigations (forensic analysis is conducted in a perfunctory way and is not tailored to each case). The lack of protection for those who report authorities or organized crime is another significant hindrance to filing a complaint.

An obstacle to investigations that was mentioned repeatedly in interviews with local authorities is the inherent mobility of migrants. Also mentioned was the fact that migrants are rarely able to identify the perpetrators of the crime. All these challenges persist and combined, they complicate access to justice while also explaining the limited number of complaints.

*There is a great deal of fear about filing a report. Those who do decide to file a report don't believe in justice, they are not from Nogales and their plans are not to stay here and move forward with the proceedings. (...) Getting a response to the report takes a long time. In July 2014, we filed a complaint against the agency specialized in sex crimes and intra-familial violence. This week, after a year, they just closed the case because there was a change in personnel; it was another person who didn't do what they were supposed to, processing the cases. We have to pressure them to get a response to the reports and complaints. We need personnel to do this follow-up; to bolster this work we would need an attorney, a psychologist, a doctor, another social worker. This would help to document the cases and have time to devote to advocacy. —Marla Conrad, Kino Border Initiative*

When migrants who are victims of crime during their time in Mexico reach their destination or are deported to their countries of origin, it is difficult to file a complaint. They may not, for example, have any way to prove injuries and other damages. Although the overwhelming majority of migrants in Mexico come from El Salvador, Honduras, and Guatemala, there are no established mechanisms either for migrants who have already been deported, or family members who learn of the crime, to inform Mexican authorities about these crimes from their countries of origin.

Nor are there effective mechanisms for migrants who reach the United States to file a report with the Mexican authorities. Although U.S. authorities could exercise jurisdiction for crimes that involve individuals residing in the United States (for example, in a kidnapping, if the ransom is demanded from a family member in the United States), few cases are reported. This is due to the fact that few migrants are aware that this possibility, and many fear going to the authorities if they are undocumented in the United States.

After the hearing on "Access to Justice for Migrants" held on March 20, 2015, as part of the 154th Regular Session of the IACHR, the Mexican government committed to creating a transnational mechanism for the search for and investigation of crimes against migrants. There now is a definitive proposal for creating a Specialized Unit of the Transnational Mechanism and Investigation of Crimes against Migrants (*Unidad Especializada del Mecanismo Transnacional e Investigación de Delitos Contra Migrantes*) within the PGR. This unit would have the power to, *inter alia*, investigate and prosecute crimes committed against foreign and Mexican migrants. Nevertheless, as of the writing of this report, the PGR had not formalized the unit's creation.



*Crosses in Altar, Sonora represent migrants who have died in Arizona, Texas, and California*

## SPECIALIZED PROSECUTORS: AN EFFECTIVE RESPONSE?

When a migrant is victim to a crime that falls within state jurisdiction (*fuero común*), they should be able to seek recourse in the criminal justice system in the state where they are located, regardless of their immigration status. But state-level criminal justice systems in Mexico have failed to appropriately respond to crimes against migrants, and civil society organizations within Mexico and internationally have demanded that state governments redouble their efforts. In response to these demands, several state governments in Mexico created specialized prosecutors' offices for crimes committed against migrants. The first specialized prosecutor's office for providing assistance to migrants was established in 2008 in the state of Chiapas, with

offices in Tapachula and prosecutors from the Public Prosecutor's Office (*Ministerio Público*) in Arriaga, Palenque, Comitán, Huixtla, Tuxtla Gutiérrez, Suchiate, and Comalapa.

More recently, specialized prosecutors' offices were established in 2011 in Oaxaca and Veracruz, in 2014 in Tabasco and Coahuila, and in 2015 in Campeche and Quintana Roo. The prosecutor's office in Tenosique was created following the precautionary measures granted by the IACHR due to threats received by the staff of the shelter *La 72*, while the Saltillo prosecutor's office was created as part of the State Human Rights Program, which brings together civil society organizations, including the *Casa del Migrante de Saltillo.*

### TABLE 9
## SPECIALIZED PROSECUTORS' OFFICES FOR MIGRANTS

| STATE | NAME OF PROSECUTOR'S OFFICE | YEAR EST. |
|---|---|---|
| CHIAPAS | *Fiscalía Especializada en Delitos Cometidos en contra de Inmigrantes* | 2008 |
| OAXACA | *Fiscalía de Atención al Migrante* | 2011 |
| VERACRUZ | *Fiscalía Especial de Atención al Migrante* | 2011 |
| COAHUILA | *Fiscalía Especializada para la Atención de Delitos Cometidos en agravio de Migrantes* | 2014 |
| TABASCO | *Fiscalía Especializada para la Atención al Migrante* | 2014 |
| CAMPECHE | *Fiscalía de Atención al Migrante* | 2015 |
| QUINTANA ROO | *Fiscalía Especializada en Delitos Cometidos en contra de Migrantes* | 2015 |

Source:  Website of the Chiapas State Attorney General's Office: http://bit.ly/1OcAnXA;
Website of the Oaxaca State Attorney General's Office: http://bit.ly/1OcAt1o;
Website of the Veracruz State Attorney General's Office: http://bit.ly/1OcAxhR;
Website of the Coahuila State Government: http://bit.ly/1OcC9rU;
Website of the Tabasco State Attorney General's Office: http://bit.ly/1OcAJxz;
Website of the Chiapas State Government: http://bit.ly/1OcBFlp.

It is too soon for a definitive assessment of the work of these state prosecutors' offices. In theory, designating an authority with the sole responsibility of addressing the issue of crimes committed against migrants, one that is properly trained and equipped with procedures that are tailored to the specific characteristics of these crimes, could lead to more effective investigations and better access to justice for migrants who are victims of crimes. However, initial data, particularly from the Oaxaca prosecutor's office, strongly indicate that the presence of specialized prosecutors' offices has not yet led to the intended outcome. The experiences of migrant shelters confirm that the creation of these specialized offices does not necessarily entail an effective response, unless such offices possess sufficient resources, personnel, capacities, and the political will to conduct timely investigations and ensure that cases reach a satisfactory resolution.

It bears mentioning that many migrants are frequently referred to the prosecutors' offices by the shelters and organizations advocating for their rights. Lack of trust and awareness of their undocumented status may prevent migrants from going to the specialized prosecutors' office on their own, so shelters provide legal assistance when there is no public legal assistance available. This can make a significant difference in terms of how seriously a complaint or report is taken. The experience shelters have had with these offices is quite varied, but there are some commonalities.

> *More than 110 complaints have been made since the Southern Border Program began, with 411 persons having filed reports. The prosecutor has not been able to arrest anyone. —Alberto Donis, Albergue de Migrantes "Hermanos en el Camino"*

In addition to the problems previously identified regarding the prolonged duration of investigations and proceedings, which is exacerbated for those cases that are referred to other states, we have also detected a lack of appropriate office settings for migrants to file complaints, particularly in the prosecutors' offices in Tenosique, Tabasco and Ixtepec, Oaxaca. These offices sometimes lack private rooms for individuals to provide sensitive testimony or personnel properly trained to take statements in sensitive cases, such as those that involve sexual violence. Authorities claim to be aware of the sensitive nature of these cases, but it is not clear how they have modified their actions to address these situations. Public areas should not be used to receive testimony in cases of sexual violence, and it is important that the prosecutor is sensitive to gender issues. Finally, public officials must know how to serve victims and have the appropriate level of sensitivity to ensure that victims do not unnecessarily relive painful experiences, and thus become re-victimized.

Specialized prosecutors' offices must have updated, accessible data on the results of their work. In interviews with some prosecutors, offices were ambiguous on the number of preliminary investigations initiated and the number of indictments. We therefore requested the information through the state governments' information transparency systems. The states of Chiapas, Tabasco, Oaxaca, and Veracruz have all stated they do indeed have a registry of crimes committed against migrants. In Chiapas, the specialized prosecutor's office for migrants reported that from the beginning of 2013 through April 2015, a total of 950 preliminary investigations had been opened for cases of crimes against migrants, including organized crime, homicide, human trafficking, rape, and the "smuggling of illegals." The office stated that

information regarding the number of sentences "was not available in the unit's files, as it was not their purview."[88] Although the prosecutor's office certainly does not have the jurisdictional authority to issue judgments in cases of crimes against migrants (that authority belongs to the judge under the jurisdiction of the judicial authority), it would be rather improbable for a prosecutor's office to have no knowledge of the matter. The fact that the Chiapas specialized prosecutor's office lacks information on convictions implies a worrisome indifference towards understanding and measuring the outcome of its work. Meanwhile, the specialized prosecutor's office for migrants in Tabasco reported having information on 209 crimes committed against migrants in the state, the most frequent crime being robbery (59 in 2013, 10 in 2014, and 31 in 2015).[89]

In contrast, the Oaxaca prosecutor's office did provide more comprehensive data for cases of crimes against migrants for 2011 through May 2015, including the number of reports (383 in total), preliminary investigations opened (96 in total), cases referred to other states (130 in total), and sentences (four in total). According to these numbers, 25 percent of the complaints led to preliminary investigations, which is approximately half national average for all crimes between 2010 and 2014 (a period that partially corresponds to Oaxaca's data and offers an approximate idea of how the results obtained by the prosecutors' offices compare to the national average). Only four percent of the preliminary investigations launched by the Oaxaca Attorney General's Office resulted in a sentence. This low percentage is indicative of the poor quality of the investigations.

## TABLE 10
## CASES OF CRIMES AGAINST MIGRANTS
### DOCUMENTED BY THE GOVERNMENT OF OAXACA

| | 2011 | 2012 | 2013 | 2014 | 2015 (JAN–MAY) | TOTAL |
|---|---|---|---|---|---|---|
| REPORTS | 22 | 52 | 103 | 123 | 83 | 383 |
| PRELIMINARY INVESTIGATIONS | 7 | 14 | 24 | 19 | 32 | 96 |
| CASES REFERRED TO OTHER STATES | 4 | 17 | 36 | 59 | 14 | 130 |
| SENTENCES | - | - | 3 | 1 | - | 4 |

*Source:  Oaxaca State Attorney General's Office, response to information request 16795, July 22,2015, document available on WOLA's website, http://bit.ly/1kaCVcs.*

These paltry outcomes match the findings of other investigations. For example, in a response to an IACHR information request, the Mexican government reported that between 2008 and 2011, district courts in Mexico ruled on a mere 57 criminal cases involving migrants (and it is unclear how many cases involved migrants as victims and

how many cases involved migrants as defendants). Upon evaluating these statistics, the IACHR expressed its "deep concern at what is clearly the State's patently inadequate response in terms of the investigation, prosecution, and punishment of such crimes."[91]

The information obtained clearly shows that the majority of reports of crimes against migrants do not end in convictions. Advocates and some prosecutors agree that key problems occur during the investigations, particularly due to bureaucratic internal procedures, including the large number of official communications necessary to conduct investigations, carry out forensic analysis, and obtain evidence. Another challenge is the lack of economic resources available to prosecutors to travel to the site of the incident; expert examinations must be tailored to the intricacies of each case and must be conducted expeditiously. In many cases, it is difficult for migrants to identify their perpetrators, as they are not familiar with the uniforms or vehicles of the authorities in a country through which they are transiting. This should be considered during the investigation.

Another recurring problem is when the crime occurred in one state, but is reported in another. In such cases, the prosecutors' offices should refer the complaint to the corresponding state. This, however, does not always happen in a timely fashion, further complicating efforts by migrants or their legal advisors to follow-up on the cases.

These problems, when compounded with migrants' aspiration to continue their journey and their lack of means to subsist while waiting for the case to be processed, perpetuate the cycle of impunity.[92]

> *The local public prosecutor in Agua Prieta put up obstacles to avoid taking complaints for crimes committed in other states. It wanted migrants to travel to file the complaints there, for example to Veracruz. For cases from Nogales or Naco, they wanted the migrants to travel there, even though they're in Sonora. We talked to them and told them it wasn't their job to investigate, just to refer the case and then they agreed to take the complaint. The only other way is for the organization's attorney to write up a complete report of the events, print it, sign it; that way they only have to certify it. This can make it more accessible. —Perla Del Angel, Centro de Recursos para Migrantes*

Hence, despite the existence of specialized prosecutors' offices and the efforts of some prosecutors, the lack of capacity and resources combined with the lack of political will and sensitivity impedes effective investigations. Based on the experiences of the shelters and organizations involved in this report, we can conclude that, even though the prosecutors' offices receive the complaints and open preliminary investigations, they do not follow through on their primary duty of obtaining justice.

The government of Mexico should carefully assess the performance of existing prosecutors' offices, before promoting the creation of new offices. The federal and state governments should work together to ensure that specialized prosecutors' offices possess the physical space and resources necessary to operate, and that staff are appropriately and effectively trained. The government should also acknowledge that prosecutors are limited in their capacity to fully resolve migrants' obstacles to justice. In particular, as will be described later, it is vital for the migrants who do report crimes to have access to humanitarian visas. Such visas are important not only because they are an incentive to report the crimes, but also because they enable migrants to remain in the country during the duration of proceedings.

# THE NATIONAL HUMAN RIGHTS COMMISSION AND STATE HUMAN RIGHTS COMMISSIONS

*Migrants continue to have more trust in the legal work of non-judicial bodies, like the CNDH and CEDHs; in many cases, they are the only mechanism that migrants can use for accessing justice. Nonetheless, they fail to respond to real needs: they are very bureaucratic, the victim has to provide all evidentiary exhibits, and they cannot investigate. —Alberto Xicoténcatl, Casa del Migrante de Saltillo*

When federal authorities violate migrants' human rights, the victims are entitled to file a complaint with the National Human Rights Commission (*Comisión Nacional de los Derechos Humanos*, CNDH), which has various offices across the country. The State Human Rights Commissions (*Comisiones Estatales de Derechos Humanos*, CEDHs) takes cases in which the human rights violations were committed by local authorities. In some cases, both the CNDH and the CEDHs refer migrants to other bodies, including local attorneys general offices and shelters. Some migrant shelters and organizations believe the CNDH and CEDHs are most approachable for demanding justice, but their procedures and investigative capacities are not particularly expeditious or effective. It does appear that it is easier for migrants and their advocates to get in contact with the CNDH than with the CEDHs, as the latter (at least in the cases of Tabasco and Oaxaca, whose offices are in Tenosique and Ixtepec) reported having received very few migrants.

The recommendations that the CNDH and CEDHs can issue to authorities that have committed human rights violations are not binding; however, they can have a positive impact. Given their formal nature, it is difficult for authorities to ignore them entirely.

These commissions also have the authority to conduct conciliation efforts; however, the shelters report that, based on their experience, migrants who are victims have a limited role in this process.

To better understand the frequency and outcomes of the CNDH's interventions in cases of human rights violations against migrants, we requested public information regarding such complaints received by the CNDH. According to the figures obtained, between December 1, 2012 and June 15, 2015, the CNDH reported having received 1,617 complaints, of which 1,220 were against the INM, followed by 143 complaints against the Federal Police, and 120 against the PGR. Only 18 complaints were officially initiated.[93]

The system that the CNDH utilizes to categorize human rights violations provides little insight into the nature of the acts themselves. The CNDH uses categories such as "inappropriately providing a public service" and "actions or omissions that infringe upon the rights of migrants and their family members."

Strikingly, only four out of the 1,617 complaints recorded led to the CNDH issuing recommendations. This figure highlights the limited capacities of the CNDH to investigate allegations of human rights violations and guarantee that they are not repeated.

Table 11 shows that most (73.7 percent) of the incidents for which formal complaint proceedings were initiated occurred in the southern states of Chiapas, Oaxaca, Tabasco, and Veracruz, in the Federal District, and in the northern state of Tamaulipas. The fact that there the CNDH offices in these states receive an even higher number of overall complaints is because some receive complaints of incidents that took place in another state. For example, in Ixtepec, Oaxaca, most of the complaints are related to human rights violations committed in Chiapas.

## TABLE 11
## DISTRIBUTION OF COMPLAINTS REGARDING HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS
## DECEMBER 1, 2012–JUNE 15, 2015

| STATE | NO. OF COMPLAINTS | CNDH OFFICE | NO. OF COMPLAINTS |
|---|---|---|---|
| CHIAPAS | 326 | TAPACHULA | 210 |
| FEDERAL DISTRICT | 279 | GENERAL DIRECTORATE FOR ATTENTION TO MIGRANTS (*DIRECCIÓN GENERAL DEL PROGRAMA DE ATENCIÓN A MIGRANTES*) | 498 |
| VERACRUZ | 241 | COATZACOALCOS | 127 |
| OAXACA | 132 | IXTEPEC | 265 |
| TAMAULIPAS | 116 | REYNOSA | 159 |
| TABASCO | 98 | VILLAHERMOSA | 135 |

Source:   CNDH, response to information request 00036515, document available on WOLA's website, http://bit.ly/1kaBL0D.

We heard a variety of perspectives during the interviews at CNDH field offices in Villahermosa, Tabasco; Ixtepec, Oaxaca; and Nogales, Sonora. In Villahermosa, most of the complaints of violations stemmed from migration enforcement operations; others were attributed to the municipal police. However, we noted that the response to these operations was limited to rudimentary procedures such as interviewing detained migrants, and ensuring the minors spoke with one of the INM's Child Protection Officers (*Oficial de Protección a la Infancia*, OPI).[94] In Saltillo, most of the cases were police abuse from police officers at various levels and mistreatment in migrant detention centers. Similarly, the cases in Ixtepec mostly involved treatment at migration detention centers and police abuse of authority. According to the director of the CNDH field office in Ixtepec, Oaxaca, there has been an uptick in cases since the launch of the Southern Border Program.

The CNDH is equipped with a rather sound infrastructure to service migrant cases through its various offices with resources from the Fifth General Inspection Unit (*Quinta Visitaduría*). It bears noting, however, that specializing in migration issues should not be limited merely to knowledge of the Migration Law or the INM's obligations during enforcement operations or migrant detention, or the internal regulations of other authorities; specialization also requires understanding international human rights standards to ensure that their intervention truly prevents repetition. This could entail, for example, recommending changes in regulations or resource allocation.

## THE RESPONSIBILITY OF THE NATIONAL MIGRATION INSTITUTE

The INM is often singled out by migrants, shelters, and the CNDH for perpetrating human rights violations during operations and at migrant detention centers. Excessive use of force during migration enforcement operations figures prominently in reported cases of abuse and such cases have multiplied since the Southern Border Program began. Inside migrant detention centers, the INM is the authority charged with informing migrants of their rights, including their right to seek asylum and request a humanitarian visa if they have been victims of a crime. However, testimonies confirm that INM agents often fail to inform migrants of their rights or they tell migrants that applying for asylum will result in prolonged detention, in order from discourage potential asylum seekers.[95]

These problems are at least partly due to the lack of internal and external oversight for INM operations. Although the INM has an Internal Control Body (*Órgano Interno de Control*) that can impose administrative sanctions on agents for failing to fulfill their duties, it does not yet have an Internal Affairs Unit able to open investigations against agents for alleged criminal activities or serious misconduct or disciplinary infractions. Such a unit, however, is provided for in the SEGOB's internal regulations.[96] The INM does possess a Citizen Council, but the conditions for conducting internal oversight could be bolstered further.[97] As for external oversight, civil society organizations have limited access to migrant detention centers, and procedures for determining entrance remain opaque. According to the "Agreement issuing operating procedures for the National Migration Institute migrant detention centers and provisional holding facilities," civil society organizations must apply to be included in an access registry, but there are no clear standards for authorization.[98] This procedure should not be discretional and must be flexible in order to ensure that organizations can assist migrants by informing them of their rights, as well as monitor detention conditions.

While there are few incentives for reporting crimes, Mexican legislation allows for migrant who are victims of crime to apply for "visitor resident status for humanitarian reasons" (Migration Law, Article 52, paragraph V).[99] Such a permit would grant temporary residence to migrant who are victims of a crime that is committed in Mexico and that the authorities recognize. Nonetheless, the INM has issued few humanitarian visas in recent years, and organizations report that only a few of the applications that they have accompanied have been successful. This number, however, is increasing, according to government data (see table 12).[100]

The support provided by the shelters and organizations in the procedures to obtain a humanitarian visa greatly increases the probability of a favorable outcome. One of the hurdles that migrant shelters have identified in obtaining humanitarian visas is the requirement that the crime must be a felony, as provided for in Article 50 of the regulations of the Migration Law. However, whether or not a given crime is considered a felony depends on the particular state's criminal procedure legislation. This determination could also depend on the opinion and willingness of the prosecutor to consider the context of the migrant's vulnerability. If the complaint does not clearly specify the degree of the crime, it is up to the INM's discretion to interpret the crime. That decision, however, technically belongs within the purview of the justice system. The small number of visas granted could, thus, be increased by standardizing the procedures for determining the severity of crimes.

## TABLE 12
# HUMANITARIAN VISAS* ISSUED BY THE INM

|  | 2012 | 2013 | 2014 | 2015 (JAN–JUN) |
|---|---|---|---|---|
| TOTAL | 108 | 277 | 623 | 527 |
| CENTRAL AMERICA | 103 | 208 | 501 | 461 |

*Tarjetas de Visitante por Razones Humanitarias (TVRH)*
*Source:   Secretaría de Gobernación, Unidad de Política Migratoria, Boletines Mensuales de Estadísticas Migratorias 2012, 2013, 2014, 2015, http://bit.ly/1jMKo1.*

Although filing a report is a requirement for accessing a humanitarian visa, this visa has become a prerequisite for migrants to access justice. It is impossible for migrants to remain present for the duration of criminal proceedings without it. It is, therefore, important for the process to be clear, simple, and leave no leeway for discretion.

The information in this section demonstrates that, despite the obstacles migrants face in reporting crimes, there have indeed been complaints in recent years filed by migrant victims of crimes or human rights violations, many of whom have been accompanied by migrant shelters. In light of problems documented, it is necessary to improve the number of reports filed as well as the number of investigations carried out and sentences and recommendations issued. It would seem that the creation of specialized prosecutors' offices has not succeeded in incentivizing migrants to report crimes, nor has it led to successfully prosecuting criminals. Advocates and some prosecutors agree that the results obtained by these specialized prosecutors leave room for improvement, and also that the criteria for granting humanitarian visas to migrant who are victims of crime must be clarified.

This section has made clear that migrants face greater obstacles in accessing justice than others; the next section proposes feasible changes that would help to reduce that discrepancy.

# CONCLUSIONS AND RECOMMENDATIONS

A review of official data, reports, and documented cases has given us a picture of the crimes and human rights violations committed against migrants, as well as important clues as to what specific obstacles lie in the way of access to justice. In addition, we have identified a direct relationship between the intensification of migration enforcement under the Southern Border Program and a number of violations of specific rights. Current policies have led to more frequent violations of the rights to humane treatment, liberty, and access to asylum.

Serious crimes against migrants, including kidnappings, trafficking, disappearances, and murders continue to occur; the June 2015 attack against a group of migrants in Caborca, Sonora and the possible disappearance of some members of that group is emblematic. Federal, state, and municipal police rob and extort money from migrants, and those acts are frequently accompanied by physical and psychological abuse.

Migrant shelters and civil society organizations produce the most reliable data on this subject through their documentation, but we have not found any information that enables us to assess the State's intervention in these cases.

Despite the existence of some specialized prosecutors' offices for assisting migrants and focused efforts by migrant shelters and civil society organizations to report and document cases, most cases go unpunished. When migrants go to the authorities to file reports, cases are often hampered, primarily during the investigation stage. Humanitarian visas available to certain migrants who have been victims of crimes are granted by the INM almost solely when the migrant has the legal assistance of a civil society organization. In addition, given the situation of human rights violations migrants face, the CNDH's intervention in cases of complaints and recommendations falls short.



*Mural in La 72, Hogar—Refugio para Personas Migrantes*

# RECOMMENDATIONS

**WE BELIEVE THE FOLLOWING RECOMMENDATIONS TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES ARE BOTH IMPORTANT AND FEASIBLE.**

**TO THE NATIONAL MIGRATION INSTITUTE (INM):**
**STRENGTHEN INTERNAL OVERSIGHT AND ACCOUNTABILITY TO PREVENT HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS FROM OCCURRING WITHIN THE FRAMEWORK OF MIGRATION ENFORCEMENT ACTIVITIES,** specifically through the establishment of an Internal Affairs Unit equipped with the necessary financial and human resources and the political will to investigate allegations of crimes and human rights violations perpetrated by INM agents.[101]

**TO THE MINISTRY OF THE INTERIOR (SEGOB):**
**PROMOTE A NATIONAL STRATEGY FOR IMPLEMENTING AND MONITORING THE 2014–2018 SPECIAL MIGRATION PROGRAM (PEM) THAT INCLUDES, AS A CORE ELEMENT, SUFFICIENT FUNDING.** Rather than creating new programs that further duplicate responsibilities, such as the Southern Border Program, the 2014–2018 PEM should be held up as the primary public policy document regarding migration by all federal government agencies and should be implemented as such. To this end, there must be a transparent allocation of sufficient funding for the PEM.

**CREATE AN ASYLUM AND INTERNATIONAL PROTECTION POLICY THAT UPHOLDS MEXICO'S VALUES.** COMAR's budget must be increased so that it is proportional to the increased needs of the migrant population and so that each individual who so desires may have the opportunity to tell his or her story to an official specialized in asylum. Specifically, there is an urgent need to hire and train more COMAR protection officers to conduct eligibility interviews, as well as to evaluate the possibility of opening new COMAR offices at key points along the migration route, such as on the border between the state of Tabasco and Guatemala.

It is also necessary to build institutional capacity and enhance mechanisms for coordination between the INM and COMAR in order to inform all migrants in Mexican territory about their right to asylum and international protection, as well as facilitate cooperation with civil society organizations that provide legal assistance in order to increase the number of requests and reduce the rate of desisted or abandoned cases.

In addition, cooperation agreements should be reached with university law schools nationwide in order to encourage attorneys to provide pro bono assistance to migrants eligible for refugee status in Mexico.

**DEVELOP CLEAR REGULATIONS FOR MIGRATION ENFORCEMENT OPERATIONS, SPECIFICALLY REGARDING APPROPRIATE PLACES AND CIRCUMSTANCES IN WHICH TO CONDUCT THEM, COOPERATION BETWEEN THE INM AND OTHER**

**AUTHORITIES, THE RESPONSIBILITIES OF EACH OF THESE AUTHORITIES, AND CLEAR LIMITS ON THE USE OF FORCE.** Such regulations should include a protocol that regulates and limits the use of force during migration enforcement operations, ensures the training of all agents on such guidelines, and establishes oversight and sanctions. The UPM's website should post up-to-date information on the number of migration enforcement operations, broken down by month and state.

It is also necessary to develop a clear protocol on the procedure for granting humanitarian visas, including explicit and consistent definitions of eligibility requirements in order to eliminate discretion, and mechanisms for coordination between the PGR, the PGJEs, the INM, and civil society organizations.

## TO THE FEDERAL ATTORNEY GENERAL'S OFFICE (PGR):
**IMPLEMENT THE SPECIALIZED UNIT OF THE TRANSNATIONAL MECHANISM AND INVESTIGATION OF CRIMES AGAINST MIGRANTS** (*Unidad Epecializada del Mecanismo Transnacional e Investigación de Delitos contra Migrantes*). Create a protocol for investigating crimes against migrants that facilitates cooperation between the PGR and state attorneys general offices. Such a protocol should include travel provisions for prosecutors and agents, so they can receive reports in places such as consulates, migrant detention centers, and shelters.

Work with the states to standardize and systematize data collection on investigations and prosecutions in connection with crimes against migrants, including case outcomes, and make such data available on a monthly basis on the PGR's website.

## TO THE GOVERNMENT OF THE UNITED STATES:
**PROMOTE THE INVESTIGATION OF CRIMES AND HUMAN RIGHTS VIOLATIONS AGAINST MIGRANTS IN MEXICO.** Provide technical assistance to the Mexican government and to the countries of Central America on the investigation and sanctioning of crimes against migrants that are transnational in nature. Through the Department of Justice, broaden technical assistance to Mexico's specialized prosecutors' offices, including training staff on investigative techniques.

Through the Merida Initiative, the Department of State should work with the Mexican government to determine ways to support the INM in strengthening oversight mechanisms, such as through the establishment of an Internal Affairs Unit.

The Department of State's Bureau of Population, Refugees, and Migration must continue to support efforts to strengthen the Mexican government's capacity to identify, protect, and assist vulnerable migrants in Mexico.

## TO THE GOVERNMENTS OF MEXICO AND THE UNITED STATES:
**EXPLORE THE CREATION OF PROSECUTOR EXCHANGE PROGRAMS REGARDING THE STRATEGIC USE OF HUMANITARIAN VISAS AS AN INCENTIVE FOR REPORTING CRIMES COMMITTED AGAINST MIGRANTS, AS WELL AS TO SHARE SUCCESSFUL PRACTICES IN INVESTIGATING CRIMES AGAINST MIGRANTS.**

# REFERENCES

[1] Angélica Jocelyn Soto Espinosa, "Más de 100 migrantes desaparecidos tras ataque de grupo armado," *Cimacnoticias*, July 2, 2015, accessed September 25, 2015, http://bit.ly/1LvYfDl.

[2] Amnesty International, "México debe investigar el atroz aumento de los ataques y homicidios de migrantes", June 18, 2015, accessed September 25, 2015, http://bit.ly/1OcDSNK; Testimony and information received by the authors; Comisión Nacional de los Derechos Humanos, *Investiga la CNDH la probable ejecución de tres migrantes centroamericanos, cuyos cuerpos fueron hallados en Caborca, Sonora,* June 9, 2015, accessed September 25, 2015, http://bit.ly/1OcDUoX.

[3] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[4] México: Presidencia de la República, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur," July 7, 2014, accessed September 25, 2015, http://bit.ly/1OcDVck.

[5] In some places like Apizaco, Tlaxcala, the company Ferrosur has placed barriers next to the train tracks, which have already caused seven serious accidents, including one that was fatal.

[6] For years, images of Central American migrants riding as stowaways on trains were used to demonstrate the serious risks that migrants face when crossing Mexico, as well as the Mexican government's apparently permissive approach to transmigration. In this regard, the Southern Border Program was a great success (although some migrants continue to travel by freight train, the numbers have decreased and it is only happening in some parts of the country). WOLA, "Mexico Now Detains More Central American Migrants than the United States", June 11, 2015, accessed September 25, 2015, http://bit.ly/1MlQy2U. Boletines Mensuales de Estadísticas Migratorias 2012, 2013, 2014, 2015. Migration Policy Unit, Secretariat of the Interior, http://bit.ly/1jMKo18.

[7] Lupita Thomas and Xóchitl Álvarez, "Abren 16 rutas más peligrosas para migrantes", *El Universal*, June 14, 2015, accessed September 25, 2015, http://eluni.mx/1OcE0wG.

[8] The areas of concern with respect to migrants' human rights include: lack of access to asylum (only 270 refugees recognized in 2013 and 451 in 2014); the excessive use of force by migration officials; detention of children; prolonged detention of asylum-seekers; and failure to provide protection or effective access to justice for victims of crimes and human rights violations. The United Nations Special Rapporteur on the Human Rights of Migrants, Jorge Bustamante, visited Mexico in 2008, and expressed concern about migrants' victimization by gangs and government officials, and about the government's detention and deportation practices. For its part, the Inter-American Commission on Human Rights (IACHR) published an extensive report on migrants' human rights in Mexico in 2013, based on a visit made in 2011: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, 2013, accessed October 27, 2015, http://bit.ly/1KBsgMU.

[9] When conducting research for this report, the authors also consulted a wide array of secondary sources, including a series of reports from Mexican civil society organizations on the situation of migrants, government reports, and reports from NGOs on crime and victimization, as well as several evaluations on Mexico's law enforcement and criminal justice institutions. We have also analyzed official documents, including migration data regularly published by SEGOB, as well as a series of information requests made to the federal and state government through the service *Infomex*.

[10] Many migrant rights advocates have had to resort to national and international protection mechanisms, including the CNDH, the federal Protection Mechanism for Human Rights Defenders and Journalists, and the IACHR, in order to obtain basic protection from authorities: Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 106. Even when protection measures are granted, the implementation has been poor. WOLA and Peace Brigades International, *The Mechanism to Protect Human Rights Defenders and Journalists in Mexico: Challenges and Opportunities*, February 3, 2015, accessed September 25, 2015, http://bit.ly/1OcE3ZB.

[11] México: Presidencia de la Republica, "Pone en marcha el presidente Enrique Peña Nieto el Programa Frontera Sur".

[12] Diario Oficial de la Federación, "Decreto por el que se crea la Coordinación para la Atención Integral de la Migración en la Frontera Sur,"  July 8, 2015, accessed October 15, 2015, http://bit.ly/1Lw0ir2

[13] According to the *Red de Documentación de Organizaciones Defensoras de Migrantes* (REDODEM), the flow of migrants assisted by its 15 member organizations dropped abruptly in mid-2014. In the first half of the year, 21,000 people passed through their shelters and soup kitchens. In the second half of the year, the number was not even half that, but records show there were still 10,000 migrants. REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migration Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx.

[14] It is worth noting that migrants often pay in installments from their place of origin to a "*pollero*" or "*coyote*" to cross the border.

[15] Secretaría de Gobernación, *Coordinación para la Atención Integral de la Migración en la Frontera Sur, Informe de Actividades Julio de 2014—Julio de 2015*, document obtained via Infomex request number 0000400282715, available on WOLA's website, http://bit.ly/1kay9LQ.

[16] Instituto Nacional de Migración, Resolución del Comité de Información, Infomex request 0411100011515, April 16, 2015, accessed September 25, 2015, http://bit.ly/1OcEnHN.

[17] Instituto Nacional de Migración, Respuesta a la solicitud de información pública, Infomex request 0411100035415, June 17, 2015, available on WOLA's website, http://bit.ly/1KBwKDh.

[18] According to figures from SEGOB, in 2013 the INM detained 86,298 foreigners. In 2014, the number of foreigners detained increased to 127,149. Secretaría de Gobernación, Unidad de Política Migratoria, *Boletines Mensuales de Estadísticas Migratorias 2013 y 2014*, http://bit.ly/1jMKo18.

[19] Ardelio Vargas, "Combate el Gobierno de la Republica Delitos Cometidos en Contra de Migrantes" Press Conference, March 3, 2015, document obtained via Infomex request 0411100024215, June 17, 2015, available on WOLA's website, http://bit.ly/1kaQUPk.

[20] Diario Oficial de la Federación, "Decreto por el que se expide la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones de la Ley General de Población, del Código Penal Federal, del Código Federal de Procedimientos Penales, de la Ley Federal contra la Delincuencia Organizada, de la Ley de la Policía Federal, de la Ley de Asociaciones Religiosas y Culto Público, de la Ley de Inversión Extranjera, y de la Ley General de Turismo" May 25, 2011, accessed October 6, 2015, http://bit.ly/1VBUpPO.

[21] Policía Federal, *Convenio de Colaboración para brindar apoyo en el control, verificación, vigilancia, revisión y traslado de migrantes, así como resguardo perimetral de las estaciones migratorias*, document obtained via Infomex, request 0413100043715, May 27, 2015, document available on WOLA's website, http://bit.ly/1kaRAV3.

[22] La 72, CODEMIRE, COMPA, and Movimiento Migrante Mesoamericano, "INM y PF realizan operativo violento en Tabasco contra migrantes y defensores de derechos humanos," May 3, 2015, accessed October 6, 2015, http://bit.ly/1VBSWJf.

[23] Case documented and followed by the Kino Border Initiative, a civil society organization based in Nogales that is a member of the *Red Sonora*.

[24] "*Federales y personal del INM dejan morir ahogado a un joven migrante centroamericano*", Sin Embargo, March 18, 2015, accessed September 25, 2015, http://bit.ly/1OcEqDq; Carlos Marí, "*Perseguían policías a migrantes accidentados*", *Reforma*, June 28, 2015, accessed September 25, 2015, http://bit.ly/1OcEtz0.

[25] The UPM was created in August 2012 and its mission is: "To develop and propose strategies, programs, and actions to establish a comprehensive, consistent, and well-founded Mexican migration policy that respects and safeguards human rights, facilitates the documentation of migration, and helps to preserve national sovereignty and security, taking into account the branches of government, government orders, and civil society in a framework of shared responsibility with the governments of other countries and of contributing to national development." See: http://bit.ly/1OcEtPB.

[26] The Mexican public administration tends to spend most of the budget at the end of the year, which explains the expenditure increases shown in the last quarters of 2013 and 2014.

[27] The Special Migration Program (*Programa Especial de Migración*, PEM) was published in the Mexico's Official Federal Gazette (*Diario Oficial de la Federación*) on April 30, 2013. The PEM is a cross-cutting multi-sectoral instrument that sets forth the Mexican government's priorities with regard to migration. Its preparation stems from the 2013-2018 National Development Plan (*Plan Nacional de Desarrollo*). The PEM, which consists of five objectives and several strategies and courses of action, seeks to coordinate the work between different bodies and government levels with the aim of ensuring migrants' well-being, taking into account the origin, transit, destination, and return processes. Diario Oficial de la Federación, "Programa Especial de Migración 2014-2018," April 30, 2014, accessed September 25, 2015, http://bit.ly/1OcEzXv.

[28] United States Border Patrol, "Total Unaccompanied Alien Children (0-17 Years Old) Apprehensions by Month - FY 2010-2014," data updated September 2014, accessed September 25, 2015, http://1.usa.gov/1OcECCJ.

[29] Clare Seelke and Kristin Finklea, *U.S.-Mexican Security Cooperation: The Mérida Initiative and Beyond*, Congressional Research Services, May 7, 2015, accessed October 1, 2015 http://bit.ly/1OcEDq8.

[30] *Presupuesto priorizado de los Proyectos para INM en los FY10 y FY 11*, document provided to WOLA in 2012.

[31] U.S. Embassy – Mexico, "The Merida Initiative – An Overview", May 2015, accessed September 25, 2015, http://1.usa.gov/1OcEEue.

[32] Thomas A. Shannon, "Testimony to Senate Foreign Relations Committee," July 17, 2014, accessed September 25, 2015, http://1.usa.gov/1OcEIdq; Congressional Research Service, "Mexico's Recent Immigration Enforcement Efforts," April 29 2015, accessed September 25, 2015, http://bit.ly/1OcEItV. Congress allocated funds totaling US$79 million for border security and/or judicial reform, without specifying amounts.

[33] Adam Isacson, Maureen Meyer, and Gabriela Morales, Mexico's Other Border: Security, Migration, and the Humanitarian Crisis at the Line with Central America, WOLA, June 2014, accessed September 25, 2015, http://bit.ly/1OcEJ0R.

[34] For example, during a budget hearing on U.S. assistance to Central America in March 2015, Rep. Kay Granger, Chairwoman of the State, Foreign Operations and Related Programs Subcommittee of the House Appropriations Committee stated that, "Our neighbor, Mexico is on the front lines of combatting the illegal migration issue and we must do all we can to help Mexico strengthen its borders." Office of Congresswoman Kay Granger, "Granger Opening Statement: Budget Hearing – Assistance to Central America," March 24, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHpV.

[35] For example, Rep. Albio Sires, Ranking Member of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, stated during a June 25, 2014 Subcommittee hearing that "reports indicate that the migrants are increasingly citing widespread incident[s] of extortion, kidnapping and other abuses committed by both criminal groups and Mexican federal, state and local police officials. Mexico must work together with the Central American neighbors to address security concerns along the southern border." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis," June 25, 2014, information accessed October 27, 2015, http://1.usa.gov/1O67YD1. In another rare instance of dissent, during an April 30, 2015 Western Hemisphere Subcommittee hearing, Representative Joaquín Castro raised questions about Mexico's Southern Border Plan: "Many folks have been cut off from riding what is known as the Beast—the train that ultimately leads them on the path toward the United States. But what I would like to see going back through the testimony that you all give is an understanding of how we are doing that with respect for human rights or understanding the cost of human life." House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Migration Crisis: Oversight of the Administration's Proposed $1 Billion Request for Central America," April 30, 2015, information accessed September 25, 2015, http://1.usa.gov/1OcEHGy.

[36] For example, Congressman Jeff Duncan, Chairman of the Western Hemisphere Subcommittee of the House Committee on Foreign Affairs, asked Deputy Assistant Secretary Palmieri the following question during the aforementioned June 25, 2014 hearing: "What has changed within the country of Mexico that it has allowed 60,000 children to transit that area? Whether they are Honduran or Guatemalan or El Salvadorean [sic], they crossed that border and they came through Mexico to get to the United States. They didn't get on an airplane. They walked or they rode a train or in a car or something and we are talking about, what, 3-year-olds?" House Committee on Foreign Affairs, Subcommittee on the Western Hemisphere, "Subcommittee Hearing: Children Migrating from Central America: Solving a Humanitarian Crisis."

[37] Comisión Nacional de los Derechos Humanos, Informe Especial Sobre los Casos de Secuestro en Contra de Migrantes, June 15, 2009, accessed September 25, 2015, http://bit.ly/1L4VR2W; Comisión Nacional de los Derechos Humanos, Informe Especial Sobre Secuestro de Migrantes en México, February 22, 2011, accessed September 25, 2015, http://bit.ly/1L4VW6D.

[38] The 2015 REDODEM report is *Migrantes invisibles, violencia tangible* information accessed on October 15, 2015, http://bit.ly/1Lw2Aqd; while the 2013 report is *Narrativas de la transmigración centroamericana en su paso por México*, accessed October 7, 2015, http://bit.ly/1VEUkW6.

[39] Other reports include: Centro de Derechos Humanos Miguel Agustín Pro Juárez (Centro Prodh) and Casa del Migrante de Saltillo, *Cuaderno de Secuestros de Migrantes*, December 2011, information accessed September 28, 2015, http://bit.ly/1OcELGa; Latin America Working Group, *Perilous Journey*, October 2014, information accessed September 28, 2015, http://bit.ly/1OcEMK6; and Maureen Meyer and Stephanie Brewer, A Dangerous Journey Through Mexico: *Human Rights Violations against Migrants in Transit*, WOLA and Centro Prodh, January 2011, information accessed October 7, 2015, http://bit.ly/1VEUMUj.

[40] Interview with Brother Tomás González, Director of La 72, conducted by Gabriela Morales on April 29, 2015.

[41] U.S. Department of State, *Trafficking in Persons Report 2014, "Mexico,"* information accessed October 6, 2015, http://1.usa.gov/1OcEPpu.

[42] The IACHR indicated in its 2013 report that "During its visit to Reynosa, Tamaulipas, the Commission was told of cases of Mexican migrants who, after being deported, were abducted by criminal organizations like the Los Zetas Cartel or the Gulf Cartel, who locked them in safe houses, cemetery vaults and elsewhere. During their captivity the migrants are beaten severely and their entry into the United States will at times depend on whether they are willing to carry drugs into United States territory. This problem is particularly severe in the state of Tamaulipas." Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 61.

[43] Case documented by members of the Red Sonora.

[44] Silvia Otero, PGR liga a agentes del INM con trata", *El Universal*, September 24, 2013, information accessed September 28, 2015, http://eluni.mx/1OcERxq.

[45] Salvador Camarena, "*Hallados 72 cuerpos de inmigrantes 'sin papeles' en un rancho en México,"El País*, August 26, 2010, information accessed September 28, 2015, http://bit.ly/1OcEUcH.

[46] "Presidente de El Salvador dice que hay un tercer sobreviviente de masacre," CNN México, September 5, 2010, information accessed September 28, 2015, http://cnn.it/1OcEXVM.

[47] Reference is made in survivors' statements, Inter-American Commission on Human Rights, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 68.

[48] The National Security Archive, "Mexico: Los Zetas Drug Cartel Linked San Fernando Police to Migrant Massacres," December 22, 2014, information accessed September 28, 2015, http://bit.ly/1L4Wae4.Nick Miroff and William Booth, "Mass graves in Mexico reveal new levels of savagery," *Washington Post*, April 24, 2011, information accessed September 28, 2015, http://wapo.st/1OcEXFj; Alberto Nájar, "*México: ¿quiénes son los muertos de Cadereyta?"*,BBC, May 22, 2012, information accessed September 28, 2015, http://bbc.in/1OcF43H; "*Identifican a ocho migrantes hondureños entre víctimas de masacre en México*", El Heraldo, December 22, 2013, information accessed September 28, 2015, http://bit.ly/1OcF4AX. In its report on the situation of Central American migrants in transit through Mexico, the IACHR noted that it had received documents that contain "testimony given by migrants who said they had witnessed mass killings in which several dozen people were murdered and that they had been held in captivity with upwards of 400 people. Some migrants told of having witnessed mutilations, decapitations, migrants who were hammered to death;

there were even stories of bodies being dissolved in barrels of acid." IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 70.

[49] Case documents compiled on the website of the organization Foundation for Justice and the Democratic Rule of Law (*Fundación para la Justicia y el Estado Democrático de Derecho*), http://bit.ly/1OcF8R7, information accessed October 1, 2015.

[50] "Concluding observations of the United Nations Committee on Enforced Disappearances (CED) review of Mexico," February 13, 2015, accessed September 28, 2015, http://bit.ly/1OcFbfF..

[51] For example, the regional network Truth and Justice for Migrants (*Verdad y justicia para migrantes*) is made up of family members of disappeared migrants from Honduras and El Salvador, along with civil society organizations, http://bit.ly/1M6ChTG. The Central American mothers' convoy is organized every year by the Mesoamerican Migrant Movement (*Movimiento Migrante Mesoamericano*), http://bit.ly/1FN4T7J.

[52] See, *Informe alternativo presentado al Comité contra la Desaparición Forzada en vista del examen del informe de México durante la 8ª sesión del Comité, de 2 a 13 de febrero de 2015* (Alternative report submitted to the UN Committee on Enforced Disappearances in light of the review of Mexico's report during the Committee's 8th session from February 2 to 13, 2015), December 2014, p. 16, 2015, accessed October 7, 2015, http://bit.ly/1LztU8X. It is noteworthy that in February 2015 the CED concluded that in much of Mexico there is a grave crisis of generalized disappearances. Enorced disappearance is understood as "the act of depriving a person or persons of his or their freedom, in whatever way, perpetrated by agents of the state or by persons or groups of persons acting with the authorization, support, or acquiescence of the state, followed by an absence of information or a refusal to acknowledge that deprivation of freedom or to give information on the whereabouts of that person, thereby impeding his or her recourse to the applicable legal remedies and procedural guarantees." Article 2, Inter-American Convention on Forced Disappearance of Persons, adopted at Belém do Pará, Brazil, June 9, 1994, at the Twenty-fourth Regular Session of the General Assembly (to the Organization of American States), accessed October 7, 2015, http://bit.ly/1LztkYF.

As a result of the CED's review, the Mexican government began a process of preparing a law on enforced disappearance. While this law was being drawn up, groups of victims and organizations expressed concern about having their experiences included in the new legislation.

In multiple cases the Inter-American Court of Human Rights has defined disappearance as: "Involuntary or enforced disappearance constitutes a multiple and continuing violation of a number of rights protected by the Convention, because not only does it produce an arbitrary deprivation of liberty, but it also endangers personal integrity, safety and the very life of the detainee. Moreover, it places the victim in a state of complete defenselessness, resulting in other related crimes." Case of Bámaca-Velásquez v. Guatemala, Judgment of November 25, 2000, para. 128. See also, among others, IACHR. Report 53/96. Case 8.074. Francisco José Antonio Pratdesaba Barillas (Guatemala); Report 54/96. Case 8.075. Luis Gustavo Marroquín (Guatemala); Report 55/96. Case 8.076. Axel Raúl Lemus García (Guatemala); Report 56/96. Case 9.120.  Ana Lucrecia Orellana Stormont (Guatemala); Report 3/98. Case 11.221. Tarcisio Medina Charry (Colombia); Report 51/99. Cases 10.471; 10.955; 11.014; 11.066; 11.070; 11.067; 11.163 (Perú); IACHR Case 10.247 et al., para. 178, Peru, Report Nº 101/01, October 11, 2001, Extrajudicial Executions and Enforced Disappearances of Persons, Considerations relating to enforced disappearances.

[53] Alma Gudiño, "*Consignan a policía de Ramos Arizpe por violar a migrante*", *Excelsior*, February 23, 2015, accessed September 28, 2015, http://bit.ly/1OcFc3h.

[54] National Human Rights Commission, Recommendation No. 54/2012 *Sobre el caso de agresión sexual a la menor migrante V1*, of September 28, 2012, accessed September 29, 2015, http://bit.ly/1OcFcQP.

[55] Interview with staff from La 72, conducted by Gabriela Morales from April 29 to May 1, 2015.

[56] Natalia's (pseudonym) complaint, reviewed with her explicit authorization.

[57] Manu Ureste and Yosune Chamizo, *"Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur"*, *Animal Político*, July 7, 2015, accessed September 28, 2015, http://bit.ly/1OcFdnN.

[58] REDODEM, *Migrantes invisibles, violencia tangible*, Jesuit Migrant Services, July 29, 2015, accessed September 25, 2015, http://bit.ly/1OcE4wx

[59] Mexican Chamber of Deputies, *Código Penal Federal – Ultima reforma (Federal Criminal Code – Latest reform)*, December 26, 2013, accessed October 7, 2015, http://bit.ly/1RkI6Bm. .

[60] Documentation of case assisted by Kino Border Initiative, a civil society organization and member of the Sonora Network.

[61] Testimony taken by the authors at La 72, April 30, 2015.

[62] It is easy to confuse the different terms related to asylum and refugees. The organizations that have collaborated on this report prefer to refer to the right to asylum in a broad sense and individuals who are migrants and refugees, based on the idea that an individual's status does not depend on an administrative decision. Indeed, governments are the ones who confer or fail to confer refugee status on an individual. "Asylum seekers" are what people are called when the danger they are fleeing from has yet to be evaluated. Many countries have a specific legal framework for cases of political persecution (thus distinguishing between humanitarian and political asylum). In Mexico, Article 13 of the Law on Refugees, Complementary Protection, and Political Asylum  provides that an individual will be granted refugee status under the following conditions:

> They are outside of the country of which they are nationals, to which they cannot return for well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions;

> They have fled from their country of origin because their lives, security, or liberty have been threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights, or other circumstances that have gravely disturbed public order, and

> For circumstances that have emerged in their country of origin or as a result of activities undertaken during their time on domestic territory they have well-found fears of being persecuted for reasons of race, religion, nationality, gender, membership in a given social group, or their political opinions, or their lives, security, or liberty may be threatened by generalized violence, foreign aggression, internal conflicts, massive violation of human rights or other circumstances that have gravely disturbed public order.

Law on Refugees, Complementary Protection, and Political Asylum, 2011, accessed October 7, 2015, http://bit.ly/1GoSuSk.

[63] *Boletín Estadístico de SEGOB,* 2014, accessed October 15, 2015 http://bit.ly/1jMKhm0.

[64] National Autonomous University of Honduras (*Universidad Nacional Autónoma de Honduras*) and the University Institute for Democracy, Peace and Security (*Instituto Universitario en Democracia, Paz, y Seguridad*), *Observatorio de la Violencia (Observatory of violence),* February 2015, accessed September 28, 2015, http://bit.ly/1OcFhEe..

[65] *"El Salvador confirma a agosto como el mes más violento desde la guerra civil"*, BBC, September 2, 2015, accessed September 28, 2015, http://bbc.in/1OcFkzT.

[66] Communiqué from INM to members of its Citizen's Council, dated June 23, 2015.

[67] *La Ruta del Encierro Sin Fronteras,* 2014, accessed September 28, 2015, http://bit.ly/1OcFlUk *"Derechos Cautivos", Sin Fronteras,* 2015, accessed September 28, 2015, http://bit.ly/1OcFmHR.

[68] Secretariat of the Interior, "*Estadísticas Comar*", September 22, 2015, accessed September 28, 2015, http://bit.ly/1OcFo2D. For reasons that are unclear, the Secretariat of the Interior provides a much lower figure—296—for the number of refugees documented as permanent residents in 2014; Secretariat of the Interior, Migration Policy Unit, and the National Migration Institute, 2014 Monthly Migration Statistics Report, 2014, accessed October 10, 2015 http://bit.ly/1OcFuap.

[69] Ibid.

[70] United Nations High Commissioner for Refugees, *Arrancados de Raíz,* accessed September 28, 2015, http://bit.ly/1Kl0Qv4. .

[71] Chamber of Deputies of the Honorable Congress of the Union, *Law on Refugees, Complementary Protection, and Political Asylum,* October 30, 2014, accessed September 28, 2015, http://bit.ly/1OcFwPu

[72] Ibid.

[73] U.S. Citizenship and Immigration Services, "Refugees", accessed September 28, 2015, http://1.usa.gov/1OcFzef

[74] Secretariat of the Interior, "Estadísticas COMAR", September 22, 2015, September 28, 2015, http://bit.ly/1JBst5L..

[75] United Nations High Commissioner for Refugees (UNHCR), *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y separados de Centroamérica y su necesidad de protección internacional* 2014, accessed October 1, 2015, http://bit.ly/1OcFBTb

[76] IACHR, Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico, p. 227-228

[77] Interview with Salvador Leyva, attorney for La 72, conducted by Gabriela Morales on April 29, 2015. It is worth noting that in 2015, investigators from the Human Rights Institute of Georgetown Law School conducted a week-long investigative mission to Tapachula, Chiapas, and the capital of Guatemala. They conducted interviews with 45 migrants and found that children were not appropriately interviewed to identify their need for international protection nor were they informed about their right to seek asylum. Furthermore, investigators found that the conditions, as well as the length, of detention dissuade children

from applying for asylum. Georgetown Law Human Rights Institute, *The Cost of Stemming the Tide: How Immigration Enforcement Practices in Southern Mexico Limit Migrant Children's Access to International Protection*, April 2015, information accessed on October 27, 2015. http://bit.ly/1O6ajOk.

[78] Clay Boggs, Carolina Carreño y Diana Martinez, "New Data Show that Mexico has Intensified Its Immigration Operations Without Building an Adequate Refugee Protection System," Washington Office on Latin America, June 24, accessed September 28, 2015, http://bit.ly/1Lzsxae.

[79] Secretariat of Finance, "Presupuesto de Egresos de la Federación" ("Federal Expenditures Budget"), September 9, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyk.

[80] Manu Ureste, *"México recibe 67% más solicitudes de refugio, pero sólo tiene 15 oficiales para atender 2 mil casos"*, *Animal Político*, June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFEyz.

[81] Miguel Agustín Pro Juárez Center for Human Rights (*Centro de Derechos Humanos Miguel Agustín Pro Juárez*) and the Migrant Affairs Program of the Ibero-American University, Mexico City Campus (*Programa de Asuntos Migratorios de la Universidad Iberoamericana Campus Ciudad de México*), *Migrantes en prisión: La incriminación de migrantes en México*, September 2014, accessed September 28, 2015, http://bit.ly/1OcFgQt.

[82] The phenomenon of falsely accusing migrants of crimes became evident thanks to the case of Ángel Amílcar Colón Quevedo, an indigenous Garífuna man from Honduras, who in January 2009 left his country headed for the United States. Detained in a house where he was awaiting a "coyote" to take him to the US, Ángel was falsely accused of participating in organized crime. Following his detention he was assaulted and tortured by the army and federal police agents, who above all made reference to the color of his skin and his origins as a foreign migrant. He was jailed at the Federal Social Readaptation Center No 4 Northwest (*Centro Federal de Readaptación Social No. 4 Noroeste*), in Tepic, Nayarit. The Miguel Agustín Pro Juárez Center for Human Rights took charge of his legal defense and undertook a publicity campaign to gain his release. Five years, six months and seven days later on October 16, 2014 he was released after the PGR presented its decision to not indict.

[83] Cases documented by the Saltillo Migrant Shelter (*Casa de Migrante de Saltillo*).

[84] Ibid.

[85] Federal Attorney General's Office, Deputy Attorney General's Office for Legal and International Affairs, General Directorate of Legal Affairs, Official Letter SJAI/DGAJ/08863/2015, response to Infomex request, number 0001700224815, July 14, 2015, document available on the WOLA website, http://bit.ly/1kaC0bS.

[86] Procuraduría General de la Republica, Subprocuraduría Jurídica y de Asuntos Internacionales, Dirección General de Asuntos Jurídicos, Oficio SJAI/DGAJ/08863/2015, respuesta a solicitud de información folio 0001700224815, July 15, 2015, available on WOLA's website, http://bit.ly/1kaC0bS.

[87] Organization of American States, "Report on the 154th Session of the IACHR", June 19, 2015, accessed September 28, 2015, http://bit.ly/1OcFE1w.

[88] This information was taken from the four responses to requests for information from the Chiapas Government. The first three requests were made independently of this report by journalist Manu Ureste of *Animal Político* to the Government of Chiapas, the State's Attorney General's Office, the Specialized Prosecutor's Office on Crimes against Immigrants (responses to requests for information, number 12855

(data for 2013); 12856 (data for 2014); and 12857 (data for 2015), June 5, 2015). Documents available on WOLA's website, http://bit.ly/1kayxdl (2013); http://bit.ly/1kayBdb (2014); and http://bit.ly/1kayFJK (2015). However, the aforementioned request did not make reference to the number of sentences handed down. As such, it was necessary to consult the response to the request submitted by the authors of this report (the Government of Chiapas, the State's Attorney General's Office, and the Specialized Prosecutor's Office on Crimes against Immigrants (response to request for information, number 12960, June 18, 2015), available on WOLA's website, http://bit.ly/1kazoe8.

[89] Response from the Tabasco Attorney General's Office to the request for information, number 00993815, June 10, 2015, as part of an investigative journalism report. See Manu Ureste and Yosune Chamizo, *"Plan Frontera Sur: un año después, los robos a migrantes se disparan 81% en los estados del sur"*, *Animal Político*. July 7, 2015, accessed September 28, 2015: http://bit.ly/1OcFdnN. Documents available on the WOLA website, http://bit.ly/1kaBnPt (2013); http://bit.ly/1kaBryW (2014); and http://bit.ly/1kaBvP7 (2015). For 2014 and 2015, the document refers to "information pertaining to migrants (injured party)," while for 2013 it only refers to "information pertaining to migrants (injured party) [sic]." This creates confusion as to whether the 2013 data include cases with migrants who are perpetrators or only victims. The IACHR criticizes this same lack of precision in its report, when analyzing the response given by the Mexican state to its request for information on cases of crimes against migrants (Inter American Commission on *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico*, p. 136).

[90] National Statistics and Geography Institute (Instituto Nacional de Estadística y Geografía), National Survey of Victimization and Perception of Safety (*Encuesta Nacional de Victimización y Percepción sobre Seguridad Pública*, ENVIPE) 2015, "Principales Resultados," accessed October 16, 2015 http://bit.ly/1Mu3y2L, p. 27.

[91] Ibid.

[92] The case of Beylin Sarmiento, a Honduran murdered while crossing Mexico in August 2014, shows that the lack of communication among state Attorney General's Offices can have serious consequences. John Washington, "Who Killed Beylin Sarmiento?" T*he Nation*, August 11, 2015. Accessed September 28, 2015. See http://bit.ly/1OcFG9F.

[93] National Human Rights Commission, in response to request for information, number 00036515, July 1, 2015, document available on WOLA's website, http://bit.ly/1kaBOJK.

[94] OPIs are Federal Migration Agents whose duty it is to guarantee respect of child migrant rights, particularly unaccompanied minors. The INM currently has 543 OPIs in its 32 regional delegations. OPIs are selected to receive ongoing specialized training. Their duties are to: (1) protect the physical and mental integrity of children; (2) immediately provide basic health, food, clothing, and shelter services; (3) facilitate contact between minors and their families via free telephone calls; (4) keep minors apprised of their migratory status, using a kind, age-appropriate language; and (5) assist child migrants throughout their repatriation process. INM website. Accessed October 7, 2015, http://bit.ly/1LztuiV.

[95] Interview with Alberto Xicoténcatl, conducted by Gabriela Morales. May 14, 2015.

[96] Diario Oficial de la Federación, *"Reglamento Interior de la Secretaria de Gobernación"* ("Internal Regulations for the Secretariat of the Interior), February 4, 2013. Accessed September 28, 2015: http://bit.ly/1OcFGGy.

[97] See, Rodolfo Córdova, *"Transformar construyendo: dos años de Presidencia del Consejo Ciudadano del Instituto Nacional de Migración, informe rendición de cuentas"*, *Fundar*, August 2015. Accessed October 7, 2015, http://bit.ly/1LzvJCB; and Adam Lane, Bryan Maekawa, Manuel Ruiz and Ricardo Vázquez, *"Mejores prácticas para los consejos consultivos ciudadano en México"*, May 11, 2015.

[98] Diario Oficial de la Federación, "Acuerdo por el que se emiten las Normas para el funcionamiento de las Estaciones Migratorias y Estancias Provisionales del Instituto Nacional de Migración", August 11, 2012. Accessed September 28, 2015: http://bit.ly/1OcFIhL.

[99] Migration Law, http://bit.ly/1OiZaZ0.

[100] See Articles 178 through 184 of the Migration Law Regulations. Diario Oficial de la Federación, "Decreto por el que se expide el Reglamento de la Ley de Migración y se reforman, derogan y adicionan diversas disposiciones del Reglamento de la Ley General de Población y del Reglamento de la Ley de Asociaciones Religiosas y Culto Público, September 29, 2012. Accessed September 28, 2015: http://bit.ly/1OcFJ5n.

[101] SEGOB's internal regulations provide for an Internal Affairs Unit within the INM, but no such unit has yet been established. The functions, objectives, and goals of such Unit should be consistent with best practices on this matter and approved by the INM's Citizen's Council.

## ABOUT THE ORGANIZATIONS

**CASA DEL MIGRANTE DE SALTILLO "FRONTERA CON JUSTICIA", AC,** in Saltillo, Coahuila, provides comprehensive humanitarian assistance as well as case documentation and legal services.

**FUNDAR, CENTRO DE ANÁLISIS E INVESTIGACIÓN, AC** is a civil society organization based in Mexico City, Mexico that works toward a substantive democracy.

**ALBERGUE DE MIGRANTES "HERMANOS EL CAMINO,"** in Ixtepec, Oaxaca, provides comprehensive humanitarian assistance to migrants in transit in Mexico.

**LA 72, HOGAR—REFUGIO PARA PERSONAS MIGRANTES,** is a Franciscan project dedicated to providing comprehensive assistance to migrants and refugees traveling through Tenosique, Tabasco in Mexico.

**WOLA (WASHINGTON OFFICE ON LATIN AMERICA)** is a leading research and advocacy organization that promotes human rights in the Americas.

**LA RED SONORA** is a network of three organizations based in Sonora, Mexico dedicated to defending and providing humanitarian assistance to migrants in Mexico.

- **Centro Comunitario de Atención al Migrante y Necesitado,** in Altar, is a migrant shelter run by the local Nuestra Señora de Guadelupe Church.
- **Centro de Recursos para Migrantes,** in Agua Prieta, works to provide humanitarian assistance to migrants and document abuses.
- **Kino Border Initiative** is an organization based in Nogales, Sonora and Nogales, Arizona that works in support of migrants and refugees in the United States and Mexico.

**UN MUNDO, UNA NACIÓN, AC** is an organization dedicated to providing humanitarian assistance and promoting the human rights of migrants in Apizaco, Tlaxcala.

## ABOUT THE AUTHORS

José Knippen is a migration project coordinator at Fundar. Clay Boggs was a Program Officer at WOLA until October 2015. Maureen Meyer is WOLA's Senior Associate for Mexico and Migrant Rights.

## ACKNOWLEDGMENTS

We thank the following people for their contributions to this report. Gabriela Morales worked with WOLA and Fundar in the research for this report and made a series of field visits to migrant shelters and organizations to gather documentation and conduct interviews. Irazú Gómez has worked as a migrant rights advocate in Puebla for many years. Rodolfo Córdova, a researcher at Fundar, and Kristel Muciño, WOLA's Communications Director, offered valuable suggestions to multiple versions of the report. Hannah Smith, WOLA Program Assistant, and Andrés Díaz, a researcher at Fundar, edited the text of the report. We also want to thank Mike Evans of the National Security Archive for advice on the process of requesting information through the Infomex system. This report would not have been possible without the generous support of the Ford Foundation, the MacArthur Foundation, and CAMMINA-the Alliance for Migration in Central America and Mexico.

# EXHIBIT 10



WOMEN'S
REFUGEE
COMMISSION

Research, Rethink, Resolve,

# Migrant and Refugee Caravans: Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

## May 2019

The Women's Refugee Commission (WRC) improves the lives and protects the rights of women, children, and youth displaced by conflict and crisis. We research their needs, identify solutions, and advocate for programs and policies to strengthen their resilience and drive change in humanitarian practice.

## Acknowledgements

This study was made possible by generous funding support from CAMMINA, Hispanics in Philanthropy, and Oak Foundation.

This report was written by Tatiana Brofft and reviewed by Michelle Brané, Leah Chavla, Ursela Ojeda, and Dale Buscher of the Women's Refugee Commission. It was edited by Lauren Wolkoff and designed by Diana Quick.

The author thanks Omar Robles and Jimmy McDonough for their valuable contributions in the research process.

The Women's Refugee Commission extends deep thanks to the research participants, particularly the refugees and migrants, who generously shared their time and experiences, as well as: Al Otro Lado, Albergue Jesús el Buen Pastor, Albergue Madre Asunta, Albergues YMCA, Alma migrante, Asylum Access, Catholic Legal Immigration Network, Centro de Derechos Humanos Fray Matías de Córdova, Comisión Mexicana de Ayuda a Refugiados, Comité Estratégico de Ayuda Humanitaria, Consejo Nacional para Prevenir la Discriminación, Desarrollo Integral para la Familia, Doctors Without Borders, El Colegio de la Frontera Norte , Futbol Más, Grupo Beta, Human Rights First, Human Rights Watch, Instituto para las Mujeres en la Migración, Instituto Nacional de Migración , International Organization for Migration, Jesuit Refugee Service, Secretaría de Relaciones Exteriores, Tech Palewi, Servicio Nacional de Empleo, Sistema de Desarrollo Integral de la Familia (DIF), Una mano amiga en la lucha contra el SIDA, United Nations Children's Fund, United Nations High Commissioner for Refugees , and US Customs and Border Protection.

Cover photo: Girls who traveled with the 2018  caravans at the Benito Juárez sports complex shelter. © Michelle Brané

© 2019 Women's Refugee Commission

# Contents

Background ...................................................................................................................................1

Objectives and Methodology ....................................................................................................... 3

Map of the Region and Main Route of the 2018 Caravan ................................................................ 4

Mexico: Protection Gaps and Risks.............................................................................................. 4

United States: Closing Borders..................................................................................................... 8

Heightened Tensions against Immigrants in Mexico and the US ....................................................11

Recommendations .......................................................................................................................11

Acronyms and Abbreviations...................................................................................................... 13

Endnotes ................................................................................................................................... 14

*"We left Honduras in July, before the caravans started. The Maras were after us.*

*"We moved slowly through Mexico. We were taking temporary jobs to have enough money to feed the kids and for a smuggler for the most dangerous parts of the journey. When the caravan arrived, we were already in San Luis Potosi, but we decided to go back and join it in Guadalajara. It would be safer. We were constantly afraid of being deported, extorted, robbed, or having a child kidnapped … you know, the usual. In that, I do feel the caravan was safer than traveling alone. Also, people were nicer, they gave us food and clothes. Even a police officer helped me when my boy was dehydrated.*

*"But I never felt safe."*

—Lili,[1] a woman from Honduras in her early 20s who joined the caravans in Mexico, traveling with her husband and four children. (Interviewed by the Women's Refugee Commission in Tijuana on November 30, 2018)

# BACKGROUND

Over the last decade, an increasing number of Hondurans, Salvadorans, and Guatemalans have been forced to flee their countries of origin due to widespread criminal violence, life-threatening gender and domestic violence, and extreme economic hardship.[2] In recent years, particularly in the first months of 2019, the number of unaccompanied children and families forced to flee has sharply increased.[3] The levels of violence and human rights violations Central Americans experience resemble those of people in war-torn countries.[4] Notwithstanding, this humanitarian crisis has largely evolved in the shadows. It has been neglected by the US and Mexican governments, which—failing to recognize the refugee nature of the displacement—have turned a blind eye to the lack of safe and legal channels to claim asylum, as well as to the deadly risks and systematic abuses faced by Central Americans in their journey to safety.[5]

On October 12, 2018, a group of 160 people left San Pedro Sula, Honduras,[6] one of the most violent cities in the world.[7] The dire living conditions of people from Central America, paired with the well-known dangers of the migrant trail, proved fertile ground for turning the rumors of a historically large caravan into a self-fulfilling prophecy.[8] By the time it reached the Mexican border with Guatemala, more than 7,000 refugees and migrants were moving north at the same time.[9] Four additional smaller groups followed, bringing the estimated total to more than 17,900 caravan members traveling through Mexico between October and December 2018.[10] Central Americans saw in caravans a traveling strategy to render themselves and their plight visible and thus obtain safe passage to Mexico and the US.[11]

Migrant and Refugee Caravans:
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 2:26-cv-04831-MTL     Document 19-1     Filed 07/13/26     Page 310 of 399



*Drawing made by Salvadoran boy in psychosocial support activity. When asked to share his drawing and memories about his house in his hometown, he referred to violent incidents.*

The size, cohesion, and organization of the 2018 caravan fueled constant monitoring and reporting by journalists and human rights defenders.[12] In the case of this group, putting the spotlight on people on the move generally deterred large-scale criminal activities and human rights violations. Moreover, it rallied humanitarian aid and highlighted the need for policy responses. To a certain extent, the 2018 caravans delivered on the expectation of reducing costs, granting protection, and facilitating transit through Mexico.[13]

However, a risk assessment conducted by the Women's Refugee Commission (WRC) found that the protection offered by caravans is extremely narrow. People who follow this traveling strategy still face myriad risks and protection gaps. Furthermore, WRC is concerned that, due to heightened xenophobia and immigration control, members of the caravans that traveled Mexico in the first four months of 2019 were more exposed to ever-present dangers such as police abuse and criminal activities[14] and received less humanitarian support.[15] Caravans had unintended consequences on public opinion and policy decisions that will affect refugees and migrants adversely over the long term.



# OBJECTIVES AND METHODOLOGY OF THE ASSESSMENT

From November 26, 2018 to January 25, 2019, WRC assessed the protection risks faced by women, children, and families traveling in caravans through Mexico.

WRC engaged in semi-structured interviews with members of the caravan to learn about why they were fleeing their countries of origin and traveling in large groups, their needs, the risks they face during the journey, and their intended destination. Individuals were informed that they could refuse to participate or to answer questions they deemed sensitive. The team also met with relevant authorities and key stakeholders, such as international organizations, nongovernmental organizations (NGOs), and faith groups, to map their capacities and share concerns regarding the rights and well-being of caravan members.

WRC began the assessment in Tijuana because asylum seekers and migrants in this border city with the US had completed their journey through Mexico, which allowed them to report on the whole route. Additionally, it was the locality were the largest group concentrated for the longest time. This situation multiplied the needs and challenges in terms of service provision and protection. In Tijuana, WRC visited shelters run by civil society for families, women, and children, as well as the temporary shelters set up by the government at the Benito Juarez sports complex and the Barretal concert venue. Additionally, WRC visited the job fair offered by the Mexican National Employment Service (SNE) to learn about who was availing themselves of the option to regularize their immigration status in Mexico, how they were doing so, and why. WRC also visited the Mexican side of El Chaparral port of entry to document the dynamics that obstruct access to international protection in the US.

WRC returned to Tijuana to assess the evolution of the situation and follow up with persons interviewed in the first visit. The team identified the impact of having transferred refugees and migrants to Barretal as well as of the policies of the incoming Mexican administration of Andrés Manuel López Obrador.

Following the research conducted in Tijuana, WRC traveled to Tapachula to identify the needs and risks faced by the caravan when they arrived to Mexico, as well as of women, children, and youth who separated from the main group. In this border city with Guatemala, the team made a field visit to the immigration station Siglo XXI, the largest in Mexico; visited shelters run by civil society and UNHCR; and participated in psychosocial activities for refugee children.

To have a comprehensive perspective, WRC met with representatives of the Mexican federal government in Mexico City and of national headquarters of international organizations and NGOs that have provided services and protection to the 2018 Caravans and inquire about their preparedness for future caravans. Additionally, WRC conducted media monitoring and desk research.

This initial evaluation is a snapshot of a moving target and constantly changing dynamic and political context.

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 312 of 399

# MAP OF THE REGION AND MAIN ROUTE OF THE 2018 CARAVAN



# MEXICO: PROTECTION GAPS AND RISKS

WRC was particularly troubled by the fact that neither the caravan itself nor the Mexican government response to it provided adequate protection to women and children. The caravans provided unaccompanied children and single women the option to link themselves with a family, friends, or partner for the journey north. While these relationships offer some protections, WRC identified a significant number of cases in which they created problematic situations that led to violence and abuse. A service provider shared a story of a 12-year-old Mexican girl who joined the caravan to look for her mother, who lived in northern Mexico. On the journey, she met a family with whom she stayed for protection but eventually they restricted her movement and prevented her from speaking to or approaching authorities, service providers, and even other children. When her real identity was discovered and she was rescued and referred to Mexico's child services agency (DIF),[16] authorities found her real family had been looking for her.[17]

Overall, pressure to stay with the caravan in a group put the most vulnerable populations at high risk by preventing them from seeking assistance and support when needed and rendering them and their specific needs invisible. WRC spoke with women and children who were unwilling to go to specialized shelters that could provide better care and services. They said they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group. A pregnant woman told the WRC that she crossed the Suchiate river just after a threatened miscarriage of her seven-month pregnancy because she did not want to be left behind in Guatemala while the rest of the group advanced into Mexico.[18]

Women's Refugee Commission | May 2019





*Women and children told the WRC that they would rather sleep on the streets or stay in the overcrowded, unsafe, and unhygienic temporary shelters set up by the government than split from the larger group.*

Despite the pressure and efforts to stay together, the caravan left women and children behind, in both a metaphorical and a literal sense. Structural barriers, such as security considerations and having to care for the children, prevented them from participating in decision-making meetings.[19] Those who followed the caravan, such as humanitarian workers, human rights and international organizations, reported that, as the group advanced, the presence of women and families reduced. They pointed out that contingents composed mostly of young single men who could move faster took the lead.[20] WRC met a boy in southern Mexico who was unable to keep up with the caravan because his prosthetic leg broke.[21] He is only one example. Many women, families, and people with disabilities who could not maintain the pace lagged or stopped along the route, were left behind, or opted for voluntary repatriation. Women who traveled in the caravan, service providers, and government officials expressed outrage that women and children were pushed to the front of the caravan whenever there was confrontation with authorities. Otherwise, they were left behind.[22]

Furthermore, the humanitarian response, both from Mexican authorities and nongovernmental actors, was lacking and had few or no age and gender considerations, reproducing systemic obstacles that hamper women and children's access to information and services, as well as their ability to exercise their rights. WRC did not identify any safe space for women or child care services to assist them. In Tijuana, the Mexican government set up a job fair featuring representatives from the agencies that process asylum claims and humanitarian visas. Due to the lack of services that addressed women's needs, women interviewed by WRC were often unaware of the job fair because this information did not reach them or did not attend because they assumed that having to care for their children meant they would not qualify for a job, or because accessing those locations with children was a challenge.

**Migrant and Refugee Caravans:**
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 314 of 399

Service provision was intermittent, placed a heavy reliance on overburdened civil society organizations and inexperienced volunteers, and was distributed without engaging beneficiaries. WRC spoke with women and children who had gone days without eating and who reported that water was scarce or not potable. Mothers and humanitarian aid workers expressed concerns that children were at risk of malnutrition.[23] People on the move slept on the streets or were housed in overcrowded, unsanitary shelters. The WRC team observed how unhygienic conditions and lack of protection against the elements resulted in widespread sickness.

Privacy and safety considerations geared to prevent sexual and gender-based violence were substandard. When WRC visited Benito Juarez and Barretal, the two temporary shelters the Mexican government set up in Tijuana to hold caravan members, the team observed that overcrowding resulted in insufficient designated space for families, women, and children. There was only one space for these three populations, which implied that even single women, women with their children, and unaccompanied girls in a so-called safe space were placed together with men they did not know. Moreover, while these shelters claimed to offer sex-separated toilets, in most cases they were rows of portable toilets that were used interchangeably and had broken locks. Showers had no privacy barriers; at best they were separated by improvised sheets and blankets.

WRC learned of instances of domestic violence, sexual harassment, physical assaults, transactional sex, forced prostitution, and rape, and yet there was no clear referral network for survivors. Assistance services were bureaucratic and cumbersome, rendering them practically inaccessible. The absence of prevention and response to sexual and gender-based violence was stark. There were no safe spaces for women to privately report abuse. When people would raise questions about post-rape care, they were met with silence and frozen looks by health care providers at Barretal, even though by law they should be available.[24]

Access to protections in Mexico is not always meaningful. The asylum system has considerable shortcomings, including prolonged or unnecessary use of immigration detention, proceedings that last for years with restrictions on geographical mobility that force applicants to remain in insecure and underdeveloped areas, limited integration options, and underdeveloped and under-resourced refugee status determination procedures.[25] In the case of unaccompanied children, these shortcomings are compounded by flawed or nonexistent best interests determinations. In Mexico, children in need of international protection are inadequately screened, or not screened at all, and are often returned to places where they fear irreparable harm,[26] violating the principle of *non-refoulement* —a cornerstone of refugee protection that prescribes that no one should be returned to a country where his or her life or freedom would be threatened by persecution, other ill-treatment, or torture.[27] Furthermore, since the Mexican and US child protection services do not communicate with each other, the Mexican protection service does not consider protection or family reunification in the US as an option.[28]

The glaring lack of information, coupled with the troubling widespread misinformation, heightened risks. WRC spoke in Tijuana and Tapachula[29] with refugees and migrants who were making ill-informed decisions—such as abandoning their asylum applications, rejecting moving to safer spaces, or hiring a smuggler—that increased their vulnerability and in some cases put them at grave danger. The inability of the Mexican government, international organizations, legal service providers, and humanitarian agencies to fill the information void facilitated dangerous power dynamics that led to manipulation and abuse. Both in Tapachula and in Tijuana, WRC spoke to numerous people who were deeply confused and misinformed about immigration procedures both in Mexico and the US. An accredited humanitarian worker shared that, while they gave accurate information about asylum in Mexico, people in the caravan with megaphones accused them of being untruthful.[30]

Women's Refugee Commission | **May 2019**

Protection gaps were compounded by the indisputable fact that parts of Mexico are not safe.[31] WRC learned of cases of child labor, forced prostitution, forced recruitment, kidnapping, forced drug dealing, and trafficking, as well as misconduct and human rights violations by authorities. Service providers shared stories of an accusation of sexual assault against a government official in Tapachula,[32] men in Benito Juárez shelter being tricked into jobs and having been forced to clean blood from cars,[33] and girls and trans women being forcibly prostituted.[34] The two places where caravan members waited the longest—Tapachula and Tijuana— have a large presence of criminal organizations and are hubs of the illegal sex industry.[35]

> "A man offered me and some friends a job. He also offered to bring us to a safe shelter; that is how we got here. We did not follow up with the job offer because I noticed he had a Barrio 18 tattoo.[36] I have not left the shelter since we arrived. I do not want to run into him and I'm scared of gangs and organized crime operating in the city."
> —Adriana, a woman in her 40s from El Salvador who traveled in the caravan with some friends. Interviewed by WRC in Tijuana on December 19, 2018.

All service providers interviewed by WRC agreed that institutional challenges were aggravated by the Mexican government's lack of leadership and preparedness in responding to the caravans. Even though the advance of the 2018 caravan was widely reported, when it reached Mexico there was no protocol in place to grant humanitarian assistance nor to process the arrival of large numbers of people seeking protection. Federal authorities at the time decided that local governments would be responsible for providing basic needs and social services. This resulted in poor planning, for example the government of Tijuana opening a temporary shelter with capacity for 2,000 persons that, two weeks later, held over 6,000 persons in precarious conditions. This shelter later closed, and the people still housed there at the time had to be transferred to a new shelter.[37] Additionally, the avenues available to caravan members to seek legal status in Mexico were constantly changing—ranging from strict border enforcement to a two-week pilot program of documenting all caravan members with humanitarian visas.[38]



**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 316 of 399



*Shelters set up for migrants soon became severely overcrowded and unsanitary.*

To date, no long-term policy has been outlined or implemented by the Mexican government. As a result, since mid-March there is a mounting administrative and humanitarian crisis at Mexico's southern border. More and more people are stranded in precarious conditions because Mexico's National Institute of Migration (INM) increased immigration enforcement against caravans and temporarily suspended immigration procedures in Tapachula, where the immigration station is at capacity and people are being held in detention-like temporary shelters.[39]

One reason for the Mexican government's insufficient response for the 2018 caravans was the fact that, in the last third of that year, a significant number of authorities at all levels of government, including the president, were in a lame duck period.[40] While the synchronized displacement of more than 10,000 people would naturally create challenges, Mexico has the capacity to offer an adequate humanitarian response.[41] Once the new government came into power, it has struggled to reconcile its seemingly contrasting objectives of avoiding a confrontation with the US government[42] and fulfilling its promise of a new immigration policy that follows a human rights approach and leaves behind its deterrence and contention approach.[43]

Improvisation, lack of clarity regarding responsibilities, changing strategies, informal procedures, and overreliance on volunteers have prevented the government from mitigating risks and left basic needs unsatisfied.

## UNITED STATES: CLOSING BORDERS

Caravan members were trapped in one of Mexico's most dangerous cities[44] as a direct consequence of a preexisting US practice of turning back and regulating the number of asylum seekers that can present themselves at a port of entry (a practice known as "metering").[45] Everything about this illegal

practice, which is currently under litigation,[46] jeopardizes the rights and integrity of people in need of international protection. WRC observed on its visits to Tijuana that asylum seekers are asked to register on an unofficial list with an average two-month waiting time to present their claim. This practice was confirmed by a Customs and Border Protection (CBP) officer in San Diego[47] and is also occurring at ports of entry across the border.[48] Given that neither the US nor Mexico accept their evident participation in this ad hoc process, the list is run by migrants themselves. As it has no clear guidelines, regulations, oversight, or accountability, the process prevents the most vulnerable populations from being identified, jeopardizes people's privacy, and opens the floodgates for corruption and abuse. On the day after WRC spoke with list managers— questioning what oversight existed to prevent exploitation—the team learned of a migrant who came forward to report demands for sex and/or money in exchange for getting on the list.[49] Since then, interviews with migrants have revealed numerous instances of extortion.[50]

Even more problematic, WRC identified that metering is leaving unaccompanied children with no avenue to present themselves at a US port of entry, systematically ignoring their best interests and denying their right to seek asylum or be granted protection under US laws. Unaccompanied migrant children are not only turned back by Mexican authorities when they approach a US port of entry, they are also not allowed on the list.[51] CBP confirmed to WRC that unaccompanied children who approach the border without authorization are turned back and told to get in line unless they are with an attorney.[52] Migrants managing the list in Tijuana told WRC that children must be with an adult in order to get on the list or go the border once their name is called. This practice denies children access to their right to claim protection in the US independent of related adults, in violation of the Trafficking Victims Protection Reauthorization Act, US immigration and asylum law, and the 1951 Refugee Convention.[53]



*The border.*

**Migrant and Refugee Caravans:**
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 318 of 399

Mexican and US immigration officials are aware of the illegalities of this practice. WRC directly informed them of our findings and concerns.[54] Nonetheless, CBP continues to accept children only reluctantly in some cases where they are escorted by Members of Congress, lawyers, or advocacy organizations.[55] These exceptions, while lifesaving for those children who find assistance, do not address the illegality of turning away unaccompanied children. Accompaniment is not a legal requirement for seeking protection. At the time of this writing, unfortunately only a handful of the more than 100 unaccompanied children in Tijuana have been identified and assisted.[56]

WRC observed that unaccompanied children who have not found representation or assistance through volunteers are living in unhealthy and dangerous conditions. Children hesitate to approach Mexico's child services agency (DIF),[57] because it will not allow them to claim protection in the US—even if doing so is in their best interests. In fact, the WRC team was told repeatedly that children run from and avoid DIF, and that they are often distrustful of adults approaching them to offer assistance.[58] Left with no other option, unaccompanied children must make impossible choices between the dangers of:

A. staying stranded in Tijuana indefinitely;
B. entering the US without inspection between ports of entry;
C. looking for a smuggler or another adult to accompany them across the border (thereby creating an opportunity for those who wish to traffic or otherwise harm a child to prey upon them by exploiting this practice); or
D. submitting to voluntary return (even when it means returning to a place where their life and freedom are at risk, amounting to *refoulement*).

All these are situations the US government should aim to prevent rather than encourage. In December 2018, three Honduran children in Tijuana who traveled with the caravan and had not presented themselves at a port of entry due to metering, were tortured—and two of them were brutally murdered. At least two of them had already been identified as having a strong case for accessing protection in the US.[59] This was a painful confirmation that the caravan, Mexico, and especially the US are failing to protect children on the move. In the words of the director of the shelter where the children were staying: "It was Mexican criminals who killed them, but it was the US government who sent them to the slaughterhouse."[60]

Furthermore, the 2018 caravan had the unintended consequence of giving the US government pretext to move forward with its plans to extra-territorialize the waiting time of asylum procedures to Mexican territory by expanding the interpretation of section 235(b)(2)(C) of the US Immigration and Nationality Act (INA).[61] This expanded interpretation allows for the return to Mexico of asylum seekers—arriving at a port of entry or entering the US from Mexico between ports of entry—for the duration of their immigration proceedings.

This policy, officially named "Migrant Protection Protocols," also known as "Remain in Mexico," has created insurmountable barriers to due process, access to counsel, and the ability to present meaningful defenses to removal before US courts. Remain in Mexico disrupts the right to family unity for those with loved ones already residing in the US and traps asylum seekers in a potentially dangerous environment. On April 8, 2019, a federal court issued an injunction on these returns.[62] However, this policy has not yet been ruled out. On May 7, 2019, an appeal court overturned the injunction. Remain in Mexico and metering are examples of how the US an Mexican governments are blocking access to protection and endangering migrants.[63]

# HEIGHTENED TENSIONS AGAINST IMMIGRANTS IN MEXICO AND THE US

While the visible forced displacement of large numbers of Central Americans—and the precarious, dangerous conditions in which they traveled—rallied altruistic and humanitarian support among some sectors of Central American, Mexican, and US societies, in others it fueled xenophobic sentiments that led to calls for increased border and immigration enforcement.[64]

In January 2019, a new caravan began its journey in search of a safe haven.[65] Mexico's incoming administration expressed its intention to offer a comprehensive response following a human rights approach—seeming to signal a positive step to safeguard the rights of migrants, guarantee adequate humanitarian response, and address root causes by promoting regional development.[66] For two weeks in January, Mexico offered humanitarian visas to more than 12,500 caravan members arriving at Mexico's southern border.[67] However, six months in, no long-term policy has been put in place and service provision to members of caravans in Mexico still has considerable shortcomings.[68] President Trump's strong criticism of Mexico's immigration policies[69] seems to be contributing to a shift in Mexico's policy back to its old deterrence and containment approach.[70] WRC is concerned that, if implemented without adequate oversight or human rights considerations, immigration enforcement in Mexico will continue to violate people's rights and put them in extremely dangerous situations.

Heightened xenophobia, Mexico's inconsistent policies, and the US decision to continue narrowing avenues to protection suggest that future caravans might face even grimmer conditions than the 2018 caravan.

To prevent another humanitarian disaster and the loss of more lives, the US, Mexico, and Central American countries need to come together to offer a comprehensive regional response— not only to caravans but also to address the underlying refugee situation and its root causes.

# RECOMMENDATIONS

## Design and implement a comprehensive regional strategy

- El Salvador, Guatemala, Honduras, Mexico, and the US should **design and implement a comprehensive,** rights-based, gender- and age-sensitive **regional strategy** that honors domestic and international obligations to refugees and migrants, ensures adequate humanitarian relief to people on the move, and addresses the root causes of displacement.

## Honor domestic and international law

- The US should **allow asylum seekers**—particularly unaccompanied children—**to present themselves immediately at ports of entry,** and should **stop metering** asylum seekers and implementing the Migrant Protection Protocols, also known as **Remain in Mexico.**

- Mexico should oppose **US actions that limit access to protection** in violation of international **law,**

**Migrant and Refugee Caravans:**
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 320 of 399

including the Migrant Protection Protocols and safe third-country declarations.

- Mexico and the US should **establish** communication, collaboration, and referral **mechanisms to respect the best interests of the child** where appropriate.

- Mexico and the US should **streamline** their **asylum systems**—while still ensuring due process, family unity, and non-refoulement—**and enhance reception capacity.**

- All relevant actors should actively **counter growing anti-immigrant rhetoric and practices.**

## Ensure adequate humanitarian relief

- All relevant actors[71] should **prioritize planning and preparedness** for large displacements of people, and **meaningfully engage refugees and migrants.**

  - Mexico should comply with international standards and guidelines for shelter sites and service provision.

- **International humanitarian agencies should offer technical expertise, and capacity.**

- All actors should **ensure availability of and access to information.**

- **Human rights defenders** should continue to **monitor and take adequate measures when abuse is identified.**

## Address root causes

- All governments should continue to advance initiatives that **promote human security, rule of law, accountability, and prosperity in the region.**

**Migrant and Refugee Caravans:**
Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 320 of 399

# ACRONYMS AND ABBREVIATIONS

13

| | |
|---|---|
| CBP | US Customs and Border Protection |
| COMAR | Mexico's Commission for Refugee Assistance |
| DHS | Department of Homeland Security |
| DIF | National System for Integral Family Development |
| IACHR | Inter-American Commission on Human Rights |
| IOM | International Organization for Migration |
| INM | Mexico's National Institute of Migration |
| KIND | Kids in Need of Defense |
| NGO | Nongovernmental organization |
| SEGOB | Mexico's Ministry of the Interior |
| SNE | Mexico's National Employment Service |
| SRE | Mexico's Ministry of Foreign Affairs |
| UNICEF | United Nations Children's Fund |
| UNHCR | United Nations High Commissioner for Refugees |
| WOLA | Washington Office on Latin America |
| WRC | Women's Refugee Commission |

# ENDNOTES

1 All names have been changed to protect the privacy and identity of the persons interviewed.

2 Abdel Camargo, *Arrancados de Raíz: Causas que originan el desplazamiento transfronterizo de niños, niñas y adolescentes no acompañados y/o separados de Centroamérica y sus necesidades de protección internacional,* UNHCR, 2014. UNHCR, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection,* March 13, 2014; UNHCR, *Women on the Run: First-hand accounts on Refugees Fleeing El Salvador, Guatemala, Honduras, and Mexico,* October 26, 2015. UNICEF, *Desarraigados en Centroamérica y México: Los niños migrantes y refugiados se enfrentan a un círculo vicioso de adversidad y peligro;* August 2018. Sandra Albicker, et al., *La caravana de migrantes centroamericanos en Tijuana 2018: diagnóstico y propuestas de acción*, El Colegio de la Frontera Norte, 2018, pp. 2-4.

3 U.S. Customs and Border Protection Commissioner, Kevin McAleenan, El Paso Press Conference, March 27, 2019, https://www.cbp.gov/newsroom/speeches-and-statements/el-paso-press-conference-transcript. CBP, *Agency Experiences Record Number of Apprehensions/Inadmissible Family Units,* March 5, 2019, https://www.cbp.gov/newsroom/national-media-release/cbp-releases-fiscal-year-2019-southwest-border-migration-stats. Kristen Bialik, "Border apprehensions increased in 2018—especially for migrant families," Pew Research Center, January 16, 2019, http://www.pewresearch.org/fact-tank/2019/01/16/border-apprehensions-of-migrant-families-have-risen-substantially-so-far-in-2018/. Cristobal Ramón, "2018 Border Apprehensions Confirm Longer-Term Shift to Families and Children," Bipartisan Policy Institute, November 7, 2018, https://bipartisanpolicy.org/blog/2018-border-apprehensions-confirm-longer-term-shift-to-families-and-children/.

4 Doctors without Borders, *MSF Pulse: Violence and migration from Central America—why are people seeking asylum in the US?,* October 19, 2018, http://www.doctorswithoutborders.ca/article/msf-pulse-violence-and-migration-central-american-—-why-are-people-seeking-asylum-us.

5 Doctors without Borders, *MSF Pulse*. See also, Adam Isacson, Maureen Meyer, and Hannah Smith, *Increased Enforcement at Mexico's Southern Border: An Update on Security, Migration, and US Assistance,* WOLA, November 2015.

6 Sandra Albicker, et al., p. 6.

7 Christopher Woody, "These were the 50 most violent cities in the world in 2017," *Business Insider*, March 6, 2018, https://www.businessinsider.com/most-violent-cities-in-the-world-2018-3.

8 IACHR, *Human Rights of Migrants and Other Persons in the Context of Human Mobility in Mexico,* OEA/SER.L/V/II:, Doc. 48/13, December 30, 2013. WOLA, "Migrant Shelters and Organizations Denounce That 99% of Crimes Against Migrants in Mexico Remain in Impunity," July 28, 2017, https://www.wola.org/2017/07/99-crimes-migrants-mexico-remain-impunity/. Doctors without Borders, *MSF Pulse.*

9 UNHCR, *Guatemala protection monitoring report: large mixed movements* (October 15–November 21), https://acnur.org/5c2417894.

10 9,400 persons reported to remain in Mexico and 8,500 returned to Honduras and El Salvador. UNHCR, IOM and UNICEF, *Inter-Agency Response: Mixed Movements from the North of Central America 15 October— December 15, 2018*, https://www.acnur.org/op/op_fs/5c241d274/mixed-migration-flows-from-the-north-of-central-america-inter-agency-response.html.

11 Sandra Albicker, et al., pp.5- 6.

12 News outlets that covered the Caravans included: ADN40, Al Jazeera, Animal Político, Buzzfeed, CNN, El Universal, Fox News, Reforma, Reuters, Televisa, *The Guardian, The Intercept, The LA Times, The New York Times, The Washington Post*, TV Azteca, Vox. Human rights organizations included, among others: Amnesty International, Centro de Derechos Humanos Fray Matías de Córdova, Human Rights First, Human Rights Watch, Jesuit Migrant Service, Kids in Need of Defense, and Programa de Asuntos Migratorios de la Universidad Iberoamericana. Among the international organizations: IACHR, IOM, UNICEF, and UNHCR.

13 Sandra Albicker, et al., pp.5-6, 16-29.

14 Ariadna García, "Encinas detalla que son 44 los desaparecidos en Tamaulipas," *El Universal*, March 12, 2019, https://www.eluniversal.com.mx/nacion/seguridad/son-44-desaparecidos-en-tamaulipas-confirma-alejandro-encinas. Antonio Hernández, "Publican fotos de migrantes reportados como desaparecidos en Tamaulipas", *Milenio,* March 29, 2018, https://www.milenio.com/policia/fgr-publica-imagenes-migrantes-reportados-desaparecidos-tamaulipas. Jesuit Network, *Denunciamos el hostigamiento, uso de la fuerza y la detención arbitraria de migrantes y personas que acompañan el caminar de las Caravanas del Éxodo Centroamericano por parte de la Policía de la Ciudad de México,* February 15, 2019, http://caravanamigrante.ibero.mx/uploads/monitoreos_pdf/7521843add620334e0e9c447695fac64.pdf. lena Reina, "La frontera Sur de México es una olla de presión", *El País*, April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/

wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

15 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante.ibero.mx.

16 National System for Integral Family Development (DIF).

17 Phone interview with service provider on December 30, 2018.

18 Interviewed by WRC on November 30, 2018.

19 Interview with a humanitarian worker in Tapachula on January 10, 2019.

20 Dynamic referred by service providers interviewed in Tijuana on December 18, 2018 and in Tapachula on January 10, 2018.

21 Interview in Tapachula on January 9, 2019.

22 "Migrantes colocaron al frente a mujeres y niños para empujar la reja: Navarrete," *Vanguardia*, October 19, 2018, https://vanguardia.com.mx/articulo/navarrete-descarto-utilizar-violencia-vs-caravana-de-migrantes. Dynamic also referred by women interviewed in Tijuana on November 30, 2018, service providers (interviewed in Tijuana on December 18, 2018, in Tapachula on January 10, 2018), a researcher on Tijuana (interviewed in Tapachula on January 9, 2018), Mexican official (interviewed in Mexico City on December 10, 2018), and officers from an international organization interviewed in Mexico City on January 7, 2019.

23 Coordination meeting of service providers in Tijuana on November 28, 2018 and women interviewed in Tijuana on November 30, 2018.

24 Official Mexican Norm on Domestic and Sexual Violence and Violence against Women (NOM 046-SSA2-2005), April 16, 2009.

25 UNHCR, A*genda para la protección de las personas refugiadas en México: 2019-2024*, http://www.acnur.org/fileadmin/Documentos/RefugiadosAmericas/Mexico/Agenda_proteccion_Mexico_2019-2024.pdf. Mark Manly, "Hacia una nueva agenda sobre refugiados en México," *El Universal,* May 18, 2018, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/hacia-una-nueva-agenda-sobre-refugiados-en-mexico.

26 Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019. Georgetown Law Human Rights Institute Fact-Finding Project, *The Cost of Stemming the Tide: How immigration enforcement practices in southern Mexico limit migrant children's access to international protectio*n, April 13, 2015. Human Rights Watch, *Closed Doors: Mexico's Failure to Protect Central American Refugee and Migrant Children,* March 2016.

27 Enshrined, among others on: Art. 33 (1) of the 1951 Convention relating to the Status of Refugees; Article 22 (8) of the American Convention on Human Rights and Article 3 of the 1984 Convention against Torture and other Cruel, Inhuman or Degrading Treatment or Punishment; Section III(5) of the 1984 Cartagena Declaration on Refugees; Art. 5 and 6 of Mexico's Law on Refugees, Complementary Protection and Political Asylum.

28 Jennifer Podkul, *The Protection Gauntlet: How the United States is Blocking Access to Asylum Seekers and Endangering the Lives of Children at the US Border,* Kids in Need of Defense (KIND), December 21, 2018, https://supportkind.org/wp-content/uploads/2018/12/Protection-Gauntlet_12-21-18-FINAL.pdf.

29 Tapachula is where those who claimed asylum when they arrived in Mexico awaited their refugee status determination, and Tijuana is where most of the caravan was stranded once they reached the US border.

30 Interview in Tapachula on January 10, 2019.

31 InSight Crime, "Balance de InSight Crime sobre los homicidios en 2018," January 22, 2019. https://es.insightcrime.org/noticias/analisis/balance-de-insight-crime-sobre-los-homicidios-en-2018/.

32 Interview with an official of a humanitarian agency in Mexico City on January 7, 2019.

33 Email for human rights defender in Tijuana on December 6, 2018.

34 Interview with human rights defender in Tijuana on December 18, 2018. Interview with health service provider in Tapachula on January 8, 2019.

35 Laura Sánchez, "Lujuria, Sexo, las 24 horas del día en Tijuana," *El Universal*, March 24, 2016, https://www.eluniversal.com.mx/articulo/estados/2016/03/25/lujuria-sexo-las-24-horas-del-dia-en-tijuana#imagen-7. , Sheldon Zhang, *Sex trafficking in a border community: a field study on sex trafficking in Tijuana, Mexico,* University of California, San Diego, 2012. Jimena Duarte, "Migración y prostitución en Chiapas, de la necesidad al placer," February 12, 2018, https://www.excelsior.com.mx/nacional/2017/02/17/1146931.

36 Barrio 18 is one of the largest gangs in the Americas. It operates in Central and North America.

37 Sandra Albicker, et al., p. 8.

38 *Medidas del gobierno de México ante la eventual llegada a la frontera sur de la caravana de migrantes hondureños,* SEGOB, October 17, 2018, https://www.gob.mx/segob/prensa/medidas-del-gobierno-de-mexico-ante-la-eventual-llegada-a-la-frontera-sur-de-la-caravana-de-migrantes-hondurenos-178838?idiom=es. *El Presidente Enrique Peña Nieto anuncia el Plan "Estás en tu casa" en apoyo a los migrantes centroamericanos que se encuentran en México*, SRE, October 26, 2018, https://

 **Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 324 of 399

www.gob.mx/sre/prensa/el-presidente-enrique-pena-nieto-anuncia-el-plan-estas-en-tu-casa-en-apoyo-a-los-migrantes-centroamericanos-que-se-encuentran-en-mexico?idiom=es. Jorge Alejandro Medellín, "Cierra INM registro de migrantes; entregará 12,600 visas humanitarias," January 30, 2019, https://lasillarota.com/cierra-inm-registro-de-migrantes-entregara-12600-visas-humanitarias/268836. Interview with humanitarian worker in Mexico City on January 25, 2019. Óscar Gutiérrez, "Caravana de migrantes es detenida a su entrada por Chiapas," *El Universal*, February 2, 2017, https://www.eluniversal.com.mx/estados/caravana-de-migrantes-es-detenida-su-entrada-por-chiapas.

39 lena Reina, "La frontera Sur de México es una olla de presión", *El País*, April 19, 2019, https://elpais.com/internacional/2019/04/17/mexico/1555463562_198481.html. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g.

40 Carina García, "Elección 2018. La más grande de la historia", *El Universal*, July 1, 2018, https://www.eluniversal.com.mx/elecciones-2018/eleccion-2018-la-mas-grande-de-la-historia. Lexica, "El proceso de transición más largo del mundo," *Animal Político*, September 12, 2018, https://www.animalpolitico.com/el-blog-de-lexia/el-proceso-de-transicion-mas-largo-del-mundo/.

41 Mark Manly, "Las lecciones de las caravanas," *El Universal*, January 18, 2019, https://www.eluniversal.com.mx/articulo/mark-manly/nacion/las-lecciones-de-las-caravanas.

42 Misael Zavala y Alberto Morales, "No me voy a enganchar en debates con Trump: AMLO", *El Universal*, April 24, 2019, https://www.eluniversal.com.mx/nacion/no-me-voy-enganchar-en-debates-con-trump-amlo. Trudy Rubin, "Mexico has a strategy to deal with Trump's wall and rejection of migrants", *The Philadelphia Inquirer*, March 13, 2019, https://www.philly.com/opinion/commentary/mexico-trump-amlo-migrants-braceros-andres-manuel-lopez-obrador-20190313.html. Misael Zavala, "Por muro, no me voy a pelear con el presidente Trump:AMLO", *El Universal*, September 22, 2018, http://www.eluniversal.com.mx/nacion/politica/por-muro-no-me-voy-pelear-con-el-presidente-trump-amlo.

43 Roberto Velasco, "Mexico stands with migrants. The new US asylum policy must respect their rights", *The Washington Post*, January 28, 2019, https://www.washingtonpost.com/opinions/2019/01/28/mexico-stands-with-migrants-new-us-asylum-policy-must-respect-their-rights/?utm_term=.5b1dfcbb0ccc. Joint press conference between the Mexican Ministry of the Interior and the Mexican Ministry of Foreign Affairs on April 23, 2019. Letter to President Andrés Manuel López Obrador condemning actions taken by authorities against migrants on April 22, April 26, 2019, http://cdhfraymatias.org/web/wp-content/uploads/2019/04/26.04.19_Comunicado.pdf?fbclid=IwAR0k53uphlLxt1Z4NLSt_cp-ZZLvi4-NyNsKWQ8xj0-iPopktGqYmKRv0_g

44 "En Tijuana, uno de cada 10 homicidios en el país," *La Jornada Baja California*, October 25, 2018, https://www.jornada.com.mx/ultimas/2018/10/25/en-tijuana-uno-de-cada-10-homicidios-en-el-pais-7122.html.

45 We are 'metering', which means that if we don't have the resources to let them [asylum-seekers] in on a particular day, they are going to have to come back. They will have to wait their turn and we will process them as we can, " DHS Secretary, Kirstjen Nielsen, interview on Fox News (May 15, 2018), quoted by Amnesty International, USA: *'You Don't Have Any Rights Here.'* Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border,* Strauss Center at UT Austin, Center for US-Mexican studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

46 *Al Otro Lado, Inc. v. Nielsen*, No. 3:17-cv-02366-BAS-KSC (S.D. Cal.)

47 Meeting with CBP officer in San Diego, California, on November 29, 2018.

48 Stephanie Leutert, Ellie Ezzell, et. al., *Asylum Processing and Waitlists at the US-Mexico Border,* Strauss Center at UT Austin, Center for US-Mexican Studies at UC San Diego, and the Migration Policy Center at the European University Institute, December 2018.

49 Interview with legal service providers on November 29, 2018.

50 Stephanie Leutert, Ellie Ezzell, et al. and Emily Green, "Exclusive: Mexican officials are extorting thousands of dollars from migrants applying for asylum," *Vice*, March 13, 2019, https://news.vice.com/en_us/article/kzdy4e/exclusive-mexican-officials-are-extorting-thousands-of-dollars-from-migrants-to-apply-for-asylum.

51 Adolfo Flores, "Mexican Authorities are Stopping Unaccompanied Kids from Seeking Asylum in the US at Every Turn," *BuzzFeed News*, February 13, 2019, https://www.buzzfeednews.com/article/adolfoflores/children-unaccompanied-asylum-immigration-mexico-border. "Upon approaching the port of entry, the delegation was stopped by Mexican authorities who refused to allow the children to proceed any further to present their asylum claims. The authorities claimed that asking for asylum at the port of entry is against proper procedure and advised the children to get on the asylum waitlist. The authorities also claimed that the asylum waitlist is kept in an informal notebook managed by the asylum seekers themselves ... In any case, minors are not allowed to put their names on the list. Children have no choice but to present their claims at the port of entry." @amnestyusa, December 29, 2019. Twitter.

52 Meeting with CBP officer in San Diego, California, on November 29, 2018.

53 Zuzana Cepla, *Trafficking Victims Protection Reauthorization Act Safeguards Children,* National Immigration Forum, May 23, 2018, https://immigrationforum.org/article/trafficking-victims-protection-reauthorization-act-safeguards-children/.



54 Meeting with CBP officer in San Diego, California, on November 29, 2018. Telephone conversation with CBP high level official on December 7, 2018. Meetings with high-level Mexican officer from the Ministry of Foreign Affairs, National Institute of Migration, and Mexican Commission for Refugee Assistance in Mexico City on January 15, 2019.

55 John Bowden, "Dem lawmaker says she helped group of migrants enter US, apply for asylum," *The Hill*, December 12, 2018, https://thehill.com/latino/419287-dem-lawmaker-to-join-group-of-migrants-applying-for-asylum. *Reps. Jimmy Gomez and Nanette Barragán Travel to Southern Border to Investigate Conditions of Asylum Seekers,* December 18, 2018, https://gomez.house.gov/news/documentsingle.aspx?DocumentID=431. "Last night, a delegation of our senior leadership joined partners @NIJC, @AlOtroLado_Org, and @TransLawCenter in accompanying three LGBT minors fleeing violence and persecution in Central America. Here's what we found …The delegation refused to leave until the children were allowed to present their claims. In order to discourage the delegation to leave, Mexican authorities asked everyone with proper documents to proceed through the port of entry while the delegation stood to the side. Over an hour later, our director @MargaretLHuang was able to negotiate an agreement w/ Mexican authorities. She & an interpreter would accompany the children onto US soil to ask for asylum if the rest of the delegation left. The children were then processed & made it into the US. Yesterday's standoff with Mexican officials validates reports that authorities there are cooperating with the US to dissuade people from asking for asylum. It demonstrates the lengths Mexico and the US will take to violate the human rights of people, including children, desperately seeking safety." @amnestyusa, December 29, 2019. Twitter.

56 Per the information provided by service providers on the ground, estimates of UMC in Tijuana varied from 120 to 200. The estimates include all unaccompanied children in Tijuana in December 2018 and January 2019, not only those who traveled with the caravans.

57 National System for Integral Family Development (DIF).

58 Interviews with children in Tijuana on November 29, 2018 and on December 17, 2018. Interview with child service provider in Tijuana on November 29, 2018. Phone interview with child service provider who worked in Tijuana on December 17, 2018. Interview with child service provider in Tijuana on December 19, 2018. Interview with child service provider in Tapachula on January 8, 2019.

59 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018. Ed Vulliamy, "Tricked, abducted and killed: the last day of two children migrants in Mexico," *The Guardian*, February 16, 2019, https://www.theguardian.com/world/2019/feb/16/tijuana-migrant-child-murders-mexico-us-asylum. Julia Gavarrete and Heather Gies, "Honduran teen fled gangs at home only to be murdered while stranded at the US-Mexico Border," *The Intercept*, February 23, 2019, https://theintercept.com/2019/02/23/unaccompanied-minor-migrants-us-border-policy/.

60 Interview with director of shelter for unaccompanied minors in Tijuana on December 18, 2018.

61 Exec. Order No. 13767, 82 FR 8793 (2017), Sec. 7. "Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration" Department of Homeland Security, December 20, 2018, https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

62 Order granting motion for preliminary injunction filed on April 8, 2019. *Innovation Law Lab v. Nielsen*, No. 3:19-cv-00807-RS. Document 73.

63 Miriam Jordan, "Trump Administration Can Keep Sending Asylum Seekers to Mexico, Court Rules", New York Times, May 7, 2019, https://www.nytimes.com/2019/05/07/us/asylum-seekers-trump-mexico.html.

64 Redacción, "Agreden en Guatemala a caravana migrante y los obligan a entrar a México", *SDPnoticias,* January 28, 2019, https://www.sdpnoticias.com/internacional/2019/01/28/agreden-en-guatemala-a-caravana-migrante-y-los-obligan-a-entrar-a-mexico. Mary Lee Grant y Nick Miroff, "Milicias esperan en Texas a la caravan migrante que busca cruzar la frontera", *El Economista*, November 4, 2018, https://www.eleconomista.com.mx/internacionales/Milicias-esperan-en-Texas-a-la-caravana-20181104-0072.html. Elías Camhaji, "La xenophobia sale a las calles de Tijuana", *El País*, November 19, 2018, https://elpais.com/internacional/2018/11/18/mexico/1542511725_499305.html.

65 UNHCR, *Monitoreo de protección en Ciudad Hidalgo, México,* February 4, 2019, https://www.acnur.org/op/op_fs/5c59d76e4/monitoreo-de-proteccion-en-ciudad-hidalgo-mexico.html.

66 *Derechos humanos y cooperación con Centroamérica, base de política migratorio 2018-2014: Sánchez Cordero,* SEGOB, December 19, 2018, https://www.gob.mx/segob/prensa/derechos-humanos-y-cooperacion-con-centroamerica-base-de-politica-migratoria-2018-2024-sanchez-cordero?idiom=es.

67 @INMI_mx, "Informativo 28 enero 2019, El Salvador: 231; Guatemala: 470; Haití: 1; Honduras: 2,238; Nicaragua: 35; Brasil:2; Angola: 1," January 28, 2018. Twitter. @INMI_mx," Informativo 28 enero 19, registró 12,574 solicitudes de visitante por razones humanitarias de adultos migrantes," January 28, 2018. Twitter.

68 Monitoring conducted by the Jesuit Network with other organizations. Reports available at: http://caravanamigrante.ibero.mx.

69 "… Mexico must stop illegals from entering the U.S … /… through their country and our Southern Border. Mexico has for many years made a fortune off the U.S., far greater than Border Costs. If Mexico doesn't immediately stop ALL illegal immigration coming into the United States through our southern Border, I will be CLOSING…/…the Border, or large section of the Border, next week. This would be so easy for Mexico to do, but they just take our money and 'talk'". @realDonaldTrump, March 29, 2019, Twitter. "We have a National Emergency at our Southern Border. The Dems refuse to do what they know is necessary - amend our immigration laws. Would immediately solve the problem! Mexico, with the

 
Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 326 of 399

strongest immigration laws in the World, refuses to help with illegal immigration & drugs!" ". @realDonaldTrump, March 28, 2019, Twitter. "Mexico is doing NOTHING to help stop the flow of illegal immigrants to our Country. They are all talk and no action. Likewise, Honduras, Guatemala and El Salvador have taken our money for years, and do Nothing. The Dems don't care, such BAD laws. May close the Southern Border!" @realDonaldTrump, March 28, 2019, Twitter.

70 Fabiola Martínez, "Frontera sur de México está 'desbordada', advierte Sánchez Cordero," *La Jornada*, March 27, 2019, https://www.jornada.com.mx/ultimas/2019/03/27/frontera-sur-de-mexico-esta-desbordada-sanchez-cordero-671.html.

71 Governments of all countries in the region, international organizations, humanitarian agencies, civil society organizations, human rights defenders, shelters, community-based organizations, service providers, and faith groups.

**Migrant and Refugee Caravans:**
**Failed Responses to Women and Children in Need of International Protection and Humanitarian Aid**

18



Women's Refugee Commission | 15 West 37th Street | New York, NY 10018

212.551.3115 | info@wrcommission.org | womensrefugeecommission.org

# EXHIBIT 11



**HUMAN RIGHTS WATCH**

Search hrw.org

English

DONATE NOW

Trending      World Cup 2026      Trump Administration and Human Rights      Crisis in the Middle East      Sudan

May 31, 2022 12:54PM EDT  |  Report

**Available In**   English   Español

# US: LGBT Asylum Seekers in Danger at the Border

Biden Should Immediately Safeguard At-Risk Groups, Restore Asylum Access

 



At a rally in Tijuana, Mexico, people hold placards reading "Stand for Asylum" and "Stop Title 42 Now." The US policy often called "Title 42" allows border agents to expel people summarily to Mexico or their countries of origin with no opportunity to apply for asylum. © 2022 Aimee Melo/picture-alliance/dpa/AP Images

(Ciudad Juárez) – Lesbian, gay, bisexual and transgender (LGBT) people and other asylum seekers fleeing persecution in their home countries experience abusive and dangerous conditions in Mexico



English          DONATE NOW

Protection Protocols, commonly known as "Remain in Mexico," and the Title 42 summary expulsion policy – continue to be used under the Biden administration to block access to the asylum system for most people who try to cross into the US to seek safety. This includes people at a greater risk of harm in Mexico because of their particular conditions or identities, including gender identity or expression, disability, and age who should be entitled to an exception from expulsion. US authorities should stop sending asylum seekers to Mexico or expelling them to their countries of origin and should quickly process people waiting at the border to seek asylum who are at particular risk of abuse.

"The United States should restore access to asylum for all, but so long as Biden is blocked from doing so, he should at the very least immediately use existing exceptions for at-risk asylum seekers, including LGBT people," said Ari Sawyer, US border researcher at Human Rights Watch. "Continuing to summarily expel LGBT and HIV-positive asylum seekers to Mexico or their country of origin places their lives at serious risk."

US government protocols include exceptions for asylum seekers at a greater risk, and President Joe Biden has promised US agents will apply them. But border agents have broad discretion to grant or deny exceptions, and there are no clear consequences for agents who fail to do so or checks to ensure that exceptions are being handled properly, Human Rights Watch found.

Despite a recognition by the US Department of Homeland Security (DHS) that LGBT people may face "increased risk of harm in Mexico due to their sexual orientation or gender identity," Human Rights Watch documented cases in which border officials returned LGBT asylum seekers, including those with HIV, to Mexico under both abusive anti-asylum policies.

Human Rights Watch conducted 29 interviews with asylum seekers, migrants' rights groups, and United Nations agency officials in April and May 2022, in person and by phone, in Ciudad Juárez and Mexico City, and in El Paso, Texas. Human Rights Watch undertook research in coordination with Casa de Colores, a US-Mexican organization working to provide shelter and legal services to LGBT asylum seekers.

LGBT asylum seekers told Human Rights Watch they had been expelled even after expressing their fear of returning and telling border agents they identified as LGBT, had HIV, or had experienced abuse related to their gender identity, gender expression, or sexual orientation. They also described serious abuse during their journeys to the border, including by Mexican officials.

One woman interviewed fled to the United States from Honduras, where she previously faced targeted violence for living openly as a lesbian woman, including one incident when someone cut her face,



English        DONATE NOW

She said that when she explained to US border officials that she was a lesbian *seeking asylum from Honduras* and that she had also experienced abuse in Mexico, agents laughed at her. She said one agent told her, "I don't care what's happening to you." She was expelled to Honduras, and immediately fled again to the US border, this time afraid to seek asylum for fear of being returned to Honduras again.

Previous Human Rights Watch research has highlighted the risk of illegal and arbitrary arrest, torture, extrajudicial execution, sexual assault, and enforced disappearance for LGBT people in Central America.

Although the Biden administration has moved to terminate both Title 42 and Remain in Mexico, several US state officials have filed suits in federal court, resulting in orders to keep the programs in place during the litigation.

A federal district court judge has temporarily blocked the Biden administration from ending the expulsion policy, which was first issued at the start of the Covid-19 pandemic against the recommendation of top public health experts. There is no evidence that people seeking asylum pose a public health threat to the United States, and the expulsion policy cannot be justified on public health grounds.

Though the initial Title 42 was issued without "notice and comment" procedures, allowing a period for the public to comment, the judge found that the Biden administration should have gone through these administrative consultation processes to end Title 42. Some US lawmakers have proposed legislation that would keep summary expulsions in place until pandemic public health measures are terminated.

Asylum seekers and other migrants sent to Mexico are often unable to support themselves or access basic services such as shelter, food, water, safe transportation, or health care, and have no meaningful recourse for abuses from criminal cartels or Mexican authorities. In the Mexican state of Tamaulipas, Human Rights Watch found that asylum seekers and other migrants are systematically targeted for kidnapping, extortion, rape, and other violence, by both government officials and criminals.

LGBT people constitute one particularly at-risk group of asylum seekers, among others, including people with disabilities and chronic health conditions, Black and Indigenous asylum seekers, asylum seekers who do not speak Spanish as a first language, and families traveling with children.

LGBT asylum seekers and asylum seekers with HIV described additional discrimination and abuse as well as barriers to accessing essential services, including life-saving antiretroviral therapy and gender-affirming health care, services that include medical and mental health services, continuation of



**HUMAN RIGHTS WATCH**

<u>English</u>      DONATE NOW

Human Rights Watch asked Mexico's National Migration Institute for more information on allegations made against immigration agents. The agency responded on May 31 and said they were unaware of any reports of such abuses, were not able to investigate them, and that the Mexican constitution prohibits such behavior.

📄 **National Institute of Migration Response to HRW 5.31.22**

The United States has an obligation to protect refugees from returning to a threat of persecution, ill-treatment, and threats to life and safety, Human Rights Watch said. President Biden should ensure that the United States complies with its domestic and international legal obligations to respect the right to seek asylum.

"LGBTQ+ and HIV-positive asylum seekers face grave risks to their health and safety from the time they flee their countries, often after years of targeted abuse, to when they arrive at the US border," said Susana Coreas, director of Casa de Colores. "Biden has rightly committed to protecting LGBTQ+ refugees. He should follow through on that promise and ensure all asylum seekers are welcomed with dignity at the border."

**Abuse at the US Border**

Human Rights Watch spoke with 20 LGBT asylum seekers in Ciudad Juárez, Mexico, who hoped to cross into the United States and be allowed to seek protection. Nearly all reported they were not approaching the border or trying to ask US officials for asylum because they feared they would be expelled to Mexico or their country of origin. They said they preferred to wait for the Biden administration to restore access to asylum or for legal aid to make a request for exemption from the expulsion policy. Four asylum seekers reported that they had previously been expelled to Mexico or their country of origin without an asylum screening.

When Adolfo H. and Gerardo C., a gay couple fleeing Cuba and El Salvador, respectively, who like others interviewed are not identified by their real names for their protection, tried to seek asylum at the US border in February 2022, they were expelled by US Customs and Border Protection (CBP) agents to Mexico. They had previously experienced extortion several times by Mexican immigration agents, who stopped them at various points along their journey and demanded payment to continue. At the time, they were not yet married. US officials told the couple that Adolfo could stay and seek asylum in the United States because he is from Cuba but that his partner would be expelled, even though border officials had the authority to allow both men in. Instead, they gave them the option of being separated or of being expelled together. They said that while they were in custody, US officials told



English    DONATE NOW

- José M., a gay man who fled death threats in Honduras based on his sexual orientation, said he had tried to cross the border in March 2021. He was afraid to stay in Mexico, where he said he has experienced extortion and violence at the hands of Mexican police and discrimination at shelters. On his way to the border, Mexican immigration agents stopped the bus he was on and made everyone get off, he said, forcing each migrant to pay a bribe of about US$25 each or be expelled from the country. He also said that because of his gender expression and sexual orientation, some shelters did not allow him to stay there, leaving him to sleep on the streets. In Ciudad Juarez, the shelter operators told him it was a sin to be gay and said that if he and other LGBT asylum seekers didn't go to religious service, they would be forced to leave. He said he had told US border officials that he is gay and that he was afraid to be sent to Mexico, but hours later CBP agents sent him to Mexico. Before expelling him, US officials made him throw away everything he had, including the few clothes he had. US border agents typically throw away migrants' possessions, including items such as medicine, baby blankets, important identity documents, documents needed to prove an asylum claim, and memorabilia that hold sentimental value, claiming the practice is for health and safety reasons.

The Biden administration has also recently placed some LGBT people in the Remain in Mexico program, officials with the International Organization of Migration (IOM) told Human Rights Watch, sending them to Ciudad Juárez despite the exemption for LGBT people and others at particular risk of abuse. IOM operates a shelter for newly expelled or returned asylum seekers to test them for Covid-19 and provide quarantine before they move on to other shelters. IOM officials said LGBT asylum seekers had been sent to Mexico even after they explicitly told US border agents about their gender identity or sexual orientation.

**Abuses in Country of Origin**

LGBT asylum seekers interviewed reported serious abuses in their countries of origin, including rape, assault, death threats, extortion, and forced disappearances or killings of romantic partners and friends.

- Juan C., a transgender man, fled Honduras after he received death threats related to his gender identity and activism in an LGBT rights organization. He said that several LGBT people he has known have been killed or disappeared there. He said that the police detained him without charges on several occasions. In 2021, two men raped him and his girlfriend after saying, "Who is the man and who is the woman in the relationship?" and saying that the couple were transgender



**English**        DONATE NOW

- Eduardo O., a gay man from Honduras, said he fled the country shortly after gang members beat his romantic partner to death. Gang members had previously threatened to kill Eduardo. Then in June 2021, the same gang members attacked him and his partner while they were together. While Eduardo was able to escape, he said, his partner could not. He said he reported his partner's murder to the police, who did not investigate.

- Kayla R., a transgender woman from Guatemala, said she had to flee and seek asylum after the gangs who were extorting the business where she worked beat her when she and the store owner couldn't pay, leaving prominent scars on her face. On another occasion, gang members beat her in the street while using anti-LGBT slurs. They left a large gash and scar on her head.

**Discrimination and Abuse in Mexico**

Human Rights Watch also documented serious abuse and discrimination against LGBT asylum seekers in Mexico. Several LGBT asylum seekers said that Mexican immigration agents, police, and National Guard soldiers targeted them for extortion. Other asylum seekers experienced kidnapping, sexual assault, robbery, and other physical violence by both Mexican government officials and criminals.

- Brenda F., a transgender woman, fled El Salvador in 2017 after gang members who wanted her to sell drugs beat and threatened to kill her. After applying for protection and living for a few years in Mexico, she said she was riding a bus from Monterrey to Matamoros in the Mexican state of Tamaulipas in May 2020 when, at a checkpoint, immigration agents pulled her off the bus and took her into an office about 25 meters away. While another immigration agent stood watch outside the office, the agent questioned her about her destination and reason for traveling, she showed him an order from a doctor for laboratory tests. He accused her of lying and of wanting to cross into the United States and grabbed his genitalia, saying if she wouldn't "give me what I want," he could have two police officers expel her to Guatemala. Afterward, he told her that if she reported him, he had already taken a photo of her identification and would come after her. She said she knows other trans women who have experienced sexual assault at the hands of Mexican immigration agents.

- Mariana L., a lesbian woman who fled Honduras in 2021, said she was kidnapped for ransom in January 2021 and held for over a week near the US-Mexico border by people she believed to be cartel members. They took her to a house in Reynosa, Tamaulipas, where she saw several other kidnapped migrants. She said they stole her passport and forcibly photographed her naked until her sister managed to pay a ransom of US$3,000. Her kidnappers would hit her to make her cry when they called her sister for the ransom money.



to watch. They went to the Mexican Commission for Refugee Assistance (COMAR), Mexico's refugee authority, in Tapachula, Chiapas, where they applied for asylum in Mexico. COMAR gave them a document confirming that they were in the process of seeking asylum in Mexico, giving them legal status in Mexico. An immigration agent apprehended them outside the COMAR office as they left. When he saw their application documents, he tore them up, saying they were meaningless and sent them to a detention center. They were released and then took a bus to the US-Mexico border. They said Mexican immigration agents periodically stopped the bus and boarded it to extort them and other migrants, saying they had to pay if they wanted to continue their journey to the US border.

- Kayla R., the transgender woman who fled Guatemala, said that in July 2021 Mexican state police in Piedras Negras robbed her and beat her with batons so badly that she was ultimately hospitalized and vomited blood. The police detained her and another transgender woman she was traveling with for two days without food and water and then turned them over to immigration agents, who sent them to an immigration detention facility. There, she said, a Mexican immigration agent told her she should report the crime, which would make her eligible for a one-year humanitarian visa, giving her legal status in Mexico. She said she would like to do so, and that the agent took down her information but never gave her any paperwork or began any immigration process. Instead, after she reported the crime, Mexican immigration agents returned her to Guatemala, where she had experienced brutal violence. She immediately fled again. While she was making her way back to the US border in March 2022, criminals threatened her with a machete and robbed her.

Six asylum seekers and migrant rights workers reported that some of the shelters in Ciudad Juárez that accepted LGBT asylum seekers subjected them to discriminatory treatment, including the shelter where LGBT asylum seekers were forced to go to Christian religious services. Shelters in Ciudad Juárez are at capacity, meaning they would be homeless if they did not agree to go to the service. Some migrant shelters in Ciudad Juárez would not accept LGBT asylum seekers at all, migrant rights workers there said.

Accessing lifesaving health care for asylum seekers with HIV or other chronic illnesses was also difficult, asylum seekers said. All five HIV-positive asylum seekers interviewed, and one asylum seeker with diabetes and hypertension, said they had gone periods ranging from a few weeks to four months, without their necessary medication because they did not have any money or support.

- Mari R., a transgender woman who is HIV positive and who fled Honduras after she refused to sell drugs for a gang whose members had raped and threatened to kill her, went without her antiretroviral medication in Mexico for four months. In April, with the support of Derechos

7/8/26, 1:43 PM
US: LGBT Asylum Seekers in Danger at the Border | Human Rights Watch
Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 337 of 399



English   DONATE NOW

Four transgender asylum seekers, as well as IOM officials and a local trans rights organization called Red Solidaria Trans, said that transgender asylum seekers have not had access to gender-affirming health care in Ciudad Juárez.

- Brenda F., a transgender woman who fled after facing an attempted gang recruitment and death threats in El Salvador, said she had previously been taking hormones but that in Ciudad Juárez, she has not been able to access to gender-affirming hormone care, though she has repeatedly tried. "They always say they don't offer that care, they can't, or they don't know how," she said. Transgender people who take hormones to develop secondary sex characteristics consistent with their gender identity and expression experience a reversal of these physical traits when hormone therapy is stopped, which can cause distress among other symptoms. Brenda said she hasn't had access to hormone care since October 2021 and that she is suffering from depression as a result. "I have asked for help getting my hormones and they have said they don't offer that kind of support here [in Ciudad Juárez]," she said. "We are suffering marginalization in that way – hormone treatment is necessary, and they are denying us."

**Recommendations**

**To the Biden Administration**

- Continue and redouble efforts to end the Remain in Mexico program and Title 42 summary expulsions, including by initiating a "notice and comment" rulemaking process to end Title 42.

- While these abusive policies remain in place, ensure that border agents do not to return at-risk asylum seekers under the Remain in Mexico program or expel them under the Title 42 summary expulsion policy. People at particular risk of harm include LGBT asylum seekers; those with HIV, disabilities, and chronic health conditions; Black and Indigenous asylum seekers; those who do not speak Spanish as a first language; and families traveling with children.

- Take immediate steps to parole into the United States all LGBT asylum seekers and other asylum seekers at particular risk of harm who have previously been subjected to the Remain in Mexico program or the Title 42 summary expulsion policy.

- Review regulations, Board of Immigration Appeals and Attorney General decisions, and policies and other guidance, rescinding or amending as appropriate to ensure consistency with the right to seek asylum and the right to protection from return to harm or threat of harm as defined in



- Continue to increase the number of appropriately trained personnel – asylum officers, doctors, child-care specialists, mental health services professionals and other first responders – at the border using funds currently allocated toward immigration enforcement and detention.

- Beyond initial screening of migrants, transfer humanitarian reception, including migrant processing and asylum functions, from CBP to a separate government agency, such as the Federal Emergency Management Agency (FEMA), or groups with trauma-informed training and whose mission is to perform humanitarian services.

- Take steps to ensure that LGBT asylum seekers and asylum seekers with HIV feel safe enough to self-identify while in the custody of CBP, including by ensuring that US officials affirmatively explain a policy of nondiscrimination and ask each migrant if they would like to share their gender identity and sexual orientation.

- Investigate and discipline US border agents who wrongfully send LGBT asylum seekers and other particularly at-risk asylum seekers to Mexico or their countries of origin.

- Work with Mexico and other governments to implement a holistic regional plan for access to protection and safe and dignified migration.

**To the US Congress**

- Reject proposed legislation introduced by Sens. James Lankford (R-Oklahoma) and Kyrsten Sinema (D-Arizona) to keep Title 42 in place until after the government's Covid-19 emergency declaration is terminated.

- Enact legislation to end the Title 42 summary expulsion and Remain in Mexico policies.

**To the Mexican Government**

- End the practice of accepting non-Mexican nationals sent to Mexico by US authorities under the Remain in Mexico and Title 42 summary expulsion policies.

- Investigate abuses by Mexican immigration agents, including reports of extortion at immigration checkpoints, and take disciplinary action against any found to have been involved in such conduct.

- Ensure that Mexican immigration agents do not expel people who may need international protection without due process and screening for fear of return to potential harm.

7/8/26, 1:43 PM
US: LGBT Asylum Seekers in Danger at the Border | Human Rights Watch
Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 339 of 399



English                    **DONATE NOW**

Institute of Migration.

Your tax deductible gift can help stop human rights violations and save lives around the world.

| $50 | $100 | $250 |
|---|---|---|
| $500 | $1000 | Other |

DONATE NOW

Region / Country   Mexico, United States, Immigrants' Rights and Border Policy

Topic   LGBT Rights, Refugees and Migrants, Asylum Seekers

**RELATED CONTENT**

📄 National Institute of Migration Response to HRW 5.31.22

**MORE READING**



DONATE NOW



International Convention on the Elimination of Racial Discrimination (ICERD)



April 21, 2022  |  Letter

Leaders of Human Rights Groups Urge Biden to Safeguard Asylum Access in the US

## REPORTS



October 21, 2021  |  Report

### "They Treat You Like You Are Worthless"

Internal DHS Reports of Abuses by US Border Officials

January 6, 2021  |  Report

### "Like I'm Drowning"

Children and Families Sent to Harm by the US 'Remain in Mexico' Program

## MOST VIEWED

1    July 6, 2026  |  Dispatches

### Burkina Faso Puts Study Abroad Under Junta Control



2    July 8, 2026  |  News Release

### Germany: Government Curbing Freedom of Information Act





English        **DONATE NOW**

**4**   November 12, 2018  |  News Release

   Pakistan: Girls Deprived of Education



**5**   July 25, 2017  |  Report

   "I Want to Be Like Nature Made Me"



## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**



## Get Updates On Rights Issues Worldwide

Enter an email address          Sign Up

## Connect With Us

Contact Us  |  Corrections  |  Privacy Policy  |  Permissions  |  Site Map  |  Child Safeguarding  |  Text Version



English     **DONATE NOW**

**Human Rights Watch** | 350 Fifth Avenue, 34th Floor | New York, NY 10118-3299 USA | t 1.212.290.4700

**Human Rights Watch** is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

# EXHIBIT 12



# HUMAN RIGHTS STAIN, PUBLIC HEALTH FARCE

## Evasion of Asylum Law
## and Title 42 Abuse Must End—
## and Never Be Revived

December 2022

**Introduction**

For nearly two years, the Biden administration has wielded the Trump administration's Title 42 policy to block people from seeking asylum at official ports of entry, expel to grave dangers asylum seekers and migrants who cross the border, and evade the due process and refugee protection provisions of U.S. immigration and asylum law. Though efforts to force continuation of this cruel and counterproductive policy continue, after a federal district court in Washington DC vacated it in November for violating U.S. law, it is scheduled to end on December 21, 2022.

The misuse of Title 42 has been a public health, border management and human rights fiasco. Human Rights First has, as of the date this report was issued, tracked over 13,480 reports of murder, torture, kidnapping, rape, and other violent attacks on migrants and asylum seekers blocked in or expelled to Mexico under Title 42 since President Biden took office. It is a staggering number that will continue to mount every day that Title 42 or similar policies that evade refugee law are in place.

The Centers for Disease Control and Prevention (CDC) attempted to end the Title 42 policy in May 2022, but in the wake of a court order issued by a federal judge in Louisiana forcing the policy's continuation in a case brought by state attorneys general aligned with the former Trump administration, the Department of Homeland Security (DHS) continued to use it. In October 2022, in a disturbing step backwards, the Biden administration announced it would expand use of the policy to expel Venezuelans seeking refuge at the southern U.S. border without allowing them to apply for asylum, attempting to justify this abrogation of asylum law by pairing it with a limited parole program available to some Venezuelans. Since then, DHS has expelled thousands of Venezuelans to dangerous conditions in Mexico where they are also at risk of *refoulement, i.e.* illegal return, to persecution in Venezuela. In response to the October parole announcement, the U.N. Refugee Agency (UNHCR), IOM and UNICEF immediately warned that such efforts "cannot come at the expense of the fundamental human right to seek asylum."

The targeted, expanded use of Title 42 against Venezuelans again confirms that this policy has no basis in public health. As medical and public health experts have repeatedly affirmed and recently-revealed Congressional testimony of a top CDC scientist confirms, the Title 42 policy has no scientific basis. It was adopted at the behest of Stephen Miller and other Trump administration officials as yet another discriminatory effort to restrict immigration and block asylum. As leading epidemiologists and public health experts warned President Biden in November, the continued and expanded use of Title 42 is "a travesty" that manipulates, misuses and undermines trust in public health, and "feeds and propagates racially-based tropes that falsely paint migrants as vectors of disease, fostering stigma and heightening the vulnerability of already marginalized groups in a manner that is antithetical to the tenets of good public health practice."

3

Some members of Congress have attempted to force continuation of Title 42 or a similar suspension of asylum at the border – a codification of failed Trump policy that would eviscerate U.S. refugee law and subvert international refugee law globally. At the same time, the Biden administration is considering replacing Title 42 with other inhumane Trump policies or versions of them, including an asylum transit ban – an illegal policy that, when in effect, turned refugees away to danger and deprived other refugees of a path to family reunification, stability and citizenship, as Human Rights First detailed in a 2020 report.

Senior Biden administration officials are reportedly planning to impose other harsh policies as Title 42 ends, as well as use the notorious migrant detention center at Guantánamo Bay or other third country detention facilities to hold Haitians interdicted at sea. The United States recently returned 180 men, women and children – who had attempted to reach safety in the United States by boat – to Haiti despite multiple U.N. authorities' calls for states to halt returns to Haiti given the life-threatening conditions there.

A ruling by the U.S. Court of Appeals for the D.C. Circuit that took effect in May 2022 prohibits DHS from using Title 42 to return asylum-seeking families "to places where they will be persecuted or tortured." As the policy's scheduled end date approaches, DHS retains clear authority, consistent with the various court rulings, to except individuals from Title 42. It also remains obligated under U.S. refugee law and binding treaty commitments, and a November D.C. Circuit Court decision, not to return anyone—family, adult, or child—to persecution or torture, consistent with the legal rationale of the D.C. Circuit Court. In his November ruling concluding that the Title 42 policy violated the Administrative Procedure Act, the D.C. District Court judge who vacated the Title 42 policy cited Human Rights First's prior research documenting violent attacks against people impacted by the policy and emphasized the "harms Plaintiffs face if summarily expelled to countries [where] they may be persecuted or tortured" as well as the earlier finding by the Court of Appeals for the D.C. Circuit that "the record is replete with stomach-churning evidence of death, torture, and rape." The Trump-aligned state attorneys general who initiated the Louisiana litigation are now seeking to intervene in the separate case before the D.C. District Court and also seeking to stay that court's November ruling requiring the Title 42 policy to end on December 21. Their stay request is now pending before the D.C. Circuit Court after the District Court denied it.

It is far past time to end this illegal, inhumane, and ineffective policy and all attempts to force its continuation. After nearly two years in office, the Biden administration should institute a more effective and humanitarian response to the reception, identification, and processing of refugees seeking protection in the United States – a response that upholds U.S. refugee and immigration laws, as Human Rights First has outlined in its recommendation papers. The Biden administration should not replace one failed and illegal Trump policy with another by embracing, supporting or employing the ineffective, inhumane, xenophobic and racist immigration policies of the prior administration.

This report is based on in-person interviews Human Rights First conducted with asylum seekers in Tijuana in September 2022 and Ciudad Juárez in December 2022; and interviews by telephone and in-person with attorneys, other humanitarian workers, and additional asylum seekers in Mexico conducted from October to December 2022; reports of attacks drawn from an ongoing

4

survey of asylum seekers in Mexico conducted by Al Otro Lado between mid-June and early November 2022; open-source information identified by students from the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles); review of U.S. government data; and media and other human rights reporting.

Human Rights First published prior research on the Title 42 policy in June 2022, April 2022 (with Al Otro Lado and Haitian Bridge Alliance), March 2022, February 2022, January 2022, December 2021, November 2021 (with Florence Immigrant and Refugee Rights Project), October 2021, August 2021, July 2021 (with Hope Border Institute), June 2021, May 2021 (with RAICES and Interfaith Welcome Coalition), April 2021 (with Al Otro Lado and Haitian Bridge Alliance), December 2020, and May 2020.

## Key Findings

- **The use of the Trump-initiated Title 42 policy over the nearly two years since President Biden took office, its forced continuation through court order, and its recent expansion by the administration have inflicted terrible human rights abuses.** Human Rights First has tracked 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021. These numbers are likely just the tip of the iceberg as many victims have not spoken with investigators, journalists, or attorneys. Some recent examples include: Mexican officers kidnapped a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo, and turned them over to a cartel that held them hostage for three months and tortured them; a Honduran asylum seeker and her four-year-old daughter were kidnapped, the daughter beaten and the mother raped in front of her daughter as they waited in Tijuana due to Title 42; a 13-year-old girl was nearly abducted at gunpoint in Juárez after her family fled political persecution in Venezuela but was expelled under Title 42; and a Guatemalan lesbian trans woman was raped by Mexican police in Piedras Negras after CBP turned her away from protection at the Eagle Pass port of entry. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in Mexico.

- **The Biden administration's expansion of Title 42 to Venezuelans in October 2022 has denied thousands access to the U.S. asylum process in flagrant violation of U.S. refugee law. The expansion has stranded adults, families, and children in dangerous Mexican border cities where they are targets of kidnapping, torture, and brutal attacks. It has subjected others to onward *refoulement* to persecution and torture. It has also separated many families.** In some cases, this expansion has resulted in the separation of married couples and the delivery of mothers, wives, teenage daughters, and other family members to grave dangers in Mexico. CBP has subjected many Venezuelans to "lateral expulsions," transporting them to areas far from where they entered the United States and to locations where they have no knowledge of the specific dangers or local refugee shelters. In many cases, asylum seekers appear to have been transported to cities that lack shelter capacity.

- **Mexican asylum seekers fleeing persecution and torture have been trapped in or expelled by CBP to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations**. They include: a woman who was decapitated by the cartel that had threatened her after DHS, citing Title 42, would not let her

seek asylum; a lesbian women who had suffered multiple attacks, rape, and threats due to her sexual orientation and was refused the right to seek asylum at the San Ysidro port of entry; a gay man who had suffered beatings, sexual assaults, and an attempted kidnapping due to his sexual orientation and was turned away from asylum at the El Paso port of entry; and an Indigenous woman who had been attacked by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 and subsequently suffered sexual abuse by Mexican police.

- **Faith-based, humanitarian, and legal workers assisting asylum seekers stranded in Mexico by the Title 42 policy face acute and mounting threats and attacks from violent cartels that exercise widespread control over territory in Mexico.** Recent threats and attacks include the June 2022 kidnapping and November 2022 threats against a Baptist pastor in Nuevo Laredo, the armed raiding of a shelter in Ciudad Juarez in late November 2022, the forced closure of a Nuevo Laredo shelter after threats demanding that the shelter pay a "protection fee," and the robbery at gunpoint of a staff member of a legal organization in a Tijuana plaza near the San Ysidro port of entry while the staff member accompanied asylum seekers instructed by CBP to appear at 6 a.m. to be processed for a Title 42 exemption.

- **CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that make them even more vulnerable to harm in Mexico and undermine their ability to seek asylum in the United States** – including by sometimes expelling asylum seekers in the middle of the night, depriving them of necessary medical care, or taking their passports or other identity documents, religious items, medical items, or other documents necessary for their asylum cases. Many were expelled to deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity.

- **The Title 42 policy has continued to inflict disorder at the border, triggering multiple border crossings, artificially inflating CBP border statistics,** pushing dangerous crossings away from ports of entry, and facilitating exploitation. With Title 42 spurring dangerous attempts to cross into the United States outside of ports of entry, at least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began record keeping on border crossing deaths in 1998.

## Recommendations

- **Congress:** Reject any efforts to codify or legislatively extend the Title 42 policy or similar policies that suspend refugee law or improperly block refugees from seeking asylum, direct sufficient appropriations for asylum adjudications and to community-based, non-profit organizations providing temporary housing, transportation, and other assistance to people seeking refuge at the border, and continue to conduct oversight of the disorder and human rights abuses caused by the Title 42 policy and any similar policies that deny access to asylum.

6

- **Biden Administration:** Take all steps to ensure a final end to the Title 42 policy, restore compliance with U.S. refugee law and treaties, continue to request appropriations to conduct timely asylum adjudications and address backlogs, oppose any efforts to force continuation or resurrection of the Title 42 policy or similar policies, and reject any proposals to replace Title 42 with other policies that block, ban or prevent refugees from seeking asylum in the United States and/or turn them away to danger. Never again use an actual or purported pathway to the U.S. as an excuse to evade refugee law or abrogate the right to seek asylum.

- **Department of Homeland Security:** As Title 42 ends, uphold U.S. refugee law at U.S. ports of entry and along the border, ramp up asylum adjudication capacity and end attempts to replace it with other illegal and inhumane Trump-era policies, and during the time Title 42 is still in place, take all legally available actions to restore asylum access at and between ports of entry and mitigate the harms of Title 42, including through the use of exceptions to Title 42 and by affirmatively screening individuals subjected to Title 42 for fear of return to persecution and torture, as U.S. law and international treaty obligations require.

- **Centers for Disease Control and Prevention:** Publicly identify steps to ensure public health authority is never again misused to evade refugee law and endanger the lives and safety of people seeking protection, and if the Title 42 policy should be prolonged yet again, take any additional steps necessary to help ensure its firm and final termination.

- **The Government of Mexico**: End cooperation with U.S. policies that violate international law and/or result in human rights violations, and take steps to end Mexican police and other officers' perpetration of and complicity or acquiescence in attacks, extortions, kidnappings, rape and other harms inflicted on migrants and asylum seekers.

---

**Title 42 expansion returns Venezuelans fleeing persecution and humanitarian catastrophe to danger, deplorable conditions**

On October 12, 2022, the Biden administration announced it would expand the use of Title 42 to expel Venezuelans to Mexico, through a "New Migration Enforcement Process," pairing the expansion with a new limited humanitarian parole program that would enable some Venezuelans to enter the United States. The parole program's requirements actually preclude many refugees from accessing it, including due to its identification, sponsorship, and airline ticket purchase requirements, as well as its numerical limitations. The Hope Border Institute, which interviewed expelled asylum seekers in October, concluded that the program "left no path for relief for the people in the most vulnerable situations" and left thousands of Venezuelans in Mexico "in a cruel state of limbo."

While UNHCR and other U.N. agencies welcomed efforts to provide safe pathways for displaced persons, they warned that such pathways "cannot come at the expense of the fundamental human right to seek asylum." In their statement, these U.N. authorities specifically reminded the United States that: "**Access to safe territory for asylum seekers is a cornerstone of the 1951 Refugee Convention and of international refugee law. We remain concerned by asylum restrictions that are inconsistent with international law standards, including those imposed through Title 42 public health action, and reiterate the call for their urgent termination.**" Days after the Biden administration's decision to expand Title 42 to expel Venezuelans seeking U.S.

asylum, CBP again acknowledged in an October 21, 2022 statement that recent arrivals at the southern border included "an increased number of asylum seekers fleeing [the] authoritarian regime[] in Venezuela."

Venezuelans expelled to or blocked in Mexico due to Title 42's expanded use are now stranded in highly dangerous Mexican border cities as well as other locations in Mexico that lack capacity to safely accommodate them. Many are also at risk of onward *refoulement* – illegal return - to persecution and torture, with some Venezuelans pushed across the border into Guatemala and others flown directly back to Venezuela by Mexican authorities. Title 42 expulsions of Venezuelans by DHS are also separating families at the border.

The expanded use of Title 42 has already resulted in thousands of Venezuelans expelled to Mexico without access to the U.S. asylum process. Between October 12 and mid-November 2022, more than 8,000 Venezuelans were expelled by DHS to Mexico. As of November 7, more than 2,100 Venezuelans had been expelled to Ciudad Juárez alone since the policy was expanded less than a month prior. Human Rights First researchers interviewed multiple sources who indicated that around December 1, 2022, DHS in the El Paso region began conducting lateral expulsions of Venezuelans to Matamoros and other cities and appeared to have halted direct expulsions to Ciudad Juárez.

As it has wielded Title 42 to expel Venezuelans to Mexico, CBP has separated some families at the border and turned away mothers, daughters, wives, partners, and other family members to danger in Mexico. For example:

- **In October 2022, DHS released Miguel Peñaranda, a Venezuelan man, and his 18-year-old stepson into the United States but expelled to Mexico Peñaranda's wife, Heyllyn Yepez, and his 18-year-old stepdaughter.** The family members, who had entered the United States in El Paso, were separated and flown to other parts of the border within Texas: Peñaranda and his stepson were flown to Brownsville, where they were released, while Yepez and her daughter were flown to Laredo, where they were expelled at the border and then bused to Acapulco, Mexico. Yepez told *The New York Times*, **"I never, ever could have imagined this happening…How can they do this to families? It's so inhuman."**

- **DHS separated a Venezuelan family of four in October 2022, releasing the father and son into the United States to pursue their asylum claims while expelling the mother and daughter to Mexico under Title 42,** according to a migrant shelter director in Austin, Texas.

- **A young Venezuelan woman was separated from her mother at the border in October 2022, and while she was processed into the United States, her mother was expelled to Mexico,** according to a migrant shelter director in Austin, Texas.

- **DHS has separated numerous Venezuelan married couples since October 2022.** A woman who was returned to Ciudad Juárez without her husband in October 2022 told *Reuters*, "I am alone in a country where I have no one to help me. He was my only companion, my only help, my only support."

- **In October 2022, DHS expelled a mother to Mexico while her 20-year-old son was permitted to seek asylum in the United States.**

- **DHS separated Luis Alexander Bonilla from his mother, sister, and nine-year-old nephew at the border, detained Bonilla for 11 days, and expelled him to Tijuana, Mexico in October 2022.** Bonilla told Milenio his mother had been expelled to Ciudad Juárez, Mexico. Two weeks after the family had entered the United States, Bonilla was unaware of the whereabouts of his sister and nephew.

Venezuelans who are stranded after expulsion or are unable to seek asylum at ports of entry due to Title 42's continuation face grave dangers in Mexico. As UNHCR, IOM and UNICEF publicly warned the United States after it announced this Title 42 expansion in October, "[m]any people subject to this measure since its implementation in March 2020 have been sent to border communities with significant security challenges, limited support networks and inadequate shelter capacities, making their return to Mexico both dangerous and unsustainable." Many Venezuelan asylum seekers have already been targeted by cartels and corrupt officials in Mexico for kidnappings and other violent attacks in the wake of this Title 42 expansion. Some recent examples include:

- **In November 2022, a Venezuelan police investigator fleeing death threats for investigating cases of disappeared people was assaulted and robbed by armed men who bashed his head with the back of a gun, ordered him off the bus he was riding near Ciudad Juárez, and tried to kidnap him.** He managed to escape, but when he arrived in Ciudad Juárez, police stopped him and stole his money. The man told Human Rights First he is terrified to stay in Juárez, where he remains stranded due to Title 42, because the cartel hunting him in Venezuela also operates there.

- **In November 2022, a gay Venezuelan man was sexually assaulted and robbed in the public plaza where he had been sleeping in Ciudad Juárez.** The man told Human Rights First that he had been staying in a makeshift tent encampment near the El Paso port of entry while blocked from seeking U.S. asylum due to Title 42. After Mexican authorities forced him to leave the encampment, he moved to the plaza where he was then attacked.

- **A 13-year-old girl was nearly abducted at gunpoint in Juárez after her parents and sibling, who had fled political persecution in Venezuela, were denied the right to seek asylum and expelled to danger in Mexico in November 2022 by CBP under the Title 42 Venezuelan expansion.** They were detained by CBP for 10 days without blankets or access to showers. A CBP officer told them "You should have stayed in your country," confiscated and kept their documents, and lied to the family, telling them they were being transferred to a U.S. shelter only to then laugh at them as they were instead subjected to a lateral expulsion and sent to Sonora. The family made their way back to Juárez only to face the attempted abduction and a cartel shooting outside their shelter, as the mother explained to Human Rights First researchers.

- **A Venezuelan family with two young daughters stranded in Mexico due to Title 42 was kidnapped from a hotel in Ciudad Juárez by two hooded, armed men.** The family had been waiting for an opportunity to seek asylum in the United States. The kidnappers held the family captive for 12 days until their relatives were forced to pay a $30,000 ransom.

The U.S. government's expulsion of Venezuelans to Mexico violates U.S. *non-refoulement* legal obligations not only by exposing them to serious harm in Mexico but also because returned individuals are at high risk of onward or so-called chain *refoulement* to countries where they would face persecution or torture. Mexican officials ordered some expelled Venezuelans to

depart Mexico through the southern border within 15 days, while others were provided Mexican migration documents (*forma migratoria múltiple* or FMM) leaving them with temporary status in Mexico for reportedly as little as one week in some cases.

Expelled Venezuelans are at risk of detention and potential deportation by Mexican authorities without access to the asylum process in Mexico. For instance, a video posted online in October 2022 appears to show hundreds of Venezuelans and other nationals detained in a Mexican National Migration Institute (*Instituto Nacional de Migración* or INM) facility near the U.S.-Mexico border, reporting they had been held in crowded, unsanitary conditions for weeks. Venezuelans, as well as other asylum seekers and migrants in Mexico often report that Mexican police and other government officials routinely extort them by threatening them with deportation. In Ciudad Juárez, Mexican National Guard officers have reportedly entered hotels where Venezuelans are staying, demanded their documents, and detained those without valid visas, according to a witness account in a video posted to social media.

In early November 2022, INM began flying some Venezuelans, who supposedly agreed to be repatriated, directly to Venezuela – though there is no indication that any international or independent authorities observed these returns to confirm that they were voluntary. Concerningly, displaced Venezuelans transiting through Mexico reported in October 2022 that Mexican migration officials forced them to sign false documentation stating that they had voluntarily requested to leave Mexico through the southern border to Guatemala. In late September 2022, just prior to the Title 42 expansion, hundreds of Venezuelans were reportedly deceived by Mexican authorities into boarding buses that transported them to the land border with Guatemala. These incidents reflect a well-documented history of failures by Mexican immigration officers to inform detained migrants of their right to seek asylum and failure to forward their requests to the Mexican asylum agency.

Displaced Venezuelans in Guatemala may face further chain expulsion. In 2022, with support from the U.S. government, Guatemalan authorities expelled more than 9,000 Venezuelans across the border into Honduras without consistently administering protection screenings.

Many Venezuelans expelled by DHS to Mexico have been stranded in deplorable conditions without secure housing, leaving some sleeping on the streets. Mexican authorities have transported some expelled Venezuelans to other parts of Mexico, abandoning them in cities where migrant shelters are full beyond capacity. For instance:

- **DHS has expelled hundreds of Venezuelans to Tijuana since October 2022, including some who were flown from the Texas border and expelled to Tijuana without being provided any information about what was happening to them.** Mexican immigration officers also reportedly abandoned at a bus station in Tijuana 60 Venezuelans whom DHS had expelled. With Tijuana shelters full, some spent several nights sleeping on the ground. A fitness center was later prepared to provide temporary shelter for 300 Venezuelans expelled to Tijuana from the United States.

- **On a Saturday in October 2022, Mexican migration officers bused approximately 100 displaced Venezuelans whom DHS had expelled to Mexico City, abandoning them without food, accommodation, or basic support outside an office of the Comisión Mexicana de Ayuda a Refugiados (COMAR), the Mexican refugee assistance agency, which was closed for the weekend.** As of December 2022, migrant shelters in Mexico City are full beyond their capacity as Venezuelans expelled from the United States continue to be bused there, resulting in hundreds sleeping in city streets. Shelters are operating at double capacity with many sleeping on mattresses in common spaces, according to Gretchen Kuhner, director of the *Instituto para las Mujeres en la Migración* (IMUMI). Kuhner said IMUMI and other nonprofit organizations in

Mexico City have had to provide food, shelter, medications, and other supplies to Venezuelans arriving in the city.

- **The Mexican government has bused at least 600 Venezuelans whom DHS had expelled from the United States to the central Mexican city of Hermosillo, where shelters struggling to meet their needs are requesting food and clothing donations.** Those bused to Hermosillo include 24-year-old Juan Carlos García, who reported that he could not afford to travel to Mexico City to reunite with his relatives, from whom DHS separated him at the border.

- **Thousands of Venezuelans, including many who had been expelled from the United States under Title 42, have been sleeping in dangerous conditions in makeshift tent encampments.** Approximately 12,000 migrants and asylum seekers, most of whom are Venezuelan, have been sleeping in a makeshift tent encampment on a muddy sports field in San Pedro Tapanatepec in Oaxaca state, Mexico. In Ciudad Juárez, in November 2022, as many as a thousand Venezuelans were staying in a tent encampment on the Rio Grande near the El Paso port of entry, where temperatures had dropped below freezing and many fell ill. In November 2022, members of an organized criminal group attempted to kidnap residents of the encampment, rt thm into separate lines for men, women, and families, and instructed them to enter nearby vehicles, but the kidnappers retreated when law enforcement intervened. Ciudad Juárez government officials cleared the camp in late November 2022, citing safety concerns.

The Hope Border Institute in El Paso concluded based on its interviews with asylum seekers and migrants that the expanded expulsions of Venezuelans "separated family units and placed individuals, including vulnerable people such as young children, single mothers and elderly people on the streets, lacking access to food, shelter and medical support."

**Court-ordered Title 42 continuation condemns asylum seekers and migrants expelled to or blocked in Mexico to grave dangers**

The continued implementation of Title 42 is causing mounting human rights abuses against asylum seekers and migrants blocked in or expelled to Mexico. Individuals and families who are expelled or blocked from protection due to Title 42 are targeted for attacks in Mexico by corrupt officials as well as powerful cartels that exercise control throughout the border region and profit from kidnapping, torturing, and extorting asylum seekers turned away by the United States. These attacks often target asylum seekers and other migrants on account of their race, gender, sexual orientation, gender identity, and nationality. Black and Indigenous asylum seekers continue to be targets of bias-motivated violence and discrimination while stranded in or transiting through Mexico.

**As of the date this report was published in December 2022, Human Rights First has tracked at least 13,480 reports of murder, kidnapping, rape, torture, and other violent attacks against people blocked in or expelled to Mexico due to Title 42 since January 2021.** This count is likely just the tip of the iceberg since many asylum seekers have not spoken with investigators, journalists, or attorneys. Some recent attacks on people stranded in or expelled to Mexico due to Title 42's court-ordered continuation and recent expansion by DHS include:

11

- **Ibrahima Gueye, a 39-year-old Senegalese man, was shot and killed in a Tijuana park in broad daylight on October 18, 2022.** Police believe Gueye, who was carrying a backpack with clothing and personal belongings, was attacked by members of the violent "de la Castillo" group, which is engaged in criminal migrant smuggling in the area. With asylum seekers unable to approach ports of entry to request asylum, some have attempted to cross into the United States, unaware of danger from violent groups that control access to the border.

- **In October 2022, a Guatemalan lesbian trans woman was violently raped by Mexican police officers in Piedras Negras soon after CBP officers turned her away from protection at the Eagle Pass port of entry.** The woman reported to Al Otro Lado that she had sought protection due to her gender and sexual orientation.

- **A Haitian asylum seeker, whom DHS had previously expelled to Haiti under Title 42, was robbed at gunpoint in Tijuana in summer 2022 while unable to seek U.S. asylum at a port of entry due to the continuation of Title 42.** The armed assailants pulled the man's pants down and groped him looking for money, according to his cousin, another asylum seeker who spoke with Human Rights First.

- **A Guatemalan woman and her four-year-old son were kidnapped in Nogales and held captive for four days after DHS expelled them under Title 42. The family had sought U.S. protection to escape threats from the son's father.** The man who kidnapped the family had approached them offering help after DHS expelled them to Nogales, where they had no support and were unfamiliar with the area, according to Kino Border Initiative, who spoke with the woman in July 2022.

- **Mexican immigration (INM) officers kidnapped and turned over to the Zetas cartel a Guatemalan family with two young children after DHS expelled them to Nuevo Laredo.  The cartel held the family hostage for three months, tortured them, and extorted their relatives.** The mother told Kino Border Initiative in July 2022 that the family had watched as their captors killed other migrants who attempted to escape.

- **An Indigenous Guatemalan woman and her three young children were kidnapped and extorted after CBP officers turned them away from asylum protection at the Nogales port of entry.** The woman told Kino Border Initiative in September 2022 that after the family was expelled, a woman approached them offering to bring them to a free shelter, but instead led them to a house where they were held captive for ransom.

- **In August 2022, a Salvadoran woman and her two children were held captive for hours by members of an armed group who forced them to strip and robbed them of all their belongings, including their clothing, shoes, and water.** The family had been attempting to enter the United States near Calexico to seek asylum when the armed group approached them. "They were asking their boss what to do with us…I thought they were going to kill us," the woman told Human Rights First.

- **Juárez police sexually assaulted a Honduran mother and her four-year-old daughter after the family was blocked from seeking protection in Ciudad Juárez in August 2022, then turned**

**them over to cartel members who held the family captive for 22 days, raped the mother in front of the daughter, and physically attacked the daughter.** The mother reported the incident to Al Otro Lado.

With Title 42 still in place, Mexican asylum seekers fleeing persecution and torture are trapped in or expelled by DHS to the very country they are trying to flee without access to the U.S. asylum process in violation of U.S. law and non-refoulement legal obligations. Mexican asylum seekers stranded in Mexico or turned away from U.S. protection due to Title 42 have been brutally attacked and threatened, including:

- **A young asylum-seeking woman was decapitated by cartel members who had previously threatened her in southern Mexico after DHS turned her and her children away and would not allow them to seek asylum at a port of entry, citing Title 42.** The woman's brother-in-law, who is also seeking asylum, told Human Rights First in September 2022 that the family had been unable to find space in Tijuana shelters and after spending several nights in the streets, had no choice but to return to their hometown where they had been threatened.

- **In late October 2022, DHS used Title 42 to turn away a transgender woman from southern Mexico who had sought protection at a port of entry near Tijuana, Mexico, after an assailant had tried to kill her.** She reported to Al Otro Lado that she had suffered violence and discrimination based on her gender and sexual orientation, including multiple rapes, in Mexico.

- **A trans woman from the south of Mexico and her Indigenous partner remain stranded in Ciudad Juárez after fleeing death threats based on their race, gender, and sexual orientation by a criminal group who disappeared the woman's gay cousin and warned her not to look for him.** The woman told Human Rights First, "I am harassed every day of my life. I am afraid to go outside. There is so much hate. Even churches won't help us."

- **A woman from Michoacán who travelled to the Calexico port of entry in August 2022 with her infant and her younger brothers, ages 10 and 13, was threatened by cartel members after DHS officers turned them away due to Title 42.** The cartel members shot and killed the woman's husband in front of the family while they were eating lunch together, then threatened the woman after she reported the murder to police. The family had attempted to seek asylum at the Calexico port of entry, but U.S. officers turned them away because of Title 42. The woman told Human Rights First they fled to another city after receiving messages from neighbors warning them that the cartel members who had threatened them knew they were in Mexicali.

- **A Mexican lesbian woman who had suffered multiple attacks in her hometown due to her sexual orientation, including being kidnapped, raped, and threatened with death by police officers, was turned away from asylum protection at the San Ysidro port of entry in October 2022.** The woman reported her experience to Al Otro Lado.

- **A gay man from southern Mexico who had suffered beatings, sexual assaults, and an attempted kidnapping in his hometown due to his sexual orientation was turned away from**

**asylum at the El Paso port of entry in October 2022.** The man reported to Al Otro Lado that the people threatening him had killed his nephew to intimidate him.

- **A Mexican family of five was nearly kidnapped after DHS turned them away from seeking asylum at the San Ysidro port of entry in November of 2022.** The mother reported to Al Otro Lado that her husband and son had been kidnapped, beaten, and held for ransom in their home state in southern Mexico. After the expulsion, the family continued to receive death threats.

- **An Indigenous Triqui woman from Oaxaca who had been beaten by police, threatened, and her family members murdered for her activism defending her Indigenous community was turned away from seeking asylum with her three children at the San Ysidro port of entry in September 2022 in Tijuana.** She shared with Al Otro Lado that after the family was turned away, she was sexually abused by Mexican police in Tijuana.

The broad reach of cartels and other organized criminal groups in Mexico, which often have ties to government authorities (including Mexican military collusion with cartels that was recently confirmed by data leaks), can make relocation within Mexico impossible for Mexicans fleeing persecution and torture. For instance, at least three Mexican asylum seekers reported to Kino Border Initiative in October 2022 that the organized criminal groups persecuting them had pursued them to multiple cities within the country where they had moved in an attempt to escape these threats, confirming the national reach of these organizations.

In addition, humanitarian, faith, and legal workers assisting asylum seekers stranded in Mexico continue to face threats, as Human Rights First has previously documented, including:

- **In June 2022, cartel members kidnapped Baptist Pastor Lorenzo Ortiz, who has long provided humanitarian aid to asylum seekers in Nuevo Laredo and Monterrey, including those expelled or blocked under Title 42.** In July 2022, the U.N. Special Rapporteur on human rights defenders condemned the kidnapping, indicating that the cartel who kidnapped Ortiz accused him of stealing their business and refused to believe he aids migrants free of charge. The Special Rapporteur said, "Ortiz's case shows the extraordinary risk that human rights defenders run to provide basic support in the region. This is not an acceptable state of affairs." In November 2022, the Special Rapporteur continued to express grave concern that Pastor Ortiz was being "threatened, surveilled and harassed for his work in defence of the rights of migrants," and that asylum seekers and migrants "in his shelters are being abducted, harassed and extorted, with the alleged acquiescence of local police."

- **Another shelter in Nuevo Laredo was forced to shut down after a violent cartel demanded the shelter pay a "protection fee,"** according to a migrant who had been staying there and who reported the incident to Kino Border Initiative in October 2022. The migrant said that when the shelter closed, their family and other shelter residents were forced onto Nuevo Laredo streets, where members of a cartel photographed and threatened them.

- **In August 2022, an Al Otro Lado staff member was robbed at gunpoint in Tijuana in a plaza near the San Ysidro port of entry while accompanying asylum seekers who had been**

instructed by CBP to appear at the port at 6 a.m. to be processed under an exception to Title 42.

- **Members of organized criminal groups have threatened numerous staff and residents of several Tijuana** shelters**, including Ágape Misión Mundial and Espacio Migrante, in connection with their work assisting migrants with the Title 42 exemption process.** In November 2022, Embajada Migrante, a migrant shelter in Tijuana, was forced to close due to threats by members of an organized criminal group. A director of Embajada Migrante told EFE that members of an organized criminal group that controls the area have been harassing shelter staff for months, and at one point forcibly entered the shelter at night, demanding $200 from each of the migrants as a fee for crossing the border.

- **In November 2022, members of a violent cartel** attacked **a migrant shelter in Ciudad Juárez, plowing down its gate with a truck.** The cartel members forced the migrants to line up against a wall and ordered them to turn over their cell phones. The cartel retreated after realizing the space was a faith-based migrant shelter.

**Triggering Multiple Crossings, Artificially Inflating CBP's Border Encounters Statistics**

The continued and now expanded use of Title 42 is, while in place, trampling on U.S. refugee and immigration laws, preventing them from being upheld, prolonging disorder at the border, and inflating Customs and Border Protection (CBP) encounter statistics due to repeat entry attempts. Due to Title 42, the percentage of individuals who have attempted to repeatedly cross the southern border has increased, according to government data. Information released by CBP shows that in FY 2019 repeat crossings made up 7 percent of Border Patrol encounters, but with Title 42 in place since March 2020, repeated crossings rose to 27 percent of Border Patrol encounters in FY 2021, were 22 percent in August 2022 and 19 percent in September and October 2022 (the last months with data available).

Repeat crossings triggered by Title 42 expulsions have artificially inflated CBP's border apprehension statistics. CBP has concluded that the number of border encounters "was partly driven by high recidivism rates (repeat encounters) among individuals processed under the CDC's Title 42 public health authorities, meaning the actual number of unique individuals attempting to cross the border was substantially lower than total encounters." For example, in September 2022, government data shows that at least 43,000 encounters with Border Patrol were with individuals who had crossed the border multiple times, such that CBP acknowledged that its encounters statistics "overstate the number of unique individuals arriving at the border." Recent analysis by Syracuse University's Transactional Records Access Clearinghouse emphasizes the need for more accurate CBP data on repeat entry attempts. The American Immigration Council estimates that there were over 1.2 million repeat border encounters from August 2021 to September 2022 with Title 42 in place – inflating CBP's border apprehension data.

**Pushing dangerous crossings, resulting in record deaths as asylum remains blocked at ports of entry**

As Title 42 continues to block asylum at ports of entry, tens of thousands of migrants and asylum seekers are waiting in border cities for the opportunity to enter the United States through a limited exemption process. The exemption process requires nonprofit organizations and service providers, including migrant shelters, to refer migrants and asylum seekers with particular vulnerabilities in Mexico to DHS for consideration for Title 42 exemptions. Border cities in Mexico lack capacity to serve the thousands of migrants and asylum seekers stranded in Mexico awaiting the opportunity to request Title 42 exemptions. For example, shelters are full beyond capacity in Reynosa, forcing many migrants and asylum seekers to sleep in tent encampments or on the streets, often in sweltering heat or freezing temperatures. In September 2022, Haitian migrants frustrated by the slow Title 42 exemption process protested outside Reynosa shelters. Likewise, small tent encampments have emerged outside shelters in Tijuana, where tens of thousands of migrants and asylum seekers remain stranded as they await the opportunity to request Title 42 exemptions.

For people seeking refuge from persecution, the denial of access to asylum at U.S. ports of entry leaves them stranded in dangerous border cities and pushes some to attempt risky and sometimes life-threatening border crossings. These crossings result in severe injuries, dehydration, starvation, and drownings as well as kidnappings and other violent attacks by cartels and organized criminal groups that control border crossings. At least 853 asylum seekers and migrants have died in border crossings in FY 2022, making it the deadliest year since the U.S. government began tracking and recording border crossing deaths in 1998. The true number of deaths is likely much higher, as Border Patrol only counts deaths of individuals the agency identifies.

Some of the people who have died or were seriously injured while attempting to cross the U.S.-Mexico border to reach refuge in the United States include:

- **Dozens of migrants and asylum seekers have drowned since July 2022 attempting to cross the Rio Grande to enter Texas from the Mexican state of Chihuahua.** They include a five-year-old Guatemalan girl who drowned after a strong current ripped the girl from her mother's arms in August 2022, a 3-year-old boy who died in August 2022, nine individuals whose bodies were recovered on a single day in September 2022, and 12 people whose bodies were recovered on a single day in July 2022. Eagle Pass fire chief Manuel Mello said, "it's basically a drowning a day that you're seeing."

- **Twenty-two migrants and asylum seekers have drowned in the river and in the agricultural canals of the El Paso, Texas region in 2022 while attempting to cross the U.S.-Mexico border.** They include a young Colombian man whose body was recovered from the Rio Bravo in Reynosa, Mexico in November 2022.

- **In December 2022, a Russian man and another migrant drowned in the Pacific Ocean while attempting to swim across the U.S. border from Tijuana.**

- **In August 2022, Mexican brothers Carlos Enrique Mendoza and Edgar Mendoza died from dehydration, and were found with their bodies embracing,** in the Arizona desert after a criminal smuggling organization abandoned them.

- **A Guatemalan asylum seeker fleeing death threats in his country who had previously been expelled under Title 42 was hospitalized after he became lost in the desert in the Arizona border region as he attempted to seek U.S. protection** for the second time in September 2022. He was expelled again after recovering, according to Kino Border Initiative.

- **In December 2022, an Indian man and his 3-year-old son died after falling off the border wall** attempting to enter the United States from Tijuana, Mexico. An Indian woman also fell off the border wall and sustained injuries.

---

**CBP misconduct exacerbates danger for people subjected to Title 42**

CBP and Border Patrol officers continue to use Title 42 to expel migrants and asylum seekers in ways that increase their vulnerability to danger and violent crime in Mexico. Some Border Patrol agents have failed to provide medical attention to people with injuries, carried out Title 42 expulsions in the middle of the night, and expelled migrants and asylum seekers without their personal belongings. These practices exacerbate the risks migrants and asylums seekers face in Mexico after expulsion.

For example, CBP has endangered the lives of migrants at the Arizona border by carrying out expulsions in the middle of the night. Kino Border Initiative reported that CBP expelled at least sixteen migrants and asylum seekers to Nogales between the nighttime hours of 12:00 and 3:00 a.m. in August 2022. The organization also reported that some migrants were expelled in the rain, at times when shelters and services were closed, and had to sleep in the streets. After these CBP expulsions, some migrants were then robbed by Mexican police and other individuals. Those expelled at night include a Mexican mother and daughter fleeing sexual violence, who were expelled to Nogales at 3:00 am in August 2022.

CBP also continues to separate families subjected to Title 42 expulsions. In addition to the many examples of Venezuelan family separations detailed in a previous section, CBP separated a Mexican family fleeing death threats by cartel members in Guerrero who burned their house and killed a relative. CBP allowed the mother and younger brother to seek U.S. asylum but expelled the 18-year-old sister to Ciudad Juárez alone, according to a shelter director who assisted the young woman.

In its research, Human Rights First heard numerous accounts of instances where Border Patrol and CBP agents engaged in abusive conduct or failed to provide necessary medical attention for migrants and asylum seekers with serious medical conditions or injuries before expelling them to Mexico, including:

- **Border Patrol agents refused to provide medical attention to a woman who was eight months pregnant and who requested aid for complications with her pregnancy.** The woman

told Kino Border Initiative in October 2022 that she had requested a medical examination on three occasions while in Border Patrol custody after she had not felt the baby move in hours, but Border Patrol officers expelled her to Nogales, Mexico without allowing her to see a doctor. The following morning, the woman experienced severe pain and went to a hospital, where she learned the baby had died.

- **In July 2022, a Border Patrol officer beat an asylum seeker who requested water in the Arizona desert and told him "if you want water, go get it in your own country,"** The man told Kino Border Initiative that the officer had shoved his face into the ground, kicked him repeatedly, and stood on the back of his head, causing the man to bleed and lose consciousness. Officers eventually took the man to the hospital after repeated requests but expelled him to Mexico without any of his medical paperwork. He said, **"I'm trying to escape death in my country, only to nearly die here [in the US]."**

- **Border Patrol agents denied medical attention to a migrant who was stung on his hip by a venomous scorpion and was having difficulty breathing.** A Border Patrol agent told him to "sit down and be quiet" when he asked for medical attention for the sting. He was only brought to the emergency room and provided an anti-venom shot many hours later, after his condition had worsened while he waited in a holding cell. The man told Kino Border Initiative in October 2022 that Border Patrol agents later expelled the man to Mexico without returning his personal belongings.

- **Border Patrol agents ignored the pleas for medical attention of a man who had been severely beaten by members of an organized criminal group before seeking U.S. protection.** The man told Kino Border Initiative in October 2022 that Border Patrol agents expelled him to Mexico without providing medical attention and instructed him to ask Mexican authorities for help for his injuries.

CBP and Border Patrol officers also seize and fail to return migrants' personal property. In October 2022, ACLU of Arizona and other nonprofit organizations assisting migrants at the Arizona border sent a letter expressing concern about the practice to CBP Commissioner Chris Magnus. They wrote: "Border Patrol agents in Arizona are forcing migrants they apprehend to discard all their belongings into on-site dumpsters, the only exceptions being a single layer of clothing and certain items that can fit into a 7-by-7-inch plastic bag…The mass dispossession of migrants' belongings by Border Patrol agents is not new, yet the problem has now reached unprecedented levels of magnitude and severity." Personal belongings migrants have been forced to discard include "**items of religious, sentimental, medical, and legal significance.**" The letter indicates that in some cases, Border Patrol has provided claim tickets that would supposedly enable migrants to reclaim seized belongings, but the agency expelled those individuals to Mexico under Title 42 without providing them an opportunity to reclaim their property.

In November 2022, members of Congress Bennie Thompson, Joaquin Castro, Raúl Grijalva and Nanette Barragán requested that the Government Accountability Office "conduct a review of [CBP's] activities, policies, and procedures regarding the handling of personal property belonging to individuals in its custody."

During the course of its research, Human Rights First also heard reports of CBP and Border Patrol taking personal possessions from asylum seekers or migrants, or forcing them to discard passports, religious items, money, and other essential personal items. For example:

- **Several Venezuelan asylum seekers told Human Rights First in December 2022 that CBP expelled them without their personal possessions.** One family was expelled in November 2022 without any of the documents they had brought that were critical to their asylum case, including identification documents, birth certificates, and evidence for their asylum cases.

- **In October 2022, CBP expelled dozens of migrants and asylum seekers, including many Venezuelans, to Tijuana without any of their personal possessions, including their passports and clothing.** Nicole Ramos, Al Otro Lado's Border Rights Project director, said Al Otro Lado has had to purchase clothes and other basic supplies for individuals whose personal belongings had been seized by CBP.

- **At least thirty migrants and asylum seekers have reported to Kino Border Initiative that Border Patrol or CBP destroyed or failed to return their personal possessions from September to November 2022.** One man said Border Patrol agents confiscated his cash, a diamond ring his father had given him, a bible, the keys to his home, his cell phone with all his contacts, and his identity documents, including his birth certificate.

- **Another person reported to Kino Border Initiative that Border Patrol officers seized the SIM card from his cell phone, pocketed the cash and credit cards from his wallet, and tore up his birth certificate in front of him.** Another individual observed a Border Patrol agent rip up $3,000 pesos from a migrant they had apprehended. The officer said, "this is trash, this is of no value to you here" before disposing of the ripped bills in a trash can.

**Expansive use of Title 42 further undermines specious public health rationale, violates U.S. refugee obligations**

The increasingly expansive use of Title 42 and the calls to further prolong its use as a tool – albeit an ineffective and counterproductive one – for border management have completely undermined the already flimsy pretense that the Title 42 policy is justified on public health grounds. Indeed, Marty Cetron, the director of the CDC's Division of Global Migration and Quarantine, told congressional investigators in May 2022 that the CDC order issued by the Trump administration to expel asylum seekers and migrants under Title 42 "did not originate from CDC." It has long been confirmed that the White House pressured the CDC to issue the order after the CDC's medical experts objected to its lack of justification as a public health measure. Cetron noted that he had refused to sign the CDC order, asked to be "excused" from the policy, and warned of the "significant harms" that could arise from its use. In addressing a statement he had reportedly made to colleagues at the time, Cetron confirmed to congressional investigators that this statement was consistent with some of his concerns about the order: "**to use public health authority that has never, ever been used this way, it's to keep Hispanics out of the country and it's wrong.**"

The Biden administration's decision to expand use of Title 42 to Venezuelans, which was clearly a decision based on migration management considerations, was additional confirmation that the

policy has nothing to do with public health. Following the announcement of this expansion, which made no mention of public health in the context of Title 42 expulsions and repeatedly described the expansion as part of a migration management strategy, leading epidemiologists and public health experts wrote to President Biden emphasizing that the continued and expanded use of Title 42 is a "travesty" and that the Biden administration was "manipulating and misusing public health to advance immigration control objectives."

Not only has DHS expanded its misuse of Title 42 public health authority by adding a new nationality to its expulsion list, but some DHS officers appear to be using the supposed public health policy to expel people who have been in the United States for weeks or years, evading the (minimal but critical) due process protections of U.S. immigration law. Some DHS officers have used Title 42 as cover to expel individuals who have long resided in the United States to Mexico without due process, in some instances in coordination with Texas state officers. For example:

- **In 2022 DHS expelled to Mexico a young Honduran man who had been living in the United States for nine years and had a pending immigration court hearing in Houston, Texas scheduled for December 2022, as his attorney reported to Human Rights First.** After being expelled to Mexico, the man was beaten by Mexican police officers, kidnapped by a cartel, and threatened at gunpoint. He was only able to reenter the United States with assistance from his attorney.

- **DHS also expelled a middle-aged Mexican man who had been in the United States for at least several weeks after a Texas state sheriff pulled over the trailer truck he was driving in a small Texas town in July 2022.** The sheriff demanded to see the man's permit to drive the truck, which he produced, and then asked for his work permit, which the man did not have. The sheriff detained the man in an isolated area where the man was provided no opportunity to speak with U.S. officials or to make any phone calls before DHS expelled him to Mexico, according to Kino Border Initiative.

The U.S. government is also using Title 42 to expel asylum seekers and migrants to Mexico after they have been arrested, jailed for weeks or months, and subjected to state prosecution under Texas' illegal Operation Lone Star. These prosecutions violate Article 31 of the Refugee Convention which generally prohibits the penalization of asylum seekers for their entry or presence in a country to seek refugee protection. DHS's expulsion of asylum seekers subject to Operation Lone Star also interferes with their ability to defend themselves against pending state criminal charges and to challenge abusive and discriminatory treatment by state and local authorities. Examples of these wrongful expulsions include:

- **In August 2022, DHS expelled to Honduras a 22-year-old Honduran asylum seeker who had spent three weeks in Texas state custody after he was charged with criminal trespass under Operation Lonestar.** The young man had posted bond so that he could be released to challenge the criminal charges against him, but Texas authorities immediately turned him over to CBP upon release from custody. Though the man was visibly distressed and expressed his fear of returning to Honduras on multiple occasions, DHS expelled him to Honduras, where he remains in hiding from individuals who threatened his life, according to a South Texas legal services provider.

- **The same legal services office assisted two other Honduran individuals whom DHS expelled to Mexico under Title 42 after they had spent two months in Texas state custody on pending criminal charges under Operation Lonestar, which were dismissed.**

The expansive and expanded misuse of Title 42 is additional confirmation that the Title 42 policy has nothing to do with public health but has instead been wielded to punish people for migrating or for exercising their human right to seek asylum from persecution.

**Acknowledgements**

This report was written and researched by Julia Neusner, Kennji Kizuka, Eleanor Acer, Ana Ortega and Alejandra Aguilar Ruiz. Rebecca Gendelman, Ruby Ritchin, Robyn Barnard, Licha Nyiendo, and Jim Bernfield contributed edits to the report. Camille Chabot, Crystal Choi, Rosie Foulds, Lauren Good, Leslie Herrera, Hannah Ismael, Akif Khan, Diana Padilla Legaspi, Ana Linares, Valeria Gerber Mariscal, Chris Mathrua, Neeka Mirpour, Samantha Navarrete, Semantha Norris, Ivette Orozco, Jemma Paradise, Ashley Quezada, Kathleen Quinn, Rachel Raps, Gwenyth Rodriguez, Cole Seither, and Syeda Shagufta of the University of California Network for Human Rights and Digital Fact Finding (Berkeley, Santa Cruz, Los Angeles) contributed additional research for this report. Our thanks to the many colleagues, including those from Al Otro Lado, Las Americas Immigrant Advocacy Center, Hope Border Institute, Immigrant Defenders Law Center, Instituto para las Mujeres en la Migración, Kino Border Initiative, UC Hastings Center for Gender and Refugee Studies, and other attorneys, law firms, and service providers who provided case examples and assisted in referring asylum seekers for interview. Human Rights First thanks the donors and foundations who provide invaluable support for the organization's research on access to asylum and representation of asylum seekers. We thank the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

**Mission Statement**

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

© 2022 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org

# EXHIBIT 13

Case 2:26-cv-04821-MTL    Document 19-1    Filed 07/13/26    Page 366 of 399

ARTICLE

# Mexico's Asylum System: Good in Theory, Insufficient in Practice

March 15, 2023

Arturo Castellanos-Canales

SHARE

    

RELATED TOPICS

Border    Legal Immigration    Refugees/Asylees

**Updated on May 10, 2023 to reflect the start of the implementation of the Circumvention of Lawful Pathways Rule.**

On May 11, 2023, the Biden administration **started implementing a rule** that creates a presumption of **asylum ineligibility** that would severely

Skip to content

presumption of asylum ineligibility — with limited exceptions — for migrants who travel through a third country unless they apply for and are denied asylum before reaching the United States. Considering that most asylum seekers travel through Mexico to reach the United States, this paper explores Mexico's asylum system to determine whether it is an efficient, functional, and viable alternative for migrants to apply for asylum.

Mexico is a country whose asylum legal framework, in theory, is among the world's most inclusive and protective of asylum seekers. In recent years, Mexico has made significant legislative improvements to adapt to the new hemispheric migration patterns.[2] In addition, around 70% of asylum applications in Mexico are resolved favorably, granting refugee status to most applicants.[3] However, despite the good intentions of Mexican legislators and the high approval rate of asylum applications, the administrative authorities in charge of reviewing asylum applications are underfunded and face a growing number of asylum applications.

In addition, Mexico's economic and demographic circumstances are not ideally positioned to absorb large numbers of refugees. Finally, Mexico itself has systemic problems with gang and gender-based violence, undermining it as a destination country for asylum seekers fleeing gang and gender-based violence.

## Mexico's Asylum System

Asylum seekers looking for protection in Mexico have, in theory, a simple three-step path to being recognized as refugees:

Skip to content

**2.** Apply for asylum before the Mexican Commission for Refugee Help (COMAR); and

**3.** Wait 45 business days for COMAR to resolve their case.

## Step 1: Travel to Mexico

Except for political figures[4] and family members of refugees — who can apply for asylum abroad[5] — asylum seekers must travel to Mexico to apply for asylum.[6] Once in Mexico, migrants are eligible for asylum regardless of how they enter the country:

**1.** By commercial flight;

**2.** By land or sea at ports of entry; or

**3.** Between ports of entry.

Traveling commercially to Mexico can be fairly easy for nationals of some countries and very difficult for citizens of others.[7] Mexico does not require visas for citizens or permanent residents of the United States, Canada, Japan, the United Kingdom, the European Union, and the Schengen Area. In addition, nationals from any country member of the Pacific Alliance — namely Colombia, Chile, and Peru[8] — as well as Argentina, Australia, Bahamas, Belize, Bolivia, Costa Rica, Hong Kong, Iceland, Israel, Jamaica, Monaco, New Zealand, Panamá, Paraguay, and Uruguay can enter Mexico without a visa.[9] Moreover, individuals with valid visas from the United States, regardless of their nationality, do not require Mexican visas.[10]

Those who do not meet the criteria listed above must obtain a Mexican visa

Skip to content

to get a Mexican visa, foreign nationals must demonstrate their economic solvency by showing a bank account statement with an average balance of around $3,200 USD over the last three months. [11] They must also show proof of employment, with approximately $1,000 USD monthly earnings for the previous three months.[12]

If migrants are denied Mexican visas, they can travel by land or sea to Mexico — either through ports of entry or between them — and apply for asylum.

## Step 2: Apply for asylum before the Mexican Commission for Refugee Help (COMAR)

Once in Mexico, all migrants can apply for asylum at no cost within 30 days[13] of their arrival at any of the ten locations[14] of the Mexican Commission for Refugee Help (COMAR).[15] To apply for asylum in Mexico, applicants must demonstrate a reasonable fear of being persecuted, imprisoned, or tortured due to their race, religion, nationality, gender, membership of a particular social group, or political opinion.[16] In addition, asylum seekers are eligible for refuge in Mexico if they demonstrate that their liberty or life could be placed in danger by armed conflicts, systemic violence, or substantial human rights violations in their countries of origin.[17] The latter criterion makes Mexico's definition of refugee one of the most inclusive in the world and in line with the Cartagena Declaration on Refugees.[18]

## Step 3: Wait for COMAR's resolution

Skip to content

COMAR will also assign a Refugee Unique Code (CUR) that will allow applicants to access all public services, including healthcare and education.[20] With the certificate and the CUR, asylum seekers can obtain a Visitor Card for Humanitarian Reasons (TVRH), which allows them to work while the application is processed. [21] As a general rule, COMAR must complete the asylum process and notify the applicant within 45 business days from the date the process started.[22] However, due to backlogs related to the Covid-19 pandemic and an increasing number of asylum applications, some COMAR resolutions are taking up to 100 days. [23]

If COMAR denies asylum, applicants have 15 business days to appeal the decision.[24] If, after the appeal, COMAR denies asylum again, the agency must consider whether the applicant is eligible for complementary protection.[25] Complementary protection – equivalent to "withholding from removal"[26] in the United States – provides relief from deportation to asylum seekers who have failed in their claim for refugee status but whose lives would be in danger if sent back to their countries of origin.[27] The status of complementary protection grants access to all public services in the country.

# Rights of Refugees in Mexico

If COMAR grants asylum, the applicant immediately becomes a refugee. [28] Refugees in Mexico[29] have the right to apply for refugee status for their family members abroad.[30] Even after Mexico recognizes the refugee status of an individual, they have the right to apply for asylum in another country. In that case, Mexico suspends their refugee status while

Skip to content

the process in a third country is under consideration. However, that refugee status can resume when they return to Mexico.**[31]**

### *Access to public benefits and right to travel*

Refugees in Mexico have the right to access all public benefits, including free healthcare and education.**[32]** They also have the right to settle anywhere in the country as long as they notify COMAR of any change of residence.**[33]**

### *Specific protections for migrant children*

Notably, the Mexican asylum framework has specific provisions that protect migrant children, regardless of whether they are unaccompanied or traveling with a legal guardian.**[34]** All children who arrive in the country as migrants, and their legal guardians, are automatically granted humanitarian parole.**[35]** Once they are granted humanitarian parole, they can apply for asylum. Mexican law forbids the separation of migrant families when children are involved.**[36]** Moreover, the law forbids the detention of migrant children for reasons related to their migration status. **[37]**

# Obstacles to the Asylum Process in Mexico

While the asylum system in Mexico seems easy to navigate on paper, there are multiple obstacles hindering the asylum process in the country:

> **There are only 10 locations of COMAR across the country:** Asylum seekers can only apply for asylum before COMAR authorities.

Skip to content

have been overwhelmed by the growing number of petitions in recent years.[38]

**As a general rule, asylum seekers must remain in the state where they filed their asylum application:** Asylum seekers must present themselves every week at the COMAR location where they filed their application. The asylum process automatically ends if the applicant fails to appear before COMAR for two consecutive weeks.[39] Among the many problems derived from the lack of sufficient locations is that many of COMAR's offices are situated in some of the country's poorest states where labor opportunities are scarce. For instance, the busiest COMAR location is the one in Tapachula, Chiapas — Mexico's poorest state, where 76% of the population lives in precarious conditions below the poverty line.[40]

**COMAR is overwhelmed with the growing number of applications it receives:** Between 2014 and 2019, Mexico registered a 5,325% increase in the number of asylum applications — from 1,296 in 2014 to 70,314 in 2019. Asylum applications decreased in 2020 due to the Covid-19 pandemic, falling to 40,914. However, the number skyrocketed in 2021 to 129,791 applications, dipping slightly to 118,478 in 2022.[41] According to recent estimates, COMAR has been expecting a similar number of asylum applications in 2023. However, it is expected that the Biden administration's proposed rule will significantly increase the number of asylum applications filed in Mexico. Because applicants would be required to show an asylum denial in third countries they have transited through, thousands of migrants will presumably file for asylum in Mexico just to receive an initial denial permitting them to

Skip to content

**COMAR is an underfunded agency with a massive backlog:** Due to the increasing number of asylum applications, COMAR's annual budget has increased from $1.1 million USD in 2017[42] to $10.3 million USD in 2023.[43] However, that budget remains insufficient to provide adequate asylum services and handle the massive increase in the number of people applying for asylum.[44]

**Mexico's economic and demographic circumstances are not well-situated to absorb large numbers of refugees:** Mexico has the 15th-largest economy in the world, with a GDP of $1.2 trillion USD.[45] Compared to the United States' $23.3 trillion USD economy, Mexico's capacity to absorb refugees is limited. In addition, unlike America's aging population, Mexico's younger population generates excess workers[46] leading a considerable portion of its population to seek labor opportunities abroad.[47] These realities pose challenges to Mexico as it now attempts to absorb thousands of asylum seekers into its workforce.

**Mexico has a systemic problem of gang and gender-based violence:** Gender-based violence in Mexico is systemic. Over 70% of women in Mexico have experienced gender-based violence,[48] with an average of 6 women disappearing every day in the country.[49] Moreover, gang violence in Mexico took the lives of over 26,000 people in 2022 in Mexico.[50] Asylum seekers in Mexico have increasingly been victimized by gang violence and are regularly targeted by cartels and other transnational criminal organizations who take advantage of their vulnerability, with scores of those seeking protection being

Skip to content

thousands of asylum seekers fleeing violence in their countries of origin.

## Conclusion

In recent years, Mexico's asylum system has made significant legislative improvements to adapt to the new hemispheric migration patterns. The country's definition of 'refugee' is among the world's most inclusive, and its asylum agency – COMAR – has made real progress in recent years. As a consequence, the approval rate of asylum applications has improved considerably. However, problems remain – Mexico's asylum system is overwhelmed and underfunded.

Despite some recent strides, Mexico's asylum system is struggling to keep up with the massive uptick in hemispheric migration over the past half-decade, and Mexican economic and demographic numbers pose challenges to absorbing large numbers of asylum seekers. Persistent struggles with domestic violence and gang violence also pose a challenge in serving as refuge for those fleeing similar violence in their countries of origin.

Across the U.S.-Mexico border, the Biden administration's new rule that will force many U.S. asylum seekers to first apply for asylum in Mexico will only further strain the Mexican asylum system. The expected new surge of applications would likely overwhelm a system that is already struggling to operate under less-than-optimal conditions. While Mexico's asylum system has demonstrated progress and may eventually serve as an important hemispheric receiving country for those fleeing danger, it currently is not ready for the likely influx of asylum seekers it faces in the coming months and years.

Skip to content

Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 375 of 399

## Sources:

[1] Homeland Security Department and the Executive Office for Immigration Review; Notice of Proposed Rulemaking: Circumvention of Lawful Pathways; Federal Register. February 23, 2023. Available at **https://www.federalregister.gov/documents/2023/02/23/2023-03718/circumvention-of-lawful-pathways**

[2] See transitory articles of Ley de Migracion. Available at **https://www.diputados.gob.mx/LeyesBiblio/pdf/LMigra.pdf**

[3] Comisión Mexicana de Ayuda a Refugiados (COMAR); La COMAR en numeros: Estadistica enero 2023. February 16, 2023. Available at **https://www.gob.mx/comar/articulos/la-comar-en-numeros-327441?idiom=es**

[4] Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role. See Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 2-I.

[5] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 61.

[6] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 11.

[7] Viajeros en Ruta; Paises que necesitan visa para Mexico;

Skip to content

[8] Alianza del Pacifico; Available at **https://alianzapacifico.net/**

[9] Consulado General de Mexico en Atlanta; Personas exentas de presentacion de visa para viajar a Mexico; Available at **https://consulmex.sre.gob.mx/atlanta/index.php/visafee/247-personas-exentas-de-presentacion-de-visa-para-viajar-a-mexico#:~:text=Nacionales%20de%3A%20Argentina%2C%20Australia%2C,Uni%C3%B3n%20Europea%2C%20Uruguay%20y%20Venezuela**.

[10] Secretaria de Relaciones Exteriores de Mexico; Visas; Available at **https://consulmex.sre.gob.mx/boston/index.php/component/content/article/8-documentos-de-identidad/62-visas-ingles?Itemid=122**; Last Updated March 1, 2023.

[11] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at **https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf**

[12] Economic Commission for Latin America and the Caribbean (CEPAL); Requisitos para ingresar a Mexico; Available at **https://conferenciaelac.cepal.org/5/sites/default/files/pages/files/REQUISITOS%20PARA%20INGRESAR%20A%20MEXICO.pdf**

[13] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 18.

Skip to content

7/8/26, 1:56 PM
Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 377 of 399
Mexico's Asylum System: Good in Theory, Insufficient in Practice | National Immigration Forum

Palenque in the state of Chiapas, Guadalajara in the state of Jalisco, Saltillo in the state of Coahuila, Monterrey in the state of Nuevo León, Tijuana in the state of Baja California and Ciudad Juárez in the State of Chihuahua. *See* UNHCR, Contact COMAR. Available at [https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/](https://help.unhcr.org/mexico/en/where-to-seek-help/contacta-a-la-comar/)

[15] Comision Mexicana de Ayuda a Refugiados; Available at [https://www.gob.mx/comar](https://www.gob.mx/comar)

[16] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, I-II

[17] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 13, III

[18] Cartagena Declaration on Refugees, 1984; UNHCR. Available at [https://www.unhcr.org/en-us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-international-protection.html](https://www.unhcr.org/en-us/about-us/background/45dc19084/cartagena-declaration-refugees-adopted-colloquium-international-protection.html)

[19] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 22.

[20] UNHCR; How to Apply for Refugee Status in Mexico; Available at [https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/](https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/)

[21] Instituto Nacional de Migracion; Cambio a visitante por razones

Skip to content

https://www.gob.mx/tramites/ficha/cambio-a-visitante-por-razones-humanitarias/INM827

[22] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[23] UNHCR; How to Apply for Refugee Status in Mexico; Available at https://help.unhcr.org/mexico/en/como-solicitar-la-condicion-de-refugiado-en-mexico/

[24] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 25.

[25] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 29.

[26] American Immigration Council; The Difference Between Asylum and Withholding of Removal; October 6, 2020. Available at https://www.americanimmigrationcouncil.org/research/asylum-withholding-of-removal#:~:text=Individuals%20who%20have%20been%20banned,United%20States%20and%20work%20legally.

[27] Ruma Mandal; Protection Mechanisms Outside of the 1951 Convention ("Complementary Protection"); UNHCR; June 2005; Available at https://www.unhcr.org/435df0aa2.pdf

[28] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 26.

Skip to content

[29] Asylum seekers, refugees, and political asylees are three different concepts under Mexican law. An asylum seeker is a person who has left their country and is seeking protection from persecution and serious human rights violations in another country, but who hasn't yet been legally recognized as a refugee and is waiting to receive a decision on their asylum claim. A refugee is a person whose asylum claim was resolved favorably. Political asylees are public figures who have a reasonable fear of persecution due to their opinions expressed in their role.

[30] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 58.

[31] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 35 BIS.

[32] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 44.

[33] Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 49.

[34] Ley de Migracion; Art. 11

[35] Ley de Migracion; Art. 52-V-b

[36] Ley de Migracion; Art. 99

[37] Ley de Migracion; Art. 6

[38] UNHCR; How to Apply for Refugee Status in Mexico; Available at

Skip to content

**refugiado-en-mexico/**

[39] Reglamento de la Ley sobre Refugiados, Proteccion Complementaria y Asilo Politico. Art. 24.

[40] Consejo Nacional de Evaluacion de la Politica de Desarrollo Social (CONEVAL); Informe de evaluacion y pobreza Chiapas 2020; Available at **https://www.coneval.org.mx/coordinacion/entidades/Documents/Informes_de_pobreza_y_evaluacion_2020_Documentos/Informe_Chiapas_2020.pdf**

[41] Diego Badillo; Éxodo a Estados Unidos, sin precedentes, convierte a México en sala de espera de migrantes; El Economista; January 15, 2023. Available at **https://www.eleconomista.com.mx/politica/Exodo-a-Estados-Unidos-sin-precedentes-convierte-a-Mexico-en-sala-de-espera-de-migrantes-20230113-0069.html**

[42] Dan Kosten; Mexico's Asylum System is Inadequate; National Immigration Forum; October 29, 2019. Available at **https://forumtogether.org/article/mexicos-asylum-system-is-inadequate/**

[43] Alejandro Gomez; Presupuesto para Comar este 2023 superará los 196 millones de pesos; Diario del Sur; January 8, 2023. Available at **https://www.diariodelsur.com.mx/local/presupuesto-para-comar-este-2023-superara-los-196-millones-de-pesos-9434246.html**

[44] Jorge Butron, Comar admite crisis; "nos ven como agencia de viajes",

Skip to content

https://www.razon.com.mx/mexico/comar-admite-crisis-ven-agencia-viajes-513107

[45] Georank; Mexico vs the United States: Economic Indicators Comparison. Available at https://georank.org/economy/mexico/united-states

[46] United Nations Population Fund (UNFPA); Mexico: Population Pyramid; Available at https://www.unfpa.org/data/demographic-dividend/MX

[47] Emma Israel and Jeanne Batalova; Mexican Immigrants in the United States; Migration Policy Institute; November 5, 2020. Available at https://www.migrationpolicy.org/article/mexican-immigrants-united-states-2019

[48] INEGI; Violencia contra las mujeres en Mexico. April 29, 2022. Available at https://www.inegi.org.mx/tablerosestadisticos/vcmm/

[49] Secretaría de Seguridad y Protección Ciudadana; En México desaparecen 6 mujeres por cada día del año; El Economista; April 21, 2022. Available at https://www.eleconomista.com.mx/politica/En-Mexico-desaparecen-6-mujeres-por-dia-del-ano-SSPC-20220420-0166.html

[50] Oscar Lopez; As Mexico's epidemic of violence rages on, authorities seem powerless to stop it; The Guardian; December 8, 2022. Available at https://www.theguardian.com/world/2022/dec/08/as-mexicos-epidemic-of-violence-rages-on-authorities-seem-powerless-to-stop-it

Skip to content

[51] Miriam Jordan; Smuggling Migrants at the Border Now a Billion-Dollar Business; New York Times; July 25, 2022. Available at **https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html**

Author: Arturo Castellanos-Canales



# EXHIBIT 14

Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 384 of 399



**HUMAN RIGHTS WATCH**

"This Hell Was My Only Option"

  

DONATE NOW

November 9, 2023

# "This Hell Was My Only Option"

## Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap

**Available In**   English   Español



A Venezuelan woman, wearing a lifejacket, holds her daughter's hand as they walk from the Indigenous community of Canaán Membrillo to the riverbank, where they will take a canoe to the migrant reception center of San Vicente, both on the Panamanian side of the Darién Gap. © 2022 Human Rights Watch

📹 **Video**

**HUMAN RIGHTS WATCH**

"This Hell Was My Only Option"    **DONATE NOW**

# Summary

Over the last year, over half a million people have crossed the Darién Gap, a swampy jungle at the Colombia-Panama border, on their journey north, often to the United States. Venezuelans, Haitians, and Ecuadorians, but also people from other regions like Asia and Africa, risk their lives in this difficult terrain, where they are exposed to unchecked abuses by criminal groups, including sexual violence, and receive little protection or humanitarian assistance.

Human Rights Watch visited the Darién Gap four times between April 2022 and June 2023 and interviewed almost 300 people to document the drivers of, and responses to, this crisis. We documented why migrants and asylum seekers flee their own countries and are reluctant to stay in other countries in South America; how criminal groups abuse and exploit them on the way; and where Colombia's and Panama's responses fall short in assisting and protecting them, and in investigating abuses against them.



© 2023 Human Rights Watch

 
  

seekers fleeing human rights crises in Latin America to risk their lives crossing the Darién Gap. It suggests that restrictions on movement from South American countries to Mexico and Central America, often promoted by the United States government, have contributed—in combination with an increase in migration from South America to the United States—to sharp increases in numbers of people crossing the Darién Gap, exposing them to abuses, including sexual violence, and empowering organized crime in the area.

Between 2005 and 2020, the number of migrants in Latin America and the Caribbean more than doubled, from around 7 million to 15 million, according to the International Organization for Migration (IOM), making it the region with the highest growth globally of international migrants during that time.

Over 440,000 Venezuelans have crossed the Darién Gap since January 2022—the largest number for any nationality. They flee an ongoing humanitarian emergency in their country, which has undermined access to food and medicine, as well as abuses and persecution by security forces, armed groups, and gangs.



▶ Read a text description of this video

Ecuadorians and Haitians are also crossing the Darién Gap in large numbers. Many of the over 80,000 Ecuadorians who have crossed the gap since January 2022 flee increased

7/8/26, 1:57 PM This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 387 of 399



  

Haiti suffers a long-standing political, security and humanitarian crisis that has left all government branches inoperative, allowing overwhelming impunity for crimes committed by the brutal 300 criminal groups that control parts of the country. Over 63,000 Haitians have crossed the Darién Gap since January 2022.

On the Colombian side of the Darién Gap, the Gulf Clan, an armed group involved in drug trafficking, regulates the routes that migrants and asylum seekers can use, decides who can assist them on the way, extorts people who benefit from migrant flows, and establishes rules of conduct for locals and migrants alike, at times enforcing them through violence. The Colombian military estimates that the Clan collects, on average, US$125 per person crossing the Darién Gap. If the estimate is accurate, the armed group may have made a total of US$57 million between January and October 2023 from its control over this migration route, due in part to restrictive policies pushing migrants and asylum seekers through the Darién Gap to head north.

Criminals and bandits abuse migrants and asylum seekers as they cross the many routes across the jungle, especially on the Panamanian side. People are routinely robbed, sexually abused, and at times raped. Médecins Sans Frontières (MSF) has assisted 950 people, most of them women, who reported sexual violence crossing the Darién Gap since April 2021.

What is happening in the Darién Gap is the result of a range of failed policies across the hemisphere—and the urgent need for a rights-respecting response to protect people fleeing human rights crises in the region.

Governments in the Americas should take steps towards ensuring rights-respecting immigration policies building on the Los Angeles Declaration on Migration and Protection, signed by 21 states in the region in 2022. They should also seize the December 2023 Global Refugee Forum and the upcoming 40th anniversary of the 1984 Cartagena Declaration—a landmark international instrument on refugees' rights in Latin America—to respond to the increasing migration challenges in the region.

These governments should implement a region-wide temporary protection regime that would grant all Venezuelans and Haitians legal status for a reasonably timed and renewable term. Mexico and Central American governments, in particular, should ensure that their visa requirements do not effectively prevent access to asylum and push people to resort to dangerous crossings including the Darién Gap.


Case 2:26-cv-04831-MTL　Document 19-1　Filed 07/13/26　Page 388 of 399

protection or economic opportunities, asylum seekers and migrants deserve safe, orderly, and dignified paths to make their claims or to offer their skills. In all cases, they are entitled to basic safety and respect for their human rights during their journey.

## Related Content



**November 9, 2023** | News Release

### Americas: Migrants Pushed to Cross Darién Gap, Abused

Lack of Safe and Legal Pathways Risks People's Lives, Empowers Organized Crime

## Methodology

This report is part of a series of Human Rights Watch reports on migration in the Americas and the Darién Gap. Later reports are expected to focus on the drivers of migration in the region—including the situations in Venezuela, Haiti, and Ecuador, as well as the limited integration and regularization policies in other countries in South America—and on Colombia's and Panama's efforts to protect and assist people crossing the Darién Gap and to ensure accountability for crimes committed against them.

In researching the situation in the Darién Gap, Human Rights Watch visited the Colombian side of the Darién in April 2022 and June 2023 and the Panamanian side in May 2022 and



**"This Hell Was My Only Option"**

  

DONATE NOW

US, Costa Rica, or Mexico—were interviewed by phone. Interviews were conducted in Spanish, Portuguese, French, and English.

During its visits and by phone, Human Rights Watch also interviewed some 50 humanitarian workers from UN agencies and humanitarian organizations, as well as Colombian and Panamanian authorities within the national Ombudsperson's Offices, Attorney General's Offices, Ministries of Foreign Affairs, and migration offices, among others.

Human Rights Watch also interviewed by phone migration experts, as well as international, regional, and local organizations and legal clinics working with migrants and asylum seekers throughout the region, including in Brazil, Chile, Colombia, Ecuador and Peru.

Most migrants and asylum seekers and some humanitarian workers spoke to researchers on condition that we withhold their names and other identifying information. Interviewees' details have also been withheld when Human Rights Watch believed that publishing the information would put someone at risk. Human Rights Watch uses pseudonyms to identify migrants and asylum seekers interviewed during its research.

Human Rights Watch informed all participants of the purpose of the interview, its voluntary nature, and how the information would be used. Each participant orally consented to be interviewed. They did not receive any payment or other incentive. Where appropriate, Human Rights Watch provided migrants and asylum seekers with contact information for organizations offering healthcare, legal, social, or counseling services.

Human Rights Watch took care when interviewing survivors of abuses, particularly of sexual violence. When possible, Human Rights Watch received information from humanitarian workers supporting survivors to minimize the risk that recounting their experiences could further traumatize the survivors.

Human Rights Watch reviewed academic studies regarding migration flows in Latin America, as well as data and reports by the Colombian, Panamanian and US governments; UN agencies; international, regional, and local human rights and humanitarian organizations; local legal clinics; and media outlets.

Most significantly, Human Rights Watch obtained access and analyzed anonymized data from 1,382 surveys of migrants and asylum seekers conducted by the Office of the UN High



**"This Hell Was My Only Option"**

       DONATE NOW

As part of the research on migration in the Americas and the Darién Gap, Human Rights Watch sent multiple information requests to government authorities. Some of their responses will be also reflected in later publications. The information requests included:

- In July 2022 and July 2023, Human Rights Watch sent information requests to the following Colombian authorities regarding the departure of migrants and asylum seekers from Colombia and authorities' response: the Foreign Affairs Ministry, the Defense Ministry, the Interior Ministry, the national police, the national migration office (Migración Colombia), the Attorney General's Office, the Ombudsperson's Office, the Colombian Family Welfare Institute (Instituto Colombiano de Bienestar Familiar, ICBF), and the mayor's offices in Necoclí, Turbo, Acandí and Juradó. As of October 31, 2023, Human Rights Watch had received partial or complete responses from all Colombian authorities with the exception of the mayor's offices in Necoclí and Acandí and the national migration office.

- In July 2022 and March 2023, Human Rights Watch sent information requests to the following Panamanian authorities regarding the arrival of migrants and asylum seekers to Panama and authorities' response: the Foreign Affairs Ministry, the Ministry of Public Safety, the Ministry of Health, the National Migration Service (Servicio Nacional de Migración, SNM), the National Border Service (Servicio Nacional de Fronteras, SENAFRONT), the Attorney General's Office, the Ombudsperson's Office, the National Service for Children, Adolescents and Families (Secretaría Nacional de Niñez, Adolescencia y Familia, SENIAF), and the National Office for Refugee Care (Oficina Nacional para la Atención de Refugiados, ONPAR). As of October 31, 2023, Human Rights Watch had received partial or complete responses from all Panamanian authorities. The Health Ministry and the Attorney General's Office had not provided updated information corresponding to events occurring in 2023.

# I. The Darién Gap Crossing

   

but between South and Central America. The Pan-American Highway, which connects Alaska (in the US) and Ushuaia (in Argentina), is interrupted only for the 66 miles of dense jungle.

The terrain is steep and slippery, the rivers rushing, especially during rainy season. Most routes follow paths that crest a rugged mountain range with ridges as high as 6,000 feet— where flags mark the Colombian-Panamanian border. People crossing call the highest pass "Death Hill" (Loma de la Muerte) and the Turquesa river "Death River" (Río de la Muerte), for the large number of dead bodies in its waters.[2] Temperatures range from 20 to 35 degrees Celsius (75 to 95 degrees Fahrenheit), with heavy rainfall and flooding from May to December.

The Colombian side of the border is mostly at the Urabá region, named after the Urabá Gulf. Four Colombian municipalities directly border the Darién jungle: Juradó, Riosucio, Unguía and Acandí, all in Chocó state. The latter three are considered among Colombia's most affected by decades of armed conflict, poverty, and a weak state presence.[3] The four encompass a total population of roughly 99,000,[4] including people living in Indigenous Embera Katío and Embera Dobida reserves,[5] as well as people living in Afro-Colombian communities that, under Colombian law, are governed by "community councils" (consejos comunitarios).[6] Acandí, from which most migrants and asylum seekers launch toward Panama, has three main community councils: *Consejo Mayor de Comunidades Negras de la Cuenca del Río Acandí y Zona Costera Norte* (COCOMANORTE), *Consejo Mayor de Comunidades Negras de la Cuenca del Río Tolo y Zona Costera Sur* (COCOMASUR) and *Consejo Mayor de Comunidades Negras de La Cuenca del Río Acandí Seco, El Cedro y El Juancho* (COCOMASECO). Many migrants start the journey through the Darién in Necoclí, Antioquia state, a roughly 45,000-person coastal town near the Caribbean Sea.[7]

In Panama, the Darién jungle extends through a province with the same name. Indigenous Kuna, Emberá and Wounaan people live within the Darién province in "comarcas," territories under Indigenous jurisdiction recognized by Panamanian law.[8] More than 13,000 people from 40 different communities—including Bajo Chiquito and Canaán Membrillo—live in the 4,383-km Emberá-Wounaan comarca in the Darién, according to Panama's National Institute of Statistics and Census (Instituto Nacional de Estadísticas y Censos, INEC).[9]

## Migration through the Darién Gap


   

more than 70 nationalities,[10] have made the journey through "one of the most dangerous migration routes," according to the International Organization for Migration (IOM).[11] That number has increased dramatically in recent years.

In 2010, Panama began officially registering migrant crossings. From 2010 through 2014, Panama averaged fewer than 2,500 crossings per year. The first real peak of people crossing through the Darién Gap took place in 2015 and 2016 with roughly 30,000 registered arrivals each of those two years. Those crossings were mainly by Cubans and Haitians, Panamanian data shows, followed by nationals of other countries in Africa and Asia.[12] Between 2010 and 2019, more than 109,000 people crossed.

## Numbers of Migrants and Asylum Seekers Crossing the Darién Gap



Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023).



Despite a significant drop from in 2020, caused by border closures and quarantine measures adopted in response to the Covid-19 pandemic, the number of people crossing the Darién Gap soared by almost 4,000 percent between 2020 and 2022.[13] More than 130,000 migrants, particularly Haitians and Cubans, crossed the Darién Gap in 2021.[14] In 2022, the number of crossings increased to 250,000, with a surge of Venezuelans and Ecuadorians.[15] Between January and October 2023, more than 457,000 people crossed the Gap, a record number that has already surpassed estimates made by the Panamanian government for the entire year.[16]

7/8/26, 1:57 PM
Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 393 of 399
This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW



"This Hell Was My Only Option"    DONATE NOW



Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed September 27, 2023).

Through 2018, migrants and asylum seekers crossing the Darién were mainly adult men. Since 2019 this has changed.[17] Families with children are crossing, as are women—at times pregnant or breastfeeding—alone with their children, and unaccompanied or separated girls, boys, and adolescents.[18] Around 22 percent of those crossing between January and September 2023 were children.[19]

## The Gulf Clan's Role

Armed groups have been present in Urabá since the 1970s. These have included the Revolutionary Armed Forces of Colombia (Fuerzas Armadas Revolucionarias de Colombia, FARC) guerrillas and paramilitary groups, which at times engaged in fighting.[20]

The Gulf Clan, also known as Gaitanist Self-Defense Forces of Colombia (Autodefensas Gaitanistas de Colombia, AGC), has been the main armed group in the region since the FARC's 2016 peace accord with the Colombian government.[21] In 2020, the Clan defeated the National Liberation Army (Ejército de Liberación Nacional, ELN), which had also been present in the Urabá municipalities of Juradó, Riosucio and Carmen del Darién.[22]

7/8/26, 1:57 PM — This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-1    Filed 07/13/26    Page 394 of 399



**"This Hell Was My Only Option"**          DONATE NOW

including drug and arms trafficking, and extortion, and imposes rules to control people's daily life and economic activities.[25] "Everything that happens in Necoclí occurs under the supervision of the Clan," a man who had worked in a boat company moving migrants and asylum seekers told Human Rights Watch.[26]

For example, for five days in May 2022, the Clan declared an "armed strike" restricting civilians' movements in over 190 municipalities across 13 states.[27] These included the Urabá region, where people were forced to stay home and schools, offices and stores were closed. [28]

When the Clan's then-leader Dairo Antonio Úsaga, known as "Otoniel," was arrested, in October 2021, the group increased its involvement in the flow of migrants and asylum seekers across the Darién.[29] Today the Clan performs three main roles in connection with the flow of migrants and asylum seekers in the Darién Gap:

- The Gulf Clan regulates the routes that migrants and asylum seekers can use and decides who can assist them on the way.[30] As described below, the Clan has closed several routes, including apparently by killing a community leader involved in the movement of migrants. The Community Councils, which organize the routes, ask the Clan for permission to use certain routes, a prosecutor said.[31] The group wants to avoid migrant flow on the land routes it uses for drug trafficking, according to a prosecutor and officials with the Ombudsperson's Office.[32]

  The group also uses the migrant flow to divert attention from the movement of cocaine by sea.[33] Two people who help migrants and asylum seekers in Necoclí, for example, told Human Rights Watch that Gulf Clan members summoned them to a meeting in March 2022 and told them to take migrants and asylum seekers to boat companies that operate unlawfully out of Totumo, a small town inside Necoclí, to Carreto, in Panamá. [34] These boats often travel parallel to boats carrying cocaine.[35] When the Navy intervenes, the boatmen throw the migrants and asylum seekers into the sea and flee, several sources said.[36]

  The Clan has also set up systems to track migrants' and asylum seekers' payments to cross the Darién Gap. These included giving out bracelets to those who paid and, more recently, putting stickers on their passports or IDs.[37]

7/8/26, 1:57 PM       This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL     Document 19-1     Filed 07/13/26     Page 395 of 399



  
among others, from "taxes from the illicit activities."[39] These include people who rent their homes, sell boat trips, or provide services as "guides" across the jungle. A prosecutor estimated that the Clan gets 20 percent of all the income related to migration activities.[40] Colombia's Ministry of Defense told Human Rights Watch that the Gulf Clan obtains approximately US$125 for each migrant or asylum seeker crossing the Gap.[41]

- The Gulf Clan establishes rules on the local population and migrants and asylum seekers—and at times enforces them through threats and killings.[42] These include prohibitions on harming migrants and asylum seekers.[43] For example, in November 2021, the Clan apparently killed a "guide" who had sexually abused migrants.[44] "They conduct 'social cleansing,'" a man who worked in a boat company said, referring to the killing of alleged criminals. They maintain a lower level of violence and abuses to avoid drawing the attention of security forces, he and others said.[45]

## Journey through the Darién Gap

Transit routes through the Darién Gap have changed, over the years, in response to the needs of migrants and asylum seekers and restrictions imposed by Panamanian authorities as well as by the Gulf Clan.

The journey is a profitable business for many, including the Gulf Clan, communities in Colombia, and Indigenous groups in Panama. Tens of millions of dollars can circulate through the Darién each year due to activities related to migrants and asylum seekers.[46]

Migrants and asylum seekers often pay high fees to cross the gap, with prices depending on the routes they take. This includes fees for the people known as "guides," who show migrants and asylum seekers the routes and often accompany them part of the way. The level of risk to which migrants and asylum seekers are exposed during the journey depends in large part on the route they can afford.[47]

UNHCR estimates that almost 70 percent of the people crossing between July 2022 and January 2023 paid for a guide.[48] A member of the Colombian Ombudsperson's Office told Human Rights Watch that guides operate in a "relay system."[49] At the border, Afro-



**"This Hell Was My Only Option"**

     DONATE NOW

Some migrants and asylum seekers told Human Rights Watch that guides helped them carry their bags—and even their children—during the first part of the journey. Others said guides abandoned them at the border or even handed them over to criminal groups that abused them.[51]

The first part of the journey, approaching the Darién from Colombia, is generally accomplished by sea, which is easier than land. By September 2023, around 1,000-1,700 people were departing from Necoclí every day to cross the Gap, according to the Interagency Group for Mixed Migration Flows (Grupo Interagencial de Flujos Migratorios Mixtos, GIFMM), a coordination platform for humanitarian actors and government agencies in Colombia.[52]

Most people arriving in Panama started their journey from one of two Necoclí docks authorized by Colombian authorities.[53] The boats traditionally departed from Necoclí to take tourists to Acandí beaches, but the arrival of migrants and asylum seekers shifted their business purpose. Migrants and asylum seekers buy the same boat tickets as tourists but pay twice the price[54]—over US$40, compared to US$18.[55]

Boats from the authorized docks provide lifejackets, formal tickets, and established departure times.[56] Colombian authorities do not keep their own register of the people leaving. They rely on boat companies to register the names and passport number of every person they are transporting.[57]

Other migrants and asylum seekers start their journeys in the city of Turbo, a port district an hour south of Necoclí, with 133,430 inhabitants.[58] The route through Turbo turned popular again in 2023 after being largely unused for several years.[59] The GIFMM and the Mayor's Office estimated that around 500-1,000 people were departing each day from Turbo by September 2023.[60] Departing from Turbo is cheaper, and the route appears to be used by migrants and asylum seekers with fewer financial resources, particularly Venezuelans and Ecuadorians.[61]

Humanitarian workers and Colombia's Ombudsperson's Office told Human Rights Watch there are also unauthorized boats departing from other beaches in Necoclí and Turbo.[62] Between 2021 and 2022, the Colombian Navy intercepted "approximately seven illegal boats carrying approximately 106 people," according to the Ombudsperson's Office. These boats



**"This Hell Was My Only Option"**

     DONATE NOW

Passengers generally debark in Acandí or Capurganá, Colombian territory on the other side of the Gulf of Urabá. Once there, migrants and asylum seekers are taken—reportedly on motorcycles—to organized camps, commonly called "albergues" (the Spanish word for "shelters"), that are established or controlled by Afro-Colombian community councils or private actors. Government officials are not present in any of the shelters and one humanitarian organization, the Colombian Red Cross, is present in one of them.[64]

In 2022, COCOMASECO managed two shelters in Acandí, one in the urban area and another one in Las Tecas.[65] In 2023, COCOMASECO lost control of these shelters to a Neighborhood Action Committee (Junta de Acción Comunal, JAC) in Capurganá, a unit of social organization.[66] According to some interviewees, this change, was influenced by the Gulf Clan and the Neighborhood Action Committee is formed by members of COCOMANORTE. [67]

The Neighborhood Action Committee controls two more shelters. One is located in Capurganá, in the area of El Platanal, and is known as Abel Pacheco, according to the Ombudsperson's Office.[68] The Colombian Red Cross operates there.[69] In February 2023, the Inspector General's Office said the shelter had "no investment or support from local or national authorities."[70] The other one is located in the town of Astí, further into the jungle. It is in "precarious" conditions, a person who visited said.[71]

To access the shelters and guiding services, migrants and asylum seekers pay around US$100-300 before leaving Necoclí. Migrants and asylum seekers receive evidence that they have paid —previously, a bracelet; more recently, a sticker on their passport or ID.[72] People controlling shelters do not allow migrants or asylum seekers to start their journey without paying.[73] Armed men have threatened some migrants and asylum seekers who did not pay. [74]

After staying in for a couple of hours or overnight, migrants and asylum seekers start their several-days-long journey through the jungle, sleeping in their tents along the way. Interviewees describe climbing steep hills until reaching a summit, where a flag marks the border with Panama.[75] While UNHCR estimates that, on average, it takes people four days to cross the Darién Gap, some migrants and asylum seekers said it took them up to 12 days. [76]

7/8/26, 1:57 PM
Case 2:26-cv-04831-MTL   Document 19-1   Filed 07/13/26   Page 398 of 399
This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW



"This Hell Was My Only Option"               DONATE NOW

Comegallina. While crossing this area, criminals attack many migrants and asylum seekers, including by committing robberies and sexual violence, according to their statements and information provided by Panama's Ombudsperson's Office and humanitarian organizations. [77] (See section II below regarding abuses against people crossing the Darién Gap.)

Arriving at Comegallina, migrants and asylum seekers employ Indigenous people in small wooden canoes, known as "piraguas," to transport them to the Indigenous community of Bajo Chiquito and then to the Migrant Reception Station (Estación de Recepción Migratoria, ERM) of Lajas Blancas.[78]

During the second half of 2021, most migrants heading to the gap were coming through Acandí. The flow diminished for a while after Fredy Pestana, the leader of the community council of COCOMANORTE, was killed in December 2021, apparently at the hands of the Gulf Clan, according to several sources.[79] Since the end of 2022, the flow through Acandí has picked up again.

Some migrants and asylum seekers take a longer route passing through different Panamanian Indigenous settlements like Punta Carreto, Dos Bocas, and El Abuelo, arriving at the Indigenous community of Canaán Membrillo. From there piraguas take them to the ERM of San Vicente.[80] This was mostly unused for several months after the end of 2022, but numbers of arrivals seem to be increasing again.[81]

The following map depicts these routes, as well as others that Human Rights Watch identified as less popular or that have lost their popularity in recent years. These include a route starting in Unguía, in Colombia's Chocó state, and ending in the Guna Indigenous communities of Paya and Payita, in Panama;[82] and the route between Juradó, a Pacific-coast municipality in Colombia, and Jaqué, in Panama.[83]



© 2023 Human Rights Watch

# The Role of Misinformation

Reliable information about the Darién Gap is hard to obtain. In February 2023, Panama, Colombia, and the US announced coordinated efforts to, among other things, "combat



**"This Hell Was My Only Option"**

  　DONATE NOW

According to Human Rights Watch interviews, migrants and asylum seekers often rely on social media and word-of-mouth from friends and family for information.[85] In October 2023, UNHCR said that seven out of ten people surveyed learned about the journey through family and friends. Another 35 percent used TikTok and 29 percent Facebook.[86] Misinformation, especially coming from social media, benefits smugglers, who can spread erroneous information, humanitarian workers said; inaccurate information obtained from these sources can also be difficult to counter.[87]

Humanitarian organizations strive to inform migrants about the risks, abuses, and available services at the other side of the border, and about new migration policies and practices, such as the CBP One app in the US.[88]

But given the lack of safer routes and the human rights situations they flee, many people are unlikely to be dissuaded.[89] "The answer we get from them is 'yes, I know it is difficult, but with God's help I will continue,'" a humanitarian worker said.[90]

Some migrants and asylum seekers interviewed on the Panamanian side said they regretted risking their lives in a journey that was more dangerous than they expected. But others said they would do it again if it was necessary to seek protection and opportunity.[91]

Human Rights Watch interviewees appeared to be more knowledgeable about the risks and abuses of crossing the Darién, such as robberies and sexual violence, than about US immigration policies.[92]

---

## II. Abuses and Risks in the Darién Gap

During their days-long walk across the gap, migrants of all nationalities frequently experience robbery and serious abuses, including sexual violence.[93] They also face rushing rivers, mosquito-borne diseases, and venomous pit vipers.[94]