7/8/26, 1:57 PM "This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL Document 19-2 Filed 07/13/26 Page 1 of 120



**"This Hell Was My Only Option"**

   DONATE NOW

the most dangerous part of their journey so far. Migrants and asylum seekers reported trauma, illness and deaths, assaults related to theft and sexual violence, and other physical violence.[95]

Similarly, over 30 percent of the around 1,380 people interviewed by UNHCR in the Darién Gap between July 2022 and June 2023 suffered some type of abuse in the jungle, including theft (20 percent), fraud (14 percent), and threats or other acts of "intimidation" (11.3 percent).[96]

# Thefts, Robberies and Threats

Many migrants are threatened or robbed when they cross the Gap.

The Panamanian Attorney General's Office told Human Rights Watch they had opened 43 investigations into "crimes against property" (such as armed robbery) in the gap in 2021 and 65 from January through July 2022.[97]

Most robberies appear to take place on the Panamanian side of the border. Migrants and asylum seekers told Human Rights Watch of being robbed after they passed a Panamanian flag that allows them to identify the border or a couple of days or hours before arriving in Comegallina.[98] "The majority of the cases occur when migrants are descending the hill on the Panamanian side," one Panamanian prosecutor said.[99]

Several migrants and asylum seekers described being ambushed in the jungle by groups of about 8 to 15 armed men. Some said the perpetrators wore plain clothes. Others described military-style clothes, such as camouflage.[100]

Some victims said the robbers used pistols; others described hunting rifles and machetes. A Panamanian prosecutor confirmed that these are the common weapons.[101]

The dynamics of the robberies are often the same, according to those interviewed by Human Rights Watch. Perpetrators ambush a group at gunpoint and make people kneel or lie on the ground, then demand their money. Generally, they ask for US$100, but they open bags and backpacks, taking the scarce belongings that migrants are carrying or even wearing: food,



     DONATE NOW

**Louis Gerard** (pseudonym), a 38-year-old Haitian and his wife, sister, and 4-year-old son came north from Brazil.[103] It took them five days to cross the Darién jungle from Necoclí to Bajo Chiquito, he said. Some six to eight men ambushed them midway, wielding "short and long guns." The bandits asked if they were Haitians, demanded US$100 per person, and rummaged through their bags, taking all their clothes and food. Most worrisome to Louis was that his son had nothing to eat "for days."

**Samson Noel** (pseudonym), 30, left Cameroon after the Cameroonian government killed his father, he said.[104] Two months later, his group of people, mostly Haitians, took the route from Capurganá to Canaán Membrillo across the Darién Gap. They made it over the steep, slippery, exposed slopes of the "Death Hill," but on their second day of wending through the jungle, they were ambushed. Nine armed men with their faces covered, some wearing military-style clothes, made them lie on the ground, asked for US$100, and emptied the migrants' bags. From Samson, they took US$500, along with his cellphone, toiletries, and shoes. The men hit and threatened to kill those who had little or no money, Samson said.

**Luciana**, 31, and **Juan Herrera** (pseudonyms), 32, left Venezuela, leaving their three children, ages 2, 6, and 11, behind, with the hope of sending them money from the US.[105] "I used to say I would never leave, but the situation was impossible to sustain and I was forced to leave to be able to ensure a future for my children," Juan said. They walked for five days, along with others, between Capurganá and Bajo Chiquito.

A group of six men, wearing hoods and black clothes, assaulted them, demanding US$100 from each person in the group. The men had rifles, guns, and machetes, Juan and Luciana said. "Look straight or we will kill you," one said. The armed men took a young woman aside, letting her go once her brother paid. Frightened, she ran away and almost fell off a cliff, Juan recalled. Those in the group who did not have money were forced to turn back.

## Sexual Violence

Hundreds of people, most of them women, have suffered sexual violence while crossing the Darién in recent years, according to humanitarian organizations.

7/8/26, 1:57 PM   "This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 3 of 120

   

other types of sexual abuse) against migrants and asylum seekers in the Darién in 2021 and 32 between January and July 2022.[106] However, significant underreporting of such crimes to authorities is likely.

Médecins Sans Frontières (MSF) assisted 328 people who reported sexual violence while crossing the Darién between April and December 2021;[107] 232 in 2022; and 390 between January and October 2023.[108] MSF considers the total number of victims is likely higher.[109]

Victims, humanitarian workers, and Panamanian authorities told Human Rights Watch that in most cases of sexual violence, armed men ambushed groups of migrants and asylum seekers, separated them by gender, and forced the women to take off their clothes. Women said that the men sexually assaulted them, often under the pretext of searching for hidden money, and in some cases raped them.[110]

> **Rita Mendes**, a 39-year-old Angolan woman, crossed the Darién as part of a group, with her husband **José**, 49, and their daughter **Ana**, 12.[111] They said they were robbed twice after leaving Colombia. Two days before they reached Armila, on the Panamanian side, a group of eight or nine men ambushed them, Rita said, making them kneel, at gunpoint, and robbing them of the belongings in their bags. "Before asking us for money, they divided us by nationality," José added. The assailants' faces were covered, he said, some wore jeans, while some wore military-style clothes with camouflage. Two days after the migrants passed Armila, another group of armed men ambushed them, holding them around six hours. This time, the assailants separated the women. José said that he was beaten when he tried to stop them. Two men held a machete to Rita's neck, then hit her with a rifle butt, knocking her to the ground, and raped her. Afterwards, the two held the machete against Ana and raped her. The Panamanian SENAFRONT officers to whom Rita and Ana tried to report the rapes the next day "showed no empathy," Rita said. Humanitarian organizations provided them with medical care.

> **Beatrice Mathieu** (pseudonym), a 35-year-old Haitian, crossed the Darién with her husband, as part of a group of 16 migrants.[112] Six men with their faces covered ambushed the group, shooting their guns in the air, she said.



**HUMAN RIGHTS WATCH**

"This Hell Was My Only Option"

     DONATE NOW

rape me," she said. The armed men did the same to another five women from her group, she said.

**Jean Baptiste Devon** (pseudonym), a 42-year-old Haitian man, crossed the Darién Gap with his wife **Marie Claire** (pseudonym), 30, and their 6-month-old daughter.[113] A group of six to eight armed men ambushed them, he said. The men sexually assaulted her while asking where the money was. "They threatened they were going to rape my wife and daughter." Jean Baptiste gave them US$50 he had hidden in his sock, and the armed men let them go.

Armed men ambushed **Fabiola Moise** (pseudonym), a 22-year-old Haitian woman travelling as part of a group, with her husband and 1-year-old son, on their third day in the jungle.[114] The men separated her and other two women from the group. One man shoved her against a tree and sexually assaulted her, she said. A second man joined in the assault, asking her where the money was. She pointed to her boots. They took all the money she had stored there and let her go.

While most survivors of sexual violence in the Darién are women and girls, survivors also include men and boys, according to survivors, humanitarian organizations, and the Colombian and Panamanian Ombudsperson's Offices.[115]

**Ernesto Borja** (pseudonym), a 34-year-old Venezuelan man crossed the Darién as part of a group.[116] He said that a couple of hours before arriving in Comegallina, people armed with machetes ambushed the group. They asked all the migrants for US$100 and hit Ernesto, including with rocks, and kicked him in the knee and head with their heavy boots. They made all the migrants take off their clothes. They sexually assaulted all the men and women in the group, saying they were looking for money. After finding US$200 that Ernesto was hiding, they let the group go.

## Deaths, Disappearances, and Missing People

Many migrants have lost their lives or disappeared trying to cross the Darién Gap.



"This Hell Was My Only Option"

   DONATE NOW

in the Gap, reported recovering eight more bodies.[117] The Panamanian Attorney General's Office told Human Rights Watch of 72 investigations arising from bodies found in the Darién between January 2021 and July 2022.[118]

The IOM's Missing Migrants Project reported that at least 229 people had disappeared in the Darién between January 2021 and September 2023.[119] It also said that "anecdotal reports" suggested that figure represented "only a small fraction of the true number of lives lost."[120] Current practices for counting missing migrants only cover a portion of those who are missing, mainly relying on information from state officials.[121]

Panamanian Ombudsperson Eduardo Le Blanc told Human Rights Watch that, because Colombia does not register people leaving, there is no way to know who is missing or establish what proportion of migrants and refugees make it to Panama.[122]

Many migrants and asylum seekers told Human Rights Watch that they saw human bodies, sometimes more than a dozen, along the way.[123] Similarly, in October 2023, UNHCR reported that almost 50 percent of the over 114 migrants and asylum seekers surveyed said they saw between 1 and 15 bodies.[124]

The causes of death include drownings and, in some cases, homicides. In many cases, authorities have not determined the cause of death. Of 124 bodies that SENAFONT has recovered since 2021, they listed 74 as drownings, one as a homicide (of a Venezuelan child), and 28 as "unknown." As of April 2023, authorities had failed to identify the gender of 30 bodies and the nationality of 77.[125]

Human Rights Watch received credible reports that armed men decapitated and dismembered people.[126] Colombia's and Panama's Ombudsperson's Offices, as well as a humanitarian worker, recounted stories of bodies thrown off cliffs or burned.[127]

The Panamanian Attorney General's Office and SENAFRONT told Human Rights Watch they collaborate to find and bring back bodies for identification.[128] The Attorney General's Office performs autopsies and collects evidence, to notify embassies or consulates or to create a genetic profile for a database for future comparisons.[129] But Panamanian prosecutors reported difficulties in identifying bodies and causes of death, due to their decomposition.[130]



**"This Hell Was My Only Option"**

         DONATE NOW

to trees on either side of the river. Young men helped carry children and personal belongings. "I tied a little Chinese girl to my body and crossed the river," a young Venezuelan said. "My feet did not touch the riverbed." The girl's frail mother was swept away, he said, and two young men jumped in to save her. "Luckily, they could," he said. "Not all survive."[131]

**Alejandro and Jasmin Velez** (pseudonym), both 36, lost their 6-year-old son Isaac (pseudonym) in the Darién. The couple, originally from Venezuela, had headed north from Quito, Ecuador. They set out across the Darién from Acandí, in October 2022 with Isaac and their other sons, ages 10 and 4 years. [132] They travelled with a group of Venezuelans, including colleagues Alejandro met in Quito. As they struggled through the dense jungle, a man in their group, whom they did not known before their journey north, offered to help with Isaac, they told Human Rights Watch, to allow them all to move faster. Reluctantly, they accepted his help. The man carrying Isaac and some other members of the group moved fast, eventually leaving them behind. The river was in flood, and they made camp on its banks, hoping the flow would abate by the next day.

Early the next morning, Alejandro, Jasmin and their two children managed to cross the river. They walked fast, hoping to catch up with the man and Isaac. When they arrived at the first, improvised camp in Panama, their friends said that Isaac had been taken by the river, probably drowned.

Alejandro and Jasmin tried to file a complaint in Bajo Chiquito, but there was no prosecutor there. Two days after the alleged drowning, they were able to file a complaint in Santa Fe, a town 30 minutes away by car from the ERM San Vicente. The prosecutor's office found and spoke to the man who carried Isaac and his friends, who confirmed that Isaac drowned in the river. That group left Panama shortly after.

It took the authorities eight days, after receiving the complaint, to send search parties to the river. Interpol, the international police organization, published a yellow notice—a global alert for a missing person—on November 30, about a month-and-a-half after Isaac's disappearance.

As of October 26, 2023, he had not been found.

7/8/26, 1:57 PM    "This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 7 of 120

 **"This Hell Was My Only Option"**         DONATE NOW

migrant and never learn what happened.[133]

> **Eduardo González** (pseudonym), a 35-year-old Venezuelan, lost track of his wife Rosario (pseudonym) in the Darién.[134] He had asked a man in the group to hold their 3-year-old son Lucas (pseudonym) so that he could help his wife, who was falling behind on the steep trail. But she implored him to leave her and catch up with the man who was holding Lucas. He did so. When Human Rights Watch spoke to him, at the San Vicente ERM, Eduardo and Lucas had been there two days, waiting for her. "She disappeared," Eduardo said.

The UN Committee on Enforced Disappearances reported, in November 2021, receiving allegations of "disappearances of migrants apparently committed by criminal groups" and "mass graves of unidentified migrants" in the Darién jungle.[135] The committee noted a "lack of investigations into such allegations." Panamanian authorities have dismissed reports of mass graves.[136]

## Dangerous Natural Conditions and Diseases

The dangers of the Darién jungle are notorious, ranging from flash floods and mosquito-borne dengue fever and malaria to falls from cliffs. The steep, slippery climb to the border saps the strength of many migrants and asylum seekers. On the Panamanian side, river crossings, always treacherous, may be deadly during rainy season. Migrants sleep in makeshift camps, exposed to storms, and their food supplies often run low.[137]

Some of the bodies recovered in the Darién Gap have shown evidence of cardiopulmonary arrest or other health problems, SENAFRONT told Human Rights Watch.[138] SENAFRONT officers rescued 143 people, between January 2021 and April 2023, suffering health emergencies including seizures, dehydration, fever, vomiting, fractured bones, and risk of miscarriage.[139]

The Panamanian Ombudsperson's Office notes gastrointestinal and respiratory diseases and skin conditions from mosquito and other insect bites as risks to migrants' and asylum seekers' health.[140] Of the over 35,900 migrants and asylum seekers who received health care



conditions (15 percent).[141]

## III. How a Lack of Legal Pathways Pushes People to Cross the Darién Gap

Between 2005 and 2020, the number of migrants in Latin America and the Caribbean more than doubled, from around 7 million to 15 million, according to the IOM, making this the region with the highest growth globally of international migrants during that time.[142]

In June 2022, 21 countries, including the United States, Mexico, Costa Rica, Panama, and Honduras, signed the Los Angeles Declaration on Migration and Protection at the Summit of the Americas in Los Angeles.[143] The declaration, spearheaded by US President Joe Biden, includes commitments to strengthen and expand ways for people to safely and legally migrate and seek asylum and to pursue accountability for those who commit abuses against migrants.

However, a growing number of Latin American governments have imposed restrictions, often promoted by the US, on people trying to enter their countries, at times violating their human right to seek asylum.[144] Recently imposed visa requirements, for example, are preventing migrants and asylum seekers from several Latin American countries from flying to Mexico and Central American countries.[145]

Instead of effectively reducing the flow of migrants and asylum seekers, these policies force people on the move to take irregular and dangerous routes.[146] As shown below, data suggests that the visa requirements implemented by Mexico and Central America governments are one factor contributing to the increase of migrants crossing the Darién Gap. Venezuelans and Ecuadorians have migrated to the southern US border in large numbers in recent years but have used routes other than the Darién Gap. Following the implementation of visa requirements for Venezuelans and Ecuadorians, the numbers of people of both nationalities crossing the Darién Gap have skyrocketed, suggesting a relationship between the policy and increased crossings.



**"This Hell Was My Only Option"**

     DONATE NOW

Since 2014, a devastating humanitarian crisis and repression and persecution in Venezuela have been causing its people to leave, with some unable or unwilling to return.[147] The Venezuelan exodus represents one of the largest displacement crises in the world, with some 7.7 million living abroad.[148]

At first, people fleeing the country headed mostly to South American countries, such as Colombia, Ecuador, Perú, Chile, and Brazil.[149] But the Covid-19 pandemic and related lockdowns increased poverty and inequality and undermined employment opportunities across South America, prompting many Venezuelans to travel north.[150] These problems were compounded by increased xenophobia in the region, with Venezuelan migrants being scapegoated for problems like insecurity, job losses, and inadequate responses to the pandemic.[151]

Visa restrictions in Mexico and Central America have prevented Venezuelans from bypassing the Darién Gap by flying north. In early 2022, Mexico, Costa Rica, and Belize imposed visa requirements on Venezuelans.[152] Additionally, Panama and Honduras have required visas for Venezuelans since 2017; and Guatemala since 2018.[153] In fact, visa requirements for Venezuelans are common in the Americas; most recently, in May 2023, Suriname began requiring visas for Venezuelans, the 24th country to do so in the Americas.[154]

Despite these restrictions, Venezuelans continue to travel, many to the north. As the graph below shows, the establishment of visa requirements by Mexico, in January 2022, initially coincided with a decrease in encounters of Venezuelans at the US southern border but was soon followed by a drastic increase in the number of people crossing the Darién Gap. Since then, the number of Venezuelans apprehended in Mexico and at the US southern border has mirrored the number crossing the Darién Gap.[155] (The number of people crossing the Darién Gap decreased significantly in October 2022 when the US government announced a humanitarian parole program for Venezuelans, described below, but subsequently increased as many Venezuelans discovered they were not eligible.)

7/8/26, 1:57 PM — "This Hell Was My Only Option": Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 10 of 120

   


Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023); U.S. Customs and Border Protection, "Nationwide Encounters," n.d., https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed October 27, 2023); Mexico's Government, "Statistical Bulletins" ("Boletines Estadísticos"), n.d., http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos (accessed October 27, 2023).



Many Venezuelans told Human Rights Watch that visa requirements had limited their ability to take safer routes.

**Sofía Correa** (pseudonym) crossed the Darién Gap in 2022 with her teenage son.[156] She decided to leave Venezuela after struggling to "get food on the table," she said. As a single mom, she worked multiple jobs to ensure her son had everything he needed to keep studying, but the country situation made it "really hard." In late 2021, she decided it was time to leave Venezuela, but visa restrictions for Venezuelans went into effect soon after in Mexico and Central American countries. "I would have taken a plane, but who is going to give me a visa? This hell was my only option," she told Human Rights Watch while trying to dry her wet documents on the ground of an Indigenous community in Panama. As she crossed the Darién Gap, she fell into a river. "I thought I was going to die in there," she said.

When 32-year-old **Veronica Pérez** (pseudonym) realized she was pregnant in late in 2021, she cried, she said, knowing she would not be able to afford sufficient food, much less doctors and medicines in Venezuela.[157] She needed



**"This Hell Was My Only Option"**

    DONATE NOW

impossible for us to obtain the documentation to travel to Mexico," referring to the passport and visa. They spent days without food, as they crossed the jungle. A group of men assaulted them, taking the few belongings they had. By the time they arrived in Panama, Veronica was bleeding, and she feared she had suffered a miscarriage. She sought medical treatment from humanitarian workers.

The visa requirements are impossible to meet for many Venezuelans. In Venezuela, a passport costs roughly US$200,[158] and some officials or illegal services reportedly charge more.[159] This fee is unaffordable for most Venezuelans, in a country where most people earn a minimum wage of VED$130, around US$4-5 a month.[160]

Passports are hard to obtain even for those who can afford them. Authorities often lack basic materials to issue the documents, such as paper and ink, and sometimes their website does not work.[161] Long suspensions in the issuance of national IDs and difficulties in obtaining birth certificates also hinder access to travel documents and visas.[162]

For Venezuelans who have already left the country, consular services abroad are scarce and unaffordable, making it hard to obtain or renew passports and other official documents, including marriage and birth certificates.[163]

This problem was aggravated in 2019 when many countries in the region recognized Juan Guaidó, the then-president of the National Assembly, as the "legitimate president" of Venezuela, cutting diplomatic and consular ties with the Nicolás Maduro administration. Subsequent consular confusion aggravated legal problems for people on the move.[164] Although Guaidó formally extended the validity of expired passports, access to other documents, such as national IDs, remained a challenge.[165]

Of the 773 Venezuelans surveyed by UNHCR between July 2022 and June 2023 in the Darién Gap, roughly 8 percent travelled with a valid passport. Some 14 percent had an expired passport while more than half (54 percent) had an ID card but no other document, such as passport or residence permit. Around 6 percent had no documents at all.[166]

7/8/26, 1:57 PM
Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 12 of 120
"This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darien Gap | HRW

HUMAN RIGHTS WATCH

"This Hell Was My Only Option"

 

DONATE NOW

Percentages surveyed by UNHCR (n = 773) grouped by country of residence prior to crossing



Source: Information obtained by Human Rights Watch via UNHCR's Microdata Library, August 28, 2023 (on file with Human Rights Watch).

# Haitians

Haiti faces a long-standing political, security and humanitarian crisis that has left all government branches inoperative, allowing overwhelming impunity for human rights abuses, pushing Haitians to flee the country.[167]

After a devastating earthquake in 2010 and with the opening of job opportunities in the lead-up to the 2014 World Cup and the 2016 Olympic Games in Brazil,[168] Haitians began moving south, particularly to Brazil and Chile, which they saw as an alternative to the US and Canada, which had dauting migration restrictions.[169]

Haitians face more visa requirements in Latin American countries than people of any other nationality in the Americas.[170] At least 24 governments in the region, including countries in



**HUMAN RIGHTS WATCH**

"This Hell Was My Only Option"

    DONATE NOW

**Louis Gerard** (pseudonym), lived in Porto Alegre, Brazil, for six years prior to crossing the Darién Gap with his wife, sister, and 4-year-old son.[172] In 2016, Louis left Haiti, leaving his parents and brothers behind. He chose Brazil because "even if it was far, they received migrants well," he said. In Brazil, Louis worked several jobs to send money back home and to raise his son, a Brazilian national. Things got hard after the Covid-19 pandemic, Louis said, and his boss did not pay him for his work for several months. "There is labor abuse against us. They pay us less," he said. They left in February 2023 because "Brazil left us with no options." "We could stay in Mexico, but we cannot get there on a plane because of the visa," he said. Bandits robbed them as they crossed the Gap, leaving them without money or food.

**Antoine Petit** (pseudonym), 28, left Haiti in 2017 to go to Chile.[173] "I got there by plane, with my passport because [Chile] did not request a visa then," he said. Antoine had a work permit for one year, but then it became hard to renew it, and the pandemic also hit him hard financially. He also had a hard time speaking Spanish, so he was frequently discriminated against, he said. With the few savings he had, Antoine started his journey north. This time, he travelled by land because he lacked a visa. Some individuals stole his passport and other belongings at the border between Ecuador and Colombia. "I am aware of the dangers of the crossing," he said, "but I do not have any other option."

Visas and passports are often hard for Haitians to obtain. In recent months, media outlets have described people clutching documents and fighting their way through crowded government office buildings in Port-au-Prince to apply for passports.[174] Requests for passports went from 1,500 to 5,000 a day after the US opened a humanitarian parole program for Haitians in January 2023.[175] "Corrupt officials are selling them to women in exchange for sex," Nicole Philipps, of the Haitian Bridge Alliance, an NGO, told Human Rights Watch.[176]

## Ecuadorians

In a context of fragile democratic institutions, Ecuador has seen a sharp increase in crime and violence by organized crime, which took homicide and extortion rates to unprecedented levels. The insecurity, combined with a depressed economy and longstanding, unaddressed



**"This Hell Was My Only Option"**

     DONATE NOW

Since late 2021, several countries in the region, including Mexico and Guatemala, have imposed new visa requirements for Ecuadorians.[178] Ecuadorians must obtain visas to travel to at least 14 countries in the Americas.[179]

> **Javier Prieto** (pseudonym), a 48-year-old carpenter, crossed the Darién in March 2023 with his daughter, 25, and his 7-year-old grandson.[180] In November 2022, criminals had murdered Javier's brother to steal his phone. The police arrested them, but Javier said one of his friends received a call threatening to kill Javier and the friend once they were released from jail. "Obtaining a visa to the United States is difficult for Ecuadorians; they don't grant it to us," Javier said. So, they took a bus and left for Colombia. "It's heartbreaking to leave the family and witness so much death in the jungle. There were many bodies," Javier said. He carried his grandson on his shoulders to cross a river in the gap.

Since 2023, Mexico has increased its "economic solvency" requirement for Ecuadorians, requiring that they show that they've had a stable job for over a year, or a pension, with monthly income during the last three months of the equivalent of at least US$1,050.[181]

> From a young age, **Irina Ortega** (pseudonym), 27, had to help her mother take care of her six brothers and sisters in Ambato, a city south of Quito.[182] Irina had an informal job in a restaurant for a while. She looked in vain for more secure work to keep helping her family, but eventually, heading north out of Ecuador seemed the only option. "The Darién was my only option because obtaining a visa to travel would have required money that someone without a job [like me] cannot prove," Irina said. She traveled to Quito in late February, boarding a bus with another 23 people. The journey was not only grueling but more expensive than she had expected, because the people who earn a living moving migrants charge "for everything," she said.

As the graph below shows, the imposition of visa requirements in Mexico, in September 2021, coincided with an initial decrease in the number of Ecuadorians encountered at the US

7/8/26, 1:57 PM
This Hell Was My Only Option: Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 15 of 120

  

HUMAN RIGHTS WATCH

"This Hell Was My Only Option"

DONATE NOW

apprehended in Mexico and encountered at the US-Mexico border. The flow through the Darién Gap increased after the visa requirements were imposed.



### Ecuadorian Migration Trends

Source: Panama's National Migration Service, "Statistics. Irregular Transit in the Darién" ("Estadísticas. Tránsito irregular por Darién"), n.d., https://www.migracion.gob.pa/inicio/estadisticas (accessed October 27, 2023); U.s Customs and Border Protection, "Nationwide Encounters," n.d., https://www.cbp.gov/newsroom/stats/nationwide-encounters (accessed October 27, 2023); Mexico's Government, "Statistical Bulletins" ("Boletines Estadísticos"), n.d., http://www.politicamigratoria.gob.mx/es/PoliticaMigratoria/Boletines_Estadisticos (accessed October 27, 2023).



©

The visa requirements are hard to meet for many Ecuadorians. Since early 2022, the country's Civil Registry has struggled to produce the large number of passports being requested by people trying to leave the country. In February 2023, the Director of the Civil Registry said that while Ecuador had issued 485,000 passports in 2019 and 586,000 in 2022, he estimated that that the office would issue over one million in 2023.[183] In early 2022, the Civil Registry declared an "institutional emergency" due to a shortage of the physical materials required to issue documents, including passports.[184] According to media reports, people could wait up to three months to obtain an appointment for a passport.[185]

Of 135 Ecuadorians surveyed by UNHCR in the Darién between July 2022 and June 2023, roughly 26 percent had a valid passport. Over 74 percent had an ID card and 3 percent had no official documents.[186]



Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 16 of 120



   DONATE NOW

US immigration policies affect the migration flow through the Darién Gap and the rights of people who cross it in different ways.

The United States has sought agreements with many Latin American governments, including Mexico and Guatemala, aimed at deterring migration, which, combined with an increase in migration from South America to the United States, appear to have contributed to an increase in the number of people crossing the Darién Gap.[187] In a May 2022 US Senate hearing, an official from the US Department of State said that, when the US sees an increase in people of a certain nationality arriving at the southern border, it communicates that information to governments in the region to "look for areas of partnership." Countries may then decide "through their own sovereign decision-making process ... to impose visas on those nationalities to make sure that those who are arriving by air are not intending ... [to immigrate] to the United States," the official said. The Biden administration then continues "working in partnerships" with other countries "to ensure that route is not diverted" through another country, she said.[188]

The Biden administration has created some new legal pathways for people to seek protection in the United States, which would not require those eligible to cross the Darién. However, these pathways have serious shortcomings that make them inaccessible for large numbers of people.

Since late 2022 and early 2023, Venezuelans, Haitians, Cubans, and Nicaraguans who have a valid passport and a financial sponsor in the United States may apply for a program called humanitarian parole.[189] Those granted parole are given permission to travel to the US by plane and to remain there for a limited amount of time—potentially up to two years. Once in the US, they may apply for permission to work. They may also apply for asylum, which, if granted, could allow them to remain in the country.[190]

Obtaining a passport is difficult for people from Cuba, Nicaragua, Venezuela, and Haiti and may be dangerous or nearly impossible for those who fear being persecuted by their governments.[191]

In June of 2023, the Biden administration also announced that it would create a "Safe Mobility" program to allow people of certain nationalities in Colombia, Costa Rica, and Guatemala to apply for refugee resettlement in the US and to provide migrants and asylum seekers with information about other legal pathways like family reunification, humanitarian



**"This Hell Was My Only Option"**

      DONATE NOW

Access to the program in Colombia has been extremely limited. The online application portal opened for less than a day in June and again briefly in August. Each time it was shut down after receiving thousands of applications in just a few hours, according to news reports.[194] Only Cubans, Haitians, and Venezuelans who entered Colombia before June 11, 2023, and who have already applied for legal status in Colombia are eligible to use the platform. In September, IOM and UNHCR said the platform would re-open once the 11,000 applications that had been received were processed.[195]

While the Safe Mobility offices in Colombia and Ecuador will be open to Haitian applicants, and while 34 Haitian refugees were admitted to the US in fiscal year 2023, the US Refugee Admissions Program has essentially been closed to Haitians for the previous twelve years (FY 11-FY 22), during which a total of four Haitian refugees were admitted to the United States. [196]

Around 40,000 applications had been received in total between June and September in the three countries where the program operates, and around 3,600 people were "on a path to be allowed into the United States," according to news reports.[197] The Biden administration set a global refugee resettlement cap of 125,000 people for fiscal year 2023, which ended September 30, 2023. That cap reserved 15,000 spots for refugees from Latin America and the Caribbean, but only 6,312 were admitted, of whom roughly 3,600 came from Central American countries north of the Darién Gap.[198]

These policies take place against a backdrop of US border policies restricting the right to seek asylum in the US. In 2016, the administration of then-US President Barack Obama began limiting the number of asylum seekers allowed per day at certain border crossings, a policy known as "metering." The administration of subsequent US President Donald Trump expanded this policy and in 2019 began sending asylum seekers back to Mexico to wait while their claims were processed.[199] In 2020, the United States began misusing a public health rule, known as Title 42, to almost entirely shut down access to asylum by rapidly expelling nearly all asylum seekers without hearing their claims.[200] Mexico agreed to receive many non-Mexican asylum seekers the US rapidly removed. Human Rights Watch consistently found that migrants sent to Mexico under these policies were exposed to serious abuses and harms including rape, kidnapping, extortion, assault, and psychological trauma.[201]



**"This Hell Was My Only Option"**

      DONATE NOW

months in Mexico to obtain one of a limited number of appointments at a US border crossing through a CBP One, a mobile application developed by the US government. [203] The mobile application is inaccessible to many asylum seekers due to financial, language, technological, and other barriers that disproportionately affect Black and Indigenous asylum seekers, including due to racial bias in CBP One's facial recognition technology.[204] If non-Mexicans seek asylum at or between a port of entry without having secured an appointment through CBP One, they face a number of harsh penalties, including expedited deportation to Mexico or their country of origin with a 5-year bar on return to the United States.[205]

In July 2023, a federal judge concluded that the asylum ban had been improperly imposed and should not be enforced, although he stayed his order pending appeal. This means the ban is likely to remain in effect while an appellate court considers the case.[206]

The principle of nonrefoulement under international human rights law forbids governments from sending people to a country where they would be threatened by torture, persecution, or other serious harms. However, the Biden administration continues to send some asylum seekers back to countries in violation of this principle, including Haitians and, since October 2023, Venezuelans who are not eligible for temporary protection status.[207]

# Recommendations

The increasing scale and complexity of migration in the Americas requires a collective and concerted response. A carefully designed, rights-respecting regional approach would offer a fair and efficient way to determine which states are responsible for examining asylum claims and protecting refugees. As a practical matter, such a mechanism could and should distribute costs equitably and offer participating states other incentives for sharing responsibility. Legal representation, accommodation, and work authorization while asylum claims are pending should be included as critical common elements of this mechanism. Additionally, the essential elements of this collective approach should be reflected in a new regional agreement that builds on the Cartagena Declaration.

7/8/26, 1:57 PM
"This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 19 of 120

  
Protection to reverse existing laws, policies, and practices that effectively prevent access to asylum and force people into dangerous crossings. In line with recommendations by UNHCR and the Inter-American Commission on Human Rights, each state in the region should ensure that its legislation, policies, and practices safeguard access to asylum, including by guaranteeing legal representation, accommodation and other assistance, and access to work for those who seek asylum, and include robust protections against refoulement.

Human Rights Watch calls on states and international actors to undertake the following specific steps to address the abuses identified in this report.

## To all governments in the Americas

- Seize the upcoming 40th anniversary of the Cartagena Declaration to discuss the increasing immigration challenges in the region, as reflected in the Darién Gap, and establish specific commitments to ensure the rights of migrants, asylum seekers, and refugees in the hemisphere, including:
    - Implementing a region-wide temporary protection regime that would grant all Venezuelans and Haitians temporary legal status for a reasonable, and renewable term, even if they may not qualify for refugee status under domestic law.

    - Applying the Cartagena Declaration's expanded refugee definition for individual asylum seekers to enable the granting of asylum to people who have fled generalized violence, internal conflicts, foreign aggression, massive violation of human rights, or other circumstances which have seriously disturbed public order.

    - Creating an equitable and rights-focused regional mechanism to determine states responsible for examining asylum claims and protecting refugees. The mechanism should include incentives to encourage asylum seekers and refugees to stay, such as legal representation, accommodation, and swift access to the right to work while asylum claims are pending. Criteria for determining the country responsible for examining asylum claims should consider individual factors, like social or family ties and individual choices, to the extent possible. Additionally, it should distribute costs equitably and offer member states incentives for sharing responsibility.

7/8/26, 1:57 PM
Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 20 of 120
This Hell Was My Only Option" Abuses Against Migrants and Asylum Seekers Pushed to Cross the Darién Gap | HRW

  

work, and refugee status, among others.

- Improving domestic asylum systems by, when relevant, removing impediments to presenting asylum claims, increasing the number and competency of national staff analyzing asylum claims, ensuring that procedures are both fair and efficient, providing physical protection, accommodation, work authorization, and other social support to applicants while their asylum claims are pending, and ensuring the implementation of the Cartagena Declaration when recognized under domestic law.

- Increasing efforts to integrate migrants and refugees, particularly in the workforce, including by easing requirements to recognize their education certificates and diplomas obtained abroad and developing voluntary local and regional relocation plans that match migrants and refugees with job opportunities in the private and public sector.

- Increasing efforts to fight xenophobia and discrimination, including through programs directed at changing the national and regional perception about migrants, asylum seekers, and refugees.

- Reversing measures that effectively prevent access to asylum and push people into dangerous crossings, in line with the 2022 Los Angeles Declaration on Migration and Protection, including through a progressive liberalization of visa requirements imposed by Mexico and Central American governments to Venezuelans, Haitians, Cubans, and Ecuadorians and by creating easily accessible visa facilitation regimes or other measures for people legally staying in the country, taking into account the need for these mechanisms to be economically accessible and ensuring access to people who may not have all required documentation for reasons beyond their control.

- Work within the Organization of American States, including its Inter-American Commission on Human Rights, and domestic human rights experts and organizations to ensure a prompt and rights-respecting response to emerging human rights crises in the region that could trigger new migration waves.

## To the US Government

7/8/26, 1:57 PM    This Hell Was My Only Option": Abuses Against Migrants and Asylum Seekers Pushed Across the Darién Gap | HRW

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 21 of 120

   DONATE NOW

Asylum

- Expand legal, orderly, and safe pathways for people to migrate to the United States, including by:
  - Incorporating into the Immigration and Nationality Act the expanded definition of refugees contained in the Cartagena Declaration or a comparable standard of complementary protection that includes individuals fleeing violence or other exceptional situations that expose them to a real risk of serious harm.

  - Eliminating requirements that make humanitarian parole inaccessible to many mostly low-income Venezuelans, Cubans, and Haitians, including the need to have a financial sponsor in the United States and a valid passport.

  - Considering expanding the humanitarian parole program to people from other nationalities, including Ecuadorians.

  - Working with Colombia, Guatemala, Costa Rica, and other countries to significantly expand the capacity of the Safe Mobility Offices, increasing the number of appointments and reducing waiting times.

  - Meeting the 125,000 refugee admissions target for fiscal year 2024, including 25,000 to 50,000 refugees from Latin America and the Caribbean.

  - Extending and re-designating Temporary Protected Status (TPS) for Venezuelans and Haitians, as needed.

  - Considering other safe and legal avenues, such as family reunification visas; expanded temporary work visas; and temporary visas for witnesses of serious crimes as enumerated in the eligibility criteria for U visas.

- Rescind the asylum ban, restore access to asylum, and reform the immigration system so that it regulates migration effectively while protecting fundamental rights.

- Suspend deportations or expulsions to Haiti because of the general risk of serious or irreparable harm to returnees.

- Do not press Mexico, Central American, and other governments to establish additional visa requirements that undermine the right to seek asylum and force people to use dangerous crossings, such as the Darién Gap.



“This Hell Was My Only Option”           DONATE NOW

- Provide financial support to meaningful efforts by South American governments to expand access to asylum, carry out processes to regularize migration status, implement integration strategies, especially to ensure enjoyment of economic rights, and support campaigns and public policies directed at reducing xenophobia and discrimination.

- Ensure that financial or technical assistance provided to other countries for the purpose of strengthening border control and combating people-smuggling respects for the rights of migrants, asylum seekers, and refugees and local communities and does not establish abusive restrictions on movement.

## To the UN Office of the High Commissioner for Refugees and the International Organization for Migration

- Establish an inter-agency coordination mechanism in Panama to respond to the challenges of increased migration flows, following the example of the GIFMM in Colombia and ensuring that the mechanism has the capacity to identify gaps in assistance and where available donor funds should be directed.

- Building on the experience of the Inter-Agency Coordination Platform for Refugees and Migrants from Venezuela (R4V), ensure monitoring, documentation, and analysis of migration of people of other nationalities, including Haitians, Cubans, and Ecuadorians.

- Analyze country-of-origin conditions and provide guidance to states on Ecuadorians' asylum claims.

- Increase information available to migrants and asylum seekers in the Darién Gap about regional immigration policies and asylum systems, including in the US, as well as information about the journey north before and after migrants and asylum seekers cross the Darién Gap.

- Continue to support the Quito Process and other regional initiatives aimed at ensuring safe and complementary pathways, regularization, and integration programs.

- Increase technical and economic support to migration authorities and asylum systems throughout the region.

Case 2:26-cv-04831-MTL Document 19-2 Filed 07/13/26 Page 23 of 120



"This Hell Was My Only Option"

     DONATE NOW

- Fund credible efforts to improve the humanitarian response in the Darién Gap, including to ensure dignified migration centers and other shelters, increase humanitarian aid, improving the conditions in Bajo Chiquito and Canaán Membrillo, and help prevent and investigate abuses, particularly sexual violence, against migrants.

- Increase funding for the 2023-24 Regional Refugee and Migrant Response Plan (RMRP) and ensure similar efforts for Haitian and other migrants and refugees in South America.

- Support credible efforts to increase government presence and the enjoyment of economic and social rights in Colombia's Urabá and Panama's Darién regions.

## To Members of the United Nations Human Rights Council

- Support establishment of a mechanism to monitor rights abuses at borders, as called for by civil society and the Special Rapporteur on the human rights of migrants at the 53rd session of the Human Rights Council.[208]

## To the UN High Commissioner for Human Rights

- Closely monitor and publicly report on the human rights situation in the Darién Gap, publicly express concern about restrictive immigration policies and protection gaps that put the rights of migrants and refugees at risk and call on states to end those policies and practices.

## To the UN Special Rapporteur on the human rights of migrants

- Conduct visits to the Darién Gap, as in principle permitted under Panama's and Colombia's standing invitation to Special Procedures, to document the impact of restrictive immigration policies and protection gaps on migrants' and refugees' rights, and report to the Human Rights Council on the situation.



**"This Hell Was My Only Option"**          DONATE NOW

- Closely monitor and publicly report on the human rights situation in the Darién Gap, publicly express concern about restrictive immigration policies and protection gaps that put migrants' and refugees' rights at risk and call on states to end those policies and practices.

# Acknowledgments

This report was written by Martina Rapido Ragozzino, Americas senior research assistant; and Juan Pappier, Americas deputy director.

The report is based on research conducted by a team of Human Rights Watch research staff members: Stephania López, Americas research assistant; Nathalye Cotrino, Crisis and Conflict researcher; Maya Shack, consultant; Martina Rapido Ragozzino; and Juan Pappier.

It was reviewed and edited by Juanita Goebertus, Americas director; Margaret Knox, senior editor/researcher; Bill Frelick, director, Refugees and Migrants Rights Division; Alison Leal Parker, managing director, US Program; Vicki Gaubeca, associate director, US Program; Nicole Widdersheim, deputy director, Washington advocacy; Lucy McKernan, deputy director, Geneva advocacy; Brian Root, senior quantitative analyst; Cristian González, researcher, LGBT Rights Program; Cristina Quiroz, researcher, Women's Rights Division; and Tyler Mattiace, Mexico researcher. Maria McFarland Sánchez-Moreno and Michael Bochenek provided program and legal review, respectively.

Americas Division associate Johan Romero contributed to the report production. The report was prepared for publication by Travis Carr, publications officer; Fitzroy Hepkins, administrative manager; and José Martínez, senior administration coordinator.

Human Rights Watch would like to thank human rights, migrants' rights, humanitarian, and UN organizations that provided important information for this research. We are also grateful to Patricia Fagen and Caitlyn Yates for reviewing an earlier version of this report.



"This Hell Was My Only Option"

     DONATE NOW

**Region / Country**   Americas, Panama

**Topic**   Refugees and Migrants, Asylum Seekers, Digital Investigations Lab

## Protecting Rights, Saving Lives

Human Rights Watch defends the rights of people in close to 100 countries worldwide, spotlighting abuses and bringing perpetrators to justice

**DONATE NOW**



## Get Updates On Rights Issues Worldwide

Enter an email address        Sign Up

## Connect With Us

Contact Us │ Corrections │ Privacy Policy │ Permissions │ Site Map │ Child Safeguarding │ Text Version

© 2026 Human Rights Watch

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 26 of 120



**"This Hell Was My Only Option"**

     DONATE NOW

Human Rights Watch is a 501(C)(3) nonprofit registered in the US under EIN: 13-2875808

**"This Hell Was My Only Option"**



DONATE NOW

# EXHIBIT 15

An official website of the United States government   Here's how you know

Venezuela Earthquakes: Americans in need of consular assistance can call: +1-202-501-4444 (abroad) | +1-888-407-4747 (U.S., Canada) | Get Safety and Security Updates     | Enroll in STEP | Follow: @TravelGov, @USEmbassyVE, WhatsApp "U.S. Department of State – Security Updates for U.S. Citizens." More information

**Worldwide Caution:** The Department of State advises Americans worldwide to exercise increased caution.



Menu

Home       International Travel       Travel Advisories       Mexico

# Mexico

Review the latest State Department Travel Advisory about Mexico. You can plan for safe travel by following the entry and exit requirements, reviewing local laws, and other travel guidance from the U.S. embassy or consulate.

Visit mx.usembassy.gov

Learn more about U.S. and Mexico relations at State.gov

## TRAVEL ADVISORY LEVELS

| 1 | Exercise normal precautions | 2 | Exercise increased caution |
|---|---|---|---|
| 3 | Reconsider travel | 4 | Do not travel |

## TRAVEL ADVISORY - UNITED MEXICAN STATES

••

# Level 2 - Exercise increased caution

Also includes areas at levels    1    3    and    4

Date issued: May 29, 2026 - <u>advisory history</u>

( TERRORISM (T) )    ( CRIME (C) )    ( KIDNAPPING OR HOSTAGE TAKING (K) )

Exercise increased caution in **Mexico** due to **terrorism, crime,** and **kidnapping.** Some areas have increased risk. Read the entire Travel Advisory.

# Advisory summary

For Americans traveling to Mexico for FIFA World Cup 2026 matches, follow the <u>latest guidance from the U.S. Embassy in Mexico</u>.

- Many violent crimes take place in Mexico.  They include homicide, kidnapping, carjacking, sexual assault, and robbery.  There is a risk of terrorist violence, including terrorist attacks and other activity in Mexico.  Visit the U.S. Department of State's <u>country reports on terrorism</u> to learn more.

- The U.S. government has limited ability to help in many parts of Mexico, a large country in which conditions can vary widely from state to state and even within a state.  U.S. government employees may not travel to certain high-risk areas, which may be within states that include low-risk areas.

- Due to security risks, U.S. citizens should follow the same restrictions as U.S. government employees while traveling.

- Emergency services are limited or unavailable in remote or rural areas.

- If you encounter a road checkpoint, you should comply.  Fleeing or ignoring instructions can lead to you being hurt or killed.

- Check the maps of <u>restricted areas</u>.

## U.S. government employee travel restrictions (U.S. citizens are strongly advised to follow):

- May not travel between cities after dark.

- Must rely on dispatched vehicles from regulated taxi stands or app-based services like Uber or Cabify and may not wave down taxis on the street.

- Should avoid traveling alone, especially in remote areas.

- May not drive between Mexican border cities and the interior of Mexico, with limited exceptions.

# Risks in specific areas

*Expand all*

## Level: 4 - Do not travel

State of Colima                                                              ＋
_____

State of Guerrero                                                            ＋
_____

State of Michoacan                                                           ＋
_____

State of Sinaloa                                                             ＋
_____

State of Tamaulipas                                                          ＋
_____

State of Zacatecas                                                           ＋
_____

## Level: 3 - Reconsider travel

State of Baja California                                                     ＋
_____

State of Chiapas                                                             ＋
_____

## State of Chihuahua

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

$+$

## State of Chihuahua

$+$

+

+

+

+

+

+

+

+

- _____ _____ _____.

- _____ _____ ___ _____

- _____ _____ _____
  _____

- _____

- _____
  _____

- _____

- 



**Explore the full map**

# About Mexico

Mexico is in North America in the Northern Hemisphere. It is located between the Caribbean Sea, the Gulf of America, and the North Pacific Ocean. It has land borders with Belize, Guatemala, and the United States. It is about 3 times the size of Texas.

Mexico has 4 time zones, and depending on the region, it is 0 to 3 hours behind Washington, D.C.

## Travel requirements



### Tourist visa requirements

- A visa is required when visiting for more than 180 days.



### Vaccinations

- Visit your doctor at least 1 month before traveling to Mexico to update your vaccinations .



### Valid passport requirements

- Your passport must be **valid at the time of entry.**
- 1 blank passport page per stamp required for air travelers.
- Review details on arrival by air or land travel.



### Currency on entry and exit

- **Entry maximum:** 10,000 USD or more must be declared.
- **Exit maximum:** 10,000 USD or more must be declared.

## Tips from the U.S. embassy

- Drug possession or importation of drugs, including medical marijuana, is illegal.
- Do not bring e-cigarettes, vaping devices, or illegal drugs into the country.

- Bringing weapons including guns, ammunition, swords, knives, fireworks and explosives into Mexico without permits issued by the Mexican government is a serious crime.
- When approaching any checkpoint, cooperate. Avoid any behavior that appears aggressive. Fleeing can raise suspicion and lead to violence.
- Costs for medical care in Mexico may be higher than expected. Most hospitals will not release patients until their bill is paid in full.

# Help for U.S. citizens

U.S. Embassy Mexico City
Presa Angostura 225
Col. Irrigación
Alcaldía Miguel Hidalgo
Ciudad de México, Mexico, C.P. 11500

**Main telephone:**   52-55-2579-2000
**From U.S.:**   011-52-55-2579-2000

**Emergency after-hours:**   52-55-2579-2000
**From U.S.:**   011-52-55-2579-2000

**Email:**   Mexico.ACS@gdit-gss.com

**Website:** https://mx.usembassy.gov/

**Emergency assistance:** U.S. Citizen Services Inquiries Contact Form

Save contact to device

 **EMBASSY UPDATE**                                    Previous messages

July 4, 2026

Safety Message: Expected Large-Scale Crowds and Traffic Disruptions on July 5th, 2026

[Review full alert](#)

### Get embassy updates right to your inbox



Review how STEP works

# Travel guidance for Mexico

Explore our travel guidance topics to prepare for your trip abroad.

Travel Topics  ⌄

# Entry, exit, and visa requirements

## Helpful resources

- [Mexican government entry, exit, and visa requirements](#)  (in Spanish)
- [U.S. Embassy in Mexico ](#)

# Common terms

- **FMM** = Forma Migratoria Multiple (entry permit).
- **FMMD** = Forma Migratoria Multiple Digital
- **INM** = Instituto Nacional de Migracion (National Migration Institute)
- **PROFECO** = Procuraduría Federal del Consumidor (Mexico's consumer protection agency)
- **CONDUSEF** = Comision Nacional para la Proteccion y Defensa de los Usuarios de Servicios Financiero (Mexico's banking regulatory agency)

---

# Entry and exit procedures

**By air:** You need a passport book to enter Mexico. You can't use a U.S. passport card to board a plane at the airport. Mexican authorities issue digital Forma Migratoria Multiple Digital (FMMD) at all 66 international airports in Mexico.

- When you arrive at an airport in Mexico, the Mexican immigration authorities will determine how long you are authorized to stay.
- A date stamp will be placed in your passport. You may be directed through a self-service electronic gate (E-Gate) that will generate a printed receipt with a QR code.
- Air travelers can visit [National Migration Institute (INM)](#)     (in Spanish) to download a record of their FMMD or find more information.

**By land:** You need a passport book or card to enter Mexico. All travelers to Mexico, must apply for an FMM, [entry permit online](#)     or from an INM office, including travelers who are only staying within 12 miles (or 20 kilometers) from the border area.

**By sea:** If you are traveling to [Mexico by sea](#)    , you must have either a valid passport, a U.S. passport card, a trusted traveler card (such as NEXUS, SENTRI or

FAST), or a state-issued <u>REAL ID</u>  .

- If the cruise leaves from and returns to the same U.S. port "closed-loop" cruises, U.S. citizens may instead show an original government-issued birth certificate or certified copy (with raised seal). If you are 16 or older, you also need a government-issued photo identification, such as a valid driver's license.
- People entering Mexico on a private boat or ship must <u>get a permit</u>   from the Mexican Government before traveling.
- For more information contact the <u>U.S. Embassy of Mexico</u>   in Washington D.C.

## Vehicle regulations

- **Temporary vehicle import permits** are required for U.S. registered vehicles traveling beyond the border zone. You must obtain this permit from Banjercito (office of temporary vehicle import) and pay a refundable deposit.
- **Hassle-free zones** in the states of Baja California, Baja California Sur, and Sonora allow cars to drive throughout the state without an entry permit. Car registration is also available within the zone if you prefer.

## Legal and customs entry information

- **Declare goods worth over $300 USD (arriving by land) or $500 USD (arriving by air) with Mexican customs to avoid fines or confiscation.** This includes used goods and donations. More information is available from <u>Mexican customs</u>   (ANAM).

- While not always enforced, Mexican regulations allow the tax-free import of only one portable computer (like a laptop or tablet) per person. If you bring more than one, you might have to pay a fee of up to 19% on the value of the extra device, or up to 4,000 USD.

- Importing drugs, including medical marijuana, is illegal. It is also illegal to import e-cigarettes (vaping devices).

- Bringing weapons including guns, ammunition, swords, knives, fireworks or explosives into Mexico without permits issued by the Mexican government is a serious crime.

- **Criminal history or charges** can be a reason Mexican authorities may deny you entry.

- **Dual nationality** is permitted by both Mexico and the United States. Learn more about dual nationality requirements and customs regulations.

- **Having HIV and AIDS** does not result in a restriction on entry for visitors or residents.

- **Travelers under 18** may require a notarized parental consent letter if they are not traveling with both parents. Bring a notarized consent letter from parents who are not on the trip.

## Learn about another destination

Select your destination:

| - Select - | Go |

## Get embassy updates right to your inbox



Review how STEP works

Return to top

Last Updated: August 11, 2025
Owned by Overseas Citizens Services

Was this page helpful?     Yes     No

Report a website issue or suggest a change to this page

Travel.State.Gov Services

Information

Legal Resources

Login

The State Department provides external links solely for our readers' information and convenience. Disclaimer Details

Follow Us

An official website of the Department of State - Bureau of Consular Affairs

About Department of State

Accessibility Support

Copyright and Disclaimer

FOIA Requests

No FEAR Act Data

Office of the Inspector General

Performance reports

Privacy Policy

---

Looking for U.S. government information and services?

USA.gov        USA.gov/espanol        GSA.gov

Case 2:26-cv-04831-MTL     Document 19-2     Filed 07/13/26     Page 42 of 120

# EXHIBIT 16

Trapped, Preyed Upon, and Punished



Donate

# Trapped, Preyed Upon, and Punished

---

Refugee and Immigrant Rights

---

Report

---

Published on May 7, 2024

[One Year of the Biden Administration Asylum Ban](#)

**Executive summary**

On May 11, 2023, the Biden administration initiated a new bar on asylum through its [Circumvention of Lawful Pathways](#) rule. Often referred to as an "[asylum ban](#)," the bar is structured to deny asylum, with highly limited exceptions, to non-Mexican people who cross into the United States between ports of entry, or arrive at ports of entry without appointments. The ban is used with expedited removal to deny people full asylum hearings even if they would have a significant chance of winning asylum in immigration court, if they don't meet a higher, [unduly onerous](#), initial screening standard.

In its first year, the asylum ban and accompanying restrictions have endangered people seeking asylum; fueled returns to persecution and torture; spurred crossings outside U.S. ports of entry; undermined effective migration policy and refugee protection; and disproportionately threatened Black, Indigenous, LGBTQI+, women, children, and other at-risk people seeking asylum.  Because of the ban, vulnerable children and adults are forced to wait in danger in Mexico for up to seven months to obtain an appointment through Customs and Border Protection's "CBPOne" app to seek asylum at a port of entry. Those waiting are targets of sharply escalating cartel kidnappings and violence,  and actions by the Mexican government that prevent them from reaching U.S. ports of entry to seek asylum, even if they are waiting for or have CBP One appointments.

This report updates prior Human Rights First reports issued in July 2023 and October 2023, and follows reports issued with Haitian Bridge Alliance and other partners in May 2023 and with Florence Immigrant and Refugee Rights Project and the Kino Border Initiative in June 2023. This report is based on research conducted over the last year in five Mexican cities: Tijuana, Baja California; Nogales, Sonora; Ciudad Juárez, Chihuahua; Reynosa and Matamoros, Tamaulipas; visits to shelters in five U.S. cities: San Diego, California; Tucson, Arizona; El Paso, McAllen, and Brownsville, Texas; visits to open-air detention sites in San Ysidro and Jacumba, California, to Lukeville and Sasabe, Arizona, information and case examples shared by attorneys and legal service organizations, and by humanitarian and religious workers in Mexico and the United States. It is supported by interviews with over 500 asylum seekers as well as discussions with over sixty legal, humanitarian, and religious workers on both sides of the U.S.-Mexico border.

**Key findings:**

- **The asylum ban and accompanying restrictions are ineffective and counterproductive to effective migration policy and refugee protection**. People seeking asylum, including the over 500 interviewed over the last year by Human Rights First across the U.S.-Mexico border, were overwhelmingly not aware of the ban and its consequences. Even when asylum seekers do learn of it, their decisions are primarily driven by urgent needs for safety and protection. Rather than deterring people from irregularly crossing the southwest border or funneling people to ports of entry, the ban and accompanying restrictions spur irregular crossings and punish people who cross with penalties that violate the Refugee Convention.

- **Wait times for the U.S. port of entry appointments referenced in the rule have risen from two to four months to up to seven months, while daily CBP One appointments have stagnated at 1450 since June 2023**. Like other forms of metering, long wait times for CBP One appointments spur crossings outside of official ports of entry, making them counterproductive to effective migration policy and detrimental to the safety of people seeking asylum.

- **People seeking asylum waiting in Mexico for CBP One appointments are targeted for kidnappings, torture, rape, and brutal violence.** Human Rights First has tracked reports of over 2,500 survivors of kidnappings and other violent attacks on asylum seekers and migrants stranded in Mexico, including those waiting to secure CBP One appointments, since the asylum ban was initiated in 2023. **Targeted attacks against migrants and asylum seekers have sharply escalated** by 70% in some areas. Increasing numbers of people are missing their CBP One appointments because they are being kidnapped in Mexico, further trapping them in danger.

- **People waiting for CBP One appointments, and some people with appointments, are prevented from seeking asylum at U.S. ports of entry by the Mexican government's increased targeting** of migrants for arrest, detention, forced transfers to southern Mexico, and potential return to persecution.

- **Black, Indigenous, LGBTQI+, HIV+, women, children, and other vulnerable people seeking asylum face particular barriers and harms under the asylum ban**. The asylum ban and related restrictions discriminate against and deny equal access to asylum to people who do not speak English, Spanish, or Haitian Creole, including most African, Indigenous, and other people seeking asylum from outside of the Americas, in addition to others who cannot use the CBP One app due to access barriers.

- **The asylum ban leads to the return of refugees to persecution and torture, amounting to refoulement**. People subject to the ban's higher screening standard in expedited removal credible fear interviews are three times more likely to be ordered deported to their countries of feared persecution or to Mexico, where they face dangers and risk return (chain refoulement), compared to those who are not subject to the ban. The result has been that the United States has ordered the deportation of people with strong and obvious needs for refugee protection.

- **People deported or ordered deported under the asylum ban include**: a transgender woman from Venezuela fleeing anti-LGBTQI+ abuses, a victim of political persecution from Senegal, an illiterate man from Nicaragua fearing torture by Nicaraguan authorities, a Chinese pro-democracy dissident, and a victim of religious persecution from Egypt.

- **People who are unable to secure, or cannot safely wait in Mexico for, CBP One appointments face barriers to processing at U.S. ports of**

Trapped, Preyed Upon, and Punished

**entry and risk the asylum ban's punishment if they cross at or between ports of entry without appointments.** The barriers that impede their access to U.S. ports of entry include CBP limits on processing people without appointments (otherwise known as "metering"), and Mexican authorities' actions to block asylum seekers' access to ports of entry; they turn away people facing urgent medical needs or threats to their lives and safety in Mexico.

- **The use of the asylum ban in expedited removal and the relaunch of the Trump-era practice of conducting Credible Fear Interviews when asylum seekers are in CBP custody impedes access to counsel and prolongs detention of asylum seekers in dangerous and subpar conditions** in border holding cells, which violates CBP guidelines. Despite the Biden administration's attempts to support access to legal consultations, the vast majority of those in custody do not have meaningful access to legal assistance or representation before or during their interviews. The systemic due process issues that exist in expedited removal are amplified when people seeking asylum are in CBP custody. These issues, in addition to those inherent in the asylum ban, lead people with refugee claims to be returned to harm.

The asylum ban is a new iteration of transit and entry bans promulgated by the Trump administration that were repeatedly enjoined or struck down by federal courts as they violated U.S. law. A federal district court ruled in July 2023 that the Biden administration's asylum ban is unlawful, but it remains in place while the administration appeals this decision. The asylum ban has generated strong and diverse opposition from faith groups, Holocaust survivors, major unions, civil rights organizations, members of the president's political party, and other key Biden administration allies. As a candidate, President Biden promised to end such policies.

**Recommendations:**

Instead of banning and blocking people seeking asylum, the Biden administration and Congress should double down on humane and effective strategies that the administration has already initiated or announced, including to quickly ramp up regional refugee resettlement plans, strengthen parole initiatives, increase humanitarian and other aid to address protection gaps in the Americas, maximize access to ports of entry, properly staff asylum and immigration court adjudications, improve and restart use of the Biden administration's new asylum processing rule to help adjudicate a greater number of asylum cases more efficiently and take other key steps previously recommended by Human Rights First.

The Biden administration should rescind its asylum ban and end accompanying policies that unjustly punish and turn away people seeking asylum. Instead, the administration should take effective and humane steps to address challenges at the border as Human Rights First has long recommended and outlines in this report.

The Administration should:

- Maximize access to asylum at U.S. ports of entry: conduct processing at more ports of entry, ensure access at ports of entry for people who do not have CBP One appointments, and increase the number of CBP One appointments offered;

- Implement a whole of government approach to reception efforts: create a centralized White House office to coordinate between the federal government, states, cities, and the non-government organizations that provide essential humanitarian services, and work with Congress to secure robust and sustainable appropriations for this vital work;

- Ensure access to work authorization and prompt processing of work permit applications necessary for both migrants and receiving communities;

- Strengthen the asylum adjudication system to ensure fair and timely outcomes;

- Expand and strengthen the Biden administration's parole and regional refugee resettlement programs, as well as diplomacy and support for protection in the Americas;

- Press the Government of Mexico to ensure people seeking U.S. asylum have access to U.S. ports of entry and to take steps to protect the safety and human rights of migrants and asylum seekers, including those waiting to seek U.S. asylum.

Read the full report below.

## Downloads:

Download                                         (→)

‹ BACK TO LIBRARY

# Get Involved

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 51 of 120

Trapped, Preyed Upon, and Punished

# Enter email address

SUBSCRIBE

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Press Room

Instagram ↗

Careers

LinkedIn ↗

Contact

Bluesky ↗

Financials

X ↗

Human Rights First is a nonpartisan, 501(c)(3) charitable organization (EIN # 13-3116646). We do not favor or oppose any candidate for public office.

Privacy Policy

# EXHIBIT 17



# LIVES IN LIMBO

## DEVASTATING IMPACTS OF TRUMP'S MIGRATION AND ASYLUM POLICIES

RESEARCH
BRIEFING

AMNESTY
INTERNATIONAL

# CONTENTS

INTRODUCTION _____ 3

OVERVIEW OF US EXECUTIVE ACTIONS AND POLICIES _____ 4

- END OF ASYLUM AT THE US-MEXICO BORDER _____ 4
- MILITARIZATION OF THE BORDERS _____ 5
- ARRESTS, DETENTIONS AND DEPORTATIONS _____ 5
- REVOCATION OF TEMPORARY AND HUMANITARIAN PROTECTIONS _____ 6
- CANCELLATION OF FOREIGN AID AND FUNDING _____ 6

INTERNATIONAL STANDARDS _____ 7

END OF ASYLUM AT THE US-MEXICO BORDER _____ 8

MILITARIZATION OF BORDERS _____ 13

CURRENT SITUATION IN MEXICO _____ 15

- ACCESS TO ASYLUM IN MEXICO _____ 15
- SECURITY SITUATION _____ 15
- CANCELLATION OF THE ISSUING OF VISITOR CARDS FOR HUMANITARIAN REASONS _____ 16

IMPACTS OF CANCELLED FUNDING ON ORGANIZATIONS AND HUMANITARIAN PROJECTS
          SUPPORTING MIGRANTS AND REFUGEES _____ 17

SITUATION OF DEPORTEES IN MEXICO _____ 19

CONCLUSIONS AND RECOMMENDATIONS _____ 21

- TO THE UNITED STATES _____ 21
- TO MEXICO _____ 22

*© Lauren Murphy, Amnesty International USA*

This briefing presents Amnesty International's findings and observations from a week-long research trip to Tijuana, Mexico, in February 2025, whose purpose was to document the human rights impacts of changes to US migration and asylum policies since President Trump took office on 20 January 2025

**LIVES IN LIMBO**
DEVASTATING IMPACTS OF TRUMP'S MIGRATION AND ASYLUM POLICIES

# INTRODUCTION

This briefing presents Amnesty International's findings and observations from a week-long research trip to Tijuana, Mexico, in February 2025, whose purpose was to document the human rights impacts of changes to US migration and asylum policies since President Trump took office on 20 January 2025.[1] In particular, it focuses on the end of applying for asylum at the US-Mexico border and the situation of asylum seekers in Mexico. This briefing does not provide detailed information about mass immigration arrests and detentions in the United States, nor an analysis of the discriminatory impacts of these measures. The cumulative effects and harms of the Trump administration's punitive and discriminatory immigration and asylum measures are the subject of Amnesty International's ongoing monitoring and analysis of the situation in the United States.

During the trip to Tijuana, Amnesty International interviewed people seeking safety, met with legal, humanitarian and social service providers, local and international organizations, and visited shelters and spaces where migrants and asylum seekers are staying.

The organization spoke with two Mexican men who had recently been deported from the United States to Mexico, as well as with 35 people seeking safety (almost half of whom were women) from Belarus, Colombia, Cuba, Ecuador, Haiti, Honduras, Mexico, Russia and Venezuela. Amnesty International interviewed local and international organizations operating in Tijuana including Al Otro Lado (AOL), Asylum Access México and Haitian Bridge Alliance. The organization also visited and spoke with those running migrant shelters, including Borderline Crisis Center, Casa de los Migrantes, Casa de los Pobres, El Rubi, Jardin de las Mariposas and Villa Haitiana. The interviews with Spanish-language speakers were conducted in Spanish, while interviews with non-Spanish speakers were conducted in English with interpretation assistance from staff of local organizations and other people seeking safety.

Amnesty International requested meetings with the San Diego offices of Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE). ICE declined the meeting request and CBP did not respond. The organization's request to visit the Otay Mesa Detention Center in San Diego was denied.

Various individuals and organizations spoke to Amnesty International on the condition of anonymity. Their names have not been included in this report.



*© Lauren Murphy, Amnesty International USA*

---

[1] The findings and observations included in this briefing are based on the information that Amnesty International received from people seeking safety, service providers, local and international organizations, and shelters during its visit to Tijuana from 4 to 7 February 2025. It is not an exhaustive analysis of the issues presented in the briefing.

**LIVES IN LIMBO**
DEVASTATING IMPACTS OF TRUMP'S MIGRATION AND ASYLUM POLICIES

# OVERVIEW OF US EXECUTIVE ACTIONS AND POLICIES

Since taking office on 20 January 2025, President Trump has taken multiple measures which severely limit the human rights of migrants, asylum seekers and refugees, and the organizations and groups that support them, both inside and outside the United States.

This section presents an overview of executive actions and policies that impact asylum, involvement of the military in migration control, detentions, deportations, other migration statuses, and foreign aid and funding.

### ▪ END OF ASYLUM AT THE US-MEXICO BORDER

In recent years, the United States has implemented a series of migration and asylum policies which have drastically limited access to asylum at the US-Mexico border, resulting in irreparable harm to thousands of individuals seeking safety from persecution or serious human rights violations in their countries of origin.[2] These include "metering", the Migrant Protection Protocols (MPP), Title 42,the Circumvention of Lawful Pathways Final Rule, and the Securing the Border Final Rule.[3]

In accordance with the Circumvention of Lawful Pathways Final Rule –in place since May 2023–, people seeking asylum through the US-Mexico border were required to use the CBP One mobile application to schedule a time to arrive at one of eight participating ports of entry along the border to present their asylum claims, unless they met a few limited exceptions.[4]

A June 2024 Presidential Proclamation (later the Securing the Border Final Rule) closed the US-Mexico border for non-US citizens, aside from limited exceptions for unaccompanied children, victims of a severe form of human trafficking, people with valid visas or permanent residency, and individuals who make an appointment to present themselves at a port of entry via the CBP One mobile application.[5] Entry to anyone else was prohibited, meaning that the only way to seek international protection at the US-Mexico border was by way of a CBP One appointment. Anyone not exempted from the Presidential Proclamation was ineligible for asylum and was only referred for a credible fear screening if they expressly stated fear of being returned to their country.

The CBP One application was only available in English, Spanish and Haitian Creole. Using the application required a mid-to-high-end smartphone, quality internet access, an email address and some basic technological knowledge. Asylum seekers had to register themselves in the application and then log in each day to request an appointment. There were 1,450 appointments available daily. Seventy percent of available appointments were allocated randomly to individuals and 30% were allocated to people with the oldest accounts who have been waiting the longest.[6] There was also a limit on the number of appointments allocated to Mexican individuals.[7] Amnesty International has documented the many challenges asylum seekers faced in using CBP One, including an onerous registration process, technological flaws, lack of knowledge about the app and how it worked, and financial, literacy and language proficiency barriers. The application essentially operated as a lottery system creating vastly different experiences for individuals using it, as some people received their appointments quickly while

---

[2] Amnesty International, *Americas: Pushback Practices and their Impact on the Human Rights of Migrants and Refugees* (AMR 01/3658/2021) 8 February 2021, amnesty.org/en/documents/amr01/3658/2021/en/, p. 1; Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 10-19.

[3] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 10-19.

[4] US Federal Register, Circumvention of Lawful Pathways, 88 FR 31314, 2023-10146, 16 May 2023, federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways, p. 31322.

[5] US Federal Register, Securing the Border, 89 FR 81156, 2024-22602, 7 October 2024, federalregister.gov/documents/2024/10/07/2024-22602/securing-the-border.

[6] CBP, "CBP Releases January 2024 Monthly Update", 13 February 2024, cbp.gov/newsroom/national-media-release/cbp-releases-january-2024-monthly-update; Amnesty International, USA: CBP One – A blessing or a trap? (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 14-19.

[7] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 14-19.

others waited months.[8] Further, the wait time for appointments increased over time. When Amnesty International visited Tijuana in November 2023, organizations indicated that most people were waiting three to four months for appointments.[9] These same organizations shared that, at the end of 2024, most people were waiting between eight to ten months.[10]

On 20 January 2025, President Trump declared a national emergency at the US-Mexico border, declared that the situation qualified as an "invasion" and suspended entry of non-citizens and people without valid visas.[11] He signed an executive order directing numerous government agencies to take actions to "secure the border, including (1) establishing a wall and other barriers; (2) deterring and preventing entry of illegal aliens; (3) detaining to the maximum extent authorized by law non-citizens apprehended on suspicion of violating federal or state law until they are deported ("catch-and-release"); (4) removing promptly all aliens who enter or remain in violation of Federal law; (5) pursuing criminal charges against non-citizens who violate immigration laws, as well as those who facilitate their unlawful presence; (6) enacting federal-state partnerships to enforce immigration laws; and (7) obtaining complete operational control of US borders."[12] The CBP One application's scheduling system for asylum seekers was terminated and all existing appointments were cancelled, including appointments scheduled for the afternoon of January 20.[13]

The Department of Homeland Security (DHS) reinstated the Migrant Protection Protocols (MPP), better known as the "Remain in Mexico" policy, under which DHS can return people seeking safety to the country they entered the United States from while their asylum claims are resolved or pending the completion of their removal proceedings.[14] However, Amnesty International does not have information as to whether MPP is actually currently being implemented.

Amnesty International condemns that, under the policies put in place by the Trump administration, there is currently no way for individuals at the US-Mexico border to seek asylum in the United States. This violates the United States' international human rights and refugee law obligations.

## ▪ MILITARIZATION OF THE US-MEXICO BORDER

As part of the declared national emergency, the US armed forces have been directed to "take all appropriate action to assist the Department of Homeland Security in obtaining full operational control of the southern border", including constructing additional walls and barriers, and allowing aerial surveillance within 5-miles of the border.[15]

## ▪ ARRESTS, DETENTIONS AND DEPORTATIONS

Another executive order signed by President Trump on 20 January 2025 directs DHS and other agencies to take broad action to enforce immigration laws "against all inadmissible and removable non-

---

[8] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 30-31.

[9] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 31-33.

[10] In-person interviews with people seeking safety and organizations, 4-7 February 2025.

[11] Presidential Action, *Declaring a National Emergency at the Southern Border of the United States*, 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/2025.01.20_EO_-_Declaring_A_National_Emergency_At_The_Southern_Border.pdf; Presidential Action, *Guaranteeing the States Protection against Invasion*, 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/Proclamation_on_Guaranteeing_the_States_Protection_Against_Invasion.pdf; Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.

[12] Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.

[13] CBP, "CBP One™ Mobile Application", 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/CBP_One_Mobile_Application_Website_Update_1.20.25.pdf.

[14] DHS, "DHS Reinstates Migrant Protection Protocols, Allowing Officials to Return Applicants to Neighboring Countries", 21 January 2025, iptp-production.s3.amazonaws.com/media/documents/DHS_Reinstates_Migrant_Protection_Protocols.pdf.

[15] Presidential Action, *Declaring a National Emergency at the Southern Border of the United States*, 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/2025.01.20_EO_-_Declaring_A_National_Emergency_At_The_Southern_Border.pdf; Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.

citizens"; directs the Department of Justice (DOJ) and DHS to take civil and criminal enforcement actions against "sanctuary jurisdictions" (meaning that sanctuary city officials can be prosecuted if they attempt to stop ICE enforcement actions); directs DOJ and DHS to review, pause, terminate and claw back contracts and/or grants with organizations serving "removable or illegal aliens"; and, directs DHS to use sanctions against countries that refuse or delay the acceptance of their nationals subject to removal from the United States, among other things.[16] A policy that protected certain areas, such as churches, schools and hospitals, from immigration enforcement was rescinded, meaning that Immigration and Customs Enforcement (ICE) actions can now be undertaken in these areas.[17]

The Trump administration has begun deporting people to the US detention facility in Guantánamo Bay, Cuba.[18] Deporting individuals to Guantánamo Bay will cut them off from their families and support systems, will make it difficult for individuals to access and receive effective legal representation, and will result in a lack of transparency around immigration and deportation proceedings. The organization is also concerned about detention conditions at the facility.[19]

### ▪ REVOCATION OF TEMPORARY AND HUMANITARIAN PROTECTIONS

Other executive actions have revoked temporary protections for recently arrived people seeking safety who have entered the United States in recent years.[20] ICE issued a memo giving its agents the ability to cancel parole statuses using their discretions, impacting individuals who were paroled into the United States via the CBP One application, people who entered the US via the Cuban, Haitian, Nicaraguan, Venezuelan (CHNV) Parole Program, United for Ukraine, and certain Afghans.[21] The Trump administration ended the CHNV parole program and revoked the humanitarian parole of thousands who had entered the United States through a legal pathway that allowed people to avoid the danger of the border and have two years of temporary safety if they had sponsors in the United States.[22] DHS ended Temporary Protected Status (TPS) for Venezuela. Thousands of Venezuelans, who were otherwise shielded from being deported to the human rights crisis in Venezuela, will lose this status in the coming months, and will be targeted for deportation.[23]

### ▪ SUSPENSION OF FOREIGN AID AND FUNDING

An executive order on US foreign aid resulted in a 90-day pause in United States foreign development assistance pending "reviews of such programs for programmatic efficiency and consistency with United

---

[16] Presidential Action, *Guaranteeing the States Protection against Invasion*, 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/Proclamation_on_Guaranteeing_the_States_Protection_Against_Invasion.pdf; Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.
[17] DHS, "Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole", 21 January 2025, iptp-production.s3.amazonaws.com/media/documents/2025.01.21_DHS_Statement_on_Expanding_Law_Enforcement_and_Humanitarian_Parole.pdf; DHS, Guidelines for Enforcement Actions in or Near Protected Areas, 29 January 2025, dhs.gov/guidelines-enforcement-actions-or-near-protected-areas.
[18] Presidential Actions, *Expanding Migrant Operations Center at Naval Station Guantanamo Bay to Full Capacity*, 29 January 2025, whitehouse.gov/presidential-actions/2025/01/expanding-migrant-operations-center-at-naval-station-guantanamo-bay-to-full-capacity/; DOD, "First Flight of Illegal Aliens Arrives at Guantanamo", 5 February 2025, defense.gov/News/News-Stories/Article/Article/4055497/first-flight-of-illegal-aliens-arrives-at-guantanamo/.
[19] International Refugee Assistance Project, *Offshoring Human Rights: Detention of Refugees at Guantánamo Bay*, September 2024, refugeerights.org/wp-content/uploads/2024/09/Offshoring-Human-Rights-Guantanamo-Bay-English-Report-September-2024-1.pdf.
[20] Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/.
[21] DHS, Memorandum for ICE, CBP & USCIS, 23 January 2025, https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf.
[22] Executive Action, *Securing our Borders*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/securing-our-borders/; USCIS, "Update on Form I-134A", 28 January 2025, uscis.gov/newsroom/alerts/update-on-form-i-134a; US Committee for Refugees and Immigrants, "The Administration stops temporary humanitarian protection pathways for Cubans, Haitians, Nicaraguans and Venezuelans", 22 January 2025, refugees.org/the-administration-stops-temporary-humanitarian-protection-pathway-for-cubans-haitians-nicaraguans-and-venezuelans/#:~:text=On%20January%2020%2C%20the%20Administration,nationals%20with%20U.S.%2Dbased%20sponsors..
[23] Federal Register, Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 FR 9040, 2025-02294, 5 February 2025, federalregister.gov/documents/2025/02/05/2025-02294/termination-of-the-october-3-2023-designation-of-venezuela-for-temporary-protected-status.

States foreign policy".[24] The suspension will have devastating impacts on the operations of organizations around the world that promote human rights and provide important services for people in situations of risk, including migrants and people seeking safety.

# INTERNATIONAL STANDARDS

All individuals have the universal human right to seek and enjoy asylum from persecution and serious human rights violations.[25] All individuals also have the right not to be returned to places where their life or freedom may be endangered or where they would be at risk of torture or cruel, inhuman or degrading treatment or punishment, regardless of their migration status.[26] This principle, known as *non-refoulement*, is a protection under international human rights, refugee, and humanitarian law, and requires states to refrain from returning, removing or transferring anyone to their countries of origin or any other location where there are substantial grounds to believe they would be at risk of serious human rights abuses.[27] The principle of *non-refoulement,* a customary norm under international law, is absolute, and admits no derogations. In order to fulfill the obligation not to refoul individuals, states must have mechanisms with due process guarantees in place to assess individuals for this risk. Collective expulsions that deprive people from an individual assessment of the risks they would face upon return breach the *principle of non-refoulement*.[28]

Both the United States[29] and Mexico[30] have the obligation to ensure the right of individuals to seek asylum, to uphold the principle of *non-refoulement* at all times*,* and to protect and respect the human rights of all people without exception, including asylum seekers and migrants, who are subject to their state's authority by being present in their respective jurisdictions and/or in transit through them. This includes the obligation of allowing them access to territory, as well as the protection of their rights to life, personal integrity, equality and non-discrimination, liberty, and to be free from torture and other cruel, inhuman or degrading treatment or punishment, as well as adequate shelter, assistance and health care.[31]

The Special Rapporteur on the Rights of Migrants has highlighted that the militarization of borders has mainstreamed a security-focused approach that is intrinsically punitive in nature and that has increased the risk of human rights violations against migrants.[32] Similarly, the Inter-American Commission on Human Rights has expressed that the militarization of borders is largely ineffective in discouraging migration and has a negative effect on human rights. The cooperation and participation of the Armed

---

[24] Presidential Actions, *Reevaluating and Realigning United States Foreign Aid*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.

[25] Universal Declaration of Human Rights, Article 14; 1951 Convention Relating to the Status of Refugees; 1967 Protocol Relating to the Status of Refugees; Cartagena Declaration on Refugees, American Convention on Human Rights, Article 22.7.

[26] 1951 Convention Relating to the Status of Refugees, Article 33; Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Article 3(1), American Convention on Human Rights, Article 22.8.

[27] OHCHR, "The Principle of Non-refoulement Under International Human Rights Law", 5 July 2018, https://www.ohchr.org/sites/default/files/Documents/Issues/Migration/GlobalCompactMigration/ThePrincipleNon-RefoulementUnderInternationalHumanRightsLaw.pdf#:~:text=Under%20international%20human%20rights%20law%2C%20the%20principle%20of,degrading%20treatment%20or%20punishment%20and%20other%20irreparable%20harm.

[28] 1951 Convention Relating to the Status of Refugees, Article 33; Committee against Torture, General Comment No. 4 (2017) on the implementation of article 3 of the Convention in the context of article 22, CAT/C/GC/4, 4 September 2018, ohchr.org/en/calls-for-input/general-comment-no-4-2017-implementation-article-3-convention-context-article-22, para. 13.

[29] The United States is State party to the 1967 United Nations Protocol Relating to the Status of Refugees, and is therefore bound to comply, with the obligations deriving from the 1967 Protocol as well as, by incorporation, articles 2-34 of the 1951 Convention Relating to the Status of Refugees.

[30] Mexico is State party to the 1951 Convention Relating to the Status of Refugees, its 1967 Protocol and the Convention against Torture. Mexico has also signed the Cartagena Declaration on Refugees.

[31] International Covenant on Civil and Political Rights; International Covenant on Economic, Social and Cultural Rights; Convention on the Elimination of all forms of Racial Discrimination; Convention on the Elimination of All Forms of Discrimination against Women; Convention against Torture; American Convention on Human Rights; Additional Protocol to the American Convention on Human Rights in the area of Economic, Social and Cultural Rights "Protocol of San Salvador".

[32] Special Rapporteur on the human rights of migrants, Felipe González Morales, Report on means to address the human rights impact of pushbacks of migrants on land and at sea, A/HRC/47/30, 12 May 2021, docs.un.org/en/A/HRC/47/30, para. 54.

Forces or other security forces of a military nature to carry out migration controls, monitor or control borders, or exercise force in relation to migrants could run counter to states obligations to protect and guarantee the human rights of people in movement.[33] On the contrary, migration should be of the exclusive domain of appropriately organized and trained non-militarized, specialist professional bodies that are subject to government and judicial oversight.[34] Moreover, the use of digital technologies in border management and migration control raises serious privacy, non-discrimination and surveillance concerns.[35]

In response to the announcement of mass deportations, Amnesty International strongly recalls that migration is never a crime. International standards prohibit collective expulsion or deportations, meaning that all deportations must respect due process, which includes an individual assessment of the risks upon return. Due process guarantees also encompass the right to be heard, translation, information, and the right to appeal.[36] Particular consideration needs to be given to any international protection needs.[37] Deportations must be assessed on a case by case basis, and only in compliance with a decision made by law. Summary deportations do not comply with due process obligations and deprive individuals from the right to an effective remedy. Likewise, States must refrain from separating families through deportation proceedings.[38]

Detention solely for migration-related purposes is only allowed in the most exceptional of circumstances. The enjoyment of personal liberty must remain any individual's default condition. Migrants, refugees and asylum seekers, like anyone else, must benefit from a legal presumption of liberty and, as a consequence, if they are subject to any deprivation of liberty, this must be clearly prescribed by law, strictly justified by a legitimate purpose, necessary, proportionate and non-discriminatory.

During the deportation, migrants must have access to food, sanitation, basic health care, psychological care, shelter, and other necessities such as adequate clothing during all stages of travel.[39] International law and standards require that restraining measures can only be used when they are strictly necessary and proportionate. Misuse of restraints, such as handcuffs and shackles, can amount to torture or other cruel, inhuman or degrading treatment or punishment.[40]

Finally, States must work together to facilitate return and readmission in conditions of safety and dignity. They must ensure that returnees do not suffer threats to their life, liberty, security and integrity before, during and after return.[41]

# END OF ASYLUM AT THE US-MEXICO BORDER

There is currently no way to seek international protection at the US-Mexico border. The CBP One application was shut down on 20 January 2025 and all existing appointments were cancelled, including

---

[33] IACHR, "IACHR calls on states in the Americas to adopt migration and border management policies that incorporate a human rights approach", 1 April 2021, oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/082.asp.
[34] IACHR, "IACHR calls on states in the Americas to adopt migration and border management policies that incorporate a human rights approach", 1 April 2021, oas.org/en/iachr/jsForm/?File=/en/iachr/media_center/preleases/2021/082.asp.
[35] Amnesty International, *Primer: Defending the Rights of Refugees and Migrants in the Digital Age* (POL 40/7654/2024) 5 February 2024, amnesty.org/en/documents/pol40/7654/2024/en/, p. 12.
[36] IACHR, Inter-American Principles of the Human Rights of all Migrants, Refugees, Stateless Personas and Victims of Human Trafficking, Resolution 04/19, 2019, oas.org/en/iachr/decisions/pdf/Resolution-4-19-en.pdf, Principle 73.
[37] IACHR, Inter-American Principles of the Human Rights of all Migrants, Refugees, Stateless Personas and Victims of Human Trafficking, Resolution 04/19, 2019, oas.org/en/iachr/decisions/pdf/Resolution-4-19-en.pdf, Principle 72.
[38] IACHR, Inter-American Principles of the Human Rights of all Migrants, Refugees, Stateless Personas and Victims of Human Trafficking, Resolution 04/19, 2019, oas.org/en/iachr/decisions/pdf/Resolution-4-19-en.pdf, Principle 61.
[39] IACHR, Inter-American Principles of the Human Rights of all Migrants, Refugees, Stateless Personas and Victims of Human Trafficking, Resolution 04/19, 2019, oas.org/en/iachr/decisions/pdf/Resolution-4-19-en.pdf, Principle 74.
[40] UN General Assembly, United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) resolution / adopted by the General Assembly, A/RES/70/175, 8 January 2016, Rule 47 and 48.
[41] IACHR, Inter-American Principles of the Human Rights of all Migrants, Refugees, Stateless Personas and Victims of Human Trafficking, Resolution 04/19, 2019, oas.org/en/iachr/decisions/pdf/Resolution-4-19-en.pdf, Principle 76.

appointments that were scheduled the afternoon of January 20.[42] According to publicly available information, approximately 270,000 people had been trying to secure appointments through the application and over 30,000 existing appointments were cancelled.[43]

Amnesty International spoke with several individuals who had appointments scheduled for 1pm PST/GMT-8 on 20 January. They shared that they went with their families to the San Ysidro Port of Entry in Tijuana, Mexico, and were even told by agents of the Mexican National Migration Institute (*Instituto Nacional de Migración* – INM) that they would be able to enter the United States, only to find out via email one hour before that their appointments had been cancelled.[44] Staff at the Jardin de Mariposas shelter told Amnesty International, "On Trump's first day in office, he cancelled not only the application, but all the appointments that had already been scheduled. People lost their hopes and dreams. What he did was cruel and humiliating."[45]

Amnesty International also spoke with people who had appointments scheduled for the last days of January and first days of February. The majority had been trying to get a CBP One appointment for between 3 and 10 months. Amnesty International has previously stated that the mandatory use of the CBP One application as the exclusive manner of entry into the United States to seek international protection violates international human rights and refugee law.[46] All of the people seeking safety waiting in Mexico for CBP One appointments should had been able to simply present themselves at ports of entry and claim asylum.

**"I left two children in Colombia, I fled because I was directly threatened at my workplace by armed groups, I had already had to move within Colombia. My ex-husband even was attacked and shot five times; luckily he survived. I live in a shelter and wear masks and sunglasses all the time. I'm afraid to meet anyone from where I'm from. I try to be there as little as possible. Since I arrived in Mexico a year ago, I've been trying every day to get an appointment with the CBP One application. I finally got an appointment for February 9 at 1 pm; I'd been trying to get it for 10 months. Now that appointment is no good. I was so close. I love my country, it's beautiful, my dreams were there, but now the dream is more realistic, I just want safety and stability."[47]** Colombian woman seeking safety

**"If you speak out in Russia, you'll have problems. Two years ago I was arrested for participating in an opposition protest. I fled because the authorities threatened to send me to the war if I continued to speak out against the President, the elections and the war. I tried to get a CBP One appointment for 7 months, but never did. Now that the CBP One application no longer exists, it's complicated. I feel frustrated and disappointed. It was the only way to ask for asylum in the United States. I hope there will be another way soon. There's definitely no way I can go back, so I'm trying to think of my future."[48]** Russian man seeking safety

**"I fled with my family from Ecuador. I'm Colombian, my husband is Venezuelan and our children are Ecuadorian and Venezuelan. We waited for the CBP One appointment for 7 months. We finally got it January 20 in the afternoon. We arrived in Tijuana from the State of Mexico on January 18. We came because we had the appointment. When we arrived to Tijuana, I got an email saying that my appointment was now February 9. I thought it was a mistake because the email didn't explain that the date had changed or why. We still went to the port of entry on January 20. I wanted to go and find out what was happening. We thought they were going to honor the appointments that had been scheduled. When I found out that the appointments had been cancelled, I went cold. We can't return to Ecuador, Colombia or Venezuela. It's unfair that we've gone through so much when we were doing everything the way they asked us to. My dream is to have**

---

[42] CBP, "CBP One™ Mobile Application", 20 January 2025, iptp-production.s3.amazonaws.com/media/documents/CBP_One_Mobile_Application_Website_Update_1.20.25.pdf.

[43] In-person interviews with people seeking safety and organizations, 4-7 February 2025; The Guardian, "US asylum seekers in despair after Trump cancels CBP One app: 'Start from zero again', 23 January 2025, theguardian.com/us-news/2025/jan/23/trump-cbp-one-app-cancelled-mexico.

[44] In-person interviews with people seeking safety and organizations, 4-7 February 2025.

[45] In-person interview, 4 February 2025.

[46] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, p. 65.

[47] In-person interview, 4 February 2025.

[48] In-person interview, 7 February 2025.

**peace and security. My family comes from three countries, they're going to separate us. Trump has damaged so many lives. We can't go back to our countries. It's our right to migrate."**[49] Colombian woman seeking safety

Many asylum seekers shared that, without the CBP One application and the ability to show that they are trying to obtain an appointment because their final destination is the United States, they are afraid that they will be detained by Mexican authorities and returned to their countries of origin. Prior to the application being cancelled, asylum seekers who had been allocated a CBP One appointment were generally able to travel throughout Mexico if they were able to show proof that they had confirmed appointments.[50] A Belorussian man seeking safety said, "We don't have any Mexican documents. Before we felt safe with the CBP One application. It was kind of like a 'status' that allowed us to travel and stay in Mexico. Now without the application, we feel like we're not safe here. I'm worried that the police will stop me because I stand out."[51]

Several individuals shared that they had been living in other cities in Mexico, where they had set up homes and had been working. They left everything and travelled to Tijuana a few days before their CBP One appointments which have now been cancelled.[52] Many shared that they were not sure what to do but were also afraid that they would be stopped by the police or INM if they tried to travel back to the places they had previously been living.[53]

The fact that it is now impossible to seek asylum at the US-Mexico border places Mexicans seeking safety at particular risk. Unlike individuals of other nationalities (who may consider applying for asylum in Mexico), they are fleeing persecution in Mexico and now have no way of seeking international protection in the United States. Many of the Mexicans that Amnesty International spoke with were fleeing situations of domestic violence, organized crime and corruption by local authorities, with Mexico being unable to protect them. Prior to January 20, the situation was already complicated for Mexican asylum seekers because the CBP One application limited the number of daily appointments allotted to Mexican nationals, meaning that they often waited longer amounts of time in order to secure CBP One appointments.

**"I was in a relationship for 20 years with a man who abused me. We never went out. I felt bad all the time. When my daughter was born, he hit me, took her away from me and made me sleep outside, even though I was in pain from having a caesarean section. When I got pregnant with my other son, he hit me with the flat side of a machete. He also strangled me with a belt and wouldn't let go. I felt like he was going to kill me, I was so afraid of losing my baby. When I went for a doctor's appointment, I asked to speak with a psychologist and told her that I was very afraid. She helped me, we reported it, and they put me in a shelter. After a while I went back to my parents' house. Despite the restraining order from the court, he went to look for me, he didn't respect the order. I was working in a pizzeria. He found me, took me to his house and locked me up. Luckily, his parents saw me and let me leave. After that, he tried twice more to take me from my parents' house. They called the police, but the police never came. That's why I came here. A year ago, my sister separated from her husband. Her mother-in-law asked to see the children, so my sister went to her village to meet them. My sister never returned, she was found dead, with four bullets in her body. Even though it was obvious that she had been killed by her ex-partner, the authorities said there wasn't enough evidence. Now the case is closed because they say there is no evidence. That's when I decided to go to the United States. I didn't want to suffer the same fate as my sister. I spent 3 months asking for the CBP One appointment. Finally, I got it on February 9 at the San Ysidro port of entry. My appointment was cancelled and I don't know what we're going to do. I can't go back, I need help. I ask President Trump to give us a chance. We're not going there because we like it, but because we're afraid. The insecurity and violence are horrible. He can save many women. He couldn't save my sister, but he can save me."**[54] Mexican woman seeking safety

---

[49] In-person interview, 5 February 2025.
[50] In-person interviews with people seeking safety and organizations, 4-7 February 2025.
[51] In-person interview, 7 February 2025.
[52] In-person interviews with people seeking safety, 4-7 February 2025.
[53] n-person interviews with people seeking safety, 4-7 February 2025.
[54] In-person interview, 5 February 2025.

**"I experienced domestic violence that got worse and worse. I filed two complaints with the District Attorney's Office, but they never took it seriously. The police told me they couldn't protect me because there were 200 women just like me. They minimized my situation. One day all his threats came true, he attacked me and stabbed me. The police arrived and they called an ambulance. From then on, my nightmare began. I decided to apply for asylum in the United States. I went to the San Ysidro border crossing, but they didn't let me through. I arrived with all the documents, but the INM and National Guard agents told me that there was no way to cross the border, that the only thing to do was to request an appointment through the CBP One application. The problem is that I live here, my risk is here, so I couldn't wait. My ex-partner is still looking for me and harassing me terribly. I had been applying for 6 months and now they tell me there are no more appointments. It's frustrating, you think 'what's going to happen, how are we going to get out of this?'. My 5-year-old son has anxiety crises, he prays to God at night for the appointment. I feel very helpless; my health has been very affected. I can't stay here, I receive threats that terrify me, that say that 'because of women like me, there are so many disappeared women in Tijuana'. No one protects me."**[55] Mexican woman seeking safety

LGBTIQ+ people seeking safety and the shelters and organizations that support them told Amnesty International about the particular risks that this population faces now that it is not possible to request asylum in the United States.[56] LGBTIQ+ individuals face widespread violence and discrimination in Mexico.[57] Staff at the Jardín de Mariposas shelter said, "We feel like an opportunity has been taken away from LGBTI people from Latin America and the rest of the world to save their lives. Trump's decisions are going to cost LGBTI people their lives."[58] They shared that many of the shelter's residents are now making the difficult decisions whether to return to the places from where they originally fled violence or stay in Mexico where they also face violence and discrimination.[59] At the same time, legal protections for LGBTIQ+ people in the United States are deteriorating as a result of executive actions and other policies being put in place by the Trump administration.[60]

Haitians seeking safety and the organizations and shelters that support them also told Amnesty International about the particular risks that this population faces in Mexico.[61] Black people seeking safety are often targets of anti-Black violence, racism and discrimination, in both Mexico and the United States.[62] They are often deprived of equal access to medical treatment, housing, safer shelters, humanitarian services, language access and protection from law enforcement.[63] Haitian Bridge Alliance has identified hundreds of Haitians seeking asylum arriving to the US-Mexico border with significant medical conditions which have, at times, resulted in preventable deaths.[64] A Haitian man seeking safety

---

[55] In-person interview, 4 February 2025.

[56] In-person interviews with people seeking safety and organizations, 4-7 February 2025.

[57] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 60-61; Human Rights First, *Refugee Protection Travesty: Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers*, July 2023, humanrightsfirst.org/wp-content/uploads/2023/07/Refugee-Protection-Travesty_Asylum-Ban-Report_July-2023-1.pdf, p. 41.

[58] In-person interview, 4 February 2025.

[59] In-person interview, 4 February 2025.

[60] Executive Order, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/; Executive Order, *Ending Radical And Wasteful Government DEI Programs And Preferencing*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.

[61] In-person interviews with people seeking safety and organizations, 4-7 February 2025.

[62] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, p. 60; Human Rights First, *Refugee Protection Travesty: Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers*, July 2023, humanrightsfirst.org/wp-content/uploads/2023/07/Refugee-Protection-Travesty_Asylum-Ban-Report_July-2023-1.pdf, 38-39; Black Alliance for Just Immigration, *"There is a Target on Us" – The Impact of Anti-Black Racism on African Migrants at Mexico's Southern Border*, 2021, baji.org/wp-content/uploads/2021/01/The-Impact-of-Anti-Black-Racism-on-African-Migrants-at-Mexico.pdf; Human Rights First, *Inhumane and Counterproductive: Asylum Ban Inflicts Mounting Harm*, October 2023, humanrightsfirst.org/wp-content/uploads/2023/10/Inhumane-and-Counterproductive-final-report.pdf, pp. 31-32.

[63] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, p. 60; Haitian Bridge Alliance et al, *Lives at Risk: Barriers and Harms as Biden Asylum Ban Takes Effect, May 2023*, humanrightsfirst.org/wp-content/uploads/2023/05/Barriers-and-Harms-As-Biden-Asylum-Ban-Takes-Effect31.pdf, p. 3.

[64] Human Rights First, *Inhumane and Counterproductive: Asylum Ban Inflicts Mounting Harm*, October 2023, humanrightsfirst.org/wp-content/uploads/2023/10/Inhumane-and-Counterproductive-final-report.pdf, p. 31.

told Amnesty International, "I tried to get a CBP One appointment for eight months but never got one. Life in Mexico is very difficult. We're discriminated against. It's difficult for us to get jobs. Imagine having a baby and no job. I have to buy diapers. We can't live here but we can't go home. Maybe in four years, something will change."[65]



© Lauren Murphy, Amnesty International USA

Organizations interviewed by Amnesty International also indicated that they are afraid to accompany unaccompanied children to the port of entry in Tijuana because they are not sure how Customs and Border Protection agents will respond and whether the children will be able to enter the United States.[66] Staff at Al Otro Lado told the organization, "Nothing can prepare a person to face the system that is meant to fail them – especially a child. The people accountable for this should be the ones who face these kids and tell them that they're not a priority – they should be the ones to wipe away their tears."[67]

Both individuals and organizations that Amnesty International spoke with shared the profound mental health impacts that the cancellation of the CBP One application has had on people seeking safety. Many people seeking safety told the organization that they were afraid and felt despair, sadness, anger and frustration.[68] Many also expressed frustrations that they been following the policies put in place by the United States and had been using the CBP One application trying to get appointments. A Mexican woman seeking safety said, "I was very excited, but then they told me it was cancelled. I went into depression, despair. I'm trying to figure out how to get through this. I cried a lot of tears."[69] Staff at the Jardin de Mariposas shelter shared, "The residents of the shelter cried a lot when they found out about the appointments. Now it's like we're in mourning. It was a dark, grey week. The feeling was tense. They were robbed of a dream. They had every desire to do things in the right way, following the laws and

---

[65] In-person interview, 7 February 2025.
[66] In-person interview, 4 February 2025.
[67] In-person interview, 4 February 2025.
[68] In-person interviews with people seeking safety, 4-7 February 2025.
[69] In-person interview, 5 February 2025.

rules."[70] Another woman said, "I was disappointed when they cancelled the appointments. It was our hope. I lost everything the day they took away the appointments. We were doing things right; we did things the right way. We're people who need help. Now we have nowhere to go. We need a safe place. It's a dream gone down the drain."[71] A Venezuelan woman seeking safety shared, "Trump broke my heart. When our appointments were cancelled, I wanted to cry. I've never experienced such a bad feeling."[72] A Mexican woman shared, "I was using the app for 10 months and never got the appointment. I feel bad. I had hope; now what are we going to do? We're hanging by a thread. I go through ups and downs. I'm surviving. It's exhausting to be surviving all the time."[73] Another added, "I'm very sad, we were hoping to be able to enter the United States legally. Now that the appointments have been cancelled, I don't know what we are going to do. My children have already missed out on the school year. It's very hard. My son is desperate, he tells me 'Mom, when are we going to cross, we've been here for a long time?'. It breaks my heart."[74]

Amnesty International condemns that, under the policies put in place by the Trump administration, there is currently no way for individuals at the US-Mexico border to seek asylum in the United States. This violates the United States' international human rights and refugee law obligations.

On 21 January 2025, DHS reinstated the Migrant Protection Protocols (MPP), better known as the "Remain in Mexico" policy, at the US-Mexico border. Amnesty International does not have information as to whether MPP is actually currently being implemented and none of the organizations or shelters that were interviewed had information about this. Even if MPP is being implemented, Amnesty International has documented that INM agents commonly block access to US ports of entry and stop people seeking safety from approaching them, meaning that, in practise, it will likely be difficult for individuals to approach CBP agents to enroll themselves in the program.[75] Amnesty International considers that MPP, and similar programs, violate the rights of people seeking safety as they limit access to territory, to asylum and result in pushbacks which can lead to violations of the right to *non-refoulement*.[76]

Organizations interviewed by Amnesty International shared that the fact that it is no longer possible to seek asylum at the US-Mexico border will force people seeking safety to attempt more dangerous routes to enter the United States, which will put their lives at risk.[77] They believe that there will also be an increase in smuggling, and violence against asylum seekers, including extortion, by both state and non-state actors.[78] Numerous organizations, including Amnesty International, have previously documented how past US migration policies have led to increases in irregular border crossings by at-risk people who cannot safely wait in Mexico.[79]

# MILITARIZATION OF BORDERS

As a result of the executive order declaring a national emergency at the US-Mexico border, the US Department of Defense will "begin augmenting its forces at the southwest border with an additional ~1500 ground personnel, as well as helicopters with associated crews, and intelligence analysts to

---

[70] In-person interview, 4 February 2025.
[71] In-person interview, 4 February 2025.
[72] In-person interview, 5 February 2025.
[73] In-person interview, 5 February 2025.
[74] In-person interview, 5 February 2025.
[75] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, p. 24.
[76] Amnesty International, *Americas: Pushback Practices and their Impact on the Human Rights of Migrants and Refugees* (AMR 01/3658/2021) 8 February 2021, amnesty.org/en/documents/amr01/3658/2021/en/, p. 1; Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 10-13.
[77] In-person interviews with people seeking safety and organizations, 4-7 February 2025.
[78] In-person interviews with people seeking safety and organizations, 4-7 February 2025.
[79] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 62-64.

increased detention and monitoring efforts", which represents a 60 percent increase in active-duty forces at the border since 20 January.[80]

In response to tariff threats by the United States, in February 2025, Mexico agreed to strengthened militarization measures[81] by sending 10,000 National Guard agents to the US-Mexico border.[82] In December 2024, Canada began executing a $1.3 billion CAD border security plan, and following tariff threats, agreed to mobilize additional law enforcement personnel and invest more resources in border security.[83]

Amnesty International is extremely concerned about the increased militarization of both the United States' northern and southern borders, as well as the use of armed forces in migration control operations, given their security-centered approach and the risk of human rights violations, including the profile of military personnel and their lack of training and skills to respond appropriately to people in situations of vulnerability and in need of international protection.[84]



© Alli McCracken, Amnesty International

---

[80] DOD, "Acting Secretary of Defense Robert Salesses Statement on DOD Actions Responding to President Trump's Executive Order on Securing our Border", 22 January 2025, defense.gov/News/Releases/Release/Article/4037500/acting-secretary-of-defense-robert-salesses-statement-on-dod-actions-responding/; DOD, "DOD Orders 1,500 Troops, Additional Assets to Southern Border", 22 January 2025, defense.gov/News/News-Stories/Article/Article/4037935/dod-orders-1500-troops-additional-assets-to-southern-border/.

[81] The National Guard has migration faculties since 2019 with the National Guard Law, article 9. Militarization of borders also occurred during other administrations, such as the administration of President Andrés Manuel López Obrador and Enrique Peña Nieto. Aminal Político, "En su cuarto año, AMLO despliega a 46% más militares y guardias para contener a migrante; detenciones llegan a 345 mil", 2 September 2022, animalpolitico.com/sociedad/mas-militares-guardias-nacionales-detener-migrantes (only available in Spanish).

[82] White House, "Fact Sheet: President Donald J. Trump Imposes Tariffs on Imports from Canada, Mexico and China", 1 February 2025, whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-imposes-tariffs-on-imports-from-canada-mexico-and-china/; AP News, "Mexico deploys the first of 10,000 National Guard troops to US border after Trump's tariff threat", 5 February 2025, apnews.com/article/national-guard-mexico-border-ciudad-juarez-sheinbaum-b26e9d359f4f17b60925bd3935d169d3.

[83] Government of Canada, "Strengthening border security", 3 February 2025, canada.ca/en/services/defence/securingborder/strengthen-border-security.html?utm_campaign=ps-sp-borders-frontieres-24-25&utm_medium=gc-features&utm_source=web; X, Tweet from Justin Trudeau, 3 February 2025, x.com/JustinTrudeau/status/1886529228193022429.

[84] Amnesty International, Changing the paradigm: from the militarization of public security to human rights-based citizen security, (AMR 41/8665/2024), 2024, amnistia.org.mx/contenido/wp-content/uploads/2024/11/INFORME-CAMBIANDO-PARADIGMA-DIGITAL.pdf, p. 23 (only available in Spanish); Fundación para la Justicia y el Estado Democrático de Derecho, Bajo la Bota, militarización de la poítica migratoria en México, 2022, fundacionjusticia.org/bajo-la-bota-militarizacion-de-la-politica-migratoria-en-mexico/ (only available in Spanish).

# CURRENT SITUATION IN MEXICO

### ▪ ACCESS TO ASYLUM IN MEXICO

Since it is now impossible to apply for asylum at the US-Mexico border, many people who cannot return to their countries of origin are deciding to apply for international protection in Mexico. This represents a major challenge as many of these people have been waiting for months for a CBP One appointment to present their cases in the US and now find themselves outside the 30-working-day legal window to apply for asylum in Mexico.[85]

Organizations mentioned to Amnesty International that the Mexican Commission for Refugee Assistance (*Comisión Mexicana de Ayuda a Refugiados* – COMAR) is accepting applications, despite the fact that they are past the 30-day limit, accepting as justification for the late submission of the application that the person was unable to obtain a CBP One appointment prior to the cancellation of the application. Amnesty International recognizes this as a good practice by COMAR in Tijuana. However, because of similar situations in the past, there are fears that this criterion will change, or may not be applied consistently in other states throughout Mexico.[86] There is a risk that people in need of international protection will be left without protection for failing to apply within the established timeframe.

In addition, organizations mentioned as a challenge the fact that there is only one COMAR office in the state of Baja California (where Tijuana is located), so when people seeking safety want to apply elsewhere in the state, they can do so through the National Migration Institute (INM).[87] This has presented a challenge for asylum seekers who do not have legal assistance and who present themselves before the INM to request asylum, since, according to civil society testimonies, they are often turned away by the authorities, who do not receive their asylum requests or provide them with any information about it.[88]

Another situation occurring in Tijuana are those of people who started their refugee claim in another state, such as Chiapas and Mexico City, but then abandoned the process and moved to Tijuana with the intention of obtaining a CBP One appointment to seek asylum in the United States. Since it is no longer possible to claim asylum in the US, some of these individuals wish to resume their applications in Tijuana, given that they have now settled in Baja California. This is posing a challenge because COMAR is not transferring proceedings but instead instructing people to wait until the proceedings they initiated are closed and to then start a new one. According to organizations interviewed by Amnesty International this unnecessarily delays processes and creates more bureaucracy that could be avoided so as not to further saturate and delay asylum responses in Mexico.[89]

Finally, organizations expressed concern regarding the presence of the National Guard at the border, as it could lead to human rights violations. They mentioned that, in the past weeks, National Guard agents were surrounding the COMAR office in Tijuana, which generates fear in asylum seekers of approaching authorities and exercising their right to seek asylum.[90]

### ▪ SECURITY SITUATION

The US migration policies described above and the fact that it is no longer possible to claim asylum at the US-Mexico border, mean that asylum seekers who were planning on entering the United States are

---

[85] Mexico, Law on Refugees, Complementary Protection and Political Asylum (Ley sobre Refugiados, Protección Complementaria y Asilo Político), Art. 18.

[86] In-person interview, 7 February 2025.

[87] According to Article 21 of the Law on Refugees, Complementary Protection and Political Asylum, "any authority having knowledge of the intention of a foreigner to request recognition of refugee status must immediately notify the Secretariat in writing. Failure to comply with the foregoing will be sanctioned in accordance with the applicable provisions on the responsibilities of public servants."; In-person interviews with organizations, 4-7 February 2025.

[88] In-person interviews with organizations, 4-7 February 2025.

[89] In-person interviews with people seeking safety and organizations, 4-7 February 2025.

[90] In-person interviews with organizations, 4-7 February 2025.

now stranded in Mexico. As documented previously by Amnesty International asylum seekers traveling through Mexico face violence by both state and non-state actors.[91] Many were forced to pay Mexican authorities, members of criminal groups or unknown individuals at roadblocks throughout the country. Others were charged more for bus tickets or were not sold tickets at all because they are migrants.

**"We would rather go through the Darién jungle five times than through Mexico. Mexico is the worst thing that can happen to you as migrants, you risk ending up in a coffin. We walked from Chiapas to Mexico City, you go like a crab, you advance a little, migration catches you and takes you back to Tapachula. Taxis or trucks won't pick us up, if they accept, they charge us double or triple the rate. It's a very ugly experience."**[92] Colombian man seeking safety

Amnesty International also documented how people seeking safety were subjected to extortion and kidnappings by both state and non-state actors.[93] Additionally, the majority stay in shelters or informal encampments with inadequate living conditions.[94] People seeking asylum struggle to access healthcare, education and employment opportunities.[95]

**"We had a very bad experience in Caborca. We were taken off the train by armed people, they took everything we had and kidnapped us, they took us to a house. We were lucky because at 10am the next day the army rescued us. They took us to file a complaint, but afterwards they didn't give us any support or any documents. Imagine, we fled because of the war violence in our country and here the same thing is happening to us. Now we're thinking of taking the risk and crossing however we can, whatever God wants us to do."**[96] Group of Colombian and Ecuadorian people seeking safety

## ▪ CANCELLATION OF THE ISSUING OF VISITOR CARDS FOR HUMANITARIAN REASONS

The majority of asylum seekers do not have any sort of migratory document issued to them by the Mexican Government, which places them at even greater risk of detention and deportation by state authorities, and makes it harder for them to access their rights in Mexico. This happens despite having the right to get a Visitor Card for Humanitarian Reasons (*Tarjeta de visitante por razones humanitarias – TVRH*).

Victims or witnesses of a crime committed in Mexico, children or adolescents, and people seeking international protection are entitled to a TVRH. The authorities may also decide to grant a TVRH for humanitarian reasons or if they determine that it is in the public interest.[97]

This document is essential for people who are at risk in Mexico, as it allows them to integrate into the country. With a TVRH they have a regular migration status and access to rights, such as formal paid work, health, education, and financial services. Despite being a right established by law, the INM decided to cancel the issuance of TVRHs at the beginning of 2024, a situation that continues to date.[98]

According to organizations interviewed by Amnesty International, instead of issuing a TVRH, sometimes the INM only issues a document that consists of a sheet of paper with the duration of the validity of the document; it does not even have a photograph of the person.[99] Even when this document protects them from detention and deportation and it grants them the right to work, it does not guarantee that people

---

[91] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 48-61.

[92] In-person interview, 5 February 2025.

[93] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 49-55.

[94] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 57-58.

[95] Amnesty International, *USA: CBP One – A blessing or a trap?* (AMR 51/7985/2024) 8 May 2024, amnesty.org/en/documents/amr51/7985/2024/en/, pp. 58-60.

[96] In-person interview, 5 February 2025.

[97] Mexico, Migration Law (Ley de Migración), Art. 52.V.

[98] CMDPDH, "CSOs call for guaranteeing effective access to human rights for people in mobility", 30 January 2024, cmdpdh.org/2024/01/30/osc-llaman-a-garantizar-el-acceso-efectivo-de-derechos-humanos-de-personas-en-movilidad/ (only available in Spanish).

[99] In-person interviews with organizations, 4-7 February 2025.

seeking safety will be able to fully access their rights, as, according to testimonies received by Amnesty International, the document is not accepted by companies that could hire them for formal jobs.[100]

**"We love our tropical country, but we can't live in Haiti for insecurity reasons. We also can't enter the US or live in Mexico. We're trying to work in Tijuana while we wait, but it's challenging. There are jobs here, but if you want to work for a factory, they ask for a lot of documents, including the humanitarian visa. We don't have that document. We give them what we have, but it's never enough. We also face discrimination; they always prefer to hire Mexicans or white people over black people. Some of us have a lot of experience, I'm a systems engineer, but can't find a proper job."[101]** Haitian man seeking safety

This situation causes even more concern given the current circumstances, in which there is likely to be a significant increase in asylum applications, which may cause a delay in decisions, leaving persons in need of international protection in limbo and with significant difficulties in accessing their rights.

# IMPACTS OF CANCELLED FUNDING ON ORGANIZATIONS AND HUMANITARIAN PROJECTS SUPPORTING MIGRANTS AND REFUGEES

An executive order on US foreign aid resulted in a 90-day pause in United States foreign development assistance pending "reviews of such programs for programmatic efficiency and consistency with United States foreign policy".[102] Many organizations received "stop work" orders, have had to lay off staff and have had to suspend their operations while this 90-day review takes places.[103] According to WOLA, "State Department and USAID-managed foreign assistance to Latin America and the Caribbean totaled a little over $2 billion in FY 2023, the most recent year for which an actual amount is available."[104]

Shelters, national and international organizations told Amnesty International of the immediate impacts they have suffered following the freezing of almost all US funding for overseas support programmes, which also has a direct impact on people on the move in Mexico.[105] Some shelters mentioned that the loss of funding to international organizations has had a direct impact on them, as they are no longer receiving some types of support, such as food, which they used to receive every month, or support for services such as internet, telephone, household appliances, infrastructure, fuel and security measures. Other organizations have been forced to cancel activities they used to carry out in shelters, such as providing legal advice or carrying out recreational activities with children and adolescents. Economic support given directly to asylum seekers by organizations has also been cancelled.[106]

**"It was already clear that this was going to be chaotic, but we didn't realise it was going to be like this, we thought it was going to be staggered, with time. We've been able to pay for the cut in aid for now, but we're taking money that was destined for other things, such as hiring more people. These measures directly affect a population that is being hit from all sides, they can't work in Mexico, they don't have documents, they don't have money. Imagine now that it's more difficult to give them internet, food, a safe place."[107]** Staff, Jardín de Mariposas shelter

---

[100] In-person interviews with organizations, 4-7 February 2025.
[101] In-person interview, 7 February 2025.
[102] Presidential Actions, *Reevaluating and Realigning United States Foreign Aid*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.
[103] DOS, "Implementing the President's Executive Order on Reevaluating and Realigning United States Foreign Aid", 26 January 2025, state.gov/implementing-the-presidents-executive-order-on-reevaluating-and-realigning-united-states-foreign-aid/.
[104] WOLA, Trump's pause of U.S. Foreign Assistance to Latin America: An "America Last" Policy, 31 January 2025, wola.org/analysis/trumps-pause-of-u-s-foreign-assistance-to-latin-america-an-america-last-policy/.
105 In-person interviews with organizations, 4-7 February 2025; Presidential Actions, *Reevaluating and Realigning United States Foreign Aid*, 20 January 2025, whitehouse.gov/presidential-actions/2025/01/reevaluating-and-realigning-united-states-foreign-aid/.
[106] In-person interviews with organizations, 4-7 February 2025.
[107] In-person interview, 4 February 2025.

Staff working in shelters that Amnesty International spoke with mentioned that some international organizations have already withdrawn their support in Tijuana and that others have had to close permanently.[108] Shelters are also at risk of closing or asking for financial contributions from the migrants and refugees themselves to cover their expenses.[109] There have also been reports of job losses in the humanitarian sector and the cancellation of contracts that were already underway.[110] All of this has a direct impact on the care and services received by people seeking safety, which can further aggravate their situation.



© Alli McCracken, Amnesty International

---

[108] In-person interviews with organizations, 4-7 February 2025.
[109] In-person interviews with organizations, 4-7 February 2025.
[110] Asylum Access Mexico, "Important notice: update on the recruitment process", 5 February 2025, facebook.com/AsylumAccessMX/photos/comunicadourgente-actualizaci%C3%B3nvacantesestimada-comunidadqueremos-agradecerles-p/677125011305747/?_rdr (only available in Spanish).

# SITUATION OF DEPORTEES IN MEXICO

According to publicly available information, the Mexican government has received approximately 6,244 deportees in the first two weeks of the Trump administration, including approximately 1,000 individuals of other nationalities.[111]

According to organizations and individuals interviewed by Amnesty International, deportees have special needs and challenges depending on their personal situation.[112] They are deported to Mexico without any documents from US authorities. Some of them have spent almost all, if not all, their lives in the US, and do not speak Spanish or have any ties in the country. Some lack Mexican documents, which are crucial for their access to rights, including being able to secure a formal job, access to health care or validating their studies. The majority lack information and come with mental distress and have experienced family separation. Some of them need medical support and help reintegrating into Mexican society.[113]



© Lauren Murphy, Amnesty International USA

Amnesty International interviewed a Mexican man who had recently been deported from San Diego to Tijuana. He explained that he was arrested and removed to Mexico the same day. He was not shown a

---

[111] Statista, "Trump's second term of mass deportations begins", 10 February 2025, statista.com/chart/33897/number-of-latin-american-migrants-deported-from-the-us/; Forbes, "México ha recibido 6,244 migrantes deportados por Trump incluyendo 1,371 de otros países", 30 January 2025, forbes.com.mx/mexico-ha-recibido-6244-migrantes-deportados-por-trump-incluyendo-1371-de-otros-paises/ (only available in Spanish); La Jornada, "Deportados 4 mil 94 personas en primera semana con Trump: Sheinbaum", 27 January 2025, jornada.com.mx/noticia/2025/01/27/politica/deportados-4-mil-94-personas-en-primera-semana-con-trump-sheinbaum-3318 (only available in Spanish); El País, "A breakdown of the Mexicans deported from the US: 4.4 million in 15 years, from Obama's iron fist to Trump's xenophobia", 24 January 2025, english.elpais.com/usa/2025-01-24/a-breakdown-of-the-mexicans-deported-from-the-us-44-million-in-15-years-from-obamas-iron-fist-to-trumps-xenophobia.html.
[112] In-person interviews with organizations and individuals, 4-7 February 2025.
[113] In-person interviews with organizations and individuals, 4-7 February 2025.

deportation order by ICE agents, did not have access to a lawyer throughout the process, did not appear before a judge and was not able to appeal the deportation decision.[114]

**"I've been in Tijuana for 3 weeks. I was deported from the United States. They handcuffed my hands, waist and ankles. It's mistreatment, it's not fair. I lived in San Diego for 17 years. I was leaving my house to go to work, and they arrested me. They told me I had a deportation order, but I didn't know anything about it. They arrested me between 12:30pm and 1 pm and by 4 pm I was in Tijuana. I never saw my lawyer or a judge. My car, my house, my things, everything is there. They told me I can't enter the United States for 10 years. The President is separating families, the economy is also going to suffer, I think all of this is a mistake."[115]** Mexican man

Despite the announcement of the mass deportations by President Trump, organizations that Amnesty International spoke with indicated that the number of deportees remains similar to those of previous months in Tijuana. However, in preparation for the possibility of increased numbers, the Mexican Government started a national program to welcome deportees back to Mexico called "Mexico Embraces You" (*México te abraza*). The program includes 10 shelters that will receive deportees with housing, food and access to healthcare.[116] The government is also providing a "welfare card" (*Tarjeta de Bienestar*) that has $2,000 MXN (approximately 97 USD) and free internet, as well as services and help to obtain Mexican identity documents. The government is also providing Mexican deportees with transportation to their places of origin in Mexico.[117] In Tijuana, the shelter was set up in an old event hall named "Flamingos Eventos". Once a person is deported from the US and arrives in Tijuana, they can get into vans that take them to the shelter.[118]

Organizations interviewed by Amnesty International expressed that the Mexican government developed and is implementing the plan without consulting with organizations that have years of experience and knowledge in identifying and addressing the needs of deportees.[119] They shared that they have expressed their willingness to help and to visit the Flamingos shelter, but that access has been denied. Until now, no international or national organization has accessed the shelter. Organizations reported that the shelter is "prison-like" and surrounded by militarized police (National Guard). They also claim that deportees are taken to Flamingos unless someone picks them up from the repatriation station at the PedWest port of entry and that they cannot go outside once they arrive at the shelter, unless they decide to return to their place of origin in Mexico. Further, organizations indicated that if a deportee does not go to the shelter, they do not have access to the support provided by the Mexican government, such as the "welfare card" (*tarjeta del bienestar*).[120]

The only document that deportees are given is a repatriation document provided by the Mexican government, which is not an official identification, but a piece of paper that allows them to travel within the country for one month. Likewise, the "Mexico Embraces You" program only allows deportees to go back to their place of origin in Mexico, even if they do not have any ties or family there.[121] This is especially concerning for individuals who were forcibly displaced by violence and cannot return to their place of origin. The government is not identifying them properly and has no special support for them as internally displaced persons.

---

[114] In-person interview, 5 February 2024.
[115] In-person interview, 5 February 2024.
[116] Government of Mexico, "Mexico Embraces You" (México te abraza), 28 January 2025,
gob.mx/cms/uploads/attachment/file/971337/28enero25_M_xico_te_abraza.pdf.  Two centers in Baja California: Tijuana and Mexicali; two centers in Sonora: Nogales and San Luis del Río Colorado; one center in Ciudad Juárez, Chihuahua; one center in Nueva Rosita, Coahuila; one center in El Carmen, Nuevo León; and three centers in Tamaulipas: Matamoros, Reynosa and Nuevo Laredo.
[117] Government of Mexico, "Mexico Embraces You" (México te abraza), 28 January 2025,
gob.mx/cms/uploads/attachment/file/971337/28enero25_M_xico_te_abraza.pdf.
[118] In-person interviews with organizations, 4-7 February 2025.
[119] In-person interviews with organizations, 4-7 February 2025.
[120] In-person interviews with organizations, 4-7 February 2025.
[121] Government of Mexico, "Mexico Embraces You" (México te abraza), 28 January 2025,
https://www.gob.mx/cms/uploads/attachment/file/971337/28enero25_M_xico_te_abraza.pdf.

Even when "Mexico Embraces You" is a program that aims to help deportees, the inclusion of a protection perspective towards deportees is essential. Likewise, it could benefit from civil society and international organizations' experience, feedback and help.

# CONCLUSIONS AND RECOMMENDATIONS

Amnesty International has observed the devasting and immediate impacts of the Trump administration's migration and asylum policies at the US-Mexico border. These policies violate international human rights and refugee law. Moreover, taken together, Amnesty International is concerned that these policies and the rhetoric and arguments used to justify them and garner support for them, are rooted in white supremacy and perpetuate false narratives about people seeking safety and migrants.[122]

Amnesty International calls on both the United States and Mexico to guarantee the rights of individuals to seek asylum.



*Presumably the names of people lost along the way © Alli McCracken, Amnesty International*

Taking into consideration Amnesty International's independent findings and the United States' and Mexico's human rights obligations under international law, the organization makes the following recommendations.

### ▪ TO THE UNITED STATES

Guarantee the right of individuals to seek asylum, including by immediately restoring access to asylum at the US-Mexico border and immediately admitting asylum seekers who had CBP One appointments that were cancelled.

Ensure access to US territory. Ensure that access to US ports of entry is not restricted and refrain from requesting or encouraging Mexican authorities to block access to ports of entry.

---

[122] Amnesty International, "Amnesty International USA Reaction to President Trump's Anti-Immigrant Executive Actions", 20 January 2025, amnestyusa.org/press-releases/amnesty-international-usa-reaction-to-president-trumps-anti-immigrant-executive-actions/.

Respect the principle of non-refoulement at all times and ensure that no one, regardless of status, is returned to a place where their life or safety are at risk. Ensure an assessment of the risk upon return prior to any removal from the United States and the right of individuals to due process, including the right to an effective remedy

Guarantee the right to due process in all immigration and asylum proceedings, including the right to counsel, the right to see a judge, and without the fear of immigration enforcement at courthouses.

End any agreements with the Government of Mexico, or any other countries, that allow or facilitate the return of people seeking safety to places where their lives or safety are at risk.

Immediately revoke the declaration of a national emergency at the US-Mexico border. Immediately rescind the order that the Department of Defense participate in migration control operations.

Stop mass Immigration and Customs Enforcement (ICE) operations in the United States. Immediately reinstate the policies that protected certain areas, including churches, schools and hospitals, from immigration enforcement.

Refrain from using hand, waist and ankle shackles when removing individuals from the United States.

Ensure that any individuals who are deported from the United States to their countries of origin are provided with their US immigration documents and any other relevant documents.

Stop the transfer of migrants and asylum seekers to the Guantanamo Bay Detention Center.

Immediately reinstate US foreign aid. Increase funding available to humanitarian and community-based organizations that provide shelter and services to asylum seekers on both sides of the US-Mexico border.

Invest in the creation of a system of welcome where people seeking safety have safe pathways and access to ports of entry to enter the US and pursue their asylum claims in communities supported by family, lawyers, and case management and social services for those that need them.

## ▪ TO MEXICO

Stop collaborating with the United States Government in the implementation of policies that violate the human rights of migrants and asylum seekers.

Ensure that asylum seekers who wish to apply for asylum in the US are not prevented from accessing US ports of entry and are able to safely access US territory.

Immediately implement measures to ensure the safety and security of asylum seekers transiting through Mexico. This should include public policies to prevent crimes against them, such as providing security to migrants in high-risk areas and ending impunity. Strengthen the mechanisms to combat corruption.

Guarantee the right of individuals to seek asylum. Continue the good practice observed in Tijuana of allowing persons in need of international protection to initiate their applications in Mexico, despite the expiry of the 30-working day deadline established in national legislation. This good practice should continue to be implemented throughout the country and should not be restricted in time.

Issue TVRHs for migrants and asylum seekers in accordance with the Migration Law. Ensure migrants and asylum seekers have effective access to their economic and social rights.

Ensure that the National Guard is not involved in migration enforcement.

Provide comprehensive assistance to Mexican internally displaced persons who are at the border fleeing violence in their places of origin or habitual residence and who cannot return for security reasons.

Include civil society organizations and international organizations in the policies being implemented for the reception of Mexican nationals deported from the United States. This includes allowing them access to the shelters that the federal government is building at the borders.

Allow Mexican deportees to decide to return to a place other than their place of origin if they have ties, family, or simply a desire to settle in another state. Identify persons who cannot return to their place of origin for protection or security reasons and provide them with adequate care.

Allow deportees to access government support, without conditioning support to their stay in shelters established by the government.

Amnesty International is a movement of 10 million people which mobilizes the humanity in everyone and campaigns for change so we can all enjoy our human rights. Our vision is of a world where those in power keep their promises, respect international law and are held to account. We are independent of any government, political ideology, economic interest or religion and are funded mainly by our membership and individual donations. We believe that acting in solidarity and compassion with people everywhere can change our societies for the better.



**Contact**

info@amnesty.org

facebook.com/
AmnestyGlobal

@Amnesty

amnesty.org

Amnesty International
Peter Benenson House
1 Easton Street
London WC1X 0DW, UK

Except where otherwise noted, content in this document is licensed under a Creative Commons (attribution, non-commercial, no derivatives, international 4.0) licence (see creativecommons.org/licenses/by-nc-nd/4.0/legalcode).

Where material is attributed to a copyright owner other than Amnesty International, this material is not covered by the Creative Commons licence.

For more information, visit the permissions page on Amnesty International's website.

Index: **AMR 51/9029/2025**

Publication: **February 2025**

Original language: **English**

© Amnesty International 2022

# EXHIBIT 18

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 78 of 120



COMMUNITY

# Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise.

*When Jerry Sheridan was second-in-command at the Maricopa County Sheriff's Office, a federal judge found he had undermined reforms meant to root out racial profiling. Now, as head of the department, Sheridan is pushing to end the court's oversight.*

by Rafael Carranza, Arizona Luminaria, photography by Jesse Rieser for ProPublica
March 26, 2026

The sheriff of Maricopa County, Arizona, Jerry Sheridan, spent his first year in office grappling with a long-running racial profiling lawsuit. / El sheriff del condado de Maricopa, Arizona, Jerry Sheridan, ha pasado su primer año en el cargo lidiando con una demanda de larga data por perfilamiento racial. Crédito: Jesse Rieser para ProPublica Credit: Jesse Rieser for ProPublica

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 79 of 120

**Lee en español**

*This article was produced for ProPublica's Local Reporting Network in partnership with Arizona Luminaria. **Sign up for Dispatches** to get ProPublica stories in your inbox every week.*

In one talk radio appearance after another, Sheriff Jerry Sheridan has declared that his department had eliminated the racial bias that plagued it under his former boss Joe Arpaio. As a result, he's quick to add, a landmark racial profiling court case dictating much of what the Maricopa County sheriff's department does should be dismissed.

"I believe we are in compliance with the court order. We're not a racist organization, and we don't racial profile," he said on Phoenix-area talk radio in March 2025.

In May, he told the same radio host: "Is the Maricopa County Sheriff's Office racially profiling or are they racially biased? We have documentation for well over 10 years that that is not the case."

His evidence for ending oversight stemming from Melendres v. Arpaio, the federal case whose 2013 settlement imposed parameters the department has operated under ever since, was a monthly sampling of a few dozen traffic stops. The settlement requires deputies to document each stop in exacting detail. The report, analyzed by a court-appointed monitor, showed individual deputies had not used race to initiate that limited sample of traffic stops.

But annual reviews of every traffic stop or arrest of a Latino driver have repeatedly contradicted Sheridan's claim. With the exception of one year, **each of the past 10 reports showed disparities affecting Latino drivers**. The latest, **covering 2024**, found, "Stops involving Hispanic drivers were more likely to result in an arrest than stops involving White drivers."

Under Sheriff Arpaio, deputies began in 2007 to use traffic stops to arrest people on immigration charges, illegally racially profiling Latinos in the process. When the constitutional violations spurred the Melendres lawsuit, a judge found they were so widespread that he included the county's more than 1 million Latino residents as plaintiffs in the case. Fallout from it ended Arpaio's political career.

Sheridan, a Republican, was Arpaio's second-in-command. During his campaign for sheriff in 2024, Sheridan pledged to cooperate with the court-appointed monitor. He predicted that the judge overseeing the case, U.S. District Judge G. Murray Snow, would be pleased to see him back in the courtroom given his understanding of the settlement. He could hit the ground running and bring the case to a close, Sheridan said.

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 80 of 120

**READ MORE**



## This Arizona county was the "model" for local police carrying out immigration raids. It ended in civil rights violations.

Under Sheriff Joe Arpaio, Maricopa County was one of the first testing grounds for ICE's 287(g) program, which lets local police enforce immigration laws. Many…

**Keep reading**

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 81 of 120



## Arizona police agencies were once at the forefront of local immigration enforcement. Now most are avoiding it.

In January, the Trump administration launched a national recruitment campaign to deploy local officers as deportation agents. It has added more than 900 agencies, but…

**Keep reading**

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 82 of 120



**Local police join ICE deportation force in record numbers despite warnings program lacks oversight**

Since the start of President Donald Trump's second term, U.S. immigration officials have deputized a record number of local police to function as deportation agents,…

**Keep reading**

In June 2025, the latest report finding bias against Latino drivers was released. Months later, in October, Sheridan was back on the radio repeating his argument: "There has been no racial profiling or bias in well over 10 years, and that's the gist of this lawsuit. The judge didn't want MCSO to racially profile or be biased, and we have proven time and time again that the deputies are not."

Latino activists and residents who endured the racial profiling and anti-immigrant policing of the Arpaio era tracked Sheridan's first year as sheriff with growing alarm.

They remembered that as chief deputy, Sheridan was caught on camera telling deputies that court-mandated reforms were "ludicrous" and "crap." (He later **apologized to the judge**.) They also pointed out that Sheridan

Case 2:26-cv-04831-MTL          Document 19-2          Filed 07/13/26          Page 83 of 120

staffed his administration with key figures from Arpaio's time.

The activists and residents said their concerns were also rooted in the reality of the second Trump administration.

As Sheridan took office, President Donald Trump was initiating plans for mass deportations. Trump tasked Immigration and Customs Enforcement with expanding local law enforcement's involvement in street and workplace operations. If the case ended now, Sheridan would be free to join forces with ICE, critics said. Without the court to keep it in check, the Sheriff's Office could backslide.



The town of Guadalupe, Arizona, was a frequent target of immigration sweeps and patrols when Joe Arpaio was Maricopa County sheriff. Credit: Jesse Rieser for ProPublica

The anxiety and anger were evident in the town of Guadalupe in February 2025, as Sheridan arrived for his first court-mandated public meeting as sheriff. Guadalupe was among the communities most affected by Arpaio's immigration patrols and workplace raids. Residents, who were there to receive an update on the court case, greeted the new sheriff with signs saying, "Deport Jerry Sheridan," and "We belong together not separated."

The court-appointed monitor, Robert Warshaw, told the crowd inside an elementary school cafeteria that Sheridan had requested that the meeting be canceled, citing safety concerns related to ongoing anti-ICE protests around metro Phoenix. (The request was denied.) This angered the residents.

Their frustration grew as Warshaw noted that although the Sheriff's Office was complying with more than 90% of the settlement, it fell short in two critical areas: continued racial disparities in traffic stops and failure to quickly investigate misconduct claims against deputies. Long delays in such investigations discouraged the public from reporting wrongdoing by deputies, attorneys and advocates said.

When it was Sheridan's time to speak, he addressed the doubters, citing the sample of traffic stops that showed deputies didn't use race to initiate traffic stops. He has also noted that the department is prioritizing the investigation of deputy misconduct complaints from Latino residents.

"The judge wants bias-free policing, and I want bias-free policing," Sheridan said. "All I can ask from all of you in this room, the people that live in this community, and the 4.6 million people in Maricopa County, is to let me show you by actions the things that I have said and the fact that we all want bias-free police."

Joel Cornejo, a community activist from south Phoenix who had protested Sheridan's arrival, told the sheriff that he'd come of age during Arpaio's raids. He said he was skeptical that Sheridan would fully comply with the lawsuit.

"We learned to fight your department," Cornejo said. "We destroyed Joe Arpaio's career. And if you target our community, we will do the same to your career."

Sheridan repeated his pledge to show them the department had truly changed.

"I need that opportunity from you, to give me that chance," he said.

7/9/26, 12:18 AM
Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria
Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 85 of 120



South Phoenix community activist Joel Cornejo is skeptical that the new sheriff will comply with court orders in the racial profiling lawsuit. Credit: Jesse Rieser for ProPublica

Sheridan's victory in the sheriff's race capped a comeback that began after Arpaio lost reelection in 2016.

Under Arpaio, Sheridan rose through the ranks to chief of custody in 1999, running the county's jails. In 2010, Arpaio elevated him to chief deputy, helping oversee the entire department. He held the job for six years.

During those years, Snow later ruled, the Sheriff's Office illegally enforced federal immigration laws, violated residents' constitutional rights and ignored the judge's orders to end these practices.

Sheridan tried to distance himself from the controversies that led to Arpaio's defeat, rarely speaking of his former boss. He maintained that the immigration sweeps and patrols were carried out by a separate division while he was focused on running the jails.

Sheridan stands by his work as detention chief, which included supervising 60 detention officers certified through an ICE program known as 287(g), allowing the department to process people in its jails for

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 86 of 120

deportation. Maricopa County remains the only Arizona county to provide office space for ICE agents in its jails.

Arpaio's efforts to arrest undocumented immigrants began under the same 287(g) agreement, which also allowed local officers to question individuals' immigration status during routine policing. Sheridan says he disagreed with Arpaio's tactics and tried to persuade him to not target day laborers or set up patrols in mostly Latino communities like Guadalupe. (Arpaio told Arizona Luminaria and ProPublica that he considered enforcing immigration laws to be part of his job.)

During a 2015 court hearing, Sheridan denied that he knew about a 2011 preliminary injunction — issued while he was Arpaio's chief deputy — barring the Sheriff's Office from making immigration arrests. He didn't learn about the injunction until 2014, Sheridan said.

Evidence presented in court showed Sheridan had been notified starting in 2011. Snow accused Sheridan and Arpaio of "deliberately" violating the order, withholding evidence and failing to investigate and discipline deputy misconduct, among other things. "Sheriff Arpaio and Chief Deputy Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees," Snow wrote in a 2016 ruling. He held them in civil contempt of court.

7/9/26, 12:18 AM

Case 2:26-cv-04831-MTL Document 19-2 Filed 07/13/26 Page 87 of 120

Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria

Case 2:07-cv-02513-GMS   Document 1748   Filed 07/20/16   Page 15 of 67

employees because, as MCSO policy makes clear, management employees should typically be held to a higher standard of conduct. (Ex. 2001 at MELC416243.) Nevertheless, even for those employees subject to a disciplinary matrix, Sheriff Arpaio, and his designee, Chief Deputy Sheridan, have the authority to ignore the matrix and impose whatever discipline they deem appropriate.

Chief Deputy Sheridan is the highest level management employee within the MCSO. As an employee, he is clearly subject to departmental policy and discipline, and he has previously been a principal or a person of interest in the disciplinary process. Chief Deputy Sheridan is, however, an unclassified employee. Thus, although he is subject to GC-17, there is no specific disciplinary matrix that applies to him. Defendants argue that because there is no specific disciplinary matrix that applies to him, the Court should take greater care, due to federalism concerns, in subjecting his misconduct to evaluation (or re-evaluation) and to potential discipline than it takes with respect to other MCSO employees.

Nevertheless, as the Findings of Fact make clear, Sheriff Arpaio and Chief Deputy Sheridan are the authors of the manipulation and misconduct that has prevented the fair, uniform, and appropriate application of discipline on MCSO employees as that misconduct pertains to the members of the Plaintiff class. Sheriff Arpaio, as an elected official of Maricopa County, however, is not subject to any MCSO disciplinary policy. He is also, of course, an official who is elected by the people of Arizona. Neither of these factors is true with respect to Chief Deputy Sheridan. To the extent that Sheriff Arpaio and Chief Deputy Sheridan have manipulated the Internal Affairs process at the MCSO to ensure that many employees—including Chief Deputy Sheridan—were disciplined in a relatively lenient manner or not at all for violating the rights of the Plaintiff class, a remedy is necessary and within the scope of the Court's authority, as the condition flows from the constitutional violation at issue in this case. *See Milliken*, 433 U.S. at 282.

///

- 15 -

U.S. District Judge G. Murray Snow ruled in 2016 that then-Sheriff Joe Arpaio and his chief deputy at the time, Jerry Sheridan, were ultimately responsible for the department's conduct. Obtained and highlighted by ProPublica.

"I don't even remember exactly why the judge held me in contempt of the court — what exactly he used against me," Sheridan told Arizona Luminaria and ProPublica. "He didn't think that I was truthful because I wasn't aware of something. And I was very truthful."

Arpaio did not endorse Sheridan's 2024 bid for sheriff and has declined to talk about him while hinting at a falling-out. "I made a couple mistakes, which are management mistakes," Arpaio told Arizona Luminaria and ProPublica. "I may have appointed a couple of wrong people. But in managing, you try to back up your people and so on. So, in any big organization, you can't be perfect."

Sheridan filled key leadership positions in his administration with former colleagues who worked under Arpaio and who, like Sheridan, had left the Sheriff's Office after Arpaio lost reelection. Sheridan appointed retired Sgt. Clint Doyle to the Court Implementation Division, which is responsible for enforcing the court's mandates. And he rehired Paul Chagolla, who ran public relations at the time of Arpaio's raids and sweeps. Snow criticized Doyle's appointment, calling out Sheridan for attempting to bypass a court requirement that key leadership roles dealing with the Melendres settlement be approved by the monitor.

Doyle and Chagolla didn't respond to requests for comment.

Christine Wee, the lead attorney for the American Civil Liberties Union of Arizona, told Arizona Luminaria and ProPublica that it was alarming to see so many from Arpaio's administration return. "These folks were instrumental in the abuse and the terror that so many of our clients had to experience," she said. "And then to bring them back in again, I think it sends a dangerous message to the community."

Sheridan acknowledges the criticism, but points to improvements like significantly reducing the misconduct complaints backlog. "From the sins of the previous administration, we're now three different sheriffs since then, and some people just don't want to let go."

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 89 of 120



Residents of Gila Bend at a March 2025 town hall Credit: Jesse Rieser for ProPublica

7/9/26, 12:18 AM    Maricopa County sheriff says his department eliminated racial bias. Data shows otherwise. • AZ Luminaria

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 90 of 120



Sheridan and other representatives of the Maricopa County Sheriff's Office at a March 2025 town hall. Credit: Jesse Rieser for ProPublica

Since Sheridan took office last January, Arizona Luminaria and ProPublica have attended seven of his public appearances, reviewed his public remarks and interviewed him on three occasions. During that time, his assertions that the department had done enough to justify ending court oversight grew bolder, and Republican allies amplified his efforts.

"It's about time that the public gets over some of the things that happened well over a decade ago and to realize the deputy sheriffs that work in their community are really good law enforcement officers," he told Arizona Luminaria and ProPublica in a March 2025 interview.

Ending the settlement would eliminate the near-constant recordkeeping tasks deputies face while on duty, including documenting 13 details about each traffic stop. This hampers their "ability to do the job," Sheridan said, and discourages interacting with the public. Deputies fear prolonging a traffic stop, even for a brief chat, will lead to discipline.

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 91 of 120

"If they see somebody walking down the street, they can't just pull over and say, 'Hi, how are you doing?'" Sheridan told Arizona Luminaria and ProPublica. "Every time they contact a member of the public, it is a lengthy process. And so it slows them down and it intimidates them not to want to do it."

Last March, Sheridan began organizing meetings, in addition to the court-ordered gatherings, in rural communities policed by the Sheriff's Office.

In Gila Bend, a town of about 1,800 southwest of Phoenix, Sheridan said he wanted to hear about locals' needs. The town pays more than $900,000 a year to the Sheriff's Office for public safety services.

"I'm a good leader and our deputies are responsive to your needs," Sheridan told the group inside a community center. "And that's really what this is all about, right? The sheriff's main job is to keep people safe."

A slide displayed data about traffic stops, calls for service and dispatch times. "For the population that's here in Gila Bend, for the number of violent crimes — at least the ones that are notated here -– you guys are a very safe community," a sheriff's office lieutenant told the group.

The town's vice mayor, Chris Riggs, a former deputy himself, disagreed. Crimes weren't being reported, making the town seem safer than it is, he said.

Residents "just don't trust MCSO anymore," Riggs said. "They'll deal with it themselves."

Several residents agreed.

No deputies live in Gila Bend, where response times lag and police services have suffered, they said.

"Deputies aren't like they used to be, where they get out and they mingle with the community," Riggs said.

Sheridan blamed the settlement for overburdening the department.

Ten days later, residents of Aguila, an unincorporated community nestled among farms where the population swells to about 1,000 during the winter growing season, told the sheriff they too felt neglected by deputies.

"We have 9,224 square miles to cover" and limited resources, Sheridan said.

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 92 of 120

Sheridan has tried to address this. When he took office, there were about 140 vacancies for patrol deputies. He raised starting pay to compete with other local law enforcement agencies in the county. By the start of 2026, vacancies declined to 65, according to his office. Sheridan called it one of his biggest successes in his first year.

But hiring was still hindered by the paperwork deputies do to comply with the settlement, he said.



Sheridan at a meeting in Gila Bend, where some residents said they had lost trust in the Sheriff's Office. Credit: Jesse Rieser for ProPublica

The Sheriff's Office has made significant progress on a key requirement of the court: reducing the backlog of misconduct investigations. Although it has been cut by 76% since November 2022, there are still about **475 claims** that haven't been investigated, and three recently completed investigations dated from 2017.

In June, the Sheriff's Office released the court-mandated traffic stop report for 2024.

Case 2:26-cv-04831-MTL   Document 19-2   Filed 07/13/26   Page 93 of 120

It tracked some improvements. But when all traffic stops by deputies were analyzed, the report concluded: "Stops involving Hispanic drivers were more likely to result in an arrest than stops involving White drivers"; and traffic stops involving Black drivers, who are not covered in the Melendres settlement, were more likely to take longer and result in an arrest compared to stops of white drivers.

Despite the findings, Sheridan insisted there was no racial profiling at the department.

In July, the court's monitor team held another community meeting to review the Sheriff's Office's progress. It was in Maryvale, a West Phoenix neighborhood where three-quarters of the residents identify as Latino.

Before it began, Sheridan told Arizona Luminaria and ProPublica that while he remained committed to reaching full compliance with the court's requirements, a majority of Republicans on the county's governing board "have a different perspective because they're the ones that fund what the sheriff does."

Three members of the Maricopa County Board of Supervisors were at the meeting.

Latino residents and advocates from the heavily Democratic area typically made up a majority of attendees. But this crowd was mostly white Republicans, including some from retirement communities miles away. From the front of the gym, Sheridan could see signs that read, "We support MCSO," and, "Take the handcuffs off Jerry!"

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 94 of 120



The West Phoenix neighborhood of Maryvale is predominantly Latino. Credit: Jesse Rieser for ProPublica

Case 2:26-cv-04831-MTL    Document 19-2    Filed 07/13/26    Page 95 of 120



Residents from other parts of Maricopa County, many of them white, filled a Maryvale community meeting to call for court oversight of the Sheriff's Office to end.
Credit: Jesse Rieser for ProPublica

Republican Supervisor Debbie Lesko, who represents retirement communities in western parts of the metro area, said she believed the settlement was getting in the way of public safety. "They're spending a lot of time on paperwork instead of being able to provide public safety. And when I talked to the sheriff's department, they said it's hurting the morale of the deputies."

When Latino residents asked questions and voiced concerns, they were interrupted by jeers and groans from white members of the audience.

Warshaw, the court monitor, pleaded for the crowd to allow others to speak.

Sheridan's supporters focused on $350 million the county supervisors had approved since 2013 to implement the court-mandated reforms, including $226 million allocated to the Sheriff's Office. The monitor later found

that the Sheriff's Office had greatly exaggerated total expenses, and the judge cautioned county leaders against citing the dollar figure because it was misleading.

"Mr. Warshaw, tell the judge to stop looting Maricopa County tax dollars to pay for that oversight," Tom Berry, a retiree from Sun City, said to the monitor. "Advise the judge to stop the oversight."

The case hinges on how well the Sheriff's Office complies with 368 paragraphs outlined in four court orders aimed at rooting out racial profiling, Warshaw responded. "Is there still work to be done? Yes, there is still work to be done. Is this thing going to go on forever? No."

"It looks like it," a woman blurted.

Salvador Reza is a longtime organizer of Latino communities and day laborers who regularly attends meetings related to the settlement. He said it appeared Republicans were organizing to call for an immediate end to court oversight, which Sheridan would welcome.

"That's what he's hoping, that the federal court lets him off the hook so he can do whatever he wants," Reza said, noting he was concerned by Sheridan's history with Arpaio and approach to the case since taking office. "So there's no way that we can rebuild trust in the community knowing very well who Sheridan is."

Sheridan denied he had coordinated with the supervisors to publicly call for an end to the settlement.



The most recent annual report on the Sheriff's Office showed improvements but also found that "stops involving Hispanic drivers were more likely to result in an arrest than stops involving White drivers."
Credit: Jesse Rieser for ProPublica

Months later, debate over the settlement's cost came to a head.

Community members asked for details about how the $226 million the sheriff's department had attributed to enforcing the settlement was spent. The monitor's team published a report in October that concluded the Sheriff's Office had greatly exaggerated the cost. More than $163 million, about 72%, of the total attributed to the reforms was unrelated or lacked justification, the report found.

Sheridan attacked the audit.

"These guys are not CPAs, they don't have the experience to do an audit of a huge government operation," he said on the conservative talk radio show where he regularly appeared. "The sheriff's budget is about $700 million a year, and the county's budget is a couple of billion. They don't have the expertise to do this, and so they come up with this report."

Case 2:26-cv-04831-MTL Document 19-2 Filed 07/13/26 Page 98 of 120

He listed some expenses, including an order to create and staff new divisions. "We have three Ph.D.s that are analysts, and all of this has led to the fact that there has been no racial profiling or bias in well over 10 years, and that's the gist of this lawsuit."

Sheridan's attorneys petitioned the court to dispute the audit but later dropped the challenge, saying the county wanted to avoid additional "unnecessary" expenses.

The audit reinforced many Latino community members' belief that the agency couldn't be trusted.

After the raucous gathering in Maryvale, advocates alleged there had been an effort to intimidate Latino residents, including the use of racial insults in a forum intended to gather their input and check on the Sheriff's Office's progress.

Judge Snow held the next public meeting at the federal courthouse. He acknowledged the increasingly vocal opposition to the settlement and its costs, but defended it as necessary.

"This is not an easy case. It is an expensive case. It is a case where everybody in Maricopa County has benefited, whether or not they appreciate it," Snow said, before noting there was still work to do resolving the backlog of misconduct reports. "Sheriff Sheridan has done a considerable amount in reducing the backlog he was left with, but there is still a considerable backlog to be resolved."

Sheridan conceded the settlement had made his office better, even if it sometimes caused friction. Still, attorneys for the Sheriff's Office and the county government argued to Snow that they had done enough to end his oversight.

In December, the county filed a motion to sidestep the remaining reforms and end court supervision. Sheridan's attorneys signed onto the motion in January.

"After 14 years, four sheriffs, and hundreds of millions spent tax dollars, it is essential to defend taxpayer money if federal oversight is no longer warranted," Thomas Galvin, the Republican chair of the Maricopa County Board of Supervisors at the time, said in a video statement released after the motion was filed.

Attorneys representing Latino residents in the Melendres case opposed the bid to end court oversight. Snow has yet to rule on the motion.

Raul Piña, a member of a court-mandated Community Advisory Board tasked with helping the Sheriff's Office rebuild trust with Latinos, said the push to end oversight ignored a plain fact: The most comprehensive

data still showed the department hadn't eliminated bias from its policing.

"If Melendres goes away, that takes away significant protections for brown and Black people or the immigrant community in Maricopa County," he said.



Sheridan addresses Latino faith leaders and residents at a February town hall in the Phoenix suburb of Gilbert. Credit: Jesse Rieser for ProPublica

Since it joined the Melendres case and settlement in 2015, the U.S. Department of Justice had supported the reforms. But with Trump back in the White House, Suraj Kumar, an attorney in the DOJ's Civil Rights Division, informed Snow in January that the DOJ backed efforts to end oversight of the Sheriff's Office.

This added to Latino community leaders' worries that the Sheriff's Office could once again, as it had under Arpaio, partner with ICE and allow deputies to enforce immigration laws.

Sheridan tried to put those concerns to rest, saying that if court oversight ended, he would not enter such an agreement.

Case 2:26-cv-04831-MTL          Document 19-2          Filed 07/13/26          Page 100 of 120

But the questions grew louder as ICE surged into Los Angeles, Chicago and Minneapolis to carry out mass deportations. **Phoenix was reportedly next**.

After a U.S. citizen was killed during ICE operations in Minnesota, Sheridan was asked on a conservative radio talk show what he would do if something similar happened in Arizona.

His deputies would step in if ICE agents did anything "illegal," Sheridan said in the mid-January interview.

Four days later, Sheridan backtracked, saying he would instead side with immigration officers: "I will be here to protect them to do that and keep people from interfering with them."

Cornejo, the community activist who attended the meeting in Guadalupe, read the reversal as a sign that Sheridan was too easily swayed and could not be trusted without court oversight. "Facing a crowd that tends to lean to the left, he's going to give rhetoric that kind of says that he's working on those things that he's supposed to be," Cornejo said. "If he's with more conservatives, his language and rhetoric is completely different."

Sheridan said that his position has not changed and that he "firmly believes that the Sheriff's Office is in full compliance and that the current oversight should be concluded."

Later that month, ICE raided 15 metro Phoenix restaurants that federal prosecutors alleged had knowingly hired undocumented laborers. Protests erupted outside some of the raided restaurants.

Sheridan sent deputies to help with crowd control, saying ICE had first asked Tempe police for assistance but the request was declined.

"We went out there, not to facilitate what ICE was doing or get involved in their business, because we don't do that," Sheridan told Latino faith leaders and residents at a February town hall in the suburb of Gilbert. "We were there to keep the peace."

The Tempe Police Department told Arizona Luminaria and ProPublica that it did not receive a request for help from ICE, nor was it notified in advance of the immigration operation. ICE did not respond to a question about local law enforcement participation in the raids.

Latino activists said the episode raised more questions about Sheridan's willingness to collaborate with ICE and whether he would be transparent about his intentions. It would be harder for him to earn back their trust, they said.

*__Gabriel Sandoval__ contributed research.*

© 2026 AZ Luminaria

Powered by Newspack

# EXHIBIT 19

  

January 15, 2014

Charles K. Edwards
Deputy Inspector General
Department of Homeland Security
Office of Inspector General
245 Murray Drive, SW
Building 410
Washington, D.C. 20528

Tamara Kessler
Officer for Civil Rights and
  Civil Liberties
Department of Homeland Security
Office of Civil Rights and Civil Liberties
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

> **Re: Complaint and request for investigation of abuses at U.S. Border Patrol interior checkpoints in southern Arizona, including unlawful search and seizure, excessive force, and racial profiling.**

Dear Mr. Edwards and Ms. Kessler:

We write with serious concerns regarding U.S. Border Patrol interior vehicle checkpoints in southern Arizona. This complaint is submitted on behalf of 15 U.S. citizens, aged 6 to 69 years old, whose rights were violated in the course of more than 12 separate incidents over the past 15 months at 6 different Arizona checkpoints, as described in detail below.[1] The ACLU receives frequent reports from Arizona residents regarding unconstitutional searches and seizures, excessive use of force, racial profiling, and other agent misconduct at checkpoints. Residents describe similar patterns of abuse at various checkpoints throughout the state—including searches based on service canines "alerting" to nonexistent contraband[2] and prolonged, unjustified detentions—indicating that these incidents are not anomalous or perpetrated by a few "bad apples," but rather are the result of systemic deficiencies in Border Patrol policies and practices, which are leading to widespread rights violations.

The ACLU is a non-partisan, non-profit, nation-wide organization that works daily in courts, communities, and legislatures across the country to protect and preserve the rights and liberties established by the Bill of Rights and state and federal law. The ACLU has a particular commitment to ensuring that fundamental constitutional protections of due process and equal protection are extended to every person, regardless of citizenship or immigration status, and that government respects the civil and human rights of all people. The ACLU of Arizona is an ACLU state affiliate organization with over 7,000 supporters. The ACLU's Border Litigation Project investigates, documents, and litigates civil and human rights violations in the U.S.-Mexico border region.

---

[1] Five of these incidents occurred in the same week in late November-early December 2013, at three different checkpoints. Though several of the individuals described below have experienced checkpoint-related abuses on multiple occasions, this letter focuses on the most recent incidents.

[2] In at least eight of the incidents documented herein, Border Patrol service canines "alerted" in the absence of contraband. The ACLU recently filed a lawsuit on behalf of a U.S. citizen subjected to a strip search, multiple genital and cavity searches, a forced bowel movement, an X-ray, and a CT scan following a similar false alert by a U.S. Customs and Border Protection service canine. *See Jane Doe v. El Paso County Hospital District, et al.*, No. 3:13-CV-00406-DB (W.D.Tex. *filed* Dec. 18, 2013); Complaint *available at* http://www.aclu-nm.org/wp-content/uploads/2013/12/Complaint-Jane-Doe-v-Various-Defendants-12-18-13.pdf

Residents of southern Arizona are increasingly outraged by Border Patrol checkpoints, and for good reason. Forty years ago, the U.S. Supreme Court condoned immigration checkpoints under the assumption that the stops are "brief," and involve, at most, a "limited inquiry into residence status" and a "visual inspection" of the exterior of the vehicle.[3] In practice, border residents regularly experience extended interrogation and detention not related to establishing citizenship, invasive searches, verbal harassment, and physical assault, among other abuses. As discussed below, Border Patrol checkpoints often appear to be operated as drug interdiction checkpoints, which are unconstitutional,[4] and not for the limited purpose of verifying residence status. Indeed, most of the individuals described herein were never asked about their citizenship, and Border Patrol's own figures show that the vast majority of drug-related arrests at checkpoints do not involve unauthorized immigrants at all, but rather, U.S. citizens.[5]

According to a 2009 U.S. Government Accountability Office (GAO) Report, Border Patrol operates 71 permanent and tactical checkpoints across the southwest.[6] These operations stem from Border Patrol's authority to conduct warrantless seizures within "a reasonable distance"[7] of the border. That distance is defined by outdated regulations to be "100 air miles"[8] from any external boundary, including coastal boundaries, and thus encompasses roughly two-thirds of the U.S. population and the entirety of several states.[9] In practice, Border Patrol ignores that limitation, roaming still further into the interior of the country.[10] In Arizona, most checkpoints are located on rural state highways between 25 and 50 miles north of the border, many of them in the vicinity of southern Arizona towns and cities.

---

[3] *See United States v. Martinez-Fuerte*, 428 U.S. 543, 558–60 (1976), discussed *infra*.

[4] *See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000), discussed *infra.*

[5] The vast majority of these arrests are for marijuana-related offenses, and the number of arrests in 2011 was triple that in 2005. *See* Andrew Becker, *Four of Five Border Patrol Drug Busts Involve US Citizens, Records Show*, CENTER FOR INVESTIGATIVE REPORTING, Mar. 26, 2013, *available at* http://cironline.org/reports/four-five-border-patrol-drug-busts-involve-us-citizens-records-show-4312. Meanwhile, CBP's data shows that apprehensions of undocumented immigrants are at 40-year lows while deaths of border crossers are at historic highs. *See* Bob Ortega, *Border Apprehensions Up, But Still Near Historic Lows*, ARIZONA REPUBLIC, Jun. 3, 2013 *available at* http://www.azcentral.com/news/politics/articles/20130531mexico-border-apprehensions-up.html

[6] U.S. GOVERNMENT ACCOUNTABILITY OFFICE, REPORT TO CONGRESSIONAL REQUESTERS, BORDER PATROL: CHECKPOINTS CONTRIBUTE TO BORDER PATROL'S MISSION, BUT MORE CONSISTENT DATA COLLECTION AND PERFORMANCE MEASUREMENT COULD IMPROVE EFFECTIVENESS, GAO-09-824, (Aug. 2009) *available at* http://www.gao.gov/products/GAO-09-824.

[7] *See* 8 U.S.C. § 1357(a)(3).

[8] *See* 8 C.F.R. § 287.1(b). The Justice Department published regulations defining "reasonable distance" as 100 miles in 1957. *See* Field Officers: Powers and Duties, 22 Fed. Reg., 236, 9808–09 (Dec. 6, 1957) (to be codified at C.F.R. § 287). There is no public history to indicate *why* the Justice Department chose 100 miles as the "reasonable distance" from the border. It may have been that 100 miles had historically been considered a "reasonable" distance regarding availability of witnesses for examination, responses to subpoenas, and other discovery issues under federal law. *See, e.g.*, 10 U.S.C. § 849; FED. R. CRIM. P. 7; FED. R. CIV. P. 45.

[9] Though immigration checkpoints are mostly confined to the southwest, Border Patrol has operated temporary checkpoints in northern states as well. A recent Freedom of Information Act (FOIA) request uncovered design plans for permanent checkpoints on southbound New England highways. *See* ACLU OF VERMONT, SURVEILLANCE ON THE NORTHERN BORDER, (Sept. 17, 2013), *available at* http://www.acluvt.org/surveillance/northern_border_report.pdf.

[10] *See, e.g.*, Todd Miller, *War on the Border*, NY TIMES, Aug. 18, 2013, *available at* http://www.nytimes.com/2013/08/18/opinion/sunday/war-on-the-border.html?pagewanted=all&_r=0 (describing checkpoint stop of Senator Patrick Leahy 125 miles from the border in New York state: "When Mr. Leahy asked what authority the agent had to detain him, the agent pointed to his gun and said, 'That's all the authority I need.'"); Michelle Garcia, *Securing the Border Imposes a Toll on Life in Texas*, AL JAZEERA AMERICA, Sept. 25, 2013, *available at* http://america.aljazeera.com/articles/2013/9/25/living-under-thelawofbordersecurity.html#mainpar_adaptiveimage_0 ("[W]hen it was pointed out that [Alice, Texas] sits more than 100 miles from the border, [a Border Patrol spokesman] explained that 'the law does not say that we cannot patrol. Our jurisdiction kinda changes.'"); *see also United States v. Venzor-Castillo*, 991 F.2d 634 (10th Cir. 1993) (finding Border Patrol lacked

Border Patrol checkpoints have profoundly negative impacts on border communities. Recently, residents of Arivaca, Arizona[11] began petitioning for the removal of one of three local checkpoints that surround their town, citing ongoing rights violations and harassment as well as harm to property values,[12] tourism, and quality of life resulting from checkpoint operations. Community members have also been documenting examples of checkpoint abuses. One former local business owner (her small business suffered from the decline in tourism caused by the checkpoint and was forced to close its doors at the end of 2013) described being detained on her way to a doctor's appointment following a heart attack, held for over an hour in the hot sun, not permitted to sit down, and denied water. Other Arivacans report that agents at the checkpoint have told them, "You have no rights here," or that all community members are considered suspect simply by virtue of living in Arivaca.[13] The Arivaca petition, recently presented to Border Patrol's Tucson Sector Chief Manuel Padilla Jr., reads in part:

> Residents are intimidated by armed federal agents and subjected to improper questioning and warrantless searches in violation of their 4th, 5th and 14th Amendment rights. It is not possible for Arivaca residents to leave northbound without passing through one of three area checkpoints. Thus, locals must pass through the checkpoint with regularity, sometimes daily, such that these constitutional rights violations are not merely occasional or minor inconveniences but rather frequent and substantial infringements. People of color experience greater scrutiny and longer detentions at the checkpoint; such racial profiling violates the law as well as the federal government's own guidelines prohibiting any consideration of race or ethnicity in such encounters.[14]

The experiences described by the residents of Arivaca—and those listed below—are not unique; rather, they are consistent with numerous reports of rights violations across the state and throughout the southwest, and have become more common as Border Patrol has expanded at an unprecedented rate.[15] The GAO has found numerous problems with checkpoint oversight, including "information gaps and reporting issues [that] have hindered public accountability, and inconsistent data collection and entry [that] have hindered management's ability to monitor the need for program improvement."[16]

---

reasonable suspicion to stop and search vehicle 235 miles from the border where agent had no knowledge regarding the origin of the vehicle).

[11] A town of approximately 700 people, Arivaca is located 11 miles north of the U.S.-Mexico border and within 30 miles of three different Border Patrol checkpoints—one on Arivaca Road in Amado, Arizona, another on State Route 286, south of Three Points, Arizona, and a third on Interstate 19 outside of Tubac, Arizona. Residents must pass through the checkpoints daily to go to work, purchase groceries, or run basic errands.

[12] *See, e.g.*, Judith Gans, THE BORDER PATROL CHECKPOINT ON INTERSTATE 19 IN SOUTHERN ARIZONA: A CASE STUDY OF IMPACTS ON RESIDENTIAL REAL ESTATE PRICES, UNIVERSITY OF ARIZONA, (Dec. 2012), *available at* http://udallcenter.arizona.edu/ucpubs/gans_2012b.pdf

[13] Additional narratives of Arivaca community members, three of which are described in greater detail in this complaint, are available at http://phparivaca.org/?page_id=210

[14] Arivaca Checkpoint Petition, *available at* https://www.change.org/petitions/u-s-border-patrol-remove-the-check-point-on-arivaca-rd-in-amado-az-quite-el-ret%C3%A9n-de-la-carretera-de-arivaca-en-amado-az

[15] From 2004 to 2011, as the ranks of agents doubled to more than 21,000, complaints involving CBP received by the DHS Office of Civil Liberties and Civil Rights nearly tripled. *See* DEP'T OF HOMELAND SEC., OFFICE OF CIVIL RIGHTS AND CIVIL LIBERTIES, "DEPARTMENT-WIDE DATA ON COMPLAINTS RECEIVED," *available at* http://www.dhs.gov/department-wide-data-complaints-received. Given the many problems with the DHS complaint system, discussed *infra,* it is likely that incidents of abuse are substantially under-reported.

[16] *See* GAO-09-824, *supra* at *28. Those findings were made in 2009, the last time the federal government conducted a thorough review of Border Patrol checkpoint operations and their impact on border residents and local communities. GAO's "community impact" analysis omitted Tucson sector checkpoints on the grounds that, at the time, they were considered "tactical" and not permanent checkpoints. *Id.* at *89.

We request that you promptly investigate and respond appropriately to each of the individual incidents detailed herein, and conduct a comprehensive review of *all* complaints regarding Border Patrol checkpoints over the past five years. Furthermore, a thorough review of Border Patrol checkpoint policies and practices is needed to ensure that operations are in fact limited to briefly verifying citizenship. This review should determine whether agents are receiving direction and instructions regarding the limits of their authority and if they adhere to those guidelines in practice. It should include all policies and procedures related to service canines, in light of widespread reports of "false alerts," a problem that federal courts have long recognized.[17] We believe significant changes in Border Patrol training, oversight, and accountability mechanisms are needed to prevent ongoing and systematic violations of state and federal law, as well as Border Patrol's own guidelines, and to protect the rights of border communities. We urge you to make recommendations for such changes consistent with your mission to prevent further abuses.

Section I of this complaint describes 12 recent examples of unlawful practices at Border Patrol checkpoints in southern Arizona. Section II presents the applicable legal framework.

I.      **Individual Complaints of Border Patrol Abuses at Checkpoints**

1.   **Samaritans of Green Valley (Kathy Zweig, Lyn Nowakowski, & Fawn Brown) - Arivaca Road Checkpoint, Amado, AZ, Dec. 18, 2013.**

At approximately 1:45 p.m. on December 18, 2013, Kathy Zweig, 69, Lyn Nowakowski, 68, and Fawn Brown, 59, arrived at the Arivaca Road checkpoint. All three are volunteers with Samaritans of Green Valley ("Samaritans"). The group has been providing humanitarian aid in southern Arizona for the past decade and passes through the Arivaca Road checkpoint daily. On this occasion, the volunteers pulled into the checkpoint in a clearly marked Samaritans vehicle and were met by a Border Patrol agent later identified as John Howard. Agent Howard did not ask any of the women about their citizenship; instead, he asked a series of questions about the contents of their vehicle, which they answered truthfully. Agent Howard was particularly interested in the volunteers' backpacks in the rear of the vehicle, which the volunteers explained were used to carry food, water, and medical supplies for their humanitarian aid work. Agent Howard stated that the backpacks could also be used to carry narcotics and asked the volunteers to open the trunk. When they asked why, Agent Howard stated, "Because I have mere suspicion you could be carrying drugs." Agent Howard then directed them to "pull into secondary."

The volunteers pulled into the secondary inspection area and exited the vehicle. They again asked for an explanation. Agent Howard said, "I pulled you over for due diligence and mere suspicion." When the women asked Agent Howard to articulate what his suspicion was based upon, Agent Howard explained that there could be narcotics in the backpacks "because that's what backpacks are used for. When we see backpacks, we become suspicious." Agent Howard then repeated, "Just pop your trunk." The women again refused and continued to ask for an explanation. Agent Howard replied, "The backpacks." Agent Howard handed the volunteers a small, laminated card bearing U.S. Customs and Border Protection ("CBP") and Border Patrol insignia and titled "Authority as an Agent."[18]

---

[17] *See infra.*

[18] Attached herein as Exhibit A, the card reads in part: "Border Patrol agents may stop and question motorist [sic] at reasonably located checkpoints, even in the absence of individualized or reasonable suspicion." Among other omissions, the card does not specify that questioning must be "brief" and the stop confined to a "limited inquiry into residence status." *United States v. Martinez-Fuerte*, 428 U.S. 543, 558–60 (1976). Neither does it specify that "reasonable suspicion" is required for non-immigration inquiries (the standard is not "mere suspicion," as the agent claimed), or that searches must be based on "probable cause" that a crime has *likely* been committed. *See infra.*

Ms. Zweig, Ms. Nowakowski, and Ms. Brown proceeded to record the names of Agent Howard and the two other agents present, Agent Miguel San Quentin and Agent Alexis Barrios. As they were doing so, Agent Barrios became visibly angry and agitated, and ripped his name tag off his chest and thrust it in Ms. Nowakowski's face in an aggressive and intimidating manner. Agent Howard continued to ask for consent to search the vehicle, and the volunteers continued to refuse. After approximately ten minutes, Agent Howard told them, "We called the dog and it will be here in a few minutes." After another ten minutes had elapsed, a service canine and its handler arrived. Ms. Nowakowski recognized the handler, Agent Ewing, from several prior interactions. Agent Ewing said, "Just let me walk around the car with the dog." Ms. Nowaskowski again objected, and asked if she and the others were free to go. Agent Ewing said that they were. As Ms. Nowaskowski was returning to the vehicle, Agent Howard asked Agent Ewing, "Are you releasing them?" Agent Ewing responded that he was.

Ms. Zweig, Ms. Nowakowski, and Ms. Brown were detained for approximately thirty minutes. They were never asked about their citizenship.

### 2.    John Forrey – Tombstone Checkpoint, Route 80, Dec. 6, 2013.

On December 6, 2013, John Forrey arrived at the Tombstone checkpoint located on Arizona State Route 80. Mr. Forrey is a professional photographer and native of Bisbee, Arizona. An agent peered through the back window of his vehicle and asked him to open his trunk. Mr. Forrey did not consent to a search of his trunk. The agent asked Mr. Forrey where he was coming from. Mr. Forrey responded that this was personal information. The agent asked Mr. Forrey if he had a driver's license, and Mr. Forrey said that he did. The agent then directed Mr. Forrey into a secondary inspection area. Mr. Forrey asked why he was being detained. The agent called over another agent, identified as Agent Torres, who asked Mr. Forrey if he was refusing to go to secondary. Mr. Forrey replied that he was not refusing but was asking why he was being detained. Mr. Forrey then pulled into secondary and left the motor running and his foot on the brake.

Agent Torres approached and asked if Mr. Forrey had a weapon. Mr. Forrey did not have a weapon, but because the question was not related to his citizenship, he paused to consider whether or not he was required to answer. Before Mr. Forrey could respond, however, Agent Torres unholstered his gun, and holding it a foot away, pointed it at Mr. Forrey's face, screaming at him not to reach for anything. Other agents approached, pulled Mr. Forrey's left arm through the open window, and began twisting it. The agents opened the door as Agent Torres directed them to pull Mr. Forrey out. Mr. Forrey tried to put the automatic transmission in park so the car would not roll. Agent Torres, still pointing his gun at Mr. Forrey's head, started screaming, "He's reaching for the console!" Mr. Forrey stopped reaching for the transmission. The agents started dragged Mr. Forrey out of the car, causing his foot to come off the brake and the car to roll forward. Agent Torres yelled, "Put it in park, asshole!" Mr. Forrey put the car in park. Agent Torres then holstered his pistol, pulled out his Taser and yelled, "Let's just Taser him!" Instead, the agents handcuffed Mr. Forrey and left him on a bench nearby while they searched his car.

A supervisor approached and accused Mr. Forrey of intentionally trying to harm the agents by allowing his car to roll forward. Mr. Forrey noted that, with a gun pointed at his head, he had been instructed not to reach for anything while being forcibly removed from his vehicle. Mr. Forrey objected strongly to his detention and to the conduct of Agent Torres. The supervisor did not release Mr. Forrey from the handcuffs, but said that he would "talk to Torres."

Agents continued to search the interior of the vehicle over Mr. Forrey's repeated objections. To open the passenger door, which was locked, one of the agents broke the door latch mechanism; as a result, the door now does not open or close securely. The agents called for an Arizona Department of Public

Page **5** of **17**

Safety officer, but an officer never arrived. Mr. Forrey was detained for approximately 40 minutes before he was finally taken out of handcuffs and released. He suffered a bruise on his upper left arm and cuts on his left hand. Mr. Forrey was not asked about his citizenship status.

This was not the first time Mr. Forrey has been detained by the Border Patrol. About three months earlier, Mr. Forrey was pulled over while driving approximately 30 miles north of the border. An agent approached him and immediately asked to look in his trunk. The agent did not say why he pulled Mr. Forrey over and did not ask him about his residence status. Mr. Forrey was detained for 30 minutes before being released. The next day, Mr. Forrey arrived at the Tombstone checkpoint. Again an agent asked to look in Mr. Forrey's trunk. Mr. Forrey refused and had to wait while a service canine inspected his car. Mr. Forrey is a professional photographer who travels extensively in southern Arizona. He has been pulled over by Border Patrol dozens of times, sometimes as far as 60 miles from the border.

### 3. Dale Polen – Arivaca Road Checkpoint, Amado, AZ, Dec. 2, 2013.

Dale Polen is a six-year resident of Arivaca, Arizona and a local mechanic. On December 2, 2013, Mr. Polen was on his way to get supplies for work when he arrived at the Arivaca Road checkpoint at approximately 8:45 a.m. An agent slapped the side of his vehicle and told him to "pull into secondary." Mr. Polen asked why, to which the agent responded, "You're driving like an idiot." Mr. Polen objected to the agent's characterization of his driving. The agent then stated that a service canine had "alerted."

Mr. Polen pulled into the secondary inspection area and the agent directed him to exit his vehicle. The agent again stated, "The only reason we pulled you over is because you were driving like an idiot." Mr. Polen objected that traffic enforcement was outside Border Patrol's authority. The agent then claimed that a service canine had "tagged" the vehicle. The agent proceeded to remove Mr. Polen's two dogs from the car and search the interior of Mr. Polen's vehicle. When Mr. Polen objected to the search, one agent said, "You won't be laughing when we find stuff." Another agent remarked, "Arivaca is just a bunch of smugglers." One of the agents kept his right hand on his firearm during his interaction with Mr. Polen. Mr. Polen was detained for approximately 30 minutes before he was released. He was never asked about his citizenship.

Like all Arivaca residents, Mr. Polen must pass through a checkpoint anytime he wishes to leave town, and has had similar encounters with Border Patrol at the Arivaca Road checkpoint in the past. Last year, agents detained Mr. Polen for 30 minutes and searched the interior of his vehicle after claiming that a service canine had alerted. On another occasion, Mr. Polen arrived at the checkpoint on his motorcycle. A service canine alerted, jumping up on Mr. Polen's motorcycle. Agents told Mr. Polen to get off his motorcycle and began to question him about drugs. When Mr. Polen objected to being detained, an agent reached out and grabbed Mr. Polen's arm. The other agents assisted in throwing Mr. Polen to the ground. Agents held Mr. Polen down while his motorcycle was searched. After more than 20 minutes, he was released. Mr. Polen tried to make a complaint to local law enforcement, but officials dismissed his concerns. As a result of these experiences, Mr. Polen feels extremely apprehensive every time he approaches the checkpoint, which he tries as much as possible to avoid.

### 4. Tim Buchanan – Arivaca Road Checkpoint, Amado, AZ, Dec. 2, 2013.

On December 2, 2013, Tim Buchanan arrived at the Arivaca Road checkpoint at approximately 9:30 a.m. Mr. Buchanan is a 61-year-old retiree and 12-year resident of Arivaca. He drives through the checkpoint several times a week, usually on his way to play golf. On this occasion, an agent asked Mr. Buchanan if he was a U.S. citizen, and he confirmed that he is. The agent then directed him to the secondary inspection area. Mr. Buchanan pulled into the secondary inspection area and exited his vehicle.

An agent who later identified himself as Agent Taylor approached with a service canine, opened the driver's side door, and directed the dog to enter Mr. Buchanan's vehicle. Mr. Buchanan immediately objected that he did not consent to allowing the dog inside his vehicle. Agent Taylor responded by yelling, "Shut your fucking mouth!" Mr. Buchanan repeated his objection to the search. Agent Taylor yelled, "Shut your fucking mouth you fucking asshole and let me do my job!" Mr. Buchanan turned to another agent standing by and asked for an explanation. Agent Taylor interjected, "Shut your fucking mouth!" The other agent directed Mr. Buchanan to sit on a bench. Mr. Buchanan repeated his request for an explanation. Agent Taylor again interrupted him, screaming, "I said shut the fuck up," and placed his right hand on his firearm. Agent Taylor then continued searching Mr. Buchanan's vehicle, muttering loudly to himself, "These fuckers...the fucking cunts." Mr. Buchanan was deeply shaken by Agent Taylor's actions, but he persisted in asking the other agent why his vehicle was being searched. Agent Taylor again interrupted and said, "Because I didn't recognize you."

Mr. Buchanan was detained for approximately 30 minutes before he was released. When he asked Agent Taylor for his name, the agent concealed his badge from view but responded, "Taylor." Mr. Buchanan was deeply traumatized by the encounter; nonetheless, he called a Border Patrol supervisor to report the incident. Approximately one week later, a Border Patrol "community liaison" called Mr. Buchanan. The liaison informed Mr. Buchanan that agents had confirmed his account, and clarified that the abusive agent's name was not "Taylor," but "Haley." The liaison said, "I don't know why he lied to you." The liaison would not say whether Agent Haley faced any consequences for his actions, but tried to reassure Mr. Buchanan that "it won't happen again." Mr. Buchanan later learned that a Border Patrol agent in Arivaca had asked Mr. Polen (whose checkpoint encounter, described above, occurred minutes ahead of Mr. Buchanan's) for information about Mr. Buchanan; Mr. Buchanan does not know why a Border Patrol agent would be asking other Arivaca residents about him.

### 5. Shirley Stepp – Arivaca Road Checkpoint, Amado, AZ, Dec. 1, 2013.

On the morning of December 1, 2013, Shirley Stepp pulled into the Arivaca Road checkpoint following a run-in with a dead skunk. An agent asked if she was a U.S. citizen, and she confirmed that she is. The agent asked her about the smell of her car, and she explained that she had been at the home of a neighbor who recently killed a skunk. The agent said, "No, that's not what it smells like," and directed Ms. Stepp to the secondary inspection area.

Ms. Stepp pulled into the secondary inspection area and exited the vehicle. The agent indicated that he had called for a service canine. No service canine arrived, however, and after waiting nearly 45 minutes, the agent told Ms. Stepp, "It will save time if we can search your car." In order to be released, Ms. Stepp consented to a search. The agent conducted an extended, invasive search of her vehicle. Ms. Stepp keeps a gas treatment additive in the rear of her vehicle; later, she discovered the container had been opened and flammable liquid was leaking all over the rear of the vehicle. After searching the interior of her car, the agent directed Ms. Stepp to empty her pockets. The agent questioned her at length about drugs and her prescribed medication, refusing to believe that the smell was due to a skunk, even when Ms. Stepp offered to call her neighbor to confirm her story. At one point, the agent claimed that by carrying her prescribed medication, Ms. Stepp had committed "an arrestable offense." The service canine never arrived. Finally, after detaining Ms. Stepp for over an hour, the agents released her.

Ms. Stepp was outraged by this encounter. She felt humiliated watching her friends and neighbors drive by while she was detained. Some people tried to stop to check on her but were waved away by Border Patrol agents who claimed that she was "under investigation." Though she has lived in Arivaca for the past 25 years, Ms. Stepp fears interacting with Border Patrol agents at the checkpoint, which she must drive through several times every week. She hears frequent reports from friends and neighbors about Border Patrol agents harassing and abusing Arivaca residents at the checkpoint.

6. **Don Tran & Chad Ivey – I-8 Checkpoint, California-Arizona State Line, Nov. 29, 2013.**

On November 29, 2013, Don Tran and Chad Ivey were driving from San Diego to Phoenix on I-8. Mr. Tran, 49, is a law school graduate and Mr. Ivey, 41, is a Marine veteran; both are IT professionals. They arrived at the I-8 Border Patrol checkpoint around 10:30 p.m. An agent asked if they were U.S. citizens, and they confirmed that they are. The agent directed Mr. Tran to pull into the secondary inspection area. Mr. Tran complied. In the secondary inspection area, agents again asked if Mr. Tran and Mr. Ivey were U.S. citizens, and again they stated that they are. An agent then asked Mr. Tran and Mr. Ivey to step out of the vehicle, without explanation. They both complied. As he was exiting, Mr. Tran locked his car.

Mr. Tran spoke with a supervising agent and made clear that he did not consent to a search of his vehicle. Mr. Tran and Mr. Ivey sat on a bench and watched as an agent arrived with a service canine. Mr. Tran and Mr. Ivey observed the dog and its handler, later identified as Agent Danny Ruiz circled their vehicle. The dog did not react to Mr. Tran's vehicle in any way. After passing Mr. Tran's vehicle, the dog alerted to a hand bag in an adjacent vehicle, pulling the bag out of the open trunk. The Border Patrol supervisor then notified Mr. Tran and Mr. Ivey, "We need to search your car. The dog got a hit on your car." Mr. Tran objected that the dog had not alerted on his vehicle but rather on an item in an adjacent vehicle. Nonetheless, both the supervisor and Agent Ruiz asserted that they dog had "hit a positive scent" in Mr. Tran's vehicle, giving Border Patrol probable cause for a search.

An agent tried to open Mr. Tran's vehicle but it was locked. Mr. Tran repeated his objection to any search of his vehicle and suggested they call a judge to obtain a warrant. A group of agents conferred together before notifying Mr. Tran, "It's going to be a while, we need to pat you down and put you in a holding cage while we wait for the magistrate." Mr. Tran was directed to leave his car keys with the agents. Mr. Tran and Mr. Ivey each asked if they were being detained. Both of them were told, "You are being detained." Mr. Tran and Mr. Ivey were taken to a holding area of small, wire cages and placed in separate cells. After approximately 45 minutes, agents returned and released them. After returning to their vehicle, it was apparent from the disarray that agents had searched the interior, including the glove compartment, center console, and trunk.

7. **The Garcia Family – Route 86 Checkpoint, east of Tohono O'odham Indian Reservation, Aug. 19, 2013.**

On August 19, 2013, Jason and Charlotte Garcia were driving east on State Route 86 from Sells, Arizona with their twin six-year-old foster children. Mrs. Garcia was driving when the family arrived at the checkpoint. Without inquiring about the family's residence status, the agent directed Mrs. Garcia to pull into the secondary inspection area. Mrs. Garcia asked why they were being detained and the agent responded angrily, "Because I told you so." The Garcias again asked for an explanation. A female agent, later identified as K. Riden, approached and directed Mrs. Garcia to pull into secondary. Agent Riden stated that she would forcefully remove the Garcias from their vehicle and drive the car into secondary if they did not comply. The Garcias repeated their request for an explanation. Agent Riden claimed that a service canine had "alerted" to the vehicle. The Garcias stated that they did not have anything in the vehicle that would cause a dog to alert, and no dog was nearby.

Agent Riden then directed another agent to "put it down," shorthand for deploying a tire deflation device to prevent the vehicle from driving away. Mrs. Garcia told the agent that she would go to the secondary inspection area, and Agent Riden instructed her to "hold on." The tire deflation device was removed and Mrs. Garcia drove into secondary, where Agent Riden demanded that the Garcias exit the vehicle. The Garcias had begun recording the incident on a cell phone. When Mrs. Garcia exited the

vehicle with the phone, Agent Riden yelled at her to turn it off, and tried unsuccessfully to grab the phone from Mrs. Garcia's hand, poking her chest. Mrs. Garcia handed the phone to her husband. Agent Riden continued to yell and demanded that Mr. Garcia turn the phone off. Agent Riden stated that Mr. Garcia could not use her phone to record because Border Patrol was searching the vehicle "based on probable cause." Agent Riden continued yelling at Mr. Garcia to turn off the phone.

The Garcia family was escorted to a nearby bench. Several agents stood over them in a threatening manner as the Garcia parents tried to comfort their sons, who were terrified by what was happening. From where they were sitting the Garcias could not see whether or not agents were searching their vehicle. Agent Riden continued yelling at Mr. Garcia to turn off his phone. Another agent told the Garcias they were "setting terrible role models" for their children. Mr. Garcia could see that Agent Riden's behavior was upsetting his children, so he turned the phone off, but not before Agent Riden attempted, again unsuccessfully, to grab the phone out of his hands. Another agent pulled Mr. and Mrs. Garcia aside and told them not to "argue" with Agent Riden which would "just make matters worse" for them. The Garcia parents continued to try to comfort their children, who were visibly upset. Finally, the Garcia family was released. They were never asked about their citizenship.

This incident was extremely traumatic for the Garcia children, who continued to refer to the experience for several weeks. One of the children stated that he was afraid that Border Patrol agents were going to "throw Mom down." The other child said he did not want to visit his cousin in Sells anymore because he did not want to cross the checkpoint again. Several days after the incident, the Garcia children spotted some Border Patrol agents in a local diner and were instantly afraid; the boys clung to their parents and asked if the agents were going to harm them. Both Mr. and Mrs. Garcia work in Sells. It is not possible for them to return from work without passing through one of the four Border Patrol checkpoints surrounding the Tohono O'odham Indian Reservation. Mrs. Garcia often returns from work late at night, sometimes arriving at the checkpoint around midnight, with no other cars around. Agents have repeatedly demanded that she open her trunk for inspection, questioned her about matters unrelated to her immigration status, and refused to provide names and badge numbers when requested.

Mr. Garcia says, "The Reservation has become a police state. It seems like no one can go out in public without being questioned by Border Patrol agents." He says Border Patrol agents do not respect tribal customs or the law, and that abuses of tribal members[19] have become more common because agents "are never held accountable for their actions."

---

[19] *See* Stanley Throssell, *77-year-old woman says Border Patrol agent abused her at AZ 86 checkpoint*, THE RUNNER, Oct. 18, 2013, *available at*, http://oodhamrunner.com/community/77-year-old-woman-says-border-patrol-agent-abused-her-at-az-86-checkpoint/ ("A 77-year-old woman from San Pedro Village says a Border Patrol agent left her with bruises when he grabbed her arm as she went to open the trunk of her car at the checkpoint on Arizona Highway 86 east of the reservation boundary. Mildred Antone said the incident took place Oct. 12, between 5 and 6 p.m. as she was on her way to San Xavier for the celebration of Saint Kateri Tekakwitha…Antone said when she drove up to the checkpoint, an older Border Patrol agent asked her to open her car trunk. She noted that it's not easy for her to get in and out of her car, so she told the agent that there was nothing in her trunk. She said he continued to insist that she open the trunk, and an argument ensued. Antone admitted to letting loose an expletive, and the agent responded by implying that tribal members lie to the agents all the time. Antone said she then pushed her car door open and the agent walked into it. She walked to open up the trunk, and that is when the agent grabbed her by the arm, she said. The incident escalated from there, she said, as the agent accused her of assaulting a federal officer. She was told to pull her car to a secondary checkpoint area, and she said she complied, giving the agent her driver's license. Several agents huddled together, then the agent with whom she had the confrontation came over to her, saying her age was of no consequence, he would throw her in jail and tow away her car, she recalled. He then tossed her driver's license into the front window of her car and told her to leave, she said. Antone said she is now fearful of going to the checkpoint. 'I'm afraid to go down there to the checkpoint. I haven't gone because I'm afraid he might still be there,' she said.")

8. **Julia Turner – Tombstone Checkpoint, Route 80, Jan. 1, 2013.**
9. **Julia Turner – Tombstone Checkpoint, Route 80, Nov. 8, 2012.**

On the evening of January 1, 2013, Julia Turner, then 19-years-old, was on her way home from work. Ms. Turner is Hispanic and describes her appearance as Hispanic. At the Tombstone checkpoint, Ms. Turner was questioned about her citizenship and asked to hand over her driver's license. An Agent Cooper walked around her vehicle with a service canine. Ms. Turner saw that the dog did not react to her vehicle and had begun to move to the car behind hers when Agent Cooper pulled on the dog and started tapping on the trunk of Ms. Turner's vehicle. Agent Cooper then told Ms. Turner the dog had "hit" on something in the car and directed her to pull into the secondary inspection area.

Ms. Turner pulled into the secondary inspection area, turned off her vehicle, and exited with her purse and phone. Agent Cooper told her to leave her purse and phone in the car. Ms. Turner objected, and Agent Cooper tried to grab her phone out of her hands. She again objected, but Agent Cooper told her it was "part of procedure." Ms. Turner retained her phone and called her father, a retired Sheriff's Deputy with extensive experience with police dogs.[20] Two other agents approached and an Agent Nabity told Ms. Turner that if she did not hang up the phone she would have to "sit there a long time and not be able to leave." Meanwhile, Agent Cooper and another agent searched Ms. Turner's car. Agents removed Ms. Turner's registration as well as her prescription medication. Agent Cooper and Agent Nabity began to question her about the medication at length, even after they were presented with a valid prescription. Ms. Turner was detained approximately 35 minutes before she was released.

Two months earlier, on the evening of November 8, 2012, Ms. Turner was driving home from work when an agent asked her for her driver's license, proof of insurance, and information related to her commute. An agent then notified Ms. Turner that a dog had "alerted," giving Border Patrol probable cause to search her car, and directed her to the secondary inspection area. An agent told Ms. Turner to hand over her cell phone, but she refused and was able to call her father. Agents detained Ms. Turner for approximately 45 minutes while they searched her vehicle before releasing her.

In addition, Ms. Turner faced additional scrutiny on at least three prior occasions at the same checkpoint. In each instance, agents asked Ms. Turner to turn off her engine and open her trunk for inspection. Each time she was asked about her work, where she was going and why, and about her vehicle. Each time, agents asked her to show identification, registration, and proof of insurance. On several occasions, Ms. Turner witnessed other cars being waved through while she was detained. Ms. Turner believes she was subject to additional scrutiny and harassment on account of her ethnicity.

10. **David Chapman – Huachuca City Checkpoint, Route 90, December 28, 2012.**
11. **David Chapman – Sunsites Checkpoint, Route 191, Dec. 21, 2012.**
12. **David Chapman – Sunsites Checkpoint, Route 191, Oct. 24, 2012.**

David Chapman, 45, is a small business owner and 15-year resident of Pearce, Arizona. On December 28, 2012 at approximately 11:45 a.m., Mr. Chapman arrived at the Border Patrol checkpoint located on Route 90 north of Sierra Vista, Arizona. Mr. Chapman was informed that a service canine had alerted to his car, and he was directed to pull into the secondary inspection area. A supervisor named Agent Caspar approached Mr. Chapman's vehicle with an Agent Debusk. Agent Debusk proceeded to

---

[20] Brian Turner has driven through the Tombstone checkpoint and observed the dogs being improperly handled. He believes agents arbitrarily decide whom to question, only subjecting some persons to stops and searches, and that his daughter was repeatedly detained on account of her Hispanic appearance. Mr. Turner, who is Caucasian, has driven his daughter's vehicle through Border Patrol checkpoints without facing similar detention or harassment.

search the interior of the vehicle and Mr. Chapman's personal effects. Mr. Chapman repeatedly objected to the search, which greatly amused Agent Caspar. Agent Caspar laughed and said, "Go tell Congress, it won't get you anywhere." Mr. Chapman was detained for over ten minutes while his car was searched before he was released. He was not questioned about his residence status.

On December 21, 2012, at approximately 1:30 p.m., Mr. Chapman arrived at the Sunsites checkpoint on Route 191. He was not asked about his citizenship; instead, he was immediately directed to pull into the secondary inspection area. An Officer C. Swanson told him that a service canine had alerted and directed the dog into Mr. Chapman's vehicle. Mr. Chapman objected to the search. Mr. Chapman later discovered the dog had destroyed some business-related paperwork in the front seat. Mr. Chapman was eventually released.

On October 24, 2012 at approximately 9:30 a.m., Mr. Chapman arrived at the Sunsites checkpoints. A service canine jumped onto Mr. Chapman's vehicle. Mr. Chapman objected that the dog was scratching his truck. An Agent M. Torres informed him that his dog had "hit," and directed Mr. Chapman to pull into the secondary inspection area. Agent Torres then told Mr. Chapman that he had probable cause to search the vehicle. Another agent asked Mr. Chapman for identification and asked him to exit his vehicle. Agent Torres proceeded to lead the dog around the vehicle, saying, "Get it boy, get it boy." The dog continued to jump onto the vehicle. Agent Torres returned the dog to its kennel and continued to search Mr. Chapman's truck bed, pausing to confer with an Agent J. Caporale. Agent Torres questioned Mr. Chapman about his use of the vehicle and about drugs. After being detained for approximately fifteen minutes, Mr. Chapman was released. He was not asked about his residence status.[21]

## II.     <u>Constitutional Limitations on Immigration Checkpoints</u>

The Fourth Amendment imposes limits on the government's search-and-seizure powers to prevent "arbitrary and oppressive" interference with the privacy and personal security of individuals. *United States v. Martinez-Fuerte*, 428 U.S. 543, 555 (1976). Accordingly, courts have imposed strict limitations on Border Patrol checkpoint operations; indeed, the legal legitimacy of immigration checkpoints is premised upon those limitations. *Id.* at 556–57. ("The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop.")

In *Martinez-Fuerte*, the Supreme Court found immigration checkpoints to be permissible only insofar as they involve a "brief detention of travelers during which (a)ll that is required of the vehicle's occupants is a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558 (citation omitted). The Court specified, "Neither the vehicle nor its occupants are searched, and visual inspection of the vehicle is limited to what can be seen without a search." *Id.* The Court condoned referrals to secondary inspection areas "made for the sole purpose of conducting a routine and *limited inquiry into residence status* that cannot feasibly be made of every motorist *where the traffic is heavy*." *Id.* at 560 (emphasis added). "The objective intrusion of the stop and inquiry thus remains minimal [and] should not be frightening or offensive because of their public and relatively routine nature," the Court observed. *Id.*; *see also United States v. Ortiz*, 422 U.S. 891, 894–95 (1975) ("At traffic checkpoints the motorist can see that other vehicles are being stopped…and he is much

---

[21] This was not Mr. Chapman's last encounter with Agent Torres. On December 16, 2012 at around 11:30 a.m., Mr. Chapman again arrived at the Sunsites checkpoint. The checkpoint was not in operation, but as Mr. Chapman drove through, he made eye contact with Agent Torres before continuing westbound on Route 191. Approximately one quarter mile down the road, a Border Patrol vehicle approached Mr. Chapman from the rear until it was a car's length from his rear bumper. The Border Patrol vehicle tailgated Mr. Chapman at a speed of 65 miles per hour for about half a mile before pulling off the road. Mr. Chapman subsequently called the Wilcox Border Patrol station to submit a verbal complaint, but did not receive a response.

less likely to be frightened or annoyed by the intrusion.") As for local residents subject to frequent stops, the Court noted, "Motorists whom the officers recognize as local inhabitants…are waved through the checkpoint without inquiry." *Id.* at 550.

That case was decided almost 40 years ago, in 1976.[22] Today, Border Patrol checkpoints diverge in significant respects from those described in *Martinez-Fuerte*. In Arizona, most checkpoints are located in rural areas where local residents are often forced to undergo searches and detentions ranging far beyond "limited" citizenship inquiries and not justified by "heavy traffic."[23] Border residents—including the many individuals who must pass through checkpoints daily to go to work, run errands, or take children to school—describe feelings of anxiety, fear, and anger after being interrogated, harassed, searched, and/or assaulted by federal agents. These individuals are not "waved through the checkpoint without inquiry," as the Supreme Court envisioned. *Id.* Each of the motorists described herein was referred for non-routine, unjustified detentions in a secondary inspection area on at least one occasion. Two of the above complainants were threatened with firearms.[24] Mr. Forrey and Mrs. Garcia were physically assaulted. Ms. Stepp was threatened with imprisonment. Mr. Ivey and Mr. Chan were detained in wire cages for approximately 45 minutes while their car was searched on a pretext and without their consent. The Garcia children fear passing through the checkpoints that surround the Tohono O'odham Indian Reservation where their parents work. While the Supreme Court in *Martinez-Fuerte* condoned immigration checkpoints because they were thought to impose a "minimal," non-offensive intrusion on the rights of motorists, the daily experiences of border residents profoundly undermine that premise, and by extension, the legitimacy of the checkpoints themselves. *Id.*[25]

In many cases, agents appear to be dispensing with any pretext of immigration enforcement, instead conducting generalized criminal investigations, which the Supreme Court has found to be unconstitutional. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) ("We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."); *Delaware v. Prouse*, 440 U.S. 648 (1979); *see also United States v. Ellis*, 330 F.3d 677, 680 (5th Cir. 2003) (allowing Border Patrol to routinely tack on otherwise impermissible drug interdiction questioning was "essentially an attempt to circumvent the [Supreme] Court's holding in *Edmond*…") (quotations omitted). In *Edmond*, the Supreme Court invalidated a checkpoint established for general crime control purposes: "Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

---

[22] There were roughly 1,800 Border Patrol agents nationwide in 1976. Today, there are over 21,000.

[23] One of the checkpoints at issue in *Martinez-Fuerte* was located on I-5 in California, and referrals to secondary inspection areas were justified in part by the necessity of managing heavy traffic on "important highways." *Martinez-Fuerte*, 428 U.S. at 556–57. By contrast, the majority of Border Patrol checkpoints are located on rural state highways and county roads where traffic is light and motorists often interact with agents in isolation.

[24] Both of those incidents occurred shortly before The Arizona Republic reported on the absence of known consequences for agents who use deadly force. *See* Rob O'Dell and Bob Ortega, *Deadly Border Agents Incidents Cloaked in Silence*, ARIZONA REPUBLIC, Dec. 16, 2013, *available at* http://www.azcentral.com/news/politics/articles/20131212arizona-border-patrol-deadly-force-investigation.html (noting that 42 individuals have been killed by Border Patrol agents since 2005 and, "In none of the 42 deaths is any agent or officer publicly known to have faced consequences — not from the Border Patrol, not from Customs and Border Protection or Homeland Security, not from the Department of Justice, and not, ultimately, from criminal or civil courts.")

[25] *See also Martinez-Fuerte*, 428 U.S. at 572–73 (Brennan, J., dissenting) ("One wonders what actual experience supports my Brethren's conclusion that referrals 'should not be frightening or offensive because of their public and relatively routine nature.'…[F]or the arbitrarily selected motorists who must suffer the delay and humiliation of detention and interrogation, the experience can obviously be upsetting." (citations omitted))

For many border residents, invasive stops have long since become a "routine part of life." *Id.* In the above cases, three humanitarian aid workers were detained for thirty minutes solely because an agent claimed that backpacks are *per se* suspicious; one motorist was detained over an hour because her car smelled like a skunk; another because he was "driving like an idiot"; and yet another was detained and threatened with a firearm because an agent "didn't recognize" him. Ms. Stepp and Ms. Turner were harassed and questioned about their legitimate prescription medications. The residents of Arivaca have documented similar experiences.[26] Most tellingly, in each of the stops described herein, Border Patrol had either completed or never initiated any immigration-related inquiry when it detained these motorists; ten of the fifteen individuals described above were never asked about residence status at all. Also revealing is the common sight of local law enforcement with no immigration enforcement authority accompanying Border Patrol agents at checkpoints. With so many agents going far beyond—or simply ignoring—the permissible "limited inquiry into residence status," it is difficult to discern what differentiates Border Patrol checkpoints from the general crime control checkpoints held to be unconstitutional more than a decade ago in *Edmond*. *See also United States v. Soyland,* 3 F.3d 1312, 1316 (9th Cir. 1993) (Kozinski, J., dissenting) ("There's reason to suspect the agents working these checkpoints are looking for more than illegal aliens. If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment.")[27]

Additionally, it is clear that Border Patrol agents regularly exceed the lawful limits of their authority in the course of individual stops, resulting in widespread rights abuses. There is no question that agents cannot extend checkpoint stops for *any* length of time for non-immigration purposes, absent "reasonable suspicion" that a crime has been committed. *See United States v. Preciado-Robles*, 964 F.2d 882, 884–85 (9th Cir. 1992) (articulable suspicion is required for detention following immigration questioning and "there *must* be a valid basis for any additional intrusion, and it must be of a brief duration."); *Ellis*, 330 F.3d 677, 680 ("[A]n agent at an immigration stop may investigate non-immigration matters beyond the permissible length of the immigration stop if and only if the initial lawful stop creates reasonable suspicion warranting further investigation."); *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001) ("[T]he scope of an immigration checkpoint is limited to the justifying, programmatic purpose of the stop: determining the citizenship status of persons passing through the checkpoint.").

---

[26] In one case, "[a]n Arivaca resident and a friend arrived at the checkpoint and identified themselves as U.S. citizens. An agent asked to search their vehicle and they declined. As a result, the agent directed them to the secondary inspection area. When they asked for an explanation, the agent replied that if they would not consent to a search, they would have to wait for a service canine to inspect the vehicle. They waited 20 minutes for the dog to arrive, at which point agents demanded that they exit the vehicle, without explanation, and then opened the door of their car and let the dog in. When they objected, agents yelled at them to remain still and keep their hands visible. They were not allowed to use their phones. One of the agents then claimed that the dog had 'alerted' because it had 'changed its breathing pattern.' After 45 minutes, they were finally released. Agents told them the search was, 'for [their] own protection.'" In another case, an Arivaca resident, "arrived at the checkpoint and notified the agent she was a U.S. citizen. The agent asked if the vehicle she was driving belonged to her. She responded that she was a U.S. citizen. The agent said, 'You can answer a simple question or we can do it the hard way,' and directed her to the secondary inspection area. More agents arrived with a service canine, and claimed that the dog had 'alerted' to the presence of contraband. The agents demanded that the woman exit the vehicle, over her objections, then questioned her about drugs, firearms, and the vehicle's history. The service canine found no drugs or contraband, but agents continued to search her trunk, then rifled through her purse and opened and smelled her water bottle. Before letting her go, the agents told her she had not been 'respectful.'" *See* http://phparivaca.org/?page_id=210

[27] *See also Soyland,* 3 F.3d 1312 at 1320 (Kozinski, J., dissenting) ("Given the strong hints that the Constitution is being routinely violated at these checkpoints, we owe it to ourselves and the public we serve to look into the matter. Even without an order of this court or the district court, the Department of Justice would be well-advised to establish the bona fides of these checkpoints.")

The government itself acknowledges this limitation on its authority. *See* Legal Opinion of INS General Counsel, *Other Agencies Working at Border Patrol Checkpoints*, at 2 (May 9, 1994) ("Referrals to the secondary inspection area that do not involve an immigration based violation must be supported by *at least* reasonable suspicion.") (emphasis added); UNITED STATES BORDER PATROL, SAN DIEGO SECTOR, LEGAL ANALYSIS OF BORDER PATROL CHECKPOINTS 14 (June 1, 2003) ("Where Border Patrol agents seek to detain a vehicle for secondary inspection solely for some non-immigration purpose, the law generally requires the agents to have a 'reasonable suspicion' of criminal wrongdoing."); *see also CBP Inspector's Field Manual*, Section 18.7(b) ("Before an inspector may constitutionally detain a person…the inspector must have reasonable suspicion that the person is an alien and is illegally in the United States.")

By contrast, southern Arizona residents are regularly detained and questioned regarding weapons and drug trafficking, as well as medical history, work and family, their comings and goings, and other subjects in no way related to verifying immigration or residence status or based on reasonable suspicion of a crime. The stops described herein ranged from 15 minutes to over an hour, not the "brief" three to five minute stops and "limited" inquiries contemplated by the Supreme Court—though, as noted, absent reasonable suspicion of criminal wrongdoing, each of these stops would have been unlawful for *any* period of time. *See Martinez-Fuerte*, 428 U.S. at 547, 558-59; *Ellis*, 330 F. 3d at 680 ("[W]hen the purpose of a stop switches from enforcement of immigration laws to drug interdiction, *a Fourth Amendment violation occurs* unless the Border Patrol agent has individualized suspicion of wrongdoing.") (emphasis added).[28]

It is also well-established that Border Patrol agents at permanent checkpoints may not search the *interior* of any vehicle without consent or probable cause. *Ortiz*, 422 U.S. 891; *see also Almedia-Sanchez v. United States*, 413 U.S. 266 (1973). Consent to a search must be knowingly and voluntarily given, and must not be the product of coercion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Agents routinely ignore this limitation as well. As described above, Mr. Buchanan's vehicle was searched without any lawful basis and over his repeated objections. Ms. Stepp only consented to a search of her vehicle and her person after being forcibly detained and humiliated for 45 minutes. Mr. Forrey's vehicle was searched after he was threatened at gunpoint. Mr. Tran's vehicle was searched on a pretext. Mr. Forrey, Mr. Polen, Mrs. Garcia, Ms. Turner, and Mr. Chapman were all subjected to vehicle searches on multiple occasions. These searches, lacking consent and probable cause, were unlawful. *Id.*

Equally troubling is agents' common practice of asserting that service canines have "alerted" to contraband as a basis for probable cause to conduct a search. A canine alert can provide agents with probable cause for a search only if the reliability of the dog and the handler are established. *United States v. Lingenfelter*, 997 F. 2d 632, 639 (9th Cir. 1994). There are ample grounds, however, to doubt the reliability of Border Patrol's use of service canines, including numerous studies and court decisions questioning the ability of canines to detect contraband accurately. *See, e.g.*, *United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (Border Patrol canine certification records showed marginal performance but were too heavily redacted to afford adequate opportunity to challenge basis for search); *Merrett v. Moore*, 58 F.3d 1547, 1549 (11th Cir. 1995) (noting that narcotics were not found in twenty-seven out of twenty-eight alerts at a temporary checkpoint); *Doe v. Renfrow*, 631 F.2d 91, 95 (7th Cir. 1980) (Fairchild, C.J., dissenting) (noting false alerts in thirty-five out of fifty encounters); *see generally* Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 Ky. L.J. 405, 427, 430 (1997) (noting that "even a very high accuracy rate can produce an unreasonable amount of false positives" and that service canines are "least effective when they survey a random population.")

---

[28] *See also Edmond*, 531 U.S. at 56. (Thomas, J., dissenting) ("I rather doubt that the Framers would have considered 'reasonable' a program of indiscriminate stops of individuals not suspected of wrongdoing.")

The experiences of Arizona motorists raise similar concerns. In the eight examples of false canine alerts documented herein, none resulted in the discovery of contraband. In some instances, agents appeared to be using the service canines as excuses to conduct a search. In the case of Mr. Tran and Mr. Ivey, a canine's alert to *another* motorist's bag was used as a basis for searching their vehicle. Ms. Turner described a similar experience, with agents striking her vehicle to encourage the dog to alert.[29] In the case of Mr. Polen, agents were unclear about the basis for his detention before settling on an alleged canine alert, even though there was no dog nearby. Several of the cases documented by Arivaca residents involved Border Patrol calling for service canines only *after* motorists legitimately declined to consent to a search or answer questions not related to citizenship; in several instances, agents then claimed a service canine "alerted," giving them probable cause for a search. In none of those cases was any contraband discovered. The frequency of false canine alerts at Border Patrol checkpoints indicates either that canines are frequently unreliable, or that agents are using canines fraudulently in order to obtain probable cause where it does not otherwise exist, or both. Whichever the case may be, the result is that border residents are regularly subject to unconstitutional searches and detentions.

Additionally, as we have seen in the context of "roving patrol" stops,[30] Border Patrol continues to rely on race and ethnicity as factors in subjecting certain motorists to additional scrutiny and detention at checkpoints. In addition to Ms. Turner's account of multiple racially-motivated detentions, the ACLU receives reports from Latino and Native American residents who experience additional scrutiny and delay at checkpoints, for no apparent reason other than their perceived race or ethnicity.[31] Such practices are unlawful as well. *See Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000); *Melendres v. Arpaio*, Civ. No. PHX–CV–07–02513–GMS, 2013 WL 2297173, at *69 (D. Ariz. May 24, 2013) ("[T]here is no legitimate basis for considering a person's race in forming a belief that he or she is more likely to engage in a criminal violation, and the requisite 'exact connection between justification and classification,' in focusing on Hispanic persons in immigration enforcement is lacking.") (citation omitted).[32]

***

Border Patrol checkpoints today bear little resemblance to those authorized by the Supreme Court in *Martinez-Fuerte.* Many Border Patrol officials do not understand—or simply ignore—the legal limits of their authority at checkpoints. One of the agents described above resorted to reading legalese from a tiny script that he did not understand, misstating the applicable legal standard, to try to justify the stop. Others claimed, falsely, that motorists could not make phone calls or videotape agents searching vehicles. Multiple citizens have reported being told by agents, "You have no rights here," or that refusal to consent to a search gives agents probable cause for a search. In many cases, agents responded to citizens who legitimately asserted their rights with additional abuses. The Office of Inspector General recently

---

[29] The agent's contact with the vehicle may have in and of itself been unlawful. *See Thomas*, 726 F.3d at 1093 ("[I]t is conceivable that by directing the drug dog to touch the truck and toolbox in order to gather sensory information about what was inside, the border patrol agent committed an unconstitutional trespass or physical intrusion.")

[30] The ACLU submitted a complaint on October 9, 2013, on behalf of five Arizona residents subjected to unlawful roving patrols, at least one of whom appeared to have been racially profiled by Border Patrol. *See* http://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf

[31] One Arivaca resident, a naturalized U.S. citizen, has "repeatedly faced extended questioning and demands for identification at the Arivaca Road checkpoint. Although she is a citizen, agents have demanded that she show proof of naturalization, which she is not required to carry. She believes this scrutiny is based solely on her Hispanic appearance and her accent." *See* http://phparivaca.org/?page_id=210

[32] *See also* U.S. DEP'T OF JUSTICE, GUIDANCE REGARDING THE USE OF RACE BY FEDERAL LAW ENFORCEMENT AGENCIES, (June 2003), *available at* http://www.justice.gov/crt/about/spl/documents/guidance_on_race.pdf

concluded that Border Patrol agents do not understand agency use of force policies.[33] This profound lack of understanding evidently extends to checkpoint procedures as well. These problems are compounded by the fact that agents at checkpoints do not appear to document their interactions with motorists—including agents' use of force, false alerts by service canines, and prolonged detentions—*not* resulting in arrest. The lack of documentation and oversight makes it impossible to know when Border Patrol agents are exceeding their authority or straying from agency guidelines. This is a recipe for further abuse.

Finally, as we have noted before, the complaint process by which individuals report abuses to Border Patrol and other DHS entities is lacking in consistency and transparency and fails to provide meaningful redress to those whose rights have been violated. Border Patrol and DHS officials often fail to provide accurate information to complainants about the investigatory process or the status of their complaint, and are not responsive to reasonable requests for information. The ACLU is still awaiting response to a complaint filed on April 26, 2012 on behalf of eleven individuals abused by agents at Ports of Entry,[34] and another filed on October 9, 2013 on behalf of five Arizona residents subjected to unlawful roving patrol stops.[35] Unfortunately, the lack of attention by DHS and its agencies to these complaints—involving civil rights abuses by the largest federal law enforcement agency in the nation—is not atypical. As should by now be clear, the entire DHS complaint process is in dire need of reform, and a broader commitment to Border Patrol oversight, accountability, and transparency is long overdue.

## III.    Conclusion

We request that you conduct a prompt investigation of these individual allegations of abuse, along with any known checkpoint-related complaints from the past five years. We also urge a comprehensive review of checkpoint policies and practices to determine whether Border Patrol is complying with its obligations under the U.S. Constitution and agency guidelines—**with particular attention to** the extent to which agents at checkpoints are:

1) conducting investigations unrelated to verifying immigration status and without reasonable suspicion of criminal activity;
2) searching vehicles without consent or probable cause;
3) using service canines to obtain probable cause, either by claiming falsely that a dog has "alerted," or by relying on inadequately trained or unqualified canines, resulting in significant rates of false alerts;
4) racially profiling motorists at checkpoints; and
5) using excessive force, making false claims, and/or improperly interrogating, intimidating, and harassing motorists at checkpoints.

---

[33] *See* Brian Bennett, *Many Border Agents Don't Understand Use-Of-Force Rules, Report Says*, LA TIMES, Sept. 18, 2013, *available at* http://articles.latimes.com/2013/sep/18/nation/la-na-nn-border-patrol-use-of-force-20130918 (An audit showed that many agents "do not understand use of force and the extent to which they may or may not use force.") This is in part due to the fact that training and hiring standards were lowered to accomplish the rapid expansion of the Border Patrol from roughly 12,000 agents in 2006 to over 21,000 today. *See* Greg Morgan, *Hiring Practices Questioned after Border Agent's Arrest*, SAN DIEGO UNION TRIBUNE, Apr. 1, 2011, *available at* http://www.utsandiego.com/news/2011/Apr/01/hiring-practices-questioned-after-border-agents-ar/ (quoting a Border Patrol representative, "Pretty much everyone was being pushed through because they needed the bodies.")

[34] *Available at* https://www.aclu.org/files/assets/aclu_2012_cbp_abuse_complaint_2.pdf . DHS sent form responses regarding three of the eleven cases of abuse documented in the ACLU's April 2012 complaint, without commenting on the many allegations of abuse by CBP officials or conducting interviews with any of the complainants.

[35] *Available at* http://www.acluaz.org/sites/default/files/documents/ACLU%20AZ%20Complaint%20re%20CBP%20Roving%20Patrols%20Oct%209%202013.pdf. To date, DHS has contacted only one of the five individuals whose abuses were documented in the ACLU's October 2013 complaint.

In cases of unlawful conduct, we urge that the agents responsible be appropriately disciplined and that the results of your investigation be made public. Finally, significant changes in Border Patrol training, oversight, and accountability mechanisms are needed, and we again urge you to make substantive recommendations for such changes consistent with your institutional mission in order to prevent further abuses.

Please contact us with any questions or concerns at (602) 650-1854.

Sincerely,

James Lyall
Staff Attorney
ACLU of Arizona

Cc:    Jeh Johnson
Acting Secretary of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane SW
Washington, D.C. 20528

Thomas Winkowski
Acting Commissioner
U.S. Customs and Border Protection
1300 Pennsylvania Avenue, N.W.
Washington, D.C. 20229

Manuel Padilla, Jr.
Chief Patrol Agent – Tucson Sector
U.S. Customs and Border Protection
2430 S. Swan Road
Tucson, AZ 85711

Jocelyn Samuels
Acting Assistant Attorney General
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

John S. Leonardo
United States Attorney
Department of Justice
405 W. Congress Street, Suite 4800
Tucson, AZ 85701

Senator John McCain
U.S. Senator for Arizona
241 Russell Senate Office Building
Washington, DC 20510

Senator Jeff Flake
U.S. Senator for Arizona
B85 Russell Senate Office Building
Washington, DC 20510

Congressman Raúl Grijalva
U.S. House of Representatives
1511 Longworth HOB
Washington, DC 20515

Congressman Ron Barber
U.S. House of Representatives
1029 Longworth HOB
Washington, DC 20515

Page **17** of **17**

# EXHIBIT A