## Authority As An Agent
## U.S. Border Patrol

**Statutory Authority:**

INA 274(b): Seize alien and smuggling conveyance (for forfeiture)

INA 287(a)(1): Interrogate aliens

INA 287(a)(2): Arrest unlawfully present aliens (likely to escape at a checkpoint)

INA 287(a)(3): Board conveyances (within 100 air miles)

INA 287(b): Administer oaths

19 USC 1589a(3): Arrest for federal misdemeanors committed in the presence and for any federal felonies.

19 USC 1959a(a): Seize anything used for smuggling merchandise.

**Frequently asked questions:**

Am I being detained? Yes.

What authority do you have to stop me?

The United States Supreme court has stated in U.S. v. Martinez-Fuerte that the U.S. Border Patrol has authority to conduct an immigration inspection at a checkpoint without individualized suspicion. This is an immigration checkpoint and I am conducting an immigration inspection. Of what country are you a citizen?



U.S. Customs and Border Protection

## Checkpoint Authority
## U.S. Border Patrol

**U.S. v. Martinez-Fuerte – 428 U.S. 543 (1976):**

Holding: Border Patrol agents may stop and question motorist at reasonably located checkpoints, even in the absence of individualized or reasonable suspicion.

What section of the INA did the Supreme Court use to justify their opinion? INA 287 (a)(3)

• Within a reasonable distance from any external boundary of the United States, to board and search for aliens in any vessel within territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle.

What section of the INA gives us the authority to question motorist? INA 287 (a)(1)

• Court surmised that there was only a minimal intrusion to motorist when stopped at immigration checkpoints.

CBP Publication No. 0415-0511; May 2011

 

U.S. Customs and Border Protection

# EXHIBIT 20

# Record of Abuse

## Lawlessness and Impunity in Border Patrol's Interior Enforcement Operations



**October 2015**

The findings in this report are based on government records produced in *ACLU Foundation of Arizona v. U.S. Department of Homeland Security*, No. 14 -02052 (D. Arizona filed Apr. 28, 2014).

By James Lyall, Staff Attorney, ACLU of Arizona; Jane Yakowitz Bambauer, Professor of Law, James E. Rogers College of Law, University of Arizona; Derek E. Bambauer, Professor of Law, James E. Rogers College of Law, University of Arizona.

This report was produced with the financial support of the Central America and Mexico Migration Alliance (CAMMINA).

## SUMMARY

Government records obtained by the ACLU shed new light on Border Patrol's vast interior enforcement operations, most of which occur far from any international border. Though Border Patrol says these operations are "safe, efficient, and cost-effective," the agency's own records undermine those claims, revealing a systemic lack of oversight and accountability for agents who violate border residents' most basic civil and constitutional rights on a dramatic scale. These documents show that Border Patrol's extra-constitutional police practices often amount to a de facto policy of "stop and frisk" for border residents.

The records contain recurring examples of Border Patrol agents detaining, searching, and terrorizing individuals and entire families at interior checkpoints and in "roving patrol" vehicle stops far into the interior of the country; threatening motorists with assault rifles, electroshock weapons, and knives; destroying and confiscating personal property; and interfering with efforts to video record Border Patrol activities. They reference dozens of false alerts by Border Patrol service canines resulting in searches and detentions of innocent travelers. Above all, these documents show a near-total lack of investigation of, much less discipline for, egregious civil rights abuses; to the contrary, some of the records show Border Patrol tacitly or explicitly encouraging its agents to violate the law.

Produced pursuant to a Freedom of Information Act (FOIA) lawsuit filed by the American Civil Liberties Union of Arizona (ACLU) in April 2014, the records include scores of civil rights complaints originating in Border Patrol's Tucson and Yuma Sectors and submitted to Department of Homeland Security (DHS) and Customs and Border Protection (CBP) from 2011 to 2014. These documents, consistent with reports the ACLU receives from border residents on a regular basis, indicate that civil rights violations arising out of Border Patrol interior operations are far more numerous than the government's publicly reported figures would suggest.

Specifically, though the complaint records obtained by the ACLU to date are incomplete and taken from just two of Border Patrol's twenty sectors, they significantly outnumber the civil rights complaints DHS and CBP disclosed to Congress during the same period. For example, from Fiscal Year 2012 through Fiscal Year 2013, DHS oversight agencies reported just three complaints involving alleged Fourth Amendment violations, nationwide. Yet government records produced to the ACLU reveal that at least 81 such complaints originated in Tucson and Yuma Sectors alone during the same period (with at least 38 more through just part of FY 2014).

The records further demonstrate the ways in which CBP's existing oversight mechanisms—including basic data collection—fall well short of accepted best practices and are inadequate to detect and deter rights violations by agents. Border Patrol fails to record any stops that do not lead to an arrest, even when the stop results in a lengthy detention, search, and/or property damage. The agency also does not document false alerts by service canines, which frequently result in prolonged searches and seizures of innocent travelers. As a result, it is impossible for Border Patrol to track or respond to recurring incidents involving "problem agents" or chronically inaccurate service canines. CBP itself appears to be unaware of the full extent to which agents are violating residents' rights and wasting taxpayer dollars.

These documents also confirm CBP's persistent unwillingness to hold agents accountable: substantive, independent investigations into civil rights violations are rare, lacking in transparency, and almost never result in disciplinary consequences of any kind. The records produced to the ACLU contain numerous reports of abuse and corruption, but only one example of disciplinary action: one agent, suspended for one day, for an unlawful vehicle stop. (In that case, the complainant was alleged to be a government employee and the son of a Border Patrol agent.)

Finally, CBP's own data calls into question the agency's claims that interior checkpoint operations are an efficient and effective enforcement strategy. For example, CBP apprehension statistics show that for 2013, Tucson Sector checkpoint apprehensions accounted for only 0.67 percent of the sector's total apprehensions. In calendar year 2013, nine out of 23 Tucson Sector checkpoints produced zero arrests of "deportable subjects." The same year, Yuma Sector checkpoint arrests of U.S. citizens exceeded those of non-citizens by a factor of nearly eight (and in 2011, by a factor of 11). One checkpoint in Yuma Sector, located 75 miles from the border, reported only one non-citizen apprehension in three years, while producing multiple civil rights complaints during the same period. Despite the Supreme Court's prohibition on general "crime control" checkpoints, these records indicate that Border Patrol checkpoint activities are more often directed at drug busts than at immigration enforcement. Moreover, though CBP did not account for the financial costs of its interior operations, its records suggest the human costs far outweigh the limited enforcement gains.

Border Patrol abuse has reached epidemic levels in border communities, and the agency has demonstrated that it is incapable of policing itself. Still, as the Obama Administration pushes states and localities to implement long-overdue police reforms, it has not held CBP, the nation's largest law enforcement agency, to the same best-practices standards. The results are as predictable as they are devastating to the communities situated within Border Patrol's "100 mile zone."

A selection of the documents produced in *ACLU Foundation of Arizona v. DHS*, which were the basis of this report, is available online at http://www.acluaz.org/Record_of_Abuse.



## INTRODUCTION

In January 2014, the ACLU, along with two University of Arizona law professors, filed a FOIA request with DHS.[1] The request sought records related to Border Patrol interior enforcement activities from 2011 to 2014 in Border Patrol's Tucson and Yuma Sectors (covering all of Arizona as well as a portion of southeastern California), including complaints and investigations, apprehension statistics and stop records, policies, and training materials.

The request was made in response to a growing number of complaints involving Border Patrol in Arizona and around the country. In 2013 and 2014, the ACLU submitted administrative complaints to DHS oversight agencies, documenting numerous rights violations in Border Patrol interior checkpoint and "roving patrol" vehicle stops.[2] The government still has not responded to those complaints. Meanwhile, Border Patrol has refused to share basic information, such as checkpoint arrest statistics, with impacted communities.[3]

### "STOP AND FRISK" FOR BORDER RESIDENTS

A 2012 complaint submitted by a Border Patrol agent described a supervisor at Border Patrol's Naco Station instructing agents to "stop any vehicle on the US/Mexican border road that is open to the public ... [on the basis of the] mere presence of the vehicle on the roadway." The supervisor allegedly "didn't care if it was the Chief of the Border Patrol and the agent conducted a high risk traffic stop removing the Chief ... at gun point" because he "would then know they were doing their job." It is unclear whether the agency ever investigated the complaint, but the supervisor was apparently never disciplined.

Source: *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 049-053.

DHS failed to respond to the FOIA request, prompting the ACLU to sue in federal court in April 2014.[4] The government eventually identified at least 10,000 pages of responsive records, but has released only half of those records to the ACLU. The records produced include heavy redactions and approximately 1,200 pages have been withheld in full without any legal justification or explanation. (CBP has since acknowledged the existence of substantially more responsive records, which it has refused to provide.)

Nonetheless, even the limited records released to date provide troubling insights into Border Patrol's little-understood internal enforcement operations and demonstrate the continuing need for fundamental agency reforms.

## RAMPANT CIVIL RIGHTS VIOLATIONS

The roughly 6,000 pages of government records obtained by the ACLU include scores of detailed complaints submitted to DHS oversight agencies by Arizona residents and motorists from 2011 to 2014. Far from complete—the majority of those complaints cover just two years, FY 2012 and FY 2013, the only years for which CBP appears to have provided complete records[5]—and taken from just two of Border Patrol's twenty sectors, these complaints represent a fraction of the total complaints submitted to DHS and CBP during the same period nationwide.



Moreover, these records reflect only those complaints the agencies actually documented. DHS, CBP, and Border Patrol have not adopted a consistent, uniform process for filing complaints, and do not make complaint forms available in Spanish, such that many individuals do not submit formal abuse complaints. Through extensive community outreach and investigations, it is the ACLU's experience that the vast majority of individuals whose rights are violated by Border Patrol agents never submit formal or informal complaints.

Still, the complaint records produced to the ACLU provide an important and disturbing window into Border Patrol interior enforcement abuses. The records include roughly 142 civil rights complaints, 134 of them involving allegations of Fourth Amendment violations, including numerous reports of stops and searches undertaken by agents without any valid legal basis.

Among the complaint records produced to date are approximately 44 allegations of false canine alerts resulting in prolonged detentions and/or searches of individuals who did nothing wrong and were ultimately released. At least 29 people reported property damage or confiscation for which they do not appear to have been compensated. (In many cases, when agents or canines damage or destroy personal property, Border Patrol directs victims to initiate a lawsuit to obtain reimbursement; one man who attempted to do so was notified by CBP that the law "bars recovery for property damaged by CBP employees while the property is under detention in CBP custody."[6])

Numerous complainants describe agents making roving patrol stops on legally insufficient or dubious grounds—including motorists stopped for speeding;[7] driving too slowly;[8] driving with out-of-state license plates;[9] driving vehicles "registered in another town;"[10] driving on less common routes;[11] "turning around;"[12] commuting to work in the early morning;[13] on the basis of a tip from a "concerned citizen"[14] and on the basis of "a possible mistake."[15] Many agents refused to provide motorists with any explanation at all.[16] One woman demanded to know why she was pulled over in Tucson, 60 miles from the border; agents told her, "We'll think of something."[17]

Many other complainants, including the Nogales City Attorney, reported stops and/or searches they believe resulted from racial profiling.[18] Other stops appear to have been conducted far into the interior of the country: several people were stopped on the I-10 freeway about 75 miles north of the border; one person described agents stopping vehicles on Highway 93 north of Phoenix, at least 125 miles from the border, well beyond the area in which Border Patrol has authority to operate.[19]

Complainants also repeatedly describe agents' violent, reckless, and threatening conduct, including physically assaulting non-threatening motorists;[20] driving aggressively and tailgating at high speeds;[21] wielding weapons, including knives, electroshock weapons, and assault rifles in routine traffic encounters;[22] threatening to shoot motorists or their pets;[23] and mocking and insulting motorists with profane and derogatory language.[24] Several complaints describe agents forcibly confiscating cell phones from motorists who attempt to video record Border Patrol activities.[25]

Among the many complaints submitted to DHS are the following representative accounts, none of which appear to have resulted in the complainant's arrest or discipline for the agent(s) involved.

- Border Patrol detained a man at the I-19 interior checkpoint after a service canine falsely alerted to his vehicle. After he was released, he realized Border Patrol agents had confiscated much of his prescription medication.

- A woman driving at night with her 4-year-old daughter was followed from an I-10 rest area, tailgated, and stopped roughly 75 miles north of the border. A Border Patrol agent approached the vehicle with his hand on his weapon and along with another agent shone flashlights into the vehicle. Agents claimed they had "probable cause" to stop the vehicle but did not provide any specific reason. The woman and her daughter were terrified—the daughter experienced nightmares following the incident—but one of the agents told them that "only criminals and people trying to hide things get nervous." Agents interrogated the woman and searched the family's personal effects before finally releasing them.

- A man complained of racial profiling after agents followed him and his family from the I-10 interior Border Patrol checkpoint, about 75 miles from the border, to a highway restaurant. Agents interrogated the man and his family about their legal status, residence, and arrest history before releasing them without explanation.

- A motorist reported being frequently subjected to searches, interrogation and harassment at the Highway 90 interior Border Patrol checkpoint. After the motorist complained, a supervisor responded that there is "no exact standard" for secondary inspections and that agents' actions are "based on how the agent feels."

- An individual who attempted to record a roving patrol stop near Three Points, Arizona, reported that Border Patrol agents confiscated his phone and deleted the video footage.

- In March 2013, the Nogales City Attorney's Office submitted a complaint to Border Patrol alleging racial profiling and abuse of authority after agents at the I-19 interior checkpoint falsely relied on a non-existent canine alert as a basis for prolonged detention and search. The complaint describes the agents' actions as "egregious and illegal," though not isolated, and refers to a Deputy City Attorney detained and searched on multiple occasions on the basis of claimed or false canine alerts.

- Multiple Border Patrol agents described one agent's "abuse of authority and unstable behavior" at an interior checkpoint, characterizing the agent as "out of control and mentally unstable." The agents were so alarmed that they removed the agent's duty belt and service weapon "and secured it in a K-9 vehicle lock box." It is unclear whether any further action was ever taken.

**LONG HISTORY OF ABUSE**

In 2008, the ACLU successfully represented two Border Patrol whistleblowers who faced retaliation after they testified about agents' practice of "shotgunning"—stopping motorists without any "reasonable suspicion" and inventing justifications after the fact. CBP's complaint records suggest that the practice of shotgunning persists: one motorist reported being stopped 60 miles from the border; when she asked for an explanation, agents told her, "We'll think of something." Border Patrol agents do not record vehicle stops—like this one—not resulting in arrest, a practice that both enables and conceals abuse.

Source: Press Release, *ACLU Defends Border Patrol Agents for Exposing Practice of 'Shotgunning,'* May 21, 2008, available at https://www.aclu.org/news/aclu-defends-border-patrol-agents-exposing-practice-shotgunning.

- A man reported a Border Patrol agent repeatedly drove past the man's house as he and his family were leaving, and then pulled them over. When the man asked the agent why they were stopped the agent replied, "I don't have to tell you that."

- A man reported being pulled over by Border Patrol agents seven times in one year while commuting to work on Highway 86, approximately 30 miles from the border. During one stop, an agent explained that "the time he is driving to work is also a peak time for smuggling."

- A woman was detained following a false canine alert at an interior checkpoint on Highway 86, west of Tucson. A Border Patrol agent told her to "put the fucking keys in the truck." When she objected to his language, the agent said, "I can talk to you any fucking way I want." The agent later reported to supervisors, "I felt that a more forceful approach was needed in order to convey her need to follow my direction." An hour and half later, a woman and her brother were detained at the same checkpoint following another false canine alert; an agent forcibly removed the woman's cell phone from her hand and threatened her brother with an electroshock weapon before releasing them. The next day, at the same checkpoint, agents attempted to prevent a different woman from videotaping them and allegedly spit on her following yet another false canine alert.

- Additional complaint summaries are provided in the Appendix.

These accounts are consistent with a growing number of complaints submitted to the ACLU by border residents reporting racial profiling, unwarranted stops and searches, false canine alerts, and other abuses.[26] Also consistent is the lack of any meaningful response to these allegations from DHS oversight agencies.

## FAILURE TO INVESTIGATE OR DISCLOSE ABUSE COMPLAINTS

The records obtained by the ACLU illustrate just some of the ways in which DHS oversight agencies are ill-equipped to detect and respond to rights violations, much less hold Border Patrol agents accountable for those violations. These same agencies fail to accurately disclose the abuse complaints they do receive, effectively concealing the full extent of the problem from Congress and the public.

Among the offices tasked with Border Patrol oversight are the DHS Office of Inspector General (OIG), the DHS Office for Civil Rights and Civil Liberties (CRCL), CBP Internal Affairs, and ICE's Office of Professional Responsibility (ICE-OPR). Government records show these component agencies repeatedly delegating investigatory responsibility to the local Border Patrol stations from which abuse complaints originate, eliminating any semblance of independent agency oversight.[27] These offices also systematically de-prioritize all but the most egregious civil rights complaints, resulting in cursory investigations and virtual impunity for widespread interior enforcement abuses.

**INADEQUATE DISCLOSURE CONCEALS ABUSE**

| PRIMARY ALLEGATION | 1ST QTR | 2ND QTR | 3RD QTR | 4TH QTR |
|---|---|---|---|---|
| Discrimination/Profiling | | 1 | | |
| Excessive Force | 1 | 1 | | |
| Fourth Amendment (Search and Seizure) | | | | |
| Inappropriate Touch/Search of Person (Non-TSA) | | | | 1 |
| Medical/Mental Health Care | | | | |
| Sexual Assault/Abuse | | | | |
| Total | 1 | 2 | 0 | 1 |

CRCL complaints received and retained by OIG. Available here: http://www.dhs.gov/sites/default/files/publications/crcl-fy-2013-annual-report.pdf.

Source: *DHS CRCL FY2013 Annual Report.*

OIG, for example, rarely investigates allegations of civil rights abuse by agents, which it designates as lower priority, "non-criminal misconduct."[28] OIG records, though heavily redacted, show that office closing or referring back to CBP cases involving allegations of civil rights abuse soon after receiving them.[29] In other cases, OIG refers allegations of serious rights violations to CRCL, despite the fact that CRCL has no disciplinary authority—that agency's mandate is limited to policy recommendations and CRCL officials have no power to hold individual agents accountable for abuse.

For example, in October 2013 the ACLU submitted to OIG and CRCL five complaints related to roving patrol abuses in southern Arizona. The complaints alleged excessive force, unlawful stops and searches, and racial profiling, among other abuses; nonetheless, after 11 days OIG referred the complaints to CRCL.[30] Two years later, CRCL has not responded. In January 2014, the ACLU submitted another complaint to OIG and CRCL on behalf of 15 individuals alleging rights violations at southern Arizona checkpoints.[31] Agency records show the complaints were referred back to the sector level, where supervisors were quick to downplay them as mere "allegations."[32] It does not appear from these records that any of the complaints were ever properly investigated by Border Patrol or any other agency.

In light of DHS oversight agencies' failure to hold agents accountable for even fatal use of force,[33] it is perhaps unsurprising that less extreme forms of abuse—racial profiling, prolonged detention, unlawful searches—recur without consequences for the agents responsible. The result, however, is that widespread rights violations continue to go unchecked. In FY 2013, for example, OIG retained for investigation just four complaints involving CBP, nationwide, none related to Fourth Amendment search and seizure, even though complaints of Fourth Amendment violations are frequent.[34] In FY 2012, OIG retained just three complaints involving CBP, each related to excessive use of force.[35]

For its part, CRCL vastly downplays the extent of Border Patrol abuse. Like OIG, CRCL does not disclose the number of complaints it receives, only complaints it accepts for "investigation," which are comparably few and are largely delegated to the sector level. At the same time, CRCL relies on these limited numbers to make broad conclusions: in one report to Congress, CRCL suggests that CBP's revised use of force policy contributed to a decline in "complaints alleging excessive use of force," of which it reported only 18, without acknowledging how arbitrarily—and narrowly—it defines "complaints."[36] (In a similar manner, CBP has claimed a reduction in use of force incidents without defining "use of force."[37])

### TOTAL COMPLAINTS OF CBP FOURTH AMENDMENT VIOLATIONS, COMBINED FY12 AND FY13



| | |
|---|---|
| Tucson and Yuma Sectors Only | 81 |
| Reported by CRCL (Nationwide) | 3 |
| Reported by OIG (Nationwide) | 0 |

### TOTAL CBP CIVIL RIGHTS COMPLAINTS, COMBINED FY12 AND FY13



| | |
|---|---|
| Tucson and Yuma Sectors Only | 85 |
| Reported by CRCL (Nationwide) | 131 |
| Reported by OIG (Nationwide) | 4 |

Source: *DHS CRCL FY2012 Annual Report* and *DHS CRCL FY2013 Annual Report.*

The disparity between complaints CRCL receives and complaints it reports is striking. In its FY 2014 report to Congress, CRCL reported only two "complaints opened" involving Fourth Amendment violations by CBP nationwide[38]—the same period in which the agency received the ACLU's complaints describing more than a dozen allegations of unlawful search and seizure and other violations by Border Patrol in Arizona alone.[39] In its FY 2013 report, CRCL disclosed zero Fourth Amendment complaints involving CBP, nationwide.[40] For FY 2012, CRCL reported only three such complaints.[41]

By contrast, the records provided to the ACLU to date—representing just half of the records requested and only two of Border Patrol's 20 sectors—describe at least 134 complaints recorded by DHS oversight agencies describing potential Fourth Amendment violations, including numerous false canine alerts resulting in prolonged detention and warrantless searches. Complete statistics for all 20 Border Patrol sectors, if made publicly available, would reveal many additional abuse allegations that are never publicly disclosed.

Though ostensibly better suited to providing meaningful oversight than OIG or CRCL, CBP Internal Affairs generally refrains from investigating Border Patrol abuses other than excessive use of force.[42] Like OIG and CRCL, Internal Affairs most often delegates racial profiling and unlawful search and seizure allegations to the sectors where they are generally dismissed after a cursory review. Additionally, Internal Affairs does not publicly report any of the civil rights complaints it receives, leaving Congress and the public with a profoundly misleading and inaccurate picture of the disturbing extent of civil rights abuses by Border Patrol and other DHS officials.

These failures clearly go beyond what CBP Commissioner R. Gil Kerlikowske has called "antiquated" computer systems. "We have trouble tracking the complaint numbers because the systems were put together from a variety of agencies," Kerlikowske told CBS News in 2014.[43] At the time, Commissioner Kerlikowske acknowledged that CBP could have used some of its $13 billion dollar budget to fix that system in order to track complaints properly.

Others within the government have been more critical: former head of CBP Internal Affairs, James Tomsheck, has said that DHS oversight was "clearly engineered to interfere with our efforts to hold the Border Patrol accountable"[44] while DHS's own Integrity Advisory Panel has called for CBP to reform oversight measures by, among other things, expanding its "woefully understaffed" Internal Affairs by 175 percent.[45]

Perhaps most significantly, the agency's records show the near total impunity with which agents operate. This is consistent with the findings of a prior FOIA request, by the American Immigration Council, which found that 97 percent of Border Patrol abuse complaints were designated "No Action Taken."[46] From the records released to the ACLU, only one complaint appears to have resulted in discipline of any kind: an agent suspended for one day following an unjustified vehicle stop. In that case, the complainant was allegedly a government employee and the son of a retired Border Patrol agent.[47]

## INADEQUATE DATA COLLECTION AND LACK OF TRANSPARENCY

The records demonstrate that Border Patrol's failure to track even basic stop data makes it nearly impossible for supervisors or anyone else to know when agents have violated the law in the course of interior operations. For example, Border Patrol does not keep *any* record of vehicle stops and searches not resulting in arrest—if a motorist is detained without justification and eventually released, there is no record that the stop ever occurred. The agency does not systematically track other key information such as the location of roving patrol stops, agents' justifications for initiating or prolonging vehicle stops, or conducting searches of vehicles and their occupants.[48]

### FAILURE TO ADDRESS RECURRING ABUSES

Border Patrol's records contain numerous accounts of false canine alerts, and the ACLU receives similar complaints from border residents on a regular basis. For example, on New Year's Day 2015, 65-year-old Curtis Milan, a retired police officer and former K-9 handler, was stopped at an interior Border Patrol checkpoint while driving with his wife. An agent advised the couple that a dog had alerted to contraband in their vehicle and directed them to a secondary inspection area. There, they were separated, interrogated, and detained for more than 45 minutes before finally being released without explanation. Because there was no arrest, agents made no record of the couple's detention or of the false alert.

Simply put, because of Border Patrol's substandard data collection practices, neither the agency nor the public has any way to know how often agents subject innocent travelers to unlawful stops, many of them far from any border. Yet countless complaints and a growing number of lawsuits indicate that the agency fails to detect thousands of unlawful searches and seizures every year.[49]

Likewise, though the reliability of service canines in uncontrolled environments such as checkpoints is highly questionable,[50] Border Patrol does not record or track false alerts, nor does it require continuing canine certification based on field performance.[51] Despite regular complaints of false canine alerts[52]— including multiple complaints of false alerts at the same checkpoint in less than 24 hours[53]—resulting in prolonged detentions and searches of innocent motorists, there is no indication in the records that Border Patrol takes any action when a canine's recurrent false alerts call the dog's accuracy into question. Meanwhile, in the ACLU's FOIA litigation, the government has refused to produce records related to service canines' training and certification.

The government has withheld or redacted many other forms of public information, on dubious grounds or without any explanation at all. The names of agents—and even service canines—are redacted in all the records produced to date, making it impossible to know how many are repeat offenders or "problem agents."[54] The agency has also redacted narrative portions to conceal the factual basis for agents' stops and searches.[55] OIG has produced only case summaries, all of them heavily redacted, and at least 1,200 pages have been withheld in full, without any explanation.[56]

Border Patrol's failure to track basic data and its persistent aversion to transparency are clearly out of line with accepted law enforcement best practices, the same standards regularly promoted by other federal government agencies.[57] Litigation should not be required for the public to obtain even a limited window into the agency's interior enforcement activities.

## FLAWED POLICIES AND TRAINING

Significant portions of the checkpoint policy and training records produced to date are also redacted.[58] Nonetheless, these records reveal once again the inadequacy of current training materials and policies to ensure that Border Patrol agents do not exceed the lawful scope of their authority in interior operations.[59] Of the many documents referencing or describing what agents can do under that authority, few training and policy documents clearly articulate the many things agents cannot do. Rather, Border Patrol encourages agents to push or exceed the limits of their authority, while demonstrating that there will be no consequences for agents who stray over the line.

Take, for example, training materials produced by Border Patrol's Wellton Station which address agents' legal authority at checkpoints. Other than a recitation of the text of the Fourth Amendment, the training makes no explicit mention of any limits on Border Patrol authority.[60] For example, agents are not informed that probable cause is required for vehicle searches. To the contrary, the training states simply that agents have drug enforcement authority to "conduct warrantless searches and seizures at Border Patrol checkpoints."[61] In other places, the agency hedges: whereas the law unequivocally requires reasonable suspicion for non-immigration secondary inspections, the Wellton training states reasonable suspicion is just "generally" required.[62]



**BORDER PATROL'S "GUIDANCE ON UNCOOPERATIVE MOTORISTS"**

Source: Document stamped CBP 1479, produced in *ACLU Foundation of Arizona v. DHS*, No. 14-02052 (D. Arizona filed Apr. 28, 2014).

In many of its training materials and other guidance to agents, Border Patrol appears to be more concerned with managing public relations than with respecting the rights of those with whom the agency comes into contact. For example, one training presentation entitled "Guidance on Uncooperative Motorists: Know your authority, stay off YouTube" advises agents, "#SocialMedia: The fastest and easiest way for an agent to get in trouble – don't embarrass yourself or your agency" (the same page features the hashtag "#noteveryoneneedstoknow").[63] The Wellton training warns agents to be "cognizant that non-compliant motorists may carry audio or video recording devices," which could lead to embarrassment.[64] Another directive instructs agents on how to address all checkpoint-related press inquiries, directing officials to respond—without regard to the specific nature of the inquiry—that checkpoints are "safe, efficient, and cost-effective."[65]

## BORDER COMMUNITIES UNDER SIEGE

As even this snapshot of Border Patrol interior operations makes clear, the consequences of systemic oversight failures have been devastating to communities in Arizona and around the country.[66]



ACLU client Clarisa Christiansen recounts her encounter with Border Patrol: https://www.aclu.org/blog/why-us-border-patrol-terrorizing-innocent-families.

For example, the Tohono O'odham Nation, a federally recognized tribe of approximately 28,000 citizens in southwestern Arizona, has been transformed into what tribal members describe as a modern day police state. Tohono O'odham tribal lands are inundated with federal agents, surveillance equipment, helicopters, Forward Operating Bases and other Border Patrol infrastructure, including four interior checkpoints at which tribal members must answer to an armed federal agent. The records produced to the ACLU include multiple complaints submitted by Tohono O'odham tribal members subjected to unlawful searches and seizures, harassment, and intimidation by Border Patrol agents operating on tribal lands.[67]

Agency records describe agents brandishing weapons and threatening tribal members during routine vehicle stops.[68] One complaint described a school bus that has been detained "dozens of times" for secondary inspection while students are forced to stand in 100 degree heat and submit to searches of personal belongings.[69] A family reported being pulled over by agents after they returned to their home to retrieve a forgotten item, an act viewed as "suspicious" by agents.[70] Tribal members have been submitting complaints like these for years, to no effect.[71] Although Border Patrol does not appear to have altered its conduct in response, it is clearly aware of the community's grievances: among the records obtained by the ACLU are internal emails showing agents monitoring community meetings on Border Patrol abuses and Know Your Rights presentations.[72]

The government's records also provide some insights into past abuses documented by the ACLU. For example, in October 2013 the ACLU submitted a complaint on behalf of Clarisa Christiansen, an Arizona woman who was stopped by Border Patrol agents while driving her two young children home from school. After Ms. Christiansen demanded an explanation, agents threatened to use an electroshock weapon on her and to cut her out of her seatbelt with a knife. Agents then slashed her rear tire, leaving Ms. Christiansen and her children stranded on a hot desert road with no explanation.[73]

Agency records confirm Ms. Christiansen's account in most material respects. The records further indicate that Ms. Christiansen's ordeal—which occurred nearly 40 miles from the border—resulted from agents responding to a tip from a "concerned citizen" who believed Ms. Christiansen was "evading" agents (in fact, Ms. Christiansen had simply missed a turn on her way home).[74] None of the agents responsible appear to have been disciplined and, nearly two years after submitting her complaint, Ms. Christiansen has not been contacted by investigators.

## QUESTIONABLE RESULTS

Border Patrol describes its interior checkpoints as an efficient and effective strategy for securing the border, but the data obtained by the ACLU suggests the claimed benefits of those activities have been exaggerated. Of particular note is CBP's checkpoint arrest and seizure data for 23 Tucson Sector checkpoints and eight Yuma Sector checkpoints for calendar years 2011-2013.[75] Though checkpoint identifying information is mostly redacted, the arrest statistics are telling. For example:

- For FY 2012 and FY 2013, combined checkpoint apprehensions for Tucson and Yuma Sectors accounted for just 0.74 percent of those sectors' total apprehensions.[76] In FY 2013, Tucson Sector's 804 checkpoint apprehensions accounted for just 0.67 percent of the sector's total apprehensions.[77]

- While CBP reported that its FY 2012 nationwide checkpoint apprehensions accounted for two percent of total apprehensions, the data shows Tucson and Yuma Sectors' combined 882 checkpoint apprehensions represented only 0.7 percent of those sectors' total apprehensions during the same period.[78]

- In calendar year 2013, nine out of 23 Tucson Sector checkpoints reported zero arrests of "deportable subjects." Fifteen of those checkpoints reported fewer than 10 arrests of deportable subjects; only six reported more than 20 arrests, and only two reported more than 40—those two checkpoints accounted for 74 percent of the deportable subjects arrested at Tucson Sector checkpoints in 2013.

- The vast majority of those arrested at Yuma Sector checkpoints are U.S. citizens: in calendar year 2013, 1,535 "non-deportable subjects" were arrested as compared to only 197 deportable subjects, a nearly eightfold differential. In 2011, non-deportable subject arrests exceeded deportable subject arrests by a factor of more than 11, 1,822 to 161. (These numbers are consistent with FOIA data obtained by the Center for Investigative Reporting which showed approximately four out of five drug-related arrests by Border Patrol involved U.S. citizens.)[79]

- Yuma Sector's Highway 95 checkpoint—the only checkpoint for which identifying information was not redacted—reported only one non-citizen apprehension in three years. The Highway 95 checkpoint is roughly 75 miles from the border and the subject of several abuse complaints referenced in this report.[80]

CBP did not provide data to reflect the significant financial cost of Border Patrol interior operations, so taxpayers do not know the price tag, for example, for Yuma Sector's 200-300 annual checkpoint apprehensions,[81] nor does the agency attempt to quantify the checkpoints' "deterrent" effect. Still, the agency's data suggests the limited enforcement gains of most interior checkpoints do not outweigh the many harms their operation inflicts upon border communities in the form of additional crossing-related deaths,[82] widespread civil rights and civil liberties abuses, and negative impacts on local businesses and property values.[83]

Finally, the high percentage of U.S. citizen arrests illustrate what many border residents already know from experience: Border Patrol agents at checkpoints are often more concerned with finding drugs than with immigration enforcement, notwithstanding U.S. Supreme Court precedent prohibiting general "crime control" checkpoints.[84] The records support the contention that, in the words of Ninth Circuit Court of Appeals Judge Alex Kozinski, there is "reason to suspect the agents working these checkpoints are looking for more than illegal aliens. If this is true, it subverts the rationale of *Martinez–Fuerte* and turns a legitimate administrative search into a massive violation of the Fourth Amendment."[85]



## RECOMMENDATIONS

The records provided to the ACLU underscore the urgent need for systemic reform of Border Patrol oversight and accountability mechanisms at every level. Changes have long been promised, and yet the limited modifications introduced by the agency in recent months[86] do not begin to address the extent of the problem—namely, Border Patrol's insular culture of abuse and impunity. The agency has shown that it cannot police itself, and yet DHS, CBP, and Congress have largely failed to exercise their oversight roles.

As the government's own records make clear, the following Border Patrol reforms are still badly needed:

- **Prioritize and Investigate Civil Rights Complaints**
  Civil rights complaints must not be designated as lower priority or simply delegated to the local Border Patrol offices at which the offending agents are stationed. CBP Internal Affairs must be empowered to investigate serious allegations of civil rights abuse involving Border Patrol agents.

- **Prompt and Transparent Investigations**
  CBP must create a uniform complaint system, with multilingual access, to ensure all complaints are captured and addressed. CBP must publicly disclose its internal investigation and discipline policies and procedures. CBP must ensure that complaints are investigated in a timely and transparent manner, and that agents are held accountable for wrongdoing.

- **Clear Prohibition on Racial Profiling**
  The Department of Justice's prohibition on use of race by law enforcement exempts Border Patrol activities "in the vicinity of the border," a position that appears to be at odds with existing legal precedent.[87] As evidence of Border Patrol agents improperly relying on race continues to mount,[88] DHS and CBP must explicitly close that loophole.

- **Data Collection**
  Border Patrol must collect data for all roving patrol stops and all secondary inspections at interior checkpoints, including recording the factual basis for and duration of the stops and/or searches. Border Patrol must also record all canine alerts, including false canine alerts, resulting in detention and/or search of innocent travelers.

- **Early Warning Systems**
  CBP should centralize complaint records to detect and monitor agents who violate policy or against whom complaints are filed, as well as service canines that falsely alert in the field. Repeat incidents involving abusive agents should result in escalating interventions, including additional training and disciplinary action, as necessary.

- **Access to Information and Accurate Reporting of Abuse Numbers, Apprehension Statistics, and Financial Costs**

  Border Patrol should provide access to public records, including policies, complaint, investigation, and disciplinary records, stop data, and apprehension statistics. All DHS oversight agencies should be required to disclose to Congress all allegations of civil rights abuse by CBP personnel nationwide. Litigation should not be required to obtain accurate information from the agency.

- **Restrictions on Interior Enforcement**

  Border Patrol interior enforcement operations extend 100 miles or more from the border, impacting tens of millions of travelers and residents.[89] Allowing agents to have free reign over such a broad territory with little oversight has led to endemic civil rights abuses. In addition to the reforms cited above, the agency should move to limit interior activities to no more than 25 miles from the border and reduce its zone of warrantless incursions onto property to no more than 10 miles.

## CONCLUSION

According to the former head of CBP Internal Affairs, Border Patrol views itself as a "paramilitary border security force" that operates outside "constitutional constraints" and rejects outside scrutiny.[90] Nowhere is Border Patrol's culture of impunity more evident than in its disregard for constitutional norms in interior enforcement operations throughout, and even beyond, the "100 mile zone" in which the agency operates.[91] Indeed, Border Patrol union representatives have complained of being "handcuffed" by civil liberties protections, which prevent agents from "simply question[ing] random people."[92]

At a time of growing national attention to abusive police practices, the Obama Administration and some members of Congress are finally pushing long overdue reforms of local police departments. Those efforts are undermined, however, by the government's continuing failure to hold Border Patrol to the same standards. Until that changes, abuses by Border Patrol agents operating far in the interior of the country—with near total impunity—are certain to persist.

A selection of the documents produced in *ACLU Foundation of Arizona v. DHS*, which were the basis of this report, is available online at http://www.acluaz.org/Record_of_Abuse.

## APPENDIX

The following are summaries of just some of the many complaints submitted to DHS agencies regarding Border Patrol interior enforcement operations in Tucson and Yuma Sectors from 2011 to 2014. None of the incidents described appear to have resulted in arrest of the detained individual(s) or disciplinary action for the agent(s) involved. Citations are to Bates numbered documents produced in *ACLU Foundation of Arizona v. DHS*, No. 14 -02052 (D. Arizona filed Apr. 28, 2014).

A camper was woken by Border Patrol agents in the middle of the night, interrogated, and asked to show identification. (CBP 002)

A woman returning from a fishing trip was stopped at the I-19 Border Patrol checkpoint. Agents claimed drugs were in her vehicle and detained her before releasing her without explanation or charge. When she returned home she realized agents had torn and cut out much of the vehicle's interior carpeting. (CBP 002-003)

A motorist was detained after a service canine falsely alerted to his vehicle at the I-19 interior checkpoint. After he was released, he realized Border Patrol agents had confiscated much of his prescription medication. (CBP 003-004)

A man and his wife were detained and interrogated about drug use following a false canine alert at the I-8 interior checkpoint. (CBP 005-006)

An individual described being detained and interrogated for up to two hours following false canine alerts on six separate occasions at interior Border Patrol checkpoints, several of them resulting in damage to the individual's vehicle. (CBP 006)

An individual described experiencing two false canine alerts at the I-19 checkpoint, both resulting in a search of the vehicle. The individual added that, "several friends all have had the same problem." (CBP 006)

A motorist was detained and searched at the I-8 checkpoint after a canine falsely alerted to the motorist's vehicle. The resulting search damaged an interior compartment. The driver described being detained with other motorists who were also searched and then released. (CBP 006-007)

A motorist was detained by Border Patrol on Highway 93, northwest of Phoenix, Arizona—more than 125 miles north of the border—where agents were reportedly "pulling over every vehicle." (CBP 011)

A man was detained at the Highway 90 checkpoint after a canine falsely alerted to his vehicle. When he attempted to record his checkpoint interaction, a Border Patrol agent forcibly confiscated the man's phone while a Huachuca City Police Officer looked on. (CBP 011-012)

A man was detained for an hour because he refused to consent to a search of his trunk at the Highway 83 interior checkpoint. Agents threatened to "lock [him] in a cell" if he did not surrender his keys and empty his pockets. Border Patrol agents later claimed a canine had alerted to his vehicle, but no contraband was discovered and the man was released. (CBP 012-013)

A driver returning home at night was tailgated by an unidentified vehicle for approximately 10 miles. The driver pulled into a shopping center and only then realized the pursuing vehicle was Border Patrol. An agent first claimed the driver was speeding, and then said the vehicle matched a description. The driver was interrogated and released. (CBP 013-015)

A motorist reported being detained and insulted by agents at the Highway 90 checkpoint. Agents demanded the motorist's driver's license, which they lost or confiscated, and searched the interior of the vehicle before letting the driver go. (CBP 015)

A motorist was tailgated at a high rate of speed and forced off the road by Border Patrol agents outside of Douglas, Arizona, resulting in a flat tire. An agent then approached the vehicle wielding an assault rifle. The motorist was interrogated (not about citizenship), searched, and then released without any explanation. (CBP 015-017)

A woman driving at night with her 4-year-old daughter was followed from an I-10 rest area, tailgated, and stopped roughly 75 miles north of the border. A Border Patrol agent approached the vehicle with his hand on his weapon and along with another agent shone flashlights into the vehicle. The agents claimed they had "probable cause" to stop the vehicle but did not provide any specific reason. The woman and her daughter were terrified—the daughter experienced nightmares following the incident—but one of the agents told them that "only criminals and people trying to hide things get nervous." Agents interrogated the woman and searched the family's personal effects before finally releasing them. (CBP 018-020)

A motorist complained of being subjected to racial profiling and harassment "every time" the motorist passes through the Highway 90 checkpoint. (CBP 020-021)

A U.S. citizen was detained for an hour at the I-8 checkpoint and harassed by Border Patrol agents who refused to acknowledge the driver's U.S. citizenship. One agent commented that the driver was "lucky to be in his country." Agents and their supervisor refused to provide the agents' names. (CBP 022)

A motorist was assaulted by a Border Patrol agent attempting to prevent the motorist from video recording an unapproved canine search of the motorist's vehicle at the Highway 86 checkpoint. (CBP 023)

A motorist was told he would not be allowed to pass through the Highway 95 Border Patrol checkpoint unless he "consented" to a search. (CBP 023-024)

A man described damage to the interior of his vehicle and personal laptop caused by a muddy Border Patrol canine allowed inside his vehicle at an interior checkpoint. (CBP 025-026)

A man complained of racial profiling after Border Patrol agents followed him and his family from an I-10 interior checkpoint, about 75 miles from the border, to a highway restaurant. Agents interrogated the man and his family about their legal status, residence, and arrest history before releasing them without explanation. (CBP 026)

A motorist was detained and searched following a canine alert at the I-8 checkpoint. After being released and returning home, the motorist discovered the dog had damaged the contents of the vehicle. (CBP 026-027)

A man reported refusing to consent to a search of his vehicle at a Border Patrol interior checkpoint on Highway 95, approximately 75 miles from the border. He was directed to secondary inspection under threat of bodily injury. An agent kicked and dented the passenger side door while four agents surrounded the man with weapons drawn before forcing him to the ground and handcuffing him. After four hours, he was released without explanation. (CBP 027-028)

A complaint described multiple stops of the Tohono O'odham Community College school bus at the Highway 86 checkpoint, including a June 2013 stop in which passengers were forced to disembark and submit to interrogation and searches of their personal effects before being released. (CBP 030-031; CBP 241-242)

A motorist on the Tohono O'odham Indian Reservation was tailgated then pulled over and searched by Border Patrol agents who said her vehicle's out-of-state license plate looked "suspicious." (CBP 033-034)

A motorist listed some of the questions agents have asked at the Highway 95 Border Patrol checkpoint, including "What is your social security number?," "What is your home address?," "What is your home phone number?," "What is your date of birth?," "What company do you work for?," and "What projects are you working on?" One on one occasion, when the motorist objected to questions related to his government employment, a supervisor stated the motorist was "required to have a job to cross the checkpoint." (CBP 036)

A military veteran complained of profiling after a Border Patrol agent accosted the man and frightened his young children at the Highway 90 checkpoint. The agent repeatedly asked, "[A]re these your children[?] ... [H]ow do I know these are your kids[?] ... [A]re these your kids[?] ... [R]eally are they your kids[?]" The agent frightened the man's 3-year-old child and woke the man's 12-year-old daughter to repeatedly ask, "[I]s this your Dad ... really he's your Dad[?]" (CBP 038-040)

A motorist reported being frequently subjected to searches, interrogation and harassment at the Highway 90 interior Border Patrol checkpoint. After the motorist complained, a supervisor responded that there is "no exact standard" for secondary inspections and that agents' actions are "based on how the agent feels." (CBP 040)

A motorist was pulled over by a Border Patrol agent outside of Bowie, Arizona, roughly 70 miles from the border, allegedly because his vehicle was "registered in another town." (CBP 040-041)

Two separate motorists reported vehicle damage caused by a service canine at the I-19 checkpoint on the same day. One of the motorists sought reimbursement and was directed to file a legal claim under the Federal Tort Claims Act. A third motorist submitted a complaint about a nearly identical incident that occurred at the same checkpoint three days later. (CBP 041-042)

A man driving on Highway 93 north of Sonoita, Arizona, was tailgated for several miles before being stopped by a Border Patrol agent. The agent refused to provide an explanation for the stop. Additional agents arrived and surrounded the vehicle; one of the agents produced an assault rifle while another conducted a canine search. After approximately 40 minutes, the man was released without any explanation. (CBP 042-043)

An individual reported a Border Patrol agent threatened to "have a bullet put in [the individual's] head." (CBP 044)

A woman complained of racial profiling on the grounds that she and her African-American husband are searched and harassed "every time" they pass through a Yuma Sector interior checkpoint. (CBP 044)

A naturalized U.S. citizen, along with his three children and nephew were returning from a family vacation when they were interrogated and detained at the Highway 95 checkpoint following an alleged canine alert. The family was surrounded by agents while their vehicle and luggage were searched. (CBP 044-045)

A Border Patrol agent reported that a supervisor at Border Patrol's Naco Station instructed agents to "stop any vehicle on the US/Mexican border road that is open to the public." The supervisor "didn't care if it was the Chief of the Border Patrol and the agent conducted a high risk traffic stop removing the Chief ... at gun point" because he "would then know they were doing their job." It is unclear whether the agency ever investigated the complaint, but the supervisor was apparently never disciplined. (CBP 049-053)

An individual who attempted to record a roving patrol stop near Three Points, Arizona, reported that Border Patrol agents confiscated his phone and deleted the video footage. (CBP 108-111)

In March 2013, the Nogales City Attorney's Office submitted a complaint to Border Patrol alleging racial profiling and abuse of authority after agents at the I-19 interior checkpoint falsely relied on a non-existent canine alert as a basis for prolonged detention and search. The complaint describes the agents' actions as "egregious and illegal," though not isolated, and refers to a Deputy City Attorney detained and searched on multiple occasions on the basis of claimed or false canine alerts. (CBP 194-197)

A Border Patrol agent at a Highway 95 interior checkpoint threatened to shoot a motorist's dog "for safety reasons." (CBP 603-611)

A motorist was stopped at the Highway 95 checkpoint where an agent asked a series of questions unrelated to citizenship. Only after the motorist declined to answer further questions about his employment did the agent direct him to the secondary inspection area, claiming that a canine had alerted. After a search of the interior of the man's vehicle he was released. (CBP 713-714)

A woman was pulled over and detained for two hours without explanation in the back of a Border Patrol vehicle near the Arizona-California line, approximately 75 miles from the U.S.-Mexico border. The woman was denied water while her vehicle was "taken apart" by Border Patrol agents. She reported that as a result of her experience she discontinued her trip, but that her car broke down on the way home because agents had disconnected some of the engine parts. (CBP 727)

A man was directed to a secondary inspection area at the Highway 78 interior checkpoint, allegedly for failing to look the inspecting Border Patrol agent in the eyes. He was then handcuffed so tightly that his wrists turned red. After he was released he discovered a service canine had damaged his vehicle. (CBP 730-762)

A motorist referred for secondary inspection following a false canine alert at the Highway 78 checkpoint reported Border Patrol agents removed the rear seats and inspected the fuel tank, after which the vehicle's fuel gauge ceased to function. The complainant was given the option of initiating a federal lawsuit to obtain redress. (CBP 775-783)

An off-duty agent departing the Highway 78 checkpoint was pursued, detained, and searched following a Border Patrol canine's false alert to his vehicle. (CBP 785-797)

A woman reported being pulled over three times in one year as a result of racial profiling. During the most recent incident, Yuma Sector Border Patrol agents pulled her over roughly 75 miles from the border. When she asked for an explanation, agents said there was a "possible mistake that was made," then "laughed and snickered" while she attempted to get their names and badge numbers. (CBP 798-809, 989-1011)

Following a false canine alert, a disabled motorist was detained for over an hour at the Highway 95 checkpoint while Border Patrol agents searched his vehicle, damaging its contents. (CBP 811-823)

A motorist was confronted by a Border Patrol agent who claimed he was driving too fast as he approached the Highway 78 checkpoint. The agent touched his weapon and stated, "How would you like to have a gun pointed at your face?" The supervisor who reviewed the incident concluded the agent had "prepared himself mentally for a possible life threatening situation and responded accordingly." (CBP 906-914)

Border Patrol agents searched a woman's vehicle following a false canine alert at the Highway 78 checkpoint. Agents apparently failed to secure the hood of the vehicle and as the woman was driving away the hood opened, causing damage to the vehicle. (CBP 929-946)

A woman was pulled over while driving southbound on Highway 95 after dropping one of her children off at a relative's house. A Border Patrol agent approached her vehicle with his weapon drawn. The woman responded to the agent's direction to lower the rear window of the vehicle by stating that her infant child was in the backseat. The agent responded, "I don't give a fuck who is in the back seat, lower the window." (CBP 972-984)

Multiple Border Patrol agents described one agent's "abuse of authority and unstable behavior" at a checkpoint as "out of control and mentally unstable." The agents were so alarmed that they removed the agent's duty belt and service weapon "and secured it in a K-9 vehicle lock box." It is unclear whether any further action was ever taken. (OIG 100-102)

A DHS Report of Investigation describes a Border Patrol agent who "acted unprofessionally when he escalated [a] vehicle stop by drawing his weapon on [the] driver" on the Tohono O'odham Indian Reservation. (CBP 985)

A woman driving her two children to school was pulled over and detained by Border Patrol agents on Ajo Way in Tucson, Arizona, approximately 60 miles north of the border. When she asked for an explanation, the agents first claimed her vehicle was "riding low" then told her, "We'll think of something." (CBP 1035-1037)

A Border Patrol agent repeatedly drove past a family's house as they were leaving, and then pulled them over. When they asked the agent why they were stopped the agent replied, "I don't have to tell you that." (CBP 1043)

A man reported being pulled over by Border Patrol seven times in one year while commuting to work on Highway 86, approximately 30 miles from the border. An agent explained that "the time he is driving to work is also a peak time for smuggling." (CBP 1070)

A woman was detained in secondary inspection following a false canine alert at an interior checkpoint on Highway 86. A Border Patrol agent told her to "put the fucking keys in the truck." When she objected to his language, the agent said, "I can talk to you any fucking way I want." The agent later reported to supervisors, "I felt that a more forceful approach was needed in order to convey her need to follow my direction." (CBP 1073-1079)

An hour and a half later, a woman and her brother were detained at the same checkpoint following another false canine alert; an agent forcibly removed the woman's cell phone from her hand and threatened her brother with an electroshock weapon before releasing them. (CBP 1081-1088)

The next day, at the same checkpoint, agents attempted to prevent a different woman from videotaping them and allegedly spit on her following yet another false canine alert. (CBP 1089-1098)

A woman driving with her husband and children was pulled over on Highway 86 on the Tohono O'odham Indian Reservation. Agents allegedly explained that the woman "turned around after leaving her house because she forgot something, which appeared suspicious." (CBP 1099-1100)

A man driving the posted speed limit was pulled over on Irvington Road in Tucson, Arizona, approximately 60 miles from the border. The Border Patrol agent accosted the man for "driving too slow." (CBP 1113-1114)

A Border Patrol agent in Green Valley, Arizona, followed a store employee into a parking lot, approached the individual with a service revolver drawn, ordered him to his knees, and handcuffed him. When other employees approached, the agent yelled, "Stay away or I'll shoot you." After 10 minutes, the agent removed the handcuffs, released the employee, and drove away. (CBP 1123-1124)

A man was pulled over by agents east of Three Points, Arizona. A canine falsely alerted to the man's truck, then caused nearly $1,000 in damage to the vehicle. The man was released. (CBP 1125-1133)

## ENDNOTES

1    Although the ACLU requested Tucson and Yuma Sector records dating from January 2011 to the present, CBP has not produced complete records for all of the years in question, while OIG has produced (heavily redacted) case summaries but no other complaint or investigation-related documents. *See infra* note 5. Thus, given the government's incomplete production of responsive records, the total number of Border Patrol complaints submitted for this period is impossible to ascertain. Of the records produced, however, the authors counted at least 142 detailed complaints involving clear allegations of civil rights violations, including unlawful search and seizure, racial profiling, and interference with the right to record. None of these incidents resulted in seizure of persons or contraband. This figure, along with the other complaint totals provided herein—such as false canine alerts, racial profiling, and property damage—includes the 17 complaints submitted by the ACLU to DHS oversight agencies in FY 2014. *See infra* note 2. Excluded from these totals are vague or general complaints, clearly frivolous complaints, and complaints unrelated to civil rights concerns, including numerous allegations of rude and unprofessional conduct, as well as corruption and drug trafficking by Border Patrol agents.

2    *See* ACLU of Arizona, *Complaint and request for investigation of abuses at U.S. Border Patrol interior checkpoints in southern Arizona, including unlawful search and seizure, excessive force, and racial profiling* (Jan. 15, 2014), available at http://bit.ly/1k73lqO; ACLU of Arizona, *Complaint and request for investigation of unlawful roving patrol stops by U.S. Border Patrol in southern Arizona including unlawful search and seizure, racial profiling, trespassing, excessive force, and destruction of personal property* (Oct. 9, 2013), available at http://bit.ly/1oOBYEz.

3    For example, in Arivaca, Arizona, residents have organized to demand the removal of one of several local checkpoints, citing years of harassment and abuse, negative impacts on local businesses and property values, and the refusal of Border Patrol to share basic information. To obtain such information themselves, and to detect and deter checkpoint abuses, members of the community initiated a checkpoint monitoring campaign at the Arivaca Road checkpoint. While monitors did not observe a single arrest, the data they collected shows Latinos at the Arivaca Road checkpoint are 20 times more likely than Caucasians to be detained by agents. *See* Imelda Mejia, *Border Patrol Check: Some Arivaca Residents Want Checkpoint Gone*, Cronkite News, Nov. 20, 2014, available at http://bit.ly/1JQkmPz; Paul Ingram, *Residents Claim Racial Profiling at Border Patrol Checkpoint*, Tucson Sentinel, Oct. 19, 2014, available at http://bit.ly/1B52CeR; *see also* Bob Ortega, *Border Patrol Sued for Harassing at Arivaca Checkpoint*, Arizona Republic, Nov. 26, 2014, available at http://bit.ly/1Ec1k6n; Fernanda Santos, *Border Patrol Scrutiny Stirs Anger in Arizona Town*, N.Y. Times, June 27, 2014, available at http://nyti.ms/1EY9oca.

4    *ACLU Foundation of Arizona v. DHS*, No. 14-02052 (D. Arizona filed Apr. 28, 2014).

5    For example, CBP has not provided complaints submitted to its Joint Intake Center for FY 2011 or FY 2015, and has provided incomplete records for FY 2014.

6    *See, e.g., ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 775-783; *see also* ACLU of Arizona, *Complaint and request for investigation of unlawful roving patrol stops, supra* note 2 at 7.

7    *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 013-014.

8    *See id.* at CBP 1113-1114.

9    *See id.* at CBP 033-034.

10   *See id.* at CBP 040.

11   *See id.* at CBP 043.

12   *See id.* at CBP 1100.

13   *See id.* at CBP 1070.

14   *See id.* at CBP 1597-1601; 1621-1625.

15   *See id.* at CBP 798.

16  *See, e.g., id.* at CBP 002-003; 015-017; 026-028; 042-043.

17  *Id.* at CBP 1035-1037.

18  *See, e.g., id.* at CBP 194-197.

19  *Id.* at CBP 011. Border Patrol claims authority to make stops beyond the "100 mile zone," existing regulations and Supreme Court guidance notwithstanding. *See* 8 C.F.R. § 287.1(b). The Justice Department published regulations defining "reasonable distance" as 100 air miles in 1957. *See Field Officers: Powers and Duties,* 22 Fed. Reg. 236, 9808–09 (Dec. 6, 1957)(to be codified at C.F.R. § 287). It remains unclear why the Justice Department chose that distance; it may have been that 100 miles had historically been considered a "reasonable" distance in the context of various discovery issues under federal law. *See, e.g.,* 10 U.S.C. § 849; Fed. R. Crim. P. 7; Fed. R. Civ. P. 45. At the time those regulations were issued, the Border Patrol was comprised of fewer than 1,100 agents; today, there are over 21,000. The "100 mile zone" question may be moot, however, as the agency has argued that there is no geographic limitation on its interior enforcement authority, and at least some courts seem to agree. *See, e.g., United States v. Pacheco-Espinosa,* 121 Fed. Appx. 352, 256–57 (10th Cir. 2005)("Current regulations interpret 'reasonable distance' as 100 air miles from the border. The Tenth Circuit has nevertheless held that the regulation does not foreclose searches beyond that limit ... this Court determines that the approximately 120-mile distance in which Defendant was stopped was a reasonable distance from the border.")(citations omitted); *United States v. Orozco,* 191 F.3d 578, 584 (5th Cir. 1999) (Dennis, J., dissenting)("As I read *Brignoni-Ponce,* the Supreme Court's authorization of roving Border Patrol stops on the basis of reasonable suspicion is limited to such stops within the 100 mile border zone created by 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1. It would be unreasonable to assume that the Supreme Court meant to dilute the protections of the Fourth Amendment so as to authorize the Border Patrol to make suspicion-based roving patrol stops anywhere in the United States. The Court's opinion indicates no such intention."). *See also* ACLU, *The Constitution in the 100-Mile Border Zone,* available at http://bit.ly/1LG99WJ.

20  *See, e.g., ACLU Foundation of Arizona v. DHS,* government document production, Bates No. CBP 023; 027-028; 730-731; 1609-1612; 1605-1608.

21  *See, e.g., id.* at CBP 013-016; 46.

22  *See, e.g., id.* at CBP 15-20; 42-43; 972-74; 985; 1597-1601; 1621-1625.

23  *See, e.g., id.* at CBP 044; 603-611; 1123-24.

24  *See, e.g., id.* at CBP 022; 024; 027-028; 030.

25  *See, e.g., id.* at CBP 011-012; 23; 100-103; 906-914.

26  The ACLU has documented numerous examples of systemic Border Patrol interior enforcement abuse on both the southern and northern borders. A recent report described more than fifty complaints the ACLU received from New Mexico residents in 2014 alone, including reports of excessive force, racial profiling, and unlawful searches and seizures. *See* ACLU of New Mexico, *Guilty Until Proven Innocent: Living in New Mexico's 100 Mile Zone,* (May 2015), available at http://bit.ly/1Jhlz5U. A 2011 investigation of roving patrol practices in New York found the vast majority of stops occurred far from the border, with only one percent resulting in the initiation of removal proceedings; many involved clear violations of agency guidelines, including improper reliance on race and hundreds of arrests of lawfully present individuals. NYCLU, *Justice Derailed,* (Nov. 2011), available at http://bit.ly/1LG95pK. In 2012, CBP settled an ACLU lawsuit arising out of unlawful roving patrol stops on the Olympic Peninsula, in which the agency agreed to retrain agents on the Fourth Amendment and provide stop data to the ACLU. *See* Manuel Valdes, *ACLU, Immigrant Groups to Keep an Eye on U.S. Border Patrol After Profiling-case Win,* Wash. Post, Sept. 24, 2013, available at http://wapo.st/1Eb3ggd.

27  *See, e.g., ACLU Foundation of Arizona v. DHS,* government document production, Bates No. at 597-694.

28  *See, e.g., ACLU Foundation of Arizona v. DHS,* government document production, Bates No. OIG 109; 124; 198. For its part, CBP differentiates between "mission compromising corruption" and "non-mission compromising corruption." *See* Garrett Graff, *The Green Monster: How the Border Patrol Became America's Most Out-Of-Control Agency,* Politico, Nov./Dec. 2014, available at http://politi.co/1TUANlG ("CBP's problems were becoming so bad they couldn't entirely be ignored. In Obama's first year, CBP and DHS leadership even

ordered the agency to change its definition of 'corruption' to downplay the number of total incidents. Instead, according to internal affairs official Wong, the agency began to differentiate between 'mission-compromising corruption'—bribery, narcotics-smuggling or human-smuggling allegations—and 'non-mission-compromising corruption,' a 'lesser' category of cases that included things like employees' sexually assaulting detainees or workplace theft. Only the 'mission-compromising' problems, the agency now decreed, would be reported to Congress ... The distinction helped them wipe nearly a third of the corruption cases out of statistics.").

29  *See, e.g., ACLU Foundation of Arizona v. DHS*, government document production, Bates No. OIG 209-311.

30  *Id.* at OIG 138-140.

31  *Supra* note 2.

32  *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 1495.

33  *See, e.g.,* Bob Ortega, *CBP: No Action Against Border Agents in Deadly-Force Cases*, Arizona Republic, June 8, 2015, available at http://bit.ly/1gQPh7L ("U.S. Customs and Border Protection will not take any disciplinary or legal action against Border Patrol agents or CBP officers involved in 67 deadly-force incidents that had been under internal review, CBP Commissioner R. Gil Kerlikowske said in an interview with The Arizona Republic."); Brian Bennett, *Border Patrol Sees Little Reform on Agents' Use of Force*, L.A. Times, Feb. 23, 2015, available at http://lat.ms/1MqyNQT.

34  U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, *Fiscal Year 2013 Annual Report to Congress* at 57 (July 18, 2014), available at http://1.usa.gov/1MnPBXA.

35  U.S. Department of Homeland Security Office for Civil Rights and Civil Liberties, *Fiscal Year 2012 Annual Report to Congress* at 62 (July 25, 2013), available at http://1.usa.gov/1g8hzul.

36  U.S. Department of Homeland Security, Office for Civil Rights and Civil Liberties, *Quarterly Report to Congress* at 4, (Feb. 23, 2014), available at http://1.usa.gov/1g8hEOR.

37  *See* Daniel Gonzalez and Rob O'Dell, *CBP Chief: Border Patrol's Use of Force Down 30 Percent*, Arizona Republic, April 8, 2015, available at http://bit.ly/1JBuoVA; U.S. Customs and Border Protection, *Use of Force Policy, Guidelines, and Procedures Handbook*, Office of Training and Development, HB 4500-01C (May 2014), available at http://1.usa.gov/1EDCxwr.

38  Office for Civil Rights and Civil Liberties, *Fiscal Year 2014 Annual Report to Congress* at 24 (July 28, 2015), available at http://1.usa.gov/1ECifmp.

39  *Supra* note 2.

40  *Supra* note 34 at 29.

41  *Supra* note 34 at 33.

42  As DHS's own Integrity Advisory Panel recently concluded, "OIG's investigations are reactive, chronically slow and not prioritized to focus on [CBP corruption]." *Homeland Security Advisory Council: Interim Report of the CBP Integrity Advisory Panel* at 9 (June 29, 2015), available at http://1.usa.gov/1Fkil7P. Accordingly, the Panel recommended that Management Directive 810.1 of June 10, 2004, be amended to give Internal Affairs greater control over investigations.

43  *Border Patrol Killings Face New Scrutiny*, CBS Evening News, Aug. 18, 2014, available at http://cbsn.ws/XXNUui.

44  Carrie Johnson, *Former Border Protection Insider Alleges Corruption, Distortion in Agency*, NPR, Aug. 28, 2014, available at http://n.pr/1wGGPdv. Several other high-ranking U.S. government officials have described CBP's consistent efforts to thwart meaningful investigations into misconduct within the agency. *See* Andrew Becker, *Border Agency's Former Watchdog Says Officials Impeded His Efforts*, Wash. Post, Aug. 16, 2014, available at http://wapo.st/1wGHdc9; Andrew Becker, *Removal of Border Agency's Internal Affairs Chief Raises Alarms*, Ctr. For Investigative Reporting, June 12, 2014, available at http://bit.ly/1odP2Rr.

45  *See* Brian Bennett, *Border Patrol Needs to Crack Down on Internal Corruption, Report Says*, L.A. Times, June 30, 2015, available at http://lat.ms/1HMhlJ.

46    Damien Cave, *Complaints of Abuse by Border Agents Often Ignored, Records Show*, N.Y. Times, May 5, 2014, available at http://nyti.ms/1iTzDY5.

47    *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 068; 706-712.

48    That information, if it is recorded at all, appears in the narrative portions of the Form I-213 ("Record of Deportable/Inadmissible Alien") and any attachments thereto; it is not aggregated or compiled for analysis by supervisors.

49    *See, e.g.*, Encarnacion Pyle, *Alleging Profiling, OSU Students Help Sue Border Patrol*, Columbus Dispatch, Nov. 19, 2014, available at http://bit.ly/1RVgfvy ("Although the Sandusky Bay region is only 3 percent Latino, Latinos made up 85 percent of those arrested by Border Patrol agents in 2009, according to an analysis by Kara Joyner, a sociology professor at Bowling Green State University, who was hired by the plaintiffs. In 2010 and 2011, Latinos made up 67 percent and 62 percent of those arrested, Joyner wrote in her report. By comparison, less than a quarter of 1 percent of those stopped by agents were Canadian, despite Lake Erie being on that border.").

50    *See, e.g.*, *United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013)(Border Patrol canine certification records showed marginal performance but were too heavily redacted to afford adequate opportunity to challenge basis for search); *Merrett v. Moore*, 58 F.3d 1547, 1549 (11th Cir. 1995)(noting that narcotics were not found in 27 out of 28 alerts at a temporary checkpoint); *Doe v. Renfrow*, 631 F.2d 91, 95 (7th Cir. 1980)(Fairchild, C.J., dissenting)(noting false alerts in 35 out of 50 encounters); *see generally* Robert C. Bird, *An Examination of the Training and Reliability of the Narcotics Detection Dog*, 85 Ky. L.J. 405, 427, 430 (1997)(noting that "even a very high accuracy rate can produce an unreasonable amount of false positives" and that service canines are "least effective when they survey a random population.").

51    Though the government has refused to provide most of the records related to canine certification in its possession, CBP did produce a redacted copy of an April 22, 2013 memorandum addressing canine certification requirements. *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 1201-1202.

52    Border Patrol service canines falsely alerted in the absence of contraband in two-thirds of the checkpoint encounters documented in the ACLU's January 2014 complaint, *supra* note 2. In 2013, the ACLU filed suit on behalf of a U.S. citizen subjected to a strip search, multiple genital and cavity searches, a forced bowel movement, an X-ray, and a CT scan following a similar false alert by a CBP service canine. *See Jane Doe v. El Paso County Hospital District, et al.*, No. 3:13-CV-00406-DB (W.D.Tex. filed Dec. 18, 2013); Complaint available at http://bit.ly/1Lytmzb.

53    *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 040-041; 1073-1098.

54    *See, e.g., id.* at CBP 410; 432; 457; 460; 488; 493; 503; 544; 553; 559; 568; 854, 1075.

55    *See, e.g., id.* at CBP 057; 085; 093; 785-788; 793; 803; 862; 864-865; 967-971; 1001; 1020; 1025-1026; 1031-33; 1035-1037; 1052; 1072; 1103-1104; 1233-1234; 1248, 1271; OIG 006; 011; 040; 056; 060; 082; 094; 103; 113; 120-121; 209; 236; 242; 269; 274; 294; 309; 317; 321-23.

56    After more than a year of litigation, the government acknowledged withholding large numbers of canine certification records, e-mails, and other responsive information, claiming that production would be "unreasonably burdensome," allegedly outside the scope of the ACLU's request, and/or because the records were "likely" exempt from disclosure.

57    *See, e.g.*, President's Task Force on 21st Century Policing, *Final Report of the President's Task Force for 21st Century Policing*, Washington D.C. Office of Community Oriented Policing Services (2015), available at http://1.usa.gov/1JQ9buQ; Police Executive Research Forum and Department of Justice, Office of Community Oriented Policing Services, *Future Trends in Policing (2014)*, available at http://bit.ly/1KMgYKT; International Association of Chiefs of Police, *Protecting Civil Rights: A Leadership Guide for State, Local, and Tribal Law Enforcement (2006)*, available at http://bit.ly/1UptYw4; Joyce McMahon, Joel Garner, Ronald Davis, and Amanda Kraus, *How to Correctly Collect and Analyze Racial Profiling Data: Your Reputation Depends On It!*, Final Project Report for Racial Profiling Data Collection and Analysis, (2002), available at http://bit.ly/1JBySvF.

58   *See, e.g., ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 1029-1030; 1134-1219; 1282-1291; 1327-1444; 1466-1492; 1498-1511.

59   *See, e.g.,* Brian Bennett, *Many Border Agents Don't Understand Use-Of-Force Rules, Report Says*, L.A. Times, Sept. 18, 2013, available at http://lat.ms/1KncECs (An audit showed that many agents "do not understand use of force and the extent to which they may or may not use force.").

60   *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 1416-1443.

61   *Id.* at CBP 1433.

62   *Id.* at CBP 1431.

63   *Id.* at CBP 1482.

64   *Id.* at CBP 1440-1441. Border Patrol training materials show the agency's preoccupation with non-compliant motorists. The Wellton training goes into great detail on this point, referring agents to 18 U.S.C. § 111, which provides criminal penalties for "impeding" government officials.

65   *Id.* at CBP 1330.

66   *See supra* note 26.

67   *See, e.g., ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 004; 031; 241; 727; 985; 1035-1037; 1068; 1091; 1100; 1271; 1461.

68   *See id.,* CBP 031.

69   *Id.* at CBP 030-031; 241-242.

70   *Id.* at CBP 1099-1100.

71   *See* Caitlin Dickson, *A Shooting on Tribal Land Uncovers Feds Running Wild*, The Daily Beast, Aug. 26, 2014, available at http://thebea.st/1BBlUz5; Rose Arrieta, *A Nation Divided*, Orion, July/August 2003, available at http://bit.ly/182j5JE.

72   *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 290; 1295-96; 1459-60.

73   Ms. Christiansen's account of the stop is available here: http://bit.ly/1Gwr3XN.

74   *ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 1597-1601; 1621-1625.

75   *See id.* at CBP 704-705.

76   *See id. See also* United States Border Patrol, *Sector Profile – Fiscal Year 2013*, available at http://1.usa.gov/1CCKTj4; United States Border Patrol, *Sector Profile – Fiscal Year 2012*, available at http://1.usa.gov/1L8b0Qp.

77   *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 704-705. *See also* United States Border Patrol, *Sector Profile – Fiscal Year 2013*, available at http://1.usa.gov/1CCKTj4.

78   In 2009, the GAO criticized Border Patrol's accounting methods, noting that Border Patrol had excluded Tucson Sector checkpoint data from its annual Performance and Accountability report, on the grounds that including it would "unfairly reflect on overall checkpoint performance." (The agency "inadvertently omitted" any mention of that edit in its report.) *See* U.S. Government Accountability Office, Report to Congressional Requesters, *Border Patrol: Checkpoints Contribute to Border Patrol's Mission, but More Consistent Data Collection and Performance Measurement Could Improve Effectiveness*, GAO-09-824 at 32 (Aug. 2009) available at http://1.usa.gov/1NdBaXX. It appears 2012 was the last year Border Patrol included checkpoint performance data in its annual Performance and Accountability report. Even in that report, the agency did not break down checkpoint apprehensions by sector or disclose the number of U.S. citizens arrested). *See* U.S. *Customs and Border Protection Performance and Accountability Report Fiscal Year 2012* at 18, available at http://1.usa.gov/1JRmuep.

79  Andrew Becker, *Four of Five Border Patrol Drug Busts Involve U.S. Citizens, Records Show*, Ctr. For Investigative Reporting, March 26, 2013, available at http://bit.ly/1N68DBW. ("Of nearly 2,000 press releases from the Border Patrol and its parent agency, Customs and Border Protection, between 2005 and 2011 that mentioned a drug-trafficking suspect, 38 percent noted a Mexican national had been arrested. U.S. citizens, meanwhile, were mentioned roughly 30 percent of the time, even though they represent a much higher percentage of those busted, according to the analysis.")

80  *See ACLU Foundation of Arizona v. DHS*, government document production, Bates No. CBP 005; 023-024; 027-028; 036; 044-045; 603-611; 713-714; 811-823.

81  In 2014, CBP Commissioner R. Gil Kerlikowske promised to review checkpoint data to determine whether the agency is "getting the most bang for the buck" at checkpoints. Alan Gomez, *Border Commissioner, Facing Heat, Promises Changes*, USA Today, Oct. 30, 2014, available at http://usat.ly/1JE7IGG.

82  Migrants attempting to evade checkpoints often end up in remote and deadly wilderness areas. As the Texas Observer noted, "The checkpoint—or more precisely its location—is the proximate cause of the crisis. Without the checkpoint, many more migrants would survive." Forrest Wilder, *To Save Lives, Close the Falfurrias Border Patrol Checkpoint*, Texas Observer, May 20, 2015, available at http://bit.ly/1Qc0CLV.

83  *See, e.g.*, Judith Gans, *The Border Patrol Checkpoint on Interstate 19 in Southern Arizona: A Case Study of Impacts on Residential Real Estate Prices*, University of Arizona, Dec. 2012, available at http://bit.ly/1VBLgnH.

84  In *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), the Supreme Court held that immigration checkpoints were permissible only insofar as they involve a "brief detention of travelers" during which all that is required of the vehicle's occupants is "a response to a brief question or two and possibly the production of a document evidencing a right to be in the United States." *Id.* at 558. Neither vehicles nor occupants should be searched, and referrals to secondary inspection areas should involve "routine and limited inquiry into residence status" only. *Id.* at 560. By contrast, the Supreme Court has ruled that general crime control checkpoints are unconstitutional. *City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000) ("Without drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life.").

85  *United States v. Soyland*, F.3d 1312, 1316, 1318 (9th Cir. 1993)(Kozinski, J., dissenting); *See also United States v. Garcia*, 732 F.2d 1221, 1229 (5th Cir. 1984)(Tate, J., dissenting)("Quite unfortunately, we have the opportunity only to review the successful guesses of these agents; we are never presented with the unconstitutionally intrusive stops of Hispanic residents and citizens that do not result in an arrest. Differentiating the United States from police states of past history and the present, our Constitution in its Fourth Amendment prohibition against unreasonable searches protects all our residents, whether middle-class and well-dressed or poor and disheveled, from arbitrary stop by governmental enforcement agents in our travel upon the highways of this nation.").

86  R. Gil Kerlikowske, *At Border Patrol, We Know We're Not Above the Law*, Arizona Republic, June 14, 2015, available at http://bit.ly/1MqCRR3.

87  *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000)("[A]t this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required.").

88  *See supra* note 49.

89  *See supra* note 19.

90  Andrew Becker, *Ousted Chief Accuses Border Agency of Shooting Cover-ups, Corruption*, Ctr. For Investigative Reporting, Aug. 14, 2014, available at http://bit.ly/1MgOeGt.

91  *See supra* note 19.

92  Nigel Duara, *Border Patrol Agents, Facing Scrutiny, Have Harsh Words for Their Leaders*, L.A. Times, June 17, 2015, available at http://lat.ms/1IoWTdW.