**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua Bendor (Bar No. 031908)
Joshua Whitaker (Bar No. 032724)
William Durbin (Bar No. 036941)
Timothy Horley (Bar No. 038021)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Joshua.Whitaker@azag.gov
William.Durbin@azag.gov
Timothy.Horley@azag.gov
ACL@azag.gov

*Attorneys for Defendant Arizona Attorney*
*General Kristin K. Mayes*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Florence Immigrant & Refugee Rights Project, | No. CV-26-04831-PHX-MTL |
| Plaintiff, | Hon. Michael T. Liburdi |
| v. | |
| Kris Mayes, et al., | **DEFENDANT ARIZONA ATTORNEY GENERAL KRIS MAYES'S RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER** |
| Defendants. | |

Defendant Kris Mayes, in her official capacity as Arizona Attorney General, hereby responds to Plaintiff Florence Immigrant and Refugee Rights Project's ("Florence Project's" or "the Project's") Motion for a Temporary Restraining Order.[1]  In this facial challenge, Florence Project asks the Court to temporarily restrain all enforcement of a law that Arizona voters duly enacted, before the law has been implemented and regardless of how it might be implemented.  The Court should deny the Motion for three reasons.  First, Florence Project has not made a clear showing of standing.  Second, Florence Project has not shown irreparable harm, and the other equitable factors counsel against a temporary restraining order.  Third, the scope of Florence Project's requested temporary restraining order is overbroad.

**INTRODUCTION**

In 2024, 63 percent of Arizona voters voted to enact Proposition 314.  *See* Gov. Katie Hobbs, State of Arizona, Proclamation, General Election 2024, Proposition 314 (Nov. 25, 2024), https://apps.azsos.gov/election/2024/bm/Proclamation_for_Prop_314.pdf.  The portion of Proposition 314 that Florence Project challenges is Section 5.  *See* Doc. 1 at 1 ¶ 1.  Section 5 includes an "illegal entry" provision that makes it a state misdemeanor for "an alien to enter or attempt to enter this state directly from a foreign nation at any location other than a lawful port of entry."  A.R.S. § 13-4295.01(A), (F).

The illegal entry provision "may only be enforced prospectively."  A.R.S. § 13-4295.01(D).  That means it will not apply to anyone who entered Arizona "unlawfully from a foreign nation at any time before" the provision becomes enforceable.  *Id.*  Section 5 became enforceable on July 14, 2026, by operation of A.R.S. § 13-4295.04, which ties the enforceability of Section 5 to the implementation of Texas's S.B. 4 or another similar state law.  As a result of the Fifth Circuit's recent decision in *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026) (en banc), Texas's S.B. 4 has been in effect for 60 consecutive

---

[1] Per the Court's July 10 order (Doc. 14), the Attorney General addresses only Florence Project's request for a temporary restraining order in this response and will respond to its request for a preliminary injunction at a later date as the Court directs.

1

days as of July 14, 2026, triggering Section 5's enforceability.  *See* A.R.S. § 13-4295.04; Doc. 1 at 8 ¶ 41.

Alongside the illegal entry provision, Section 5 prescribes a process for a court to order a person who has illegally entered to return to his nation of origin or departure.  *See* A.R.S. § 13-4295.03.  Importantly, this process applies only if a person has been charged, convicted, or adjudicated for a violation of the illegal entry provision.  *See* A.R.S. § 13-4295.03(A), (C).  Because the illegal entry provision did not become effective until July 14, 2026, only a person who has been charged with illegal entry on or after that date could be subject to a court order to leave the United States.  *See* A.R.S. § 13-4295.01(D).

Because Section 5 has barely gone into effect, Florence Project has not shown and likely cannot show that anyone has been subject to arrest, detention, or prosecution for violating the illegal entry provision.  Likewise, no one has been subject to an order to depart the country under § 13-4295.03, because such orders are tied to a charge or conviction for violating the illegal entry provision.

Florence Project brings a facial, pre-enforcement challenge to Section 5 and seeks a temporary restraining order preventing its enforcement.  The Court should deny this request for three reasons.

*First*, Florence Project has not made a clear showing of standing.  It has not shown that it has actually suffered or will imminently suffer a concrete injury caused by Section 5.  Instead, it alleges that responding to hypothetical future instances of enforcement will make its mission of representing undocumented immigrants in Arizona more difficult than it currently is.  But a legal advocacy organization *potentially* having to do its job differently in response to new law is not an Article III injury, as the Fifth Circuit recently held in *Texas*, 173 F.4th at 665–66.  Although there may be situations in which a clear roadblock to representing clients could constitute injury to a law firm or legal advocacy organization, those facts are not present here.  Rather, Florence Project's theory is extremely speculative.  The manner and extent of Section 5's enforcement are not yet known.  To the Attorney General's knowledge, it has not yet affected any Arizonan, much

less any existing Florence Project client, and any effects on unidentified "prospective clients" are unknowable. And to the extent the Florence Project relies on a diversion of resources in anticipation of a change in law, the Supreme Court has rejected that theory of standing.

*Second*, regardless of the merits of its preemption claim, Florence Project has not shown that a temporary restraining order is necessary to prevent irreparable harm. And the balance of equities and the public interest weigh heavily against an injunction.[2]

*Third*, the scope of Florence Project's requested temporary restraining order is overbroad. Its Motion aims to completely restrain the enforcement of Section 5 in its entirety, even though the Project has provided no evidence of enforcement and the Section has barely gone into effect. Indeed, because Section 5 applies only prospectively, Florence Project does not and cannot allege that a single existing client has been charged, detained, or prosecuted under Section 5. *See* A.R.S. § 13-4295.01(D). The Project's Motion, including its standing theory and request for relief, is based on prospective clients whose number, circumstances, and very existence are unknowable. Even if the Court decides to grant the temporary restraining order, it should tailor the restraint as narrowly as possible—only to unconstitutional applications of Section 5 to the Project's clients.

**BACKGROUND**

**I.      The Enactment and Implementation of Proposition 314**

**A.      The 2024 Voter Referendum**

In 2024, the Arizona Legislature referred the "Secure the Border Act" to voters for the 2024 general election. *See* H.C.R. 2060, 56th Leg., 2d Reg. Sess. (Ariz. 2024). The proposal was labeled as Proposition 314. *See* Ariz. Sec'y of State, *Arizona 2024 General Election Publicity Pamphlet* 312 (2024), https://apps.azsos.gov/election/BallotMeasures/2024/2024_AZGeneralElection_PublicityPamphlet_E.pdf.

---

[2] The Attorney General will not address the merits of Florence Project's preemption arguments at this early stage of the proceedings, on the understanding that the Legislator-Intervenors will do so.

The measure passed with 63 percent voter approval. *See* Hobbs, *supra*.

**B.     Proposition 314 Section 5's Triggering Provision and Texas's S.B. 4**

Although the voters approved Proposition 314 in November 2024, Section 5 did not go into effect right away. That is because Section 5 includes a provision stating that it "may not be enforced in any manner until any part of section 2 of S.B. 4 . . . that was enacted in the state of Texas, or any other law of any other state similar thereto, has been in effect for a period of sixty consecutive days." A.R.S. §13-4295.04.

As of November 2024, a federal district court had enjoined the enforcement of S.B. 4 in its entirety in response to a lawsuit from a nonprofit legal services organization. *See United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024). A divided Fifth Circuit panel upheld the injunction in 2025. *See United States v. Texas*, 144 F.4th 632 (5th Cir. 2025). But the full Fifth Circuit voted to rehear the case en banc and then, in April 2026, vacated the injunction because the nonprofit legal services organization and county plaintiff lacked Article III standing. *See Texas*, 173 F.4th at 664–67. The mandate issued on May 15, 2026. *Texas*, No. 24-50149, Dkts. 445-1, 445-3 (5th Cir. May 15, 2026). Thus, Proposition 314's Section 5 went into effect on July 14, 2026, because that is 60 days after the Texas injunction was dissolved. *See* A.R.S. § 13-4295.04.[3]

**II.     Proposition 314 Section 5's Prospective Criminalization of Illegal Entry**

Unlike Texas's S.B. 4, Proposition 314's Section 5 does not create a crime called "illegal reentry." *Compare* H.C.R. 2060, 56th Leg., 2d Reg. Sess. (Ariz. 2024)*, with* S.B. 4, 88th Leg., 4th Spec. Sess. (Tex. 2023). That means that in Arizona, unlike in Texas, it is not a crime to be "found" in the state after the person has already been removed from the United States. *Compare* Tex. Penal Code § 51.03, *with* A.R.S. §§ 13-4295 to -4295.06.

---

[3] After the Fifth Circuit decided *Texas*, the district court once again preliminarily enjoined various provisions of S.B. 4 in a different case. *See L.M.L. v. Martin*, --- F. Supp. 3d ---, 2026 WL 1355237, at *30 (W.D. Tex. May 14, 2026). But that injunction is not material to the enforceability of Proposition 314 Section 5 for two reasons. One, the *Martin* plaintiffs did not challenge S.B. 4's illegal entry provision, so the court did not enjoin it. *See id.* at *2–3, *30. Second, the Fifth Circuit has stayed the *Martin* injunction pending appeal. *See L.M.L. v. Martin*, No. 26-50418, 2026 WL 1617149 (5th Cir. May 29, 2026).

Instead, Section 5 makes it a state crime to illegally enter the state from a foreign country. A.R.S. § 13-4295.01(A). And liability for this crime is cabined in several important respects.

First and foremost, the law only applies prospectively. Thus, anyone who illegally entered Arizona from a foreign country before July 14, 2026, is definitionally not guilty of violating Section 5. *See* A.R.S. § 13-4295.01(D).

The law also ties culpability to federal immigration status: It is an affirmative defense if the defendant has been granted lawful presence or asylum under 8 U.S.C. § 1158 or if the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a), the federal illegal entry provision. *See* A.R.S. § 13-4295.01(B).

The illegal entry provision also recognizes constitutional limits on probable cause to make arrests. A person cannot be arrested for illegal entry unless: (1) a law enforcement officer witnesses the illegal entry, (2) there is a technological recording of the illegal entry, or (3) there are "[a]ny other constitutionally sufficient indicia of probable cause." A.R.S. § 13-4295.01(C).

In short, the illegal entry provision does not create a general warrant for state law enforcement officers to search out persons who may, at some point, have entered the country illegally. Rather, it narrowly targets persons who illegally enter on or after July 14, 2026 and satisfy probable cause requirements. A.R.S. § 13-4295.01(A), (C)–(D). It directly ties enforcement to a violation of the federal illegal entry statute, 8 U.SC. § 1325(a)—something that is already a prosecutable offense. A.R.S. § 13-4295.01(B)(2). And it provides an affirmative defense for someone who has received asylum. A.R.S. § 13-4295.01(B)(1).

Section 5 makes it possible for a court to dismiss an illegal entry charge before conviction and order the person to depart of his own volition if the person voluntarily agrees to the order and other conditions are met. *See* A.R.S. § 13-4295.03(A)–(B). If, on the other hand, a person is *convicted* of violating the illegal entry provision, then a state court judge will order him to return to his nation of origin or the foreign nation from which

he entered or attempted to enter after the person completes any term of incarceration or imprisonment. A.R.S. § 13-4295.03(C). If the court issues an order to deport—either under the consensual pre-conviction option under (A) or the mandatory post-conviction option under (C)—and the person disobeys the order to depart, the person commits a class 4 felony. *See* A.R.S. § 13-4295.02. The court order process also involves cooperation with the federal government. When a court issues an order, it "must include an authorization that allows a state or local law enforcement agency to transport the person to a port of entry or to any other point of transfer into federal custody." A.R.S. § 13-4295.03(D).

**III.    This Lawsuit**

Florence Project brings a single claim, asserting that Section 5 is preempted by federal law. Doc. 1 at 25 ¶¶ 113–16. It seeks a temporary restraining order and preliminary injunction. *See* Doc. 12. This response addresses only the Project's request for a temporary restraining order. *See supra* note 1.

**ARGUMENT**

**I.    The Project has not made a clear showing of an actual or imminent injury caused by Section 5, and therefore lacks standing.**

This Court may only exercise jurisdiction if the Project has established "'the irreducible constitutional minimum of standing,' consisting of three elements: injury in fact, causation, and a likelihood that a favorable decision will redress [its] alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Article III requires that a plaintiff's injuries not be "conjectural or hypothetical," but "actual or imminent." *Lujan*, 504 U.S. at 560 (cleaned up). Allegations of possible future injury are not sufficient. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Rather, the potential future injury must be "certainly impending" or there must at least be a "substantial risk" that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

6

At the temporary restraining order stage, the Project must make "a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013); *see Babaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) ("The legal standards applicable to TROs and preliminary injunctions are 'substantially identical.'" (quoting *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017))).

Before discussing Florence Project's asserted bases for standing, it is worth noting what Florence Project does not and cannot allege. Nowhere in its complaint, motion for temporary restraining order, or declarations does Florence Project state that it has already been harmed by Section 5. *See generally* Docs. 1, 1-2, 1-3, 12. Nor does it identify any other person who has been harmed by Section 5. This makes sense, because conduct occurring before July 14, by definition, does not violate Section 5. A.R.S. § 13-4295.01(D). The Project also does not identify any individual person who *will* be harmed by Section 5. *See generally* Docs. 1, 1-2, 1-3, 12. This too makes sense, because Section 5 has not been implemented yet, and the Project does not and cannot know how it will be enforced, how many people will be affected, or how such people will be affected.

Instead, Florence Project argues it has satisfied the elements of standing because, it alleges, "Section 5 will perceptibly impair Florence Project's ability to provide legal services . . . to existing and new clients, in turn impairing its ability to achieve its mission of providing free direct legal services to detained adults and children facing removal from the United States in Arizona and its ability to achieve its vision of universal representation for these individuals." Doc. 12 at 16; *see* Doc. 1 at 9 ¶ 46.

There are two overarching flaws to this standing theory.

First, Section 5 does not require or forbid any action by Florence Project. Therefore, the Project carries a difficult burden to show standing.

Second, the Project fails to meet this burden because its allegations about harms are speculative. The Project's allegations about future harm are all based on hypothetical conduct affecting Florence Project's as-yet unascertained clients at some future date and the future burdens that Florence Project fears it may incur based on a law that has barely

gone into effect and has not been implemented.  The Project therefore fails to show that any injuries are imminent or are caused by Section 5.[4]

**A.    Florence Project must satisfy the "substantially more difficult" standard for unregulated party standing.**

To establish injury-in-fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural or hypothetical."'"  *Lujan*, 504 U.S. at 560 (citation omitted).  The injury "must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance."  *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Lujan*, 504 U.S. at 560 n.1).

A plaintiff therefore "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Thus, when "a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,'" standing is "ordinarily substantially more difficult to establish."  *Hippocratic Med.*, 602 U.S. at 382 (quoting *Lujan*, 504 U.S. at 562).

Section 5 does not directly regulate Florence Project.  Indeed, the Florence Project does not claim otherwise.  It must therefore meet the "substantially more difficult" standard for unregulated party standing.

**B.    Florence Project's asserted injuries are speculative.**

Florence Project Deputy Director Roxana Avila-Cimpeanu asserts a variety of potential problems for the Project's hypothetical future clients that she alleges could affect the Project's mission of representing people "facing immigration removal proceedings in Arizona."  Doc. 1-2 at 3 ¶ 3.  For instance, Ms. Avila Cimpeanu states that enforcing

---

[4] As the Supreme Court recognized in *Hippocratic Medicine*, "[i]n cases of alleged future injuries to unregulated parties from government regulation," as here, "the causation requirement and the imminence element of the injury in fact requirement can overlap." 602 U.S. at 385 n.2.  "Both target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?" *Id.*

Section 5 could result in potential clients being removed *in absentia* in their federal immigration proceedings while they are detained in state court. Doc. 1-2 at 25 ¶ 56. She also states that the Project may have to hire new attorneys to train its existing attorneys to represent future clients in state court. Doc. 1-2 at 14 ¶ 29, 18 ¶ 36. She anticipates additional mileage reimbursement expenses and procedural complications from visiting state and local jails rather than federal detention facilities. Doc. 1-2 at 22 ¶¶ 46–47. Generally, Ms. Avila-Cimpeanu connects Florence Project's potential harms to problems she believes will affect persons who are subject to Section 5 prosecution, such as interference with federal proceedings or inability to obtain the same relief in state court that they could obtain in federal court. *See, e.g.*, Doc. 1-2 at 25–26 ¶ 58, 32 ¶¶ 72–75.

### 1. The mere fact that the Project might have to change its representation of immigrants is not enough to confer standing.

There is an obvious flaw to Florence Project's assertions: Section 5 applies to persons who have illegally crossed into Arizona from a foreign country on or after July 14, 2026, not a nonprofit organization like Florence Project. A.R.S. § 13-4295.01(D). It is true that there are some "familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff." *Hippocratic Med.*, 602 U.S. at 384. But those circumstances are predicated on a "predictable chain of events leading from the government action to the asserted injury," such as downstream or upstream economic injuries to a plaintiff when the government regulates a third-party business, or harms to individual users when the government regulates parks or forests, or when regulation of one property reduces the value of adjacent property. *Id.* at 385.

This is not such a case. Indeed, the Project's theory that enforcement of Section 5 will negatively affect its operations mirrors theories that the Supreme Court rejected in *Hippocratic Medicine*. In that case, a group of doctors challenged the FDA's relaxing of regulations for an abortion drug. 602 U.S. at 372–73. The doctors alleged that the FDA's relaxed regulation of the drug would cause it to divert resources and time from other

patients to treat patients with complications from the drug, increase the risk of liability suits, and potentially increase insurance costs. *Id.* at 390; *cf.* Doc. 1-2 at 19 ¶ 39; 34–35 ¶ 80. The Court rejected these purported injuries and observed, "the law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." *Hippocratic Med.*, 602 U.S. at 391.

The same logic applies here. Any time a state creates a new crime, it could result in lawyers having to adjust in myriad ways, including by complicating practice, representing more or fewer clients, incurring greater transportation or administrative costs, and undertaking hiring or training efforts. *Cf.* Doc. 12 at 17–21. That alone does not confer Article III standing. The Florence Project has to show concrete, non-speculative harm.

That is precisely what the Fifth Circuit held when legal advocacy organizations challenged Texas's S.B. 4 based on similar standing theories: "A legal-services organization cannot have Article III standing merely because a new law or regulation requires it to understand the legal change, to adjust resources in response, or to increase the degree or scope of legal representation for its current or prospective clients who may be adversely affected." *Texas*, 173 F.4th at 666. This Court should hold the same here, lest "any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities' and manufacture Article III standing every time a new law or regulation goes into effect." *Id.*; *see also Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004) ("[I]t would be a short step from the grant of third-party standing in this case to holding that lawyers generally have third-party standing to bring in court the claims of future unascertained clients." (citation modified)).

### 2. The Project cannot show a direct impediment to its organizational mission because its harms are speculative.

Florence Project seeks to establish organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See* Doc. 12 at 16. But as the Supreme Court

recently explained, "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Hippocratic Med.*, 602 U.S. at 396. This case does not fit the *Havens* context.

In *Havens*, the defendant lied to the nonprofit organization's employees in a way that directly thwarted those employees from obtaining housing on equal terms, which went against the organization's mission. *See* 455 U.S. at 368, 379. The organization accordingly suffered "far more than simply a setback to the organization's abstract social interests." *Id.* at 379. Rather, it had actually suffered a direct impediment to its organizational mission. *See also Hippocratic Med.*, 602 U.S. at 395 (describing the posture of *Havens* as "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer").

Florence Project's claim to standing lies well outside this unusual case. Unlike in *Havens*, Florence Project does not allege that any *actual* injury has taken place, nor could it, because Section 5 only went into effect a few days ago and has not been enforced.

Instead, Florence Project asserts various future harms that rely on stated or unstated assumptions about when, how, where, and against whom Section 5 will be enforced. For example, the Project states that enforcement of Section 5 will: interfere with its future clients' federal immigration proceedings, Doc. 12 at 17–19; require the Project to expend resources visiting clients in state jails and representing them in state courts, Doc. 12 at 19–20; require it to expend additional resources representing mentally incompetent individuals, Doc. 12 at 21; and result in the Project serving fewer clients, causing it to lose funding, Doc. 12 at 21.

These assertions are based on conjecture about how, and how often, Section 5 will be enforced. Section 5 went into effect on July 14, 2026. By definition, it does not apply to any person who illegally entered the country before that date. *See* A.R.S. § 13-4295.01(D). Thus, *none* of the Project's existing clients are subject to Section 5 (unless the Project has taken up a new client that could be subject to Section 5 since July 14, which the Project has not shown).

11

Further, the Project has not shown that the law has been implemented or enforced in any way. Thus, the Project has not and cannot allege that any of its clients have been arrested, charged, detained, or convicted under Section 5; that any of its clients have suffered any of the alleged harms that the Project alleges could result from enforcing Section 5; or that any of its attorneys or staff have suffered as a result of any of those alleged harms.

And before it would be possible to test whether the Project is even likely to be injured, it would be important to know key facts about how Section 5 will be enforced, including: To what extent will state and local law enforcement expend resources monitoring border crossings to establish probable cause for an arrest under Section 5? *See* A.R.S. § 13-4295.01(C). How many people are local law enforcement likely to arrest and detain for illegal reentry? Are those arrests and detentions likely to occur across the state, or solely in the counties along the Mexican border?

The answers to these questions are crucial and, at this point, unknowable. If enforcement is limited by resources or the exercise of discretion, or if arrests under Section 5 are geographically concentrated in Southern Arizona, that could affect all of the Project's hypothetical standing theories, such as its purported need to travel widely across the state to represent clients. *See* Doc. 12 at 19.

Further, in order for one of Florence Project's hypothetical future clients to be subject to Section 5, he or she would have to: (1) illegally enter Arizona from another county on or after July 14; (2) be directly observed or technologically observed doing so, or otherwise do so in a manner that is constitutionally sufficient to provide probable cause; and (3) be investigated and apprehended for doing so. *See* A.R.S. § 13-4295.01.

Steps (2) and (3) are by no means certain, even if step (1) were to occur. A law enforcement officer's discretionary decision not to investigate or apprehend someone would generally not be subject to judicial review. *See Sensing v. Harris*, 217 Ariz. 261, 262 ¶ 1 (App. 2007); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce . . . is a decision generally committed to an

agency's absolute discretion."). And Section 5 does not *require* an officer to arrest someone upon a finding of probable cause, unlike under some other Arizona statutes. *See, e.g.*, A.R.S. § 13-3601(B) (stating that police officers "shall arrest" people in certain domestic violence situations). So there is no basis to assume, as Florence Project seems to, that a significant number of persons will necessarily be arrested, detained, or prosecuted under Section 5.

In any event, if steps (1)-(3) happened, then *the person apprehended* could have Article III standing. But the Project would be injured only if: (4) that apprehended person wished to be represented by the Florence Project; (5) the Florence Project actually decided to represent that client; and (6) the Florence Project was frustrated or impaired from meeting with that client or adequately representing the client's interests.

This chain of speculation is too long. *See Clapper*, 568 U.S. at 410–14. And there are too many ways for the chain to be broken along the way—if, for example the person declined the Project's representation (perhaps in favor of a court-appointed attorney, as discussed below), or if the relevant state officials accommodated Florence Project's efforts to represent the person with minimal interference and were sensitive to the person's federal immigration proceedings.

Further, Arizona law undermines Florence Project's assertions that a person arrested under Section 5 would not be entitled to counsel paid for by the State. The Project states that "Arizona law does not necessarily guarantee the right to counsel to people facing removal under A.R.S. § 13-4295.01." Doc. 12 at 19. In fact, under Arizona law, "[a]n indigent defendant is entitled to a court-appointed attorney in any criminal proceeding: (A) that may result in punishment involving a loss of liberty." Ariz. R. Crim. P. 6.1(b)(1). The two crimes created by Section 5—illegal entry and refusing to comply with a court order to depart the country—are a class 1 misdemeanor and class 4 felony, respectively. *See* A.R.S. §§ 13-4295.01(F) (violation of illegal entry is a class 1 misdemeanor), -4295.02(B) (refusal to comply with court order is a class 4 felony). Both offenses may result in a loss of liberty. *See* A.R.S. §§ 13-702(D) (class 4 felony

13

presumptively results in 2.5 years of imprisonment), -707(A)(1) (class 1 misdemeanor punishable by up to six months in prison).

An indigent defendant would therefore be entitled to appointed counsel under Arizona Rule of Criminal Procedure 6.1(b) in all cases except where the prosecutor and presiding judge made it clear that no jail time would be pursued. *See Neilson v. Super. Ct.*, 159 Ariz. 395, 396 (App. 1988) (defendant entitled to counsel in part because he faced "the prospect of the imposition of a jail term throughout the lower court proceedings"); *Campa v. Fleming*, 134 Ariz. 330, 330 (App. 1982) (defendant not entitled to counsel when the "prosecutor avowed that no jail time would be requested, and the city magistrate ruled that no jail time would be imposed"); *State v. Allen*, 105 Ariz. 267, 269 (1969) (fact that indigent defendant made bond did not deprive him of right to appointed counsel); *see also State v. Anderson*, 185 Ariz. 454, 456 (App. 1996) (citing Rule of Criminal Procedure 6.1(b) to support proposition that Arizona has expanded the constitutional right to counsel beyond what the federal Constitution requires).

Juvenile defendants are similarly entitled to appointed counsel if a delinquency proceeding "may involve detention." Ariz. R. P. Juv. Ct. 206(a); *see* A.R.S. § 8-221. Indeed, courts have discretion to appoint counsel "in the interests of justice," adding another link of uncertainty to the Project's causal chain. Ariz. R. Crim. P. 6.1(b)(2). Arizona law strongly suggests that persons charged with violating the illegal entry or court order provisions *would* be entitled to appointed counsel unless the prosecutor avowed that no jail time would be pursued in advance and the court so ruled. *See Campa*, 134 Ariz. at 330.

This reality sharply undermines the Project's overarching theory that it would need to undertake burdensome efforts to ensure that persons charged under Section 5 are represented. At a minimum, the Project has not identified a sufficient likelihood that such persons would need the Project's representation. *See Clapper*, 568 U.S. at 410.

Further, Florence Project elsewhere acknowledges that the "vast majority" of persons facing removal under federal law in Arizona "go unrepresented in immigration

court." Doc. 1-2 at 3 ¶ 3. This reflects that there is no constitutional right to counsel at an immigration hearing. *See United States v. Cisneros-Rodriguez*, 813 F.3d 748, 756 (9th Cir. 2015); 8 U.S.C. § 1362. It is unclear how Section 5 hampers the Project's goal of ensuring people subject to removal are represented when Arizona law *does* provide for government-appointed counsel, unlike federal immigration law.

Florence Project cites *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972 (9th Cir. 2025). *See* Doc. 12 at 21–22. In that case, the plaintiff legal advocacy organization challenged the second Trump administration's "Remain in Mexico" policy. *Noem*, 145 F.4th at 979. Crucially, the organization had already incurred significant costs when it responded to the *first* Trump administration's Remain in Mexico policy in 2020, including opening a new office and engaging in cross-border travel to Mexico that exposed it to "dangerous conditions." *Id.* at 988–99. Thus, the organization's fears of future costs were grounded in actual impairment that had occurred in the past under the same policy and were not speculative. *Id.* Here, the Florence Project's purported injuries are *all* in the future and all based on speculation about how Section 5 will be enforced.[5]

In short, at this early stage, there are simply too many unanswered questions for this Court to assure itself of jurisdiction. Even if Florence Project might have standing to challenge the law if it were implemented in a certain way, that cannot be determined pre-enforcement, and so the Court cannot assure itself of jurisdiction in this posture. In a future case, a party may be actually injured by Section 5, and have standing to challenge

---

[5] Moreover, to the extent *Noem* relies on Ninth Circuit precedent that is inconsistent with *Hippocratic Medicine*, this Court should follow the precedent of the Supreme Court rather than irreconcilable Ninth Circuit case law. As the dissenting judge in *Noem* recognized, the Ninth Circuit had long interpreted *Havens* as endorsing a frustration-of-mission and diversion-of-resources theory of organizational standing. *See id.* at 1004 (R. Nelson, J., dissenting). But that approach is "clearly irreconcilable" with *Hippocratic Medicine* and therefore has been "effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Thus, this Court should consider itself "bound by the intervening higher authority" of *Hippocratic Medicine* rather than inconsistent Ninth Circuit case law. *Id.* And this issue may soon be resolved by a pending en banc case that was argued in June 2025. *See Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165 (9th Cir. 2024), *vacated and reh'g en banc granted*, 130 F.4th 1177 (9th Cir. 2025); *see* U.S. Court of Appeals for the Ninth Circuit, Status of Pending En Banc Cases, https://www.ca9.uscourts.gov/cases/en-banc/.

it. *Cf. Hippocratic Med.*, 602 U.S. at 396 (rejecting argument the plaintiffs must have standing because otherwise no one might have standing to challenge law). But Florence Project is not that party, at least not now.

**III.   The Project has not shown irreparable harm, and the balance of equities and the public interest weigh against restraining Section 5.**

Even if the Court finds the Project has standing and is likely to prevail on the merits, it is still not entitled to a temporary restraining order. The Project has not satisfied the remaining *Winter* factors: that it is "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). "[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

**A.   The Project has not clearly shown it will likely suffer irreparable harm through the implementation of Section 5.**

"A TRO preserves the status quo pending a hearing on a preliminary injunction motion in order to avoid irreparable harm in the interim." *D'Agostino v. Circle K Stores Inc.*, No. CV-26-01225-PHX-JAT, 2026 WL 933387, at *2 (D. Ariz. Apr. 7, 2026). The irreparable harm standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The Ninth Circuit has long held that "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016) (quoting *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). Thus, the Project must clearly show that it will likely suffer irreparable harm from the implementation of Section 5. It has not done so.

**1.   The envisioned harms are speculative.**

The Project worries that, as a result of Section 5, it will not be able to

- serve as many "clients and pro se individuals, which will in turn impair its ability to achieve its mission and vision" (Doc. 12 at 22);

- "seek and secure relief for some individuals facing removal whom it otherwise could have aided due to the broader avenues for relief under federal immigration law than under Section 5" (Doc. 12 at 22);
- "immediately be able to represent existing clients in state criminal proceedings under Section 5," having to either "expend extraordinary resources to be able to do so or forgo doing so," meaning the Project would be unable to represent some "individuals in Arizona facing removal categorically" (Doc. 12 at 22).

It characterizes these harms as irreparable (Doc. 12 at 22), and it bases these concerns on the declaration of Ms. Avila-Cimpeanu. Doc. 1-2. According to Ms. Avila-Cimpeanu, "Section 5 will work two distinct sets of harms to [the Project's] representation of individuals who are already [the] Project's clients and who are then arrested under Section 5: harm to [the Project's] legal representation of them in their federal immigration proceedings due to their detention in local jails under Section 5, and harm to [the Project's] legal representation of them due to state orders of removal that can result from Section 5." Doc. 1-2 at 29 ¶ 67.

Although courts generally assume a plaintiff's interpretation of a challenged statute when evaluating standing, courts do not make that same assumption when evaluating likelihood of irreparable harm. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988) (assuming that the plaintiffs' interpretation of the relevant statute was correct when undertaking standing analysis). Indeed, courts often assume the opposite and are skeptical of a plaintiff's interpretation of the statute in question when evaluating whether the plaintiff has shown irreparable harm. *See L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1201 (9th Cir. 1980) (plaintiffs must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief; they need only *allege* such injury to establish their standing).

Some assertions in Ms. Avila-Cimpeanu's declaration are legal conclusions or are general characterizations unsupported by specific facts. *See, e.g.*, Doc. 1-2 at 13 ¶ 28 (asserting that Section 5 "will fundamentally and directly interfere with [the Project's] core work"). Defendant disputes those. In addition, Defendant reserves the right to test

Ms. Avila-Cimpeanu's factual assertions via cross-examination or otherwise before the Court considers whether to issue a preliminary injunction.

Even if the Court accepts these assertions, the Project has not made a clear showing that these envisioned harms are likely to come to pass. These harms are speculative, as discussed in Part I above. Section 5 has been in effect for only a few days. The envisioned harms to the Project's representation of individuals facing removal (*e.g.*, having to either expend extraordinary resources to be able to represent existing clients in state criminal proceedings under Section 5, or forgo doing so) would necessarily take time to manifest. To construct this harm, the Project effectively takes a position that is anathema to its mission: that *it is harmed* by a reduction in federal immigration enforcement, as some individuals who might have otherwise gone into federal custody instead end up in state detention, and therefore do not become its clients.

The Project has offered no evidence that any current "existing client" is subject to Section 5 enforcement. Any harm to the Project based on enforcement against prospective clients—individuals who, by definition, are strangers to the Project at this time—is even more speculative. And any harm the Project envisions is necessarily based on assumptions about how Section 5 may be implemented or enforced, and about the Project's ability to navigate state and local systems and their interplay with the federal immigration system. For example, the Project speculates as to its ability to locate and communicate with individuals detained in local jails. *See* Doc. 1-2 at 21–23 ¶¶ 44-49, 51 ("For individuals detained in ICE custody, ICE offers an online detainee locator. To our knowledge, local jails have no such universal tool."). It is possible Section 5 is implemented in ways that do not significantly interfere with the Project's access to existing (or even prospective) clients. For one thing, there might be few arrests, so working with the state systems may not require the Project to devote resources to hiring, training, or travel. *Cf.* Doc. 1-2 at 20 ¶ 41, 22 ¶ 46. Or local jails could be good about accommodating requests from the Project for access to inmates arrested under Section 5 and facilitating communication by remote means. The Project avers to some experience with state and local jails, but it is limited.

*See* Doc. 1-2 at 21–22 ¶ 45.  But these possibilities illustrate that the Project has not (and cannot) *clearly* show that its envisioned harms are *likely* to come to pass.

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a [TRO].  A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Baldrige*, 844 F.2d at 674.  In *Baldrige*, the court declined to find irreparable harm where "[m]ultiple contingencies must occur before [plaintiff's] injuries would ripen into concrete harms."  As laid out in Section I.B, above, there are at least six separate events that must transpire before the Project could claim some harm.  "Multiple contingencies" like those cannot support a finding of irreparable harm.  To the extent the  Section 5 system impacts individuals who might otherwise be Project clients, its envisioned injuries are speculative.

**2.      The envisioned harms are not irreparable.**

The Project claims its envisioned harms are irreparable because they are "serious 'ongoing harms to [its] organizational missions,' including diversion of resources and the non-speculative loss of substantial funding."  *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)).  But *East Palo Alto* is distinguishable from this case: There, termination of government funding for plaintiff forced layoffs, which in turn prevented the plaintiff from providing representation required by federal statute (TVPRA) and agency rule (Office of Refugee Resettlement's Unaccompanied Children Program Foundational Rule).  780 F. Supp. 3d at 924–25.  Section 5 has no such direct financial effect.  To the extent the Project argues Section 5 will reduce its caseload and caseload-dependent funding, that position is speculative at best at this time.[6]

---

[6] The Project asserts in its Motion that Section 5 will cause it to lose funding, particularly with respect to individuals who otherwise would have been placed in the National Qualified Representative Program (NQRP), for which the Project says it receives funding on a per-person basis.  *See* Doc. 12 at 21.  But it does not support those statements with

The Project's reliance on *Valle del Sol* also does not illuminate any harm here. Even if the Project needed to divert resources to address the impact of Section 5, as the organizational plaintiffs did to address the law at issue in *Valle del Sol*, 732 F.3d at 1018, there is no threat of prosecution to the Project's employees or volunteers that would deter them from their work. That deterrent effect of the organizations' personnel was critical to the court's ruling in *Valle del Sol*. *Id.*

Here, the Project claims that the things it will need to do, in the context of Section 5, to accomplish its mission of providing comprehensive legal and social services to people detained and subject to immigration proceedings in Arizona are harms. *See* Doc. 1-2 at 3 ¶ 3. But no matter how noble, the Project's "vision" of reaching "*all* individuals in Arizona facing removal from the United States," *id.* at 17 ¶ 34, including people charged with Section 5 violations, is just a goal. Florence Project does not even claim to represent all such people today, or even a majority of such people. Nor does it show, in a non-speculative manner, that Section 5 will appreciably decrease the share of people in removal proceedings who it is able to represent. And even if it could, an organization does not suffer irreparable harm merely because a law makes it harder for it to achieve one of its goals. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (citation omitted) (choice to implement policy in way that led to administrative burdens and delays did not support equitable relief).[7]

---

evidence—the declaration paragraphs it cites do not discuss any direct funding mechanisms and how Section 5 might interfere with them. Even if the Project furnished the Court with evidence of loss of funding, and the Court found sufficient basis to restrain Section 5, any equitable relief would need to be narrowly tailored to that aspect of the law impacting the funding (*i.e.*, NQRP representation), as discussed in Part IV, below.

[7] And, to be clear, "Plaintiffs cannot meet their burden of establishing a likelihood of irreparable harm simply by noting that they are raising a preemption challenge. More is required." *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 979 (D. Ariz. 2020).

**B.** **The balance of equities and the public interest weigh heavily against a temporary restraining order.**

The final two *Winter* factors, which involve balancing the equities and considering the public interest, merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The balance of equities compares the burden to the Project with the burden on the Defendant if the Court restrains Section 5. *Id.* The public interest considers how a temporary restraining order would impact nonparties. *Id.*

As explained above, any harms or burdens the Project may envision resulting from enforcement of Section 5 are speculative. Defendants, however, will be harmed by a temporary restraining order. A State "suffers a form of irreparable injury" "any time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps. v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025)).

The purpose of Section 5, as the name suggests, is to "Secure the Border." There is a strong public interest in preventing dangerous cross-border crimes, like human trafficking and drug smuggling. *See* Proposition 314, Sections 2, 4 (the focus of Section 4 is the sale of fentanyl). Restraining Section 5 will take away from law enforcement authorities a method that the Legislature and the voters of Arizona have decided would make the state safer.

**IV.** **Any restraint of Section 5 should be limited.**

The Project's challenge is facial, rather than as-applied. Such challenges are "disfavored" because courts and parties must inquire "into how a law works in all of its applications." *Moody v. NetChoice*, 603 U.S. 707, 744 (2024). For this reason, the Project "bear[s] a heavy burden of persuasion." *Feldman v. Ariz. Sec'y of State's Off.*, 208 F. Supp. 3d 1074, 1088 (D. Ariz.) (citation omitted), *aff'd*, 840 F.3d 1057 (9th Cir. 2016). The Project must "carry [that] burden" as "the price of its decision to challenge the law[] as a whole." *Moody*, 603 U.S. at 744. As discussed above, it has not carried that burden.

"'Claims of facial invalidity often rest on speculation' about the law's coverage and its future enforcement." *Id.* at 723 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). "And 'facial challenges threaten to short circuit the democratic process' by preventing duly enacted laws from being implemented in constitutional ways." *Id.* (citation omitted). The Supreme Court has therefore made facial challenges "hard to win." *Id.* For all the reasons above, this Court should deny the Project's motion for a temporary restraining order.

To the extent the Project has concerns about the impact of Section 5, they are better addressed through an as-applied challenge, allowing the Court to better tailor relief. Indeed, at this stage, it is plausible that provisions of Section 5 will not be applied more strictly toward aliens than federal law.

Nevertheless, if the Court is inclined to restrain enforcement of Section 5 at this time, it should do so in as limited a fashion as possible. *United States v. BNS Inc.*, 858 F.2d 456, 464 (9th Cir. 1988) (preliminary relief should be "narrowly tailored to remedy the specific harm alleged"). The Project has requested broad relief: barring the Defendants from enforcing Section 5 in its entirety. But that requested relief is too broad (or simply not defined) for this Court to order, and a complete restraint of Section 5 would not comport with the governing legal standards.

The Project is entitled only to relief as to how it will be impacted through its clients—in other words, only that restraint "necessary to provide complete relief" to it as a plaintiff. *See CASA*, 606 U.S. at 861. But it is not clear what an injunction as to the Project's clients would look like. Does "clients" mean its current clients who are arrested under the illegal entry provision? Or does it include people who are arrested by state or local law enforcement and would have become Florence Project clients if they had gone into federal custody instead? Because the Project has not met its burden to identify what appropriate relief would be, this Court cannot comply with the requirements that a temporary restraining order "state its terms specifically" and "describe in reasonable

detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d).

This Court has "considerable discretion in fashioning the terms of an injunction" but must exercise that discretion so as "to eliminate only the specific harm alleged. An overbroad injunction is an abuse of discretion." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992); *see also Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) ("There are limitations on this discretion; an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled.").

Even if the Court decides to grant the temporary restraining order, it should tailor the restraint as narrowly as possible. For example, to the extent that the result of a prosecution under Section 5 mirrors the procedures applicable in a federal illegal reentry case, there is no irreparable harm. And this Court should be cautious and limited about restraining the enforcement of this state law, for two reasons. First, a federal court should always tread carefully when it is asked to restrain the implementation of a democratically enacted state law. *See Feldman*, 208 F. Supp. 3d at 1088. Second, as the Supreme Court instructs in *CASA*, federal courts must limit the scope of injunctions to what is necessary to grant full relief to the plaintiff. 606 U.S. at 861. Here that would mean, at most, an order temporarily restraining unconstitutional application of Section 5 to the Project as to its representation of its clients. Importantly, at this time, there is no evidence any of the Project's clients have been impacted by Section 5.

To the extent the Court issues a temporary restraining order in response to this facial challenge, it should be limited to the parts of Section 5 that the Court concludes are likely unconstitutional in all applications and that are likely to cause irreparable harm to the Project. Any other provisions should be severed, and the Court should allow Defendants to enforce those parts of the law—per the law's severability provision, Proposition 314 § 8, and the general rules in favor of severability and injunctions being no broader than necessary. *Citizens Clean Elections Comm'n v. Myers*, 196 Ariz. 516, 523 (2000) ("all doubts . . . resolved in favor of severability").

Finally, this Court should not enjoin A.R.S. § 13-2495.03, which provides that a state court may issue removal orders.  The relevant court, rather than Defendants, would be the proper party to enjoin—and that court is not before this Court.

## CONCLUSION

For the foregoing reasons, the Court should deny the Project's motion for a temporary restraining order.

RESPECTFULLY SUBMITTED this 17th day of July, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ *Timothy Horley*
Joshua D. Bendor
Joshua M. Whitaker
William Y. Durbin
Timothy E. Horley
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004

*Attorneys for Defendant Arizona Attorney*
*General Kristin K. Mayes*