Brunn (Beau) W. Roysden III, No. 028698
**CULPER LAW, PLLC**
111 W. Marshall Ave.
Phoenix, AZ 85013
(602) 315-7545
beau@culper.law

Kate B. Sawyer, No. 034264
Katlyn J. Divis, No. 035583
**FUSION LAW, PLLC**
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
(480) 624-5648
kbs@fusion.law
kd@fusion.law

*Attorneys for Intervenor-Defendants President*
*Petersen and Speaker Montenegro*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Florence Immigrant & Refugee Rights Project, | No. CV-26-04831-PHX-MTL |
| Plaintiff, | **RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| Kris Mayes, et al., | |
| Defendants. | |

**INTRODUCTION**

Proposition 314—the Secure the Border Act—is a commonsense border security measure that reflects a sovereign decision by the People of Arizona not to have a completely open border. *See* Laws 2024, H.C.R. 2060, Prop. 314 ("Prop. 314").[1] Adopting Prop. 314 by a large margin, the People recognized "a public safety crisis … occurring in Arizona, caused by transnational cartels engaging in rampant human trafficking and drug smuggling across this state's southern border." Prop. 314 § 2. The People sought to "protect[] the public and respond[] to the harms related to an unsecured border by … [e]mpowering law enforcement to … arrest[] aliens who fail to enter Arizona's southern border through official ports of entry." *Id.* Nothing about Prop. 314 purports to limit federal discretion to determine which ports of entry to establish in Arizona, or how to process any person who enters at a port of entry or any other place designated by immigration officers. Instead, Section 5 of that law simply exercises the State's police power to establish a state-law crime of illegal entry that applies only to activity that Congress has also made a criminal violation. It reflects the voters' concern about the public safety risks associated with individuals entering the State without going through any federal channels.

Plaintiff challenges Section 5, arguing that it is impliedly preempted by federal law, and requests a temporary restraining order. But Plaintiff's request fails for multiple reasons. First, under Article III of the U.S. Constitution, Plaintiff—a legal services organization not regulated by Section 5—does not have standing to challenge this law. Plaintiff's speculative allegations do not meet the constitutional threshold to show that it is likely to suffer any injury or that any injury it may suffer is caused by Section 5.

Second, Plaintiff has not shown a likelihood of success or raised serious questions on its facial preemption challenges to Section 5. Plaintiff asks this Court to create a new field of immigration law—"entry"—that is impliedly preempted by Congress. Yet this

---

[1] Available at pp. 312–16, https://apps.azsos.gov/election/BallotMeasures/2024/2024_AZ GeneralElection_PublicityPamphlet_E.pdf.

would be contrary to the careful and narrow analyses adopted in both *Arizona v. United States*, 567 U.S. 387 (2012), and *Kansas v. Garcia*, 589 U.S. 191 (2020), which found field preemption only in the narrow field of "alien registration." Plaintiff argues in the alternative that Section 5's state-law crime stands as an obstacle to the framework Congress has put in place. But in this *facial challenge*—which is the most difficult challenge to mount successfully—Plaintiff has not explained, and cannot explain, why the State creating a crime that applies to a "gotaway," i.e., a person who crosses the border and completely evades any contact or processing by federal immigration officials, is an obstacle to federal discretion, since by definition the federal government has had no interaction with the person or opportunity to exercise discretion at all. Instead, Section 5 legitimately protects the State's sovereign interest in a secure border while allowing federal officials to exercise full discretion of all immigration decisions.

The Court should deny Plaintiff's request for a temporary restraining order and allow Arizona to continue to protect its sovereign interest in having an orderly border.

## BACKGROUND

### A.  Proposition 314, the Secure the Border Act, Is Triggered Only by Illegal Entry Directly from a Foreign Nation.

In 2024, the People of Arizona overwhelmingly approved Proposition 314, titled the "Secure the Border Act." The People made several findings including that from 2021 to 2023, (1) there were "an estimated two million 'gotaways' who evaded encounters with border officials" at the southwest border; (2) Customs and Border Protection "encountered two hundred eighty-two individuals on the terrorist watchlist illegally entering the southwest border between ports of entry"—a "3033% increase over the prior three years"; and (3) "the amount of fentanyl seized at the southwest border almost tripled, amounting to billions of doses of fentanyl." Prop. 314 § 2.

At issue in this case is Section 5 of that measure, which amended Arizona Revised Statutes Title 13, Chapter 38, by adding Article 35 ("Illegal Entry into this State"), A.R.S. §§ 13-4295 to -4295.06. The titles of the new A.R.S. article and each of the provisions

2

within make clear that this measure relates to border security—in particular, the State's sovereign interest in having an orderly border with specified points of entry, rather than a border where aliens enter wherever and whenever they choose, detected or undetected. Over 62% of the voters—well over the 50% required for approval—supported Proposition 314.[2]

The threshold statute of Section 5 creates a state-law crime of illegal entry from a foreign nation. Under A.R.S. § 13-4295.01(A), "[i]t is unlawful for a person who is an alien to enter or attempt to enter this state directly from a foreign nation at any location other than a lawful port of entry."[3] Section 5 defines "port of entry" to mirror the federal definition in 19 C.F.R. § 101.1, under which Congress, the President, or the Secretary of the Treasury determine lawful ports of entry. *See* A.R.S. § 13-4295(2). Currently, 19 C.F.R. § 101.3 designates the following as ports of entry in Arizona—Douglas, Lukeville, Naco, Nogales, Phoenix, San Luis, Sasabe, and Tucson.[4]

Section 5 also provides defendants with a complete defense if their conduct does not constitute a violation of 8 U.S.C. § 1325(a).[5] *See* A.R.S. § 13-4295.01(B)(2). That federal provision does not prohibit entry "at any time or place … designated by immigration officers," so long as the alien does not "elude[] examination or inspection by immigration officers" or "attempt[] to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact." 8 U.S.C. § 1325(a). Arizona law also provides justification defenses for necessity and duress. *See* A.R.S. §§ 13-401(B), -412, -417.

Simply put, if an alien entering Arizona directly from a foreign nation does so at a "port of entry" or as "designated by immigration officers" without artifice, there is no

---

[2] *See* State of Arizona, Proclamation, General Election 2024, Proposition 314 (Nov. 25, 2024), https://apps.azsos.gov/election/2024/bm/Proclamation_for_Prop_314.pdf.

[3] A first violation is a class 1 misdemeanor; a repeat violation is a class 6 felony. A.R.S. § 13-4295.01(F).

[4] *See also Locate a Port of Entry in Arizona*, U.S. Customs and Border Protection, https://www.cbp.gov/about/contact/ports/AZ (last visited July 17, 2026).

[5] It also provides a defense if "[t]he federal government has granted the defendant lawful presence in the United States or asylum under 8 United States Code section 1158." *See* A.R.S. § 13-4295.01(B)(1); *see also* A.R.S. § 13-4295.01(E) (providing circumstances when an alien lacks lawful presence for purposes of this defense).

3

violation of Section 5, and there is no continuing state-law obligation or liability following such entry under Section 5. This is true whether the alien enters the State to immigrate, to claim asylum, to visit as a tourist, or even for an illicit purpose, such as to smuggle illegal fentanyl. Section 5's application begins and ends with commonsense border security and the People of Arizona's sovereign decision to require entry through lawful channels—a decision aliens can respect while still lawfully entering the State myriad ways.[6]

> **B.    Proposition 314 Does Not Create a Parallel State Deportation System, But Rather Provides for Voluntary Agreements In Lieu of Conviction, As Well As Delivering Aliens Who Entered Illegally to Federal Officers.**

Plaintiff also argues (at 4) that the discrete portion of Section 5 that relates to "order[s] to return to foreign nation" would *necessarily* require "state officers to effectuate deportations without any federal discretion or protection from removal." (*See also* Mot. at 4, 6, 7, 8, 14 (discussing deportation).) But this hyperbole—especially in a facial, pre-enforcement challenge—is belied by the text of Section 5 and the multiple ports of entry throughout the State. *See* 19 C.F.R. § 101.3.

First, neither the word "deportation" nor the word "removal" appears in Section 5 at all. Nor does Section 5 describe or refer to any process that resembles deportation or removal. *Compare* A.R.S. § 13-4295.03 (B) (order requiring only that "the person to return to the foreign nation from which the person entered or attempted to enter the United States or the person's nation of origin"), *with* 8 U.S.C. Part 241, Subpart A (describing details of the federal removal procedure). To the contrary, § 13-4295.03(D) makes clear that state or local law enforcement can "transport the person to a port of entry or to any other point of transfer into federal custody."

Second, an order requiring someone to return under Section 5 has nothing to do with immigration status. Rather, it is based solely on a person entering the state directly from a foreign country outside of a lawful port of entry or in violation of 8 U.S.C. § 1325(a). In some cases, a person can avoid conviction for such illegal conduct by *agreeing* to an order

---

[6] Arrests require probable cause established by an officer who witnesses the violation, a technological recording of the violation, or other constitutionally sufficient indicia. A.R.S. § 13-4295.01(C). The statutes also apply prospectively only. A.R.S. § 13-4295.01(D).

to return. A.R.S. § 13-4295.03(B). But even if an order to return is issued after a conviction, *see* A.R.S. § 13-4295.03(C), nothing about the order requires a person to abandon any pending immigration processes or asylum claims or prevents the person from immediately seeking to reenter the United States at a "port of entry" or in accordance with 8 U.S.C. § 1325(a).

**LEGAL STANDARD**

The standard for a temporary restraining order is the same as for a preliminary injunction, and a movant must show: (1) likelihood of success on the merits, (2) likelihood of irreparable harm in the absence of relief, (3) that the balance of equities tips in the movant's favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The movant bears the burden of proof on each element. *Traeger Pellet Grills, LLC v. Dansons US, LLC*, 421 F. Supp. 3d 876, 882 (D. Ariz. 2019). Where the movant's jurisdictional showing is contested, the movant "must make a clear showing" of "each element of standing" at the preliminary-injunction stage. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified). A plaintiff also must establish standing for each provision of law it challenges. *See Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025).

**ARGUMENT**

**I.     Plaintiff Lacks Standing to Challenge Section 5.**

Plaintiff does not allege that Section 5 directly regulates or injures it. Nor could it. Section 5 does not require or forbid Plaintiff to do anything. Instead, Plaintiff asserts (at 17–21) that it is injured for six other reasons. But all six focus on Section 5's potential impact on *someone else* and how Plaintiff might respond—including the possibility that Plaintiff might "forgo doing so." (Mot. 22.) And when a plaintiff challenges the "regulation … of someone else," standing "is ordinarily substantially more difficult to establish." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation modified). The en banc Fifth Circuit recently rejected organizational standing in a materially identical

challenge to a Texas statute. *See United States v. Texas*, 173 F. 4th 659, 666 (5th Cir. 2026) (en banc). Because Plaintiff has shown neither injury nor causation, it lacks standing to challenge Section 5.

### A.      Plaintiff Has Failed to Show Injury-in-Fact.

### 1.      Plaintiff Cannot Manufacture Organizational Standing with Allegations Unrelated to Its Core Business Activities.

Because Section 5 falls outside Plaintiff's "core business activities," Plaintiff lacks standing to bring this lawsuit. *Hippocratic Med.*, 602 U.S. at 395. And Plaintiff cannot spend its way into standing by alleging that it might undertake *additional* business activities in response to a challenged law.

For starters, Plaintiff's own allegations establish that its "longstanding mission" is unrelated to Section 5. *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025). Section 5 creates new state-law crimes. *E.g.*, A.R.S. § 13-4295.01. Yet Plaintiff's "mission is to provide free legal and social services to detained adults and unaccompanied children facing immigration removal proceedings in Arizona"—in particular, at "every stage of *federal removal proceedings*." (Compl. ¶¶ 7, 9 (emphasis added).) Its business activities are "entirely centered on federal immigration proceedings in federal immigration courts and federal court." (*Id.* ¶ 48.) In fact, Plaintiff stipulates that its "attorneys are civil immigration attorneys, not criminal attorneys." (*Id.* ¶ 49.) Still worse for its standing, Plaintiff "does not currently have attorneys capable of representing individuals in state criminal proceedings, including proceedings pursuant to Section 5." (*Id.*)

State-court criminal defense work is nowhere on the list of Plaintiff's business activities—"core" or otherwise. Plaintiff solely represents clients in federal civil immigration proceedings. Plaintiff's motion concedes as much. Responding to Section 5 would require Plaintiff to "expand its representation to state criminal proceedings" and begin to "serv[e] individuals detained in local jails." (Mot. 19.) And that would necessitate "a major overhaul in its attorney training." (*Id.*)

Despite conceding that it does not undertake and has never undertaken state-court

criminal defense work, Plaintiff largely bases its standing arguments on alleged injuries stemming from just such work. For example, Plaintiff alleges Section 5 will require it to expend resources, both "up front" and "on an ongoing basis," to begin representing clients in state-court criminal proceedings. (*Id.*) And "[a]s a result" of starting its new criminal-defense programs, says Plaintiff, it will serve "fewer clients than it otherwise could." (*Id.* at 19–20.) But diverting resources to start a new business activity in response to Section 5 is, by definition, not part of Plaintiff's "core activities and longstanding mission." *Immigrant Defs.*, 145 F.4th at 988. So it cannot establish Plaintiff's standing.

An organization that "diverts its resources in response to a defendant's actions" still must show that the resource-diversion "directly affected and interfered with [its] core business activities." *Hippocratic Med.*, 602 U.S. at 395; *see Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) (rejecting resource-diversion standing in challenge to abortion ban, because plaintiff was "not set up to provide abortion services"). Diverting resources from ongoing core business activities to a new activity in response to a state law is the sort of "self-inflicted injur[y]" that "does not give rise to standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). Because the only resource diversion alleged here falls outside Plaintiff's "core activities and longstanding mission," it has failed to show standing. *Immigrant Defs.*, 145 F.4th at 988.

### 2.      Plaintiff's Speculative Injuries Cannot Establish Standing.

Separately, Plaintiff's "theory of *future injury* is too speculative." *Clapper*, 568 U.S. at 401. It must show an injury that is "actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Hippocratic Med.*, 602 U.S. at 381. But Plaintiff's alleged injuries are based on what it supposes *might happen* to third parties, and on what it thinks it *might do* in response to Section 5. That "speculative chain of possibilities does not establish … injury." *Clapper*, 568 U.S. at 414.

Indeed, Plaintiff's standing arguments rely on little beside speculation. First, it speculates that Section 5 taking effect will necessarily result in a substantial number of people facing criminal prosecution. But it is just as likely that people will simply change

their conduct to comply with the law—i.e., enter at ports of entry—rather than voluntarily subject themselves to criminal liability. Second, Plaintiff speculates (at 17) that the "increased time spent serving existing clients due to Section 5 both will jeopardize [its] ability to effectively represent [its] clients in a timely manner and will decrease the number of individuals whom [it] can effectively represent." But Plaintiff offers nothing beyond its say-so to support the supposition that Section 5 will necessarily increase the time it takes to serve its existing clients. Plaintiff also posits (at 19) that it "will need to expend more time in representing individuals in state criminal proceedings scattered throughout the state than it would on comparable federal removal proceedings." Plaintiff ignores that such clients (1) may be eligible for public defenders who *are* experienced criminal-defense attorneys, *see* Ariz. R. Crim. P. 6.1, and (2) may not want to hire an organization that has no prior criminal-law expertise. *See supra* Part I(A)(1). Plaintiff therefore has no factual basis for assessing the relative time commitments required of those state and federal proceedings. And though Plaintiff says (at 21) that it will "serve[] fewer clients due to Section 5" and thus "will lose funding," again, it provides no concrete basis for this guess about a future where it begins a new activity of defending state-court criminal proceedings.

Making matters still more speculative, Plaintiff doubts whether it will (or even can) take some of the actions it discusses. For example, Plaintiff says it "will not immediately be able to represent individuals in Section 5 criminal proceedings—including existing clients who may not otherwise have representation—because it does not have staff who can do so." (Mot. 20; *accord* Compl. ¶ 49.) Even "over the longer term," Plaintiff "may not be able with its limited resources to" represent individuals in Section 5 proceedings. (Mot. 20; *accord* Compl. ¶ 66.) And Plaintiff admits that it "will likely" be "unable to provide" its "pro se materials and programming" to "individuals facing removal under" Section 5. (Mot. 20.) So it is likely that Plaintiff will continue providing those materials and programming "to people in federal immigration detention," just as it does today. (*Id.*)

Plaintiff alleges only speculative effects of Section 5 with no evidence that those effects are "certainly impending." *Clapper*, 568 U.S. at 402. It thus "cannot manufacture

standing by choosing to make expenditures based on hypothetical future harm." *Id.*

**B.      As an Unregulated Party, Plaintiff Faces a Substantially Difficult Burden to Show Causation—a Burden It Fails to Carry.**

As a "nonprofit legal services organization" (Compl. ¶ 7), Plaintiff is "not the object of [the] government regulation" challenged here. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025). Section 5 regulates the conduct only of "a person who is an alien." A.R.S. § 13-4295.01(A); *see* A.R.S. § 13-4295.02(A). It does not "require or forbid some action by" Plaintiff. *Hippocratic Med.*, 602 U.S. at 382. Because Plaintiff thus challenges the regulation of "someone else," Plaintiff faces "more difficulty establishing causation," which it in fact fails to establish. *Id.*

For example, Plaintiff says that "[i]ndividuals often have just a few weeks to find representation in immigration proceedings." (Mot. 18.) But the timeline for federal immigration proceedings is not an Article III injury to Plaintiff at all—let alone one caused by Section 5. Nor are the other barriers alleged by Plaintiff. It discusses the alleged "[b]arriers to effective representation" faced by "mentally incompetent clients … and children." (*Id.* at 18.) According to Plaintiff, for some "individuals facing removal under state law … pathways to relief will likely be entirely foreclosed by the lack of affirmative defenses." (*Id.* at 20–21.) And Plaintiff alleges "barriers to individuals accessing the pilot program" or "by disrupting representation for existing clients in the program." (*Id.* at 21.) Those facts relate to "someone else," not Plaintiff. *Hippocratic Med.*, 602 U.S. at 382.

As already discussed, *see supra* Part I(A)(1), the allegations specific to Plaintiff generally arise from its lack of any capability for representing clients in state-court criminal proceedings. (*See, e.g.*, Compl. ¶¶ 48–49.) Section 5 did not cause Plaintiff to exclude criminal law from its "core business activities." *Immigrant Defs.*, 145 F.4th at 988. Plaintiff has failed to "link[] [its] asserted injuries to the government's regulation." *Hippocratic Med.*, 602 U.S. at 382.

It makes no difference that the "someone else" identified by Plaintiff comprises its potential clients. Because Section 5 "may only be enforced prospectively," A.R.S. § 13-

9

4295.01(D), Plaintiff's allegations relate only to hypothetical clients. And lawyers generally lack "third-party standing to bring in court the claims of future unascertained clients." *Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004) (citation modified). Plaintiff cannot dodge *Kowalski* by citing hypothetical clients to support organizational standing instead of third-party standing.[7] If "Plaintiff[] were to have standing, any enterprising legal-advocacy organization could repackage a generalized grievance as an 'injury' to its 'core business activities' and manufacture Article III standing every time a new law or regulation goes into effect." *United States v. Texas*, 173 F.4th 659, 666 (5th Cir. 2026) (en banc); *see Kowalski*, 543 U.S. at 134 n.5 ("[T]he possibilities would be endless."). The Court should reject Plaintiff's repackaged third-party standing argument.

## II. Plaintiff Has Not Shown a Likelihood of Success or Raised Serious Questions on Its Facial Preemption Challenge to Section 5 of Proposition 314.

Plaintiff argues (at 6–16) that the doctrines of implied field preemption and obstacle preemption both facially preempt Section 5. But neither doctrine does.

### A. Section 5 Is Not Field Preempted.

Implied field preemption is found only in cases "where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" or "from a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("*Arizona*") (citation modified); *see also Puente Arizona v. Arpaio*, 821 F.3d 1098, 1103 (9th Cir. 2016). But implied field preemption is extremely disruptive to federalism because it frustrates even "supplementary state legislation" without any express statement from Congress. *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) ("*Kansas*"). Accordingly, the Supreme Court has recognized that implied field preemption arises only in "rare cases." *Id.*

#### 1. Plaintiff Has Not Established Field Preemption Based on a "Dominant" and "Preclu[sive]" Federal Interest.

There is no "dominant" federal interest that gives rise to implied field preemption of

---

[7] Indeed, those hypothetical clients themselves "would not have standing to assert a right to cross the border illegally, to seek asylum or otherwise." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018).

all state laws relating to immigration; rather, only discrete areas are field preempted—"alien registration" and the harboring and transporting of aliens. Section 5 does not implicate either of those discrete areas. And Plaintiff has not shown a likelihood of success of establishing a new, third area of field preemption: "entry" into the United States. Intervenor-Defendants do not dispute that Congress has exclusive power to set the conditions, locations, and manner of entry into the United States, *see Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982), but that does not mean that the State is field preempted from also criminalizing conduct that Congress itself has criminalized related to entry.

Plaintiff's argument (at 6–8) that Section 5 is field preempted based on a dominant and preclusive federal interest over immigration 1) proves too much given the more specific analyses and holdings of *Arizona* and *Kansas*; and 2) is contrary to constitutional text related to cooperative federal and state roles in the area of border security.

### a. Plaintiff's Argument Is Contradicted by the Holdings and Analyses of *Arizona* and *Kansas*.

In *Arizona*, the Court found field preemption as to only one of the four provisions of Arizona S.B. 1070 at issue—Section 3, which criminalized failure to comply with federal alien-registration requirements. 567 U.S. at 400. The Court held that Congress had engaged in field preemption of "alien registration" by "provid[ing] a full set of standards governing" that specific area of immigration law. *Id.* at 401 (citing *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)). But it did not find field preemption for the other three provisions at issue— Section 5(C) ("unauthorized employment of aliens"), Section 6 ("removal" of aliens), or Section 2(B) ("status checks" of aliens related to lawful presence). *Id.* at 406, 407, 411. And even as to "alien registration," the Court did not mention any dominant and preclusive interest of the federal government but rather based its analysis on the "comprehensive[ness]" of the federal statutes on this topic. *See id.* at 401.

If a dominant federal interest broadly preempts the entire field of immigration, the Court's individualized analysis of each of the four challenged provisions of S.B. 1070 would have been superfluous. Moreover, the Court refused to find Section 2(B) preempted—the

11

section about "status checks" of aliens related to lawful presence—given the possibility of state officers inquiring into aliens' immigration status without extending detentions. *Id.* at 414–15; *see also id.* at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). *Arizona* thus directly shows that implied field preemption must be applied much more narrowly than Plaintiff suggests. And the fact that the Court did not hold Section 6 ("removal" of aliens) or Section 2(B) ("status checks" of aliens related to lawful presence) field preempted also refutes the argument that the "entry" of aliens is field preempted, because there is no basis to distinguish between a dominant federal interest in "entry" versus the interests of removal or lawful presence, both of which were at issue in *Arizona*, and both of which the Court analyzed under the narrower obstacle-preemption framework.

In the most recent Supreme Court case on the subject—*Kansas v. Garcia*—the Court also did not find field preemption, even though the challenged laws related to immigration and employment eligibility. There, Kansas prosecuted three unauthorized aliens for state-law identity theft "for fraudulently using another person's Social Security number on state and federal tax-withholding forms." *Kansas*, 589 U.S. at 195. The Court rejected the argument that field preemption "follows directly" from *Arizona* and instead distinguished "information that a State may require employees to provide" from "alien registration." *Id.* at 210. The Court made no mention of a "dominant" federal interest, and it expressly stated that Congress "certainly" had not intended to eliminate any "room for supplementary state legislation." *Id.* at 208. *Kansas* confirms that field preemption is applied narrowly in the immigration-related context. *See also Plyler*, 457 U.S. at 225 ("[T]he States do have some authority to act with respect to illegal aliens."); *Chamber of Comm. v. Whiting*, 563 U.S. 582, 588 (2011) (federal interest in immigration does not completely supersede States' "broad authority under their police powers" to enact immigration-related laws); *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) (finding it "likely" that "in crafting the INA, Congress expected cooperation between states and federal immigration authorities"); *Geo Grp., Inc. v. Inslee*, 151 F.4th 1107, 1123 (9th Cir. 2025) (rejecting field

preemption argument for state-imposed immigration-related measures).

                **b.**       **Plaintiff's Argument Is Also Contrary to Constitutional Text Related to Cooperative Federal and State Responsibilities Over Border Security.**

Plaintiff's argument for establishing field preemption over "entry" into the United States also ignores the Constitution's text, which envisions a continuing state role related to border security and cooperative federal and state responsibilities in this area. The Court recently reiterated that "'[t]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it'" and "'the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.'" *Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026) (citations omitted); *see also Kansas*, 589 U.S. at 202 (collecting citations for propositions that "preemption cannot be based on a 'freewheeling judicial inquiry'" and "[i]nvoking some brooding federal interest … does not show preemption").

Here, the Constitution reserves to the States at least two key powers on this issue—inspection and invasion defense. First, the Import-Export Clause recognizes that even "without the consent of Congress," a State may "lay … imposts or duties on imports or exports" that are "necessary for executing its inspection laws." U.S. Const. art. I, § 10, cl. 2. A State thus retains constitutional authority to inspect goods that are entering the State. And requiring persons to enter at designated ports—as Section 5 does—is a proper exercise of that power. *See, e.g.*, *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 345–46 (1964) ("It is clear that the gravamen of the offense … was the failure to obtain, or even apply for, a permit as required by state law. Such permits … channelize the traffic in liquor and thus to prevent diversion of that traffic into unauthorized channels.").

In approving Prop. 314, the voters expressly found that "[f]rom 2021 to 2023, the amount of fentanyl seized at the southwest border almost tripled, amounting to billions of doses of fentanyl." Prop. 314 § 2. Fentanyl is not only deadly, but it also is expressly illegal under Arizona law. *See, e.g.*, A.R.S. § 13-3408 (prohibiting illegally possessing and selling fentanyl). Arizona thus has a legitimate and retained sovereign power to "channel[]" traffic

to specified routes to help law enforcement detect and seize such illegal drugs.

Second, a State also has a legitimate interest in a secure border as it relates to defending against invasions. The Constitution reserves to the States the power to "engage in war" when "actually invaded." U.S. Const. art. I, § 10, cl. 3. James Madison identified "suppress[ing] smugglers" as a justified use of a State's militia, and he cited Virginia calling out its militia to do just that: "There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions." *See* Ariz. Op. Att'y Gen. No. I22-001 (Feb. 7, 2022) (quoting James Madison, Debate From Virginia Ratifying Convention (June 16, 1788)).

As evidenced by the findings in Prop. 314, the People of Arizona were concerned about the effects of "gotaways," particularly the smuggling of illegal drugs and the potential that individuals on the terrorist watch list were attempting to enter between ports of entry. *See* Prop. 314, § 2. Consistent with its reserved power to protect against invasion, the State can legitimately require persons to enter at designated ports of entry, so that law enforcement (and the National Guard if needed) can more effectively patrol and screen for illegal activity, including smuggling.

> **2.    Plaintiff Has Not Established Field Preemption Based on Pervasive Federal Regulation That Leaves No Room for State Supplementation.**

Plaintiff also has not met its burden of showing that Section 5 is field preempted based on pervasive federal regulation over aliens entering between ports of entry. (*See* Mot. 8–10.) The federal criminal statute related to aliens entering "other than as designated by immigration officers" consists of a single sentence, *see* 8 U.S.C. § 1325(a), and it does not come close to establishing "a framework of regulation so pervasive that Congress left no room for the States to supplement it," *Arizona*, 567 U.S at 399 (citation modified); *see also Kansas*, 589 U.S. at 208 ("[P]reemption arguments[] must be grounded 'in the text and structure of the statute at issue.'" (citation omitted)).

Section 5's threshold criminal prohibition on illegal entry, A.R.S. § 13-4295.01(A)–(B), simply overlaps with the criminal prohibition in 8 U.S.C. § 1325(a). The Supreme

Court has been clear that "criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas*, 589 U.S. at 212. "Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap," and "in the vast majority of cases … allowing the States to prosecute is entirely consistent with federal interests." *Id.*

There is nothing unusually comprehensive about the criminal prohibition in § 1325(a) that shows a congressional intent to prevent a parallel state crime related to the State's own border. Section 1325(a) was enacted in 1929 in largely the same form as it is today. Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929).[8] When Congress passed the Immigration and Nationality Act ("INA") in 1952, it recodified this same prohibition with the current, differentiated penalties for first time and repeat offenders. Pub. L. No. 82-414, 66 Stat. 163 (1952).[9]

Turning to the structure of the INA, § 1325(a) was originally contained in Chapter 8 relating to General Penalty Provisions.[10] This is the same chapter that contained § 1324a (unlawful employment of aliens)—the provision at issue in *Kansas* and *Arizona*. In *Kansas*, the Court held "there is no basis for finding field preemption." 589 U.S. at 210. And the *Arizona* court undertook a conflict preemption analysis of the Arizona provision (Section 5(C) of S.B. 1070) and based its analysis on 8 U.S.C. § 1324a. 567 U.S. at 403–07. The Court's analysis would make no sense if the entire field of regulating unauthorized work by aliens was field preempted because § 1324a was so comprehensive. And yet that provision is far more comprehensive than § 1325(a). Thus, § 1325(a) comes nowhere close to establishing field preemption.[11]

[8] Available at https://www.govinfo.gov/content/pkg/STATUTE-45/pdf/STATUTE-45-Pg1551.pdf.
[9] Available at p. 67, https://www.govinfo.gov/content/pkg/STATUTE-66/pdf/STATUTE-66-Pg163.pdf.
[10] That chapter 8 is now codified as Part 8 of Subchapter II—Immigration (§ 1151 to § 1382).
[11] In *Gonzales v. City of Peoria*, 722 F.2d 468, 474–75 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc), the Ninth Circuit stated that the INA's criminal provisions—including § 1325 itself—do not reflect a congressional intent to occupy the field, because those provisions "are few in number and relatively simple in their terms" and "are not, and could not be, supported by

The INA, moreover, affirmatively preserves the States' authority "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10), and provides for several other authorizations to participate in matters relating to the entry and removal of aliens. Additionally, 6 U.S.C. § 240(b) provides for border enforcement security task forces, which "facilitat[e] collaboration among Federal, State, local, tribal, and foreign law enforcement agencies to execute coordinated activities in furtherance of border security, and homeland security." If the field of border security were preempted, then Congress would not have used such terms as "facilitat[e] collaboration," which clearly envisions different agencies of all authorities working together.

Fifth Circuit Judge Oldham recently explained that "[n]o field that the Court has deemed preempted …. has included analogous congressional authorizations." *United States v. Texas*, 144 F.4th 632, 722–23 (5th Cir.) (Oldham, J., dissenting), *reh'g en banc granted*, *opinion vacated*, 150 F.4th 656, and *on reh'g en banc*, 173 F.4th 659. Judge Oldham's reasoning is persuasive, and the Court should not find field preemption here.

Plaintiff's motion (at 8–10) repeatedly lumps § 1325(a) with several other provisions of the INA in order to support its argument for field preemption. But this is simply inapposite to the actual issue here. Section 5 does not seek to regulate immigration into the State, asylum claims, removal, or address any civil matter. Instead, it is much narrower—it merely creates a state-law crime for entry into the State directly from a foreign country other than through a port of entry or in accordance with § 1325(a). As such, it is § 1325(a) alone that determines if Congress has regulated so pervasively as to field preempt the state. *See Kansas*, 589 U.S. at 212.

### 3. Lower Court Cases Finding Field Preemption In Other Areas Do Not Change the Result Here.

The Ninth Circuit's cases do not endorse Plaintiff's broad theory that all immigration-related laws are field preempted but rather only those relating to 1) harboring

a complex administrative structure."

and transporting unauthorized aliens, and 2) creating new immigration classifications. *Valle del Sol v. Whiting* found a likelihood of success on the merits of field preemption over "harboring" of unauthorized aliens. 732 F.3d 1006, 1012 (9th Cir. 2013).[12] But that opinion's analysis, which predates *Kansas*, also gave weight to different penalties between federal and state law, which is not at issue here for the illegal entry crime, § 13-4295.01(A). And contrary to Plaintiff's broad theory, *Valle del Sol* expressly recognized that "the federal government did not occupy the field with respect to arrests for violations of" the federal criminal immigration statutes. *Id.* at 1025 n.16. Even accepting its holding of field preemption for "harboring" and transporting as law of the circuit, *Valle del Sol* does not provide a basis for extending field preemption to "entry" of aliens into the State.[13]

Nor does *Arizona Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017) (Mem.), support field preemption here. The case involved an Arizona policy not to issue drivers licenses to DACA recipients. *Id.* at 964, 972. The court held Arizona "impermissibly strayed into an exclusive domain that Congress, through the INA, delegated to the executive branch" by "creat[ing] a new immigration classification when it adopted its policy regarding driver's license eligibility," and thus the policy was field preempted. *Id.* at 972. Arizona is not creating any new immigration classifications here. The court also recognized that States

---

[12] Plaintiff also cites (at 8) *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012). But that court similarly held that provisions related to alien registration and harboring were field preempted. *Id.* at 1282, 1285–88. In *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013), the court concluded that the City's ordinance prohibiting illegal aliens from renting within the City actually regulated "which aliens may live in the United States," an area that "has always been the prerogative of the federal government." Accordingly, neither case finds field preemption over "entry" and therefore does not support Plaintiff's claim that Section 5 is field preempted here. And the question in *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022), was whether Texas had standing to challenge the Deferred Action for Childhood Arrivals program, not whether any Texas legislation was, in fact, field preempted.

[13] In *United States v. Arizona*, 119 F. Supp. 3d 955 (D. Ariz. 2014), which Plaintiff cites (at 7), this Court addressed a challenge to an Arizona law which, similarly to the law at issue in *Valle del Sol*, made it unlawful "for a person to intentionally engage in the smuggling of human beings for profit or commercial purpose." *Id.* at 957. The Court held that "[t]he Ninth Circuit Court of Appeal's holding in *Valle del Sol* … , compels the conclusion that federal law preempts [the challenged law] under the principles of field and conflict preemption." *Id.* at 959. Accordingly, it does not change this result. *We Are Am. v. Maricopa Cnty. Bd. of Supervisors*, 297 F.R.D. 373 (D. Ariz. 2013), also concerned state efforts to punish the transportation, harboring, and movement of unauthorized aliens—conduct governed by 8 U.S.C. § 1324.

can regulate in "areas of traditional state concern," even when they "impact noncitizens," if the regulation "mirror[s] federal objectives." *Id.*

Neither do non-precedential cases like *Idaho Organization of Resource Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) carry any weight here. That case is certainly not binding, and regardless, its reasoning is not persuasive. The challenged Idaho law was much broader than Section 5, and it was not focused on border security but rather illegal entry and reentry generally. *Id.* at 1040–43. Unlike Section 5, the Idaho statute did not require that the defendant entered directly from a foreign nation; it extended to reentry offenses keyed to a person's immigration history rather than to the act of crossing the border; and it contained no counterpart to Section 5's complete defense incorporating the elements of 8 U.S.C. § 1325(a). *See* A.R.S. § 13-4295.01(B)(2). That court's reasoning therefore says nothing about the narrower, federally conformed statute at issue here.

## B. Section 5 Is Not Obstacle Preempted.

### 1. Plaintiff's Facial Challenge Requires Plaintiff to Establish That There Is "No Set of Circumstances" in Which the Law Would Be Valid and to Overcome the Presumption Against Preemption.

Plaintiff seeks to enjoin Section 5, an entire article of the Arizona criminal code, in every application, before a single prosecution has been initiated, on the ground that any enforcement would "pose an obstacle to the framework Congress put in place." *Arizona*, 567 U.S. at 411; *id.* at 399–400 (describing obstacle preemption as requiring that "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (citation omitted)).

A facial challenge requires the challenger to establish that "no set of circumstances exists under which the [law] would be valid," or at a minimum that "the law lacks a plainly legitimate sweep." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 844 (9th Cir. 2026) (quoting *Moody*, 603 U.S. at 723); *United States v. Salerno*, 481 U.S. 739, 745 (1987). Such a challenge "comes at a cost" and is "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024); *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (a facial challenge is "the most difficult challenge to mount successfully"). Stated differently, facial challenges

18

are "disfavored." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

Arizona's criminal laws also receive a presumption against preemption, because they are an exercise of the State's historic police powers, even if they touch on an area of significant federal presence such as immigration. *See Geo Grp., Inc.*, 151 F.4th at 1123; *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 767–68 (9th Cir. 2025). Under the presumption, Plaintiff must demonstrate a clear and manifest purpose of Congress to preempt state law. *Geo Grp., Inc.*, 151 F.4th at 1123. In *Puente Arizona*, the Ninth Circuit applied this framework directly to state criminal laws with immigration-related effects. 821 F.3d at 1104. While the identity theft laws discussed in that case admittedly have effects in the area of immigration, "the text of the laws regulate [] the health and safety of the people of Arizona." *Id.*

### 2. Section 5's Criminal Prohibition on Illegal Entry Does Not Create an Obstacle to Federal Objectives in All Possible Circumstances.

Plaintiff has not met its burden of showing that Section 5's criminal prohibition on illegal entry stands as an obstacle—in every circumstance—to the accomplishment and execution of Congress's purposes in the INA, as amended. As noted above, Congress created a single-sentence criminal prohibition on illegal entry in 1929 and carried it forward when enacting the INA in 1952. *See supra* Part II(A)(2). Since 1952, Congress has kept § 1325(a) stable.

Section 5's heartland application shows that Plaintiff's facial obstacle preemption challenge is unlikely to succeed: a sheriff's deputy personally observes an adult man crossing the border into Arizona, between ports of entry, wearing camouflage and making no apparent attempt to make contact with federal officers.[14] After tracking the man for a few miles north, the deputy stops and thereafter arrests the man on probable cause of

---

[14] *See generally* Michael Ruiz, *Border Patrol nabs 32 Mexican nationals dressed in camo in Arizona*, Fox News (May 20, 2021, at 10:05 ET), https://www.foxnews.com/us/border-patrol-32-mexican-nationals-camo-arizona; Timothy H.J. Nerozzi, *Video captures migrants in camo scaling Arizona wall after Harris says border secure*, Fox News (Sept. 14, 2022, at 7:14 MST), https://www.fox10phoenix.com/news/video-captures-migrants-in-camo-scaling-arizona-wall-after-harris-says-border-secure.

violating A.R.S. § 13-4295.01(A). The man is charged with and convicted of violating that statute. He does not agree to the order to return under A.R.S. § 13-4295.03(A)–(B). The man receives a sentence of six months' incarceration in the county jail. A.R.S. §§ 13-707(A)(1), -4295.01(F). At the completion of the sentence, federal officers promptly take custody of the man directly from the county jail.

As shown by the above fact pattern, Plaintiff's core argument (at 11) that Section 5 "unilaterally … regulate[s] immigration" suffers from the fatal flaw that Section 5 does not directly regulate immigration at all. The Courts have defined immigration as the "'terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Kansas*, 589 U.S. at 195 (citing *Chamber of Commerce*, 563 U.S. at 587). Section 5 makes no such determination. It does not decide who may be admitted to the United States; it does not confer or deny any immigration status; nor does it adjudicate anyone's right to remain. It simply channels entry into the State to any port of entry that the federal government decides to establish, or in any manner consistent with 8 U.S.C. § 1325(a)—a federal *criminal* prohibition. And this is based on the legitimate state concern about the risks to public health and safety from "'gotaways' who evaded encounters with border officials entirely" and deadly drugs like "fentanyl." *See* Prop. 314 § 2.

Separate from an ultimate immigration determination (which Section 5 does not purport to make), whether an entry is lawful is determined entirely by federal law, which the statute incorporates wholesale: the federal definition of "port of entry" and—through A.R.S. § 13-4295.01(B)(2)—the elements of the federal improper-entry crime itself. Arizona has done what States have always done under their historic police powers: attach state criminal consequences, within state territory, to conduct that Congress already made criminal.

*Kansas* rejected exactly the argument that Plaintiff makes here—that federal charging discretion in an area of overlapping criminal liability impliedly forecloses state prosecution. 589 U.S. at 210–12. *Arizona*'s obstacle preemption analysis confirms this conclusion. For example, *Arizona*'s analysis of Section 5(C) of S.B. 1070 was based heavily

on the fact that Arizona sought to criminalize conduct that Congress had not made criminal, and it thus upset the "careful balance struck by Congress." 567 U.S. at 406–07. And with Section 6 of S.B. 1070, the Court again recognized that "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," and "Section 6 attempts to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers." *Id.* at 407. Moreover, the state officers under Section 6 were making arrests based on whether an alien was "removable." *Id.* at 409. There is no such immigration determination in Section 5 of Proposition 314.

### 3. Section 5's Order to Return Provision Also Does Not Create an Obstacle to Federal Objectives in All Possible Circumstances.

Plaintiff also has not shown that the discrete provisions in Section 5 related to an "order to return," *see* A.R.S. §§ 13-4295.02, -4295.03, are facially preempted because they have not shown that the provisions "pose an obstacle to the framework Congress has put in place" in every circumstance or lack a plainly legitimate sweep. *See Arizona*, 567 U.S. at 411 (setting forth obstacle preemption standard); *Moody*, 603 U.S. at 723–24 (facial challenge standard).

Section 13-4295.03(D) provides a key example of how these provisions defeat facial preemption. That subsection states that an order to return "must include an authorization that allows a state or local law enforcement agency to transport the person to a port of entry or to any other point of transfer into federal custody." As explained above, the federal government has complete discretion to establish such ports of entry, and there are ports throughout Arizona. Therefore, a simple hypothetical is a "gotaway" who entered between ports of entry and never previously interacted with federal immigration officials is charged with violating § 13-4295.01(A). In lieu of being convicted, the person agrees to an order as set forth in § 13-4295.03(A)–(B). That order contains the authorization for law enforcement to transport the person to a port of entry under § 13-4295.03(D). Consistent with that, law enforcement transports the person to the U.S. side of a port of entry at the Arizona-Mexico

21

border and to the custody of federal officers, who process the person solely according to the federal policies and procedures.

Critically, Plaintiff cannot explain how it frustrates any federal immigration discretion to take a person who has entered between ports of entry and completely eluded examination or inspection by federal officers, *see* 8 U.S.C. § 1325(a)(2), to federal officers for processing. Federal officers are free to exercise their full discretion. Plaintiff also cannot explain how taking a person to the U.S. side of a port of entry and delivering them to federal officials inside the U.S. constitutes "effectuat[ing] deportations without any federal discretion or protection from removal." (*See* Mot. at 14.) And if federal officials process the individual and decide to permit the person to remain in the U.S., then there is no argument for purposes of a facial challenge, that the person has "refuse[d] to comply with the order." *See* A.R.S. § 13-4295.02(A)(3).[15]

### 4. To the Extent That the Court Concludes Any Particular Provisions of Section 5 Facially Preempted, Those Provisions Can Be Severed.

Section 8 of Prop. 314 contains an express severability clause, which Plaintiff does not address. Whether to apply that clause "is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam). Arizona severability law "requires ascertaining legislative intent." *Republic Inv. Fund I v. Town of Surprise*, 800 P.2d 1251, 1259 (Ariz. 1990). And "a court can be sure that the legislature intended severability" when a statute includes a severability clause. *State v. Watson*, 586 P.2d 1253, 1264 (Ariz. Ct. App. 1978). Without addressing the severability clause here, Plaintiff cannot justify seeking to prohibit Section 5's enforcement in its entirety.

### III. Plaintiff Has Failed to Show that Irreparable Harm, the Balance of the Equities, and the Public Interest Support Granting the Motion.

Not only has Plaintiff failed to show it is likely to succeed on the merits, but it also

---

[15] Nor do the order-to-return provisions intrude on the national government's authority over foreign affairs. Section 5 does not direct any state officer to cross the international border, deliver any person to a foreign government, or purport to obligate any foreign nation to accept anyone. Its express mechanism is entirely domestic. *See* A.R.S. § 13-4295.03(D).

22

has failed to show the other three temporary-restraining-order factors: that it is likely to face irreparable harm absent relief, that the balance of equities tips in its favor, and that relief is in the public interest. *Winter*, 555 U.S. at 20; *see Stuhlbarg Int'l Sales Co.*, 240 F.3d at 839 n.7. The balance of the equities and the public interest merge "[w]hen the government is a party." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Just like Plaintiff's standing arguments, *see supra* Part I, its irreparable-harm arguments rely on "someone else's injuries." *Hippocratic Med.*, 602 U.S. at 400 (Thomas, J., concurring) (*See* Mot. 16–24 (discussing alleged injuries to others in the context of standing, irreparable harm, and the public interest).) Alleged harms to third parties will not do. *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1115 (N.D. Cal. 2018) ("Because the Ninth Circuit has held that the Organizations lack third-party standing, the Court considers only whether the Organizations themselves have made a sufficient showing of irreparable harm."). And speculative harms cannot meet Plaintiff's burden to "show that the harm is certain … and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (quotation marks omitted).

As to the remaining factors, Plaintiff has not shown that the balance of equities and the public interest weigh in its favor. Passing legislation "is in itself a declaration of public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). That is particularly true here, because the challenged law was supported by over 62% of those who voted on it.[16] Arizonans would thus acutely "suffer[] a form of irreparable injury" if the State were "enjoined by a court from effectuating" Section 5. *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

Respecting Arizona's interests in a secure border is also in the public interest. *See Arizona*, 567 U.S. at 398. The Supreme Court has acknowledged that an "influx of illegal

---

[16] *See* State of Arizona, Proclamation, General Election 2024, Proposition 314 (Nov. 25, 2024), https://apps.azsos.gov/election/2024/bm/Proclamation_for_Prop_314.pdf.

migration across private land near the Mexican border" can lead to "an epidemic of crime, safety risks, serious property damage, and environmental problems." *Id.* (quotation marks omitted). And the people of Arizona recognized this when they approved Prop. 314. *See, e.g.*, Prop. 314 § 2 (finding and declaring that "[d]ue to weaknesses in immigration enforcement, a public safety crisis is occurring in Arizona, caused by transnational cartels engaging in rampant human trafficking and drug smuggling across this state's southern border"). "The problems posed to the State by illegal immigration must not be underestimated." *Arizona*, 567 U.S. at 398.

Plaintiff vaguely asserts (at 23) that alleged harms to "individuals crossing the United States border" outweigh the public interest in allowing Arizona to enforce Section 5. But it provides no concrete examples of any effect whatsoever of Section 5 on such individuals. In fact, all the news articles it cites as exhibits in support of those harms long predate Section 5's effective date (some by nearly a decade or longer) and generally relate to the dangerous conditions in Mexico—some of the very same conditions that underpin "Arizona's concerns" about "[t]he problems posed to the State by illegal immigration." *Arizona*, 567 U.S. at 398.[17]

Even in a case where "both sides would face hardship if the Court ruled against them," preliminary relief would be inappropriate. *Tenorio-Serrano v. Driscoll*, 324 F. Supp. 3d 1053, 1067 (D. Ariz. 2018). Here, Plaintiff has identified no hardship that it would face absent a temporary restraining order, while Arizona would "face serious hardship," including interference with its interest in a secure border. *See id.* As a result, the Court should not "find that the balance tips sharply in Plaintiff's favor" and should deny the motion. *Id.*

## CONCLUSION

Plaintiff's motion for a temporary restraining order should be denied.

---

[17] Even if the Court finds standing, it must appropriately limit its relief. *See CASA*, 606 U.S. at 841.

24

RESPECTFULLY SUBMITTED this 17th day of July, 2026.

By:  */s/ Brunn (Beau) W. Roysden III*
Brunn (Beau) W. Roysden III
**CULPER LAW, PLLC**
111 W. Marshall Ave.
Phoenix, AZ 85013
(602) 315-7545
beau@culper.law

Kate B. Sawyer, No. 034264
Katlyn J. Divis, No. 035583
**FUSION LAW, PLLC**
7600 N. 15th St., Suite 150
Phoenix, Arizona 85020
(480) 624-5648
kbs@fusion.law
kd@fusion.law

*Attorneys for Intervenor-Defendants President Petersen and Speaker Montenegro*