Kathryn Huddleston***
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street NW, 7th Floor
Washington, D.C. 20005
T: (212) 549-2500
khuddleston@aclu.org

Grace Choi*
Omar Jadwat*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

John M. Mitchell**
Tara DeGeorge
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA
2712 North 7th Street
Phoenix, Arizona 85006
T: (602) 773-6007
jmitchell@acluaz.org
tdegeorge@acluaz.org

Cody Wofsy*
Hannah Steinberg*
Oscar Sarabia Roman*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
hsteinberg@aclu.org
osarabia@aclu.org

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF ARIZONA

| | |
|---|---|
| Florence Immigrant & Refugee Rights Project,<br><br>                    Plaintiff,<br><br>  v.<br><br>Mayes, *et al.*,<br><br>                    Defendants. | No. 2:26-cv-04831-MTL<br><br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

**INTRODUCTION**

Courts throughout the country have held that laws like Section 5 are both field and conflict preempted. The same is true here: Arizona has enacted its own immigration scheme, and the Supremacy Clause does not permit its enforcement. Just fourteen years ago, the Supreme Court rejected Arizona's effort to assume federal immigration enforcement power, and that case controls here. *Arizona v. United States*, 567 U.S. 387 (2012).

The Attorney General and Intervenors primarily focus their arguments on standing, irreparable harm, and scope of relief. But Florence Project has standing under Supreme Court and Ninth Circuit precedent. An immigration legal services organization can sue where a new immigration scheme—a new setting for detention and/or removal proceedings—upends its legal services model and interferes with its provision of such services. Nor is it speculative that Section 5 will do so: rather, it is predictable that some noncitizens will cross into Arizona, that some will be arrested, and that among these arrested individuals will be Florence Project's clients and prospective clients. Florence Project will be unable to successfully provide legal services where it otherwise could have, due to the extreme mismatch between avenues for relief in federal immigration proceedings and under Section 5. And it will be able to serve fewer individuals, because of the increased resources (including attorney time and mileage reimbursement) required to provide services to individuals in detention—including already-retained clients transferred to local jails or arrested by state or local officials. These harms, and others, are irreparable. A statewide injunction is necessary to remedy the harm to Florence Project, the sole provider of pro bono legal services to detained adults and unaccompanied children in Arizona.

**ARGUMENT**

**I.    FLORENCE PROJECT HAS STANDING.**

As reaffirmed in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), is

1

well-established. And this case is well within the *Havens* context: indeed, Florence Project's standing here directly follows from that of the immigration legal services organization in the post-*Alliance* case *Immigrant Defenders Law Center v. Noem*, 145 F.4th 972 (9th Cir. 2025) ("*ImmDef*").[1]

Florence Project's challenge to Section 5 is analogous to ImmDef's challenge to the reimplementation of the federal "Remain in Mexico" policy, which "caused . . . asylum seekers to remain in Mexico as they awaited adjudication of their asylum proceedings." *ImmDef*, 145 F.4th at 980. In that case, the Ninth Circuit held that ImmDef had alleged "concrete and demonstrable injury" to "advancing its core business activities and longstanding mission of providing direct representation, counseling, and legal assistance to noncitizens in removal proceedings in southern California." *Id.* at 988. In order "to *continue* carrying out its core activities and longstanding mission," ImmDef "expanded its legal representation across the U.S.-Mexico border"—including "by opening its San Diego Office, establishing its Cross-Border Initiative . . . and engaging in international, cross-border travel to Mexico." *Id.* As the Ninth Circuit explained, this work in a new setting was in furtherance of ImmDef's existing core activities and mission: "To avoid abandoning a core constituency and undermining its mission of universal representation of asylum seekers in California, ImmDef had to expend resources to counteract and offset the barriers that MPP imposed." *Id.*; *see also id.* ("Prior to Remain in Mexico, such core activities had never required cross-border work because noncitizens seeking protection were not forced to remain in Mexico while their removal proceedings were pending.").

*ImmDef* answers Intervenors' objection that "[s]tate-court criminal defense work is nowhere on the list of Plaintiff's business activities." Intervenors' Opp. ("Int.") 6-7. Florence Project provides "free legal and social services to detained adults and

---

[1] *ImmDef* expressly relied on *Alliance* and *Havens*, not any pre-*Alliance* Ninth Circuit precedent, for its analysis, so *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc), is irrelevant. *Contra* AG 15 n.5.

unaccompanied children facing immigration removal proceedings in Arizona" and works toward universal representation, as ImmDef does in California. ECF 1-2, Declaration of Roxana Avila-Cimpeanu ("FIRRP Decl.") ¶¶ 3-7. Florence Project, like ImmDef, previously expanded its representation to clients in Mexico in response to the "Remain in Mexico" policy—demonstrating that in similar situations in the past, Florence Project has responded to expand its representation to new detention and court settings. *Id.* ¶ 8; *see ImmDef*, 145 F.4th at 988. Of course, Florence Project has not previously systematically expanded its representation to the settings of local jails and state-court proceedings, but that is unsurprising: Florence Project has not needed to do so, because previously its clients and prospective clients were not systematically held in local jails under charges that could result in removal from the United States or channeled to state proceedings that could result in removal from the United States. Contrary to Intervenors' claims, Int. 6-7, providing direct legal services to individuals systematically detained in local jails under state criminal charges that will result in removal upon conviction or acceptance of what amounts to a plea deal, A.R.S. § 13-4295.03(A)-(B), is in fact directly within Florence Project's core activity of providing legal services to individuals detained in Arizona and facing removal from the United States, *see* FIRRP Decl. ¶ 3. Thus, like the immigration legal services organization in *ImmDef*, Florence Project has standing. 145 F.4th at 988 (standing where "ImmDef expanded its legal representation across the U.S.-Mexico border to *continue* carrying out its core activities and longstanding mission," where "such core activities had never [previously] required cross-border work").

*ImmDef* also answers Intervenors' assertion that Florence Project's longstanding mission "is unrelated to Section 5" because Florence Project currently provides services in federal civil immigration proceedings, not state criminal proceedings (which have never before issued removal orders). Int. 6. Again, Florence Project's mission is to serve "detained adults and unaccompanied minors facing immigration removal proceedings in Arizona." FIRRP Decl. ¶ 3. Because Section 5 sets up state proceedings that lead to

removal, Florence Project must serve clients detained in local jails, and engage with state proceedings as needed,[2] to pursue relief for clients from both federal and state removal. *Id.* ¶¶ 34-35, 42, 44-46, 50-57. Section 5 threatens Florence Project's representation of individuals in federal proceedings due to (1) detention in local jails, which will require increased attorney time and resources and so will decrease the number of individuals whom Florence Project can represent, *id.* ¶¶ 50-57, and (2) the mismatch between the relief from removal available under federal immigration law and the relief available under Section 5, which will render Florence Project unable to seek and secure relief for clients and prospective clients whom it could have aided in federal proceedings, *id.* ¶¶ 58-60. It also will interfere with Florence Project's provision of pro se services, *id.* ¶¶ 81-82, its pro bono representation, *id.* ¶ 80, and its universal representation pilot program, *id.* ¶ 83.

These bases for standing directly flow from *Havens*, *Alliance*, and *ImmDef*. As *Alliance* explains, standing is available where an organization provides direct services and the challenged action "perceptibly impair[s] [the organization's] ability to provide" the services. 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379). Here, as in *Havens*, Section 5 will perceptibly impair Florence Project's provision of services by creating an insurmountable barrier to Florence Project's successful provision of services to some clients: even if they have a pathway to relief from removal under federal law, they will be required to "return to [a] foreign nation" under state law. A.R.S. § 13-4295.03(B) (order issued upon dismissal of the charge "shall . . . require the person to return to the foreign nation from which the person entered or attempted to enter the United States or the person's nation of origin"); *id.* § 13-4295.03(C) (same for order entered upon conviction).[3] And, as in *ImmDef*, Section 5 will perceptibly impair Florence Project's

---

[2] This includes the universe of cases in which Florence Project clients and prospective clients may lack a publicly appointed defender. *See* AG 15.

[3] While Intervenors argue that the statute is not "deportation" or "removal" and that a person could continue federal immigration proceedings, Int. 4-5, they ignore that "refus[ing] to comply with" an order "to return to the foreign nation" is a class 4

4

provision of services by requiring it to expend significant additional resources "to continue carrying out its core business activities and longstanding mission"—or forgo carrying out a portion of those activities in service of its longstanding mission altogether. 145 F.4th at 988 (standing and imminent irreparable harm where ImmDef would need to "expend additional resources to reach individuals located in Mexico to adequately and ethically represent them").

Nor does *Satanic Temple v. Labrador*, 149 F.4th 1047 (9th Cir. 2025), aid Intervenors. Int. 7. In that case, prescription of abortifacients had previously been legal, but the religious association challenging the bar on such prescriptions had not previously provided them or set up the infrastructure to do so. *Satanic Temple*, 149 F.4th at 1053. Here, by contrast, Florence Project has previously served all detention centers in Arizona where individuals face removal. FIRRP Decl. ¶ 22. It must consequently either expand its representation to state jails and state criminal proceedings or, alternatively, be categorically unable to provide direct legal services to individuals facing removal—for both their state and federal immigration proceedings—whom it otherwise would have been able to serve. *Id.* ¶¶ 34, 43. This is not a situation where "some day" Florence Project would have put in place infrastructure to provide services. *Satanic Temple*, 149 F.4th at 1053. Section 5 disrupts Florence Project's existing provision of services—as *Alliance* and *ImmDef* explain confers standing.

Florence Project's standing theory is not speculative, *contra* Attorney General Opp. ("AG") 10-16, ECF 35; Int. 7-9, but rather describes "a predictable chain of events," *Alliance*, 602 U.S. at 385. It is foreseeable that some noncitizens will continue to enter Arizona between ports of entry, *contra* AG 12, Int. 7-8, particularly due to dangerous conditions in Mexico. *Dep't of Commerce v. N.Y.*, 588 U.S. 752, 768 (2019)

---

felony. A.R.S. § 13-4295.02. And if a person *does* return, that person risks running afoul of forms of relief that require presence in the United States during the pendency of their application. *See, e.g.*, 8 C.F.R. § 1208.8(a) ("applicant who leaves the United States without first obtaining advance parole . . . shall be presumed to have abandoned his or her application" for asylum).

(standing was not speculative where it "relie[d] . . . on the predictable effect of Government action on the decisions of third parties"); *see also* ECF 1-3-1-5, Declaration of Grace Choi, Exs. 4-17 (documenting harms to asylum seekers in Mexico). Law enforcement's discretion not to arrest, in the abstract, does not make standing speculative: neither the Attorney General nor legislative leaders disavow enforcement, and the State has embraced similar legislation in the past. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 583, 597 (2023) (history of past enforcement and declining to disavow future enforcement provided credible threat for pre-enforcement standing); *Arizona,* 567 U.S. 387 (litigation over prior preempted legislation). The fact that probable cause is necessary is merely an ordinary feature of all arrests. *Contra* AG 12.

Nor is it speculative that at least some arrested noncitizens will be Florence Project clients and prospective clients, *contra* AG 13: Florence Project is the only pro bono legal service provider for detained adults in Arizona, and it provided legal services to 1,300 adults in ICE custody and over 1,065 unaccompanied children last year. FIRRP Decl. ¶¶ 21, 23-24. And it is predictable, not speculative, that to serve clients newly detained in state jails and in new, different proceedings, Florence Project must expend additional resources. *Id.* ¶¶ 40, 45-49. The Attorney General posits that it might be possible that "the relevant state officials accommodate[] Florence Project's efforts to represent the person with minimal interference" and be "sensitive to the person's federal immigration proceedings." AG 14. But such accommodation—itself speculative— would not remedy the harm to Florence Project in the expenditure of resources necessary for expanding its legal services to local jails and state-court criminal proceedings, and it would not eliminate the fundamental clash between avenues for relief under federal immigration law and the lack of such avenues under state charges.

Nor can the Attorney General defeat standing simply by raising questions about how often the statute will be enforced. Only Defendants have information about

enforcement plans and existing enforcement. Critically, Defendants have not disclaimed enforcement.[4]

This is not a case in which the state has merely "create[d] a new crime." AG 10. Instead, Arizona has arrogated to itself the power of immigration enforcement—uniquely the purview of the federal government, *see infra*—and as a result will upend Florence Project's provision of legal services, which depends on a fundamentally different *federal* system of detention and removal. This fundamental category shift—toward proceedings that may lead to removal in a new forum, including through predicating dismissal of charges on acceptance of an Order to Return, A.R.S. § 13-4295.03(A)-(B), and detention of such individuals in a new setting—corresponds directly to that in *ImmDef*. 145 F.4th at 988.

Fundamentally, *Havens*, as affirmed by *Alliance*, and *ImmDef* control here. The out-of-circuit opinion in *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026), did not directly address concrete and particularized injury due to direct barriers to successful representation—including due to an organization's inability to successfully aid clients whom it otherwise could have aided in seeking federal relief from removal because they are now subject to a state Order to Return. FIRRP Decl. ¶¶ 58-60. And as *Havens* demonstrates, this is not third-party standing predicated on asserting others' rights as in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), where individual attorneys sought to stand in the shoes of their clients and asserted no injury to themselves. *Id.* at 130-32. Rather, this is "interfer[ence] with . . . core business activities" sufficient for standing. *Alliance*, 602 U.S. at 395. As in *Havens*, where provision of false information created a barrier to the housing counseling organization's successful counseling for homeseekers, *see Alliance*, 602 U.S. at 395, Section 5 creates a barrier to Florence Project's successful provision of

---

[4] As the case progresses, jurisdictional discovery to determine the nature and extent of Defendants' enforcement plans and ongoing enforcement, as well as the provision of appointed counsel to individuals charged under Section 5, may be appropriate, including at any preliminary injunction stage.

legal services to existing and prospective clients, its core service. While many cases do not involve impairment of an organization's ability to provide core services, *see id.* at 396 (describing the *Havens* context as "unusual"), this one does. *See ImmDef*, 145 F.4th at 987-88.

## II.    SECTION 5 IS PREEMPTED.

The Attorney General does not contest that Section 5 is preempted. That makes sense—over a century of Supreme Court precedent has recognized the dominant federal interest in entry and removal, Mot. for Temp. Rest. Order & Prelim. Inj. ("Mot.") 6-8, ECF 12, and the Ninth Circuit has also found "an overwhelming dominant federal interest in the field" of "the entry, movement, and residence of aliens," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 (9th Cir. 2013) (citation modified).[5] Even Intervenors "do not dispute that Congress has exclusive power to set the conditions, location, and manner of entry into the United States," instead asserting that "that does not mean that the State is field preempted from also criminalizing conduct that Congress itself has criminalized." Int. 11. But that is exactly what field preemption means—indeed, "in a preempted field, even complementary state legislation is impermissible." *Arizona*, 567 U.S. at 401-02. Intervenors also never contest that the field of removal is preempted.

Intervenors limit field preemption to "registration" and argue that no "dominant federal interest broadly preempts the entire field of immigration." Int. 11. But Intervenors are arguing against a strawman. Plaintiffs are not contending that the field of immigration is preempted—rather, Plaintiffs contend that Congress has preempted the field of entry and removal specifically. Mot. 6-11. The Ninth Circuit has already held the field of "the entry, movement, and residence of aliens" preempted. *Valle del Sol*, 732 F.3d at 1026; *see Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 971 (9th Cir. 2017)

---

[5] Intervenors' argument that "*Valle del Sol* does not provide a basis for extending field preemption to 'entry,'" Int. 17, is nonsensical, as *Valle del Sol* itself recognized that the field of "entry, movement, and residence of aliens" was preempted. 732 F.3d at 1026.

8

(the "INA provides a pervasive framework with regard to the admission, removal, and presence of aliens."). And for good reason: *Arizona* never held that registration was the *only* preempted field, and everything *Arizona* said about registration applies with even greater force to entry and removal, which implicates sovereignty and foreign affairs at least as much as registration, if not significantly more so. *Arizona*, 567 U.S. at 394-95, 409; *Jama v. ICE*, 543 U.S. 335, 348 (2005); *United States v. Texas*, 599 U.S. 670, 679 (2023); *see Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1042 (D. Idaho 2025) (finding *Arizona* "very instructive for determining whether the federal government has the exclusive power to regulate aliens' entry"); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993, 1007 (W.D. Okla. 2025) ("*Arizona*'s logic naturally extends to this case") (citation modified); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1260 (S.D. Fla. 2025) (like "noncitizen registration," "[f]ederal regulation of entry" has "impact on sensitive foreign relations interests").

The impacts on foreign affairs, and the exclusive sovereign powers over entry and removal, Mot. 6-7—which Intervenors themselves concede, Int. 11—make this case a far cry from *Kansas v. Garcia*, 589 U.S. 191 (2020), on which Intervenors rely, Int. 12. In *Garcia*, Kansas prosecuted noncitizens under a generally applicable state identity theft statute for using fraudulent social security numbers on tax withholding forms. The noncitizens based their preemption theory on the fact that the tax withholding process at the beginning of a job is typically conducted alongside employment verification, which in turn is related to the immigration system. *Id.* at 197, 208-09. But, recognizing the tax forms' glancing relevance to immigration employment rules, the Court held that these prosecutions did not impinge on immigration statutes. *Id.* at 191, 195, 208-10. That is not the case here, where the State has created its own entry and removal system. *See Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 922 (8th Cir. 2025) (rejecting

9

reliance on *Garcia*); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1007 (same); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1263-64 (same).[6]

Attempting to escape field preemption, Intervenors point to the Import-Export Clause and State War Clause. Int. 13-14. But even if the States are permitted to impose duties or wage war, Congress has enacted a comprehensive framework that has preempted states from doing so. Additionally, the Import-Export Clause *prohibits* States from "lay[ing] any Imposts or Duties on Imports or Exports, *except what may be absolutely necessary for executing it's inspection Laws*[.]" U.S. Const. art. I, § 10, cl. 2 (emphasis added). Intervenors never explain why Section 5 is necessary for executing Arizona's inspection laws. Nor do Intervenors explain why this Clause, permitting states to charge imports on *goods* in limited circumstances, would have anything to do with a law that prohibits the illegal entry of *people* into the state. Intervenors cite no case law that has applied this Clause in even remotely similar circumstances.

Intervenors' invasion arguments, Int. 14, are flawed for several reasons. First, there is no invasion within the meaning of the Clause. "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding" which "required far more than an unwanted entry; to constitute an invasion, there had to be hostilities." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring). Accordingly, courts across the country have repeatedly concluded that immigration, standing alone, is not an invasion. *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). Second, even if

---

[6] Intervenors' other cited cases, Int. 12, are similarly inapposite. *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2010), involved employment, in which the Supreme Court has allowed states to take a role, unlike core sovereign powers like entry and removal, *De Canas v. Bica*, 424 U.S. 351, 354-55 (1976). *United States v. California*, 921 F.3d 865 (9th Cir. 2019) and *Geo Group, Inc. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025), involved regulations of the health and welfare of detainees, another area where the States have "historic powers." Geo Group, Inc., 151 F.4th at 1123 (citation modified).

immigration were an invasion (which it is not), the State War Clause authorizes states to "engage in War," not to craft their own immigration laws. U.S. Const. art. I, § 10, cl. 3. Finally, the Supremacy Clause does not have any exceptions.

As to the federal framework, Intervenors narrow Congress's handiwork to "a single sentence" contained in 8 U.S.C. § 1325(a). Int. 14-15. But the question is not what statute Section 5 is trying to track, but rather what field Congress has occupied. Indeed, in reading § 1325(a) in isolation from Congress's handiwork, Intervenors overlook its part in a "larger federal scheme of criminal sanctions for those who facilitate the unlawful entry, residence, or movement of aliens"—which the Ninth Circuit recognized in *Valle del Sol*. 732 F.3d at 1024. Not only is § 1325 part of a full scheme of *criminal* statutes, as the Ninth Circuit held—it is also part of an even larger scheme of *civil* statutes regulating entry and removal, where federal officials have discretion to choose whether and when to initiate civil removal proceedings. Mot. 8-10. Section 5 directly implicates Congress's framework governing entry and removal because it sets up an illegal entry crime and the order to return provision that requires noncitizens to leave the state, backed by criminal penalties.[7]

Intervenors rely on "the States' authority to cooperate with the Attorney General." Int. 16 (citing 8 U.S.C. § 1357(g)). But the fact that "[f]ederal law specifies *limited* circumstances in which state officers may perform the functions of an immigration officer" does not give states license to set up their own removal scheme. *Arizona*, 567 U.S. at 408-09 (emphasis added) (citing 8 U.S.C. § 1357(g)). And contrary to Intervenors' assertion, Int. 16, the Supreme Court has found field preemption even where Congress had authorized limited state participation. For example, in *Pacific Gas & Electric Company v. State Energy Research Conservation & Development*

---

[7] Thus, Intervenors' argument that Section 5 "does not seek to regulate immigration into the State, asylum claims, removal, or address any civil matter," Int. 16, blinks reality—Section 5 bypasses removal proceedings by allowing state officials to order noncitizens to return to the foreign nation from which they came, backed by criminal penalties.

11

*Commission*, Congress permitted "agreements" where States would assume "regulatory authority over certain nuclear materials" and "specifically authorized" States to regulate air pollutants. 461 U.S. 190, 209 & n.20, 212 n.25 (1983). The Supreme Court nevertheless concluded that "the federal government has occupied the entire field of nuclear safety concerns, *except the limited powers expressly ceded to the states*." *Id.* at 212 (emphasis added). The same is true here.

Thus, the field of entry and removal is preempted. Because "States may not enter, in any respect, an area the Federal Government has reserved for itself," "even complementary state legislation is impermissible." *Arizona*, 567 U.S. at 401-02. Therefore, even state laws that mirror the federal entry crime are field preempted—as courts across the country have repeatedly held in challenges to laws that are almost identical to Section 5. *See Idaho Org. of Resource Councils*, 780 F. Supp. 3d at 1042-43; *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1346 (W.D. Okla. 2025); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1262. Intervenors dismiss the District of Idaho's decision, claiming that Idaho's law "was much broader than Section 5" and "was not focused on border security but rather illegal entry and reentry generally." Int. 18. In actuality, the entry crimes are nearly identical, *see Idaho Org. of Resource Councils*, 780 F. Supp. 3d at 1030, and Section 5 goes much further than Idaho's law by permitting state officials to order noncitizens removed. But in any event, "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402. Therefore, Section 5 is field preempted.

Section 5 is also conflict preempted. Intervenors have no response to the case law concluding that States are preempted from unilaterally regulating entry and removal. Mot. 11-13. Intervenors rely again on *Kansas*, Int. 20, but *Kansas* concerned a generally applicable tax prosecution with glancing relevance to immigration laws, 589 U.S. at 198.

By contrast, the INA implicates uniquely weighty federal interests that arise in the context of entry and reentry. Federal officials may need to balance multiple competing priorities, foreign relations, humanitarian considerations, and practical

resource constraints. *Arizona*, 567 U.S. at 396-97, 408 (citing these issues as reasons why unilateral state action is preempted). These decisions involve significant complexities in determining federal interests, which Section 5 runs right over. *See Bird*, 157 F.4th at 923 (explaining that illegal reentry and removal law "would allow [the state] to . . . ignor[e] the discretionary decisions of federal officials"). Section 5 does not merely "overlap to some degree" with federal law, but instead asserts state control in lieu of Congress's "considered decision" to balance various interests by placing discretion in the hands of federal officials. *Garcia*, 589 U.S. at 211. "Nothing similar" was present in *Garcia*. *Id.*; *see Bird*, 157 F.4th at 922 (rejecting reliance on *Garcia*); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1007 (same); *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1263-64 (same).[8]

Intervenors argue that Section 5 does not permit state officers to make immigration determinations. Int. 20. Not so. For example, state officers enforcing Section 5 must determine whether a noncitizen has "lawful presence," which is an exception to the "illegal entry from foreign nation" crime. A.R.S. § 13-4295.01(B), (E). The term "lawful presence" is not even defined in federal law, allowing state officers to make this determination without any federal guidance. *See Ariz. Dream Act Coal.*, 855 F.3d at 975 (holding that Arizona impermissibly "created new immigration classifications based on its independent view of who is authorized under federal law to be present in the United States.").

Intervenors' specific defense of the order to return provision, Int. 21-22, fares no better. Intervenors contend that state officials may transport a noncitizen "to the custody

---

[8] Moreover, Intervenors' claim that "Section 5 does not directly regulate immigration at all," Int. 20, blinks reality, as Section 5 sets up a separate immigration system whereby state officials may unilaterally arrest, detain, and prosecute noncitizens for illegal entry and even order them to be returned to the foreign nation from which they came under threat of criminal penalty. To say that an order to return, under which a noncitizen must leave the country or face criminal penalties, does not "adjudicate anyone's right to remain," Int. 20, is nonsensical.

of federal officers," who "are free to exercise their full discretion." Int. 22. But this argument "asks this court to ignore the plain meaning of the statute." *See Bird*, 157 F.4th at 926 (rejecting identical argument). Indeed, Section 5 directs state judges to order a noncitizen to leave the United States on pain of criminal penalties if they do not comply. And if Intervenors were right, § 13-4295.02, which criminalizes refusal to comply with an order "to return to the foreign nation from which the person entered . . . or the person's nation of origin," would criminalize nothing at all. Thus, "[t]he effect of [Section 5] is for [noncitizens] . . . to remove themselves from the United States[.]" *Bird*, 157 F.4th at 926. Section 5 "thus 'violates the principle that the removal process is entrusted to the discretion of the Federal Government.'" *Id.* (quoting *Arizona*, 567 U.S. at 409).

Finally, Intervenors assert that Section 5 is not subject to facial challenge, Int. 18-19, but never point to any valid applications of the statute.[9] Indeed, where a law is field preempted, every application of that law is preempted, because Congress has occupied the field. *See Arizona*, 567 U.S. at 401-02. And every time Section 5 is enforced against noncitizens, it flouts Congress's direction that *federal* officials exercise discretion to decide whether and when to execute final removal orders. *See Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1107 (9th Cir. 2016) (because "the contested state statutes . . . applied only to unauthorized aliens," "every application of the statute had the potential to conflict with federal immigration policy"). Thus, "every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Bird*, 157 F.4th at 927.[10] Accordingly, Section 5 is conflict preempted.[11]

---

[9] *Arizona* found facial preemption despite a claim of hypothetical permissible applications. *See Arizona*, 567 U.S. at 408-10; *see id.* at 457-58 (Alito, J., dissenting in part) ("there are plenty of permissible applications").

[10] Intervenors mention the statute's severability clause, Int. 22, but do not explain what they believe to be severable. For the reasons explained above, none of Section 5 survives scrutiny. Moreover, Intervenors have not shown that "the people of Arizona would have voted in favor of [Section 5] without" each of its parts. *Benjamin v. Ariz. Dep't of Rev.*, 786 P.2d 1033, 1035 (Ariz. Ct. App. 1989).

[11] Intervenors invoke the presumption against preemption, Int. 18-19, but "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area

14

### III.    THE EQUITIES STRONGLY FAVOR FLORENCE PROJECT.

Florence Project will suffer irreparable harm. As explained above, *see supra* Part I, Florence Project's "core business activities" will be severely impacted by Section 5. *Alliance*, 602 U.S. at 395; Mot. 16-22. Through these "serious ongoing harms to their organizational missions, including diversion of resources," Florence Project has "established a likelihood of irreparable harm[.]" *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol*, 732 F.3d at 1029; *ImmDef*, 145 F.4th at 988 (harms to organization from direct impediment to ability to provide meaningful representation and from need "to expend additional resources" for adequate representation of prospective clients in a new setting were imminent and irreparable).

Florence Project need not identify a client currently harmed in order to demonstrate harm, as precedent demonstrates. In *Valle del Sol*, the Ninth Circuit found that a *separate* individual plaintiff "demonstrated a credible threat of prosecution" as required for individual standing, while "the organizational plaintiffs ha[d] shown ongoing harms to their organizational mission" as required for organizational standing. 732 F.3d at 1029. Indeed, organizations can establish irreparable harm in a preenforcement posture based on threatened organizational harm. *See, e.g.*, *ImmDef*, 145 F.4th at 987-89; *Cmty. Legal Servs. in E. Palo Alto*, 780 F. Supp. 3d at 924. And Florence Project need not show that it is already losing funding and laying off staff, as the Attorney General argues, AG 19, but rather that it "stands to lose a significant amount of business and suffer a concomitant loss of funding." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 664 (9th Cir. 2021) (internal quotations omitted); *see also E. Bay Sanctuary Covenant v. Trump*, No. 18-cv-6810-JST, 2026 WL 1256873, at *7 (N.D. Cal. May 7, 2026) (finding *Alliance* did not alter this rule). For these reasons, Florence

where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). That is exactly the case as to the fields of entry and removal. *See* Mot. 8-9.

Project has demonstrated "[a] threat of irreparable harm." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *see* FIRRP Decl. ¶¶ 30(a), 41, 54–55, 70, 85, 87, 88.

The foregoing harms to Florence Project far outweigh any harms to the State. "Frustration of federal statutes and prerogatives [is] not in the public interest[.]" *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012). Moreover, enjoining Section 5 is orthogonal to "preventing dangerous cross-border crimes[.]" AG 21; *see also* Int. 23-24. As Arizona itself notes, the other sections of Prop. 314—not Section 5—focus on preventing those issues, *see id.*, and Florence Project does not challenge the other sections of Prop. 314, or Arizona's existing authority to prosecute human trafficking and drug smuggling under non-immigration laws. A.R.S. §§ 13-1307, 13-1308, 13-3212. In any event, it is unclear how Section 5 would have any impact on these issues.[12]

The public interest favors an injunction. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (not equitable or in the public's interest to allow state to violate the requirements of federal law, especially when there are no adequate remedies available); *Valle del Sol*, 732 F.3d at 1029 (same). Allowing Section 5 to go into effect would also force individuals fleeing persecution and torture to face arrest, prosecution, and removal to extremely dangerous conditions, without an opportunity to pursue available federal relief. *See* Mot. 23. It would also endanger those with status and erode mixed-status families' trust in government agencies and their ability to report

[12] While the Attorney General cites fentanyl concerns, AG 21, *see also* Int. 13, the U.S. government confirms that fentanyl is overwhelmingly smuggled at ports of entry by U.S. citizens, not between ports by migrants—so Section 5 is irrelevant to these problems. *See* U.S. Customs & Border Prot., *Frontline Against Fentanyl* (last modified May 22, 2025), https://perma.cc/4NAU-9GSY ("More than 90% of interdicted fentanyl is stopped at Ports of Entry (POEs), where cartels attempt to smuggle it primarily in vehicles driven by U.S. citizens."). More generally, immigrant communities have consistently lower violent and drug crime rates than others. *See, e.g.*, Nat'l Inst. of Just., Dep't of Just., *Undocumented Immigrant Offending Rate Lower Than U.S.- Born Citizen Rate* (Sept. 12, 2024), https://perma.cc/GRD7-K7WE.

crimes or obtain assistance. *See* Mot. 23-24. And at minimum, Florence Project has shown "serious questions" on the merits and "the balance of hardships tips sharply in [its] favor." *Puente Arizona*, 821 F.3d at 1103 n.4 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).

## IV.     STATEWIDE RELIEF IS WARRANTED.

Statewide relief is appropriate because it is the only way to "provide complete relief to" Plaintiff, as is required. *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). "There is no rule . . . that nonparties must remain unaffected by the court's order." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1028 (9th Cir. 2025); *see also Washington v. Trump*, 145 F.4th 1013, 1038 (9th Cir. 2025) (upholding "a universal injunction" "in order to give the [plaintiff] complete relief").

Florence Project has thousands of clients across the state facing enforcement by multiple agencies in fast-moving interactions like facility transfers and other encounters with law enforcement. A limited injunction would require officers to constantly evaluate whether individuals are Florence Project's clients, which would likely lead to erroneous arrests and detention. *See Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501-02 (9th Cir. 1996) (affirming statewide injunction for this reason). And in any event, that relief would be insufficient: relief must be statewide to remedy harm based on enforcement against future as well as current clients. *See* FIRRP Decl. ¶¶ 30(a), 30(c), 44-55, 70-71, 83, 85-88. Indeed, the Attorney General concedes "it is not clear what an injunction as to the Project's clients would look like." AG 22.

The Attorney General's objection that an injunction cannot be issued with the "specific[ity]" and "reasonable detail" required by Fed. R. Civ. P. 65(b), *see* AG 22-23, is unwarranted. In cases across the country, courts have issued such injunctive relief. *E.g.*, *Idaho Org. of Resource Councils*, 780 F. Supp. 3d at 1052 (enjoining defendants "from enforcing Idaho Code §§ 18-9003, 18-9004"); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1009 (enjoining defendants "from enforcing H.B. 1546"). An order enjoining enforcement of specific provisions of state law is ordinary and can easily be applied by

17

Defendants: indeed, the Attorney General's brief itself discusses "[a] law enforcement officer's discretionary decision not to investigate or apprehend someone," AG 12, and a *categorical rule* not to do so—and not to charge individuals under the statute—can surely be as easily applied. *See, e.g.*, *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 994 (D. Ariz. 2011) (enjoining Maricopa County Sheriff's Office "from detaining any person based only on knowledge or reasonable belief, without more, that the person is unlawfully present within the United States"), *aff'd*, *Melendres v. Arpaio*, 695 F.3d 990, 1000-02 (9th Cir. 2012).

Finally, the invocation of an injunction against the courts, AG 25, is a red herring. Florence Project seeks a temporary restraining order against enforcement of the statute by Defendants. This would enjoin prosecutions and thereby provide complete relief from state court issuance of removal orders, which require such prosecution as a predicate.

**CONCLUSION**

For the foregoing reasons, the Court should issue a temporary restraining order.

Date: July 22, 2026                                      Respectfully submitted,


/s/ *Kathryn Huddleston*                                /s/ *John M. Mitchell*
Kathryn Huddleston***                                   John M. Mitchell**
AMERICAN CIVIL LIBERTIES UNION                          Tara DeGeorge
FOUNDATION                                              AMERICAN CIVIL LIBERTIES UNION
IMMIGRANTS' RIGHTS PROJECT                              FOUNDATION OF ARIZONA
915 15th Street NW, 7th Floor                           2712 North 7th Street
Washington, D.C. 20005                                  Phoenix, Arizona 85006
T: (212) 549-2500                                       T: (602) 773-6007
khuddleston@aclu.org                                    jmitchell@acluaz.org
                                                        tdegeorge@acluaz.org

Grace Choi*
Omar Jadwat*                                            Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION                          Hannah Steinberg*
FOUNDATION                                              Oscar Sarabia Roman*
IMMIGRANTS' RIGHTS PROJECT                              AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor                            FOUNDATION
New York, NY 10004                                      IMMIGRANTS' RIGHTS PROJECT
T: (212) 549-2660                                       425 California Street, 7th Floor
gchoi@aclu.org                                          San Francisco, CA 94104
ojadwat@aclu.org                                        T: (415) 343-0770
                                                        cwofsy@aclu.org
                                                        hsteinberg@aclu.org
                                                        osarabia@aclu.org

19

## CERTIFICATE OF SERVICE

I certify that on or about July 22, 2026, I filed the foregoing through the Court's CM/ECF system which will serve a true and correct copy of the filing on counsel of record.

 /s/ *Kathryn Huddleston*
Kathryn Huddleston
